# Greenbaum Rowe
## Smith ✺ Davis |LLP

### COUNSELORS AT LAW

**METRO CORPORATE CAMPUS ONE**
**P.O. BOX 5600**
**WOODBRIDGE, NJ 07095-0988**
**(732) 549-5600    FAX (732) 549-1881**

DELIVERY ADDRESS: 99 WOOD AVENUE SOUTH, ISELIN, NJ 08830-2712

INFO@GREENBAUMLAW.COM
WWW.GREENBAUMLAW.COM

PAUL A. ROWE, ESQ.
(732) 476-2410 - DIRECT DIAL
(732) 476-2411 - DIRECT FAX
PROWE@GREENBAUMLAW.COM

ROSELAND OFFICE:
75 LIVINGSTON AVENUE
SUITE 301
ROSELAND, NJ 07068-3701
(973) 535-1600
FAX (973) 535-1698

March 16, 2010

Hon. Patty Shwartz
U.S. District Court
Frank R. Lautenberg U.S.P.O. & Courthouse Bldg.
Room 477
P.O. Box 999
Newark, NJ 07101-0999

       **Re:**    **Canavan, et al. v. Harbeck, et al.**
                   **Civil Action No. 10-cv-954**

Dear Judge Shwartz:

     We represent the defendants in the above-referenced case[1] and write to request permission to file a motion to transfer the case to the United States District Court for the Southern District of New York ("New York District Court"), for referral, under a standing Order of that Court, to the United States Bankruptcy Court for the Southern District of New York ("New York Bankruptcy Court").

     This case is directly related to the liquidation under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa et seq. ("SIPA"), of the securities brokerage, Bernard L. Madoff Investment Securities LLC ("BLMIS"). The liquidation proceeding is styled Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, Adv. No. 08-01789 (BRL), and is pending in the New York Bankruptcy Court. One of the central issues in the SIPA proceeding has been the calculation of what investors in that case are owed, that is, what their "net equity" is under SIPA. The named Plaintiffs in the instant case in New Jersey filed claims (either by themselves or through a representative) in the New York liquidation proceeding, arguing that their net equity should be based on their last fictitious account statement received from BLMIS. The account statements reflect fake profit and backdated securities positions, all invented by the principal of the firm, Bernard Madoff. The position of SIPC is that the

---

[1] This case was filed on February 24, 2010 and the time for defendants to respond to the complaint has not yet expired.

Greenbaum Rowe
Smith ▧ Davis |LLP

Hon. Patty Shwartz
March 16, 2010
Page 2

calculation of "net equity" should not be based on the fraudulent account statements and that claimants' net equity is the net amount of money given by them to BLMIS for investment.

The Defendants in the instant case in New Jersey are the President and current and/or former Directors of the Securities Investor Protection Corporation ("SIPC"). SIPC is a non-profit organization created under SIPA that provides limited protection to customers of securities brokerage firms in liquidation under SIPA. Five of SIPC's seven Directors are appointed by the President of the United States and confirmed by the United States Senate. The other two Directors are representatives of the Treasury and the Federal Reserve Board, respectively appointed by the Secretary of the Treasury and the Federal Reserve Board from among the officers and employees of those two entities. 15 U.S.C. §78ccc(c)(2). Plaintiffs' claims are all premised on the same underlying foundation: that SIPC has allegedly failed to follow the statutory framework for the satisfaction of customer claims in the SIPA liquidation proceeding as it relates to the calculation of net equity.

Plaintiffs' counsel in the instant case previously filed an adversary proceeding against the Trustee for the SIPA liquidation of BLMIS (Irving H. Picard, Esq.) alleging similar claims relating to the calculation of net equity. Peskin, et al. v. Picard (In re Bernard L. Madoff Investment Securities), 413 B.R. 137 (Bankr. S.D.N.Y. 2009). The New York Bankruptcy Court dismissed that action because of the Court's prior entry of a Claims Procedure Order that set forth the framework for the filing, determination and adjudication of the claims in the BLMIS liquidation proceeding. Thereafter, the New York Bankruptcy Court entered a scheduling order establishing a hearing date to address the net equity issue.

In an opinion issued on March 1, 2010, the New York Bankruptcy Court considered, and rejected, Plaintiffs' construction of SIPA's "net equity" definition.[2] The position that the customers' net equity should not be calculated based on the fake account statements was taken, among others, by the Trustee for BLMIS, the United States Securities and Exchange

---

[2]   Annexed hereto as Exhibit A is a copy of the Memorandum Decision Granting Trustee's Motion for an Order (1) Upholding Trustee's Determination Denying Customer Claims for Amounts Listed on Last Customer Statement; (2) Affirming Trustee's Determination of Net Equity; and (3) Expunging Objections to Determinations Relating to Net Equity, dated March 1, 2010, filed in Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, Adv. No. 08-01789 (BRL) (Bankr. S.D.N.Y.). The Bankruptcy Court's Memorandum Decision was embodied in an Order dated March 8, 2010, a copy of which is annexed hereto as Exhibit B ("March 8, 2010 Order").

Greenbaum Rowe
Smith ⊠ Davis | LLP

Hon. Patty Shwartz
March 16, 2010
Page 3

Commission, and SIPC. The Bankruptcy Court has certified the issue for immediate appeal to
the United States Court of Appeals for the Second Circuit.[3]

The New York Bankruptcy Court was and is the appropriate forum for resolution of all
issues and claims in the SIPA liquidation proceeding of BLMIS. The Bankruptcy Court in New
York is intimately familiar with the same issue Plaintiffs hope to bring before this Court in New
Jersey, and has already resolved that issue in the course of the BLMIS liquidation. Permitting
Plaintiffs to relitigate the question before this Court would risk inconsistent adjudications on the
"net equity" issue. That issue is of vital importance in the resolution of thousands of "customer"
claims in the BLMIS liquidation, and will affect the allocation and disposition of literally billions
of dollars worth of "customer property" through the BLMIS estate. Any finding in this Court
inconsistent with the New York Bankruptcy Court's March 1 opinion therefore would create
enormous confusion in the distribution of the BLMIS estate and would severely compromise the
orderly administration of the BLMIS liquidation proceeding.

In order to avoid such confusion, and ensure both judicial economy and adjudicative
consistency, we submit that the prompt transfer of this case to the New York District Court for
referral of the case to the Bankruptcy Court, is warranted. Accordingly, we request permission
to file a motion for transfer of this case to the New York District Court, together with a
memorandum of law setting forth the grounds for our motion.

We have consulted with counsel for the Plaintiffs who has indicated that she will not
consent to the transfer.

We appreciate your time and attention to this matter.

Respectfully yours,

Paul A. Rowe

PAR:jc
cc:    Helen Davis Chaitman, Esq.

---

[3]  Annexed hereto as Exhibit C is a copy of the Court's Certification of Net Equity Order of
March 8, 2010, For Immediate Appeal to the United States Court of Appeals Pursuant to 28
U.S.C. §158(d)(2), filed in Securities Investor Protection Corp. v. Bernard L. Madoff Investment
Securities LLC, Adv. No. 08-01789 (BRL) (Bankr. S.D.N.Y.). Plaintiffs' counsel in the instant
case was one of the counsel who sought certification of the Bankruptcy Court's March 8, 2010
Order.

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
In re:

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                Debtor.
-----------------------------------------------------------X
SECURITIES INVESTOR PROTECTION
CORPORATION,
                Plaintiff,

          v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
                Defendant.
-----------------------------------------------------------X

SIPA LIQUIDATION
No. 08-01789 (BRL)

(Substantively Consolidated)

**FOR PUBLICATION**

**ARGUING ON THE MOTION:**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
By:    David Sheehan
        Marc E. Hirschfield
        Oren J. Warshavsky
        Seanna R. Brown

*Attorneys for Irving H. Picard,*
*Trustee for the Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

SECURITIES INVESTOR PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, DC 20005
Telephone:  (202) 371-8300
Facsimile:  (202) 371-6728
By:    Josephine Wang
        Kevin H. Bell

*Attorneys for the Securities Investor Protection Corporation*

1

SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E., Room 8115
Washington, DC 20548
Telephone: (202) 551-5148
By:    Katharine B. Gresham
       Alistaire Bambach

*Attorneys for the Securities and Exchange Commission*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
By:    Karen Wagner
       Jonathan D. Martin

*Attorneys for Sterling Equities Associates*

GOODWIN PROCTER LLP
53 State Street
Boston, MA 02109
Telephone: (617) 570-1000
Facsimile: (617) 523-1231
By:    Daniel M. Glosband
       David J. Apfel
       Brenda R. Sharton
       Larkin M. Morton

*Attorneys for Jeffrey A. Berman, Russell DeLucia, Ellenjoy Fields, Michael C. Lesser, Norman E. Lesser 11/97 Rev. Trust, Paula E. Lesser 11/97 Rev. Trust, and Jane L. O'Connor, as Trustee of the Jane O'Connor Living Trust*

LAX & NEVILLE, LLP
1412 Broadway, Suite 1407
New York, NY 10018
Telephone: (212) 696-1999
Facsimile: (212) 566-4531
By:    Brian J. Neville
       Barry R. Lax

*Attorneys for Mary Albanese, the Brow Family Partnership, Allen Goldstein, Laurence Kaye, Suzanne Kaye, Rose Less, and Gordon Bennett*

MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
By:    Jonathan M. Landers
       Matthew Gluck
       Lois F. Dix
       Joshua E. Keller

*Attorneys for Albert J. Goldstein U/W FBO, Ruth E. Goldstein TTEE, Ann Denver, Norton Eisenberg, Export Technicians, Inc., Stephen R. Goldenberg, Judith Rock Goldman, Jerry Guberman, Anita Karimian, Orthopaedic Specialty Group PC, Martin Rappaport, Paul J. Robinson, Bernard Seldon, Harold A. Thau, and The Aspen Company*

PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103
Telephone: (212) 841-1320
Facsimile: (212) 262-5152
By:    Helen Davis Chaitman

*Attorneys for Diane and Roger Peskin, Maureen Ebel, and a group of other customers*

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4424
Facsimile: (212) 848-7179
By:    Stephen Fishbein

*Attorneys for Carl Shapiro and related entities*

SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6889
Facsimile: (212) 768-6800
By:    Carole Neville

*Attorneys for certain investors*

3

Before: Hon. Burton R. Lifland
        United States Bankruptcy Judge

### MEMORANDUM DECISION GRANTING TRUSTEE'S MOTION FOR AN ORDER (1) UPHOLDING TRUSTEE'S DETERMINATION DENYING CUSTOMER CLAIMS FOR AMOUNTS LISTED ON LAST CUSTOMER STATEMENT; (2) AFFIRMING TRUSTEE'S DETERMINATION OF NET EQUITY; AND (3) EXPUNGING OBJECTIONS TO DETERMINATIONS RELATING TO NET EQUITY

Before the Court is the motion (the "Motion") of Irving H. Picard, Esq. (the "Trustee" or "Picard"), trustee for the substantively consolidated Securities Investor Protection Act[1] ("SIPA") liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), seeking an order (1) upholding the Trustee's determination denying customer claims for amounts listed on last BLMIS customer statements, dated November 30, 2008 (the "November 30th Statements"); (2) affirming the Trustee's determination of net equity; and (3) expunging objections to the Trustee's determinations of net equity claims filed by a certain group of claimants (the "Objecting Claimants")[2] in the above-captioned adversary proceeding. The Motion is filed pursuant to the Court's "Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures For Filing, Determination, and Adjudication of Claims; and Providing Other Relief" (the "Claims Procedure Order") entered on December 23, 2008, and the Court's "Order Scheduling Adjudication of 'Net Equity' Issue" (the "Scheduling Order") entered on September 16, 2009. *See Peskin v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 413 B.R. 137 (Bankr. S.D.N.Y. 2009) (expounding generally on the Claims Procedure Order and the Scheduling Order).

---

[1] 15 U.S.C. §§ 78aaa *et seq.* References to sections of SIPA hereinafter shall replace "15 U.S.C." with "SIPA."

[2] A list of the Objecting Claimants, as well as other parties who have appeared and filed written submissions, is attached hereto as Appendix 1.

4

The Madoff proceeding and its accompanying SIPA liquidation involve staggering numbers, with more than 15,000 claims filed and billions of dollars at stake. As of December 11, 2008 (the "Filing Date"),[3] customers' November 30th Statements reflected $73.1 billion in fictional net investments and related gains. Net of "negative" accounts approximating $8.3 billion, customers are purportedly owed a total of $64.8 billion. The critical issue before the Court is how to define a claimant's "net equity" under SIPA for purposes of distributing against these astounding sums.

The statutory framework for the satisfaction of customer claims in a SIPA liquidation proceeding provides that customers share *pro rata* in customer property[4] to the extent of their net equities, as defined in SIPA section 78*lll*(11) ("Net Equity").[5] *See* SIPA § 78fff-2(c)(1)(b). If the fund of customer property is insufficient to make customers whole, the trustee is entitled to an advance[6] from the Securities Investor Protection Corporation ("SIPC") to pay each customer the amount by which his Net Equity exceeds his ratable share of customer property, subject to a cap of $500,000 for securities claims. *See* SIPA § 78fff-3(a).

