# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x

NEW YORK COMMERCIAL BANK,

                              Plaintiff,

        - against -                                    New York Supreme Court
                                                       County of New York

PAUL J. PULLO and GENE V. PULLO,                       Index No.:  653452/2012

                              Defendants.
------------------------------------------------------------------x

## <u>NOTICE OF FILING OF NOTICE OF REMOVAL</u>

**PLEASE TAKE NOTICE**, pursuant to 28 U.S.C. §1446(d), Paul J. Pullo and Gene V. Pullo

(collectively, the "Defendants") by and through their counsel, SilvermanAcampora LLP, hereby give

notice to the Clerk of the Supreme Court of the State of New York, County of New York, and to the

Plaintiff herein that, pursuant to 28 U.S.C. §§1441 and 1452, the above-captioned action has been

removed to the United States District Court for the Southern District of New York.   Attached as

**Exhibit 1** is a true and accurate copy of the Notice of Removal filed in the United States District

Court for the Southern District of New York pursuant to 28 U.S.C. §1446(a).

Dated: Jericho, New York
       October 15, 2012

                              **SILVERMANACAMPORA LLP**
                              Attorneys for Defendants Paul J. Pullo
                                and Gene V. Pullo

                              By:    _/s/ Lon J. Seidman_____
                                     Lon J. Seidman
                              Member of the Firm
                              100 Jericho Quadrangle, Suite 300
                              Jericho, New York 11753
                              (516) 479-6300


TO:    Clerk of the Supreme Court of New York
       County of New York
       New York County Supreme Court
       60 Centre Street, Room 161
       New York, New York 10007

       Loeb & Loeb LLP
       Attorneys for Plaintiff
       345 Park Avenue
       New York, New York 10154
       Attn: William M. Hawkins, Esq.

                                                            SB/1223122.1/062328

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
NEW YORK COMMERCIAL BANK,

                            Plaintiff,

        - against -

PAUL J. PULLO and GENE V. PULLO,          Case No. 12-CIV.- 7693 (LTS) (FM)

                            Defendants.
------------------------------------------------------------------------x

## NOTICE OF REMOVAL

      **PLEASE TAKE NOTICE** that, by this Notice of Removal, Defendants Paul J. Pullo and Gene V. Pullo (collectively, the "Defendants") by and through their counsel, SilvermanAcampora LLP, hereby removes to this Court that certain civil action titled *New York Commercial Bank v. Paul J. Pullo and Gene V. Pullo*, Supreme Court of the State of New York, New York County, Index Number 653452/2012 (the "Action"), in which plaintiff New York Commercial Bank (the "Plaintiff") seeks entry of an order granting summary judgment for a money judgment pursuant to certain guaranties, as well as other expenses, fees costs or other amounts due, in addition to attorneys' fees, costs and disbursements and other expenses relating to the Action, in accordance with 28 U.S.C. §§1334 and 1452, and Rules 9011 and 9027(a) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and in support state as follows:

### The Debtors and Their Bankruptcy Cases

      1.      On September 27, 2012 (the "Petition Date"), Metro Fuel Oil Corp. and its debtor affiliates[1] (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "EDNY Bankruptcy Court").

      2.      On September 28, 2012, the EDNY Bankruptcy Court entered an order authorizing the joint administration of the Debtors' bankruptcy cases.

---

[1] The debtor affiliates include, but are not limited to, Metro Terminals Corp. and Metro Terminals of Long Island, LLC.

3.      The Debtors' jointly administered bankruptcy cases have been assigned Case No. 12-46913 (ESS), and are pending before the Honorable Elizabeth S. Stong, United States Bankruptcy Judge.

**The Defendants**

4.      Defendants are majority shareholders of Debtor Metro Fuel Oil Corp. and Debtor Metro Terminals Corp., and the exclusive members of Debtor Metro Terminals of Long Island, LLC, and operate, manage and otherwise control the operations of the aforementioned Debtors (the "Borrower Debtors").

**The Bank Debt**

5.      The Borrower Debtors are indebted to Plaintiff and Valley National Bank pursuant to the Third Amended and Restated Accounts Financing Agreement, dated May 4, 2012 (the "Bank Debt").  The Defendants have personally guaranteed the Borrower Debtors' obligations to the Plaintiff with respect to the Bank Debt.  In addition, the Bank Debt is guaranteed by Debtor Apollo Petroleum Transport, LLC, Debtor Kings Land Realty, Inc., Debtor Metro Biofuels LLC, Debtor Metro Energy Group LLC, and Debtor Metro Plumbing Services Corp.

**The State Court Action**

6.      On October 2, 2012, the Plaintiff filed the Action.

7.      Plaintiff alleges in the Action that Defendants personally guaranteed payment of certain indebtedness of the Borrower Debtors, and that because the Borrower Debtors are allegedly in default of certain loan agreements, the Defendants are liable for nonpayment under the terms of those documents.

**The Basis for Removal**

8.      At this time, the Defendants hereby exercise their rights under the provisions of 28 U.S.C. §1452(a) to remove the Action from the Supreme Court of the State of New York, County of New York, in which court the Action is now pending, to this Court.  Once the Action has been removed to this Court, the Defendants intend to seek a transfer of venue because the

2

EDNY Bankruptcy Court has "related to" jurisdiction over the cause of action asserted in the Action pursuant to 28 U.S.C. §1334(b), as the Debtors' cases are pending in that District.[2]

9.      Pursuant to 28 U.S.C. §1452, "[a] party may remove any claim or cause of action . . . to the district court where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." 11 U.S.C. §1452(a); *see also* FED. R. BANKR. PROC. 9027. Section 1334 provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. §1334(b). The District Court – and the Bankruptcy Court – have original jurisdiction over the Action because it is "related to" the Debtors' bankruptcy cases.

10.     The Second Circuit employs an "expansive test for 'related to' jurisdiction articulated by the Third Circuit in *In re Pacor.*" *In re Refco, Inc. Sec. Litig.,* 628 F. Supp. 2d 432, 437 (S.D.N.Y. 2008). "Litigation is 'related to' a bankruptcy proceeding 'if the action's 'outcome might have any conceivable effect on the bankruptcy estate.'" *Post Investors LLC v. Gribble,* 2012 WL 4466619, *3 (S.D.N.Y. Sept. 27, 2012) (quoting *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.,* 639 F.3d 572, 579 (2d Cir. 2011) (quoting *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 114 (2d Cir. 1992))). *See also In re Pacor,* 743 F.2d 984, 994 (3d Cir. 1984) ("[T]he test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy"); *accord In re Cuyahoga Equip. Corp.,* 628 F. Supp. 2d at 437-38, 442-43 (applying *Pacor* and noting the "close nexus" to the bankruptcy).

11.     The Action is related to the Debtors' bankruptcy cases because it is based on financing agreements that are critical to the Debtors' restructuring. The outcome of the Action

---

[2] Defendants understand that removal to the EDNY Bankruptcy Court will entail a three-step process. First, because the Action is currently pending in New York County, New York, pursuant to 28 U.S.C. §1446 and Bankruptcy Rule 9027(a)(1), the Action must first be removed to the District Court for the Southern District of New York. Second, once removed, the Action will need to be transferred to the District Court for the Eastern District of New York. Third, once the Action has been removed and transferred to the Eastern District of New York, the Action will be referred to the EDNY Bankruptcy Court.

SB/1223183.6/062328

will affect the Debtors' rights and liabilities with respect to the Bank Debt and the administration of the Debtors' estates. Indeed, the purpose of the Action is to recover funds from the Defendants which are otherwise recoverable from the Debtors.

12. Moreover, to the extent that the Defendants are determined to be liable for and/or satisfy the debts of the Debtor Borrowers, the Defendants will have a contribution or indemnity claim in the Debtor Borrowers' chapter 11 cases. *See, e.g., Post Investors LLC,* 2012 WL 4466619 at *3 ("'Conceivable effects' typically manifest themselves by altering '[t]he amount of property available for distribution to the creditors of a bankruptcy estate or the allocation of property among such creditors.'" (quoting *In re Kolinsky,* 100 B.R. 695, 702 (S.D.N.Y. 1989)). Indeed, even "[c]ontingent outcomes can satisfy the 'conceivable effects' test." *Post Investors LLC,* 2012 WL 4466619 at *3. Therefore, the EDNY Bankruptcy Court has "related to" jurisdiction over the causes of action asserted in the Action pursuant to 28 U.S.C. §1334(b), as the Debtors' cases are pending in that District.

13. The removal of the Action is timely pursuant to Bankruptcy Rule 9027(a)(3)(B), because the Notice of Removal has been filed with the Clerk of the District Court for the Southern District of New York within 30 days after receipt of the summons. F. R. BANKR. P. 9027(a)(3)(B).

14. In accordance with the requirements of Bankruptcy Rule 9027(a)(1), Defendants state that, upon removal, the causes of action asserted in the Action are non-core proceedings pursuant to 28 U.S.C. §157(c) and 1334(b), and the Defendants consent to the entry of final orders or judgments by the bankruptcy judge.

15. Copies of the pleadings filed in the Action, *i.e.*, the Request for Judicial Intervention, Notice of Commencement of Action, Summons, Notice of Motion, Affidavit of Andrew A. Baltz in Support of Plaintiff's Motion for Summary Judgment In Lieu of Complaint, including Exhibits, are annexed hereto as **Exhibit A**.

16. Concurrently with the filing of this Notice of Removal, the Defendants are giving

4

SB/1223183.6/062328

notice to all parties in the Action of this removal.

Dated: Jericho, New York
      October 15, 2012

SILVERMANACAMPORA LLP
Attorneys for Defendants Paul J. Pullo
  and Gene V. Pullo


By:   s/ Lon J. Seidman
         Lon J. Seidman
Member of the Firm
100 Jericho Quadrangle, Suite 300
Jericho, New York  11753
(516) 479-6300

TO:   Clerk of the Supreme Court of New York
      County of New York
      New York County Supreme Court
      60 Centre Street, Room 161
      New York, New York 10007

      Loeb & Loeb LLP
      Attorneys for Plaintiff
      345 Park Avenue
      New York, New York 10154
      Attn: William M. Hawkins, Esq.

SB/1223183.6/062328

# REQUEST FOR JUDICIAL INTERVENTION

UCS-840 (7/2012)

Supreme _____ COURT, COUNTY OF NEW YORK

Index No: 653452/2012 _____ Date Index Issued: 10/2/2012 _____

| For Court Clerk Use Only: |
|---|
| IAS Entry Date |
| Judge Assigned |
| RJI Date |

**CAPTION:** Enter the complete case caption. Do not use et al or et ano. If more space is required, attach a caption rider sheet.

NEW YORK COMMERCIAL BANK

**Plaintiff(s)/Petitioner(s)**

-against-

PAUL J. PULLO and GENE V. PULLO

**Defendant(s)/Respondent(s)**

**NATURE OF ACTION OR PROCEEDING:** Check ONE box only and specify where indicated.

**MATRIMONIAL**

☐ Contested

**NOTE:** For all Matrimonial actions where the parties have children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum.**

For Uncontested Matrimonial actions, use RJI form UD-13.

**TORTS**

☐ Asbestos
☐ Breast Implant
☐ Environmental: _____
  *(specify)*
☐ Medical, Dental, or Podiatric Malpractice
☐ Motor Vehicle
☐ Products Liability: _____
  *(specify)*
☐ Other Negligence: _____
  *(specify)*
☐ Other Professional Malpractice: _____
  *(specify)*
☐ Other Tort: _____
  *(specify)*

**OTHER MATTERS**

☐ Certificate of Incorporation/Dissolution  [see **NOTE** under Commercial]
☐ Emergency Medical Treatment
☐ Habeas Corpus
☐ Local Court Appeal
☐ Mechanic's Lien
☐ Name Change
☐ Pistol Permit Revocation Hearing
☐ Sale or Finance of Religious/Not-for-Profit Property
☐ Other: _____
  *(specify)*

**COMMERCIAL**

☐ Business Entity (including corporations, partnerships, LLCs, etc.)
☒ Contract
☐ Insurance (where insurer is a party, except arbitration)
☐ UCC (including sales, negotiable instruments)
☐ Other Commercial: _____
  *(specify)*

**NOTE:** For Commercial Division assignment requests [22 NYCRR § 202 70(d)], complete and enter the **COMMERCIAL DIV RJI Addendum.**

**REAL PROPERTY:**  How many properties does the application include? \_\_\_\_\_

☐ Condemnation
☐ Mortgage Foreclosure (specify):  ☐ Residential  ☐ Commercial
Property Address: _____
  Street Address     City     State     Zip

**NOTE:** For Mortgage Foreclosure actions involving a one- to four-family, owner-occupied, residential property, or an owner-occupied condominium, complete and attach the **FORECLOSURE RJI Addendum.**

☐ Tax Certiorari - Section: \_\_\_\_\_ Block: \_\_\_\_\_ Lot: \_\_\_\_\_
☐ Tax Foreclosure
☐ Other Real Property: _____
  *(specify)*

**SPECIAL PROCEEDINGS**

☐ CPLR Article 75 (Arbitration)  [see **NOTE** under Commercial]
☐ CPLR Article 78 (Body or Officer)
☐ Election Law
☐ MHL Article 9.60 (Kendra's Law)
☐ MHL Article 10 (Sex Offender Confinement-Initial)
☐ MHL Article 10 (Sex Offender Confinement-Review)
☐ MHL Article 81 (Guardianship)
☐ Other Mental Hygiene: _____
  *(specify)*
☐ Other Special Proceeding: _____
  *(specify)*

**STATUS OF ACTION OR PROCEEDING:**  Answer YES or NO for EVERY question AND enter additional information where indicated.

|  | YES | NO |  |
|---|---|---|---|
| Has a summons and complaint or summons w/notice been filed? | ☒ | ☐ | If yes, date filed: 10/2/2012 |
| Has a summons and complaint or summons w/notice been served? | ☐ | ☒ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ☐ | ☒ | If yes, judgment date: _____ |

American LegalNet, Inc.
www.FormsWorkFlow.com

## NATURE OF JUDICIAL INTERVENTION    Check ONE box only AND enter additional information where indicated.

- ☐ Infant's Compromise
- ☐ Note of Issue and/or Certificate of Readiness
- ☐ Notice of Medical, Dental, or Podiatric Malpractice    Date Issue Joined: _____
- ☒ Notice of Motion    Relief Sought: Summary Judgment    Return Date: 11/30/2012
- ☐ Notice of Petition    Relief Sought: _____    Return Date: _____
- ☐ Order to Show Cause    Relief Sought: _____    Return Date: _____
- ☐ Other Ex Parte Application    Relief Sought: _____
- ☐ Poor Person Application
- ☐ Request for Preliminary Conference
- ☐ Residential Mortgage Foreclosure Settlement Conference
- ☐ Writ of Habeas Corpus
- ☐ Other (specify): _____

## RELATED CASES:    List any related actions. For Matrimonial actions include any related criminal and/or Family Court cases. If additional space is required, complete and attach the RJI Addendum. If none, leave blank.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## PARTIES:    For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in space provided. If additional space is required, complete and attach the RJI Addendum.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff) | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☐ | New York Commercial Bank  _Last Name_  _First Name_  _Primary Role:_ Plaintiff  _Secondary Role (if any):_ Plaintiff | Hawkins _Last Name_  William _First Name_  Loeb & Loeb LLP _Firm Name_  345 Park Avenue _Street Address_  New York _City_  NY _State_  10154 _Zip_  (212) 407-4000 _Phone_  (212) 407-4990 _Fax_  whawkins@loeb.com _e-mail_ | ☐ YES  ☒ NO | None |
| ☒ | Pullo _Last Name_  Paul _First Name_  _Primary Role:_ Defendant  _Secondary Role (if any):_ Defendant | _Last Name_  _First Name_  _Firm Name_  _Street Address_  _City_  _State_  _Zip_  _Phone_  _Fax_  _e-mail_ | ☐ YES  ☒ NO | None |
| ☒ | Pullo _Last Name_  Gene _First Name_  _Primary Role:_ Defendant  _Secondary Role (if any):_ Defendant | _Last Name_  _First Name_  _Firm Name_  _Street Address_  _City_  _State_  _Zip_  _Phone_  _Fax_  _e-mail_ | ☐ YES  ☐ NO |  |
| ☐ | _Last Name_  _First Name_  _Primary Role:_ Plaintiff  _Secondary Role (if any):_ Plaintiff | _Last Name_  _First Name_  _Firm Name_  _Street Address_  _City_  _State_  _Zip_  _Phone_  _Fax_  _e-mail_ | ☐ YES  ☐ NO |  |

I AFFIRM UNDER THE PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.

Dated: October 2, 2012

_____
SIGNATURE

2417012
ATTORNEY REGISTRATION NUMBER

William M. Hawkins
PRINT OR TYPE NAME

American LegalNet, Inc.
www.FormsWorkFlow.com

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF <u>NEW YORK</u> _____

UCS-840C
3/2011

-----------------------------------------------------------------x

NEW YORK COMMERCIAL BANK

Plaintiff(s)/Petitioner(s)

-against-

PAUL J. PULLO and GENE V. PULLO

Defendant(s)/Respondent(s)

-----------------------------------------------------------------x

Index No. <u>643452/2012</u> _____

RJI No. (if any) _____

## COMMERCIAL DIVISION
**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

☒ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions — without consideration of the monetary threshold

☐ Commercial class actions — without consideration of the monetary threshold

☒ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☐ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

☐ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ <u>31,746,929.25</u> _____

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

Action to recover money damages under personal guarantees of Defendants, which are for the payment of money only.

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).

Dated: <u>10/2/2012</u> _____

_____
SIGNATURE

William M. Hawkins
PRINT OR TYPE NAME

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** NEW YORK
------------------------------------------------------x

NEW YORK COMMERCIAL BANK

                              Plaintiff/Petitioner,

        - against -                                    Index No. 653452/2012

PAUL J. PULLO and GENE V. PULLO

                         Defendant/Respondent.
------------------------------------------------------x

# NOTICE OF COMMENCEMENT OF ACTION
# SUBJECT TO MANDATORY ELECTRONIC FILING

    PLEASE TAKE NOTICE that the matter captioned above, which has been commenced by filing of the accompanying documents with the County Clerk, is subject to mandatory electronic filing pursuant to Section 202.5-bb of the Uniform Rules for the Trial Courts. This notice is being served as required by Subdivision (b) (3) of that Section.

    The New York State Courts Electronic Filing System ("NYSCEF") is designed for the electronic filing of documents with the County Clerk and the court and for the electronic service of those documents, court documents, and court notices upon counsel and self-represented parties. Counsel and/or parties who do not notify the court of a claimed exemption (see below) as required by Section 202.5-bb(e) must immediately record their representation within the e-filed matter on the Consent page in NYSCEF. Failure to do so may result in an inability to receive electronic notice of document filings.

    Exemptions from mandatory e-filing are limited to: 1) attorneys who certify in good faith that they lack the computer equipment and (along with all employees) the requisite knowledge to comply; and 2) self-represented parties who choose not to participate in e-filing. For additional information about electronic filing, including access to Section 202.5-bb, consult the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center at 646-386-3033 or efile@courts.state.ny.us.

Dated: 10/2/2012

_____ (Signature)        345 Park Avenue        (Address)
                                            New York, New York 10154
William M. Hawkins        (Name)

Loeb & Loeb LLP           (Firm Name)       (212) 407-4000         (Phone)

                                            whawkins@loeb.com      (E-Mail)

To:    Paul J. Pullo

       Gene V. Pullo

FILED: NEW YORK COUNTY CLERK 10/02/2012                    INDEX NO. 653452/2012
NYSCEF DOC. NO. 1                                          RECEIVED NYSCEF: 10/02/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------X
                                              :
NEW YORK COMMERCIAL BANK,
                                              :
                                              :
         Plaintiff,                           :      Index No. $653412/12$
                                              :
       -against-                              :
                                              :      **SUMMONS**
PAUL J. PULLO and GENE V. PULLO,              :
                                              :
                                              :
         Defendants.                          :
---------------------------------------------------------X

     **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff's attorney an answer to the motion for summary judgment in lieu of complaint in this action at least ten (10) days prior to the return date of the motion.  In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the motion for summary judgment in lieu of complaint.

     This action will be heard in the Supreme Court of the State of New York in and for the County of New York.  The basis of the venue designated is that the parties have contractually consented to the jurisdiction of the Supreme Court of the State of New York and

the defendants have each contractually waived any objection to venue, and defendant Gene V.

Pullo maintains his place of residence in the County of New York.

Dated: New York, New York
       October 2, 2012

                                        LOEB & LOEB LLP

                                        By: _____
                                            William M. Hawkins
                                            Sara J. Crisafulli
                                            345 Park Avenue
                                            New York, New York 10154
                                            (212) 407-4000

                                        *Attorneys for Plaintiff*
                                        *New York Commercial Bank*

TO:    *By certified mail, pursuant to agreement*

       Paul J. Pullo
       500 Kingsland Avenue
       Brooklyn, New York 11222

              and

       180 Country Club Drive
       Manhasset, New York 11030

       Gene V. Pullo
       500 Kingsland Avenue
       Brooklyn, New York 11222

              and

       5 Riverview Terrace
       New York, New York 10022

NY1144586 2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-------------------------------------------------- X
                          :

NEW YORK COMMERCIAL BANK,
                          :

         Plaintiff,          :

        -against-          :

                          :

PAUL J. PULLO and GENE V. PULLO,
                          :

        Defendants.       :

                          :
-------------------------------------------------- X

Index No. 653452/2012

**NOTICE OF MOTION**

        PLEASE TAKE NOTICE that upon the annexed Affidavit of Andrew A. Baltz in

Support of New York Commercial Bank's Motion for Summary Judgment in Lieu of Complaint,

dated October 1, 2012 (the "Baltz Affidavit"), Plaintiff New York Commercial Bank ("NYCB"),

by its attorneys Loeb & Loeb LLP, will move this Court at the Clerk's Motion Calendar Call,

Room 130, at the Courthouse located at 60 Centre Street, New York, New York on November

30, 2012 at 9:30 a.m. or as soon thereafter as counsel may be heard, for an order pursuant to

CPLR 3213 granting summary judgment for a money judgment against defendants Paul J. Pullo

and Gene V. Pullo pursuant to their joint and several liability under their respective Guarantees

(as defined in the Baltz Affidavit), on the grounds that the Guarantees are instruments for the

payment of money only, the full amount of the Line of Credit Debt (as defined in the Baltz

Affidavit) is past due, outstanding and immediately payable in full, and there are no facts or

circumstances providing any valid defense for either defendant Paul J. Pullo or defendant Gene

V. Pullo, as well as other grounds set forth in the Baltz Affidavit.

PLEASE TAKE FURTHER NOTICE that pursuant to CPLR 3213, answering papers, if

any, shall be served at least ten (10) days prior to the return date of the motion.

Dated: New York, New York
       October 2, 2012

                                        LOEB & LOEB LLP

                                        By: _____
                                        William M. Hawkins
                                        Sara J. Crisafulli
                                        345 Park Avenue
                                        New York, New York 10154
                                        (212) 407-4000

                                        *Attorneys for Plaintiff*
                                        *New York Commercial Bank*

TO:    *By certified mail, pursuant to agreement*

       Paul J. Pullo
       500 Kingsland Avenue
       Brooklyn, New York 11222

              and

       180 Country Club Drive
       Manhasset, New York 11030

       Gene V. Pullo
       500 Kingsland Avenue
       Brooklyn, New York 11222

              and

       5 Riverview Terrace
       New York, New York 10022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------------- X
                                            :

NEW YORK COMMERCIAL BANK,
                                            :
                                            :   Index No. 653452/2012
                Plaintiff,          :   **AFFIDAVIT OF ANDREW A. BALTZ**
                                            :   **IN SUPPORT OF NEW YORK**
            -against-            :   **COMMERCIAL BANK'S MOTION FOR**
                                            :   **SUMMARY JUDGMENT IN LIEU OF**
                                            :   **COMPLAINT**
PAUL J. PULLO and GENE V. PULLO,
                                            :

              Defendants.           :

----------------------------------------------------------- X

           1.      Andrew A. Baltz, being duly sworn, deposes and says as follows:

           2.      I am the First Vice President of New York Commercial Bank (the "Bank"),
the plaintiff herein.

           3.      I submit this affirmation in support of NYCB's motion pursuant to CPLR §
3213 for an order granting NYCB summary judgment against Defendants Paul J. Pullo ("Paul
Pullo") and Gene V. Pullo ("Gene Pullo"), jointly and severally, for the full amount of the
outstanding, unpaid balance due and owing on the Line of Credit Debt (as defined herein) which
as of September 30, 2012 totaled not less than $31,746,929.25, consisting of not less than
$31,357,545.12 of outstanding Principal, not less than $215,218.87 in accrued outstanding
interest thereon, and known expenses of not less than $174,165.26, exclusive of any applicable
prepayment charges, and other expenses, fees, costs or other amounts due to NYCB, in addition
to attorneys' fees, costs, disbursements and other expenses relating to this action; and for such
other and further relief as the Court deems just and proper.

           4.      Paul Pullo and Gene Pullo, having personally, unconditionally and
irrevocably guaranteed payment of the indebtedness of Metro Fuel Oil Corp., Metro Terminals

Corp. and Metro Terminals of Long Island, LLC (collectively, "Borrowers") to NYCB pursuant
to their respective guarantees (discussed herein) that each executed and delivered to NYCB, are
now liable to NYCB for nonpayment under the terms of those instruments, which are for the
payment of money only.

<u>THE PARTIES</u>

5.      Plaintiff NYCB is a corporation formed under the laws of the State of New
York.  Plaintiff NYCB is the successor in interest of Atlantic Bank of New York regarding the
matters herein.

