22. In May 2010, Al Farrell, the then CFO of iGPS, again asked Moore to repay the advance. Moore refused, and instructed Farrell to "write it off," meaning to list it in the Company's accounts as funds that could not be recovered. Moore was not authorized to instruct Farrell in this manner and did so without consulting with the CEO of the Company or its Board.

23. In or around April 2011, Moore requested that iGPS advance Moore $46,763 in order to enable Moore to satisfy his IRS obligations, this time in connection with his Federal Insurance Contributions Act ("FICA") contribution. Moore instructed the then Controller of iGPS to satisfy his FICA contribution, despite having been explicitly told not to communicate with Company personnel by the then CEO of iGPS. Moore promised to repay the $46,763 advance the next day, but has not yet done so.

24. Upon information and belief, Moore has refused to repay the funds despite knowing that he is obligated to do so, and despite repeated demands from the Company. At no time was Moore's obligation to repay this advance excused by the Company, as Moore was well aware.

### B. Moore Abused the Company's Expense Reimbursement Policy

25. Section 7 of the Employment Agreements authorizes Moore to seek reimbursement for "actual and documented expenses reasonably incurred by him in furtherance of the business of the Company and in the performance of his duties hereunder..."

26. During his tenure as CEO of the Company, Moore continuously abused this provision by seeking and receiving reimbursement for many non-business expenses. These expenses included, among other things:

    a. $26,186.10 in air travel for one of Moore's non-spousal companions, who had no role in the Company;

5

b.  $10,316.00 in various lodging, food and entertainment, including establishments such as Hooters in Fort Lauderdale, where iGPS does not conduct business; and

c.  $3050.00 in Florida tolls, despite the fact that there are no tolls in the miles between the iGPS office and Moore's home in Orlando.

27. Moore breached the Employment Agreements each time he falsely submitted receipts for non-business expenses and charged these expenses to the Company.

C. **Moore Failed to Return Company Property After His Termination**

28. Section 11(b) of the Employment Agreement states that:

Promptly after the termination of [Moore's] employment with the Company, [Moore] shall deliver to the Company all copies of data, information and knowledge of the Company in his possession, including, without limitation, all Confidential Information, documents, correspondence, notebooks, reports, computer programs, names, lists, and all other materials and copies thereof (including computer discs and other electronic media) relating in any way to the business of the Company or its subsidiaries, in any way obtained by [Moore] during the period of his employment with the Company. Promptly after the termination of [Moore's] employment with the Company, [Moore] shall deliver to the Company all tangible property belonging to, leased or licensed to the Company in the possession of [Moore].

29. Moore was terminated on May 25, 2011.

30. In or about June 2011, iGPS demanded that Moore return all of iGPS's property in his possession.

31. As of the date of this Complaint, Moore has failed to return the iGPS property in his possession and, upon information and belief, continues to enjoy this Company property for his own use. Also upon information and belief, this Company property contains confidential, sensitive and proprietary Company information to which Moore is not entitled.

32. Moore has breached his obligation under the Employment Agreement to promptly return property belonging to the Company in his possession after termination of his employment with the Company.

## III. The Loan and Security Agreement

33. iGPS entered into the Loan and Security Agreement with Moore on June 14, 2006 (the "Loan Agreement"). The Loan Agreement is evidenced by a Promissory Note also dated June 14, 2006 (the "Promissory Note," together with the Loan Agreement, the "Loan Agreements").

34. Pursuant to the Loan Agreement, iGPS agreed to loan certain funds to Moore in order to fund Moore's capital contributions to iGPS. In return, and as collateral for the loan, Moore granted iGPS a security interest in and lien on (i) a promissory note dated August 15, 2005 between Bubbadog Inc. ("Bubbadog") and Moore (the "Bubbadog Note"); (ii) all proceeds and products of the Bubbadog Note; and (iii) the limited liability interests of iGPS owned by Moore (collectively, the "Collateral").

35. iGPS loaned $960,784 to Moore in connection with the Agreements relying on Moore's representations in the Loan Agreement.

