### V. Moore's Breaches of the Loan Agreement and the Event of Default

55. Upon information and belief, Moore maintained Bubbadog in an extremely under-capitalized state in contravention and breach of his affirmative covenant in Section 4(a) to use commercially reasonable efforts to preserve the business and assets of Bubbadog.

56. Further, upon information and belief, Moore sold Bubbadog to Cottondog in or about May 2007.

57. Moore acted secretly, hiding the fact of the sale from the Company despite knowing that he had pledged Bubbadog as collateral and that the Company had relied on that pledge in extending to Moore nearly two million dollars.

58. By selling Bubbadog, Moore materially breached Sections 4(a) and 5(b) of the Loan Agreement. These breaches, among others, constitute an Event of Default under Section 6(a). The sale of Bubbadog by Moore was a breach of Section 4(a) of the Loan Agreement.

59. The sale of Bubbadog by Moore was also an Event of Default under Section 6(b) of the Loan Agreement.

60. Thus, the loan is immediately due and payable. Moore is liable for additional damages under the Agreements and the law.

### VI. Mandatory Prepayment Pursuant to the Promissory Note

61. Moore's default on the Original Loan Agreement and the Amended Loan Agreement and the termination of his employment caused the Promissory Note and the Allonge to be immediately subject to mandatory prepayment.

62. Moore has not repaid the loan to iGPS.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breaches of the Employment Agreement)

63. Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs.

64. The Employment Agreements are enforceable contracts, and iGPS and Moore are each bound by their terms.

65. At all relevant times, iGPS fulfilled its required duties and obligations under the Employment Agreements.

66. Moore breached the Employment Agreements by, among other things, failing to act in the best interest of the Company when he refused to repay Company loans, directing the CFO of iGPS to write off one of the unpaid loans, and abusing the Company's expense reimbursement policy.

67. Moore also breached the Employment Agreements by failing to promptly return certain Company property to iGPS after he was terminated, even after iGPS requested that he do so.

68. Moore's intentional, willful, wrongful, and knowing breaches of the Employment Agreements have caused iGPS damages in an amount to be determined at trial, plus all costs and interest to which iGPS is lawfully entitled.

### SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty)

69. Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs.

70. As the CEO and Chairman of the Board of iGPS, Moore owed a fiduciary duty to iGPS to act in accordance with its best interest and not on his own behalf.

71. Moore breached that duty, by, among other things, failing to return money advanced to him by the Company.

72. Moore further breached his fiduciary duty by directing the CFO of iGPS to write off the outstanding amount of the advance he took from the Company.

73. Moore additionally breached his duty by charging inappropriate, non-business expenses to the Company.

74. Moore additionally breached his duty by acting in his own personal interest and failing to act in the best interest of the Company.

75. As a result of Moore's breaches of his fiduciary duties, iGPS has been damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
(Conversion)

76. Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs.

77. iGPS had an immediate superior right of possession to all Company funds.

78. Moore's retention of the at least $2,086,719.43 loaned to him by iGPS, even after iGPS demanded that Moore repay the Company, constituted a conversion.

79. Moore's retention of at least $268,702.40 in reimbursement for certain inappropriate, non-business expenses also constituted conversion.

80. Moore's retention of certain Company property after his termination constituted a conversion.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

81. Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs.

82. Moore has been unjustly enriched at the expense of iGPS by retaining Company funds.

83. Moore unjustly retained at least $2,086,719.43 in sums advanced to him by the Company, as well as at least $268,702.40 in reimbursement for inappropriate, non-business expenses at iGPS' expense.

84. Because Moore received and unjustly retained at iGPS' expense such monetary benefits, the parties should be returned to their original position prior to Moore's misconduct.

## FIFTH CAUSE OF ACTION
### (Breach of the Loan Agreement)

85. Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs.