The Trustee defines Net Equity as the amount of cash deposited by the customer into his BLMIS customer account less any amounts already withdrawn by him (the "Net Investment Method"). In contrast, the Objecting Claimants define Net Equity as the amounts reflected on

---

[3] Here, the Filing Date is the date on which the SEC brought suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the entity. *See* SIPA § 78*lll*(7)(B).

[4] A fund of "customer property" consists of assets garnered by the SIPA trustee on account of customers. These assets are not ascribable to individual customers, but rather are distributed *pro rata* to the extent of a customer's Net Equity. *See* SIPA § 78*lll*(4) (defining "customer property"); *see infra* at Discussion, section I.

[5] SIPA section 78*lll*(11) defines Net Equity as "the dollar amount of the account or accounts of a customer, to be determined by –
        (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had
            liquidated, by sale or purchase on the filing date, all securities positions of such customer . . . ; minus
        (B) any indebtedness of such customer to the debtor on the filing date . . . ."

[6] Some Objecting Claimants refer to this advance as "insurance," a designation strenuously controverted by the Securities and Exchange Commission (the "SEC"), SIPC and the Trustee, and a designation that is not supported by the controlling SIPA statute. *See* SIPA § 78fff-3(a) (titled, "*Advances* for Customers' Claims") (emphasis added).

customers' November 30th Statements (the "Last Statement Method"). The Trustee and the
Objecting Claimants maintain that their respective definitions of Net Equity are thoroughly
consistent with SIPA, statutory and case law, and notions of equity.

Congruent to the import and complexity of this issue, the briefs filed in support and
opposition to the Motion are voluminous and impressive. For the purposes of this decision, the
Court has considered all papers filed in response to the Scheduling Order, including over thirty
briefs and more than twenty *pro se* submissions.[7] SIPC and the SEC submitted briefs in support
of the Motion.[8] The Court recognizes that the application of the Net Equity definition to the
complex and unique facts of Madoff's massive Ponzi scheme is not plainly ascertainable in law.
Indeed, the parties have advanced compelling arguments in support of both positions.
Ultimately, however, upon a thorough and comprehensive analysis of the plain meaning and
legislative history of the statute, controlling Second Circuit precedent, and considerations of
equity and practicality, the Court endorses the Trustee's Net Investment Method.

Accordingly, for the reasons set forth below, the Trustee's determination of Net Equity is
hereby APPROVED.

## BACKGROUND

### I. PROCEDURAL HISTORY

The Motion arises in connection with the infamous Ponzi scheme perpetrated by Madoff
through his investment company, BLMIS. On December 11, 2008, Madoff was arrested by

---

[7] The principal arguments made in support and opposition to the Motion have been outlined in a dispassionate
manner and organized in a table for ease of reference, attached hereto as Exhibit A. This table is not exhaustive of
all arguments made. The Court does not necessarily agree or disagree with the arguments set forth in Exhibit A.

[8] The SEC differs from the Trustee in an area that does not affect the Court's analysis (the SEC recommends
compensating Madoff customers for the time value of money when utilizing the Net Investment Method (the
"Constant Dollar Approach")).

6

federal agents and charged with securities fraud in violation of 15 U.S.C. sections 78j(b), 78ff
and 17 C.F.R. section 240.10b-5, in the United States District Court for the Southern District of
New York (the "District Court"). *United States v. Madoff*, No. 08-MJ-02735.[9] That same day,
the Securities and Exchange Commission (the "SEC") filed a civil complaint in the District
Court, alleging, *inter alia*, that Madoff and BLMIS were operating a Ponzi scheme through
BLMIS's investment advisor activities. *S.E.C. v. Madoff, et al.*, No. 08-CV-10791 (the "Civil
Action").

On December 15, 2008, SIPC filed an application in the Civil Action seeking a decree
that the customers of BLMIS are in need of the protections afforded by SIPA. The District Court
granted SIPC's application and entered an order on December 15, 2008, placing BLMIS's
customers under the protections of SIPA (the "Protective Order"). The Protective Order
appointed Picard as trustee for the liquidation of the business of BLMIS, appointed Baker and
Hostetler, LLP as counsel to the Trustee, and removed the SIPA liquidation proceeding to this
Court pursuant to SIPA sections 78eee(b)(3) and (b)(4).

On March 12, 2009, Madoff pled guilty to an 11-count criminal indictment filed against
him and admitted that he "operated a Ponzi scheme through the investment advisory side of
[BLMIS]." *See United States v. Madoff*, No. 09 CR 213 (DC), Docket No. 57, Plea Hr'g Tr. at
23:14–17. On June 29, 2009, Madoff was sentenced to 150 years in prison.

## II. CLAIMS ADJUDICATION PROCEDURE

On December 23, 2008, the Court approved the Claims Procedure Order, which sets forth
a systematic framework for the filing, determination and adjudication of claims in the BLMIS
liquidation proceeding. Pursuant to this order, all claims by customers must be filed with the

---

[9] On March 10, 2009, this action was assigned to the Honorable Denny Chin in the United States District Court for
the Southern District of New York, and was given a new docket number, No. 09-CR-213 (DC).

Trustee, who must determine the claims in writing. If the claimant does not object to the determination, it is deemed approved by the Court and binding on the claimant. If the claimant objects and files an opposition, the Trustee must obtain a hearing date and notify the claimant thereof. Certain, *but not all*, Madoff claimants objected to the Trustee's determination of Net Equity due to his use of the Net Investment Method.

After a number of these objections were filed, the Court entered the Scheduling Order establishing a hearing date of February 2, 2010 to address whether Net Equity, as defined by SIPA, is calculated using the Net Investment Method or the Last Statement Method. In the interim, the Trustee continues to process and pay customer claims in the ordinary course. As of February 26, 2010, 12,047 claims have been determined, 1,936 claims have been allowed, and thus far $649,643,586.95 has been committed by SIPC.[10]

## FACTUAL HISTORY[11]

### I. THE STRUCTURE AND ORGANIZATION OF BLMIS

BLMIS is a New York limited liability company, founded by Madoff as a sole proprietorship in 1960. BLMIS was wholly-owned by Madoff, who was also its chairman and chief executive officer. Together with family members and a number of additional employees, Madoff operated the company from its principal place of business at 885 Third Avenue, New York, New York. On January 19, 1960, BLMIS registered with the SEC as a broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. section 78o(b), and, beginning in 2006, as an investment advisor. By virtue of its registration as a broker-dealer,

---

[10] *See* http://www.madofftrustee.com.

[11] These facts are largely undisputed and have been taken primarily from the Trustee's memorandum of law and supporting declarations, as well as the criminal allocutions of Madoff and Frank DiPascali, Jr. ("DiPascali"). On August 11, 2009, DiPascali pled guilty to 10 criminal charges stemming from his extensive participation in the Madoff fraud. On February 11, 2010, an order was entered releasing DiPascali on bail pending sentencing.

BLMIS is a member of SIPC. BLMIS's annual audits were conducted by Friehling & Horowitz,
CPAs, P.C., an accounting firm consisting of three employees, one of whom was semi-retired,
with offices located in a strip mall in Rockland County, New York.[12]  Outwardly, BLMIS
functioned both as an investment advisor to its customers and a custodian of their securities.
Based on the Trustee's investigation, it appears that BLMIS began to offer investment advisory
services as early as the 1960s, yet never truly acted as a legitimate investment advisor to its
customers.

BLMIS had three business units: market making (the "MM Business"), proprietary
trading (the "PT Business"), and investment advisory (the "IA Business").  While these business
units were financially intertwined,[13] the MM and PT Businesses were largely operated separately
from the IA Business.  Specifically, the MM Business competed with other market makers, and
the PT Business traded on behalf of the firm for profit.  These units, albeit unprofitable,
generally conducted legitimate activities; they traded with institutional counterparties, used live
computer systems and trading platforms that interfaced with multiple outside feeds and data
sources, and utilized a large information technology staff to support and maintain these trading
platforms.  In addition, they participated in compliance and risk monitoring programs and were
held accountable by a number of entities, including the clearing houses they used, the exchanges
they traded on, and the National Association of Securities Dealers and its successor, the
Financial Industry Regulatory Authority.

---

[12] David Friehling is the subject of a criminal information filed by the United States alleging, *inter alia*, securities
fraud. *See* Friehling Information, *United States v. Friehling*, No. 09-CR-0700 (AKH) (S.D.N.Y. July 17, 2009),
Dkt. No. 14. He has since pled guilty, and sentencing is scheduled for September 3, 2010. *Id.* at Dkt. No. 37.

[13] See the criminal complaint dated February 24, 2010 filed by the United States against Daniel Bonventre, a former
BLMIS operations director, charging, *inter alia*, securities fraud and conspiracy in connection with the Madoff
scheme, and alleging that investor money was used to support the PT and MM Businesses.

9

The IA Business, on the other hand, perpetuated Madoff's fraudulent activity. Physically isolated on the 17th floor from the MM and PT Businesses, the IA Business was accessible only to select employees and insiders.[14] Unlike the SEC registration of the MM and PT Businesses, registration of the IA Business was fabricated; only 23 of its thousands of customers were reported. In contrast to the MM and PT Businesses' live computer trading system interfacing with outside feeds, the IA Business had no contact with opposite brokers or counterparties and used only one unsophisticated and archaic computer that was not programmed to execute trading of any kind. The legitimate MM and PT Businesses limited scrutiny of the IA Business. In turn, the proceeds generated by the IA Business enabled the MM and PT Businesses to remain viable, at least from 2007 forward.

## II. MECHANICS OF THE PONZI SCHEME

Rather than engage in legitimate trading activity, Madoff used customer funds to support operations and fulfill other investors' requests for distributions of profits to perpetuate his Ponzi scheme. Thus, any payment of "profit" to a BLMIS customer came from another BLMIS customer's initial investment. Even if a BLMIS customer could afford the initial fake purchase of securities reported on his customer statement,[15] without additional customer deposits, any later "purchases" could be afforded only by virtue of recorded fictional profits. Given that in Madoff's fictional world no trades were actually executed, customer funds were never exposed to the uncertainties of price fluctuation, and account statements bore no relation to the United States securities market at any time. As such, the only verifiable transactions were the

---

[14] The IA Business was staffed by more than 25 employees, including Madoff and DiPascali, who directed its day-to-day affairs.

[15] The Trustee notes that, in most instances, the customer likely did not invest enough capital to buy even those securities listed on his first BLMIS customer statement, given that prices selected for the purchase of securities for customer accounts were backdated and orchestrated.

customers' cash deposits into, and cash withdrawals out of, their particular accounts. Ultimately, customer requests for payments exceeded the inflow of new investments, resulting in the Ponzi scheme's inevitable collapse.

### A. Solicitation of Customers and Opening of Accounts

Madoff solicited billions of dollars from investors through his fraudulent IA Business. Entry into the IA Business was coveted and selective, akin to membership in an elite club. This aura of exclusivity, combined with the secrecy and reported success of Madoff's investment strategies, limited the transparency of the IA Business to prospective investors, particularly non-institutional clients.

Once a customer was granted entry into the IA Business, standard account opening procedures followed. Under standardized written agreements, customers relinquished all investment authority to Madoff, agreeing that

> [i]n all such purchases, sales or trades . . . [Madoff] is authorized to act for the undersigned and in the undersigned's behalf in the same manner and with the same force and effect as the undersigned might or could do with respect to such purchases, sales or trades as well as with respect to all other things necessary or incidental to the furtherance or conduct of such purchases, sales or trades. All purchases, sales or trades shall be executed strictly in accordance with the established trading authorization directive.

*See* Decl. of Joseph Looby in Supp. of Trustee's Motion ("Looby Decl.") at Ex. 3. Customers retained only the authority to deposit cash and request withdrawals; all other rights associated with their accounts, including the ability to make investment decisions, were ceded to Madoff. With few isolated exceptions,[16] customers did not direct the purchase or sale of any specific security.

---

[16] The Trustee's investigation indicates that one customer directed the purchase and sale of a few specific securities. This is exclusive of those holding "friends and family" accounts, such as Jeffry Picower and Stanley Chais, who also directed securities transactions for their accounts.

11

## B. The 703 Account

Although customer account statements reflected trading activity, funds were merely deposited into a bank account at J.P. Morgan Chase Manhattan Bank ("Chase Bank"), Account Number 140081703 (the "703 Account"), and never invested. As Madoff admitted at his plea hearing, none of the purported purchases of securities actually occurred, and the reported gains were entirely fictitious. This has been confirmed by the Trustee's investigation, which reveals that with the exception of isolated individual trades, there is no record of BLMIS having cleared any purchase or sale of securities in the Depository Trust & Clearing Corporation (the "DTCC"), a custodian for most stock and government debt securities issued in the United States.[17] Instead, investors' funds were principally deposited into the 703 Account, which was little more than a "slush fund." Money was misappropriated from the 703 Account solely to enrich Madoff and his inner circle.

IA Business employees prepared daily reports for Madoff reflecting all 703 Account deposit and withdrawal activity. At the close of each business day, any net cash balances from this account were transferred to affiliated overnight investment accounts at Chase Bank to buy United States Treasuries or other short term paper until necessary to fund customers' withdrawal requests, BLMIS's capital obligations, or Madoff's personal wishes. At all relevant times, the fabricated amounts recorded on the monthly customer statements far exceeded the capital deposited in the 703 Account.