6.      Paul Pullo is a United States citizen having a place of residence at 180
Country Club Drive, Manhasset, New York 11030.

7.      Gene Pullo is a United States citizen having a place of residence at 5
Riverview Terrace, New York, New York 10022.

8.      Paul Pullo and Gene Pullo are, and were at all relevant times, the exclusive
direct or indirect shareholders of Metro Fuel and Metro Terminals and the exclusive members of
Metro Long Island, and operate, manage and otherwise control the operations of each of the
aforementioned entities.

9.      Upon information and belief, no defendant is an infant, incompetent, or
absentee, or in the military service of the United States of America.

10.     Jurisdiction is proper in this Court because the defendants have consented
to submit themselves to jurisdiction in the Courts of the State of New York.

11.     Venue is appropriate in New York County pursuant to N.Y. CPLR §§ 501
and 503.

2

## THE INDEBTEDNESS

12.    This action arises from Defendants' breaches of their respective guarantee agreements, pursuant to which each Defendant unconditionally guaranteed the payment of the indebtedness of Borrowers to NYCB.

13.    On or about May 4, 2012, NYCB together with Borrowers entered into the Third Amended and Restated Accounts Financing Agreement (the "Financing Agreement," Exhibit 1 hereto) and the Third Amended and Restated Covenant Supplement to Amended and Restated Accounts Financing Agreement (the "Supplement," Exhibit 2 hereto) (collectively, the "AFA"), pursuant to which NYCB agreed to extend to Borrowers a borrowing base formula revolving line of credit in the maximum principal amount of $55,000,000 or less ("Principal"), with a stated maturity date of December 1, 2013 (the "Line of Credit").[1]

14.    Borrowers executed and delivered to NYCB the Third Amended and Restated Secured Line of Credit Note (the "Promissory Note," Exhibit 3 hereto), dated May 4, 2012, whereby Borrowers jointly and severally promised to pay to NYCB the amount of the maximum Principal or, if less, the unpaid principal amount of the loans advanced by NYCB to Borrowers under the Line of Credit, plus interest thereon and all other amounts due as related to the Line of Credit.

15.    The indebtedness of Borrowers to NYCB outstanding, unpaid due and owing under the Line of Credit (the "Line of Credit Debt") as of September 30, 2012 totaled not

---

[1] Pursuant to the AFA, NYCB also made two terms loans to Borrowers, secured by, *inter alia*, mortgages on certain real property of Borrowers.  By this action, NYCB seeks solely to recover the outstanding obligations of Borrowers under the Line of Credit.  NYCB does not herein seek to recover the outstanding debt on either of the two term loans, nor to realize on the real property securing such debt.

less than $31,746,929.25, as further described above.[2] *See* Line of Credit Debt Statement, dated September 28, 2012, providing the outstanding principal and accrued interest on the Line of Credit as of September 30, 2012, Exhibit 4 hereto; Chart Summarizing Known Expenses on Line of Credit as of September 30, 2012, Exhibit 5 hereto.

## THE UNLIMITED, UNCONDITIONAL, IRREVOCABLE GUARANTEES

16.    On or about May 4, 2012, Paul Pullo (a "Guarantor") executed and delivered to NYCB a Guarantee (the "Paul Pullo Guarantee," Exhibit 6 hereto), whereby Paul Pullo unconditionally and irrevocably guaranteed Borrowers' obligations to NYCB under the AFA and the Promissory Note, including without limitation all interest which may be payable thereupon prior to or during the pendency of any insolvency proceedings with respect to the Borrowers.

17.    On or about May 4, 2012, Gene Pullo executed and delivered to NYCB a Guarantee (the "Gene Pullo Guarantee," Exhibit 7 hereto) (collectively, with the Paul Pullo Guarantee, the "Guarantees"), whereby Gene Pullo (individually, a "Guarantor," and collectively with Paul Pullo, the "Guarantors") unconditionally and irrevocably guaranteed Borrowers' obligations to NYCB under the AFA and the Promissory Note, including without limitation all interest which may be payable thereupon prior to or during the pendency of any insolvency proceedings with respect to the Borrowers.

---

[2] The Line of Credit Debt set forth herein includes the accrued interest on the outstanding Principal and the known expenses applicable thereto as detailed in Exhibits 4 and 5. The Financing Agreement sets forth the applicable interest rates on the Line of Credit during non-default periods (*see* Ex. 1, Section 3.1(a)) and during default periods (*see* Ex. 1, Section 3.2). As Borrowers have been in default under the AFA since no later than September 12, 2012, the interest on the Line of Credit as stated herein is calculated at the non-default interest rate for the period through September 11, 2012 and at the default interest rate as of September 12, 2012. *See* Ex. 4.

4

Case 1:12-cv-07693_LTS   Document 5-1   Filed 10/04/12   Page 20 of 101

18.    The Guarantees expressly provide that Guarantors are financially interested
in the affairs of Borrowers, each Guarantor derives benefits from the loans from NYCB to
Borrowers and the economic success of each Guarantor is dependent on the economic success of
Borrowers. *See* Exs. 6-7, ¶ 5(f).

19.    Pursuant to the Guarantees, the Guarantors guaranteed prompt and
complete payment to NYCB when due, whether at the stated maturity, upon demand, by
acceleration or otherwise. *See* Exs. 6-7, ¶ 1(a).

20.    The Guarantees are of payment and not of collection. *See* Exs. 6-7, ¶ 3(a).
Pursuant to the Guarantees, NYCB is under no obligation to institute suit, exercise rights or
remedies or take any other action against Borrowers or any other persons or any security held by
NYCB. *See id.*, ¶ 3(a).

21.    The Line of Credit Debt constitutes Indebtedness as defined in the
Guarantees.  *See* Exs. 6-7, ¶ 1(a).

## BORROWERS CAUSED EVENTS OF DEFAULT UNDER THE AFA THAT ARE CONTINUING, AND NYCB ACCELERATED THE LINE OF CREDIT DEBT AND DEMANDED PAYMENT THEREOF

22.    Borrowers are in default under Section 4.1(a) of the Supplement because
the Principal amount of the loans advanced to Borrowers under the Line of Credit exceeds the
formula set forth in Section 2.1 of the Financing Agreement, and has exceeded such amount for
more than ten (10) days.

23.    The Principal amount of the loans advanced to Borrowers under the Line of
Credit exceeds the formula set forth in Section 2.1 of the Financing Agreement because
Borrowers intentionally and willfully provided NYCB with false information regarding
Borrowers' accounts receivable in order to increase Borrowers' borrowing base, allowing
Borrowers to obtain advances under the Line of Credit far in excess of the amount permitted

5

under the AFA.  Based on the foregoing, Borrowers are also in default under Section 4.1(c) of the Supplement.

24.     Borrowers are also in default for failing to deliver to NYCB the reporting required by Sections 6.3(a)(i) and 6.3(a)(ii) of the Financing Agreement, causing an event of default under Section 4.1(b) of the Supplement.

25.     By letter dated July 24, 2012 (the "Default Letter," Exhibit 8 hereto), NYCB advised Borrowers that Borrowers' non-compliance with the Financing Agreement, as described above, constituted events of default under the AFA, the other Loan Documents[3] and applicable law (the "Events of Default").

26.     Pursuant to the terms of the AFA, the Promissory Note and the Guarantees, in the event of a default, NYCB may deem immediately due and payable from Borrowers or any or all of the Guarantors, the entire unpaid balance remaining under the AFA and the Promissory Note, together with all amounts of interest, prepayment charges, fees and expenses, including for attorneys' fees.

27.     Accordingly, by letter dated September 12, 2012 (the "Acceleration and Demand Letter," Exhibit 9 hereto), NYCB advised Borrowers and Guarantors that the Events of Default remained outstanding and in effect, and notified Borrowers and Guarantors that the entire amount of indebtedness of Borrowers to NYCB under the Line of Credit had become immediately due and payable in full to NYCB.

28.     In the Acceleration and Demand Letter, NYCB also demanded that Borrowers and Guarantors jointly and severally pay the full amount of the Line of Credit Debt no later than 5:00 pm New York time on September 13, 2012.  Additionally, pursuant to Section 8.1

---

[3] The term "Loan Documents" used herein shall have the same meaning as set forth in Section 1.20 of the Financing Agreement (Ex. 1).

of the AFA, NYCB terminated all loans or advances under the Line of Credit effective no later than September 12, 2012.

29. In addition, by letters dated September 14, 2012 and September 21, 2012, NYCB advised Guarantors of the occurrence and continuation of events of defaults under the AFA and other Loan Documents. *See* Exhibits 10-11.

30. Guarantors received copies of each of the letters described above contemporaneously with Borrowers.

## PAUL PULLO AND GENE PULLO ARE IN DEFAULT UNDER THEIR RESPECTIVE GUARANTEES

31. Under the terms of the Guarantees, the Defendants are jointly and severally liable to NYCB in the full amount of any outstanding indebtedness of Borrowers under the Line of Credit Debt.

32. NYCB has demanded payment in full of the outstanding Line of Credit Debt, which has become and is now matured, outstanding, past due and immediately payable in full, jointly and severally, from each of the Guarantors.

33. Accordingly, Guarantors are in default under their respective Guarantees for failing to pay the Line of Credit Debt in full.

34. By reason of their respective defaults under the terms of the Guarantees, Defendants Paul Pullo and Gene Pullo are jointly and severally indebted to NYCB for the full amount of the outstanding, unpaid balance due and owing on the Line of Credit Debt, which as of October 1, 2012 totaled not less than $31,746,929.25, exclusive of any applicable prepayment charges, and other expenses, fees, costs or other amounts due to NYCB, in addition to attorneys' fees, costs, disbursements and other expenses relating to this action.

35.    Borrowers and the other guarantors of the Line of Credit Debt filed for
bankruptcy relief on September 27, 2012 under title 11 of the United States Code.  The
bankruptcy case remains pending in the Eastern District of New York.

36.    The filing and continuation of the bankruptcy case is another event of
default by Borrowers under the AFA (see, specifically, Section 4.1(f) of the Financing
Agreement).

37.    There are no facts that support a defense to, or otherwise defeat, NYCB's
right to immediately collect the full amount of the Line of Credit Debt from Guarantors, jointly
and severally.

38.    In fact, pursuant to their respective Guarantees, the Guarantors have each
waived, *inter alia*, any defenses in law or equity which would release the obligations of the
Guarantors until the Line of Credit Debt has been indefeasibly paid in full.  *See* Exs. 6-7, ¶ 7.

### NYCB IS ENTITLED TO SUMMARY JUDGMENT TO RECOVER ALL INDEBTEDNESS BECAUSE IT HOLDS UNCONDITIONAL, UNLIMITED, IRREVOCABLE GUARANTEES FROM DEFENDANTS PAUL PULLO AND GENE PULLO

39.    I am advised by counsel that, pursuant CPLR 3213, New York Courts may
grant summary judgment based on personal guarantees for the payment of money only.  *See*
CPLR 3213; *Rhondia, Inc. v. Steel*, Dep't, 32 A.D.2d 753, 300 N.Y.S.2d 1005, 1006, (1st Dep't
1969) ("The unconditional guarantee is an instrument for the payment of money only within the
meaning of CPLR 3213."); *see also Manufacturers Hanover Trust Co v Green*, 95 A.D.2d 737,
464 N.Y.S.2d 474, 475 (1st Dep't 1983) (a guaranty represents a proper subject for summary
judgment in lieu of complaint whether or not it recites a sum certain); *Juste v Niewdach*, 26
A.D.3d 416, 809 N.Y.S.2d 563 (2d Dep't 2006) (summary judgment granted based on guaranty
of tenant's obligations in lease).

8

40.     I am further advised by counsel that New York courts routinely grant an accelerated judgment based on a personal guarantee under CPLR 3213, where the instrument and nonpayment thereunder establish a plaintiff's *prima facie* right to the recovery sought. *See* CPLR 3213; *Seaman-Andwall Corp. v. Wright Mach Corp.*, 31 A.D.2d 136, 295 N.Y.S.2d 752, 754 (1st Dep't 1968) ("It is incontestable that plaintiff would prove a prima facie case by proof of the note and a failure to make the payments called for by its terms."), *aff'd* 29 N.Y.2d 617 (1971); *Samsung America, Inc. v. Noah*, 209 A.D.2d 367, 619 N.Y.S.2d 260 (1st Dep't 1994) (right to recover under a guarantee agreement is established by showing "the execution [of the guarantee] and a failure to pay in accordance therewith").

41.     Here, NYCB is clearly entitled to summary judgment as a result of Borrowers' defaults and Guarantors' failure to pay the outstanding Line of Credit Debt to NYCB.  The Guarantees – constituting written agreements guaranteeing payment of all indebtedness of Borrowers to NYCB – are absolute, irrevocable unconditional and unlimited written guarantees of payment and are instruments for the payment of money only pursuant to CPLR 3213. *See, e.g., Manufacturers Hanover*, 95 A.D.2d at 737, 464 N.Y.S.2d at 474.

42.     As Borrowers have now repeatedly defaulted and remain in default under the terms of the Loan Documents, including by filing for bankruptcy, NYCB is entitled to payment from Guarantors jointly and severally, as personal guarantors of Borrowers' obligations and liabilities, pursuant to the Guarantees.

43.     Further, Guarantors have no cognizable defenses for their failure to comply with the terms of the Guarantee and have waived the right to raise any defenses until the indebtedness of Borrowers to NYCB under the AFA have been indefeasibly paid in full. *See, e.g., Fortress Credit Corp. v. Hudson Yards, LLC*, 78 A.D.3d 577, 577, 912 N.Y.S.2d 41, 41-42 (1st Dep't 2010) (unanimously affirming lower court's grant of summary judgment in favor of

9

plaintiffs where plaintiffs met their *prima facie* burden, and defendant's affirmative defenses were "precluded by the guaranty, which waived all defenses and counterclaims except actual payment and performance in full, which defendant ha[d] not alleged").

44.    The indisputable documentary evidence establishes the amount of Borrowers' outstanding Line of Credit Debt, as well as Guarantors' liability, jointly and severally, therefor. *See, e.g., Rhondia*, 32 A.D.2d at 753, 300 N.Y.S.2d at 1006.

45.    Accordingly, NYCB's motion for summary judgment in lieu of complaint should be granted.

46.    No previous application for this or similar relief has been made.

## Conclusion

47.    For the foregoing reasons, Plaintiff NYCB respectfully asks the Court to enter summary judgment in its favor and against Defendants Paul Pullo and Gene Pullo, jointly and severally, in an amount not less than $31,746,929.25, together with any additional attorneys' fees, interest, costs and disbursements as mandated by the Guarantees and applicable law (and including all such amounts subsequently accrued or incurred and all such amounts related to this action), as well as pre-judgment interest at the default rate under the Loan Documents or, in the alternative, any other applicable rate, from the date hereof, and post-judgment interest, together with such other and further relief as the Court deems just and proper.)

Sworn to before me this
1st day of October 2012

_____
Notary Public

LISA A. DRILLICH
.. RY PUBLIC, State of New York
No. 02DR4799274
Qualified in Nassau County
~~mmission Expires June 30, 20/5

NY1144674 2

10

EXECUTION COPY

**THIRD AMENDED AND RESTATED
ACCOUNTS FINANCING AGREEMENT**

Among

**NEW YORK COMMERCIAL BANK**
as successor in interest to
**ATLANTIC BANK OF NEW YORK**
615 Merrick Avenue
Westbury, New York 11590

and

**VALLEY NATIONAL BANK**
(for purposes of the New Term Loan, defined herein)
2 Jericho Plaza, Suite 207
Jericho, New York 11753-1631

and

**METRO FUEL OIL CORP.,**

and

**METRO TERMINALS CORP.**

and

**METRO TERMINALS OF LONG ISLAND, LLC**

500 Kingsland Avenue
Brooklyn, NY 11222

{N0300848; 8}

May 4, 2012

New York Commercial Bank
as successor in interest to Atlantic Bank of New York
615 Merrick Avenue
Westbury, New York 11590

Ladies and Gentlemen:

          **METRO FUEL OIL CORP.**, a New York corporation ("Metro Fuel"), **METRO TERMINALS CORP.**, a New York corporation ("Metro Terminals"), and **METRO TERMINALS OF LONG ISLAND, LLC**, a New York limited liability company ("Metro Long Island") (Metro Fuel, Metro Terminals and Metro Long Island collectively and jointly and severally, referred to below as the "Borrowers"), have requested certain financial accommodations from **NEW YORK COMMERCIAL BANK**, as successor in interest to **ATLANTIC BANK OF NEW YORK** (the "Bank").  Metro Fuel, Metro Terminals, Metro Long Island and the Bank are parties to a Second Amended and Restated Accounts Financing Agreement dated February 1, 2008, as amended by Amendment No. 1 of Second Amended and Restated Accounts Financing Agreement dated as of April 30, 2008, Amendment No. 2 of Second Amended and Restated Accounts Financing Agreement dated as of June 30, 2008, Amendment No. 3 of Second Amended and Restated Accounts Financing Agreement dated as of September 30, 2008, Amendment No 4 of Second Amended and Restated Accounts Financing Agreement dated as of December 1, 2008, Amendment No. 5 of Second Amended and Restated Accounts Financing Agreement dated as of December 1, 2009, Amendment No  6 of Second Amended and Restated Accounts Financing Agreement dated as of June 28, 2011, Amendment No. 7 of Second Amended and Restated Accounts Financing Agreement dated as of December 1, 2011 and Amendment No. 8 of Second Amended and Restated Accounts Financing Agreement dated as of January 3, 2012 (the "AFA") and (2) a Second Amended and Restated Covenant Supplement thereto dated February 1, 2008, as amended by Amendment No. 1 of Second Amended and Restated Covenant Supplement dated as of December 1, 2008, Amendment No. 2 of Second Amended and Restated Covenant Supplement dated as of December 1, 2009, Amendment No. 3 of Second Amended and Restated Covenant Supplement dated as of June 28, 2011, and Amendment No. 4 of Second Amended and Restated Covenant Supplement dated as of January 3, 2012 (the "Covenant Supplement") (the AFA and the Covenant Supplement together, the "Original Loan Documents").  This Third Amended and Restated Accounts Financing Agreement (this "Agreement") states the terms and conditions upon which, effective as of the date of acceptance by the Bank, the Borrowers have agreed with the Bank to amend and restate the Original Loan Documents and to confirm the basis on which the Borrowers may obtain loans and other financial accommodations from the Bank for the Borrowers' general corporate and business purposes upon the security referred to herein.  The Borrowers are, and the Borrowers shall be, jointly and severally bound hereunder.

          The Borrowers acknowledge that Valley National Bank ("VNB") is signing this Agreement for the purpose of being a co-lender with the Bank solely for purposes of the New Term Loan, as defined in and as described in Section 2.1(b), and VNB shall be entitled to the benefits of, and may rely on, all of the Borrowers' representations, warranties and covenants and remedies arising after any Event of Default set forth herein whether or not VNB is specifically referenced therein.

SECTION 1.  DEFINITIONS

     1 1     All terms used herein which are defined in Article 1 or Article 9 of the Uniform Commercial Code ("UCC") shall have the meanings given therein, unless otherwise defined in this Agreement or in the Covenant Supplement attached hereto and all references to the plural herein shall also mean the singular.

     1 2     "Accounts" shall mean all of the Borrowers' present and future accounts, contract rights, general intangibles, chattel paper, documents and instruments, as such terms are defined in the UCC, including, without limitation, all obligations for the payment of money arising out of the Borrowers' sale, lease or other disposition of goods or other property or rendition of services

     1 3     "Account Debtor" shall mean each debtor or obligor in any way obligated on or in connection with any Account.

     1 4     "Applicable LIBO Rate" shall mean the 60 or 90-day rate as determined by the Bank (but as selected by the Borrowers in their discretion) from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market at approximately 11:00 a m , London time, two Business Days prior to the commencement of the applicable interest period, as the rate for dollar deposits with a maturity comparable to such interest period.

1.5     "BioFuel Sublimit" shall mean the amount of $5,000,000, the proceeds of which shall be used solely for biofuel feedstock inventory purchases, and which shall be in effect upon completion of the construction of the BioFuel Plant (defined in Section 12.1 of this Agreement) or on such earlier date as the Bank may agree

1.6     "Collateral" shall have the meaning set forth in Section 4.2 hereof.

1.7     "Eligible Accounts" and "Eligible Inventory" shall each have the meaning set forth in the Covenant Supplement hereto

1.8     "Events of Default" shall have the meaning set forth in Section 8.1 hereof.

1.9     "Extended First Mortgage Loan Maturity Date" shall have the meaning set forth in Section 2 1(c)(iii) hereof.

1.10    "Extended New Term Loan Maturity Date" shall have the meaning set forth in Section 2.1(b)(iv) hereof.

1.11    First Mortgage Loan" shall have the meaning set forth in Section 2.1(c)(i) hereof.

1.12    "First Mortgage Loan Maturity Date" shall mean January 1, 2015, subject to the option to extend set forth in Section 2.1(c)(iv) hereof.

1.13    "First Mortgage Note" shall have the meaning set forth in Section 2.1(c)(i) hereof.

1.14    "Gap Mortgage" shall mean the Gap Mortgage dated the date hereof by Metro Terminals to the Bank

1.15    "Gap Note" shall mean the Gap Note dated the date hereof in the principal amount of $742,096.57 issued by Metro Terminals to the Bank.

1.16    "IDA Bonds" shall mean a Series A 5-year bond for $1,545,000 and a Series B 20-year bond for $8,405,000.

1.17    "Inventory" shall have the meaning set forth in the Covenant Supplement hereto.

1.18    "Line of Credit" shall have the meaning set forth in Section 2.1(a) hereof.

1.19    "Line of Credit Maturity Date" shall mean December 1, 2013.

1.20    "Loan Documents" shall mean this Third Amended and Restated Accounts Financing Agreement and Covenant Supplement hereto, the Security Agreements, the Guarantees, the Secured Line of Credit Note, the Mortgages, the New Secured Term Notes, the First Mortgage Note and the Subordination Agreements together with all other agreements, documents and instruments now or at any time hereafter executed and delivered in connection therewith or related thereto, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.21    "Maximum Credit" under the Line of Credit shall mean (i) the amount of $42,500,000 during the period June 1 through September 30 of each year while this Agreement is in effect and (ii) the amount of $55,000,000 at all other times while this Agreement is in effect, in each case inclusive of the BioFuel Sublimit.

1.22    "Mortgage and Security Agreement (VNB)" shall mean the Mortgage and Security Agreement dated the date hereof by Metro Terminals to VNB.

1 23    "Mortgage Consolidation and Modification Agreement" shall mean the Mortgage Consolidation and Modification Agreement dated the date hereof by Metro Terminals to the Bank.

1.24    "Mortgage Modification Agreement (First Mortgage Loan)" shall mean the Modification of Mortgage, Consolidation, Modification and Extension Agreement dated the date hereof by Metro Terminals to the Bank

1.25    "New Secured Term Notes" shall mean (i) the Consolidated, Amended and Restated Secured Term Note dated the date hereof in the principal amount of $5,500,000 issued by Metro Terminals to the Bank and (ii) the Secured Term Note dated the date hereof in the principal amount of $7,300,000 issued by Metro Terminals to VNB.

{N0300848; 3}

1.26    "New Term Loan" shall have the meaning set forth in Section 2.1(b)(i) hereof.

1.27    New Term Loan Maturity Date" shall mean May 4, 2017, subject to the option to extend set forth in Section 2.1(b)(iv) hereof

1.28    "Net Amount of Eligible Accounts" shall have the meaning set forth in the Covenant Supplement hereto.

1.29    "Net Amount of Eligible Inventory" shall have the meaning set forth in the Covenant Supplement hereto.

1.30    "Obligations" shall mean any and all loans, indebtedness, liabilities and obligations of any kind owing by any Borrower to the Bank or, in the case of the New Term Loan, VNB, however evidenced, whether as principal, guarantor or otherwise, whether arising under this Agreement, or any other Loan Document, any supplement hereto or thereto, or otherwise, whether now existing or hereafter arising, whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, original, renewed or extended, and whether arising directly or acquired from others (including, without limitation, the Bank's and VNB's participation or interests in the Borrower's obligations to others and including, without limitation, the Bank's and VNB's charges, commissions, interest, expenses, costs and attorneys' fees chargeable to the Borrowers in connection with all of the foregoing).

1.31    "Records" shall have the meaning set forth in Section 4.2(g) hereof.

1.32    "Secured Line of Credit Note" is the Third Amended and Restated Secured Line of Credit Note substantially in the form of Exhibit 1 hereto.

1.33    "Secured Term Notes" are the Term Notes in the principal original amounts of $3,000,000, $2,000,000 and $1,200,000, respectively, that will be refinanced on the date hereof by the issuance of the New Secured Term Notes.

1.34    "Term Loan Maximum Credit" shall mean the amount of $12,800,000.

1.35    "Tranche A" shall mean (i) the first $35,000,000 in principal amount outstanding under the Line of Credit under this Agreement during the period October 1 through May 31 of each year while this Agreement is in effect and (ii) the first $25,000,000 in principal amount outstanding under the Line of Credit under this Agreement during the period June 1 through September 30 of each year while this Agreement is in effect.

1.36    "Tranche B" shall mean the amount outstanding under this Agreement in excess of Tranche A up to the Maximum Credit.

1.37    "VNB" shall mean Valley National Bank.