36. Upon information and belief, in or about May 2007, Moore secretly sold his interest in Bubbadog – the very collateral that he had pledged in the Loan Agreement – for his own benefit, leaving the Company loan completely unsecured. Moore did so without providing any notice to the Company either before, during or after the sale of Bubbadog.

37. Moore's sale of his interest in Bubbadog was a direct breach of the Loan Agreement and constituted an Event of Default as defined by the Loan Agreement. The entire amount of the loan from iGPS to Moore is currently outstanding and Moore is obligated to repay iGPS in full.

38. The Loan Agreement includes certain affirmative and negative covenants (the "Loan Covenants").

39. Under Section 4(a) of the Loan Agreement, Moore agreed to:

Use commercially reasonable efforts to (i) continue to conduct, operate, and manage the business of Bubbadog substantially as such business has been conducted, operated, and managed in the past; and (ii) maintain, preserve, and protect the assets used or useful in the conduct of Bubbadog's business, keep Bubbadog's assets in good repair, working order and condition, and make, or cause to be made, all needful or proper repairs, replacements and improvements to these assets.

40. Under Section 5(b) of the Loan Agreement, Moore agreed to cause Bubbadog *not to:*

Sell, transfer, or otherwise dispose of any of its assets or properties, other than the sale of inventory and obsolete equipment in the ordinary course of business, without the prior written consent of the Company, which consent shall not be unreasonably held.

41. Under Section 6(a) of the Loan Agreement, an Event of Default shall occur upon:

the failure of the [Moore] to timely and properly observe, keep, or perform any convenant, agreement, warranty, or condition required by or otherwise set forth in this [Loan Agreement] or [the Promissory Note].

42. In the event of an Event of Default, Section 7(a) of the Loan Agreement authorizes iGPS to:

declare the entire principal amount of the Loan then outstanding and the interest accrued thereon and all other Obligations immediately due and payable in full, and [Moore] shall thereupon pay all such amounts and all other Obligations for which it is responsible immediately to [iGPS] in full.

43. Section 7(b) of the Loan Agreement authorizes iGPS, upon the occurrence of any Event of Default, to among other things, "bring suit for collection of the Loan and all other Obligations."

44. Section 14 of the Loan Agreement states that if an Event of Default occurs, Moore must pay iGPS:

"all actual and reasonable out-of-pocket costs and expenses of the Company (including, without limitation, legal fees, filing fees, recording costs and search fees) incurred in connection with protecting and/or enforcing the Company's rights and remedies under the Loan Documents and/or applicable law."

### IV. The Promissory Note

45. The Loan is evidenced by the Promissory Note.

46. Pursuant to the Promissory Note, Moore promised to pay to the order of iGPS the principal amount of $960,784, or the outstanding principal amount at the date of payment, together with interest from the date of advance of each installment of the loan until maturity at the rate of eight percent per annum, by June 1, 2013.

47. The Promissory Note is subject to mandatory prepayment upon certain circumstances, including

- The acceleration of the maturity of the Bubbadog Note following the occurrence of an Event of Default thereunder; or
- The termination of [Moore's] employment pursuant to the terms of the Employment Agreement.

48. Pursuant to the Promissory Note, the occurrence of any Event of Default under the Loan Agreement also constitutes an Event of Default under the Promissory Note.

49. As with the Loan Agreement, the Promissory Note authorizes iGPS to declare the entire unpaid principal balance and accrued interest on the Promissory Note immediately due and payable in full upon and at any time after the occurrence of any Event of Default.

50. As with the Loan Agreement, the Promissory Note requires Moore to pay attorneys' fees and all other out-of-pocket costs and expenses incurred by iGPS in the enforcement and collection of the Note.

### V. Moore's Breaches of the Loan Agreement and the Event of Default

51. Upon information and belief, Moore sold Bubbadog in or about May 2007.

52. Moore did so secretly, hiding the fact of the sale from the Company despite knowing that he had pledged Bubbadog as collateral and that the Company had relied on that pledge in extending to Moore the nearly million dollars of loan.