86. The Loan Agreement is an enforceable contract, and iGPS and Moore are each bound by its terms.

87. At all relevant times, iGPS fulfilled its required duties and obligations under the Loan Agreement.

88. Moore materially breached numerous provisions of the Loan Documents by, among other things, selling Bubbadog and thereby forfeiting the Collateral that secured the loan from iGPS.

14

89. Pursuant to Section 6(a) of the Original Loan Agreement, in the event of a failure to perform any covenant required by the Original Loan Agreement, all loans to iGPS become "immediately due and payable in full."

90. Given the acceleration clause, and Moore's failure breaches of covenants in the Loan Documents and duly noticed Event of Default, iGPS is entitled to damages in an amount equal to at least $1,960,784, the amount of principal currently due and owing under the Agreements, as well as the interest owed pursuant to the Promissory Note.

91. iGPS is also entitled to attorneys' fees incurred in enforcing the Loan Documents.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff iGPS prays for the following relief and judgment:

1. Judgment awarding iGPS compensatory damages owed by virtue of acceleration of loan payments from Moore to iGPS, as well as damages suffered by iGPS in an amount to be determined at trial, but in no event less than $2,355,421.83 plus attorneys fees;

2. Compensatory damages in an amount to be determined at trial;

3. Punitive damages in an amount to be proven at trial;

4. Disgorgement of unjustly retained gains;

5. Reasonable costs and expenses associated with this action, including, without limitation, attorneys' fees and other professional fees;

6. Prejudgment interest and/or opportunity cost damages in favor of Plaintiff; and

7. Such other and further relief as this Court may deem just and proper.

| | |
|---|---|
| DATED: New York, New York<br><br>November 21, 2011 | AKIN GUMP STRAUSS HAUER & FELD LLP<br><br>By: /s/ Stephen M. Baldini/RT<br>Stephen M. Baldini<br>Samidh Guha<br>One Bryant Park<br>New York, New York 10036<br>Telephone: (212) 872-1062<br>Fax: (212) 872-1002<br>sbaldini@akingump.com<br>sguha@akingump.com<br><br>*Attorneys for Plaintiff iGPS Company LLC* |

16

FILED: NEW YORK COUNTY CLERK 10/02/2012                                INDEX NO. 652431/2011
NYSCEF DOC. NO. 22                                                      RECEIVED NYSCEF: 10/02/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| iGPS COMPANY LLC | |
| Plaintiff, | No. 652431/2011 |
| - against - | **SECOND AMENDED COMPLAINT** |
| BOBBY L. MOORE | |
| Defendant. | |

Plaintiff iGPS Company LLC ("iGPS" or the "Company"), by and through its undersigned counsel, Akin Gump Strauss Hauer & Feld LLP, for its Second Amended Complaint against Bobby L. Moore ("Moore" or "Defendant") alleges as follows upon information and belief:

## NATURE OF THE ACTION

1. This action stems from Defendant Moore's gross misconduct and improper actions during his tenure as the CEO and Chairman of iGPS, during which Moore steered Company corporate funds to himself for his own personal benefit and ran roughshod over Company policies and practices for his own enrichment. Plaintiff iGPS also seeks by this action to recover millions of dollars in compensation paid by iGPS to Moore during this period of Moore's unfaithfulness. Moreover, iGPS further seeks to recover over $2 million in advances and loans extended to Moore at his request.

2. Prior to his termination in May 2011, Moore's employment by the Company was governed at different times by two separate employment agreements. Moore repeatedly

breached both of these employment agreements, violated his fiduciary duties to the Company, and converted the Company's assets for his own personal use.

3. During Moore's employment, iGPS paid Moore millions of dollars in compensation in the expectation that it would receive in return loyal and faithful service for iGPS from Moore. Instead, Moore repeatedly violated his duty of loyalty and faithful service to iGPS.

4. Separate and apart from Moore's breaches of his employment agreements and of his fiduciary duties to the Company, the Company generously extended a loan agreement and promissory note to Moore to provide financial assistance to Moore at his request.