---

[17] The customer funds were not segregated in a "15c3-3" account, as required by SEC Rule 15c3-3(e) and 17 C.F.R. section 240.15c3-3 promulgated under the Securities Exchange Act of 1934, which requires brokers and dealers to maintain a "Special Reserve Bank Account for the Exclusive Benefit of Customers." *See* SEC Rule 15c3-3a. This special reserve bank account is "separate from any other bank account of the broker or dealer" and is required to maintain a certain minimum balance. *Id.* BLMIS maintained a $20,000 balance from the end of 2002 until the Filing Date, which was outrageously insufficient given the apparent multi-billion dollar value of its customer accounts.

## C. The Split-Strike Conversion Strategy

The vast majority of BLMIS customer accounts were supposedly invested in the "split-strike conversion" strategy (the "Split Strike Conversion Strategy").[18]    Madoff outwardly attributed the success of his IA Business to this strategy, which appeared to generate remarkably consistent and above-average returns.    Under this strategy, Madoff purportedly invested customer funds in a subset, or "basket," of Standard & Poor's 100 Index ("S&P 100 Index") common stocks, and maximized value by purchasing before, and selling after, price increases. Several times per year, customer funds would move "into the market," whereby a basket of stocks was supposedly purchased.  Customer funds were then moved entirely "out of the market" to "invest" in United States Treasury Bills, money market funds, and cash reserves until the next trading opportunity.  This continued until the end of each quarter, when all baskets would be sold and "invested" in these "out of the market" repositories.  Focusing on large cap stocks, the strategy evaded inquiry into the volume of stocks in which BLMIS was fictitiously trading. Madoff's quarter-end liquidation of the split-strike security basket positions enabled him to avoid disclosure of the equities in the baskets required by SEC Form 13F.[19]  BLMIS also devised a hedging strategy to purchase and sell S&P 100 Index option contracts corresponding to the stocks in the baskets.  This allowed Madoff to appear to manage the downside risk associated with possible unfavorable price changes in the baskets and limit profits associated with increases in underlying stock prices.

---

[18] Although the Split Strike Conversion Strategy was carried out by Madoff, DiPascali, and the employees who worked for them, DiPascali had primary responsibility for the customer accounts.

[19] Institutional investment managers who exercise investment discretion over $100 million or more in Section 13(f) securities must report their holdings on SEC Form 13F.  This form requires disclosure to the SEC of the names of the institutional investment managers, the names of the securities they manage and the class of securities, the CUSIP number, the number of shares owned, and the total market value of each security. *See* 17 C.F.R. § 240.13f-1.

Madoff never executed his split-strike investment and hedging strategies, and could not possibly have done so. First, the customer funds were never actually invested "in the market" or "out of the market," despite customer statements to the contrary. In reality, funds were maintained in the 703 Account at Chase Bank. Second, according to the Trustee's investigation, an unrealistic number of option trades would have been necessary to implement the Split Strike Conversion Strategy because there were insufficient put and/or call option contracts available at the Chicago Board Options Exchange to properly hedge the volume of securities positions reflected on the customers' statements. In addition, one of the money market funds in which customer resources were allegedly invested through BLMIS, as reflected on customer statements, was Fidelity Brokerage Services LLC's "Fidelity Spartan U.S. Treasury Money Market Fund." Fidelity Brokerage Services LLC, however, has acknowledged that it did not even offer investment opportunities in any such money market fund from 2005 forward.

Yet Madoff successfully created the illusion that his trading activity was legitimate and his Split Strike Conversion Strategy was effective. In order to do so, Madoff and a select group of employees assembled historical price and volume data for each stock within the basket. Using this data, they strategically selected stocks after the fact at favorable prices to ensure promised, consistent annual returns of between 10-17%. They monitored the baskets to make certain that the selected stocks yielded returns that were neither above nor below the desired range. This practice of backdating allowed Madoff to engineer trades on the perfect dates at the best available prices to guarantee such results. Consequently, all documentation related to this strategy, including order tickets, trades, and customer statements, were necessarily concocted by Madoff. In fact, the Trustee's investigation revealed many occurrences where purported trades

14

were outside the exchange's price range for the trade date.[20]  At bottom, the BLMIS customer statements were bogus and reflected Madoff's fantasy world of trading activity, replete with fraud and devoid of any connection to market prices, volumes, or other realities.

### D. Non-Split-Strike Conversion Customer Accounts

While the majority of customers were supposedly invested in the Split Strike Conversion Strategy, as of the Filing Date there were fewer than 245 active non-split strike conversion BLMIS customer accounts (the "Non-Split Strike Accounts"), or roughly 5% of total active BLMIS accounts.  The Non-Split Strike Accounts were held by devoted customers such as Stanley Chais, Jeffry Picower, and Madoff family members and employees, and reported unusually high rates of return in excess of the consistent 10-17% generated for Split Strike Conversion Strategy accounts.  For example, the Trustee alleges that Chais's family and corporate accounts generated annual returns as high as 300%, and Picower's generated annual returns as high as 950%.  *See* Trustee's Compl. at ¶ 3 (May 1, 2009) (Adv. Proc. No. 09-01172 (BRL)); Trustee's Compl. at ¶ 3 (May 12, 2009) (Adv. Proc. No. 09-01197 (BRL)).  These accounts were handled on an account-by-account basis, in contrast to the more common basket approach.  This time-consuming and labor-intensive process required the manual input of backdated transactions to represent the purported trades executed on behalf of each account. Fundamentally, however, both the split-strike and non-split-strike accounts were subjected to the same basic method—statements were fabricated based on after-the-fact published selections of stocks and related prices.  With the exception of a few isolated trades and physical custody of a

---

[20] For example, in one instance, a monthly account statement for December 2006 reported a sale of Merck ("MRK") with a settlement date of December 28, 2006. BLMIS records reflect a trade date of December 22, 2006 at a price of $44.61 for this transaction. However, the daily price range for MRK stock on December 22, 2006 was a low of $42.78 and a high of $43.42. *See* Looby Decl. at ¶ 106.

limited number of securities entrusted to BLMIS by certain customers, trading in the Non-Split Strike Accounts did not take place.

### E. The AS/400 Computer System

To manage purported split-strike trade activity, the IA Business used an archaic computer system, the AS/400, consisting of an IBM computer and custom software dating to the early 1990s. The AS/400 was programmed to store BLMIS customer account information, record fictitious securities positions and customer cash transactions, prepare customer statements, and produce trade confirmations. Specifically, it contained software that could enter a basket of trades with any price or trade date and allocate the trades *pro rata* to BLMIS customer accounts in the database. Once a fictitious return was chosen for a given basket trade, "key punch operators" would manually input the relevant pricing information into the AS/400 database. This basket trade was automatically replicated in each customer account and divided proportionately according to the fraction or number of baskets each customer could afford. The AS/400 then generated the customer statements and related trade confirmations for BLMIS customers. This monthly process repeatedly compounded customers' false profits during the course of the scheme. The AS/400 was not programmed, however, to execute, communicate, or facilitate trading of any kind. None of the split-strike trades inputted into the AS/400 was reconciled with the DTCC.[21]

This outmoded technology prevented customers from obtaining electronic, real-time online access to their accounts, as was customary in the industry by the year 2000, and instead generated paper trade confirmations.[22] Mailing these paper statements and confirmations to

---

[21] DTCC records from 2002-2008 were made available to the Trustee.

[22] The Trustee's investigation indicates that BLMIS provided customer statements in electronic form to only two of its thousands of customers, representing only six accounts. Even though these statements were electronic, they

customers allowed BLMIS additional time to concoct trading records and delay the delivery of information, thereby facilitating Madoff's scheme.

## III. CLASSIFICATION OF CLAIMANTS

Under the Trustee's Net Equity calculus, the Objecting Claimants fall into three classifications according to their respective deposit and withdrawal histories.[23] The first group of Objecting Claimants withdrew funds from BLMIS in an amount that exceeds their initial investments and subsequent deposits (the "Net Winners"). A customer in this category received a full return of his principal as well as some "profit," which consisted, in reality, of other customers' investments. Under the Net Investment Method, these customers have zero Net Equity, and thus no allowed claims.

A second category of customers withdrew less money from BLMIS than they deposited, with net investment amounts over the $500,000 statutory limit ("Over the Limits Net Losers"). According to the Trustee's Net Investment Method, an Over the Limits Net Loser has positive Net Equity, and thus an allowed claim for the amount invested less the amount withdrawn. The Over the Limits Net Losers will receive full $500,000 advances from SIPC, as their respective *pro rata* shares of customer property will be insufficient to satisfy their Net Equity claims.

A third category of customers similarly withdrew less money than they deposited, with net investment amounts under the $500,000 statutory limit ("Under the Limits Net Losers") (together with "Over the Limits Net Losers," "Net Losers"). An Under the Limits Net Loser receives a SIPC advance against his *pro rata* share of customer property in the amount of his net investment. This is so even though his November 30th Statement may reflect a balance higher

---

consisted merely of data files. No BLMIS customer had real-time access to his account information and trading data, as no such information or data existed because no trading actually took place.

[23] For purposes of this decision, the Court will adopt the Trustee's nomenclature with regard to his classification of claimants.

17

than $500,000.  These customers are not entitled to a further distribution from the fund of customer property because their Net Equity claims will be fully satisfied by the SIPC advance. In general, Net Winners will be concentrated among early investors, while a critical mass of Net Losers will be found among later investors.[24]

## DISCUSSION

### I.  THE HISTORY OF SIPA

#### A.  Generally

As a backdrop for the Court's review of the Net Equity issue in this SIPA proceeding, a brief overview of the history and purpose of the statute will provide helpful context.  Congress enacted SIPA in 1970 for the primary purpose of protecting customers from losses caused by the insolvency or financial instability of broker-dealers.  *See SEC v. S.J. Salmon & Co., Inc.*, 375 F. Supp. 867, 871 (S.D.N.Y. 1974).  In doing so, Congress sought to "reinforce the confidence that investors have in the U.S. securities markets" and "strengthen[] . . . the financial responsibilities of broker-dealers." H.R. Rep. No. 91-1613, at 2–4 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5254, 5257.

To accomplish these aims, SIPA establishes procedures for liquidating failed broker-dealers and provides "customers," as defined by SIPA section 78*lll*(2),[25] with special protections. A SIPA liquidation is essentially a bankruptcy liquidation tailored to achieve SIPA's objectives.

---

[24] For reasons that are self-evident, a majority of those objecting to the Trustee's Net Investment Method are Net Winners.

[25] A "customer" is defined as—

> any person . . . who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with . . . collateral security, or for purposes of effecting transfer.  The term 'customer' includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities . . . .

SIPA section 78*lll*(2).

18

*See* SIPA § 78fff(b) ("[A] liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of Title 11."); *In re Adler Coleman Clearing Corp*, 195 B.R. 266, 269–70 (Bankr. S.D.N.Y. 1996). Separate from the general SIPA estate, a fund of "customer property" is established for priority distribution exclusively among the debtor's customers. *See* SIPA § 78*lll*(4) (defining "customer property"); *In re Adler, Coleman Clearing Corp.*, 216 B.R. 719, 722 (Bankr. S.D.N.Y. 1998) ("A person whose claim against the debtor qualifies as a 'customer claim' receives preferential treatment in the distribution of assets from the debtor's estate."). Each customer is entitled to share in this fund *pro rata* to the extent of his Net Equity. *See* SIPA § 78fff-2(c)(1)(b). In many SIPA liquidations, however, customer property is inadequate to wholly satisfy customers' Net Equity claims. Under these circumstances, SIPC, an independent, non-profit membership corporation created by SIPA, provides additional protection. SIPC is charged with establishing and administering a SIPC fund to advance money to the SIPA trustee to promptly pay each customer's valid Net Equity claim, up to $500,000 per customer.[26] *See* SIPA §§ 78ddd(a)(1), ccc(a)(1), fff-3(a). However, these advances cover only "the amount by which the net equity of each customer exceeds his ratable share of customer property." SIPA § 78fff-3(a). If the amount of the SIPC advance taken together with the subsequent customer property distribution exceeds the customer's Net Equity, SIPC recoups the excess. In effect, SIPC becomes subrogated to the claims of customers to the extent it has supplied advances, and cannot seek recovery from customer property "until after the allocation thereof to customers." SIPA §§ 78fff-3(a), 2(c)(1).

---

[26] SIPA section 78fff-3(a)(1) divides customer claims into "claims for cash" and "claims for securities" in order "to distinguish the custodial functions of a broker-dealer with respect to securities from the broker-dealer's depository-like functions with respect to cash deposits." *In re New Times Secs. Servs., Inc.*, 371 F.3d 68, 86 (2d Cir. 2004). When eligible, claims for cash are entitled to a $100,000 advance from SIPC, while claims for securities are entitled to a $500,000 advance from SIPC. *See* SIPA § 78fff-3(a)(1).