SECTION 2.  LOANS; SPECIAL PREPAYMENT

2.1  (a) Line of Credit.  The Bank shall, in the Bank's discretion (to be exercised in a commercially reasonable manner), make loans to the Borrowers from time to time at the Borrowers' request, of up to the following percentages of the Net Amount of Eligible Accounts during the following periods, plus in each case the Net Amount of Eligible Inventory (the "Line of Credit"):

| Period | Advance Rate |
| --- | --- |
| 12/1/11 - 4/30/12 | 90% |
| 5/1/12 – 9/30/12 | 80% |
| 10/1/12 – 4/30/13 | 90% |
| 5/1/13 – 9/30/13 | 80% |
| 10/1/13 - 12/1/13 | 90%; |

provided that in all events during all periods the advance rate on governmental Account Debtors shall be 90%.  In addition, the Bank may, in the Bank's discretion (to be exercised in a commercially reasonable manner), make loans to the Borrowers from time to time at the Borrowers' request up to the BioFuel Sublimit when such BioFuel Sublimit becomes effective, any such loans to be used solely for biofuel feedstock inventory purchases

{N0300848; 8}

4

(b)   **New Term Loan.** (i) The Bank and VNB as co-lenders shall loan to Metro Terminals up to the aggregate principal amount of $12,800,000 (the "New Term Loan") evidenced by the New Secured Term Notes, which are due and payable on the New Term Loan Maturity Date, in the amount of $5,500,000 and $7,300,000 respectively. The Bank's portion of the New Term Loan shall be $5,500,000 and VNB's portion of the New Term Loan shall be $7,300,000. The proceeds of the New Term Loan shall be issued in part to pay off all amounts owing under the Secured Term Notes.

(ii)   Metro Terminals shall have the right to prepay the Bank and VNB, on a pro rata basis, on or before the New Term Loan Maturity Date, up to $1,000,000 of principal of the New Term Loan, in whole or in part, upon no fewer than 10 days prior written notice to the Bank and VNB, provided that (i) each partial prepayment shall be in increments of $100,000 or integral multiples in excess thereof and (ii) the Borrowers shall simultaneously with any prepayment in excess of $1,000,000 in any calendar year, pay to the Bank and VNB, on a pro rata basis, a premium equal to the percentage set forth below of the amount of such excess prepaid during the periods indicated:

| Premium | Date of Prepayment |
|---------|--------------------|
| 5% | Before the first anniversary of the issue date. |
| 4% | On or after the first anniversary and before the second anniversary. |
| 3% | On or after the second anniversary and before the third anniversary. |
| 2% | On or after the third anniversary and before the fourth anniversary. |
| 1% | On or after the fourth anniversary and before the sixtieth day before the New Term Loan Maturity Date. |

Any prepayment of principal of the New Term Loan in full shall include all interest accrued to the date of prepayment, and all prepayments of principal shall be applied against the scheduled installments of principal due on the New Term Loan in the inverse order of maturity. No amount prepaid with respect to the New Term Loan may be reborrowed.

(iii)   In addition to all other customary conditions to closing of the New Term Loan, the execution and delivery of the Mortgage Consolidation and Modification Agreement evidencing a second mortgage in favor of, and in form satisfactory to, the Bank and VNB on the terminal property known as lot 14 shall be a condition to the closing of the New Term Loan.

(iv)   Metro Terminals will have the option, exercised in writing delivered to the Bank and VNB no later than December 1, 2016 so long as no Event of Default has occurred and is continuing, to extend the New Term Loan and to refinance all amounts outstanding thereunder as of May 4, 2017 for a term of five (5) years to May 4, 2022 (the "Extended New Term Loan Maturity Date"), bearing interest at a rate set forth in Section 3.1(c) hereof, with monthly payments of principal and interest based on a 15-year amortization schedule. A facility fee shall be payable in respect of any such extension, as described in Section 3.8 hereof. Metro Terminals shall have the right to prepay up to $1,000,000 of principal of the New Secured Term Notes, on a pro rata basis, in whole or in part, without premium or penalty, upon not fewer than 10 days prior written notice to the Bank and VNB, provided that (i) each partial prepayment shall be in increments of $100,000 or integral multiples in excess thereof and (ii) Metro Terminals shall simultaneously with any prepayment in excess of $1,000,000 in any calendar year, pay to the Bank and VNB on a pro rata basis a premium equal to the percentage set forth below of the amount of such excess prepaid during the periods indicated:

| Premium | Date of Prepayment |
|---------|--------------------|
| 5% | Before the first anniversary of the issue date. |
| 4% | On or the first anniversary and before the second anniversary. |
| 3% | On or after the second anniversary of the third anniversary. |
| 2% | On or after the third anniversary and before the fourth anniversary |
| 1% | On or after the fourth anniversary and before the sixtieth day before the Extended New Term Loan Maturity Date. |

At the time of any extension of the New Term Loan, Metro Terminals shall provide such documentation as the Bank and VNB may reasonably require, including without limitation, evidence of the status of all liens and encumbrances securing the New Term Loan.

(c)   **Amended and Restated First Mortgage Note.** (i) Simultaneously with the execution and delivery of this Agreement, Metro Terminals shall execute and deliver to the Bank an Amended and Restated Consolidated and Restated Mortgage

Note (the "First Mortgage Note") in the principal amount of $7,000,000 (the "First Mortgage Loan"), which is due and payable on the First Mortgage Loan Maturity Date.

(ii)  In addition to all other customary conditions to the issuance of the First Mortgage Note, the execution and delivery of a the Mortgage Modification Agreement (First Mortgage Loan) in favor of, and in form satisfactory to, the Bank on the terminal property known as lot 14 shall be a condition to the closing under this Agreement.

(iii)  Metro Terminals will have the option, exercised in writing delivered to the Bank no later than September 1, 2014 so long as no Event of Default has occurred and is continuing, to extend the First Mortgage Loan and to refinance all amounts outstanding thereunder as of January 1, 2015 for a term of five (5) years to January 1, 2020 (the "Extended First Mortgage Loan Maturity Date"), bearing interest at a rate set forth in Section 3.1(e) hereof, with equal monthly payments of principal (equal to the principal amount outstanding on January 1, 2015 divided by sixty (60)) and interest.  A facility fee shall be payable in respect of any such extension, as described in Section 3.9 hereof.  Metro Terminals shall have the right to prepay principal of the First Mortgage Loan, in whole or in part, upon not fewer than 10 days prior written notice to the Bank, provided that (i) each partial prepayment shall be in increments of $100,000 or integral multiples in excess thereof and (ii) Metro Terminals shall simultaneously with any prepayment, pay to the Bank a premium equal to the percentage set forth below of the amount of such principal prepaid during the periods indicated:

| Premium | Date of Prepayment |
|---------|--------------------|
| 5% | Before the first anniversary of the issue dated. |
| 4% | On the first anniversary and before the second anniversary. |
| 3% | On or after the second anniversary of the third anniversary. |
| 2% | On or after the third anniversary and before the fourth anniversary. |
| 1% | On or after the fourth anniversary. |

At the time of any extension of the First Mortgage Loan, the Borrowers shall provide such documentation as the Bank may reasonably require, including without limitation, evidence of the status of all liens and encumbrances securing the First Mortgage Loan.

2.2    All loans (whether the Line of Credit, the New Term Loan or the First Mortgage Loan) shall be charged to a loan account in the name of the applicable Borrower on the Bank's books and, in the case of the New Term Loan, VNB's books.  The Bank shall render to the appropriate Borrower, and, in the case of the New Term Loan, VNB shall render to Metro Terminals, each month a statement of each Borrower's loan account which shall be considered correct and deemed accepted by, and conclusively binding upon, each Borrower as an account stated, except to the extent that the Bank or VNB, as the case may be, receives a written notice of any specific exceptions by a Borrower thereto within thirty (30) days after the date of such statement.

2.3    Except in the Bank's and, in the case of the New Term Loan, VNB's sole discretion, the outstanding aggregate principal amount of all loans under the Line of Credit by the Bank to any of the Borrowers hereunder, under any supplement hereto or evidenced by any promissory note, shall not exceed the Maximum Credit or, in the case of the New Term Loan, the Term Loan Maximum Credit, at any time.  Without limiting the Bank's and VNB's right to demand payment of the Obligations, or any portion thereof, in accordance with any other terms of this Agreement, or any supplement hereto, in the event that the outstanding aggregate principal amount of loans under the Line of Credit exceeds the Maximum Credit, or the New Term Loan exceeds the Term Loan Maximum Credit, as the case may be, or the formula set forth in Section 2.1 hereof in respect of the Line of Credit, each of the Borrowers shall remain liable therefor and the entire amount of such excess(es) shall be and become immediately due and payable, without demand or notice.

2.4    At Bank's and, in the case of the New Term Loan, VNB's option, all principal, and interest, and reasonable fees, commissions, costs, expenses or other charges with respect to this Agreement or any supplement hereto (all of which shall be cumulative and not exclusive) and any and all loans and advances by the Bank or VNB to any of the Borrowers may be charged directly to any account of any Borrower maintained by the Bank or VNB, as the case may be.

2.5    All loans shall be payable at the office of the Bank or VNB, as the case may be, as the Bank and VNB may hereafter designate from time to time

2.6    In the event that Metro Terminals shall propose at any time to sell or otherwise dispose of the real property now or hereafter encumbered by any mortgage in favor of the Bank, Metro Terminals must obtain the Bank's prior written consent to any such

{N0300848; 8}

sale or disposition and then, if such consent is granted, Metro Terminals shall pay to the Bank the difference between the net proceeds received on such sale and the amount of such mortgage or other instrument (up to the principal amount of the outstanding obligations hereunder) plus any applicable prepayment premium, and the amount of the Maximum Credit shall be permanently reduced by the amount of such payment.

2.7     In the event that the Borrowers repay in full all amounts outstanding under the Line of Credit, including, without limitation, a repayment at maturity on the Line of Credit Maturity Date, Metro Terminals shall simultaneously prepay all amounts then outstanding under the New Term Loan and the First Mortgage Loan, together with interest accrued thereon and any prepayment premium applicable thereto.

SECTION 3.   INTEREST AND FEES

3.1     (a)  **Line of Credit**   (i) Interest shall be payable by the Borrowers to the Bank on the first day of each month upon the closing daily balances in our loan accounts for each day during the immediately preceding month, (x) in the case of Tranche A at the Applicable LIBO Rate plus 275 basis points but in no event less than 4.75%, and (y) in the case of Tranche B, at a rate equal to the New York Commercial Bank base commercial Benchmark interest rate (presently 3.25%) from time to time publicly announced by the Bank, whether or not such announced rate is the best rate available from the Bank to the Bank's other borrowers, plus 100 basis points but in no event less than 4.75%

(ii) In the event of the payment of any principal of any loan under Tranche A other than on the last day of an interest period applicable thereto (including as a result of an Event of Default), then the Borrowers shall compensate the Bank for the loss, cost and expense attributable to such event. Such loss, cost or expense to the Bank shall be deemed to include an amount determined by the Bank to be the excess, if any, of (x) the amount of interest which would have accrued on the principal amount of such loan had such event not occurred, at the Applicable LIBO Rate that would have been applicable to such loan, for the period from the date of such event to the last day of the then current interest period therefor, over (y) the amount of interest which would accrue on such principal amount for such period at the interest rate which the Bank would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market. A certificate of the Bank setting forth any amount or amounts that the Bank is entitled to receive pursuant to this Section shall be delivered to the Borrowers and shall be conclusive absent manifest error   The Borrowers shall pay the Bank the amount shown as due on any such certificate within 10 days after receipt thereof.

(b)     **New Term Loan.**  Interest shall be payable by the Borrowers to the Bank and VNB on the fourth day of each month upon all amounts outstanding under the New Term Loan for each day during the immediately preceding month, at a fixed rate of 5 5% per annum

(c)     **Extended New Term Loan.**  In the event of any extension of the New Term Loan pursuant to Section 2.1(b)(iv) hereof, interest during such extension shall be payable by the Borrower to the Bank and VNB on the first day of each month upon all amounts outstanding under the extended New Term Loan for each day during the immediately preceding month, at a fixed rate per annum equal to the greater of (i) the then prevailing yield on the five year Federal Home Loan Bank Rate plus 350 basis points regardless of the number of months remaining until the Extended Term Loan Maturity Date or (ii) 5.5%.

(d)     **First Mortgage Loan.**  Interest shall be payable by the Borrowers to the Bank on the first day of each month upon all amounts outstanding under the First Mortgage Loan for each day during the immediately preceding month, at a fixed rate of 4 625% per annum.

(e)     **Extended First Mortgage Loan.**  In the event of any extension of the First Mortgage Loan pursuant to Section 2.1(c)(iv) hereof, interest during such extension shall be payable by the Borrower to the Bank on the first day of each month upon all amounts outstanding under the extended First Mortgage Loan for each day during the immediately preceding month, at a fixed rate per annum equal to the greater of (i) the then prevailing yield on the five year Federal Home Loan Bank Rate plus 350 basis points regardless of the number of months remaining until the Extended First Mortgage Loan Maturity Date or (ii) 5 50%.

3.2     **Default Interest.**  On or after the date of any Event of Default or termination or non-renewal hereof, interest on all outstanding unpaid Obligations shall accrue at a rate equal to the lesser of (i) the rate in effect at the time of the Event of Default plus 500 basis points or (ii) the maximum rate of interest permitted by applicable law on the principal sum to such date of actual payment

3.3     **Interest Calculation; Interest Reserve**   Interest shall be calculated on the basis of the number of days elapsed in a 365/360 day year and shall be included in each monthly statement of our loan account. The Bank and, in the case of the New Term

{N0300848; 8}

7

Loan, VNB shall have the right, at their option, to charge all interest to the Borrowers' loan accounts on the first day of each month, and such interest shall be deemed to be paid by the first amounts subsequently credited thereto. Simultaneously with the execution and delivery of this Agreement, the Borrowers shall establish blocked interest reserve accounts bearing interest at the Bank and at VNB to service the interest payments required during the first year of the New Term Loan. The initial amount of such account at the Bank shall be $306,702 and the initial amount of such account at VNB shall be $407,077. The Bank and VNB are irrevocably authorized to deduct from such accounts the amount of interest when due and payable each month on the New Term Loan.

      3.4    **No Usury.** In no event shall charges constituting interest, payable by the Borrowers under this Agreement, exceed the rate permitted under any applicable law or regulation, and if any part or provision of this Agreement is in contravention of any such law or regulation, such part or provision shall be deemed amended to conform thereto.

      3.5    **Administrative Agency Fee.** The Borrowers shall pay to the Bank an administrative agency fee each year in the amount of $25,000. The first such fee was paid on February 1, 2012 and subsequent annual fees shall be payable on each February 1 of succeeding years.

      3.6    **Unused Line Fee.** The Borrowers agree to pay the Bank, in immediately available funds, an unused line fee equal to .125% per annum (based on a 360-day year) of the average daily unused amount of the Maximum Credit determined as of the end of each day. The unused fee shall accrue from the date hereof to and including the Maturity Date or the termination of this Agreement in accordance with the terms hereof. Such fee shall be payable monthly in arrears commencing on the first day of the first whole calendar month after the date hereof and on the first day of each calendar month thereafter until and on the Maturity Date or such earlier date. As used in this Section 3.6, the term "unused amount of the Maximum Credit" shall mean the amount of the Maximum Credit less the aggregate principal amount of all loans under the Line of Credit then outstanding hereunder.

      3.7    **Line of Credit Fee; New Term Loan Fee.** The Borrowers will pay the Bank, in immediately available funds, a facility fee in respect of the Line of Credit in the amount of $45,000, and the Bank acknowledges receipt of such facility fee on January 3, 2012. Simultaneously with the execution and delivery of this Agreement, the Borrowers will pay the Bank, in immediately available funds, an additional facility fee in respect of the Line of Credit in the amount of $10,000 for the benefit of People's United Bank. Simultaneously with the execution and delivery of this Agreement, the Borrowers will pay the Bank and VNB, in immediately available funds, a facility fee in respect of the New Term Loan in the aggregate amount of $64,000 (to be shared pro rata based on their respective amounts of the New Term Loan).

      3.8    **New Term Loan Extension Fee.** In the event of any extension of the New Term Loan on May 4, 2017, the Borrowers will pay the Bank and VNB on a pro rata basis on such date, in immediately available funds, a facility fee in the amount of .50% of the principal amount of the extended New Term Loan.

      3.9    **First Mortgage Loan Extension Fee.** In the event of any extension of the First Mortgage Loan on January 1, 2015, the Borrowers will pay the Bank on such date, in immediately available funds, a facility fee in the amount of 50% of the principal amount of the extended First Mortgage Loan.

SECTION 4.   <u>SECURITY INTEREST.</u>

      4.1    As security for the prompt performance, observance and payment in full of all Obligations, the Borrowers are simultaneously executing the Security Agreement (or a confirmation thereof) in the Bank's favor.

      4.2    As security for the prompt performance, observance and payment in full of all Obligations, the Borrowers hereby grant to the Bank and otherwise ratify and reaffirm the grant to the Bank (subject only to liens granted by Metro Terminals in connection with the IDA Bonds) of a continuing security interest in, a lien upon and a right of setoff against, and the Borrowers hereby assign, transfer, pledge and set over to the Bank the following (which together with any of the Borrower's other property in which the Bank may at any time have a security interest or lien, whether pursuant to this Agreement or any supplement hereto, or security agreement or document entered into in connection herewith, or otherwise, are herein collectively referred to as the "Collateral"): All present and future, now or hereafter acquired (a) Accounts; (b) moneys, securities and other property and the proceeds thereof, now or hereafter held or received by, or in transit to, the Bank from or for the Borrowers, whether for safekeeping, pledge, custody, transmission, collection or otherwise, and all of the Borrowers' deposits (general or special), balances, sums and credits with the Bank at any time existing; (c) all of the Borrowers' right, title and interest, and all of the Borrowers' rights, remedies, security and liens, in, to and in respect of the Accounts and Collateral, including, without limitation, rights of stoppage in transit, replevin, repossession and reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, guaranties or other contracts or suretyship with respect to the Accounts, deposits and remedies of an unpaid vendor, lienor or secured party, guaranties or

{N0100848; 8}

8

the other contracts of suretyship with respect to the Accounts, deposits or other security for the obligation of any Account Debtor; and credit and insurance; (d) all of the Borrowers' right, title and interest in, to and in respect of all goods relating to, or which by sale have resulted in, Accounts including, without limitation, all goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, any Accounts or other Collateral, including without limitation, all returned, reclaimed or repossessed goods; (e) all Inventory of any kind or nature; (f) all deposit accounts, and all sums now or hereafter in, payable to or withdrawable from such accounts; (g) all books, records, ledger cards, computer programs, customer lists and other property and general intangibles evidencing or relating to the Accounts, the Inventory and any other Collateral or any Account Debtor, together with the file cabinets or containers in which the foregoing are stored ("Records"); (h) all other general intangibles of every kind and description, including without limitation, customer lists, trade names and trademarks, and the goodwill of the business symbolized thereby, patents, copyrights, licenses and Federal, State and local tax refund claims of all kinds and (i) all proceeds of the foregoing, in any form, including, without limitation, any claims against third parties for loss or damage to or destruction of any or all of the foregoing.

4.3    The Borrowers shall keep and maintain, at the Borrowers' cost and expense, satisfactory and complete books and records of all Accounts, all payments received or credits granted thereon, and all other dealings therewith  The Borrowers shall assign and deliver to the Bank or to the Bank's order, unless the Bank expressly authorizes otherwise, all original documents evidencing the sale and delivery of goods or the performance of services which created any Accounts, including but not limited to all original contracts, orders, invoices, bills of lading, warehouse receipts, delivery tickets and shipping receipts, together with schedules describing the Accounts and/or written confirmatory assignments to the Bank of each Account, in form and substance satisfactory to the Bank and duly executed by the Borrowers, together with such other information as the Bank may request.  In no event shall the making or the failure to make or the content of any schedule or assignment or our failure to comply with the provisions hereof be deemed or construed as a waiver, limitation or modification of the Bank's security interest in, lien upon and assignment of the Collateral or the Borrowers' representations warranties or covenants under this Agreement or any supplement hereto.

4.4    In no event is any provision of this Section 4 intended to limit or modify rights granted to the Bank under the Security Agreements, and all rights granted hereunder are cumulative and not limited.

4.5    In no event shall any provision of this section 4 constitute or be construed to grant to the Bank a security interest or mortgage in lot 150, any improvements made to that parcel of real property or any equipment installed in the Metro Biofuel Plant.

SECTION 5.  COLLECTION AND ADMINISTRATION.

5.1    Until the Borrowers' authority to do so is curtailed or terminated at any time by the Bank, the Borrowers shall, at the Borrowers' expense and on the Bank's behalf, collect, as the Bank's property and in trust for the Bank, all remittances and all amounts unpaid on Accounts. All amounts collected on Accounts when received by the Bank shall be credited to the Borrower's loan accounts, conditional upon final payment to the Bank.

5.2    The Bank or the Bank's representatives shall at all times upon reasonable notice, not less than 24 hours prior, have free access to and right of inspection of the Collateral and have full access to and the right to examine and make copies of the Borrower's Records, to confirm and verify all Accounts, to perform general audits and to do whatever else is reasonably necessary to protect the Bank's interests.  The Bank may at any time upon reasonable notice, not less than 24 hours prior, require the Borrowers or any accountants and auditors employed by the Borrowers to deliver any Records to the Bank's order and the Bank may without cost or expense to the Bank use such of our supplies, computer equipment and space at the Bank places of business as may be reasonably necessary for the handling of collections.  Without limiting the foregoing, the Bank and any other representatives, including any participants in this loan facility,  may conduct two field examinations in any twelve-month period at any facility owned or controlled by the Borrowers, to be scheduled at a mutually agreed time upon five (5) days' prior notice, both of which field examinations shall be at the Borrowers' expense.  The Borrowers shall make available to the Bank and the Bank's representatives all business and financial information, and access to the Borrowers' respective officers, employees, accountants and other representatives, as the Bank may reasonably request to complete any such field examination and in at least one of such field examinations the Bank and any representative so designated may, with the Borrowers' prior consent, which shall not be unreasonably withheld, conduct such additional tests, examine such additional records and review such additional operations in connection with the Accounts as the Bank or such representative may deem appropriate.  All field examinations shall be conducted in a reasonable period of time and at a reasonable expense.

5.3    The Borrowers shall immediately upon obtaining knowledge thereof report to the Bank all reclaimed, repossessed or returned goods, Account Debtor claims and any other matter affecting the value, enforceability or collectability of Accounts.  At the Bank's request, any goods reclaimed or repossessed by or returned to the Borrowers will be set aside, marked with the Bank's name

and held by the Borrowers for the Bank's account and subject to the Bank's security interest. All claims and disputes relating to Accounts are to be promptly adjusted within a reasonable time, at the Borrowers' own cost and expense. The Bank may, at the Bank's option settle or compromise claims and disputes relating to accounts which are not adjusted by the Borrowers within a reasonable time.

5.4      The Borrowers hereby authorize the Bank to execute, deliver and file such financing statements and other instruments as the Bank determine are necessary or appropriate to confirm the grant of and perfection of the security interests granted to the Bank.

SECTION 6.   REPRESENTATIONS WARRANTIES AND COVENANTS.

The Borrowers hereby represent, warrant and covenant to the Bank and, in the case of the New Term Loan, VNB the following (which shall survive the execution and delivery of this Agreement) the truth and accuracy of which, or compliance with, being a condition of the making of loans hereunder by the Bank and, in the case of the New Term Loan, VNB or under any supplement hereto:

6.1      Each Borrower is and shall be, with respect to all Collateral (including, without limitation, all the Borrowers' Inventory), now existing or hereafter acquired, the owner of such Collateral and Inventory free from any lien, security interest, claim or encumbrance of any kind, except in the Bank's favor or as otherwise consented in writing by the Bank, including in respect of the IDA Bonds, and the Borrowers shall defend the same against the claims of all persons.

6.2      Each Borrower's records, including, without limitation, the Records, are maintained at the address referred to below and each Borrower's chief executive office is at the address referred to below, but may be moved as provided for by the Covenant Supplement hereto. Except as provided in the Covenant Supplement, the Borrowers may not change such location without the Bank's prior written consent and prior to making any such change, the Borrowers agree to execute and record such additional financing statements or other documents or notices which the Bank may reasonably require.

6.3      (a)   The Borrowers shall maintain books, records and accounts in accordance with generally accepted accounting principles consistently applied. The Borrowers agree to furnish, in form and substance satisfactory to the Bank:

(i) a summary of accounts receivable agings, including, without limitation, reflecting receivables of Metro BioFuels LLC, a biofuel feedstock inventory report and a borrowing base certificate on the 15th and final day of each month for the preceding fifteen-day period;

(ii) biofuels feedstock inventory reports on the 15th and final day of each month for the preceding fifteen-day period;

(iii) quarterly financial statements reasonably acceptable to the Bank (including balance sheet, statement of income and surplus account) within 60 days after the end of each quarter;

(iv) audited financial statements on an annual basis certified by independent public accountants selected by the Borrowers and reasonably acceptable to the Bank not later than 120 days after the end of the fiscal year, which shall fairly present the Borrowers' financial condition as of the dates and the results of the Borrowers' operations for the periods, as of and for which the same are furnished; and

(v) such other information regarding the Borrowers' business affairs and financial condition as the Bank may reasonably request.

(b)      The Borrowers shall deliver or cause to be delivered to the Bank (1) within thirty (30) days after the filing thereof with the Internal Revenue Service but in no event more than one hundred twenty (120) days after the end of each calendar and/or tax year, as the case may be, copies of the income tax returns (or applicable extension applications) filed by each Borrower and by each of the Guarantors for the immediately preceding year and (2) within one hundred twenty (120) days after the end of each calendar year, copies of financial statements in form satisfactory to the Bank of each of the individual Guarantors. In the case of any Guarantor other than an individual Guarantor, such income tax returns shall be prepared by an independent certified public accountant reasonably satisfactory to the Bank, it being acknowledged that Cremer & Associates and Berdon LLP are acceptable certified public accountants for purposes of this paragraph.