53. By selling Bubbadog, Moore materially breached Sections 4(a) and 5(b) of the Loan Agreement. These breaches, among others, constitute an Event of Default under Section 6(a).

54. The sale of Bubbadog by Moore was also an Event of Default under Section 6(b) of the Loan Agreement.

55. Thus, the loan is immediately due and payable. Moore is liable for additional damages under the Agreements and the law.

## VI. Mandatory Prepayment Pursuant to the Promissory Note

56. Moore's default on the Loan Agreement and the termination of his employment caused the Promissory Note to be immediately subject to mandatory prepayment.

57. Moore has not repaid the loan to iGPS.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breaches of the Employment Agreements)

58. Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs.

59. The Employment Agreements are enforceable contracts, and iGPS and Moore are each bound by their terms.

60. At all relevant times, Moore fulfilled its required duties and obligations under the Employment Agreements.

61. Moore breached the Employment Agreements by, among other things, failing to act in the best interest of the Company when he refused to repay Company loans, directing the CFO of iGPS to write off one of the unpaid loans, and abusing the Company's expense reimbursement policy.

62. Moore also breached the Employment Agreements by failing to promptly return certain Company property to iGPS after he was terminated, even after iGPS requested that he do so.

63. Moore's intentional, willful, wrongful, and knowing breaches of the Employment Agreements have caused iGPS damages in an amount to be determined at trial, plus all costs and interest to which iGPS is lawfully entitled.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty)

64. Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs.

65. As the CEO and Chairman of the Board of iGPS, Moore owed a fiduciary duty to iGPS to act in accordance with its best interest and not on his own behalf.

66. Moore breached that duty, by, among other things, failing to return money advanced to him by the Company.

67. Moore further breached his fiduciary duty by directing the CFO of iGPS to write off the outstanding amount of the advance he took from the Company.

68. Moore additionally breached his duty by charging inappropriate, non-business expenses to the Company.

69. Moore additionally breached his duty by acting in his own personal interest and failing to act in the best interest of the Company.

70. As a result of Moore's breaches of his fiduciary duties, iGPS has been damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (Conversion)

71. Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs.

72. iGPS had an immediate superior right of possession to all Company funds.

73. Moore's retention of the at least $125,935.43 loaned to him by iGPS, even after iGPS demanded that Moore repay the Company, constituted a conversion.

74. Moore's retention of at least $39,552.10 in reimbursement for certain inappropriate, non-business expenses also constituted conversion.

75. Moore's retention of certain Company property after his termination constituted a conversion.

### FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

76. Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs.

77. Moore has been unjustly enriched at the expense of iGPS by retaining Company funds.

78. Moore unjustly retained at least $125,935.43 in sums advanced to him by the Company, as well as at least $39,552.10 in reimbursement for inappropriate, non-business expenses at iGPS' expense.

79. Because Moore received and unjustly retained at iGPS' expense such monetary benefits, the parties should be returned to their original position prior to Moore's misconduct.

## FIFTH CAUSE OF ACTION
### (Breach of the Loan Agreement)

80.  Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs.

81.  The Loan Agreement is an enforceable contract, and iGPS and Moore are each bound by its terms.

82.  At all relevant times, iGPS fulfilled its required duties and obligations under the Loan Agreement.

83.  Moore materially breached numerous provisions of the Loan Agreement by, among other things, selling Bubbadog and thereby forfeiting the Collateral that secured the loan from iGPS.

84.  Pursuant to Section 6(a) of the Loan Agreement, in the event of a failure to perform any covenant required by the Loan Agreement, all loans to iGPS become "immediately due and payable in full."

85.  Given the acceleration clause, and Moore's failure breaches of covenants in the Loan Agreement and duly noticed Event of Default, iGPS is entitled to damages in an amount equal to at least $960,784, the amount of principal currently due and owing under the Agreements, as well as the interest owed pursuant to the Promissory Note.