5. The documents that govern the loan made by iGPS to Moore require Moore to repay the full amount of the loan upon the occurrence of certain triggering events, which have occurred. The loan agreement and promissory note give iGPS the right to bring this suit for collection of the full loan amount given these triggering events. There can be no dispute that Moore is required to repay the loan agreement and promissory note immediately, yet Moore has repeatedly refused to do so.

## PARTIES

6. Plaintiff iGPS is a limited liability company organized under the laws of Delaware, with its principal place of business in Orlando, Florida.

7. Defendant Moore is a resident of Orlando, Florida

## JURISDICTION AND VENUE

8. This Court has jurisdiction over Moore under CPLR § 301 because both parties consented to the jurisdiction of the State Courts of New York in the relevant agreements.

9. Venue is proper under CPLR § 501 because the relevant agreements identify New York State court as an appropriate venue for any claims arising out of or relating to those agreements.

## FACTUAL BACKGROUND

### I. Moore's Employment by iGPS

10. iGPS was launched on or about March 15, 2006 pursuant to the Limited Liability Company Agreement of iGPS Company LLC ("Original LLC Agreement") between and among Moore and Pegasus Partners III (AIV), L.P., Pegasus iGPS, LLC, and Pegasus Investors III, L.P. (the "Pegasus Entities"). The Original LLC Agreement (together with its subsequent amendments, the "LLC Agreements") was subsequently amended on six different occasions, most recently in or about April 2009 in the Sixth Amended and Restated Limited Liability Company Agreement of iGPS Company LLC ("Sixth Amended LLC Agreement").

11. In December 2007, KIA VIII (IGPS), L.P., KIA VIII (IGPS) GP, L.P., KEP VI AIV (IGPS), LLC, and Kelso GP VIII (the "Kelso Entities") became members of the Company.

12. The Pegasus Entities, along with the Kelso Entities, invested a significant amount of money into iGPS and trusted that Moore, as the CEO of the Company, would steer its progress faithfully. In return, Moore was very handsomely compensated with a combination of salary and iGPS equity totaling millions of dollars in value.

13. Moore's equity interests were governed by the LLC Agreements, which imposed, among other things, a non-compete provision on Moore.

14. On March 15, 2006, Moore was made the CEO of iGPS pursuant to an employment agreement (the "CEO Employment Agreement").

15. As CEO, Moore failed to execute on the Company's business plan and market advantages for its product. Accordingly, in late 2009, iGPS undertook a search for a new CEO.

16. In December 2010, iGPS transitioned Moore to a position as Chairman of its Board pursuant to a new employment agreement (the "Chairman Employment Agreement," and together with the CEO Employment Agreement, the "Employment Agreements").

17. Under Section 3(a) of the Employment Agreements, Moore agreed to:

> undertake to perform his duties in a manner consistent with the best interests of the Company, and shall perform all duties, services and responsibilities in accordance with the guidelines, policies and procedures established by the Company Board, and shall be subject to the supervision of the Company Board.

18. In addition to his other obligations to the Company, Moore expressly agreed to confidentiality and non-competition provisions in the Employment Agreements, which mirrored his ongoing obligations under the LLC Agreements.

19. With respect to the confidentiality provisions of the Sixth Amended LLC Agreement, pursuant to Section 4.6 of the Sixth Amended LLC Agreement, Moore agreed that:

> Without the prior written consent of a majority of the Board, except to the extent required by law, rule, regulation or court order, no Member shall disclose any confidential or proprietary trade secrets, customer lists, drawings, designs, source code, information regarding product development, marketing plans, sales plans, management organization information (including data and other information relating to members of the Board or management), operating policies or manuals, business plans, financial records, packaging design or other financial, commercial, business or technical information or Developments relating to the Company or any of its Subsidiaries or information designated as confidential or proprietary that the Company or any of its Subsidiaries may receive belonging to suppliers, customers or others who do business with the Company or any of its Subsidiaries (collectively, "Confidential Information") to any third person unless such Confidential Information has been previously disclosed to the public by the Company or is in the public domain (other than by reason of such Member's breach of this Section 4.6(a)).