19

### B. SIPC Payments Are Inextricably Connected to Payments from Customer Property.

Contrary to the contention of many Objecting Claimants,[27] permitting a customer to recover SIPC payments based on final account statements would in fact affect the limited amount available for distribution from the customer property fund. These Objecting Claimants rely upon the false premise that Madoff customers are statutorily entitled to an additional source of recovery in the form of SIPC *insurance*, separate and apart from customer property distributions. This argument finds no support in the text of the statute, which characterizes SIPC payments as *advances* inextricably tied to distributions of customer property. SIPA provides that:

> In order to provide for prompt payment and satisfaction of *net equity claims* of customers of the debtor, SIPC shall advance to the trustee such moneys, not to exceed $500,000 for each customer, *as may be required to pay or otherwise satisfy claims for the amount by which the net equity of each customer exceeds his ratable share of customer property . . . .*

SIPA § 78fff-3(a)(1) (emphasis added). SIPC payments therefore serve only to replace missing customer property and cannot be ascertained independently of the determination of a customer's *pro rata* share of customer property. Accordingly, the SIPA statute does not allow bifurcation of the claims process, with customers recovering SIPC payments based on the Last Statement Method, and recovering customer property shares based on the Net Investment Method.

## II. PLAIN LANGUAGE AND LEGISLATIVE HISTORY SUPPORT THE NET INVESTMENT METHOD

Given that BLMIS account statements purport securities positions totaling an unparalleled $64.8 billion, the dispute concerning the definition of Net Equity is pivotal both to customers and SIPC. Resolution of this issue "begins where all such inquiries must begin: with the language of the statute itself." *U.S. v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241 (1989); *see*

---

[27] *See, e.g.,* Reply Mem. of Phillips Nizer Claimants at 8 (arguing that SIPC advances take the form of a completely separate and independent insurance obligation).

*also Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). SIPA defines Net Equity in section 78*lll*(11):

> The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all *securities positions* of such customer . . . ; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . . .

SIPA § 78*lll*(11) (emphasis added).

The main source of contention between the Trustee and the Objecting Claimants lies in how each would determine a customer's "securities positions," as that term is used in the definition of Net Equity. The Objecting Claimants state that the best evidence of a customer's securities positions is the customer's account statement as of the Filing Date, or in this case, his November 30th Statement. They assert that SIPA's legislative history, indicating the intent to protect investors' "legitimate customer expectations" and "make customer accounts whole," supports this position. H.R. Rep. No. 95-746, 95th Cong., 1st Sess. at 21 (1977). Written upon consideration of the 1978 amendments to SIPA, a House of Representatives' Report states,

> A customer generally expects to receive *what he believes is in his account at the time the stockbroker ceases business.* But because securities may have been . . . never purchased or even stolen, this is not always possible . . . . [C]ustomers generally receive pro rata portions of the securities claims, and as to any remainder, they will receive cash based on the market value as of the filing date.

*Id.* (emphasis added). Here, as argued by the Objecting Claimants, the customers had legitimate expectations that they held the securities positions reflected on their November 30th Statements. Therefore, the Objecting Claimants espouse the Last Statement Method and believe that Net Equity claims must be recognized in the amount of the customers' account balances as of November 30, 2008.

21

However, the Court agrees with the Trustee, joined by the SEC and SIPC, that the Objecting Claimants' "securities positions" can be ascertained only by reference to the books and records of BLMIS. The account statements are entirely fictitious, do not reflect actual securities positions that could be liquidated, and therefore cannot be relied upon to determine Net Equity. As a result, the definition of Net Equity under SIPA section 78*lll*(11) must be read in tandem with SIPA section 78fff-2(b), which requires the Trustee to discharge Net Equity claims only "insofar as such obligations are [1] ascertainable from the books and records of the debtor or [2] are otherwise established to the satisfaction of the trustee." SIPA § 78fff-2(b). The BLMIS books and records expose a Ponzi scheme where no securities were ever ordered, paid for or acquired. Because "securities positions" are in fact nonexistent, the Trustee cannot discharge claims upon the false premise that customers' securities positions are what the account statements purport them to be. Rather, the only verifiable amounts that are manifest from the books and records are the cash deposits and withdrawals. Moreover, if customers' legitimate expectations are relevant to any determination other than whether customers hold "claims for securities" or "claims for cash," they do not apply where they would give rise to an absurd result. *See New Times Secs. Servs.*, 371 F.3d 68, 87–88 (2d Cir. 2004) ("*New Times I*") (rejecting the District Court's Net Equity calculation, which was based on customers' "legitimate expectations"); *New Times Secs. Servs.*, 463 F.3d 125, 130 (2d Cir. 2006) ("*New Times II*") ("The [*New Times I*] court declined to base the recovery on the rosy account statements . . . because treating the fictitious paper profits as within the ambit of the customers' 'legitimate expectations' would lead to [] absurdity . . . ."). The Trustee has properly satisfied expectations by providing all customers with "claims for securities."[28]   Accordingly, the plain

---

[28] In *New Times I*, the SEC stated that the SIPA trustee sought to treat claims as claims for cash, with a $100,000 limit on SIPC advances. *New Times I*, 371 F.3d at 74. Here, notwithstanding a cash component reflected on

22

language of the SIPA statute supports adoption of the Net Investment Method in distributing customer property to Madoff investors.

### III.   THE TRUSTEE'S AVOIDANCE POWERS AND IRS TAX TREATMENT OF MADOFF CLAIMANTS

#### A. The Trustee's Calculus of Net Equity is Consistent with his SIPA and Bankruptcy Avoidance Powers.

The Trustee, in reliance on his avoidance powers and a substantial body of case law, propounds his theory of Net Equity as being net of fraudulent transfers. The Court agrees and finds that only the Net Investment Method is consistent with the Trustee's statutory avoidance powers. In the context of this hybrid proceeding (U.S.C. Titles 11 and 15), the definition of Net Equity cannot be construed in isolation from corollary provisions of SIPA and the Code. *See Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002) ("the preferred meaning of a statutory provision is one that is consonant with the rest of the statute."); *see also* SIPA § 78fff(b) ("[A] liquidation proceeding shall be conducted in accordance with ... Title 11."). SIPA and the Code intersect to, *inter alia*, grant a SIPA trustee the power to avoid fraudulent transfers for the benefit of customers. *See* SIPA § 78fff-2(c)(3) ("[T]he trustee may recover any property transferred by the debtor ... to the extent that such transfer is voidable or void under the provisions of Title 11."). The Trustee relies on numerous cases, all holding that transfers made in furtherance of a Ponzi scheme, and specifically transfers of fictitious profits, are avoidable.[29] The Net Investment Method harmonizes the definition of Net Equity with these

---

monthly statements, the Madoff Trustee has regarded all claims as claims for securities, eligible for advances of up to $500,000 each.

[29] *See, e.g., Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 8 (S.D.N.Y. 2007) ("There is a general rule-known as the 'Ponzi scheme presumption'-that such a scheme demonstrates 'actual intent' as matter of law because 'transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors.'"); *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 634 (Bankr. S.D.N.Y. 2007) ("redemption payments of ... wholly-fictitious profits, as reflected on fraudulent financial statements, were made to earlier investors requesting redemption using funds invested by subsequent

avoidance provisions by similarly discrediting transfers of purely fictitious amounts and
unwinding, rather than legitimizing, the fraudulent scheme. The Last Statement Method, by
contrast, would create tension within the statute by centering distribution to customers on the
very fictitious transfers the Trustee has the power to avoid.

Whether the Objecting Claimants have defenses to avoidance actions in this specific case
does not change the inherent inconsistency between the Last Statement Method and the Trustee's
avoidance powers. The Objecting Claimants devote much discussion to defenses that could be
asserted against hypothetical avoidance actions, including statutes of limitations, the section
548(c) good faith defense, and the section 546(e) safe harbor for securities contracts.[30] The fact
that the Trustee may be unable to avoid a transfer in particular circumstances, however, is
irrelevant to the Court's finding that the power itself is inconsistent with a distribution scheme
that credits the reported products of a fraud. The Net Investment Method allows the definition of
Net Equity and the Trustee's powers to avoid and recover property, contained in the same
statutory framework, to be interpreted with preferred consonance. *See Auburn Hous. Auth.*, 277
F.3d at 144.

---

investors. Indeed, it is impossible to imagine any motive for such conduct other than actual intent . . . ."); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 429 (S.D.N.Y. 2006) ("Plaintiffs' complaint adequately pleads fraudulent intent on the part of the transferor-namely, the defrauding defendants-who are alleged elsewhere in the complaint to be perpetrators of a Ponzi scheme. In such cases, courts have found that the debtor's intent to hinder, delay or defraud is presumed to be established."); *Donell v. Kowell*, 533 B.R. 762, 772 (9th Cir. 2008) ("[A]ll payments of fictitious profits are avoidable as fraudulent transfers.").

[30] As no avoidance action is currently pending here, the Court does not reach the merits of these defenses. It should be noted, however, that the application of section 546(e) of the Code to insulate transferees of Madoff's fictitious securities from avoidance actions is dubious. Indeed, courts have held that to extend safe harbor protection in the context of a fraudulent securities scheme would be to "undermine, not protect or promote investor confidence . . . [by] endorsing a scheme to defraud SIPC," and therefore contradict the goals of the provision. *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 105 (Bankr. S.D.N.Y. 1999), *aff'd*, 263 B.R. 406 (S.D.N.Y. 2001); *see also In re Grafton Partners*, 321 B.R. 527, 539 (B.A.P. 9th Cir. 2005) ("The few decisions that involve outright illegality or transparent manipulation reject [section] 546(e) protection."); *Wider v. Wootton*, 907 F.2d 570, 573 (5th Cir. 1990) ("To apply the stockbroker defense to shield the payments Cohen made to Wider would lend judicial support to 'Ponzi' schemes by rewarding early investors at the expense of later victims.") (internal quotations and citations omitted). In any event, the safe harbor provision explicitly excepts from its protection actual fraudulent transfers avoidable under section 548(a)(1)(A) of the Code. *See* 11 U.S.C. § 546(e).

### B. The Net Investment Method Does Not Contradict the IRS's Treatment of Madoff Claimants.

Some Objecting Claimants liken the IRS's treatment of Madoff claimants to recognizing fictitious profits as real income. The characterization of the IRS's treatment of Madoff claimants is irrelevant, however, as the IRS and SIPC are governed by disparate statutory schemes with different purposes. *See, e.g.*, *SIPC v. Morgan, Kennedy & Co., Inc.*, 533 F.2d 1314, 1318–19 (2d Cir. 1976) (declining to interpret SIPA by reference to the Federal Deposit Insurance Act, as "SIPA and FDIA are independent statutory schemes, enacted to serve the unique needs of the banking and securities industries, respectively"). In addition, the IRS treatment of Madoff claimants is temporal, rather than part of an established statutory scheme. *See, e.g.*, Post-Madoff Rev. Proc. 2009-20, 2009-14 I.R.B. 749 (established Mar. 17, 2009 to address, in relevant part, the tax treatment of losses from criminally fraudulent investment arrangements that take the form of Ponzi schemes).

### IV.    THE HOLDING IN *NEW TIMES I* SUPPORTS THE TRUSTEE'S NET INVESTMENT METHOD

Even though the mechanics of Ponzi schemes are essentially the same, with later investors' money used to pay earlier investors, underlying factual disparities make the definition of Net Equity susceptible to differing formulations. The Second Circuit has addressed this issue in *New Times I*. Not surprisingly, both the Trustee and Objecting Claimants cite *New Times I* as support for their respective positions.

The *New Times I* case was a SIPA liquidation involving a Ponzi scheme in which investors were fraudulently induced to purchase securities through New Times Securities Services, Inc. and New Age Financial Services, Inc. (collectively, the "Debtors"). The securities intended to be purchased included (1) nonexistent money market funds and (2) shares of bona

fide mutual funds.[31] *New Times I*, 371 F.3d at 71. Rather than invested, the customer funds advanced were misappropriated by the Debtors and used to pay fictitious profits on prior investments. *Id.* at 71–72, 72 n.2. To facilitate the fraud, the Debtors generated bogus confirmations and fake monthly account statements that reflected fictitious profits and nonexistent securities positions. *Id.* at 71, 74.

In the course of the liquidation, the SIPA trustee determined that customers who were fraudulently induced to invest in bogus money market funds (the "Fake Securities Claimants") were entitled to claims for cash, and thus eligible for a SIPC advance of up to only $100,000. *Id.* at 71, 74. Moreover, the SIPA trustee concluded that the value of their claims was the amount principally invested less any withdrawals or redemptions. *Id.* Thus, fictitious profits shown on their account statements as interest or dividends on the phantom securities were not included in calculating their net equity claims. *Id.* at 74.

By contrast, customers who were induced to invest in mutual funds that in reality existed (the "Real Securities Claimants") were entitled to claims for securities, eligible to receive up to $500,000 in SIPC advances. *Id.* In addition, their net equity claims were based upon the "profits" reflected on their customer account statements. These claimants received favorable treatment from the SIPA trustee because, *inter alia,* the trustee could purchase real securities to satisfy their claims, and the information shown on the account statements reflected what would have happened had the transactions been executed. *Id.*

The Fake Securities Claimants filed written objections to both (1) the SIPA trustee's determination of their claims as claims for cash, and (2) his refusal to value claims based on the fictitious amounts shown as dividends and interest on their last account statements. *Id.* at 74. In

---

[31] Certain investors were also induced to invest in fraudulent promissory notes. *Id.* at 71. However, the treatment of those investors is irrelevant for purposes of this decision.

response, the SIPA trustee, joined by SIPC, filed a motion for an order upholding his determination of claims. *Id.* at 74–75. The District Court sustained the Fake Securities Claimants' objection and held that the claimants had claims for securities. *Id.* at 75. Moreover, the court found that the value of those claims could be ascertained by reference to the fictitious interest and dividend reinvestments reflected on claimants' last account statements. *Id.* The SIPA trustee and SIPC promptly appealed the District Court's decision to the Court of Appeals for the Second Circuit. *Id.*

The Second Circuit upheld the District Court's determination that the Fake Securities Claimants had claims for securities, not claims for cash. Citing SIPC's Series 500 Rules[32] and the legislative history of SIPA section 78fff-3(a)(1), the court found that claimants were entitled to claims for securities because they relied upon the confirmations and account statements they received from the Debtors. *Id.* at 84–87 ("[T]he premise underlying the Series 500 Rules-that a customer's 'legitimate expectations,' based on written confirmations of transactions, ought to be protected-supports the SEC's interpretation of section [78fff-3(a)(1)]."). Moreover, the court held that its ruling promoted SIPA's goal of providing investor protection. *Id.* at 83–84.