{N0300848; 8}

10

(c)      Any documents, schedules, invoices or other instruments delivered to the Bank may be destroyed or otherwise disposed of by the Bank one (1) year after the date the same are delivered to the Bank, unless the Borrowers make written request therefor and pay all expenses attendant to their return, in which event the Bank shall return same when the Bank's actual or anticipated need therefor has ceased.  The Borrowers hereby authorize and direct all accountants, auditors or other third parties to deliver to the Bank's at the Borrowers' expense, copies of the Borrowers' financial statements related thereto, and other accounting records of any nature in their possession and to disclose to the Bank any information the Borrowers may have regarding the Borrowers' business affairs and financial conditions.

6.4      Each Eligible Account represents a valid and legal enforceable indebtedness based upon an actual and bona fide sale and delivery of goods or rendition of services in the ordinary course of the Borrowers' business which has been finally accepted by the Account Debtor and for which the Account Debtor is unconditionally liable to make payment of the amount stated in each invoice, document or instrument evidencing the Eligible Account in accordance with the terms thereof without offset, defense or counterclaim and will be paid in full at maturity except as otherwise provided in the Covenant Supplement hereto.

6.5      All statements made and all unpaid balances appearing in the invoices documents and instruments evidencing each Eligible Account are true and correct and are in all respects what they purport to be. None of the transactions underlying or giving rise to any Account shall violate any state or federal laws or regulation and all documents relating to the Accounts shall be legally sufficient under such laws or regulations and shall be legally enforceable in accordance with their terms and all recording, filing and other requirements of giving public notice under any applicable law shall have been duly complied with.

6.6      The Borrowers shall be liable for any tax or penalty imposed upon any transaction under this Agreement or any supplement hereto or giving rise to the Accounts or any Collateral or which the Bank may be required to withhold for any reason and the Borrowers agree to indemnify and hold the Bank harmless with respect thereto, and to repay to the Bank on demand the amount and until paid by the Borrowers such amount shall be added to and deemed part of the Bank's loans to the Borrowers.

6.7      Except as otherwise disclosed to the Bank in writing, there is no present investigation by any governmental agency pending or threatened against any Borrower and there is no action proceeding or claim pending or threatened against the Borrowers or the Borrowers' assets or goodwill, or affecting any  transaction contemplated by this Agreement or any supplement hereto or any agreements, instruments or documents delivered in connection herewith or therewith before any court, arbitrator or governmental or administrative body or agency which if adversely determined with respect to the Borrowers would result in any material adverse change in the Borrowers' business, properties, assets, goodwill or condition, financial or otherwise.

6.8      The execution, delivery and performance of this Agreement, any supplement hereto, or any agreements, instruments and documents executed and delivered in connection herewith, are within each Borrower's corporate powers, have been duly authorized, are not in contravention of the terms of any Borrower's charter, bylaws or other incorporating papers, or of any indenture, agreement or undertaking to which any Borrower is a party or by which any Borrower is bound

6.9      The Borrowers shall, at the Borrowers' expense, duly execute and deliver, or cause to be executed and delivered, such further agreements and documents including without limitation, security agreements, mortgages, deeds of trust, deeds to secure debt, collateral assignments, Uniform Commercial Code financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers or consents to the exercise by the Bank of all the Bank's rights and remedies hereunder or under any supplement hereto or applicable law with respect to the Collateral, and do or cause to be done such further acts as  necessary or proper in the Bank's reasonable opinion to evidence, perfect, maintain the Bank's security interest and the priority thereof in the Collateral and to otherwise effectuate the provisions or purposes of this Agreement or any supplement hereto.  Where permitted by law, the Borrowers hereby authorize the Bank and grant the Bank an irrevocable power of attorney, to execute (if necessary) and file one or more Uniform Commercial Code financial statements signed (if necessary) only by the Bank to create or continue the Bank's security interest in the Collateral.

6.10      Metro Terminals shall provide prompt written notice to the Bank of Metro Terminals' failure to make any payment within ten (10) days after the same is due under the IDA Bonds or under the SEEDCO Loan (whether or not any default has been declared), and the Borrowers shall provide prompt written notice to the Bank of the declaration of any default or similar occurrence by any counterparty to any material agreement to which any Borrower is a party or otherwise bound, including, without limitation, a notice from Metro Terminals in respect of the IDA Bonds and the SEEDCO Loan

{N0300848; 8}

11

## SECTION 7. SPECIFIC POWERS.

7.1     Without limiting any of the powers and authorizations granted to the Bank under the Security Agreements or any other Loan Document, the Borrowers hereby constitute the Bank and the Bank's agent and any designee as each Borrower's attorney-in-fact at the Borrowers' own cost and expense to exercise, at any time after the occurrence of a monetary Event of Default and expiration of the applicable cure period, all or any of the following powers which being coupled with an interest shall be irrevocable until all Obligations have been indefeasibly satisfied: (a) to receive, take, endorse, assign, deliver, deposit and accept and in the Bank's or the Borrowers' names, any and all checks, notes, drafts, remittances, instruments and documents relating to the Collateral, (b) to receive, open and dispose of mail addressed to the Bank and to notify postal authorities to change the address for delivery thereof to such address as the Bank may designate; (c) to transmit to Account Debtors notice of the Bank's interest therein and request from such Account Debtors at any time in the Bank's name or the Borrowers' names or the name of the Bank's designee, information concerning the Accounts and the amounts thereon, (d) to notify Account Debtors to make payment directly to the Bank and on or after the occurrence of an Event of Default to take in the Borrowers' names all steps, actions, suits or proceedings deemed by the Bank necessary or desirable to effect collection of the Collateral and on the Borrowers' behalf to file any UCC financing statements or amendments thereto  The Borrowers hereby release the Bank and the Bank's officers, designees, and agents from any liability arising from any act or acts under Section 7.1 of this Agreement or in furtherance thereof performed in good faith and in a commercially reasonable manner, whether of omissions or commission and whether based upon any error of judgment or fact.

## SECTION 8. EVENTS OF DEFAULT AND REMEDIES.

8.1     All Obligations shall be at the Bank's option immediately due and payable without notice or demand (notwithstanding any deferred or installment payments allowed, if any, by any instrument evidencing or relating to the Obligations) and any provision of this Agreement or any supplement hereto, as to future loans and advances by the Bank shall at the Bank's option, terminate forthwith upon the termination or non-renewal of this Agreement or upon the occurrence of any Event of Default as defined in the Covenant Supplement hereto.

8.2     Upon the occurrence of any Event of Default and at any time thereafter, the Bank shall have the right (in addition to any other rights the Bank has under this Agreement, any supplement hereto, any other Loan Document or any other agreement delivered in connection herewith or therewith, or otherwise), without further notice to the Borrowers, to appropriate, set off and apply to the payment of any or all of the Obligations, any or all Collateral in such manner as the Bank shall in the Bank's sole discretion determine, to enforce payments of any Collateral, to settle, compromise or release in whole or in part, any amounts owing on the Collateral, to prosecute any action suit or proceeding with respect to the Collateral, to extend the time of payment of any and all collateral, to make allowances and adjustments with respect thereto, to issue credits in the Bank's or the Borrowers' name, to sell, assign and deliver the Collateral or any part thereof at public or private sale broker's board, for cash upon credit or otherwise at the Bank's sole option and discretion, and the Bank may bid or become purchaser at any such sale if public free from any right of redemption which is hereby expressly waived.

8.3     In the event the Bank seeks to take possession of all or any portion of the Collateral by judicial process, each Borrower irrevocably waives (a) the posting of any bond, surety or security with respect thereto which might otherwise be required, (b) any demand for possession prior to the commencement of any suit or action to recover the Collateral and (c) any requirement that the Bank retain possession and not dispose of any collateral until trial or final judgment.

8.4     The Borrowers agree that the giving of ten (10) days' notice by the Bank sent by certified mail postage prepaid, to the Borrowers' addresses set forth below, designating the place and time of any public sale or of the time after which any private sale or other intended disposition of the Collateral is to be made shall be deemed to be reasonable notice thereof and each Borrower waives any other notice with respect thereto

8.5     The net cash proceeds resulting from the exercise of any of the foregoing rights or remedies shall be applied by the Bank to the payment of the Obligations in such order as the Bank may elect and the Borrowers shall remain liable to the Bank for any deficiency.  Without limiting the generality of the foregoing if the Bank enters into any credit transaction directly or indirectly in connection with the disposition of any Collateral the Bank shall have the option, at any time, in the Bank's sole discretion, to reduce the Obligations by the principal amount of such credit transaction or to defer the reduction thereof until actual receipt by the Bank of cash or other immediately available funds in connection therewith.

8.6     The enumeration of the foregoing rights and remedies is not intended to be exclusive and such rights and remedies are in addition and not by way of limitation of any other rights or remedies the Bank may have under the UCC or other applicable law The Bank shall have the right in the Bank's sole discretion, to determine which rights and remedies, and which order any of the same,

{N0100848; 8}

12

are to be exercised, and to determine which Collateral is to be proceeded against and in which order and the exercise of any right or remedy shall not preclude the exercise of any other, all of which shall be cumulative.

8 7      No act, failure or delay by the Bank shall constitute a waiver of the Bank's rights and remedies. No single or partial waiver by the Bank of any provision of this Agreement or any supplement hereto, or breach or default thereunder, or of any right or remedy which the Bank may have shall operate as a waiver of any other provision, breach, default, right or remedy of the same provision, breach, default, right or remedy, on any future occasion.

8.8      The Borrowers waive presentment, notice of dishonor, protest and notice of protest of all instruments included in or evidencing any of the Obligations, the Collateral and any and all notices or demands (except as expressly provided therein.) The Bank may, at all times, proceed directly against any Borrower to enforce payment of the Obligations and shall not be required to take any action of any kind to preserve, collect or protect the Bank's rights in the Collateral.

8.9      The Borrowers acknowledge that the Borrowers are jointly and severally liable hereunder. The Bank may, at the Bank's election, foreclose on any security held by the Bank of any Borrower by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation in respect of any Borrower's Obligations exercise any other right or remedy available to the Bank against any Borrower, without affecting or impairing in any way the liability of any other Borrower. Each Borrower waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or suretyship or other right or remedy of any Borrower against the other or any security.

8.10     In no event is any provision of this Section 8 intended to limit or modify rights granted to the Bank under the Security Agreements, and all rights granted hereunder are cumulative and not limitative.

SECTION 9.   EFFECTIVE DATE AND TERMINATION.

9.1      This Agreement shall become effective upon acceptance by the Bank, and shall continue in full force and effect until all Obligations have been paid in full, and the Bank's continuing security interest in the Collateral shall remain until such Obligations have been fully discharged.

9.2      This Agreement, any supplement hereto, and any agreements, instruments or documents delivered or to be delivered in connection herewith represent the Borrowers' entire agreement and understanding concerning the subject matter hereof and thereof and supersede all other prior and contemporaneous agreements, understandings, negotiations, warranties, commitments, offers and contracts, whether oral or written.

9 3      No provision hereof shall be modified or amended orally or by course of conduct but only by a written instrument expressly referring hereto signed by all the parties.

9.4      Upon the Bank's request the Borrowers shall pay to the Bank or reimburse the Bank for all reasonable sums, costs, and expenses which the Bank may pay or incur in connection with or related to the administration and enforcement of this Agreement, any supplement hereto and all other agreements, instruments and documents in connection herewith and therewith, and the transactions contemplated hereunder and thereunder together with any amendments, supplements, consents or modifications which may be hereafter made or entered into in respect hereof or thereof, and all efforts made to defend, protect or enforce the security interest granted herein or therein or in enforcing payment of the Obligations including without limitation appraisal fees, filing fees and taxes, title insurance premiums, recording taxes, expenses for searches, expenses heretofore incurred by the Bank and from time to time hereafter incurred during the course of periodic field examinations of the Collateral, and the Borrowers' operations, wire transfer fees, check dishonor fees, the reasonable legal fees and disbursements of outside counsel to the Bank, all fees and expenses for the service and filing of papers, premiums on bonds and undertakings, fees of marshall, sheriffs, custodians, auctioneers and others, travel expenses and all court costs and collection charges, all of which shall be part of the Obligations and shall accrue interest after demand thereof at a rate equal to the highest rate then payable on any of the Obligations.

SECTION 10.   NOTICES.

10 1     All notices, requests and demands to or upon the respective parties hereto shall be deemed to have been duly given or made: if by hand or facsimile, upon delivery (with a copy also mailed by first class mail), if by Federal Express, Express Mail or any other overnight delivery service, one (1) day following dispatch; and if mailed by certified mail, return receipt requested, five (5) days after mailing  All notices of default, demand or acceleration shall be delivered to a Borrower at its address below its signature

{N0300848; 8}

hereto, by Federal Express or any other overnight delivery service or certified mail, return receipt requested. All notices, requests and demands are to be given or made to the respective parties at the address or to such other addresses as a party may designate (by notice in accordance with the provisions of this paragraph).

SECTION 11.  WAIVER OF JURY TRIAL, JURISDICTION CHOICE OF LAW.

11.1    Each party hereto hereby waive all rights to a trial by jury in any action or proceeding of any kind arising out of or relating to this Agreement, any supplement hereto, the Obligations, the Collateral or any other transaction between the parties. Each Borrower hereby waives rights of set-off and rights to interpose counterclaims in the event of any litigation with respect to any matter connected with this Agreement or any supplement hereto, the Obligations, the Collateral or any other transaction between the parties and each Borrower hereby irrevocably consents and submits to the non-exclusive jurisdiction of the Supreme Court of the State of New York and the United States District Court for the Southern District of New York in connection with any action or proceeding of any kind arising out of or relating to this Agreement, any supplement hereto, the Obligations, the Collateral or any such other transaction.

11.2    In any such litigation each Borrower waives personal service of any summons, complaint or other process and agrees that service thereof may be made by certified or registered mail directed to a Borrower at such Borrowers' address set forth below its signature

11.3    This Agreement, any supplement or document executed in connection herewith and all transactions hereunder or thereunder shall be deemed to be consummated in the State of New York and shall be governed by and interpreted in accordance with the substantive laws of that State without regard to principles of conflicts of laws. If any part or provision of this Agreement is invalid or in contravention of any applicable law or regulation, such part or provision shall be severable without affecting the validity of any other part or provision of this Agreement.

SECTION 12.  CONSENTS.

For the avoidance of doubt, notwithstanding any provision in this Agreement, the Bank hereby consents to the incurrence by Metro Terminals of indebtedness evidenced by the IDA Bonds and the SEEDCO Loan.

Very truly yours,

METRO FUEL OIL CORP.

By: _Paul Pullo_____
Name: Paul J Pullo
Title: President
Address: 500 Kingsland Avenue
         Brooklyn, NY 11222

METRO TERMINALS CORP.

By: _Gene Pullo_____
Name: Gene V. Pullo
Title: President
Address: 500 Kingsland Avenue
         Brooklyn, NY 11222

{N0300848; 7}

14

METRO TERMINALS OF LONG ISLAND, LLC

By: _____
    Name:  Gene V. Pullo
    Title:  Member
    Address:  500 Kingsland Avenue
              Brooklyn, NY 11222

Accepted at New York, New York
On May 4, 2012

NEW YORK COMMERCIAL BANK
    as successor in interest to
    ATLANTIC BANK OF NEW YORK

By: _____
    Name:  Anthony C. Ragone
    Title:  Vice President
    Address: 615 Merrick Avenue
             Westbury, New York 11590

VALLEY NATIONAL BANK,
    as co-lender under the New Term Loan

By: _____
    Name:  Thomas Munson
    Title:  Vice President

{N0300848; 7}

15

Exhibit 2

EXECUTION COPY

THIRD AMENDED AND RESTATED COVENANT SUPPLEMENT TO
AMENDED AND RESTATED ACCOUNTS FINANCING AGREEMENT

May 4, 2012

New York Commercial Bank,
 as successor in interest to
Atlantic Bank of New York
615 Merrick Avenue
Westbury, New York 111590

Ladies and Gentlemen:

    This Third Amended and Restated Covenant Supplement ("Supplement") is a supplement to the Third Amended and Restated Accounts Financing Agreement by and among **METRO FUEL OIL CORP.** ("METRO FUEL"), **METRO TERMINALS CORP.** ("METRO TERMINALS"), each a New York corporation, and **METRO TERMINALS OF LONG ISLAND, LLC**, a New York limited liability company ("Metro Long Island") (collectively and jointly and severally, together with the successors and assigns of each, the "Borrowers") and **NEW YORK COMMERCIAL BANK**, as successor in interest to **ATLANTIC BANK OF NEW YORK**, a New York corporation (together with its successors and assigns, the "Bank"), dated of even date herewith (together with this Supplement and any and all other supplements thereto, the "Accounts Agreement"). This Supplement is (a) hereby incorporated into the Accounts Agreement, (b) made a part thereof and (c) subject to the terms, conditions, covenants and warranties thereof. All terms (including capitalized terms) used herein shall have the meanings ascribed to them respectively in the Accounts Agreement, unless otherwise defined in this Supplement.

    The Borrowers acknowledge that Valley National Bank ("VNB") is signing this Supplement for the purpose of being a co-lender with the Bank for the New Term Loan, as defined in and as described in Section 2 1(b) of the Accounts Agreement, and VNB shall be entitled to the benefits of, and may rely on, all of Borrowers' representations, warranties and covenants and remedies arising after an Event of Default set forth herein whether or not VNB is specifically referenced therein.

Section 1. ADDITIONAL DEFINITIONS

    As used herein:

    1.1    "Apollo" shall mean Apollo Petroleum Transport LLC, a New York limited liability company.

    1.2    "Apollo Security Agreement" shall mean the Security Agreement between Apollo and the Bank.

    1.3    "Borrower Security Agreement" shall mean the Security Agreement between each Borrower and the Bank.

    1.4    "Consolidated Capital Expenditures" shall mean, as to any Person, at any time, in accordance with generally accepted accounting principles consistently applied, on a consolidated basis for such Person and its Subsidiaries, for any period for which the same is to be determined, the aggregate amount of any expenditures made for capital assets (less any amounts received from shareholders of Borrower, whether in the form of debt or equity, for use specifically as part of any such expenditure not funded with debt), plus the aggregate amount of capitalized lease obligations first incurred for such period.

    1.5    "Consolidated Net Cash Flow" shall mean, as to any Person, at any time, in accordance with generally accepted accounting principles consistently applied, on a consolidated basis for such Person and its Subsidiaries, for any period for which the same is to be determined, an amount equal to (i) net income, plus (ii) depreciation and amortization expense, and other non-cash items, in each case to the extent deducted in determining net income, plus (iii) any net increase in consolidated deferred tax liabilities, as measured at the end of such period in comparison to the end of the preceding period, less (iv) net repayments of loans outstanding hereunder, as measured at the end of such period in comparison to the end of the preceding period, less (v) non-funded Consolidated Capital Expenditures made in cash, plus (the amount of any decreases) or less (the amount of any increases) in (vi) Consolidated Working Capital during such period.

{N0300850; 8}

1.6     "Consolidated Tangible Net Worth" shall mean, as to any Person, at any time, in accordance with generally accepted accounting principles consistently applied (except only for the qualification described in footnote 1(d) on the auditor's transmittal letter dated September 30, 2005, as further amended thereafter), on a consolidated basis for such Person and its Subsidiaries, the amount equal to the difference between: (a) the aggregate net book value of all assets, including the value set forth in footnote 1(d) of the auditor's transmittal letter dated September 30, 2005, of such Person and its Subsidiaries, calculating the book value of inventory for this purpose on a first-in-first-out basis, after deducting from such book values all appropriate reserves (including all reserves for doubtful receivables, obsolescence, depreciation and amortization), less (i) the book amount of intangible assets, including without limitation, good-will, non-compete agreements, trademarks, trade names, copyrights, patents, licenses, and any rights with respect thereto, and less (ii) deferred charges and deferred expenses, and (b) the total aggregate Indebtedness of such Person and its Subsidiaries (including tax and other proper accruals).  For the purpose of calculating the Consolidated Tangible Net Worth, in no event may any appraisal or reappraisal of any asset be used as a basis to adjust upward the value of such asset on each Borrower's financial statements.

1.7     "Consolidated Working Capital" shall mean, as to any Person, at any time, on a consolidated basis for such Person and its Subsidiaries, the amount equal to the difference between: (a) the aggregate net book value of all assets of such Person and its Subsidiaries, on a consolidated basis, calculating the book value of inventory for this purpose on a first-in-first-out basis, which would, in accordance with generally accepted accounting principles consistently applied, be classified as current assets and (b) all Indebtedness of such Person and its subsidiaries, on a consolidated basis, which would in accordance with generally accepted accounting principles consistently applied, be classified as current liabilities; and in any event including Indebtedness payable on demand or within one (1) year from the date of determination without any option of the obligor to extend or renew beyond such year, all accruals for federal or other taxes based on or measured by income and payable within such year, and including the current portion of long-term debt required to be paid within one (1) year.  For the avoidance of doubt, in all events amounts outstanding under the Secured Line of Credit Note shall be classified as current liabilities.

1.8     "Eligible Accounts" shall mean the Accounts created by a Borrower in the ordinary course of business, which are and at all times continue to be acceptable to the Bank in all respects to be determined in a commercially reasonable manner.  An Account shall not be deemed eligible unless (a) such Account shall not be more than 90 days from invoice date for retail customers and 60 days from invoice for wholesale customers, (b) such Account complies in all respects with the representations, covenants and warranties set forth herein and in the Accounts Agreement, and provided that (c) the excess of any Accounts of any non-governmental Accounts Debtor over $3,000,000 shall not be counted in Eligible Accounts, and (d) no intercompany receivables (other than receivables from Metro BioFuels LLC not more than 60 days from invoice date) or receivables from shareholders shall be Eligible Accounts.

1.9     "Eligible Inventory"  shall mean the lesser of (i) fifty percent (50%) of the cost (exclusive of transportation or related costs) of biofuel feedstock in the possession of Metro Terminals or Metro BioFuels LLC, stored or otherwise held for conversion in a location or locations and in a manner reasonably acceptable to the Lender and in which the Lender has a prior security interest at all times or (ii) $5,000,000.  Standards of acceptability shall be fixed and may be revised from time to time solely by the Lender in a commercially reasonable manner.

1.10     "Environmental Laws" shall mean any and all laws, statutes, ordinances, rules, regulations, orders, or determinations of any governmental authority pertaining to health or the environment in effect in any and all jurisdictions in which the Borrower is conducting or at any time has conducted business, including, without limitation, the Clean Air Act, as amended, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, the Federal Water Pollution Control Act, as amended, the Occupational Safety and Health Act of 1970, as amended, the Resource Conservation and Recovery Act of 1976, as amended, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, and other environmental conservation or protection laws.

1.11     "Fixed Charge Coverage Ratio" shall mean, with respect to any entity or entities, for any period for which the same is to be determined, the ratio of (a) earnings from continuing operations of such entity or entities (but excluding gains other than in the ordinary course of business) before interest, income taxes, depreciation and amortization  for such  period plus the aggregate amount of paid-in-capital by the shareholders of a Borrower and the aggregate principal amount of loans to a Borrower from any shareholder of a Borrower subordinated to (b) the sum of (i) the aggregate of all interest expense incurred by such entity or entities for such period, (ii) the scheduled payments of principal for all amortization of Indebtedness of the Borrowers for such period,  (iii) Capital Expenditures actually made during such period that are not funded with term debt or capital leases, (iv) income and franchise taxes paid for during such period, all determined in accordance with GAAP and (v) distributions to shareholders

1.12     "Guarantees" shall mean each of the Guarantees executed and delivered by a Guarantor on or at any time prior to the date hereof

1.13    "Guarantor" shall mean, collectively and jointly and severally, Kings Land Realty, Inc., Metro Energy Group LLC, Apollo Petroleum Transport LLC, Metro Plumbing Services, Corp., Metro BioFuels LLC, Gene V. Pullo and Paul J. Pullo. For the avoidance of doubt, Metro Fuel and Metro Long Island are also guarantors of the New Term Loan.

1.14    "Indebtedness" shall mean, as to any Person, all items which, in accordance with generally accepted accounting principles as in effect on the date hereof, consistently applied, would be included in determining total liabilities shown on the liability side of its balance sheet as at the date such Indebtedness is to be calculated and, in any event, shall include any liabilities secured by any mortgage, pledge, lien or security interest existing on such Person's owned or acquired property

1.15    "Inventory" shall mean all raw materials, finished goods, and work-in process and all other inventory of whatsoever kind or nature, wherever located, whether now owned or hereafter existing or acquired.

1.16    "Metro Energy Security Agreement" shall mean the Security Agreement between Metro Energy Group LLC and the Bank.

1.17    "New Subordinated Loans" shall have the meaning set forth in Section 2.3(i) of this Supplement.

1.18    "Net Amount of Eligible Accounts" shall mean the gross amount of Eligible Accounts, less sales tax, excise tax or similar taxes, and less returns, discounts, claims, credits and allowances of any nature at any time issued, owed, granted, outstanding, available or claimed

1.19    "Net Amount of Eligible Inventory" shall mean fifty percent (50%) of the costs of Eligible Inventory, excluding any transportation costs related thereto.

1.20    "Person" or "person" shall mean any individual, sole proprietorship, limited liability company, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture or other entity or government or any agency, instrumentality or political subdivision thereof.