86.  iGPS is also entitled to attorneys' fees incurred in enforcing the Loan Agreement and the Promissory Note.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff iGPS prays for the following relief and judgment:

1. Judgment awarding iGPS compensatory damages owed by virtue of acceleration of loan payments from Moore to iGPS, as well as damages

suffered by iGPS in an amount to be determined at trial, but in no event less than $1,126,271.50 plus attorneys fees;

2. Compensatory damages in an amount to be determined at trial;

3. Punitive damages in an amount to be proven at trial;

4. Disgorgement of unjustly retained gains;

5. Reasonable costs and expenses associated with this action, including, without limitation, attorneys' fees and other professional fees;

6. Prejudgment interest and/or opportunity cost damages in favor of Plaintiff; and

7. Such other and further relief as this Court may deem just and proper.

DATED:   New York, New York
         September 2, 2011

AKIN GUMP STRAUSS HAUER & FELD LLP

By: _____
    Stephen M. Baldini
    Samidh Guha

One Bryant Park
New York, New York  10036
Telephone: (212) 872-1062
Fax: (212) 872-1002
sbaldini@akingump.com
sguha@akingump.com

*Attorneys for Plaintiff iGPS Company LLC*

14

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

iGPS COMPANY LLC

                    Plaintiff,

- against -

BOBBY L. MOORE

                    Defendant.

No. 652431/2011

**FIRST AMENDED COMPLAINT**

---

      Plaintiff iGPS Company LLC ("iGPS" or the "Company"), by and through its undersigned counsel, Akin Gump Strauss Hauer & Feld LLP, for its First Amended Complaint against Bobby L. Moore ("Moore" or "Defendant") alleges as follows upon information and belief:

### NATURE OF THE ACTION

      1.    This action stems from Defendant Moore's gross misconduct and improper actions during his tenure as the CEO and Chairman of iGPS, during which Moore steered Company corporate funds to himself for his own personal benefit and ran roughshod over Company policies and practices for his own enrichment. Plaintiff iGPS also seeks by this action to recover over $2 million in advances and loans extended to Moore at his request.

      2.    Prior to his termination in May 2011, Moore's employment by the Company was governed at different times by two separate employment agreements. Moore repeatedly breached both of these employment agreements, violated his fiduciary duties to the Company, and converted the Company's assets for his own personal use.

3. Separate and apart from Moore's breaches of his employment agreements and of his fiduciary duties to the Company, the Company generously extended a loan agreement and promissory note to Moore to provide financial assistance at his request.

4. The documents that govern the loan made by iGPS to Moore require Moore to repay the full amount of the loan upon the occurrence of certain triggering events. The loan agreement and promissory note also give iGPS the right to bring this suit for collection of the full loan amount should any of these triggering events occur. There can be no dispute that Moore is required to repay the loan agreement and promissory note immediately, yet Moore has repeatedly refused to do so.

## PARTIES

5. Plaintiff iGPS is a limited liability company organized under the laws of Delaware, with its principal place of business in Orlando, Florida.

6. Defendant Moore is a resident of Orlando, Florida

## JURISDICTION AND VENUE

7. This Court has jurisdiction over Moore under CPLR § 301 because both parties consented to the jurisdiction of the State Courts of New York in the relevant agreements.

8. Venue is proper under CPLR § 501 because the relevant agreements identify New York State court as an appropriate venue for any claims arising out of or relating to those agreements.

## FACTUAL BACKGROUND

### I. Moore's Employment by iGPS

9. iGPS was launched on or about March 15, 2006 pursuant to the Limited Liability Company Agreement of iGPS Company LLC ("Original LLC Agreement") between and among

2

Moore and Pegagus Partners III (AIV), L.P., Pegagus iGPS, LLC, and Pegagus Investors III, L.P. (the "Pegasus Entities"). The Original LLC Agreement was subsequently amended on six different occasions, most recently in or about April 2009.

10. In December 2007, KIA VIII (IGPS), L.P., KIA VIII (IGPS) GP, L.P., KEP VI AIV (IGPS), LLC, and Kelso GP VIII (the "Kelso Entities") became members of the Company.