4

20. The Sixth Amended LLC Agreement also contains a non-compete provision for all Members of the Company, including Moore. Specifically, Section 4.7 of the Sixth Amended LLC Agreement, provides that:

> "[n]o Member shall be permitted to engage in or possess an interest in any plastic pallet pool business other than the Company (such business, a "Competing Business")."

21. With respect to the confidentiality provisions of the Employment Agreements, pursuant to Section 11(a) of the Employment Agreements, Moore:

> "acknowledge[d] and agree[d] that, to the extent protectable under applicable law, all Confidential Information that comes into Executive's possession or knowledge any time during the Term of Employment, whether or not developed by Executive and whether or not during working hours, is the exclusive property of the Company and Executive waives any rights therein.
>
> ...
>
> "covenant[ed] and agree[d] that he shall not during the Term of Employment *or at any time thereafter*, directly or indirectly, use for his own purpose or for the benefit of any person or entity other than the Company, nor otherwise disclose, any Confidential Information to any individual or entity unless such disclosure has been authorized in writing by the Company Board or is otherwise required by law." (emphasis added)

22. With respect to the non-competition provisions, pursuant to Section 12(a) of the Employment Agreements, Moore agreed to refrain from:

> "directly or indirectly, alone or as a partner, joint venturer, officer, director, member, employee, consultant, agent, independent contractor, or equity interest holder of, or lender to, any Person or business, engage in any business related to the manufacture, sale, leasing or pooling of pallets and/or any business involved in logistics related thereto, in each case in the geographic locations in which the Company engages in any such activities as of the date of termination."

23. After installing a new CEO who was able to independently review the manner in which the Company had been operated under Moore, the Company for the first time learned of Moore's misconduct during his previous tenure as CEO. It learned quickly that Moore had in fact operated the Company in a manner that benefitted him personally, disregarding his fiduciary

and contractual obligations to the Company and its shareholders. It also learned that Moore had committed significant financial improprieties with the Company's funds for his own benefit, all while collecting lucrative compensation from iGPS.

24. During his time as CEO and then Chairman of the Company, Moore repeatedly engaged in conduct that was not in the best interests of the Company, and was not in accordance with Company guidelines, policies and procedures. A more detailed description of these violations is included below.

25. In light of Moore's gross misconduct, a notice of for Cause termination was delivered to Moore and his counsel by letter dated May 25, 2011.

## II. Moore's Breaches of His Contractual and Fiduciary Obligations

### A. Moore Misappropriated Company Funds

26. In 2007, Moore requested and received an advance of $79,172.43 from iGPS. Moore told the then CFO of iGPS that the requested sum was an advance on an expected Internal Revenue Service ("IRS") refund and that he would repay the advanced sum immediately upon receipt of the IRS refund.

27. Despite repeated requests from the CFO and others at iGPS that Moore repay the advance over subsequent months and years, and despite receiving the expected IRS refund, Moore never repaid the $79,172.43 that was advanced to him by the Company.

28. Upon information and belief, Moore received a refund for approximately $79,172.43 which he deposited in his personal bank account and has kept to this day.

29. In May 2010, Al Farrell, the then CFO of iGPS, again asked Moore to repay the advance. Moore refused, and instructed Farrell to "write it off," meaning to list it in the Company's accounts as funds that could not be recovered. Moore was not authorized to instruct

Farrell in this manner and did so without consulting with the current CEO of the Company or its Board.

30. In or around April 2011, Moore again requested that iGPS advance Moore $46,763 in order to enable Moore to satisfy his IRS obligations, this time in connection with his Federal Insurance Contributions Act ("FICA") contribution. Moore instructed the then Controller of iGPS to satisfy his FICA contribution, despite having been explicitly told not to communicate with Company personnel by the then CEO of iGPS. Moore promised to repay the $46,763 advance the next day, but has not yet done so.