However, as to the Net Equity issue, the Second Circuit reversed the District Court's holding. Instead, the court upheld the joint position of the SIPA trustee, SEC and SIPC that customer claims should be based upon the net cash invested in the scheme, not the fictitious interest or dividend reinvestments reflected on the claimants' account statements. *Id.* at 87–88. The court agreed that the amounts on the account statements were arbitrary, and basing Net

---

[32] These rules apply to determine whether a securities transaction gives rise to a "claim for cash" or a "claim for securities" on the filing date of a SIPA liquidation proceeding. *See* 17 C.F.R. §§ 300.500-300.503.

Equity claims on them would be "irrational and unworkable."[33] *Id.* at 88. Accordingly, the Second Circuit found that the value of the claimants' Net Equity claims was the net cash invested in the scheme.

In a subsequent decision issued in the *New Times* SIPA liquidation, *New Times II*, a different Second Circuit panel explained the court's holding in *New Times I* with respect to the Net Equity calculation issue. The *New Times II* court highlighted the absurdity and inherent unfairness that would result from relying on the fictitious account statements when no such securities existed and explained that reimbursing customers with actual securities or their market value on the filing date was impossible. *New Times II*, 463 F.3d at 129–30.

The Objecting Claimants identify with the Real Securities Claimants while the Trustee analogizes the Madoff claimants to the Fake Securities Claimants.

The Objecting Claimants assert that Madoff customers, comparable to the Real Securities Claimants in *New Times I*, are entitled to the value of the securities listed on their final account statements. They maintain that *New Times I* stands for the proposition that when a customer's account statement reflects securities positions in real securities, the SIPA trustee must either purchase the securities or pay the market value of those securities as of the filing date. Citing *New Times II*, they contend that the Second Circuit used the Net Investment Method in *New Times I* only "[b]ecause there were no [] securities, and it was therefore impossible to reimburse customers with the actual securities or their market value." *New Times II*, 463 F.3d at 129. The securities listed on the Objecting Claimants' account statements, they argue, like those of the *New Times* Real Securities Claimants, exist in the market and therefore have values that can be ascertained. As such, the Objecting Claimants posit that the Trustee must satisfy Net Equity

---

[33] When SIPC and the SEC disagreed as to the interpretation of SIPA section 78fff-3(a)(1) with regard to whether claimants had claims for cash or for securities, the court found, in a lengthy discourse, that the *SEC* was entitled to a degree of deference, a deliberative factor not lost on the Court. *See New Times I*, 371 F.3d at 82-83.

claims by either purchasing, or paying the market value of, the securities reflected on their November 30th Statements.

Although somewhat sympathetic to the Objecting Claimants' arguments, the Court agrees with the Trustee that *New Times I* and *II* support using the Net Investment Method here. The holding in *New Times I*, as it relates to the Net Equity analysis, hinged on the fact that customer account statements reflected "arbitrary amounts that necessarily ha[d] no relation to reality." *New Times I*, 371 F.3d at 88 (quoting Br. for *Amicus Curaie* SEC at 16). In addition, the court recognized "the potential absurdities created by reliance on the entirely artificial numbers." *New Times I*, 371 F.3d at 88. To adopt the Last Statement Method in this case would be to likewise base recovery on "rosy account statements," leading to "the absurdity of 'duped' investors reaping windfalls as a result of fraudulent promises." *New Times II*, 463 F.3d at 130.

Analogous to the account statements of the Fake Securities Claimants, the BLMIS account statements "have no relation to reality." *New Times I*, 371 F.3d at 88. Although the securities that Madoff allegedly purchased were identifiable in name, the securities positions reflected on customer account statements were artificially constructed. By backdating trades to produce predetermined, favorable returns, Madoff, like the fraudster in *New Times*, essentially pulled the fictitious amounts from thin air. The resulting securities positions on customers' November 30th Statements were therefore entirely divorced from the uncertainty and risk of actual market trading. In fact, at certain times, Madoff customers, like the Fake Securities Claimants, held at least one imaginary security.[34]

---

[34] As discussed *supra* at Factual History, section II, part C, "Fidelity Spartan U.S. Treasury Money Market Fund," was reflected on customer account statements at times when Fidelity Brokerage Services LLC was not offering participation in any such fund for investment.

The Objecting Claimants are also clearly distinguishable from the Real Securities Claimants in the *New Times* liquidation. The Real Securities Claimants' initial investments were sufficient to acquire their securities positions, and the corresponding paper earnings "mirrored what would have happened" had the fraudster purchased the securities as promised. *New Times I*, 371 F.3d at 74 (quoting Br. for Appellants James W. Giddens and SIPC at 7, n.6). In contrast, the Madoff customers' initial investments were insufficient to acquire their purported securities positions, which were made possible only by virtue of fictitious profits. Rather than "mirroring" the market, the account activity was manipulated with the benefit of deliberately calibrated hindsight, and many purported trades were settled outside the exchange's price range for the trade dates of those securities. As such, the Objecting Claimants should not be treated like the Real Securities Claimants, but rather like the Fake Securities Claimants.

Accordingly, a careful review of *New Times I* and *II* convinces the Court that the Trustee's Net Investment Method is correct. [35] It would be simply absurd to credit the fraud and legitimize the phantom world created by Madoff when determining Net Equity. *See New Times I*, 371 F.3d at 88. The Net Investment Method is appropriate because it relies solely on

---

[35] The Court is also persuaded by the reasoning in *Focht v. Athens (In re Old Naples Secs., Inc.)*, 311 B.R. 607 (M.D. Fla. 2002). *In re Old Naples* was a SIPA liquidation involving a Ponzi scheme in which the court adopted the Net Investment Method in satisfying claims for cash:

> According to the Trustee, participants in a Ponzi scheme such as that involved here are entitled only to receive their net loss, or the amount invested less any payments received.

> [P]ermitting claimants to recover not only their initial capital investment but also the phony "interest" payments they received and rolled into another transaction is illogical. No one disputes that the interest payments were not in fact interest at all, but were merely portions of other victims' capital investments. If the Court were to agree with the Athens claimants, the fund would likely end up paying out more money than was invested in Zimmerman's Ponzi scheme. This result is not consistent with the goals of SIPA, which does not purport to make all victimized investors whole but only to partially ameliorate the losses of certain classes of investors.

*In re Old Naples*, 311 B.R. at 616–17. Some of the Objecting Claimants attempt to distinguish *Old Naples* on the grounds that the claims in that case were for cash ($100,000 SIPC advance), and not for securities ($500,000 SIPC advance). This purported distinction, however, was irrelevant to the Net Equity holding. Whether the claims were for cash or securities, the fact remains that the *Old Naples* court found that it would be "illogical" to rely on fictitious interest payments in determining Net Equity claims. *Id.* at 617.

unmanipulated withdrawals and deposits and refuses to permit Madoff to arbitrarily decide who wins and who loses. Given the utter disconnect between the securities positions on customer account statements and market trading reality, the Court finds that the Objecting Claimants and the Fake Securities Claimants are similarly situated and should therefore be afforded the same treatment. As such, the proper way to determine Net Equity is by adopting the Net Investment Method, which is the only approach that can appropriately serve as a proxy for the imaginary securities positions shown on customers' last account statements.

## V.    EQUITY AND PRACTICALITY FAVOR THE NET INVESTMENT METHOD

While the Court recognizes that the outcome of this dispute will inevitably be unpalatable to one party or another, notions of fairness and the need for practicality also support the Net Investment Method.

As distribution of customer property to the "equally innocent victims" of Madoff's fraud is a zero-sum game,[36] equity dictates that the Court implement the Net Investment Method. *See Cunningham v. Brown*, 265 U.S. 1, 13 (1924). Customer property consists of a limited amount of funds that are available for distribution. Any dollar paid to reimburse a fictitious profit is a dollar no longer available to pay claims for money actually invested. If the Last Statement Method were adopted, Net Winners would receive more favorable treatment by profiting from the principal investments of Net Losers, yielding an inequitable result.

To demonstrate the profound negative impact on Net Losers were Net Equity claims to be based upon fictitious statements rather than net investment, the Trustee submitted an illustrative

---

[36] Zero-sum is a colloquial term that describes a scenario in which a participant's gain or loss is exactly balanced by the losses or gains of the other participants. If the total gains of the participants are added up, and the total losses are subtracted, they will equal zero. *See* http://www.merriam-webster.com.

31

hypothetical.[37]   Investor 1 invested $10 million many years ago, withdrew $15 million in the
final year of the collapse of Madoff's Ponzi scheme, and his fictitious last account statement
reflects a balance of $20 million.   Investor 2 invested $15 million in the final year of the collapse
of Madoff's Ponzi scheme, in essence funding Investor 1's withdrawal, and his fictitious last
account statement reflects a $15 million deposit.   Consider that the Trustee is able to recover $10
million in customer funds and that the Madoff scheme drew in 50 investors, whose fictitious last
account statements reflected "balances" totaling $100 million but whose net investments totaled
only $50 million.

Under the Last Statement Method, Net Equity claims would be fulfilled based on a 10%
recovery ($10 million recovered ÷ $100 million in fictitious account balances).   Investor 1 would
be entitled to 10% of his $20 million "account balance" and a $500,000 SIPC advance, or $2.5
million, despite his recent withdrawal of $15 million from the scheme.   The total recovery would
be $17.5 million on an initial investment of $10 million, or a $7.5 million profit.   Investor 2
would be entitled only to 10% of his $15 million "account balance" and a $500,000 SIPC
advance, or $2 million of his $15 million investment, resulting in a $13 million loss.   Therefore,
even though Investor 2 invested more money than Investor 1, and even though Investor 2's
money was used to fund Investor 1's withdrawal, Investor 2 stands to lose significantly more
money.   Employing the Last Statement Method would yield a grossly inequitable outcome.

In contrast, under the Net Investment Method, Investor 1 would not have a Net Equity
claim and would not be entitled to a SIPC advance because he already withdrew more than he
deposited.   Investor 2, however, would recover 20% ($10 million recovered ÷ $50 million in
total net investment) of his $15 million net investment, plus a $500,000 SIPC advance, totaling
$3.5 million, a significantly more just result.

---

[37] *See* Trustee's Reply Br. in Supp. of the Motion at 18–19.

32

This hypothetical demonstrates that if the Last Statement Method were used, Net Winners such as Investor 1 would continue to recover funds from customer property at the expense of Net Losers, who recovered little or nothing from Madoff and whose "investments" were used to fund the very withdrawals that made the earlier investors Net Winners. Adopting the Last Statement Method would only exacerbate the harm caused to Net Losers and would improperly distribute customer funds based on Madoff's arbitrary design. Net Winners and Net Losers, equally innocent in Madoff's Ponzi scheme, should not be treated disparately. Accordingly, the circumstances of this case "call strongly for the principle that equality is equity." *Cunningham*, 265 U.S. at 13.

Equality is achieved in this case by employing the Trustee's method, which looks solely to deposits and withdrawals that in reality occurred. To the extent possible, principal will rightly be returned to Net Losers rather than unjustly rewarded to Net Winners under the guise of profits. In this way, the Net Investment Method brings the greatest number of investors closest to their positions prior to Madoff's scheme in an effort to make them whole.[38]

With refreshing clarity, Simon Jacobs ("Jacobs"), himself a victim of Madoff's fraud, makes this very point in his *pro se* letter brief:

> In a Ponzi scheme, the perpetrator takes in money from investors, promising a return that is wholly fictitious, and instead pays cash returns to early investors with cash collected from later investors. This means that any cash returned to an investor was either his own, *or more likely, was taken from another later investor*. No money is actually invested for either gain or loss. Money is simply moved by the perpetrator from one investor to another.
>
> *Such cash that [Net Winners] withdrew in excess of their deposits was, by definition, cash that other customers put in, NOT a return on their purported investment*, since there was no investment made, and hence no return.

---

[38] Compensating Madoff investors on the basis of fictional account statements leads to an additional inequality as it enables the thief to dictate who receives a larger proportion of the assets collected by the Trustee. Madoff should not be entitled to award, to equally deserving clients, higher and lower returns based solely on his whim.

> The idea that because Madoff was a broker dealer, the assets recovered by the trustee should be returned to investors in proportion to their last monthly statement would effectively *make the trustee perpetrate his own Ponzi scheme, because the net winners would again receive money put into the scheme by the net losers*. This is so because any money recovered must, ipso facto, have come from the net losers, the net winners having already recovered their original investment, and more. Thus *later investors, the net losers, would lose even more money and the earlier investors, the net winners . . . would gain still further.*

Ltr. Br. in Favor of the Trustee's Motion on the Net Equity Issue (Dec. 7, 2009) (Case No. 08-1789, Docket No. 1041) (emphasis added). Jacobs concludes that adoption of the Last Statement Method would run "directly counter to any concept of equitable fairness."