1.21    "Security Agreements" shall mean the Borrower Security Agreement, the Apollo Security Agreement and the Metro Energy Security Agreement.

1.22    "Seedco Intercreditor Agreement" shall mean the Intercreditor Agreement dated June 29, 2011 between Seedco Financial Services, Inc. and the Bank.

1.23    "SEEDCO LOAN" shall mean the loan in the original principal amount of $1,500,000 to the Borrowers from Seedco Financial Services, Inc. .

1.24    "Subordination Agreement" shall mean each Agreement of Subordination, executed by certain officers of each Borrower in favor of the Bank, as the same may be amended, modified, supplemented or extended from time to time.

1.25    "Subordinated Principal" shall mean, at any time, the aggregate principal amount of loans subject to the Subordination Agreement.

1.26    "Subsidiary" or "subsidiary" shall mean any corporation, association or organization, active or inactive, as to which more than fifty (50%) percent of the outstanding voting stock or shares or interests shall now or hereafter be owned or controlled, directly or indirectly, by a Borrower, any Subsidiary of a Borrower, or any Subsidiary of such Subsidiary, specifically excluding McGuiness Realty Corp.

Section 2    ADDITIONAL CONDITIONS PRECEDENT

Each of the following is an additional condition precedent to the Bank making any loans to Borrowers, pursuant to the Accounts Agreement, this Supplement and any other supplement thereto and the other Loan Documents, including the making of the initial and any future loans, advances and other financial accommodations contemplated hereunder:

2.1    The Bank shall have received, in form and substance satisfactory to the Bank, evidence that Borrowers have duly received all authorizations, waivers, consents, approvals, licenses, franchises, permits and certificates by or of all federal, state and local governmental authorities necessary or desirable for the operation and conduct of its businesses.

2.2      The Bank shall have received evidence of insurance and loss payee endorsements required hereunder and under the other Loan Documents, in form and substance and in amounts satisfactory to the Bank, and certificates of insurance policies and/or endorsements naming the Bank, Cathay Bank and VNB as loss payees, all at Borrowers' cost and expense.

2.3      The Bank shall have received in form and substance reasonably satisfactory to the Bank:

(i)   Confirmation and Amendment of the Subordination Agreements (including, without limitation, confirmation of the subordination of additional loans in the aggregate principal amount of $3,000,000 (the "New Subordinated Loans"), such confirmations to confirm the Bank's agreement to release up to $2,000,000 of the subordination dollar-for-dollar against new retained earnings from the BioFuel Project retained each year by Metro Terminals as substantiated by audited financial statements commencing with Metro Terminal's 2013 fiscal year end;

(ii)   the Guarantees and Guarantee Agreements from Metro Fuel and Metro Long Island;

(iii)   the Security Agreements;

(iv)   Releases in favor of the Bank;

(v)   the Third Amended and Restated Secured Line of Credit Note, the New Secured Term Notes and the First Mortgage Note;

(vi)   the Mortgage Modification Agreement (First Mortgage Loan), together with the corresponding 255 Affidavit;

(vii)   the Gap Mortgage and the Gap Note;

(viii)   the Mortgage Consolidation and Modification Agreement, together with the corresponding 255 Affidavit;

(ix)   the Mortgage and Security Agreement (VNB), together with the corresponding 255 Affidavit;

(x)   Intercreditor Agreement between the Bank and VNB;

(xi)   Confirmation of the Seedco Intercreditor Agreement;

(xii)   opinion of counsel to Metro Fuel, Metro Terminals and Metro Long Island including opinions customary for a transaction of the type covered by the Loan Documents, including, without limitation, that the execution, delivery and performance of the Loan Documents will not contravene any material agreement to which Borrower is a party or is otherwise bound, including, without limitation, the IDA Bonds; and

(xiii)   such closing certificates and instruments as the Bank may reasonably request

2.4      No material adverse change in the business, operations, profits or prospects of any Borrower or in the condition of the assets of any Borrower shall have occurred since the date of the Bank's latest field examination which have not been disclosed to the Bank

2.5      All representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects.

2.6      No Event of Default shall have occurred and no event shall have occurred or condition be existing which, with notice or passage of time or both, would constitute an Event of Default

Section 3   ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS

In addition to the representations, warranties and covenants contained in the other Loan Documents, each Borrower hereby represents, warrants and covenants to the Bank the following (which shall survive the execution and delivery of this Supplement), the truth and accuracy of which, and compliance with, being a continuing condition of the making of loans or providing other financial accommodations to Borrower's by the Bank under the Loan Documents:

3.1      Indebtedness   Borrowers will not, and will not permit any Subsidiary, to create, incur, assume or permit to exist, contingent or otherwise, any Indebtedness, except:

(a)      Indebtedness to the Bank;

(b)      Indebtedness consisting of unsecured current liabilities incurred in the ordinary course of its business which are not past due;

(c)      Indebtedness incurred in the ordinary course of its business secured only by liens permitted under Section 3.2;

(d)   Indebtedness incurred in connection with a sale and leaseback transaction permitted under Section 3 17;

(e)   Indebtedness of a Borrower existing on the date hereof which is described on Exhibit A hereto.

3.2   <u>Limitation on Liens.</u>   Borrowers will not, and will not permit any Subsidiary to, create, incur, assume, or permit to exist any mortgage, pledge, security interest, lien, encumbrance, defect in title or restriction upon the use of their respective real or personal properties, whether now owned or hereafter acquired, except:

(a)   the liens, encumbrances or security interests in favor of the Bank;

(b)   tax, mechanics, and other like statutory liens arising in the ordinary course of its business to the extent: (i) such liens secure Indebtedness which is not overdue or (ii) until foreclosure or similar proceedings shall have been commenced, such liens secure Indebtedness relating to claims or liabilities which are being contested in good faith by appropriate proceedings available to Borrowers or their respective subsidiaries prior to the commencement of foreclosure or other similar proceedings and are adequately escrowed for or reserved against in the Bank's judgment;

(c)   purchase money mortgages or other purchase money liens or security interests upon any specific fixed assets here-after acquired, or mortgages, liens, or security interests existing on any such future fixed assets at the time of acquisition thereof (including, without limitation, capitalized or finance leases) or in connection with the refinancing of existing capitalized leases with respect to specific fixed assets, <u>provided, that</u> (i) no such purchase money or other mortgage, lien or security interest (or capitalized or finance lease, as the case may be) with respect to specific future fixed assets or as refinanced shall extend to or cover any other property, other than the specific fixed assets so acquired, or acquired or refinanced subject to such mortgage, lien or security interest (or lease) and the proceeds thereof, (ii) such mortgage, lien or security interest secures the obligation to pay the purchase price of such specific fixed assets only (or the obligations under the capitalized or finance lease), and (iii) the principal amount secured thereby shall not exceed one hundred (100%) percent of the cost of the fixed assets so acquired;

(d)   the liens, encumbrances or security interests set forth in Exhibit B annexed hereto.

3.3   <u>Loans, Investments, Guaranties, Etc.</u>   Borrowers will not, and will not permit any Subsidiary to, directly or indirectly, make any loans or advance money or property to any Person, or invest in (by capital contribution, dividend or otherwise) or purchase or repurchase the stock or Indebtedness or all or a substantial part of the assets or properties of any Person, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly) the Indebtedness, performance, obligations, payments or other obligations in respect of stock or dividends of any Person or agree to do any of the foregoing, <u>except:</u>

(a)   guarantees by any subsidiary of a Borrower of the obligations in favor of the Bank (except for guarantees by any such subsidiary required and executed in connection with the IDA Bonds and the SEEDCO Loan);

(b)   the endorsement of instruments for collection or deposit in the ordinary course of business;

(c)   after written notice thereof is given to the Bank, investments in the following instruments, which shall be pledged and delivered to the Bank upon the Bank's request following an Event of Default hereunder, (i) marketable obligations issued or guaranteed by the United States of America or an instrumentality or agency thereof, maturing not more than one (1) year after the date of acquisition thereof, (ii) certificates of deposit or other obligations maturing not more than one (1) year after the date of acquisition thereof issued by the Bank or any bank or trust company organized under the laws of and located in the United States of America or any State thereof and having capital, surplus and undivided profits of at least $50,000,000, (iii) open market commercial paper with a maturity not in excess of two hundred seventy (270) days from the date of acquisition thereof which have the highest credit rating by either Standard & Poor's Corporation or Moody's Investors Service, Inc., and (iv) as listed on Exhibit C hereto;

(d)   loans, advances and / or investments by and between any Borrower, any subsidiary, and / or Guarantor; and

(e)   acquisitions or a series of related acquisitions of the equity or assets or properties of any Person not exceeding $1,000,000

Notwithstanding the foregoing, each Borrower represents and warrants that it does not now guarantee, and covenants that it shall not at any time hereafter guarantee, any loans payable by Eckford Realty LLC.

3 4   <u>Dividends</u>   Borrowers will not, and will not permit any Subsidiary to, directly or indirectly, during any fiscal year, commencing with the current fiscal year, declare or pay any cash dividends (except for the payment of subchapter "S" corporation profits and income taxes related to subchapter S corporation profits so long as Borrowers are in compliance with all other provisions of this Supplement) or dividends payable in property other than stock on account of any shares of any class of capital stock now or hereafter outstanding, or set apart any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any shares of

any class of capital stock (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration other than stock or apply or set apart any sums, or make any other distribution (by reduction of capital or otherwise) in respect of any such shares or agree to do any of the foregoing.

3.5   <u>Transactions with Affiliates</u>.  Except as set forth on Schedule 3.5 hereto, Borrowers will not, and will not permit any Subsidiary to, directly or indirectly:

(a)   purchase, acquire or lease any property to, or otherwise deal with, in the ordinary course of business or otherwise, any Affiliate of a Borrower (namely any Person who, directly or indirectly, controls or is controlled by a Borrower) except in each case on an arm's length basis in transactions which are on no less favorable terms to a Borrower or such Subsidiary than would be the case with a similar transaction with an unaffiliated Person, except as required and executed in connection with the IDA Bond issue; or

(b)   make any payment of management or other fees, specifically excluding salaries, or of the principal amount of any Subordinated Principal owing to any Affiliate of a Borrower or any Person who is a director, officer, shareholder or employee of such Person.

3.6   <u>Compliance with Laws, Regulations, Etc</u>.  Each Borrower has obtained all permits, licenses, certificates, approvals, consents, orders or authorizations of any governmental regulatory authority or other governmental body or authority required for the lawful conduct of its business as conducted or proposed to be conducted on the date hereof.  Each Borrower is in material compliance and will at all times materially comply in all respects with all applicable provisions of laws, rules, regulations, licenses, permits, approvals and orders and duly observe all requirements, of any foreign, Federal, State or local governmental authority, including, without limitation, all statutes, rules, regulations, orders, permits and stipulations relating to environmental pollution and employee health and safety, including, without, limitation, the Environmental Laws.

3.7   <u>Capitalization</u>.

(a)   All of the issued and outstanding shares of capital stock or membership interests, as the case may be, of a Borrower are, at of the date hereof, directly and beneficially owned and held by the shareholders or members identified in Exhibit D who own the number of shares set forth adjacent to their respective names.  All of such shares of capital stock and membership interests of Borrowers and Guarantor are fully paid and nonassessable, free and clear of all claims, liens, pledges and encumbrances of any kind, except as set forth on Exhibit D.

(b)   Each Borrower has sufficient capital to carry on all businesses and transactions in which such Borrower now engages or proposes to engage in, is solvent and will continue to be solvent after the creation of the Obligations and the security interests in favor of Lender, and is able to pay its debts as they mature

3.8   <u>Payment of Taxes and Claims</u>.  Borrowers will, and will cause any Subsidiary to, pay all taxes, assessments and other governmental charges imposed upon them or any of their respective properties or assets or in respect of any of their respective franchises, business income or properties before any significant penalty or interest accrues thereon, and all claims (including, without limitation, claims for labor, services, materials and supplies) for sums which have become due and payable and which by law have or may become a lien upon any of their properties or assets, <u>provided, that</u>, no such charge or claim need be paid if being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and if such accrual or other appropriate provision, if any, as shall be required by generally accepted accounting principles shall have been made therefor

3.9   <u>Pollution and Other Regulations</u>.  To the best of each Borrower's knowledge, and after reasonable due diligence, the conduct of the business of each Borrower as presently conducted materially complies with all Environmental Laws.  Specifically, and without limiting the generality of the foregoing, each Borrower acknowledges that (a) to the knowledge of each Borrower, all notices, permits, licenses or similar authorizations required under any Environmental Laws for the conduct of the business of each Borrower as presently conducted have been duly obtained or filed, (b) to the knowledge of each Borrower, each Borrower has not been involved in the disposal of hazardous waste, toxic materials or other regulated contaminated wastes, toxic materials or other regulated contaminants, (c) no citations, fines or penalties have been assessed, threatened or asserted in connection with the conduct of the business of each Borrower under Environmental Laws, (d) no Borrower has received any notice from a governmental body of any violation or possible violation of any zoning, health or Environmental Laws, rules, regulations or ordinances or of any licenses, permits or similar authorizations, and (e) no Borrower is aware of, and each Borrower has taken all steps it has deemed to be reasonably necessary to determine the existence of, any substance, material or situation relating to the business of each Borrower that would give rise to remediation obligations under Environmental Laws

3 10   <u>Intellectual Property</u>   Each Borrower possesses all patents, patent rights, trademarks, trademark rights, trade names, trade name rights, copyrights, trade secrets, information, proprietary rights and processes necessary to conduct its business at now

being or proposed to be conducted, without conflict with or infringement upon any valid rights of others, and the lack of which could materially and adversely affect the financial condition or operations of each Borrower, and has not received any notice of infringement upon or conflict with the asserted rights of others.  Except as set forth on Exhibit E, there are no outstanding options, licenses, or agreements of any kind relating to the foregoing, nor is any Borrower and Guarantor bound by or a party to any option, license or agreement of any kind with respect to the patents, patent rights, copyrights, trade secrets, information, proprietary rights and processes of any other person or entity.  No stockholder, director, officer or employee of any Borrower or Guarantor has any interest in any such patents, patent rights, trademarks, trademark rights, trade names, trade name rights, copyrights, trade secrets, information, proprietary rights and processes

3.11    Tangible Net Worth Plus Subordinated Principal.  (i) Borrowers will, at the end of each fiscal year or period as indicated below, maintain the amount of Consolidated Tangible Net Worth plus Subordinated Principal of not less than:

| For Period Ending | Amount ($) |
|---|---|
| June 30, 2012 | 19,500,000 |
| June 30, 2013 | 20,000,000 |

(ii)  Borrowers will, for all quarters while the Accounts Agreement is in effect, maintain the amount of Consolidated Tangible Net Worth plus Subordinated Principal of not less than $15,000,000.

3.12    Working Capital.  Borrowers will, at all times, maintain the amount of Consolidated Working Capital of not less than:

| For Period Ending | Amount ($) |
|---|---|
| June 30, 2012 | 4,000,000 |
| June 30, 2013 | 4,000,000 |

3.13    Consolidated Capital Expenditures.  Borrowers shall not permit Consolidated Capital Expenditures to exceed the following (and, for the avoidance of doubt, the following limitations exclude capital expenditures related to the Biofuel Plant Sublimit operations):

| For Period Ending | Amount ($) |
|---|---|
| June 30, 2012 | 1,200,000 |
| June 30, 2013 | 1,200,000 |

3.14    Indebtedness to Consolidated Tangible Net Worth Plus Subordinated Debt   Borrowers shall not permit the ratio of Indebtedness to Consolidated Tangible Net Worth plus Subordinated Debt to exceed the following:

| For Period Ending | Ratio |
|---|---|
| June 30, 2012 | 3.75 to 1 |
| June 30, 2013 | 3 50 to 1 |

3 15    Fixed Charge Coverage Ratio.  Borrowers shall not permit the Fixed Charge Coverage Ratio to be less than the following:

| For Period Ending | Ratio |
|---|---|
| June 30, 2012 | 1.10 to 1 |
| June 30, 2013 | 1.10 to 1 |

3.16    Debt Service Coverage.  Borrowers will at all times not permit its annual Debt Service Coverage Ratio to be less than 1 3:1, tested on June 30, 2012 and June 30, 2013   As used in this Agreement, "Debt Service Coverage Ratio" means, with respect to any entity or entities, for any period for which the same is to be determined, the ratio of (a) earnings from continuing operations of such entity or entities (but excluding gains and losses other than in the ordinary course of business) before depreciation and interest expense for such period to (b) the sum of (i) the current portion of all Indebtedness classified as long-term (in accordance with generally accepted accounting principles consistently applied ("GAAP") and (ii) the annual payments on any capitalized or finance

lease and all interest expense on all Indebtedness except paid in kind interest on shareholder loans. For purposes of the calculation of the Debt Service Coverage as of June 30, 2012, the principal amount of $1,000,000 of the $3,000,000 in aggregate principal amount of New Subordinated Loans plus $500,000 of unsubordinated loans that were subordinated effective January 3, 2012 shall be added to net income. For purposes of clarity, the current portion of long term Indebtedness shall include the amounts owing under the First Mortgage Loan, the New Term Loan, the IDA Bonds and the SEEDCO Loan.

    3 17    _Sale and Leaseback_.  Borrowers will not, and it will not permit any of its Subsidiaries to, directly or indirectly, enter into any arrangement with any lender or investor or to which such lender or investor is a party providing for the leasing by Borrowers or a Subsidiary of any real or personal property (i) which has been or is to be sold or transferred by Borrowers or any Subsidiary to such lender or investor or to any Person to whom funds have been or are to be advanced by such lender or investor on the security of such property or rental obligations of Borrowers or any Subsidiary or (ii) which has been or is to be acquired from another Person by such lender or investor, or on which one or more buildings have been or are to be constructed by such lender or investor, for the purpose of leasing such property to Borrowers or such Subsidiary

    3.18    _Sale of Assets, Consolidation, Merger, Etc_.  No Borrower will directly or indirectly sell, lease, transfer, abandon or otherwise dispose of all or any substantial portion of its property or assets or consolidate or merge with or into any other entity or permit any other entity to consolidate or merge with or into it. Each Borrower will at all times preserve, renew and keep in full force and effect its existence as a corporation and the rights and franchises with respect thereto, except to the extent provided above, and continue to engage in business of the same type as each Borrower is engaged as of the date hereof  Each Borrower shall give the Bank thirty (30) days prior written notice of any proposed change in its corporate name which notice shall set forth the new name.

    3 19    _Future Address_.  A Borrower may change the location of its chief executive office; provided, _that_, the Bank shall receive (30) days prior written notice of the date of the change of such Borrower's chief executive office within three (3) days after such change

    3.20    _Tax Loss_.  Each Borrower shall, and shall cause its shareholders to, notify the Bank of any refund owing to such Borrower or any shareholder or other affiliate of such Borrower arising out of any tax loss for any year related to the Subchapter S status of such Borrower and upon receipt of such refund shall promptly contribute, or cause such shareholder or other affiliate to contribute, such refund to the capital of such Borrower.

    3 21    _Amendment and Extension of Covenants_. The parties shall negotiate in good faith to determine covenants, including, without limitation, financial covenants that will apply following the Line of Credit Maturity Date, if the Bank in its discretion elects to extend the Line of Credit.

Section 4. EVENTS OF DEFAULT AND REMEDIES

    4 1    The occurrence of any one or more of the following shall constitute an "Event of Default" hereunder, under the Accounts Agreement and under the other Loan Documents:

    (a)    a Borrower shall be in default in the payment of any of the Obligations when due and said default is not cured within ten (10) days thereafter; or

    (b)    a Borrower, Guarantor or any other person at any time liable on or in respect of the Obligations shall fail to observe or perform in any material respect any covenants or agreements contained in this Agreement, the other Loan Documents or in any other document, instrument or mortgage referred to herein or therein other than as described in Section 4.1(a) above; or

    (c)    any present or future representation, warranty or statement of fact when made by or on behalf of a Borrower, Guarantor or any other person at any time liable on or in respect of the Obligations to the Bank is false or misleading in any material respect; or

    (d)    a judgment is rendered against a Borrower, Guarantor, or any other person at any time liable on or in respect of the Obligations in excess of $100,000 in any one case or in excess of $200,000 in the aggregate and the same shall remain undischarged for a period in excess of sixty (60) days or execution shall at any time not be effectively stayed; or

    (e)    a Borrower, Guarantor or any other person at any time liable on or in respect of the Obligations shall be generally unable to pay its debts as they mature, suspend or discontinue doing business for any reason, become insolvent, call a meeting of creditors or have a creditors' committee appointed, make a general assignment for the benefit of creditors, shall admit in writing its inability to pay its debts as they become due or shall commence any action or

proceeding for the appointment of any trustee, receiver, custodian or liquidator of a Borrower, Guarantor or such other person or all or any part of their respective properties or assets; or

(f)     a Borrower, Guarantor, any other person at any time liable on or in respect of the Obligations shall commence any action or proceeding for relief under the Bankruptcy Code or any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Bankruptcy Code or any other present or future statutes, law or regulation or shall take any corporate action to authorize any of such actions or proceedings; or

(g)    a Borrower, Guarantor or any other person at any time liable on or in respect of the Obligations shall have commenced against it any action or proceeding for relief under the Bankruptcy Code or any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Bankruptcy Code or any other present or future statute, law or regulation, or any action or proceeding for the appointment of any trustee, receiver, custodian or liquidator of a Borrower, Guarantor or such other Person or all or any part of their respective properties or assets, which is not dismissed within sixty (60) days of its commencement, or a Borrower, Guarantor or such other person shall file any answer admitting or not contesting the allegations of a petition filed against it in any such proceeding or by any act or omission indicates its consent to, acquiescence in or approval of, any such action or proceeding or if the relief requested is granted sooner; or

(h)    any guarantee of the Obligations shall at any time cease to be in full force and effect, or shall be declared void or invalid or the validity or enforceability thereof shall be contested by the applicable Guarantor of the Obligations or such Guarantor shall deny he or she has any further liability or Obligation, or shall fail to perform the obligations, under the applicable guarantee; or

(i)    a Borrower, Guarantor or any other person at any time liable on or in respect of the Obligations shall default in the payment of any amounts due on any Indebtedness, including, without limitation, the IDA Bonds or the SEEDCO Loan, owed by it or other obligations or liabilities owing by it to any person other than the Bank or in the performance of any other terms or covenants of evidence of such Indebtedness or of any mortgage, security agreement, indenture, pledge or other agreement or instrument relating thereto or securing such Indebtedness, or with respect to any contract, lease which default continues for more than the applicable cure period, if any, with respect thereto, but in no event more than thirty (30) days after the occurrence of any such default; or

(j)    there is any change in the control or ownership of a Borrower specifically excluding the transfer of shares by and between the shareholders or members, as the case may be, of a Borrower; their immediate families; and / or trusts for the benefit of any of them; or

(k)    there shall be a material adverse change in the business, assets or condition (financial or otherwise) of a Borrower, Guarantor or any other person at any time liable on or in respect of the Obligations;

(l)    any event or condition referred to in any agreement or instrument evidencing any indebtedness from the Bank shall occur or fail to occur so that, as a result thereof, such indebtedness included therein or secured or covered thereby may be declared due and payable prior to the date on which such indebtedness would otherwise become due and payable;

(m)   any proceeds of any Collateral are paid, disbursed or otherwise distributed to any Person other than the Bank; or

(n)    the occurrence of any default or Event of Default under any of the other Loan Documents or under the Other Financing Documents

4.2    Notwithstanding anything to the contrary herein, in the Accounts Agreement or in any of the other Loan Documents, all provisions of any such agreement with respect to the making of future loans and advances by the Bank to a Borrower shall, at the Bank's option, terminate forthwith upon the occurrence or existence of any act, condition or event which with notice or passage of time or both would constitute an Event of Default

4 3    Without limiting any rights or remedies of the Bank at any time on or after an Event of Default pursuant to the other Loan Documents or applicable law, the Bank may, at its option, cure any default by a Borrower under any agreement, law, regulation, permit, license or approval with, or issued or promulgated by any Person, which constitutes, or with notice or passage of time or both would constitute an Event of Default hereunder or under any of the other Loan Documents, or pay or bond on appeal any judgment, order, directive, claim or citation entered or made against a Borrower (irrespective of the amount of said judgment or the time elapsed since entry thereof, and charge a Borrower's account therefore, such amounts to be repayable by a Borrower to the Bank on demand, together with interest thereon at the rate of interest then payable by a Borrower under the Accounts Agreement; provided, however, the Bank shall be under no obligation to effect such cure, payment or bonding and shall not, by making any payment for a Borrower's account, be deemed to have assumed any obligation or liability of a Borrower or any such Affiliate.

Section 5   <u>MISCELLANEOUS</u>

    5 1    In the event of a conflict between the terms of the Accounts Agreement and the terms of any of the other Loan Documents, the Accounts Agreement shall control in each instance

Very truly yours,

METRO FUEL OIL CORP.

By: _____
    Name: Paul J. Pullo, Jr
    Title:  President


METRO TERMINALS CORP.