11. The Pegasus Entities, along with the Kelso Entities, invested a significant amount of money into iGPS and trusted that Moore, as the CEO of the Company, would steer its progress faithfully. In return, Moore was very handsomely compensated with a combination of salary and equity.

12. On March 15, 2006, Moore was made the CEO of iGPS pursuant to an employment agreement (the "Original Employment Agreement").

13. Moore's performance as CEO was inconsistent with the Company's business plan and market advantages for its product. Accordingly, in late 2009, iGPS undertook a search for a new CEO.

14. When the Original Employment Agreement lapsed in December 2010,[1] iGPS transitioned Moore to a position as Chairman of its Board pursuant to a new employment agreement (the "Employment Agreement," and together with the Original Employment Agreement, the "Employment Agreements").

15. Under Section 3(a) of the Employment Agreements, Moore agreed to:

undertake to perform his duties and obligation in a manner consistent with the best interests of the Company, and shall perform all duties, services and responsibilities in accordance with the guidelines, policies and procedures established by the Company Board.

---

[1] The Original Employment Agreement was modified by the Amended and Restated Employment Agreement in December 2007. The Amended and Restated Employment Agreement had a three-year term.

3

16. After installing a new CEO, the Company for the first time was able to get a clearer picture as to the manner in which Moore had operated the Company during his tenure as CEO. It learned that Moore had in fact operated the Company in a manner that benefitted him personally, disregarding his fiduciary obligations to the Company and its shareholders. It also learned that Moore had committed significant financial improprieties with the Company's funds for his own benefit.

17. During his time as CEO of the Company Moore repeatedly engaged in conduct that was not in the best interests of the Company, and was not in accordance with Company guidelines, policies and procedures. A more detailed description of these violations is included below.

18. In light of Moore's gross misconduct, a notice of for Cause termination was delivered to Moore and his counsel by letter dated May 25, 2011.

## II.  Moore's Breaches of the Employment Agreements

### A.  Moore Misappropriated Company Funds

19. In 2007, Moore requested and received an advance of $79,172.43 from iGPS. Moore told the then CFO of iGPS that the requested sum was an advance on an expected Internal Revenue Service ("IRS") refund and that he would repay the advanced sum immediately upon receipt of the IRS refund.

20. Despite repeated requests from the CFO and others at iGPS that Moore repay the advance over subsequent months and years, and despite receiving the expected IRS refund, Moore never repaid the $79,172.43 that was advanced to him by the Company.

21. Upon information and belief, Moore received a refund for approximately $79,172.43 which he deposited in his personal bank account and has kept to this day.

22. In May 2010, Al Farrell, the then CFO of iGPS, again asked Moore to repay the advance. Moore refused, and instructed Farrell to "write it off," meaning to list it in the Company's accounts as funds that could not be recovered. Moore was not authorized to instruct Farrell in this manner and did so without consulting with the current CEO of the Company or its Board.

23. In or around April 2011, Moore again requested that iGPS advance Moore $46,763 in order to enable Moore to satisfy his IRS obligations, this time in connection with his Federal Insurance Contributions Act ("FICA") contribution. Moore instructed the then Controller of iGPS to satisfy his FICA contribution, despite having been explicitly told not to communicate with Company personnel by the then CEO of iGPS. Moore promised to repay the $46,763 advance the next day, but has not yet done so.

24. Upon information and belief, Moore has refused to repay the funds despite knowing that he is obligated to do so, and despite repeated demands from the Company. At no time was Moore's obligation to repay this advance excused by the Company, as Moore was well aware.

B. **Moore Abused the Company's Expense Reimbursement Policy**

25. Section 7 of the Employment Agreements authorizes Moore to seek reimbursement for "actual and documented expenses reasonably incurred by him in furtherance of the business of the Company and in the performance of his duties hereunder..."