31. Upon information and belief, Moore has refused to repay the funds despite knowing that he is obligated to do so, and despite repeated demands from the Company. At no time was Moore's obligation to repay this advance excused by the Company, as Moore was well aware.

### B. Moore Abused the Company's Expense Reimbursement Policy

32. Section 7 of the Employment Agreements authorizes Moore to seek reimbursement for "actual and documented expenses reasonably incurred by him in furtherance of the business of the Company and in the performance of his duties hereunder…"

33. During his tenure as CEO of the Company, Moore continuously abused this provision by seeking and receiving reimbursement for many non-business expenses. These expenses included, among other things:

   a. $144,220.57 in improper air travel, including for one of Moore's non-spousal companions, who had no role in the Company; and

7

b.  $124,481.83 in various lodging, car rental, food and entertainment, and other non-business purposes, including at clubs such as Hooters in Fort Lauderdale, where iGPS does not conduct business.

34. Moore breached the Employment Agreements each time he falsely submitted receipts for non-business expenses and charged these expenses to the Company.

35. Upon information and belief, Moore acted in a disloyal manner towards iGPS from the start of his employment with the Company in 2006, and Moore's disloyal behavior continued through his tenure as CEO and Chairman and until his termination.

36. Moore's actions demonstrate his disregard for and neglect of his obligation to act in good faith and in accordance with his duties as an iGPS employee. Further, this conduct was in direct contravention of the interests of iGPS.

### III.    The Loan and Security Agreement

37. iGPS entered into the Loan and Security Agreement with Moore on June 14, 2006 (the "Original Loan Agreement"). The Loan Agreement is evidenced by a Promissory Note also dated June 14, 2006 (the "Promissory Note").

38. Pursuant to the Original Loan Agreement, iGPS agreed to extend a loan to Moore in order to fund Moore's capital contributions to iGPS. In return, and as collateral for the loan, Moore granted iGPS a security interest in and lien on (i) a promissory note dated August 15, 2005 between Bubbadog Inc. ("Bubbadog") and Moore (the "Bubbadog Note"); (ii) all proceeds and products of the Bubbadog Note; and (iii) the limited liability interests of iGPS owned by Moore (collectively, the "Collateral").

39. iGPS loaned $960,784 to Moore in connection with the Original Loan Agreement and the Promissory Note, relying on Moore's representations that he would abide by the terms of the Original Loan Agreement and Promissory Note.

40. Upon information and belief, at the time of entering into the Original Loan Agreement, Bubbadog was tremendously under-capitalized, and it held value much less than the $960,784 it purportedly-secured. Further, upon information and belief, by May 2007, Bubbadog only held two types of assets: (1) an airplane, subject to a senior lien; and (2) assets of a hydraulic hose business in Miami, Florida valued at approximately $100,000.

41. Upon information and belief, in or about May 2007, Moore deceptively sold his interest in Bubbadog – the very collateral that he had pledged in the Original Loan Agreement – for his own benefit, leaving the Company loan completely unsecured. Moore did so without providing proper notice to the Company as required by the Original Loan Agreement and Promissory Note either before, during or after the sale of Bubbadog.

42. On March 14, 2008, iGPS and Moore executed an allonge to the Promissory Note (the "Allonge") that increased the amount of iGPS's loan to Moore from $960,784 to the amount of $1,960,784. On the same date, iGPS and Moore entered into the First Amendment to the Original Loan Agreement that reflected the new loan amount of $1,960,784 (the "Amended Loan Agreement").

43. Under the Allonge and the Amended Loan Agreement, Moore renewed his obligations pursuant to the terms of the Promissory Note and the Original Loan Agreement, including his representation that Bubbadog secured the Loan Documents.[1] Under the Amended

---

[1] Herein, "Loan Documents" refers to the Original Loan Agreement, the Promissory Note, the Allonge, and the Amended Loan Agreement.