The Court agrees and finds that the Net Investment Method proposed by the Trustee is the more equitable and appropriate way to determine Net Equity, is consistent with Second Circuit precedent, and gives a workable blueprint for distribution to the victims of Madoff's incogitable scheme.

## CONCLUSION

For all the reasons set forth herein, the Trustee's Motion for an order, *inter alia*, upholding his determination of Net Equity is hereby GRANTED. The Trustee is directed to submit an order consistent with this decision.

Dated: New York, New York
March 1, 2010

/s/ Burton R. Lifland
UNITED STATES BANKRUPTCY JUDGE

34

# EXHIBIT A

## EXHIBIT A – SUMMARY OF ARGUMENTS

| TOPIC | ARGUMENTS IN SUPPORT OF THE TRUSTEE | ARGUMENTS IN OPPOSITION TO THE TRUSTEE |
|---|---|---|
| **Proposed Definition of Net Equity** | I. **The amount of cash deposited by the customer into his customer account less any amounts withdrawn by him: the Net Investment Method.**<br>a. The SEC further proposes the "constant dollar" method by adjusting for the effects of inflation (or deflation). | I. **The liquidation value of the securities positions listed on a customer's November 30th Statement: the Last Statement Method.**<br>a. A customer's securities positions need not represent actually-held securities, because the Trustee is authorized to "purchase securities as necessary for the delivery of securities to customers in satisfaction of their claims for net equities." SIPA § 78fff-2(d). |
| **Plain Language and Legislative History** | I. **The plain language of SIPA supports the Net Investment Method.**<br>a. SIPA section 78*ll*(11) defines Net Equity generally as the liquidation value of the customer's "securities positions," minus amounts owed to the debtor. If Congress had intended for customers to be satisfied based solely upon their last statement, it would have included such language in SIPA.<br>b. The SEC and the Trustee agree that the "books and records" requirement of SIPA section 78fff-2(b) applies in this case to determine Net Equity.<br>   i. The SEC concludes that Net Equity claims must always be *"ascertainable from the books and records of the debtor or [] otherwise established to the satisfaction of the trustee."* SIPA § 78fff-2(b). The Last Statement Method satisfies neither because (1) the books and records reveal a fraud and (2) customers cannot show that they paid for the securities positions.<br>   ii. The Trustee argues that the "books and records" requirement gives "guidance" in this case, as the account statements are fictitious. The only bona fide transactions ascertainable from the books and records are deposits and withdrawals. Therefore, the Net Investment Method is appropriate. | I. **The Net Investment Method is at odds with SIPA's plain language.**<br>a. The Trustee erroneously interprets net equity to mean "net investment," rendering the Net Equity section superfluous.<br>   i. The Net Investment Method looks back over the life of an account, while the temporal focus of SIPA is on the filing date. SIPA aims to restore a customer's account to its amount as of the filing date of the SIPA liquidation, just as the FDIC restores a bank customer to the time of the bank failure.<br>b. Net Equity claims need not be *"ascertainable from the books and records of the debtor or [] otherwise established to the satisfaction of the trustee."*<br>   i. The SEC misreads SIPA section 78fff-2(b), which treats "obligations of the debtor" and "Net Equity claims" separately, and states only that "obligations" be ascertainable or established to the trustee's satisfaction. The amount of the Net Equity claim is a separate issue, under the separate SIPA section 78*ll*(11), unrelated to the books and records requirement of SIPA section 78fff-2(b).<br>   ii. SIPA section 78fff-2(b) is limited to establishing a customer's status as a preferred customer to qualify for a SIPC advance.<br>   iii. SIPA section 78fff-2(b) governs the Trustee's obligations in satisfying customer claims, not the amount of those claims, which are governed by the definition of Net Equity. |

| Plain Language and Legislative History (cont'd) | |
|---|---|

iii. It is appropriate to look to SIPA section 78fff-2(b). SIPA section 78lll(11)(defining net equity) does not address how to determine a broker-dealer's obligations to its customers. That is supplied by SIPA section 78fff-2(b). Thus, 78fff-2(b) is not limited to establishing whether claimants are entitled to customer status.

II. **Customers do not have a legitimate expectation in fictitious profits.**

i. A customers' legitimate expectations relate only to whether he holds a "claim for securities" or "claim for cash," as defined under SIPA. To the extent that the concept of "legitimate expectations" has some relevance to net equity, claimants cannot articulate a legitimate expectation in the proceeds of a fraud.

ii. The Trustee has properly satisfied customers' legitimate expectations by providing them with claims for securities.

1. Claims for securities cannot be satisfied in kind because they cannot be purchased in a "fair and orderly market" under SIPA section 78fff-2(d). Purchasing the securities would wreak havoc on the market place. Moreover, because of the enormous number of buys and sells, it is impossible to trace a customer's "real" money to any particular securities.

iv. In *New Times*, the fraudster's books and records were deemed not dispositive of the proper calculation of the customer claims.

v. Claimants should not be harmed because the fraudster did not keep good books and records. SIPA provides money to claimants where brokers misappropriated or stole securities and have unreliable books and records.

II. **The Net Investment Method is at odds with SIPA's legislative history indicating Congressional intent to protect customers' legitimate expectations.**

a. SIPA's purpose, according to the legislative history, is to protect investors' "legitimate customer expectations," and to "make customer accounts whole."

i. "A customer generally expects to receive *what he believes is in his account at the time the stockbroker ceases business. But because securities may have been ... never purchased or even stolen, this is not always possible ... customers generally receive pro rata portions of the securities claims, and as to any remainder, they will receive cash based on the market value as of the filing date.*" H.R. Rep. No. 95-746, at 21 (emphasis added).

ii. Customers' legitimate expectations should not be affected by badges of fraud.

1. Customers cannot monitor all investors' accounts, and therefore did not expect that the trading volume among all investors was impossible or that there were insufficient option contracts available to accomplish the aggregate split-strike conversion strategy.

2

| | | |
|---|---|---|
| **Focht v. Athens (In re Old Naples Secs., Inc.) 311 B.R. 607 (M.D. Fla. 2002) and Non-SIPA Cases** | **I. The Net Investment Method mirrors the standard judicial treatment of Ponzi schemes and has been specifically upheld under SIPA.** | **I. The Trustee erroneously relies on *Old Naples* and non-SIPA case law.** |

**I. The Net Investment Method mirrors the standard judicial treatment of Ponzi schemes and has been specifically upheld under SIPA.**

   **a.** *Old Naples* held that the Net Investment Method was the proper way to calculate customers' Net Equity in a SIPA liquidation involving a Ponzi scheme.

      **i.** "[P]ermitting claimants to recover not only their initial capital investment but also the phony 'interest' payments they received and rolled into another transaction is illogical. No one disputes that the interest payments . . . were merely portions of other victims' capital investments. If the Court were to agree with the [] claimants, the fund would likely end up paying out more money than was invested in [the] Ponzi scheme. This result is not consistent with the goals of SIPA, which does not purport to make all victimized investors whole but only to partially ameliorate the losses of certain classes of investors." *Old Naples*, 311 B.R. at 617.

   **b.** Non-SIPA Ponzi scheme cases are relevant to the equitable principle that early investors should not benefit at the expense of later investors.

      **i.** *Visconsi v. Lehman Brothers, Inc.*, 244 F. App'x 708 (6th Cir. 2007), which upheld an arbitrator's award that was in excess of the cash in/cash out amount, does not support the claimants interpretation of Net Equity:

        **1.** Lehman Brothers, unlike BLMIS, was solvent and therefore had sufficient funds to satisfy all claims.

        **2.** The *Visconsi* case involved a tort lawsuit that was not governed by SIPA.

      **ii.** *Byers* did not reject the Net Investment Method.

**I. The Trustee erroneously relies on *Old Naples* and non-SIPA case law.**

   **a.** The Net Investment Method was appropriate in *Old Naples* because the claims were ones for cash and not, as here, for securities.

   **b.** *Old Naples* is distinguishable because customers were not given trade confirmations. *See SIPC v. Old Naples Secs., Inc. (In re Old Naples Secs., Inc.)*, 236 B.R. 854, 860 (Bankr. M.D. Fla. 1999).

   **c.** Non-SIPA cases are not authoritative.

      **i.** In non-SIPA cases, the SIPA definition of Net Equity and the purposes behind SIPA were not in play. SIPA is the exclusive framework to apply when a broker-dealer fails for any reason. SIPA was enacted to accomplish a specific purpose in the special cases involving broker-dealers. Non-SIPA cases are therefore irrelevant.

   **d.** Non-SIPA Ponzi scheme cases support the Last Statement Method

      **i.** "[T]he out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages." *Visconsi v. Lehman Brothers, Inc.*, 244 Fed. Appx. 708, 713 (6th Cir. 2007).

      **ii.** "Although many courts . . . believe that it is more 'just' to require that an innocent investor victim who received reasonable contractual interest return it so that it can be redistributed among the investors who did not recover of their principal . . . . I believe that the majority of the general public would agree that allowing those victims to keep their interest is as fair or even a more fair solution." *Lustig v. Weisz & Assocs., Inc. (In re Unified Comm. Capital, Inc.)*, 260 B.R. 343, 351 (Bankr. W.D.N.Y. 2001).

      **iii.** In *SEC v. Byers*, 637 F. Supp. 2d 166 (S.D.N.Y. 2009), the court approved a formula to fix claims at investors' net investment plus reinvested earnings. Distributions would "roll over" into investors' accounts, even though distributions never existed and did not correlate to an out of pocket loss.

| | | |
|---|---|---|
| *New Times Secs. Servs., Inc.* 371 F.3d 68 (2d Cir. 2004) (*New Times I*) | **I.** *New Times I* controls—insofar as it adopted the Net Investment Method for the Fake Securities Claimants.<br><br>a. The Objecting Claimants closely resemble the Fake Securities Claimants in *New Times I*.<br><br>  i. Under the Last Statement Method, customers would recover amounts that have no relation to reality.<br><br>    1. Stocks were purportedly traded in impossible volumes, and at least one purported investment fund was not offered for investment as of 2005 (Fidelity Mutual Funds).<br><br>    2. Securities positions could not have been purchased as shown because trades were concocted after the fact based on historical prices.<br><br>    3. BLMIS customers did not have enough actual monies to purchase the securities reflected on their statements.<br><br>    4. The "transactions" were not subject to any of the risks associated with market trading.<br><br>b. The Objecting Claimants are distinguishable from the Real Securities Claimants in *New Times I*.<br><br>  i. Unlike the BLMIS statements, those of the Real Securities Claimants reflected earnings that were real and subject to market risks. As a result, the securities behaved on paper the way they actually did in the market.<br><br>c. *New Times I* does not hold that customers have a legitimate expectation in fictitious profits.<br><br>  i. The Second Circuit discussed legitimate expectations as it relates to whether claimants hold claims for securities or cash—it did not rely upon legitimate expectations to calculate Net Equity. | **I.** *New Times I* controls—insofar as it rejected the Net Investment Method for the Real Securities Claimants.<br><br>a. Madoff investors are analogous to the *New Times I* Real Securities Claimants, whose net equities were calculated as the liquidation value of the securities listed on their final account statements.<br><br>  i. Madoff's purported trading activity similarly involved "real" securities that existed in the marketplace. Both *New Times I* and Madoff investors could check, against real world results, the existence and value of the stocks that they believed they owned. They are thus entitled to such value as their legitimate expectation.<br><br>b. The court's decision to value Net Equity for the Fake Securities Claimants as the value of customers' initial investments was based entirely on the fact that the fictitious funds could not be valued. It was impossible to apply the Net Equity definition because there was no liquidation value for the fake securities.<br><br>  i. By contrast, virtually all of the Madoff securities were blue chip securities, the values of which can be ascertained. |