By: _____
    Name: Gene V. Pullo
    Title: President


METRO TERMINALS OF LONG ISLAND, LLC

By: _____
    Name: Gene V. Pullo
    Title: Member


ACCEPTED ON MAY 4, 2012:

NEW YORK COMMERCIAL BANK,
  as successor in interest to
   ATLANTIC BANK OF NEW YORK

By: _____
    Name:  Anthony C. Ragone
    Title: Vice President


VALLEY NATIONAL BANK,
  as co-lender under the New Term Loan

By: _____
    Name:  Thomas Munson
    Title:  Vice President

Case 1:12-cv-07093_LTS    Document 5-1    Filed 10/04/12    Page 53 of 101

EXHIBIT A
To the Covenant Supplement to
Amended and Restated Accounts Financing Agreement

<u>Existing Indebtedness</u>

<u>IDA Bonds</u>  --  Principal of $9,075,000 outstanding

Series A 5-year term – $1,545,000 (original)
Series B 20-year term – $8,405,000 (5 year principal moratorium in 2008-2012) (original)
Interest rate not to exceed 7% in each facility

Interest -- Quarterly
Repayment schedule – 20-year amortization with principal payments commencing 1 year after closing.


SEEDCO Loan – Principal of $1,452,000 outstanding
                ($1,500,000 original)

EXHIBIT B


To the Covenant Supplement to
Amended and Restated Accounts Financing Agreement


Existing Liens



First, Second and Third Mortgage on land designated as lot 150 and all improvements thereon and First, Second and Third Mortgage securing up to $10,000,000 on the equipment to be used at the BioFuel Plant, all in connection with the IDA Bonds.

EXHIBIT C

To the Covenant Supplement to
Amended and Restated Accounts Financing Agreement (Security Agreement)

<u>Non-Standard Investments</u>

None

EXHIBIT D

To the Covenant Supplement to
Amended and Restated Accounts Financing Agreement

Shareholders: METRO FUEL OIL CORP.

| NAME | PERCENTAGE |
|------|------------|
| Paul J. Pullo | 47.5% |
| Gene V. Pullo | 47.5% |
| Paul Pullo Sr | 5% |

Shareholders: METRO TERMINALS CORP.

| NAME | PERCENTAGE |
|------|------------|
| Paul J. Pullo | 50% |
| Gene V. Pullo | 50% |

Interest Holders: METRO TERMINALS OF LONG ISLAND, LLC

| NAME | PERCENTAGE |
|------|------------|
| Paul J. Pullo | 50% |
| Gene V. Pullo | 50% |

Case 1:12-cv-07693_LTS   Document 5-1   Filed 10/??/12   Page 57 of 101

EXHIBIT E

To the Covenant Supplement to
Amended and Restated Accounts Financing Agreement

Intellectual Property License

None

Schedule 3.5

<u>Transactions with Affiliates</u>

-- Lease among Metro Fuel Oil Corp. and Kingsland Realty dated 1991.

-- Transactions between Metro Terminals Corp. and Metro BioFuels LLC
   in respect of the purchase, sale, conversion and storage of biofuel feedstock inventory.

-- Sublease Agreement between Metro Terminals Corp. and Metro BioFuels, LLC entered into as part of the IDA Bonds.

-- Lease between Metro Terminals of Long Island and Metro Terminals Corp. for the Calverton facility.

Exhibit 3

## THIRD AMENDED AND RESTATED
## SECURED LINE OF CREDIT NOTE

$55,000,000.00
(Maximum Principal Amount)

May 4, 2012

    This Third Amended and Restated Secured Line of Credit Note amends and restates that certain Second Amended and Restated Secured Line of Credit Note dated February 1, 2008 in the principal amount of $60,000,000 issued by the Borrower (as defined below) to the Bank (as defined below).

    FOR VALUE RECEIVED, the undersigned, METRO FUEL OIL CORP., a New York corporation, METRO TERMINALS CORP., a New York corporation, and METRO TERMINALS OF LONG ISLAND LLC, a New York limited liability company (each, a "Borrower" and together, the "Borrowers"), hereby jointly and severally promise to pay to the order of NEW YORK COMMERCIAL BANK, as successor in interest to ATLANTIC BANK OF NEW YORK (the "Bank") at the Bank's head office at 615 Merrick Avenue, Westbury, New York 11590:

        (a)    prior to or on the Line of Credit Maturity Date, the principal amount of Fifty-Five Million Dollars ($55,000,000) or, if less, the aggregate unpaid principal amount of loans advanced by the Bank to the Borrowers under the Line of Credit pursuant to the Third Amended and Restated Accounts Financing Agreement dated as of the date hereof (as amended and in effect from time to time, the "Accounts Financing Agreement"), among the Bank, Valley National Bank (for the limited purpose set forth therein) and the Borrowers;

        (b)    the principal outstanding hereunder from time to time at the times provided in the Accounts Financing Agreement; and

        (c)    interest on the principal balance hereof from time to time outstanding under the Accounts Financing Agreement through and including the maturity date hereof at the times and at the rate provided in the Accounts Financing Agreement.

    This Note evidences borrowings under and has been issued by the Borrowers in accordance with the terms of the Accounts Financing Agreement. The Bank and any holder hereof is entitled to the benefits of the Accounts Financing Agreement, the Security Agreement and the other Loan Documents, and may enforce the agreements of the Borrowers contained therein, and any holder hereof may exercise the respective remedies provided for thereby or otherwise available in respect thereof, all in accordance with the respective terms thereof. All capitalized terms used in this Note and not otherwise defined herein shall have the same meanings herein as in the Accounts Financing Agreement.

    Each Borrower irrevocably authorizes the Bank to make or cause to be made, at or about the time of the drawdown of any loan under the Line of Credit or at the time of receipt of any payment of principal of this Note, an appropriate notation on the grid attached to this Note, or the

continuation of such grid, or any other similar records, including computer records, reflecting the making of such loan or (as the case may be) the receipt of such payment. The outstanding amount of the loans under the Line of Credit set forth on the grid attached to this Note, or the continuation of such grid, or any other similar records, including computer records, maintained by the Bank with respect to any loans under the Line of Credit shall be prima facie evidence of the principal amount thereof owing and unpaid to the Bank, but the failure to record, or any error in so recording any such amount on any such grid, continuation or other record shall not limit or otherwise affect the obligation of the Borrowers hereunder or under the Accounts Financing Agreement to make payments of principal of and interest on this Note when due.

Each Borrower has the right in certain circumstances and the obligation under certain other circumstances to prepay, the whole or part of the principal of this Note on the terms and conditions specified in the Accounts Financing Agreement.

If any one or more of the Events of Default shall occur, the entire unpaid principal amount of this Note and all of the unpaid interest accrued thereon may become or be declared due and payable in the manner and with the effect provided in the Accounts Financing Agreement.

No delay or omission on the part of the Bank or any holder hereof in exercising any right hereunder shall operate as a waiver of such right or of any other rights of the Bank or such holder, nor shall any delay, omission or waiver on any one occasion be deemed a bar or waiver of the same or any other right on any further occasion.

Each Borrower and every endorser and guarantor of this Note or the obligation represented hereby waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note, and assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral and to the addition or release of any other party or person primarily or secondarily liable.

EACH BORROWER HEREBY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING OF ANY KIND ARISING OUT OF OR RELATING TO THIS NOTE. EACH BORROWER HEREBY WAIVES RIGHTS OF SET-OFF AND RIGHTS TO INTERPOSE COUNTERCLAIMS IN THE EVENT OF ANY LITIGATION WITH RESPECT TO ANY MATTER CONNECTED WITH THIS NOTE. EACH BORROWER HEREBY IRREVOCABLY CONSENTS AND SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK IN CONNECTION WITH ANY ACTION OR PROCEEDING OF ANY KIND ARISING OUT OF OR RELATING TO THIS NOTE. IN ANY SUCH LITIGATION EACH BORROWER WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS AND AGREES THAT SERVICE THEREOF MAY BE MADE BY CERTIFIED OR REGISTERED MAIL DIRECTED TO A BORROWER AT ITS ADDRESS SET FORTH BELOW. THIS NOTE SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THAT STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

{N0301172; 2}

IN WITNESS WHEREOF, the undersigned have caused this Third Amended and Restated Secured Line of Credit Note to be signed in its corporate name by its duly authorized officer as of the day and year first above written.

METRO FUEL OIL CORP.

By:
Name: Paul J. Pullo
Title: President

Address:   500 Kingsland Avenue
                  Brooklyn, New York 11222

METRO TERMINALS CORP.

By:
Name: Gene V. Pullo
Title: President

Address:   500 Kingsland Avenue
                  Brooklyn, New York 11222

METRO TERMINALS OF LONG ISLAND, LLC

By:
Name: Gene V. Pullo
Title: Member

Address:   500 Kingsland Avenue
                  Brooklyn, New York 11222

- 3 -

{N0303172; 2}

| Date | Amount of Loan | Amount of Principal Paid or Prepaid | Balance of Principal unpaid | Notation Made by: |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

-4-

Exhibit 4

1/903/06705

|  |  |
|---|---|
| | LOAN NUMBER        120631100001 |
| | CUSTOMER NUMBER            861 |
| METRO FUEL OIL CORP | BILLING DATE          9/28/12 |
| | PAYMENT DUE DATE       10/01/12 |
| ****** NO MAIL ****** | CURRENT PAYMENT DUE   215,218.87 |
| | PAST DUE PAYMENT(S)         .00 |
| | LATE CHARGES DUE            .00 |
| | TOTAL DUE             215,218.87 |

IF PAYMENT MADE AFTER   10/01/12          AMOUNT ENCLOSED $_____

INCLUDE LATE CHARGE OF 10,760.94          EXTRA APPLIED TO _____ $_____

   PLEASE RETURN THIS TOP PORTION WITH YOUR PAYMENT

                                             PAGE    1

---

LOAN NUMBER 120631100001    INTEREST RATE 9.750004    MATURITY DATE 12/01/13

PROPERTY ADDRESS:
NO ADDRESS

BILLING SUMMARY:

| BILL-DESCR | DUE DATE | PRIN DUE | INT DUE | LC DUE | TOTAL DUE |
|---|---|---|---|---|---|
| CURRENT | 10/01/12 | .00 | 215,218.87 | .00 | |
| | ESC DUE | MISC CHARGE | OTH CHARGE | | |
| | .00 | .00 | .00 | | 215,218.87 |
| | | | TOTAL DUE THIS LOAN | | 215,218.87 |

ACCOUNT SUMMARY:

| | | | |
|---|---|---|---|
| PRINCIPAL BALANCE | 31,357,545.12 | ESCROW BALANCE | .00 |
| YTD INTEREST | 1,405,101.04 | YTD TAXES | .00 |

ACTIVITY SUMMARY:          FROM  9/01/12 THRU  9/28/12

| DESCRIPTION | DATE | TRAN AMT | PRIN AMT | INT AMT | LC AMT | OTHER |
|---|---|---|---|---|---|---|
| PAYMENT | 9/04/12 | 138,251.32 | .00 | 138251.32 | .00 | |
| RATE CHANGE | * 9/11/12 | | | | | 9.75000 |
| INTEREST PMT | * 9/11/12 | 30,770.47 | | 30770.47 | | |
| PRINCIPAL PMT | 9/12/12 | 1467,538.76 | 1467,538.76 | | | |
| PRINCIPAL PMT | 9/13/12 | 1249,464.06 | 1249,464.06 | | | |
| PRINCIPAL PMT | 9/14/12 | 54,885.50 | 54,885.50 | | | |

Exhibit 5

### Expenses on Line of Credit as of September 30, 2012

| DATE SENT | DATE RCVD | DESCRIPTION | DEBIT | CREDIT | TOTAL BALANCE |
|---|---|---|---|---|---|
| 8/7/2012 | 8/7/2012 | Consulting Services | $15,000.00 | | $15,000.00 |
| 8/15/2012 | 8/15/2012 | Consulting Services | $13,749.02 | | $28,749.02 |
| 8/21/2012 | 8/21/2012 | Appraisal Services | $25,000.00 | | $53,749.02 |
| 9/7/2012 | 9/7/2012 | Consulting Services | $44,488.16 | | $98,237.18 |
| 9/7/2012 | 9/7/2012 | Consulting Services | $19,058.10 | | $117,295.28 |
| 9/18/2012 | 9/18/2012 | Consulting Services | $37,769.48 | | $155,064.76 |
| 9/28/2012 | 9/28/2012 | Consulting Services | $19,100.50 | | $174,165.26 |

Case 1:12-cv-07693_LTS   Document 5-1   Filed 10/04/12   Page 68 of 101

Exhibit 6

EXECUTION COPY

## GUARANTEE AGREEMENT

GUARANTEE AGREEMENT dated as of May 4, 2012 made by **Paul J. Pullo** (the "Guarantor") in favor of NEW YORK COMMERCIAL BANK, as successor in interest to ATLANTIC BANK OF NEW YORK (the "Bank").

WHEREAS, the Guarantor has guaranteed amounts owing to the Bank by the Borrower (as defined herein) under a loan facility provided by the Bank; and

WHEREAS, the Bank and the Borrower are this day executing the Accounts Financing Agreement (as defined herein) and the Bank requires the Borrower to ratify and reaffirm his guarantee obligations by executing and delivering this Guarantee Agreement;

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Guarantor agrees as follows:

1.    Guarantee.  (a) The Guarantor hereby unconditionally and irrevocably guaranties to the Bank the prompt and complete payment when due (whether at the stated maturity, upon demand, by acceleration or otherwise) of any and all present and future indebtedness and obligations of the Borrower at any time and from time to time owing or otherwise payable to the Bank, whether mature or contingent (including without limitation all obligations of Borrower under or otherwise described in the Accounts Financing Agreement, as defined below), including without limitation all interest which may be payable on such indebtedness and obligations prior to or during the pending of any insolvency or similar proceeding with respect to the Borrower. All such indebtedness and obligations  are referred to in this Guarantee Agreement as the "Indebtedness" and will be payable by the Guarantor to the Bank at its office set forth alongside its name on the signature page hereof or at such other payment office as the Bank may notify Guarantor of in writing, in immediately available funds, immediately on demand in the event of any default of the Borrower with respect to the Indebtedness or any part thereof, without setoff or counterclaim.  If the Bank is prevented by law from accelerating any of the Indebtedness in accordance with the terms of any agreement or instrument governing same, the Bank shall be entitled to receive hereunder from Guarantor, upon demand therefor, the sum which would have otherwise been due had such acceleration occurred.

(b)     Anything herein to the contrary notwithstanding, in the event of a bankruptcy of Guarantor the maximum liability of the Guarantor hereunder (said maximum liability, the "Maximum Guaranteed Amount") shall in no event exceed such amount as was able to be guaranteed by the Guarantor under applicable federal and state laws relating to the insolvency of debtors.

(c)     Guarantor agrees that the Indebtedness may at any time and from time to time exceed the Maximum Guaranteed Amount of Guarantors without impairing this Guarantee Agreement or affecting the rights and remedies of the Bank hereunder.

(d)     No payment or payments made by the Borrower, any other guarantor or any other Person or received or collected by the Bank from the Borrower, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or

any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time in reduction of or in payment of the Indebtedness shall be deemed to modify, reduce, release or otherwise affect the liability of Guarantor hereunder which shall, notwithstanding any such payment or payments other than payments made to the Bank by Guarantor or payments received or collected by the Bank from Guarantor, remain liable for the Indebtedness up to the Maximum Guaranteed Amount until the Indebtedness is indefeasibly paid in full.

2.    Rights of Bank.  Guarantor authorizes the Bank at any time in its discretion  to alter any of the terms of the Indebtedness (subject only to the consent of the Borrower), to take and hold any security for the Indebtedness and to accept additional or substituted security, to subordinate, compromise or release any security, to release the Borrower or any other party of its liability for all or any part of the Indebtedness, to release, substitute or add any one or more guarantors or endorsers, and to assign this Guarantee Agreement in whole or in part.  Any modifications, renewals and extensions of the Indebtedness may be made at any time by the Bank, before or after any termination of this Guarantee Agreement, and Guarantor shall be fully liable for any such modifications, renewals or extensions.  The Bank may take any of the foregoing actions upon any terms and conditions as the Bank may elect, without giving notice to Guarantor or obtaining the consent of Guarantor and without affecting the liability of Guarantor to the Bank.

3.    Independent Obligations.  (a) This Guarantee Agreement is a guarantee of payment rather than a guarantee of collection.  Guarantor's obligations under this Guarantee Agreement are independent of those of the Borrower and any security for or other guarantee of the Indebtedness of the Borrower.  The Bank may bring a separate action against the Guarantor without first proceeding against the Borrower or any other person or any security held by the Bank and without pursuing any other remedy.  The Bank's rights under this Guarantee Agreement will not be exhausted by any action or inaction by the Bank until all of the Indebtedness has been indefeasibly paid in full.  Any statute of limitations which is tolled as to the Borrower by reason of any payment by the Borrower or other circumstance shall operate to toll the statute of limitations as to Guarantor.

(b)    The liability of Guarantor hereunder is not affected or impaired by any direction or application of payment by the Borrower or by any other party, or by any other guarantee or undertaking of any other guarantor or any other party as to the Indebtedness of the Borrower, by any payment on, or in reduction of, any such other guarantee or undertaking, by the termination, revocation or release of any obligations hereunder or of any other guarantor, or by any payment made to the Bank on the Indebtedness which the Bank repays to the Borrower or any other guarantor or other person or entity pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, or any other fact or circumstance which would excuse the obligation of a guarantor or surety, and the Guarantor waives any right to the deferral or modification of the Guarantor's obligations hereunder by reason of any such proceeding, fact or circumstance.  This Guarantee shall continue to be effective in accordance with its terms, or be reinstated, as the case may be, if at any time payment, or any part thereof, of or with respect to any of the Indebtedness is rescinded or must otherwise be restored or returned by the Bank upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any other payor thereof, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the

- 2 -

Borrower or any other payor thereof or any substantial part of its property, or otherwise, all as though such payments had not been made.

4.  Definitions. (a) Capitalized terms used herein without definition (by cross-reference or otherwise) shall have the meanings provided for such terms (by cross-reference or otherwise) in the Accounts Financing Agreement (as defined below).

(b)  As used herein, unless the context indicates otherwise the following terms have the following meanings (and shall include in the singular number the plural and in the plural number the singular):

"Accounts Financing Agreement" means the Third Amended and Restated Accounts Financing Agreement dated the date hereof among the Bank, Valley National Bank (for certain limited purposes) and Borrower, together with the Third Amended and Restated Covenant Supplement pursuant thereto, as each of the same may hereafter be amended.

"Borrower" shall mean collectively Metro Fuel Oil Corp., Metro Terminals Corp., each a New York corporation, and Metro Terminals of Long Island, LLC, a New York limited liability company.

(c)  Unless otherwise specified, each reference in this Guarantee Agreement or in any other Loan Document to a Loan Document shall mean such Loan Document as the same may from time to time be amended, restated, replaced, supplemented or otherwise modified from time to time with the consent of the Bank.

(d)  As used in this Guarantee Agreement, the terms "including," "including without limitation" and "such as" (and like terms) are illustrative and not limitative. No difference shall be imputed to the use in some places herein of "including" and in others of "including without limitation." Phrases such as "hereof" and "herein" refer to the entire Agreement and not just the section or other portion in which said reference appears.

5.  Representations and Warranties. The Guarantor represents, warrants and agrees that (which representations, warranties and agreements shall survive the Guarantor's execution of this Guarantee Agreement):

(a)  Guarantor has the full power and authority to own his properties and assets and to carry on his business as now being conducted.

(b)  Guarantor has full power, authority and legal right to execute, deliver and perform this Guarantee Agreement.

(c)  The execution, delivery and performance by Guarantor of this Guarantee Agreement has been duly authorized by all necessary action. This Guarantee Agreement constitutes a legal, valid and binding obligation of Guarantor enforceable against Guarantor in accordance with its terms.

(d)  This Guarantee Agreement is in proper legal form under the laws of Guarantor's residence and principal location for enforcement thereof against Guarantor in the courts of any such jurisdiction and that in any legal action upon this Guarantee Agreement in any

- 3 -

{N0306122; 1}

such jurisdiction, the choice of law set forth in Section 15 hereof would be given effect by the courts of such jurisdiction.

(e)    The execution, delivery and performance of this Guarantee Agreement will not contravene any provision of law, rule or regulation to which Guarantor is subject or any judgment, decree or order applicable to Guarantor nor conflict or be inconsistent with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any lien or other encumbrance upon any of the property or assets of Guarantor pursuant to the terms of, any agreement or other instrument to which Guarantor is a party or by which he or his property is bound or to which he or his property may be subject.

(f)    Guarantor is financially interested in the affairs of the Borrower and derives benefit, directly or indirectly, from loans made to the Borrower under the Accounts Financing Agreement. The economic success of Guarantor is dependent on the economic success of the Borrower.

6.    Covenants. So long as this Guarantee Agreement shall be in effect or any obligations shall remain outstanding hereunder, the Guarantor agrees to comply with each of the following covenants, unless the Bank should otherwise consent in writing:

(a)    Guarantor will not take any action which would prevent or interfere with the performance by the Borrower or any other guarantor of any of the covenants, agreements, or obligations of such Person contained in any agreements or instruments governing the Indebtedness.

(b)    Not later than April 30 of each year while this Guarantee Agreement is in effect, Guarantor shall deliver to the Bank the Guarantor's personal financial statement in such form as the Bank may require, and a copy of the Guarantor's personal tax returns (or applicable extension applications) filed for the immediately preceding year.

7.    Waivers of Defenses. The Guarantor, to the fullest extent permitted by law, waives: (a) any defense based upon any legal disability of the Borrower or any discharge or limitation of the liability of the Borrower to the Bank, whether consensual or arising by operation of law or any bankruptcy, insolvency, or debtor-relief proceeding, or from any other cause; (b) presentment, demand and protest of any kind; (c) any defense based upon or arising out of any defense which the Borrower may have to the payment or performance of any part of the Indebtedness; (d) any defense based upon any disbursements by the Bank to the Borrower pursuant to any agreements or instruments governing or securing the Indebtedness whether same be deemed an additional advance or be deemed to be paid out of any special interest or other fund accounts, as constituting unauthorized payments hereunder or amounts not guaranteed by this Guarantee Agreement; (e) all rights to participate in any security held by the Bank for the Indebtedness; (f) irregularity or unenforceability of any agreement or instrument representing or governing or securing the Indebtedness; (g) any request that the Bank be diligent or prompt in making demands hereunder or under any agreement or instrument representing or governing or securing the Indebtedness; and (h) any other defense in law or equity (other than the defense that the Indebtedness has been indefeasibly paid in full) which, under applicable law, would release the obligation of a guarantor or surety, until the Indebtedness has been indefeasibly paid in full.

- 4 -

{N0306122; 1}

8.    <u>Borrower's Authority and Financial Condition</u>.  It is not necessary for the Bank to inquire into the capacity or powers of the Borrower or the officers, directors, partners or agents acting or purporting to act on the Borrower's behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.  The Guarantor assumes full responsibility for keeping fully informed of the financial condition of the Borrower and all other circumstances affecting the Borrower's ability to perform its obligations to the Bank, and agrees that the Bank will not have any duty to report to Guarantor any information which it receives about the Borrower's financial condition or any circumstances bearing on its ability to perform, and expressly waives any right to receive such information and any defense based upon failure to receive such information.

9.    <u>Waiver of Subrogation Until Indebtedness Paid</u>.  Irrespective of any payment by the Guarantor to the Bank pursuant to this Guarantee Agreement, the Guarantor will not be subrogated in place of and to the claims and demands of the Bank nor will the Guarantor have any right to participate in any security or lien now or hereafter held by or on behalf of the Bank until the final indefeasible payment and satisfaction of all claims and demands due to the Bank hereunder and under the Accounts Financing Agreement.

10.   <u>Right of Setoff</u>.  In addition to all rights of setoff or lien against any moneys, securities or other property of Guarantor given to the Bank by law, upon the occurrence of any default under any agreement or instrument governing any of the Indebtedness or under this Guarantee Agreement, the Bank is authorized (to the full extent permitted by applicable law) at any time and from time to time, to set-off and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by the Bank to or for the credit or the account of Guarantors against and on account of the obligations of Guarantor under this Guarantee Agreement, irrespective of whether or not the Bank shall have made any demand hereunder or any demand for payment of any Indebtedness and although said obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

11.   <u>Default</u>.  The Bank may declare the Guarantor in default under this Guarantee Agreement, and may exercise all of its rights hereunder and demand payment of the aggregate outstanding principal amount of all Indebtedness, if the Guarantor fails to perform any of its obligations under this Guarantee Agreement or if the Guarantor becomes the subject of any bankruptcy, insolvency, arrangement, reorganization, moratorium, or other debtor-relief proceeding under any law, whether now existing or hereafter enacted, or upon the appointment of a receiver for, or the attachment, restraint of or making or levying of any order of court or legal process affecting, the property of the Guarantor.

12.   <u>Costs and Expenses</u>.  In addition to the amounts guaranteed hereunder, Guarantor agrees to pay the Bank's reasonable out-of-pocket costs and expenses, including but not limited to legal fees and disbursements, incurred in any effort to collect or enforce any of the Indebtedness or this Guarantee Agreement, whether or not any lawsuit is filed.

13.   <u>Delay; Cumulative Remedies</u>.  No delay or failure by the Bank to exercise any right or remedy against, or to require performance by, the Borrower or Guarantor or any other party shall be construed as a waiver of that right, remedy or requirement, and all such powers of the Bank shall remain in full force and effect, until specifically waived or released by an instrument in writing executed by the Bank.  All remedies of the Bank against the Borrower and Guarantor are cumulative.