26. During his tenure as CEO of the Company, Moore continuously abused this provision by seeking and receiving reimbursement for many non-business expenses. These expenses included, among other things:

5

  a. $144,220.57 in improper air travel, including for one of Moore's non-spousal companions, who had no role in the Company; and

  b. $124,481.83 in various lodging, car rental, food and entertainment, and other non-business purposes, including at clubs such as Hooters in Fort Lauderdale, where iGPS does not conduct business.

 27. Moore breached the Employment Agreements each time he falsely submitted receipts for non-business expenses and charged these expenses to the Company.

### C. Moore Failed to Return Company Property After His Termination

 28. Section 11(b) of the Employment Agreement states that:

Promptly after the termination of [Moore's] employment with the Company, [Moore] shall deliver to the Company all copies of data, information and knowledge of the Company in his possession, including, without limitation, all Confidential Information, documents, correspondence, notebooks, reports, computer programs, names, lists, and all other materials and copies thereof (including computer discs and other electronic media) relating in any way to the business of the Company or its subsidiaries, in any way obtained by [Moore] during the period of his employment with the Company. Promptly after the termination of [Moore's] employment with the Company, [Moore] shall deliver to the Company all tangible property belonging to, leased or licensed to the Company in the possession of [Moore].

 29. Moore was terminated on May 25, 2011.

 30. In or about June 2011, iGPS demanded that Moore return all of iGPS's property in his possession.

 31. As of the date of this Complaint, Moore has failed to return the iGPS property in his possession and, upon information and belief, continues to enjoy this Company property for his own use. Also upon information and belief, this Company property contains confidential, sensitive and proprietary Company information to which Moore is not entitled.

32.    Moore has breached his obligation under the Employment Agreement to promptly return property belonging to the Company in his possession after termination of his employment with the Company.

## III.    The Loan and Security Agreement

33.    iGPS entered into the Loan and Security Agreement with Moore on June 14, 2006 (the "Original Loan Agreement"). The Loan Agreement is evidenced by a Promissory Note also dated June 14, 2006 (the "Promissory Note").

34.    Pursuant to the Original Loan Agreement, iGPS agreed to loan certain funds to Moore in order to fund Moore's capital contributions to iGPS. In return, and as collateral for the loan, Moore granted iGPS a security interest in and lien on (i) a promissory note dated August 15, 2005 between Bubbadog Inc. ("Bubbadog") and Moore (the "Bubbadog Note"); (ii) all proceeds and products of the Bubbadog Note; and (iii) the limited liability interests of iGPS owned by Moore (collectively, the "Collateral").

35.    iGPS loaned $960,784 to Moore in connection with the Original Loan Agreement and the Promissory Note, relying on Moore's representations that he would abide by the terms of the Original Loan Agreement and Promissory Note.

36.    Upon information and belief, at the time of entering into the Original Loan Agreement, Bubbadog was tremendously under-capitalized, and it held value much less than the $960,784 it purportedly-secured. Further, upon information and belief, by May 2007, Bubbadog only held two types of assets: (1) an airplane, subject to a senior lien; and (2) assets of a hydraulic hose business in Miami, Florida valued at approximately $100,000.

37.    Upon information and belief, in or about May 2007, Moore secretly sold his interest in Bubbadog – the very collateral that he had pledged in the Original Loan Agreement –

7

for his own benefit, leaving the Company loan completely unsecured. Moore did so without providing any notice to the Company either before, during or after the sale of Bubbadog.

38. On March 14, 2008, iGPS and Moore executed an allonge to the Promissory Note that increased the amount of iGPS's loan to Moore from $960,784 to the amount of $1,960,784. On the same date, iGPS and Moore entered into the First Amendment to the Original Loan Agreement that reflected the new loan amount of $1,960,784 (the "Amended Loan Agreement").

39. Under the Allonge, Moore renewed his obligations pursuant to the terms of the Promissory Note and the Original Loan Agreement, including his representation that Bubbadog secured the Loan Documents.[2] Under the Amended Loan Agreement, Moore agreed that all the terms and conditions of the Loan Documents continued in full force. Further, Moore covenanted that he had no defenses or challenges to the Loan Documents.