4

| | | |
|---|---|---|
| **Whether Claimants are "Customers" with Respect to Transactions in Furtherance of a Ponzi Scheme** | I. **Claimants are not "customers" to the extent the securities transactions did not occur in the "ordinary course of business."**<br><br>a. A customer has no claim to the securities on his account statement unless the purchase of those securities occurred in the "ordinary course of business." *See* SIPA § 78*lll*(2) (defining "customer" as a person with "a claim on account of securities received, acquired, or held by the debtor in the *ordinary course of its business*") (emphasis added).<br><br>i. Transfers to investors made in furtherance of a Ponzi scheme are not made in a broker's "ordinary course of [] business." Thus, a claimant is not a customer for claims to securities whose purported "purchase" was made in furtherance of Madoff's Ponzi scheme. | I. **Claimants are "customers" with claims against the debtor regardless of, and even because of, the fraudulent transactions.**<br><br>a. SIPA is designed to reimburse customers when a broker-dealer misappropriates funds, which is never in the "ordinary course of business."<br><br>b. Under the alternative definition of "customer" in SIPA section 78*lll*(2), a customer is any person "who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities." SIPA section 78*lll*(2). This alternative definition does not have an "ordinary course" requirement.<br><br>i. In any event, the Trustee has acknowledged the claimants' customer status without raising the "ordinary course of business" argument, and is therefore estopped from taking an inconsistent position with respect to Net Equity claims. |

| Whether the Trustee's Ability to Avoid Transfers is Consistent with the Last Statement Method | I. A Trustee can avoid fictitious profits as fraudulent transfers in a SIPA proceeding.<br>  a. It would be inherently inconsistent to allow a trustee to recover fictitious profits through avoidance actions and, at the same time, recognize claims based on fictitious profits.<br>  b. The fact that some transfers cannot be avoided does not eliminate the inherent inconsistency between a distribution scheme based upon fraud and the Trustee's ability to avoid fraudulent transfers.<br>  c. Section 546(e) of the Code, which precludes a trustee from avoiding a transfer made in connection with a securities contract, does not prevent the trustee from avoiding Ponzi scheme transfers. Moreover, this section has no applicability here because Madoff never actually traded in securities for customers, and thus never entered into securities contracts. In any event, even if the agreements are securities contracts, section 546(e) of the Code expressly excludes from its reach transactions that are actually fraudulent under section 548(a)(1)(A) of the Code. Moreover, the "Ponzi-scheme presumption"—that transfers made in a Ponzi scheme are presumed to be made with fraudulent intent—is still valid Second Circuit law. Thus, section 546(e) of the Code does not eliminate the inherent conflict discussed above.<br>    i. In addition, this section was meant to protect brokers, not customer account withdrawals.<br>    ii. Applying section 546(e) of the Code in this context would have the effect of sanctioning backdated trades at fabricated prices, which would undermine the financial markets. | I. The Trustee's avoidance powers are reconcilable with the Last Statement Method.<br>  a. Fictitious profits should be recognized as included in customers' Net Equity claims, even though, as the Trustee argues, they can theoretically be avoided, because in this case they are not avoidable:<br>    i. Section 546(e) of the Code (safe harbor protection against avoidance for securities transactions) limits the Trustee to section 548(a)(1)(A) of the Code.<br>    ii. Transfers were made outside of the statute of limitations period for avoidance actions under the Code and New York law.<br>  b. The Trustee's avoidance powers are inapplicable to the calculation of customers' Net Equity.<br>    i. The Trustee cannot summarily avoid transactions on a mass basis by conflating his avoidance powers with SIPA's definition of Net Equity. If the Net Investment Method is used to determine that Net Winners' fictitious profits can be clawed back, the Trustee should still be required to meet the specific requirements of the avoidance provisions of the Code with regard to each customer and transaction, and customers are entitled to defenses.<br>  c. "Net Equity" must be determined before any transfers can be deemed fraudulent.<br>    i. Any transfer up to the value of a customer's Net Equity is not fraudulent because it is for "value."<br>    ii. Determining fraudulent conveyances first undermines SIPA's goal to expeditiously pay customer claims. |

| Equity and Public Policy | |
|---|---|
| **I. Basing Net Equity on fictitious statements would be inequitable and make for poor public policy.**<br>a. Last Statement favors earlier investors.<br>b. It's a zero-sum game: every dollar paid to reimburse a fictitious profit is one less dollar available to pay a claim for money actually invested. Equality is Equity.<br>c. Adherence to the final fictitious customer statements permits Madoff to determine who wins and loses.<br>d. Customers who have not yet made significant withdrawals are unfairly penalized under the Last Statement Method.<br>e. A ruling in favor of the Last Statement Method would have a materially adverse effect on customers who did not withdraw fictitious profits, by greatly expanding the pool of claims that would share in whatever customer property is recovered.<br>f. The Last Statement Method assumes that which is impossible—that if every dollar of customer property were recovered, each customer could recover the full amount of his last account balance.<br><br>**II. The SEC recommends compensating for the time value of money—the Constant Dollar Approach.**<br><br>**III. Adopting the Last Statement Method and giving credence to fictitious profits has the effect of undermining securities laws—thus weakening them.**<br>a. While the primary function of SIPA is to provide investor protection, another central function is to reinforce the broker-dealer's financial responsibility requirements so that the securities laws are strengthened and not weakened. If the Trustee utilizes the Last Statement Method, he will give credence to the backdated trades and false profits invented by Madoff. *See Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51 (Bankr. S.D.N.Y. 1999). | **I. Equity and public policy are irrelevant in statutory interpretation and, in the alternative, weigh against the Net Investment Method.**<br>a. Net Investment subrogates older investors—who did not take advantage of different investment opportunities because they believed they were successfully invested with Madoff—to newer investors, who had the opportunity to invest outside of Madoff for decades.<br>b. It is vital to national securities markets that investors retain confidence in the industry's ability to safeguard customer funds and securities. The only way to do so is to apply the statute as written.<br>c. "Some investors who received 'fictitious profits' may have spent the money on education or other necessities many years ago. What else in equity and good conscience should plaintiffs who received money in good faith pursuant to an 'investment contract' have done?" *Johnson v. Studholme*, 619 F. Supp. 1347, 1350 (D. Colo. 1985), *aff'd, Johnson v. Hendricks*, 833 F.2d 908 (10th Cir. 1987).<br><br>**II. Nor is the SEC's Constant Dollar Approach a more equitable solution.**<br>a. No legal basis in SIPA.<br>b. Would not significantly increase the number of claimants with allowable Net Equity claims, and would deny more than half of BLMIS customers' SIPA protection.<br>c. Does not equalize older and newer investors—Newer investors can supplement SIPA recovery with theft loss tax benefits that permit them to deduct from their ordinary income their net BLMIS investments and fictitious BLMIS income reported during the past five years.<br>d. Denies long-term investors credit for their legitimate BLMIS investments prior to the commencement of the fraud. |

| Whether Madoff's Fraud is Imputed to Claimants such that They Have no Claims for Fictitious Profits | I. To give effect to the Last Statement Method would be to improperly allow claimants to benefit from the fraud of their agent.<br>  a. The Trustee can avoid fictitious trades and transfers as illegal contracts under federal and state securities laws, as well as common-law fraud (IE: section 10(b) of the Securities Exchange Act of 1934 and the Martin Act).<br>    i. Under NY agency law, customers cannot benefit from Madoff's fraud.<br>  b. The Trustee is not barred by the doctrine of unclean hands because the Trustee has not brought any affirmative fraud claims against the claimants.<br>II. Even if the transactions fall outside of the agency relationship, claimants are still chargeable with the underlying fraud because they rely on the BLMIS fraudulent statements as the foundation for their Net Equity claims. | I. Claimants are not precluded from receiving fictitious profits on the basis that Madoff was acting as their agent in committing fraud.<br>  a. SIPA expressly allows customers to receive claims where the broker-agent misappropriated their investments.<br>  b. The contracts were not illegal: Madoff did not fulfill trading authorizations or customer agreements, but they were not agreements to do anything illegal. Trades listed on customer statements are not "illegal contracts."<br>  c. While customers cannot retain a benefit resulting from an agent's fraud, these customers lost money. Thus, they seek not to benefit, but to be made whole.<br>II. Madoff acted outside the scope of his agency when he executed the Ponzi scheme and failed to trade securities as required in the authorizations. |

8

| | | |
|---|---|---|
| The Extent to Which the Net Investment Method Contravenes Tax Law | **I.** **The IRS tax treatment of Madoff claimants does not conflict with the Net Investment Method.**<br>**a.** First, the IRS and SIPC are governed by different statutory schemes. Second, the IRS does not treat fictitious profits as income. Rather, it allows a taxpayer to treat fictitious profits as a loss for IRS purposes only if the taxpayer previously treated those profits as income and paid taxes on them, but never in fact received them. | **I.** **The Net Investment Method is inconsistent with tax law.**<br>**a.** The Trustee's Net Equity calculation is inconsistent with Revenue Procedure 2009-20, which expressly recognizes the income earned by customers, and customers paid taxes on this income annually.<br>**b.** Rev. Proc. 2009-20 provides for a five-year carryback of theft loss, but the Trustee is intending to claw back income withdrawn over the last six years.<br>**c.** The IRS does not allow taxpayers to go back more than three years to correct and file amended returns. |
| Whether SIPC's Prior Interpretations of Net Equity Prevent the Trustee from Using the Net Investment Method | **I.** **SIPC's prior positions do not prevent the Trustee from arguing the Net Investment Method.**<br>**a.** Even if SIPC did advance an opposite position in *New Times*, the Trustee would not be estopped because he is legally distinct from SIPC and was not a party to *New Times*. In addition, judicial estoppel applies only to factual, not legal, positions.<br>**b.** In any event, SIPC did not advance an opposite position; rather, where the *New Times* "gains" were the result of the fraudster's imagination, SIPC did not support recognition of those gains. Here, the Trustee and SIPC are espousing the same position. | **I.** **Net Investment is contrary to SIPC's previous interpretations of Net Equity.**<br>**a.** In *New Times*, SIPC maintained that "reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality . . . [such as] where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase." SIPC Br. *New Times II*, at 23–24, 2005 WL 5338148, at *12.<br>**b.** SIPC publicly stated, "in the unlikely event your brokerage firm fails, you will need to prove that cash and/or securities are owed to you. This is easily done with a copy of your most recent statement and transaction records of the items bought or sold after the statement," and "net equity of a customer's claim is determined by adding the total value of cash and securities the firm owes the customer and subtracting the total value of cash and securities the customer owes the firm."<br>**c.** SIPC changed its standard customer claim form specifically for the Madoff case to ask questions relevant to the Net Investment Method. Withdrawal amounts were never relevant before.<br>**d.** As reported less than a week after Madoff was arrested, Josephine Wang, SIPC General Counsel, stated, "if client number 1234 was given a *statement showing* that they owned 1000 GOOG shares, even if a *transaction never took place*, then SIPC *has to* buy and replace the 1000 GOOG shares." *See* SIPC's Role in Madoff-Of-All-Scams Could Save The Stock Market, *available at Streetinsider.com*, Dec. 16, 2008. (emphasis added). |

9

| | |
|---|---|
| **Whether SIPC's Series 500 Rules Support the Last Statement Method** | I. **The Series 500 Rules do not support the Last Statement Method.** <br> a. Rather, these rules are only relevant in deciding whether a customer has a claim for cash or securities. Furthermore, they apply only with respect to transactions made in the ordinary course of business. Thus, they are irrelevant with respect to fraudulent transactions. | I. **The Series 500 Rules support the Last Statement Method.** <br> a. "Where the Debtor held cash in an account for a customer, the customer has a 'claim for securities' with respect to any authorized securities purchase *[i]f the Debtor has sent written confirmation to the customer* that the securities in question have been purchased for or sold to the customer's account." 17 C.F.R. § 300.502(a) (emphasis added). <br>    i. These rules concern the type of claim, rather than how to value the claim, but they make clear that the customer's receipt of confirmations, not the debtor's performance, is controlling for the purpose of SIPC advancements. Statutes should be interpreted to avoid inconsistencies. |
| **Whether Distribution is a "Zero-Sum Game" such that the Net Investment Method is Necessary for Equality Among Claimants** | I. **Entitlement to a SIPC advance arises only when a customer will receive a distribution from the fund of customer property, and participation in the fund requires a valid Net Equity claim. Thus, if a customer has negative Net Equity based on the Net Investment Method, they are not entitled to any funds from SIPC.** <br> a. If a customer is entitled to share in customer property, and if his pro rata share is insufficient to fully satisfy his Net Equity, then he will receive a SIPC advance. | I. **Payments to one customer using the Last Statement Method will not deny payments to another.** <br> a. Initial payments of up to $500,000 come from SIPC's fund, not customer property or the bankruptcy estate. <br> b. The Madoff liquidation is not a zero-sum game because SIPC is a third party insurer that has an absolute obligation to replace securities. That obligation is completely separate from each customer's share of estate property, and the payment by SIPC of insurance to each customer in no way reduces estate property. <br> c. SIPC has authority to obtain more funding from Congress. |

10

# APPENDIX 1

# APPENDIX 1 - APPEARANCES

## PARTIES SUPPORTING THE NET INVESTMENT METHOD

1. BAKER & HOSTETLER LLP
   45 Rockefeller Plaza
   New York, NY 10111
   Telephone:    (212) 589-4200
   Facsimile:    (212) 589-4201
   By:    David Sheehan
          Marc E. Hirschfield
          Oren J. Warshavsky
          Seanna R. Brown

   *Attorneys for Irving H. Picard,*
   *Trustee for the Substantively Consolidated SIPA Liquidation of*
   *Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

2. SECURITIES INVESTOR PROTECTION CORPORATION
   805 Fifteenth Street, N.W. Suite 800
   Washington, DC 20005
   Telephone:    (202) 371-8300
   Facsimile:    (202) 371-6728
   By:    Josephine Wang
          Kevin H. Bell

   *Attorneys for the Securities Investor Protection Corporation*

3. SECURITIES AND EXCHANGE COMMISSION
   100 F. Street, N.E.
   Washington, DC 20548
   Telephone:    (202) 551-5148
   By:    Katharine B. Gresham
          Alistaire Bambach

   *Attorneys for the Securities and Exchange Commission*

4. CRAVATH, SWAINE & MOORE LLP
   825 Eighth Avenue
   New York, NY 10019
   Telephone:    (212) 474-1000
   Facsimile:    (212) 474-3700
   By:    Richard Levin

   *Attorneys for Optimal Strategic U.S. Equity Limited and Optimal Arbitrage*
   *Limited*