- 5 -

{N0306122; 1}

14.     _Subordination._  Except to the extent otherwise permitted by the Agreement of
Subordination dated the date hereof between the Bank and Guarantor, the Guarantor agrees that
any and all indebtedness or claims it may have against the Borrower or any other guarantor,
whether such claims are in connection with this Guarantee Agreement, the Indebtedness, or are
completely independent of this Guarantee Agreement and the Indebtedness, will be subordinate
to the claims of the Bank under this Guarantee Agreement and all Indebtedness guaranteed
hereby, and that the Guarantor will not assert any such claim against the Borrower until all
Indebtedness to the Bank has been completely satisfied hereunder.  Notwithstanding such
subordination, and without affecting or impairing in any manner the liability of Guarantor under
the other provisions of this Guarantee Agreement, any Indebtedness of the Borrower to any other
guarantor, if the Bank so requests, shall be collected, enforced and received by Guarantor as
trustee for the Bank and paid over to the Bank on account of the Indebtedness of the Borrower to
the Bank.

15.     _Governing Law._  THIS GUARANTEE AGREEMENT AND THE RIGHTS AND
OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND
CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE
STATE OF NEW YORK WITHOUT REFERENCE TO CHOICE OF LAW DOCTRINE THAT
WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

16.     _Jurisdiction._  The Guarantor hereby agrees that ANY LEGAL ACTION OR
PROCEEDING AGAINST GUARANTOR WITH RESPECT TO THIS GUARANTEE
AGREEMENT OR ANY OTHER AGREEMENTS OR DOCUMENTS CONTEMPLATED
HEREBY OR REFERRED TO HEREIN (INCLUDING WITHOUT LIMITATION ANY
SECURITY DOCUMENT EXECUTED BY HIM) MAY BE BROUGHT IN THE COURTS OF
THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE
SOUTHERN DISTRICT OF NEW YORK AS THE BANK MAY ELECT, AND BY
EXECUTION AND DELIVERY OF THIS GUARANTEE AGREEMENT GUARANTOR
ACCEPTS AND CONSENTS FOR HIMSELF AND IN RESPECT TO HIS PROPERTY,
GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID
COURTS AND AGREES THAT SUCH JURISDICTION SHALL BE EXCLUSIVE, unless
waived by the Bank in writing, with respect to any action or proceeding brought by him against
the Bank and any questions relating to usury, and further consents (to the extent permitted by
applicable law) to the service of process in any such action or proceeding being made upon
Guarantor by certified mail, return receipt requested at the address stated alongside his name on
the signature page hereof or at such other address as the Bank is notified of in accordance with
Section 19 hereof.  Guarantor hereby waives any objection that he may now or hereafter have to
the venue of any such suit or any such court or that such suit is brought in an inconvenient court.
Nothing herein shall limit the right of the Bank to bring proceedings against Guarantor in the
courts of any other jurisdiction.  Guarantor covenants that he is and will remain subject to service
of process in the State of New York so long as any of the Indebtedness is outstanding.  If for any
reason Guarantor should not be or remain so qualified, Guarantor hereby designates and
appoints, without power of revocation, CT Corporation System, Inc., 111 Eighth Avenue, New
York, New York, as the agent of Guarantor upon whom may be served all process, pleadings,
notices or other papers which may be served upon Guarantor as a result of any of his obligations
under this Guarantee Agreement.  Nothing herein shall affect the right of the Bank to serve
process in any other manner permitted by law.

{N0306122; 1}

17.   <u>Severability</u>.  If any one or more of the provisions contained in this Guarantee Agreement or any document executed in connection herewith shall be invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality and enforceability of the remaining provisions contained herein shall not (to the full extent permitted by law) in any way be affected or impaired.

18.   <u>Judgment Currency</u>.  If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum due hereunder into any other currency (the "<u>Other Currency</u>"), the rate of exchange used shall be that with which in accordance with normal banking procedures the Bank could purchase Dollars with the Other Currency on the business day preceding that on which final judgment is given.  The obligation of Guarantor in respect of any sum due from him to the Bank hereunder, notwithstanding judgment in such Other Currency, shall be discharged only to the extent that on the business day following receipt by the Bank of any sum adjudged to be so due in the Other Currency, the Bank may in accordance with normal banking procedures purchase Dollars with the Other Currency; if the Dollars so purchased shall be less than the sum originally due to the Bank, Guarantor agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Bank against such loss.

19.   <u>Notices</u>.  Except as otherwise expressly provided herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be deemed to have been duly given or made when delivered if sent by Federal Express or other similar overnight delivery service, or when deposited in the mails (by registered or certified mail, return receipt requested), postage prepaid, or in the case of telex, telegraphic, telecopier or cable notice (if a number therefor is set forth below), when delivered to the telex, telegraph, telecopier or cable company, or in the case of telex or telecopier notice sent over a telex or telecopier owned or operated by a party hereto, when sent, addressed to the party entitled to receive same to the address stated alongside his name on the signature page hereto (or to such other address as any party hereto may hereafter specify to the other in writing); <u>provided that</u> communications with respect to a change of address shall be deemed to be effective when actually received.

20.   <u>Amendment</u>.  No provisions of this Guarantee Agreement shall be waived, amended or supplemented except by a written instrument executed by Guarantor and the Bank.

21.   <u>Miscellaneous</u>.  The provisions of this Guarantee Agreement will bind and benefit the successors, heirs, estate, representatives and permitted assigns of Guarantor.  No obligation hereunder may be assigned by the Guarantor without the prior written consent of the Bank, and any purported assignment without such consent shall be null and void.  The term "<u>Borrower</u>" will mean both the named Borrowers and any other person or entity at any time assuming or otherwise becoming primarily liable on all or any part of the Indebtedness.  The descriptive headings used in this Guarantee Agreement are for convenience only and shall not be deemed to affect the meaning or construction of any provision hereof.

22.   <u>Counterparts</u>.  This Guarantee Agreement may be executed in any number of counterparts, and by the different parties hereto or thereto (as the case may be) on the same or separate counterparts, each of which when so executed shall be deemed to be an original and all such counterparts shall together constitute one and the same instrument.  Telecopied or pdf signatures hereto shall be of the same force and effect as an original of a manually signed copy.

{N0306122; 1}

23.    <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE BANK AND THE GUARANTOR
HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY AND
ALL RIGHTS IT OR HE MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY
LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH,
THIS GUARANTEE AGREEMENT OR ANY LOAN DOCUMENT, OR ANY COURSE OF
CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR
WRITTEN), OR ACTIONS OF THE BANK, THE GUARANTOR, THE BORROWER OR
ANY OTHER PERSONS.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Guarantee
Agreement as of the date first above written.

Address

Paul J. Pullo

500 Kingsland Avenue
Brooklyn, New York  11222

{N0306122; }

Exhibit 7

EXECUTION COPY

## GUARANTEE AGREEMENT

      GUARANTEE AGREEMENT dated as of May 4, 2012 made by **Gene V. Pullo** (the "Guarantor") in favor of NEW YORK COMMERCIAL BANK, as successor in interest to ATLANTIC BANK OF NEW YORK (the "Bank").

      WHEREAS, the Guarantor has guaranteed amounts owing to the Bank by the Borrower (as defined herein) under a loan facility provided by the Bank; and

      WHEREAS, the Bank and the Borrower are this day executing the Accounts Financing Agreement (as defined herein) and the Bank requires the Borrower to ratify and reaffirm his guarantee obligations by executing and delivering this Guarantee Agreement;

      NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Guarantor agrees as follows:

      1.    Guarantee.  (a) The Guarantor hereby unconditionally and irrevocably guaranties to the Bank the prompt and complete payment when due (whether at the stated maturity, upon demand, by acceleration or otherwise) of any and all present and future indebtedness and obligations of the Borrower at any time and from time to time owing or otherwise payable to the Bank, whether mature or contingent (including without limitation all obligations of Borrower under or otherwise described in the Accounts Financing Agreement, as defined below), including without limitation all interest which may be payable on such indebtedness and obligations prior to or during the pending of any insolvency or similar proceeding with respect to the Borrower. All such indebtedness and obligations  are referred to in this Guarantee Agreement as the "Indebtedness" and will be payable by the Guarantor to the Bank at its office set forth alongside its name on the signature page hereof or at such other payment office as the Bank may notify Guarantor of in writing, in immediately available funds, immediately on demand in the event of any default of the Borrower with respect to the Indebtedness or any part thereof, without setoff or counterclaim.  If the Bank is prevented by law from accelerating any of the Indebtedness in accordance with the terms of any agreement or instrument governing same, the Bank shall be entitled to receive hereunder from Guarantor, upon demand therefor, the sum which would have otherwise been due had such acceleration occurred.

      (b)    Anything herein to the contrary notwithstanding, in the event of a bankruptcy of Guarantor the maximum liability of the Guarantor hereunder (said maximum liability, the "Maximum Guaranteed Amount") shall in no event exceed such amount as was able to be guaranteed by the Guarantor under applicable federal and state laws relating to the insolvency of debtors.

      (c)    Guarantor agrees that the Indebtedness may at any time and from time to time exceed the Maximum Guaranteed Amount of Guarantors without impairing this Guarantee Agreement or affecting the rights and remedies of the Bank hereunder.

      (d)    No payment or payments made by the Borrower, any other guarantor or any other Person or received or collected by the Bank from the Borrower, any other guarantor or

any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time in reduction of or in payment of the Indebtedness shall be deemed to modify, reduce, release or otherwise affect the liability of Guarantor hereunder which shall, notwithstanding any such payment or payments other than payments made to the Bank by Guarantor or payments received or collected by the Bank from Guarantor, remain liable for the Indebtedness up to the Maximum Guaranteed Amount until the Indebtedness is indefeasibly paid in full.

    2.    Rights of Bank. Guarantor authorizes the Bank at any time in its discretion  to alter any of the terms of the Indebtedness (subject only to the consent of the Borrower), to take and hold any security for the Indebtedness and to accept additional or substituted security, to subordinate, compromise or release any security, to release the Borrower or any other party of its liability for all or any part of the Indebtedness, to release, substitute or add any one or more guarantors or endorsers, and to assign this Guarantee Agreement in whole or in part. Any modifications, renewals and extensions of the Indebtedness may be made at any time by the Bank, before or after any termination of this Guarantee Agreement, and Guarantor shall be fully liable for any such modifications, renewals or extensions. The Bank may take any of the foregoing actions upon any terms and conditions as the Bank may elect, without giving notice to Guarantor or obtaining the consent of Guarantor and without affecting the liability of Guarantor to the Bank.

    3.    Independent Obligations. (a) This Guarantee Agreement is a guarantee of payment rather than a guarantee of collection. Guarantor's obligations under this Guarantee Agreement are independent of those of the Borrower and any security for or other guarantee of the Indebtedness of the Borrower. The Bank may bring a separate action against the Guarantor without first proceeding against the Borrower or any other person or any security held by the Bank and without pursuing any other remedy. The Bank's rights under this Guarantee Agreement will not be exhausted by any action or inaction by the Bank until all of the Indebtedness has been indefeasibly paid in full. Any statute of limitations which is tolled as to the Borrower by reason of any payment by the Borrower or other circumstance shall operate to toll the statute of limitations as to Guarantor.

        (b)    The liability of Guarantor hereunder is not affected or impaired by any direction or application of payment by the Borrower or by any other party, or by any other guarantee or undertaking of any other guarantor or any other party as to the Indebtedness of the Borrower, by any payment on, or in reduction of, any such other guarantee or undertaking, by the termination, revocation or release of any obligations hereunder or of any other guarantor, or by any payment made to the Bank on the Indebtedness which the Bank repays to the Borrower or any other guarantor or other person or entity pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, or any other fact or circumstance which would excuse the obligation of a guarantor or surety, and the Guarantor waives any right to the deferral or modification of the Guarantor's obligations hereunder by reason of any such proceeding, fact or circumstance. This Guarantee shall continue to be effective in accordance with its terms, or be reinstated, as the case may be, if at any time payment, or any part thereof, of or with respect to any of the Indebtedness is rescinded or must otherwise be restored or returned by the Bank upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any other payor thereof, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the

- 2 -

Borrower or any other payor thereof or any substantial part of its property, or otherwise, all as
though such payments had not been made.

    4.    Definitions. (a) Capitalized terms used herein without definition (by cross-
reference or otherwise) shall have the meanings provided for such terms (by cross-reference or
otherwise) in the Accounts Financing Agreement (as defined below).

        (b)    As used herein, unless the context indicates otherwise the following terms
have the following meanings (and shall include in the singular number the plural and in the
plural number the singular):

        "Accounts Financing Agreement" means the Third Amended and Restated
    Accounts Financing Agreement dated the date hereof among the Bank, Valley National
    Bank (for certain limited purposes) and Borrower, together with the Third Amended and
    Restated Covenant Supplement pursuant thereto, as each of the same may hereafter be
    amended.

        "Borrower" shall mean collectively Metro Fuel Oil Corp., Metro Terminals Corp.,
    each a New York corporation, and Metro Terminals of Long Island, LLC, a New York
    limited liability company.

        (c)    Unless otherwise specified, each reference in this Guarantee Agreement or
in any other Loan Document to a Loan Document shall mean such Loan Document as the same
may from time to time be amended, restated, replaced, supplemented or otherwise modified from
time to time with the consent of the Bank.

        (d)    As used in this Guarantee Agreement, the terms "including," "including
without limitation" and "such as" (and like terms) are illustrative and not limitative. No
difference shall be imputed to the use in some places herein of "including" and in others of
"including without limitation." Phrases such as "hereof" and "herein" refer to the entire
Agreement and not just the section or other portion in which said reference appears.

    5.    Representations and Warranties. The Guarantor represents, warrants and agrees
that (which representations, warranties and agreements shall survive the Guarantor's execution
of this Guarantee Agreement):

        (a)    Guarantor has the full power and authority to own his properties and assets
and to carry on his business as now being conducted.

        (b)    Guarantor has full power, authority and legal right to execute, deliver and
perform this Guarantee Agreement.

        (c)    The execution, delivery and performance by Guarantor of this Guarantee
Agreement has been duly authorized by all necessary action. This Guarantee Agreement
constitutes a legal, valid and binding obligation of Guarantor enforceable against Guarantor in
accordance with its terms.

        (d)    This Guarantee Agreement is in proper legal form under the laws of
Guarantor's residence and principal location for enforcement thereof against Guarantor in the
courts of any such jurisdiction and that in any legal action upon this Guarantee Agreement in any

- 3 -

{N0306117; 1}

such jurisdiction, the choice of law set forth in Section 15 hereof would be given effect by the
courts of such jurisdiction.

      (e)     The execution, delivery and performance of this Guarantee Agreement
will not contravene any provision of law, rule or regulation to which Guarantor is subject or any
judgment, decree or order applicable to Guarantor nor conflict or be inconsistent with or result in
any breach of any of the terms, covenants, conditions or provisions of, or constitute a default
under, or result in the creation or imposition of (or the obligation to create or impose) any lien or
other encumbrance upon any of the property or assets of Guarantor pursuant to the terms of, any
agreement or other instrument to which Guarantor is a party or by which he or his property is
bound or to which he or his property may be subject.

      (f)     Guarantor is financially interested in the affairs of the Borrower and
derives benefit, directly or indirectly, from loans made to the Borrower under the Accounts
Financing Agreement. The economic success of Guarantor is dependent on the economic
success of the Borrower.

    6.    <u>Covenants.</u> So long as this Guarantee Agreement shall be in effect or any
obligations shall remain outstanding hereunder, the Guarantor agrees to comply with each of the
following covenants, unless the Bank should otherwise consent in writing:

      (a)     Guarantor will not take any action which would prevent or interfere with
the performance by the Borrower or any other guarantor of any of the covenants, agreements, or
obligations of such Person contained in any agreements or instruments governing the
Indebtedness.

      (b)     Not later than April 30 of each year while this Guarantee Agreement is in
effect, Guarantor shall deliver to the Bank the Guarantor's personal financial statement in such
form as the Bank may require, and a copy of the Guarantor's personal tax returns (or applicable
extension applications) filed for the immediately preceding year.

    7.    <u>Waivers of Defenses</u>. The Guarantor, to the fullest extent permitted by law,
waives: (a) any defense based upon any legal disability of the Borrower or any discharge or
limitation of the liability of the Borrower to the Bank, whether consensual or arising by operation
of law or any bankruptcy, insolvency, or debtor-relief proceeding, or from any other cause; (b)
presentment, demand and protest of any kind; (c) any defense based upon or arising out of any
defense which the Borrower may have to the payment or performance of any part of the
Indebtedness; (d) any defense based upon any disbursements by the Bank to the Borrower
pursuant to any agreements or instruments governing or securing the Indebtedness whether same
be deemed an additional advance or be deemed to be paid out of any special interest or other
fund accounts, as constituting unauthorized payments hereunder or amounts not guaranteed by
this Guarantee Agreement; (e) all rights to participate in any security held by the Bank for the
Indebtedness; (f) irregularity or unenforceability of any agreement or instrument representing or
governing or securing the Indebtedness; (g) any request that the Bank be diligent or prompt in
making demands hereunder or under any agreement or instrument representing or governing or
securing the Indebtedness; and (h) any other defense in law or equity (other than the defense that
the Indebtedness has been indefeasibly paid in full) which, under applicable law, would release
the obligation of a guarantor or surety, until the Indebtedness has been indefeasibly paid in full.

{N0306117; 1}

8.     Borrower's Authority and Financial Condition.  It is not necessary for the Bank to inquire into the capacity or powers of the Borrower or the officers, directors, partners or agents acting or purporting to act on the Borrower's behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.  The Guarantor assumes full responsibility for keeping fully informed of the financial condition of the Borrower and all other circumstances affecting the Borrower's ability to perform its obligations to the Bank, and agrees that the Bank will not have any duty to report to Guarantor any information which it receives about the Borrower's financial condition or any circumstances bearing on its ability to perform, and expressly waives any right to receive such information and any defense based upon failure to receive such information.

9.     Waiver of Subrogation Until Indebtedness Paid.  Irrespective of any payment by the Guarantor to the Bank pursuant to this Guarantee Agreement, the Guarantor will not be subrogated in place of and to the claims and demands of the Bank nor will the Guarantor have any right to participate in any security or lien now or hereafter held by or on behalf of the Bank until the final indefeasible payment and satisfaction of all claims and demands due to the Bank hereunder and under the Accounts Financing Agreement.

10.     Right of Setoff.  In addition to all rights of setoff or lien against any moneys, securities or other property of Guarantor given to the Bank by law, upon the occurrence of any default under any agreement or instrument governing any of the Indebtedness or under this Guarantee Agreement, the Bank is authorized (to the full extent permitted by applicable law) at any time and from time to time, to set-off and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by the Bank to or for the credit or the account of Guarantors against and on account of the obligations of Guarantor under this Guarantee Agreement, irrespective of whether or not the Bank shall have made any demand hereunder or any demand for payment of any Indebtedness and although said obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

11.     Default.  The Bank may declare the Guarantor in default under this Guarantee Agreement, and may exercise all of its rights hereunder and demand payment of the aggregate outstanding principal amount of all Indebtedness, if the Guarantor fails to perform any of its obligations under this Guarantee Agreement or if the Guarantor becomes the subject of any bankruptcy, insolvency, arrangement, reorganization, moratorium, or other debtor-relief proceeding under any law, whether now existing or hereafter enacted, or upon the appointment of a receiver for, or the attachment, restraint of or making or levying of any order of court or legal process affecting, the property of the Guarantor.

12.     Costs and Expenses.  In addition to the amounts guaranteed hereunder, Guarantor agrees to pay the Bank's reasonable out-of-pocket costs and expenses, including but not limited to legal fees and disbursements, incurred in any effort to collect or enforce any of the Indebtedness or this Guarantee Agreement, whether or not any lawsuit is filed.

13.     Delay; Cumulative Remedies.  No delay or failure by the Bank to exercise any right or remedy against, or to require performance by, the Borrower or Guarantor or any other party shall be construed as a waiver of that right, remedy or requirement, and all such powers of the Bank shall remain in full force and effect, until specifically waived or released by an instrument in writing executed by the Bank.  All remedies of the Bank against the Borrower and Guarantor are cumulative.

- 5 -

14.    Subordination. Except to the extent otherwise permitted by the Agreement of
Subordination dated the date hereof between the Bank and Guarantor, the Guarantor agrees that
any and all indebtedness or claims it may have against the Borrower or any other guarantor,
whether such claims are in connection with this Guarantee Agreement, the Indebtedness, or are
completely independent of this Guarantee Agreement and the Indebtedness, will be subordinate
to the claims of the Bank under this Guarantee Agreement and all Indebtedness guaranteed
hereby, and that the Guarantor will not assert any such claim against the Borrower until all
Indebtedness to the Bank has been completely satisfied hereunder. Notwithstanding such
subordination, and without affecting or impairing in any manner the liability of Guarantor under
the other provisions of this Guarantee Agreement, any Indebtedness of the Borrower to any other
guarantor, if the Bank so requests, shall be collected, enforced and received by Guarantor as
trustee for the Bank and paid over to the Bank on account of the Indebtedness of the Borrower to
the Bank.

15.    Governing Law. THIS GUARANTEE AGREEMENT AND THE RIGHTS AND
OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND
CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE
STATE OF NEW YORK WITHOUT REFERENCE TO CHOICE OF LAW DOCTRINE THAT
WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

16.    Jurisdiction. The Guarantor hereby agrees that ANY LEGAL ACTION OR
PROCEEDING AGAINST GUARANTOR WITH RESPECT TO THIS GUARANTEE
AGREEMENT OR ANY OTHER AGREEMENTS OR DOCUMENTS CONTEMPLATED
HEREBY OR REFERRED TO HEREIN (INCLUDING WITHOUT LIMITATION ANY
SECURITY DOCUMENT EXECUTED BY HIM) MAY BE BROUGHT IN THE COURTS OF
THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE
SOUTHERN DISTRICT OF NEW YORK AS THE BANK MAY ELECT, AND BY
EXECUTION AND DELIVERY OF THIS GUARANTEE AGREEMENT GUARANTOR
ACCEPTS AND CONSENTS FOR HIMSELF AND IN RESPECT TO HIS PROPERTY,
GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID
COURTS AND AGREES THAT SUCH JURISDICTION SHALL BE EXCLUSIVE, unless
waived by the Bank in writing, with respect to any action or proceeding brought by him against
the Bank and any questions relating to usury, and further consents (to the extent permitted by
applicable law) to the service of process in any such action or proceeding being made upon
Guarantor by certified mail, return receipt requested at the address stated alongside his name on
the signature page hereof or at such other address as the Bank is notified of in accordance with
Section 19 hereof. Guarantor hereby waives any objection that he may now or hereafter have to
the venue of any such suit or any such court or that such suit is brought in an inconvenient court.
Nothing herein shall limit the right of the Bank to bring proceedings against Guarantor in the
courts of any other jurisdiction. Guarantor covenants that he is and will remain subject to service
of process in the State of New York so long as any of the Indebtedness is outstanding. If for any
reason Guarantor should not be or remain so qualified, Guarantor hereby designates and
appoints, without power of revocation, CT Corporation System, Inc., 111 Eighth Avenue, New
York, New York, as the agent of Guarantor upon whom may be served all process, pleadings,
notices or other papers which may be served upon Guarantor as a result of any of his obligations
under this Guarantee Agreement. Nothing herein shall affect the right of the Bank to serve
process in any other manner permitted by law.

- 6 -

{N0306117; 1}

17.   <u>Severability</u>.  If any one or more of the provisions contained in this Guarantee Agreement or any document executed in connection herewith shall be invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality and enforceability of the remaining provisions contained herein shall not (to the full extent permitted by law) in any way be affected or impaired.

18.   <u>Judgment Currency</u>.  If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum due hereunder into any other currency (the "<u>Other Currency</u>"), the rate of exchange used shall be that with which in accordance with normal banking procedures the Bank could purchase Dollars with the Other Currency on the business day preceding that on which final judgment is given.  The obligation of Guarantor in respect of any sum due from him to the Bank hereunder, notwithstanding judgment in such Other Currency, shall be discharged only to the extent that on the business day following receipt by the Bank of any sum adjudged to be so due in the Other Currency, the Bank may in accordance with normal banking procedures purchase Dollars with the Other Currency; if the Dollars so purchased shall be less than the sum originally due to the Bank, Guarantor agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Bank against such loss.

19.   <u>Notices</u>.  Except as otherwise expressly provided herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be deemed to have been duly given or made when delivered if sent by Federal Express or other similar overnight delivery service, or when deposited in the mails (by registered or certified mail, return receipt requested), postage prepaid, or in the case of telex, telegraphic, telecopier or cable notice (if a number therefor is set forth below), when delivered to the telex, telegraph, telecopier or cable company, or in the case of telex or telecopier notice sent over a telex or telecopier owned or operated by a party hereto, when sent, addressed to the party entitled to receive same to the address stated alongside his name on the signature page hereto (or to such other address as any party hereto may hereafter specify to the other in writing); <u>provided that</u> communications with respect to a change of address shall be deemed to be effective when actually received.

20.   <u>Amendment</u>.  No provisions of this Guarantee Agreement shall be waived, amended or supplemented except by a written instrument executed by Guarantor and the Bank.

21.   <u>Miscellaneous</u>.  The provisions of this Guarantee Agreement will bind and benefit the successors, heirs, estate, representatives and permitted assigns of Guarantor.  No obligation hereunder may be assigned by the Guarantor without the prior written consent of the Bank, and any purported assignment without such consent shall be null and void.  The term "<u>Borrower</u>" will mean both the named Borrowers and any other person or entity at any time assuming or otherwise becoming primarily liable on all or any part of the Indebtedness.  The descriptive headings used in this Guarantee Agreement are for convenience only and shall not be deemed to affect the meaning or construction of any provision hereof.

22.   <u>Counterparts</u>.  This Guarantee Agreement may be executed in any number of counterparts, and by the different parties hereto or thereto (as the case may be) on the same or separate counterparts, each of which when so executed shall be deemed to be an original and all such counterparts shall together constitute one and the same instrument.  Telecopied or pdf signatures hereto shall be of the same force and effect as an original of a manually signed copy.