40. Pursuant to the Allonge and Amended Loan Agreement, iGPS loaned the additional $1,000,000 to Moore in connection with an equity offering of 150,000,000 Series B Preferred Units (the "Offering") in order to enable Moore to purchase 666,666.67 Series B Preferred Units in the Offering.

41. Moore's sale of his interest in Bubbadog in May 2007 was a direct breach of the Original Loan Agreement and constituted an Event of Default as defined by the Loan Documents. The entire amount of the loan from iGPS to Moore is currently outstanding and Moore is obligated to repay iGPS in full.

42. The Original Loan Agreement also includes certain affirmative and negative covenants (the "Loan Covenants").

43. Under Section 4(a) of the Original Loan Agreement, Moore agreed to:

---

[2] Herein, "Loan Documents" refers to the Original Loan Agreement, the Promissory Note, the Allonge, and the Amended Loan Agreement.

8

> Use commercially reasonable efforts to (i) continue to conduct, operate, and manage the business of Bubbadog substantially as such business has been conducted, operated, and managed in the past; and (ii) maintain, preserve, and protect the assets used or useful in the conduct of Bubbadog's business, keep Bubbadog's assets in good repair, working order and condition, and make, or cause to be made, all needful or proper repairs, replacements and improvements to these assets.

44. Under Section 5(b) of the Original Loan Agreement, Moore agreed to cause Bubbadog *not to*:

> Sell, transfer, or otherwise dispose of any of its assets or properties, other than the sale of inventory and obsolete equipment in the ordinary course of business, without the prior written consent of the Company, which consent shall not be unreasonably held.

45. Under Section 6(a) of the Original Loan Agreement, an Event of Default shall occur upon:

> the failure of the [Moore] to timely and properly observe, keep, or perform any convenant, agreement, warranty, or condition required by or otherwise set forth in this [Loan Agreement] or [the Promissory Note].

46. In the event of an Event of Default, Section 7(a) of the Original Loan Agreement authorizes iGPS to:

> declare the entire principal amount of the Loan then outstanding and the interest accrued thereon and all other Obligations immediately due and payable in full, and [Moore] shall thereupon pay all such amounts and all other Obligations for which it is responsible immediately to [iGPS] in full.

47. Section 7(b) of the Original Loan Agreement authorizes iGPS, upon the occurrence of any Event of Default, to among other things, "bring suit for collection of the Loan and all other Obligations."

48. Section 14 of the Original Loan Agreement states that if an Event of Default occurs, Moore must pay iGPS "all actual and reasonable out-of-pocket costs and expenses of the Company (including, without limitation, legal fees, filing fees, recording costs and search fees)

9

incurred in connection with protecting and/or enforcing the Company's rights and remedies under the Loan Documents and/or applicable law."

### IV.    The Promissory Note

49.    The loan is evidenced by the Promissory Note.

50.    Pursuant to the Promissory Note and the Allonge, Moore promised to pay to the order of iGPS the principal amount of $1,960,784, or the outstanding principal amount at the date of payment, together with interest from the date of advance of each installment of the loan until maturity at the rate of eight percent per annum, by June 1, 2013.

51.    The Promissory Note and the Allonge are subject to mandatory prepayment upon certain circumstances, including

- The acceleration of the maturity of the Bubbadog Note following the occurrence of an Event of Default thereunder; or
- The termination of [Moore's] employment pursuant to the terms of the Employment Agreement.

52.    Pursuant to the Promissory Note and the Allonge, the occurrence of any Event of Default under the Loan Documents also constitutes an Event of Default under the Promissory Note.

53.    As with the Original Loan Agreement, the Promissory Note authorizes iGPS to declare the entire unpaid principal balance and accrued interest on the Promissory Note immediately due and payable in full upon and at any time after the occurrence of any Event of Default.

54.    As with the Original Loan Agreement, the Promissory Note requires Moore to pay reasonable attorneys' fees and all other out-of-pocket costs and expenses incurred by iGPS in the enforcement and collection of the Note.

10