5. Simon Jacobs (Pro Se)

OBJECTING CLAIMANTS

Represented by Counsel

1.  BERNFELD, DEMATTEO & BERNFELD LLP
    600 Third Avenue
    New York, NY 10016
    Telephone:    (212) 661-1661
    Facsimile:    (212) 557-9610
    By:    David B. Bernfeld
           Jeffrey Bernfeld

    *Attorneys for Dr. Michael Schur and Mrs. Edith A. Schur*

2.  BROWN RUDNICK LLP
    Seven Times Square
    New York, NY 10036
    Telephone:    (212) 209-4800
    Facsimile:    (212) 209-4801
    By:    David J. Molton
           Martin S. Siegel

    *Attorneys for Kenneth M. Krys and Christopher D. Stride as Liquidators of and
    for Fairfield Sentry Limited*

3.  STANLEY DALE COHEN
    41 Park Avenue, Suite 17-F
    New York, NY 10016
    Telephone:    (212) 686-8200
    By:    Stanley Dale Cohen

    *Attorney for Lee Mellis, Lee Mellis (IRA), Jean Pomerantz T.O.D., and Bonita
    Savitt*

4.  DAVIS POLK & WARDWELL LLP
    450 Lexington Avenue
    New York, NY 10017
    Telephone:    (212) 450-4000
    Facsimile:    (212) 701-5800
    By:    Karen Wagner
           Jonathan D. Martin

    *Attorneys for Sterling Equities Associates*

5. DEWEY & LEBOEUF LLP
   1301 Avenue of the Americas
   New York, NY 10019
   Telephone:   (212) 259-8000
   Facsimile:   (212) 259-6333
   By:   Seth C. Farber
         James P. Smith III
         Kelly A. Librera

   *Attorneys for Ellen G. Victor*

6. GIBBONS, P.C.
   One Pennsylvania Plaza, 37th Floor
   New York, NY 10119
   Telephone:   (212) 613-2009
   Facsimile:   (212) 554-9696
   By:   Jeffrey A. Mitchell
         Don Abraham

   *Attorneys for Donald G. Rynne*

7. GOODWIN PROCTER LLP
   53 State Street
   Boston, MA 02109
   Telephone:   (617) 570-1000
   Facsimile:   (617) 523-1231
   By:   Daniel M. Glosband
         David J. Apfel
         Brenda R. Sharton
         Larkin M. Morton

   *Attorneys for Jeffrey A. Berman, Russell DeLucia, Ellenjoy Fields, Michael C.*
   *Lesser, Norman E. Lesser 11/97 Rev. Trust, Paula E. Lesser 11/97 Rev. Trust, and*
   *Jane L. O'Connor, as Trustee of the Jane O'Connor Living Trust*

8. HERRICK, FEINSTEIN LLP
   2 Park Avenue
   New York, NY 10016
   Telephone:   (212) 592-1400
   Facsimile:   (212) 592-1500
   By:   William R. Fried

   *Attorneys for Magnify, Inc.*

3

9. KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
551 Fifth Avenue, 18th Floor
New York, NY 10176
Telephone:     (212) 986-6000
Facsimile:     (212) 986-8866
By:     David Parker
        Matthew J. Gold
        Jason Otto

*Attorneys for Lawrence Elins and Malibu Trading and Investing, L.P.*

10. LAX & NEVILLE, LLP
1412 Broadway, Suite 1407
New York, NY 10018
Telephone:     (212) 696-1999
Facsimile:     (212) 566-4531
By:     Brian J. Neville
        Barry R. Lax

*Attorneys for Mary Albanese, the Brow Family Partnership, Allen Goldstein,
Laurence Kaye, Suzanne Kaye, Rose Less, and Gordon Bennett*

11. MCCARTER & ENGLISH, LLP
245 Park Avenue, 27th Floor
New York, NY 10167
Telephone:     (212) 609-6800
Facsimile:     (212) 609-6921
By:     Joseph Lubertazzi, Jr.

*Attorneys for Wachovia Bank, National Association*

12. MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119
Telephone:     (212) 594-5300
Facsimile:     (212) 868-1229
By:     Jonathan M. Landers
        Matthew Gluck
        Lois F. Dix
        Joshua E. Keller
        Sanford P. Dumain
        Jennifer L. Young

SEEGER WEISS LLP
One William Street
New York, NY 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
By: Stephen A. Weiss
Christopher M. Van de Kieft
Parvin K. Aminolroaya

*Attorneys for Albert J. Goldstein U/W FBO, Ruth E. Goldstein TTEE, Ann Denver, Norton Eisenberg, Export Technicians, Inc., Stephen R. Goldenberg, Judith Rock Goldman, Jerry Guberman, Anita Karimian, Orthopaedic Specialty Group PC, Martin Rappaport, Paul J. Robinson, Bernard Seldon, Harold A. Thau, and The Aspen Company*

13. PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103
Telephone: (212) 841-1320
Facsimile: (212) 262-5152
By: Helen Davis Chaitman

*Attorneys for Diane and Roger Peskin, Maureen Ebel, and a group of other customers*

14. BRUCE S. SCHAEFFER
404 Park Avenue South
New York, NY 10016
Telephone: (212) 689-0400
By: Bruce S. Schaefer

*Attorney for Irving J. Pinto Revocable Trust, Irving J. Pinto Grantor Retained Annuity Trust of 1994, Irving J. Pinto Grantor Retained Annuity Trust of 1996, and Amy Lome Pinto Revocable Trust*

15. SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955
By: William D. Zabel
Michael L. Cook
Marcy Ressler Harris
Frank J. LaSalle

*Attorneys for the SRZ Claimants*

16. SHEARMAN & STERLING LLP
    599 Lexington Avenue
    New York, NY 10022
    Telephone:    (212) 848-4000
    Facsimile:    (212) 848-7179
    By:    Stephen Fishbein
           James Garrity
           Richard Schwed

    *Attorneys for Carl Shapiro and associated entities*

17. SONNENSCHEIN NATH & ROSENTHAL LLP
    1221 Avenue of the Americas
    New York, NY 10020
    Telephone:    (212) 768-6889
    Facsimile:    (212) 768-6800
    By:    Carole Neville

    *Attorneys for certain investors*

<u>Pro Se</u>

1.  Hugh de Blacam

2.  Ethel and James Chambers

3.  Anthony Fusco

4.  Herbert and Ruth Gamberg

5.  Cynthia Pattison Germaine

6.  Lillian Gilden

7.  Phyllis Glick

8.  Yolanda Greer

9.  Joseph M. Hughart

10. Marvin Katkin

11. Marshall W. Krause

12. Jason Mathias

13. Michael and Stacey Mathias

14. Shawn Mathias

6

15. Herbert A. Medetsky

16. Josef Mittleman

17. Josef Mittleman, on behalf of Just Empire, LLC

18. Arlene Perlis

19. Gunther and Margaret Unflat

20. Lawrence R. Velvel

21. Alan J. Winters


## PARTIES NOT TAKING A POSITION ON THE CALCULATION OF NET EQUITY

1. JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP
   911 Chestnut Street
   Clearwater, FL 33757
   Telephone:   (727) 461-1818
   Facsimile:   (727) 443-6548
   By:    Angelina E. Lim
          Michael C. Cronin

   *Attorneys for Anchor Holdings, LLC*

2. MORRISON COHEN LLP
   909 Third Avenue
   New York, NY 10022
   Telephone:   (212) 735-8600
   Facsimile:   (212) 735-8708
   By:    Michael R. Dal Lago

   *Attorneys for David Silver*

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

**ORDER (1) UPHOLDING TRUSTEE'S DETERMINATION DENYING CUSTOMER CLAIMS FOR AMOUNTS LISTED ON LAST CUSTOMER STATEMENT; (2) AFFIRMING TRUSTEE'S DETERMINATION OF NET EQUITY; AND (3) EXPUNGING THOSE OBJECTIONS WITH RESPECT TO THE DETERMINATIONS RELATING TO NET EQUITY**

This matter came before the Court on February 2, 2010 on the motion (the "Motion") of Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"), and as trustee for the estate of Bernard L. Madoff ("Madoff"), for entry of an order (1) upholding the Trustee's determinations denying the claims in question for the securities and credit balances listed on the claimants' last BLMIS customer statement; (2) affirming the Trustee's "cash in/cash out" determinations of net equity with respect to each customer claim; and (3) expunging the objections to the Trustee's determinations to the customer claims in question insofar as they relate to net equity; and the Court having considered:

1

1.     That the Trustee's Motion concerns the proper interpretation and application of net equity ("Net Equity"), as that term is defined in section 16(11) of SIPA, 15 U.S.C. § 78*lll*(11); and

2.     That as delineated in the Motion papers, it is the Trustee's position that for purposes of determining customer claims, each BLMIS customer's Net Equity should be determined by crediting the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn by him from his BLMIS customer account (the "Net Investment Method"); and

3.     That certain customer claimants ("Objecting Claimants") asserted that Net Equity should be determined on the basis of each claimant's balance as shown on their November 30, 2008 account statement provided by BLMIS ("Final Customer Statements"); and

4.     The responses and oppositions filed in this Court to the Motion, as listed in Appendix 1 to the Memorandum Decision Granting Trustee's Motion For An Order (1) Upholding Trustee's Determination Denying Customer Claims For Amounts Listed On Last Customer Statement; (2) Affirming Trustee's Determination Of Net Equity; and (3) Expunging Objections to Determinations Relating To Net Equity ("Net Equity Decision"), dated March 1, 2010.

Due notice of the Motion has been given, and it does not appear that other or further notice need be given, and after a hearing and the proceedings before the Court, and after due

2

deliberation, having determined the Motion is in the best interests of BLMIS, its creditors and the estate, it is hereby:

ORDERED, that the relief requested in the Motion is granted as set forth in the Net Equity Decision, fully incorporated herein; and it is further

ORDERED, that the Trustee's determination of Net Equity using the Net Investment Method is upheld; and it is further

ORDERED, that each customer's Net Equity with respect to their customer claims in this SIPA liquidation proceeding shall be calculated using the Net Investment Method rather than the balances listed on the Final Customer Statements; and it is further

ORDERED, that the oppositions submitted by the Objecting Claimants, as listed in Appendix 1 of the Net Equity Decision, are overruled; and it is further

ORDERED, that the objections to the determinations of customer claims, as listed on Exhibit A to the Trustee's Motion [Dkt. No. 530], are expunged insofar as those objections are based upon using the Final Customer Statements rather than the Net Investment Method to determine Net Equity; and it is further

ORDERED, that this Court shall retain jurisdiction with respect to the remainder of the claimants' objections in accordance with the order entered by this Court on December 23, 2008 (the "Claims Procedures Order"); and it is further

ORDERED, that the Trustee shall in due course schedule a hearing or hearings regarding the remainder of the claimants' objections in accordance with the Claims Procedures Order; and it is further

3

**ORDERED**, that with regard to the Net Equity Dispute, this Order is a final order as that term is defined in 28 U.S.C. § 158(a)(1), and there is no just reason for delay; and it is further

**ORDERED**, that in view of the factors contained in 28 U.S.C § 158(d)(2)(A)(i) - (iii), this Court will upon appropriate request or motion consider favorably a request to certify a direct appeal to the United States Court of Appeals for the Second Circuit; and it is further

**ORDERED**, that this Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order.

Dated: New York, New York
     March 8, 2010                    /s/Burton R. Lifland
                                       HONORABLE BURTON R. LIFLAND
                                       UNITED STATES BANKRUPTCY JUDGE

4

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff,<br><br>        v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | |

## COURT'S CERTIFICATION OF NET EQUITY ORDER OF MARCH 8, 2010 FOR IMMEDIATE APPEAL TO THE UNITED STATES COURT OF APPEALS PURSUANT TO 28 U.S.C. § 158(d)(2)

The Court having issued its Memorandum Decision Granting Trustee's Motion for an Order (1) Upholding Trustee's Determination Denying Customer Claims for Amounts Listed on Last Customer Statement; (2) Affirming Trustee's Determination of Net Equity; and (3) Expunging Objections to Determinations Relating to Net Equity (the "Net Equity Decision") on March 1, 2010; and having entered an order on March 8, 2010 implementing the Decision (the "Net Equity Order"); and because the Net Equity Decision and Order impact with finality on the interests of the parties to the above-captioned proceeding, the Court, on its own motion, joined by the annexed request of the law firms of Becker & Poliakoff, LLP, Davis Polk & Wardwell LLP, Lax & Neville, LLP, Milberg LLP, and Shearman & Sterling LLP, on behalf of the BLMIS claimants represented by the same, setting forth the bases for certification pursuant to 28 U.S.C. § 158(d)(2), which request the Court treats as a motion for certification; and the United

1

States Securities & Exchange Commission and the Securities Investor Protection Corporation having indicated that they have no objection to this request; and the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); and (iii) the legal and factual issues presented establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1. The relief sought in the request is GRANTED.

2. The Court certifies that an immediate appeal of the Net Equity Order is appropriate because this proceeding involves a matter of public importance, and an immediate appeal may materially advance the progress of this proceeding.

3. The Court therefore certifies the Net Equity Order for immediate appeal to the United States Court of Appeals pursuant to 28 U.S.C. § 158(d)(2).

Dated: New York, New York
       March 8, 2010

                              /s/ Burton R. Lifland_____
                              United States Bankruptcy Judge

2