- 7 -

{N0306117; 1}

23.    WAIVER OF JURY TRIAL.  EACH OF THE BANK AND THE GUARANTOR
HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY AND
ALL RIGHTS IT OR HE MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY
LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH,
THIS GUARANTEE AGREEMENT OR ANY LOAN DOCUMENT, OR ANY COURSE OF
CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR
WRITTEN), OR ACTIONS OF THE BANK, THE GUARANTOR, THE BORROWER OR
ANY OTHER PERSONS.

    IN WITNESS WHEREOF, the undersigned has executed and delivered this Guarantee
Agreement as of the date first above written.

                                                    Address

_____         500 Kingsland Avenue_____
    Gene V. Pullo                        Brooklyn, New York  11222_____

- 8 -

{N0306117; 1}

Exhibit 8



Andrew A. Baltz
First Vice President

One Jericho Plaza, Wing B • Jericho, NY 11753

July 24, 2012

<u>VIA OVERNIGHT COURIER</u>

Metro Fuel Oil Corp.
Metro Terminals Corp.
Metro Terminals of Long Island, LLC
500 Kingsland Avenue
Brooklyn, New York 11222

       Re:     <u>Notice of Event of Default; Reservation of Rights</u>

Ladies and Gentlemen:

Reference is made to that certain Third Amended and Restated Accounts Financing Agreement dated as of May 4, 2012 by and among Metro Fuel Oil Corp. ("Metro Fuel"), Metro Terminals of Long Island, LLC ("Metro Long Island"), Metro Terminals Corp. ("Metro Terminals" together with Metro Fuel and Metro Long Island, each a "Borrower" and collectively, "Borrowers"), New York Commercial Bank ("Bank") and for limited purposes Valley National Bank ("VNB") (as amended, restated, supplemented or otherwise modified from time to time, the "Financing Agreement") together with the Third Amended and Restated Covenant Supplement to Amended and Restated Accounts Financing Agreement dated as of May 4, 2012 among Borrowers, Bank and VNB (as amended, restated, supplemented or otherwise modified from time to time, the "Supplement" and together with the Financing Agreement, the "ARA")). Capitalized terms used herein which are not defined herein shall have the meanings given to them in the ARA.

Borrowers have informed Bank that the principal amount of loans under the Line of Credit exceeds the formula set forth in Section 2.1 of the Financing Agreement for a period which exceeds ten (10) days and as such an Event of Default exists under Section 4.1(a) of the Supplement. In addition, Borrowers have failed to deliver the reporting required by Sections 6.23(a)(i) and (ii) of the Financing Agreement and as such an Event of Default has occurred under Section 4.1(b) of the Supplement. As a result of these Events of Default, Bank is entitled to exercise any and all default-related rights and remedies under the ARA, the other Loan Documents and/or applicable law.

This letter confirms that Bank has not waived such Events of Default and Bank hereby reserves all of its rights, remedies, powers and privileges under the Loan Documents and



Andrew A. Baltz
First Vice President

**One Jericho Plaza, Wing B • Jericho, NY 11753**

applicable law with respect to such Events of Default. Such rights and remedies under the Loan Documents and applicable law, include, without limitation, (i) the right to declare immediately due and payable any or all of the Obligations, (ii) the right to cease making any further loans; (iii) the right to terminate the ARA, (iv) the right to charge the default rate of interest; and (v) the right to enforce its liens and security interests under the Loan Documents. Bank's voluntary forbearance, if any, from exercising any of its rights or remedies is not intended (and should not be construed) as a waiver of such Events of Default or Bank's rights and remedies with respect thereto, all of which are reserved and preserved by Bank to be executed at any time.

No oral representations or course of dealing on the part of Bank or any of its officers, employees or agents, and no failure or delay by Bank with respect to the exercise of any right, power, privilege or remedy under any of the ARA, other Loan Documents or applicable law shall operate as a waiver thereof, and the single or partial exercise of any such right, power, privilege or remedy shall not preclude any later exercise of any other right, power, privilege or remedy.

Very truly yours,

NEW YORK COMMERCIAL BANK

By: _____
    Name: Andrew A. Baltz
    Title: First Vice President

cc:   Metro Biofuels LLC
      Metro Plumbing Services Corp.
      Apollo Petroleum Transport LLC
      Kings Land Realty Inc.
      Metro Energy Group LLC
      Paul J. Pullo
      Gene V. Pullo

Exhibit 9

Member FDIC



**NEW YORK
COMMERCIAL BANK**

*One Jericho Plaza – Wing B/2ⁿᵈ Floor*
*Jericho, NY 11753*
*Tel (516) 942-6063*

September 12, 2012

**VIA FACSIMILE ((718) 383-6586);
VIA FIRST CLASS MAIL;
VIA REGISTERED / CERTIFIED MAIL,
RETURN RECEIPT REQUESTED;
VIA OVERNIGHT COURIER**

Metro Fuel Oil Corp.
Metro Terminals Corp.
Metro Terminals of Long Island, LLC
Metro Biofuels LLC
Metro Plumbing Services Corp.
Apollo Petroleum Transport LLC
Kings Land Realty Inc.
Metro Energy Group LLC
Paul J. Pullo
Gene V. Pullo
500 Kingsland Avenue
Brooklyn, New York 11222

Re:    Demand of Payment in Full; Notice of Termination of any Future Loans or Advances;
       Notice of Default Interest Rate

Ladies and Gentlemen:

        Reference is made to that certain Third Amended and Restated Accounts Financing
Agreement dated as of May 4, 2012 by and among Metro Fuel Oil Corp. ("Metro Fuel"), Metro
Terminals of Long Island, LLC ("Metro Long Island"), Metro Terminals Corp. ("Metro
Terminals," together with Metro Fuel and Metro Long Island, each a "Borrower" and
collectively, "Borrowers"), New York Commercial Bank ("Bank") and for limited purposes
Valley National Bank ("VNB") (as amended, restated, supplemented or otherwise modified from
time to time, the "Financing Agreement") together with the Third Amended and Restated
Covenant Supplement to Amended and Restated Accounts Financing Agreement dated as of
May 4, 2012 among Borrowers, Bank and VNB (as amended, restated, supplemented or
otherwise modified from time to time, the "Supplement" and together with the Financing

Agreement, the "<u>ARA</u>").  Reference is further made to those certain Guarantee Agreements, each dated as of May 4, 2012, by Metro Fuel, Metro Long Island, Metro Biofuels LLC, Paul J. Pullo, Gene V. Pullo, Metro Plumbing Services Corp., Apollo Petroleum Transport LLC, Kings Land Realty Inc., and Metro Energy Group LLC (each a "<u>Guarantor</u>" and collectively, the "<u>Guarantors</u>").  Reference is further made to those certain Security Agreements, each dated as of May 4, 2012, executed in favor of Bank, of Metro Fuel, Apollo Petroleum Transport LLC, Metro Terminals, Metro Long Island and Metro Energy Group LLC.  Reference is further made to the letter dated July 24, 2012 from Bank to Borrowers regarding the "Notice of Event of Default; Reservation of Rights" (the "<u>July 24 Letter</u>").  Capitalized terms used herein which are not defined herein shall have the meanings given to them in the ARA.

The Events of Default as described in the July 24 Letter have not been cured and remain outstanding and in effect.  Based thereon, Bank has further declared each Guarantor in default under its respective Guarantee Agreement, and Bank has further declared an Event of Default under each of the Security Agreements, as defined therein, as well as all other Loan Documents.

Please be advised that, effective upon the date hereof, pursuant to its rights under, *inter alia*, Section 8.1 of the Financing Agreement, Bank has declared immediately due and payable the entire amount of indebtedness of Borrowers to Bank under the Line of Credit (the "<u>Line of Credit Debt</u>").  As of and through September 11, 2012, the principal amount outstanding under the Line of Credit Debt was not less than $32,332,461.24, the interest amount outstanding was not less than $130,112.63, and the current known expenses were not less than $117,295.28, together totaling $32,579,869.15, exclusive of any applicable prepayment charges, or other expenses, fees or costs due to Bank, which total amount is now immediately due, owing and payable to Bank.  Bank hereby demands that Borrowers and Guarantors (collectively, "<u>Obligors</u>"), jointly and severally, pay such amount of principal, interest and known expenses under the Line of Credit Debt to Bank by or before 5:00 p.m. New York time on September 13, 2012, in immediately available funds, in full, without discount or reduction of any kind, at the above address, time being of the essence.  Upon receipt of such payment, Bank shall advise Obligors of any additional amounts of principal, or interest that may have accrued in addition to the foregoing under the Line of Credit Debt, as well as any amounts of fees, expenses and costs, and any other amounts, which remain or have become due and payable from Borrowers under the Line of Credit Debt.  Such amounts shall remain payable by Obligors.

Please also be advised that, effective upon the date hereof, pursuant to its rights under, *inter alia*, Section 8.1 of the Financing Agreement, Bank has declared immediately due and payable the entire amount of indebtedness of Borrowers to Bank under the New Term Loan (the "<u>New Term Loan Debt</u>").  As of and through September 11, 2012, the principal amount outstanding under the New Term Loan Debt was not less than $5,296,419.79, and the interest amount outstanding was not less than $24,524.20, together totaling $5,320,943.99, exclusive of any applicable prepayment charges or other expenses, fees or costs due to Bank, which total amount is now immediately due, owing and payable to Bank.  Bank hereby demands that Obligors, jointly and severally, pay such amount of principal and interest under the New Term Loan Debt to Bank, by or before 5:00 p.m. New York time on September 13, 2012, in immediately available funds, in full, without discount or reduction of any kind, at the above address, time being of the essence.  Upon receipt of such payment, Bank shall advise Obligors of any additional amounts of principal, or interest that may have accrued in addition to the

foregoing under the New Term Loan Debt, as well as any amounts of fees, expenses and costs, and any other amounts, which remain or have become due and payable from Borrowers under the New Term Loan Debt. Such amounts shall remain payable by Obligors.

Please also be advised that, effective upon the date hereof, pursuant to its rights under, *inter alia*, Section 8.1 of the Financing Agreement, Bank has declared immediately due and payable the entire amount of indebtedness of Borrowers to Bank under the First Mortgage Loan (the "First Mortgage Loan Debt"). As of and through September 11, 2012, the principal amount outstanding under the First Mortgage Loan Debt was not less than $4,210,179.86, and the interest amount outstanding was not less than $16,226.73, together totaling $4,226,406.59, exclusive of any applicable prepayment charges or other expenses, fees or costs due to Bank, which total amount is now immediately due, owing and payable to Bank. Bank hereby demands that Obligors, jointly and severally, pay such amount of principal and interest under the First Mortgage Loan Debt to Bank, by or before 5:00 p.m. New York time on September 13, 2012, in immediately available funds, in full, without discount or reduction of any kind, at the above address, time being of the essence. Upon receipt of such payment, Bank shall advise Obligors of any additional amounts of principal, or interest that may have accrued in addition to the foregoing under the First Mortgage Loan Debt, as well as any amounts of fees, expenses and costs, and any other amounts, which remain or have become due and payable from Borrowers under the First Mortgage Loan Debt. Such amounts shall remain payable by Obligors.

Bank hereby notifies Obligors that, pursuant to Section 8.1 of the ARA, all provisions of the ARA pursuant to which Borrowers were provided any loans or advances under the Line of Credit have, and are, terminated. Accordingly, no such loans or advances shall be available at any time from and including the date of this letter.

Bank hereby further notifies Obligors that interest now accrues, and has accrued since the date of the Events of Default described in the July 24 Letter, on the entire amount of the Line of Credit Debt at the default rate, pursuant to Section 3.2 of the Financing Agreement, which default rate of interest is not less than 9.75%, as calculated and applied pursuant to Section 3.3 of the Financing Agreement.

Bank hereby further notifies Obligors that interest now accrues, and has accrued since the date of the Events of Default described in the July 24 Letter, on the entire amount of the New Term Loan Debt at the default rate, pursuant to Section 3.2 of the Financing Agreement, which default rate of interest is not less than 10.5%, as calculated and applied pursuant to Section 3.3 of the Financing Agreement.

Bank hereby further notifies Obligors that interest now accrues, and has accrued since the date of the Events of Default described in the July 24 Letter, on the entire amount of the First Mortgage Loan Debt at the default rate, pursuant to Section 3.2 of the Financing Agreement, which default rate of interest is not less than 9.625%, as calculated and applied pursuant to Section 3.3 of the Financing Agreement.

Bank waives no rights, remedies, powers or privileges hereby, whether under the Loan Documents, applicable law, in equity or otherwise, all of which rights and remedies Bank hereby expressly and specifically reserves, including the right to enforce its liens and security interests

under the Loan Documents.  Nothing herein constitutes a forbearance by, or an agreement to forebear by, Bank.  Bank's voluntary forbearance, if any, from exercising any of its rights or remedies is not intended (and should not be construed) as a waiver thereof or Bank's rights and remedies with respect thereto, all of which are reserved and preserved by Bank to be executed at any time.  Without limiting the foregoing, nothing contained herein shall limit in any manner whatsoever Obligors' obligations to comply with, and Bank's right to insist on Obligors' compliance with, each and every term of the ARA and the other Loan Documents.

No oral representations or course of dealing on the part of Bank or any of its officers, employees or agents, and no failure or delay by Bank with respect to the exercise of any right, power, privilege or remedy under any of the ARA, other Loan Documents or applicable law shall operate as a waiver thereof, and the single or partial exercise of any such right, power, privilege or remedy shall not preclude any later exercise of any other right, power, privilege or remedy.

Very truly yours,

NEW YORK COMMERCIAL BANK

By: _____
    Name: Andrew A. Baltz
    Title: First Vice President

NY1141577.1

4

Exhibit 10



Member FDIC.

**NEW YORK
COMMERCIAL BANK**

*One Jericho Plaza – Wing B/2nd Floor*
*Jericho, NY 11753*
*Tel (516) 942-6063*

September 14, 2012

**VIA FACSIMILE ((718) 383-6586);**
**VIA FIRST CLASS MAIL;**
**VIA REGISTERED / CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED;**
**VIA OVERNIGHT COURIER**

Metro Fuel Oil Corp.
Metro Terminals Corp.
Metro Terminals of Long Island, LLC
Metro Biofuels LLC
Metro Plumbing Services Corp.
Apollo Petroleum Transport LLC
Kings Land Realty Inc.
Metro Energy Group LLC
Paul J. Pullo
Gene V. Pullo
500 Kingsland Avenue
Brooklyn, New York 11222
and
498 Kingsland Avenue
Brooklyn, New York 11222

Re:    Notice of Set Off of Accounts

Ladies and Gentlemen:

        Reference is made to that certain Third Amended and Restated Accounts Financing
Agreement dated as of May 4, 2012 by and among Metro Fuel Oil Corp. ("Metro Fuel"), Metro
Terminals of Long Island, LLC ("Metro Long Island"), Metro Terminals Corp. ("Metro
Terminals," together with Metro Fuel and Metro Long Island, each a "Borrower" and
collectively, "Borrowers"), New York Commercial Bank ("Bank") and for limited purposes
Valley National Bank ("VNB") (as amended, restated, supplemented or otherwise modified from
time to time, the "Financing Agreement") together with the Third Amended and Restated
Covenant Supplement to Amended and Restated Accounts Financing Agreement dated as of
May 4, 2012 among Borrowers, Bank and VNB (as amended, restated, supplemented or

otherwise modified from time to time, the "Supplement" and together with the Financing
Agreement, the "ARA").  Reference is further made to those certain Guarantee Agreements, each
dated as of May 4, 2012, by Metro Fuel, Metro Long Island, Metro Biofuels LLC, Paul J. Pullo,
Gene V. Pullo, Metro Plumbing Services Corp., Apollo Petroleum Transport LLC, Kings Land
Realty Inc., and Metro Energy Group LLC (each a "Guarantor" and collectively, the
"Guarantors," and together with Borrowers, "Obligors").  Reference is further made to those
certain Security Agreements, each dated as of May 4, 2012, executed in favor of Bank of Metro
Fuel, Apollo Petroleum Transport LLC, Metro Terminals, Metro Long Island and Metro Energy
Group LLC.  Reference is further made to the letter dated July 24, 2012 from Bank to Borrowers
regarding the "Notice of Event of Default; Reservation of Rights" (the "July 24 Letter").
Reference is further made to the letter dated September 12, 2012 from Bank to Borrowers and
Guarantors regarding the "Demand of Payment in Full; Notice of Termination of any Future
Loans or Advances; Notice of Default Interest Rate" (the "September 12 Demand &
Acceleration Letter").  Reference is further made to the letter dated September 13, 2012 from
Bank to Obligors regarding the "Notice of Outstanding Indebtedness Under Line of Credit Debt,
New Term Loan Debt and First Mortgage Loan Debt" (the "September 13 Indebtedness
Notice").  Capitalized terms used herein which are not defined herein shall have the meanings
given to them in the ARA.

The Events of Default as described in the July 24 Letter and the September 12 Demand &
Acceleration Letter have not been cured and remain outstanding and in effect.  Prior hereto, the
Line of Credit Debt (as defined in the September 12 Demand & Acceleration Letter) has been
accelerated and demanded, and is now matured.

In light of the foregoing, and because the amount currently outstanding and past due
under the Line of Credit Debt exceeds the total of Set-Off Amount (defined below), please be
advised that pursuant to its rights under the ARA, the Guarantee Agreements and the Security
Agreements, as well as applicable law, Bank has today swept, set off and applied balances from
the following Obligor's bank account at Bank towards repayment of the Line of Credit Debt (but
expressly not in satisfaction thereof):

| | |
|---|---|
| **Account Holder:** | Metro Fuel Oil Corp. |
| | 500 Kingsland Ave. |
| | Brooklyn, NY 11222-1925 |
| **Account Number:** | 1206311 |
| **Amount Swept /** | |
| **Set-Off** | |
| **("Set-Off Amount"):** | $54,885.50 |

We will provide you in the near future with information detailing the remaining
outstanding indebtedness under the Line of Credit Debt subsequent to the application of the
amounts set forth above.

Bank waives no rights, remedies, powers or privileges hereby, whether under the Loan
Documents, applicable law, in equity or otherwise, all of which rights and remedies Bank hereby
expressly and specifically reserves, including the right to enforce its liens and security interests

under the Loan Documents. Nothing herein constitutes a forbearance by, or an agreement to forebear by, Bank. Bank's voluntary forbearance, if any, from exercising any of its rights or remedies is not intended (and should not be construed) as a waiver thereof or Bank's rights and remedies with respect thereto, all of which are reserved and preserved by Bank to be executed at any time. Without limiting the foregoing, nothing contained herein shall limit in any manner whatsoever Obligors' obligations to comply with, and Bank's right to insist on Obligors' compliance with, each and every term of the ARA and the other Loan Documents.

No oral representations or course of dealing on the part of Bank or any of its officers, employees or agents, and no failure or delay by Bank with respect to the exercise of any right, power, privilege or remedy under any of the ARA, other Loan Documents or applicable law shall operate as a waiver thereof, and the single or partial exercise of any such right, power, privilege or remedy shall not preclude any later exercise of any other right, power, privilege or remedy.

Very truly yours,

NEW YORK COMMERCIAL BANK

By: _____
    Name: Andrew A. Baltz
    Title: First Vice President

NY1141971 1

3

Exhibit 11



Member FDIC

**NEW YORK COMMERCIAL BANK**

*One Jericho Plaza – Wing B/2nd Floor*
*Jericho, NY 11753*
*Tel (516) 942-6063*

September 21, 2012

**VIA FACSIMILE ((718) 383-6586);**
**VIA FIRST CLASS MAIL;**
**VIA REGISTERED / CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED;**
**VIA OVERNIGHT COURIER**

Metro Fuel Oil Corp.
Metro Terminals Corp.
Metro Terminals of Long Island, LLC
Metro Biofuels LLC
Metro Plumbing Services Corp.
Apollo Petroleum Transport LLC
Kings Land Realty Inc.
Metro Energy Group LLC
Paul J. Pullo
Gene V. Pullo
500 Kingsland Avenue
Brooklyn, New York 11222
and
498 Kingsland Avenue
Brooklyn, New York 11222

Re:   Notice of Set Off of Accounts

Ladies and Gentlemen:

    Reference is made to that certain Third Amended and Restated Accounts Financing
Agreement dated as of May 4, 2012 by and among Metro Fuel Oil Corp. ("Metro Fuel"), Metro
Terminals of Long Island, LLC ("Metro Long Island"), Metro Terminals Corp. ("Metro
Terminals," together with Metro Fuel and Metro Long Island, each a "Borrower" and
collectively, "Borrowers"), New York Commercial Bank ("Bank") and for limited purposes
Valley National Bank ("VNB") (as amended, restated, supplemented or otherwise modified from
time to time, the "Financing Agreement") together with the Third Amended and Restated
Covenant Supplement to Amended and Restated Accounts Financing Agreement dated as of
May 4, 2012 among Borrowers, Bank and VNB (as amended, restated, supplemented or

otherwise modified from time to time, the "Supplement" and together with the Financing
Agreement, the "ARA"). Reference is further made to those certain Guarantee Agreements, each
dated as of May 4, 2012, by Metro Fuel, Metro Long Island, Metro Biofuels LLC, Paul J. Pullo,
Gene V. Pullo, Metro Plumbing Services Corp., Apollo Petroleum Transport LLC, Kings Land
Realty Inc., and Metro Energy Group LLC (each a "Guarantor" and collectively, the
"Guarantors," and together with Borrowers, "Obligors").  Reference is further made to those
certain Security Agreements, each dated as of May 4, 2012, executed in favor of Bank of Metro
Fuel, Apollo Petroleum Transport LLC, Metro Terminals, Metro Long Island and Metro Energy
Group LLC.  Reference is further made to the letter dated July 24, 2012 from Bank to Borrowers
regarding the "Notice of Event of Default; Reservation of Rights" (the "July 24 Letter").
Reference is further made to the letter dated September 12, 2012 from Bank to Borrowers and
Guarantors regarding the "Demand of Payment in Full; Notice of Termination of any Future
Loans or Advances; Notice of Default Interest Rate" (the "September 12 Demand &
Acceleration Letter").  Reference is further made to the letter dated September 13, 2012 from
Bank to Obligors regarding the "Notice of Outstanding Indebtedness Under Line of Credit Debt,
New Term Loan Debt and First Mortgage Loan Debt" (the "September 13 Indebtedness
Notice").  Reference is further made to the letter dated September 14, 2012 from Bank to
Obligors regarding the "Notice of Outstanding Indebtedness Under Line of Credit Debt After
September 13, 2012 Set Off" (the "September 14 Indebtedness Notice").  Reference is further
made to the letter dated September 21, 2012 from Bank to Obligors regarding the "Notice of
Outstanding Indebtedness Under Line of Credit Debt" (the "September 21 Indebtedness
Notice").  Capitalized terms used herein which are not defined herein shall have the meanings
given to them in the ARA.

The Events of Default as described in the July 24 Letter and the September 12 Demand &
Acceleration Letter have not been cured and remain outstanding and in effect.  Prior hereto, the
Line of Credit Debt (as defined in the September 12 Demand & Acceleration Letter) has been
accelerated and demanded, and is now matured.

In light of the foregoing, and because the amount currently outstanding and past due
under the Line of Credit Debt exceeds the total of Set-Off Amount(s) (defined below), please be
advised that pursuant to its rights under the ARA, the Guarantee Agreements and the Security
Agreements, as well as applicable law, Bank has today swept, set off and applied balances from
the following Obligors' bank accounts at Bank towards repayment of the Line of Credit Debt
(but expressly not in satisfaction thereof):

Account Holder:    Metro Fuel Oil Corp.
                   500 Kingsland Ave.
                   Brooklyn, NY 11222-1925

Account Number:    1206311

Amount Swept /
Set-Off
("Set-Off Amount"): $15,196.99

2

| Account Holder: | Metro Terminals Corp.<br>500 Kingsland Ave.<br>Brooklyn, NY 11222-1925 |
|---|---|
| Account Number: | 1206346 |
| Amount Swept /<br>Set-Off<br>("Set-Off Amount"): | $196,594.25 |

We will provide you in the near future with information detailing the remaining outstanding indebtedness under the Line of Credit Debt subsequent to the application of the amounts set forth above.

Bank waives no rights, remedies, powers or privileges hereby, whether under the Loan Documents, applicable law, in equity or otherwise, all of which rights and remedies Bank hereby expressly and specifically reserves, including the right to enforce its liens and security interests under the Loan Documents. Nothing herein constitutes a forbearance by, or an agreement to forebear by, Bank. Bank's voluntary forbearance, if any, from exercising any of its rights or remedies is not intended (and should not be construed) as a waiver thereof or Bank's rights and remedies with respect thereto, all of which are reserved and preserved by Bank to be executed at any time. Without limiting the foregoing, nothing contained herein shall limit in any manner whatsoever Obligors' obligations to comply with, and Bank's right to insist on Obligors' compliance with, each and every term of the ARA and the other Loan Documents.

No oral representations or course of dealing on the part of Bank or any of its officers, employees or agents, and no failure or delay by Bank with respect to the exercise of any right, power, privilege or remedy under any of the ARA, other Loan Documents or applicable law shall operate as a waiver thereof, and the single or partial exercise of any such right, power, privilege or remedy shall not preclude any later exercise of any other right, power, privilege or remedy.

Very truly yours,

NEW YORK COMMERCIAL BANK

By: _____
Name: Henry W. Yabroudy
Title: Vice President

NY1143191.1

3