## CAUSE OF ACTION X

102.    Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "70" and "72" as if incorporated and realleged herein.

103.    Defendant, IGPS, discriminated against Mr. Moore because of his age.

104.    By reason thereof, defendants have violated New York State Executive Law §296, et al., and as a consequence, plaintiff has been damaged in an amount to be determined at trial, including, but not limited to, lost past and future earnings, other employment benefits, and emotional injuries.

**WHEREFORE,** plaintiff demands judgment against defendants as follows:

(i)     On the First Cause of Action assessing compensatory damages in an amount to be determined at trial;

(ii)    On the Second Cause of Action assessing compensatory damages in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

(iii)   On the Third Cause of Action assessing compensatory damages in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

(iv)    On the Fourth Cause of Action assessing compensatory damages in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

(v)     On the Fifth Cause of Action assessing compensatory damages in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

(vi)    On the Sixth Cause of Action assessing compensatory damages in an amount to be determined at trial and punitive damages in an amount to be determined at trial

(vii)    On the Seventh Cause of Action assessing compensatory damages in an amount to be determined at trial;

(viii)    On the Eighth Cause of Action assessing compensatory damages in an amount to be determined at trial;

(ix)    On the Ninth Cause of Action assessing compensatory damages in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

(x)    On the Tenth Cause of Action assessing compensatory damages in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

(xi)    In connection with Causes of Action One through Nine for a Court Order requiring a full accounting of Mr. Moore's equity in IGPS, declaring the value of Mr. Moore's equity holdings in IGPS, and ordering the reinstatement of the full value of his original equity holdings;

(xii)    Attorney fees and disbursements; and

(xiii)    For such other relief as the Court deems just and proper.

Dated: New York, New York
July 12, 2011

KAISER SAURBORN & MAIR, P.C.

By: _____
Daniel J. Kaiser, Esq.

Attorney for plaintiff
111 Broadway, Suite 1805
New York, New York 10006
(212) 338-9100

-18-

FILED: NEW YORK COUNTY CLERK 01/17/2012
NYSCEF DOC. NO. 13
INDEX NO. 651907/2011
RECEIVED NYSCEF: 01/17/2012
95-88888-cgm   Doc 13-3   Filed 12/31/13   Entered 01/08/14 12:52:02   ntcrem 2
Pg 3 of 30

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-------------------------------------------------------------------------X

BOBBY L. MOORE,

             Plaintiff,

    -against-

IGPS COMPANY LLC, PEGASUS CAPITAL
ADVISORS LLP, PEGASUS PARTNERS III (AIV), L.P.,
PEGASUS INVESTORS III, L.P., PEGASUS
INVESTORS III GP, L.L.C., PEGASUS IGPS, LLC, IGPS
CO-INVESTMENT LLC, IGPS EMPLOYEE
PARTICIPATION, L.P., IGPS EXECUTIVE (GP) LLC,
PP IV IGPS HOLDINGS, LLC, KELSO & COMPANY,
KIA VIII (IGPS), L.P., KIA VIII (IGPS) GP, L.P., KEP VI
AIV (IGPS), LLC, KELSO GP VIII, LLC, RICH
WEINBERG, CRAIG COGUT, FRANK NICKELL, and
PHIL BERNEY,

             Defendants.

-------------------------------------------------------------------------X

**Index No.:** 651907/2011

**AMENDED**
**COMPLAINT**

       Plaintiff, Bobby L. Moore, by his attorneys Kaiser Saurborn & Mair, P.C., as and

for his amended complaint against defendants, alleges as follows:

### PARTIES, JURISDICTION, AND NATURE OF ACTION

    1.    Plaintiff, Bobby L. Moore ("plaintiff" or "Moore"), is a former Chairman of the

Board and Chief Executive Officer of IGPS Company LLC.

    2.    Upon information and belief, defendant, IGPS Company LLC ("defendant" or

"IGPS"), is a distributor of plastic pallets authorized to do business under the laws of New York

State.

    3.    Defendant, Pegasus Capital Advisors LLP ("defendant" or "Pegasus" or

collectively with all of the Pegasus related entities "Pegasus Group"), is a private equity firm and

the majority shareholder of IGPS.

4.      Defendant, Pegasus Partners III (AIV), L.P. ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a member and/or partner of Pegasus and a signatory to the LLC.

5.      Defendant, Pegasus Investors III, L.P. ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a general partner of Pegasus Partners III (AIV), L.P. and a signatory to the LLC.

6.      Defendant, Pegasus Investors III GP, L.L.C. ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a general partner of Pegasus Partners III (AIV), L.P. and a signatory to the LLC.

7.      Defendant, Pegasus IGPS, LLC ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a member and /or partner of Pegasus Capital Advisors LLP and a signatory to the LLC.

8.      Defendant, IGPS Co-Investment LLC ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a partner of Pegasus and a signatory to the Sixth Amended and Restated Limited Liability Company Agreement of IGPS Company LLC. ["LLC Agreement"]

9.      Defendant, IGPS Employee Participation, L.P. ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a member and/or partner of Pegasus and a signatory to the LLC.

10.     Defendant, IGPS Executive (GP) LLC ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a general partner of IGPS Employee Participation and a signatory to the LLC.

11.     Defendant, PP IV IGPS Holdings, LLC ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a member and/or partner of Pegasus Capital Advisors.

12.     Defendant, Kelso & Company ("defendant" or "Kelso" or collectively with all of the Kelso related entities "Kelso Group"), is a private equity firm and a principle shareholder of IGPS.

13.     Defendant, KIA VIII (IGPS), L.P. ("defendant" or collectively with all of the Kelso related entities "Kelso Group"), is a member and/or partner of Kelso.

14.     Defendant, KIA VIII (IGPS) GP, L.P. ("defendant" or collectively with all of the Kelso related entities "Kelso Group"), is a member and/or partner of Kelso and a signatory to the LLC.

15.     Defendant, KEP VI AIV (IGPS), LLC ("defendant" or collectively with all of the Kelso related entities "Kelso Group"), is a member and/or partner of Kelso and a signatory to the LLC.

16.     Defendant, Kelso GP VIII, LLC ("defendant" or collectively with all of the Kelso related entities "Kelso Group"), is a member and/or partner of Kelso and a signatory of to the LLC.

17.     Defendant, Rich Weinberg ("defendant" or "Weinberg"), is an officer of all the individually named Pegasus entities and the officer who executed the LLC on behalf of the Pegasus Group.

18.     Defendant, Craig Cogut, ("defendant" or "Cogut") is the founder and owner of Pegasus.

19.    Defendant, Frank Nickell ("defendant" or "Nickell") is the Chief Executive Officer and President of Kelso.

20.    Defendant, Phil Berney ("defendant" or "Berney"), is a partner of Kelso.

21.    Venue is properly laid in this court in that the causes of action arose in New York County and further the at issue employment agreement provides for New York venue.

22.    IGPS breached its employment agreement with Mr. Moore when it failed to compensate him consistent with the terms of his written employment agreement following his termination without cause on May 25, 2011. This breach of contract was directed by defendants, Pegasus, Kelso, and their senior partners and executives, who tortiously interfered with Mr. Moore's employment relationship with IGPS coercing IGPS to materially breach its written contract with Mr. Moore for no legitimate business purpose and to personally benefit themselves. Defendants, Pegasus, Kelso, Cogut, Nickell, and Berney, also breached their fiduciary duty to Mr. Moore by forcing a dilution of his equity stake in IGPS without his consent and employing economic coercion to require Mr. Moore to sign amended LLC agreements that resulted in a dilution of Mr. Moore's equity stake and a corresponding enrichment of their own equity stakes.

23.    Further, defendants, Pegasus Group and Kelso Group, breached the  LLC Agreement when they directed that Mr. Moore be terminated falsely for cause and denied him his accumulated equity in IGPS.

24.    Defendants' fraudulent business practices directed at Mr. Moore were typical of a larger pattern and practice of fraud in the manner in which defendants conducted their business affairs.

## BACKGROUND

### I.

### THE CREATION OF IGPS AND THE COMMENCEMENT
### OF MR. MOORE'S IGPS EMPLOYMENT

25.     In August 2005, Mr. Moore met with Mr. Cogut to discuss launching a company

that would distribute plastic pallets with Pegasus providing the principle funding.

26.     In or about October 2005, Mr. Moore and Mr. Cogut agreed to launch IGPS with

Pegasus as the majority shareholder and Mr. Moore assuming the position of IGPS's Chief

Executive Officer and Chairman.

27.     In or about December 2007, Kelso and Pegasus reached a deal allowing Kelso to

invest $250,000,000.00 in IGPS.  Pegasus, at the last possible moment, reneged on the deal, and

Kelso's investment was reduced to $125,000,000.00.

### II.

### IN CONNECTION WITH THE LAUNCH OF IGPS, MR. MOORE WAS
### AWARDED CLASS A NON-PREFERRED SHARES WHICH REPRESENTED A 6.5
### PERCENTAGE OWNERSHIP IN THE COMPANY

28.     In connection with his IGPS employment, Mr. Moore, through the issuance of

class A non-preferred shares, was awarded a 6.5 percent equity stake in IGPS.

29.     Beginning in or about December 2007, as IGPS acquired new investments, the

LLC agreement which set forth the ownership interests of all of the shareholders was amended.

30.     Mr. Moore, along with one or two other senior managers of IGPS, was sent blank

signature pages to the amended LLC agreement to sign.

31.     When Mr. Moore asked for the entire amended LLC agreement so that he could review it along with an attorney, Erica McGrady Johnson, an attorney with the law firm Akin Gump Strauss Hauer & Feld LLP, representing Pegasus and communicating on behalf of Pegasus Group and Kelso Group, refused.

32.     Further, Ms. McGrady Johnson advised him that if he did not return a signed signature page, all funding for IGPS would be cut off.

33.     Mr. Moore, as well as Rex Lowe of IGPS management, had no choice but to sign the signature pages which resulted in the LLC agreement being amended.

34.     The LLC agreement was repeatedly amended in this coerced and fraudulent manner, the most recent amendment occurring in September 2008, resulting in a Sixth Amended LLC Agreement.

35.     In May 2009, Mr. Moore learned that as a consequence of these amendments the cumulative equity stake of IGPS management was fraudulently diluted from twenty to thirteen percent. Mr. Moore's personal equity stake was diluted along with his IGPS senior management colleagues. The equity stakes of defendants, Pegasus and Kelso along with their principles, remained unchanged and undiminished.

36.     On repeated occasions, Pegasus Group and Kelso Group directed the termination of IGPS executives who challenged them on the issue concerning the dilution of IGPS's equity stake in the company.

37.     In May 2010, the management team as a group consulted a law firm that specialized in private equity to attempt to address the fraudulent dilution of their equity stake.

38.    The law firm composed a demand letter, sent under Mr. Moore's signature, to Pegasus and Kelso that resulted in a meeting to address the issue.

39.    Shortly following receipt of this letter, Chris Collins, a partner at Kelso, sent an email to Mr. Moore which in part stated, "when I look at the list of management members you are the one most under-allocated…you should make more money if we achieve these results."

40.    Pegasus Group and Kelso Group agreed to address the inequity by fully allocating management shares to existing management members, and later taking further steps to increase management's equity stake, thereby ultimately restoring IGPS's managers' equity stake to the original agreed to level of twenty percent.

41.    Pegasus Group and Kelso Group never followed through, and at no time, was an agreement executed memorializing the deal that had been reached.

42.    As majority shareholders, defendants, Pegasus Group and Kelso Group, owed a fiduciary duty to Mr. Moore as a minority shareholder.

43.    By their concerted actions to diminish his equity stake in the Company, improperly through deception and coercion, without proportionately diminishing their own stake in the Company, they breached their fiduciary duty to Mr. Moore.

### III.

### MR. MOORE IS TERMINATED AS CEO

44.    In December 2010, Mr. Moore approached the owners of Pegasus and Kelso in an effort to encourage them to finally address the dilution of equity issue.

45.    On December 17, 2010, a meeting was arranged to address the issue. Instead of addressing the issue, Mr. Moore was terminated as CEO.

-7-

46.    Two days following his termination, he was replaced as CEO by Steve Marton, a substantially younger executive with no experience as a CEO or, in particular, any executive experience in IGPS' business.

47.    At the time of his termination, Mr. Moore's original written employment agreement had previously expired.

48.    Mr. Moore was asked to continue his employment as Chairman pending execution of a new written employment agreement.

49.    Specifically, on December 17, 2010 at IGPS' Bentonville, Arkansas office Mr. Moore met with Mr. Berney and Mr. Weinberg.

50.    At the December 17, 2010 meeting, after advising Mr. Moore he was being terminated as CEO, Mr. Berney explicitly stated that he wanted Mr. Moore to say on as Chairman of the company.

51.    Further, Mr. Berney stated that IGPS needed Mr. Moore going forward to cultivate IGPS customers and that no one else had Mr. Moore's skill set to maintain and grow IGPS's customer base and IGPS' revenue.

52.    During the December 17, 2010 meeting Mr. Weinberg explicitly concurred with Mr. Berney's representations concerning Mr. Moore and also stated he wanted Mr. Moore to stay on as Chairman.

53.    The representations made by Mr. Berney and Mr. Weinberg at the December 17, 2010 meeting were knowingly false.

54.    At the time of the December 17, 2010 meeting both Mr. Berney and Mr. Weinberg knew that IGPS did not want Mr. Moore to continue as its Chairman.

-8-

55.     The purpose of making these false representations at the December 17, 2010 meeting was to induce Mr. Moore into signing a new four year employment agreement that contained written non-competition and non-solicitation provisions.

56.     Prior to the execution of the new written employment agreement, no written restrictive covenants existed relative to Mr. Moore's IGPS employment.

57.     During one of the many discussions concerning his new employment agreement, defendant, Mr. Berney angrily shouted at Mr. Moore, "You're too old, Bob. You're finished. This is your last gig. You will never work in this supply chain again."

## IV.

## THE NEW EMPLOYMENT AGREEMENT

58.     In early January 2011, an employment agreement was executed between Mr. Moore and IGPS for Mr. Moore to be employed as Chairman of the Company. ["the Agreement"]

59.     The Agreement was for a four-year term ending December 31, 2014.

60.     The Agreement provided that in the event Mr. Moore was terminated without cause during the Agreement's term, Mr. Moore would be entitled to the following payments:

(i)     payment of the Standard Benefit;

(ii)     the Annual Bonus for the year in which the termination occurs, prorated based on the Average Bonus and the number of days worked in the year in which termination occurs, payable by the Company in a lump sum on the first payroll date following the 60th day of termination;

(iii)     continued payment of Base Salary, in accordance with the Company's regular payroll practices, through December 31, 2014 (or the last day of the Extension Term);

-9-

(iv)    for as long as the Executive receives continued payments of Base Salary, the Executive also will receive payments, on the same payment schedule as Base Salary, equal to the Average Bonus, pro-rated based on the Base Salary payment schedule (e.g., if Base Salary is paid monthly, each such payment will include an amount equal to one twelfth of the Average Bonus) (the *"Bonus Payment"*); and

(v)    for so long as the Executive receives continued payments of Base Salary (but in no event longer than 18 months), continued participation at the Company's expense for the Executive and each of the Executive's dependents in all medical, dental, hospitalization and other employee welfare benefit plans, programs and arrangements covered by COBRA in which each such dependent was participating as of the date of the Executive's termination (the *"COBRA Payment"*), provided, that such company-paid benefits would not cause the imposition of any tax under Section 4980D of the Code, in which case the parties agree to negotiate in good faith towards an alternative arrangement for providing such benefits which does not cause the imposition of such tax.

61.    At the time the Agreement was executed, Mr. Moore owned the following vested and unvested shares of IGPS:

| "A Class Shares" | 32,000,000 shares | Fully vested |
| "E Class Shares" | 32,500,000 shares | Fully vested |
| "F Class Shares" | 12,000,000 shares | Fully vested |
| [10,000,000 vested if terminated without cause] | | |
| "Preferred Shares" | 11,410,000 shares | Fully vested |

62.    The Agreement defined "Cause" as follows:

*"Cause"* means:

(i)    willful refusal by the Executive to substantially perform, or a material breach by the Executive of, his employment-related duties and responsibilities (other than as a result of Disability) which is not remedied within ten days after receipt of written notice from the Company Board specifying such breach;

-10-

(ii)    willful misconduct or breach of a fiduciary duty by the Executive;

(iii)    the Executive's conviction of, or plea of guilty or <u>nolo contendere</u> to, a crime involving moral turpitude or constituting a felony;

(iv)    any act of dishonesty by the Executive that is detrimental in material respect to the interests of the Company;

(v)    failure by the Executive to follow the lawful directives of the Company Board, which directives are consistent with the Executive's duties and responsibilities hereunder which is not remedied within ten days after receipt of written notice from the Company Board specifying each breach; or

(vi)    the Executive's breach or material default under any provision of this Agreement which is not remedied within ten days after receipt of written notice from the Company specifying such breach or material default.

## V.

## MR. MOORE IS TERMINATED WITHOUT CAUSE

63.    Within three weeks of executing the Agreement, Mr. Moore was forced from his office at IGPS and directed not to contact customers, vendors, employees, or lenders.

64.    Mr. Moore was provided no explanation for this directive which so diminished his role within IGPS that it constituted a material breach of the Agreement.

65.    He was advised that IGPS would contact him with a plan moving forward.

66.    Defendants never intended for Mr. Moore's employment to continue beyond his termination as IGPS'S CEO.

67.    The new employment agreement was a ruse to bind him to a written non-compete and non-solicitation agreement secured through express misrepresentations communicated to him by Mr. Weinberg and Mr. Berney.

-11-

68.     On May 10, 2011, Mr. Berney contacted Mr. Moore to advise him that he would be terminated for cause.

69.     On May 25, 2011, Mr. Moore was sent a letter by Stephen M. Baldini, Esq., attorney for IGPS, terminating his employment for cause.

70.     The termination letter provided no details or explanation concerning the basis for IGPS' for cause termination of Mr. Moore's employment.

71.     Upon information and belief, any reasons utilized by the Company to justify Mr. Moore's for cause termination were known to IGPS, and certain of its principle shareholders and IGPS Executives, prior to executing the Agreement with Mr. Moore.

72.     Upon information and belief, defendants fraudulently induced Mr. Moore to execute the Agreement with full knowledge that they intended to direct his firing for cause for the express purpose of committing him to written non-competition and non-solicitation promises contained within the Agreement. At the time the Agreement was executed, Mr. Moore was not bound by any restrictive covenants.

73.     The Company had no legitimate business rationale for Mr. Moore's termination. In fact, IGPS was materially injured by his termination since, as the foremost expert on pallets in the world, the Company would no longer benefit from his expert Executive leadership. Further, he was replaced by an executive with only a fraction of his experience and skill set.

74.     Mr. Moore's termination was without cause.

75.     Defendants, Pegasus Group, Kelso Group, Cogut, Berney, Nickell, and Weinberg fraudulently conspired with one another and jointly directed the Company to terminate Mr. Moore for cause thereby jointly directing the material breach of the Agreement.

-12-

76.    Defendants, Pegasus Group, Kelso Group, Cogut, Berney, Nickell, and Weinberg knew at the time that they conspired with each other and jointly directed Mr. Moore to be terminated for cause no cause existed for his termination.

77.    Defendants, Pegasus Group, Kelso Group, Cogut, Berney, Nickell, and Weinberg personally benefitted from Mr. Moore's termination for cause in so far as Mr. Moore was deprived of all his equity and these defendants increased the value of their ownership interest in IGPS as a direct consequence of Mr. Moore's termination.

78.    Mr. Moore has been paid none of the compensation owed to him under the Agreement, including being entirely deprived of the value of all of his equity, as a consequence of his termination.

79.    Defendants' conduct has had a continuing impact on plaintiff.

### CAUSE OF ACTION I

80.    Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "79" as if incorporated and realleged herein.

81.    Defendant, IGPS, materially breached the Agreement, within weeks of execution of the Agreement, by so diminishing his corporate role and function that he was effectively removed from IGPS and then failing to pay Mr. Moore the compensation owed to him under the Agreement as a consequence of his termination.

82.    By reason thereof, plaintiff has been damaged in an amount to be determined at trial, including, but not limited to, all of the compensation delineated in paragraph "60" and "61" of the Complaint and additionally all of his accumulated equity at the time of his termination, none of which has been paid to him.

-13-

## CAUSE OF ACTION II

83.    Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "79" and "81" as if incorporated and realleged herein.

84.    Defendants, Pegasus Group, Kelso Group, Cogut, and Nickell tortiously interfered with the Agreement, without any legitimate business rationale, by directing IGPS to materially breach the Agreement and for the purpose of enriching their own equity stake in IGPS at Mr. Moore's expense.

85.    Further, defendants acted maliciously to punish Mr. Moore for asserting his legitimate legal rights in connection with dilution of his equity stake in the Company.

86.    By reason thereof, plaintiff has been damaged in an amount to be determined at trial, including, but not limited to, all of the compensation delineated in paragraphs "60" and "61" of the Complaint.

## CAUSE OF ACTION III

87.    Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "79," "81" and "84" as if incorporated and realleged herein.

88.    Defendants, Pegasus Group, Kelso Group, Cogut, Berney, Nickell, and Weinberg as majority shareholders of IGPS and as the principles of those majority shareholders, acted in concert to breach their fiduciary duty to Mr. Moore when, through deception and coercion, they forced a dilution of Mr. Moore's equity stake in IGPS from 6.5 to 1.1 percent of the Company.

89.    By reason thereof, plaintiff has been damaged in an amount to be determined at trial, including, but not limited to, the value differential between Mr. Moore's original equity stake and his diluted equity stake.

-14-

## CAUSE OF ACTION IV

90.     Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "79," "81" and "84" as if incorporated and realleged herein.

91.     Defendants, Pegasus Group, Kelso Group, Cogut, Berney, Nickell, and Weinberg as majority shareholders of IGPS and as the principles of those majority shareholders, acted in concert to breach their fiduciary duty to Mr. Moore when they directed his discharge from the position of Chairman for cause when they knew no cause existed and that his termination could harm IGPS in order to strip him of his accumulated equity stake in IGPS and thereby enrich their own equity stakes.

92.     By reason thereof, plaintiff has been damaged in an amount to be determined at trial, including, but not limited to, the value of Mr. Moore's equity stake at the time of his termination.

## CAUSE OF ACTION V

93.     Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "79," "81" and "84" as if incorporated and realleged herein.

94.     Mr. Berney and Mr. Weinberg fraudulently induced plaintiff into executing the Agreement.

95.     Mr. Berney and Mr. Weinberg misrepresented to him that they desired him to continue in the role of Chairman and that they required his continued services to grow IGPS's customer base and IGPS' revenue when in fact they already knew at the time the misrepresentations were made Mr. Moore would under no circumstances remain as IGPS's Chairman.

-15-

96.    Mr. Moore reasonably relied, to his detriment, upon defendants' false representations that they wanted him to remain employed as Chairman of IGPS through the four-year term of the new agreement.

97.    Messrs. Berney and Weinberg's motivation for making the misrepresentations was to secure written non-compete and non-solicitation clauses, that did not exist relative to Mr. Moore's employment at the time the misrepresentations were made, that they believed IGPS could rely upon following Mr. Moore's removal from IGPS.

98.    By reason thereof, plaintiff has been damaged in an amount to be determined at trial, including, but not limited to, the value of Mr. Moore's equity stake at the time of his termination.

## CAUSE OF ACTION VI

99.    Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "79," "81" and "84" as if incorporated and realleged herein.

100.    Defendants, Messrs. Weinberg and Berney, conspired to defraud Mr. Moore, through misrepresentation, and fraudulently inducing him into signing an employment agreement containing the desired written restrictive covenants.

101.    By reason thereof, plaintiff has been damaged in an amount to be determined at trial, including, but not limited to, the value of Mr. Moore's entire equity stake at the time of his termination.

## CAUSE OF ACTION VII

102.    Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "79," "81" and "84" as if incorporated and realleged herein.

-16-

103.    Defendants, Pegasus Group and Kelso Group, breached the Sixth Amended LLC Agreement by falsely directing Mr. Moore's termination for cause, thereby denying him his contractual entitlement to his vested equity as per the terms of the Sixth Amended LLC Agreement.

104.    By reason thereof, plaintiff has been damaged in an amount to be determined at trial, including, but not limited to, the value of Mr. Moore's equity stake at the time of his termination.

### CAUSE OF ACTION VIII

105.    Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "79," "81" and "84" as if incorporated and realleged herein.

106.    Defendant, IGPS, breach the implied covenant of good faith and fair dealing that is contractually a part of the Agreement when prior to executing the Agreement, IGPS knew it intended to remove Mr. Moore from his Chairman role and function following execution of the Agreement and ultimately terminate Mr. Moore's employment for cause.

**WHEREFORE,** plaintiff demands judgment against defendants as follows:

(i)    On the First Cause of Action assessing compensatory damages in an amount to be determined at trial;

(ii)    On the Second Cause of Action assessing compensatory damages in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

(iii)    On the Third Cause of Action assessing compensatory damages in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

-17-

(iv)     On the Fourth Cause of Action assessing compensatory damages in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

(v)     On the Fifth Cause of Action assessing compensatory damages in an amount to be determined at trial and punitive damages in an amount to be determined at trial;

(vi)     On the Sixth Cause of Action assessing compensatory damages in an amount to be determined at trial and punitive damages in an amount to be determined at trial

(vii)     On the Seventh Cause of Action assessing compensatory damages in an amount to be determined at trial;

(viii)     On the Eighth Cause of Action assessing compensatory damages in an amount to be determined at trial;

(ix)     In connection with Causes of Action One through Nine for a Court Order requiring a full accounting of Mr. Moore's equity in IGPS, declaring the value of Mr. Moore's equity holdings in IGPS, and ordering the reinstatement of the full value of his original equity holdings;

(x)     Attorney fees and disbursements; and

(xi)    For such other relief as the Court deems just and proper.

Dated: New York, New York
        January 17, 2012

**KAISER SAURBORN & MAIR, P.C.**

By: _____
        Daniel J. Kaiser, Esq.

Attorney for plaintiff
111 Broadway, Suite 1805
New York, New York 10006
(212) 338-9100

-19-

FILED: NEW YORK COUNTY CLERK 10/02/2012
NYSCEF DOC. NO. 40

INDEX NO. 651907/2011
RECEIVED NYSCEF: 10/02/2012

95-88888-cgm   Doc 13-3   Filed 12/31/13   Entered 01/08/14 12:52:02   ntcrem 2
Pg 22 of 30

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-------------------------------------------------------------------------X

BOBBY L. MOORE,                                    **Index No.:** 651907/2011

          Plaintiff,                              **SECOND**
                                                   **AMENDED**
    -against-                                **COMPLAINT**

IGPS COMPANY LLC, PEGASUS CAPITAL
ADVISORS LLP, PEGASUS PARTNERS III (AIV), L.P.,
PEGASUS INVESTORS III, L.P., PEGASUS
INVESTORS III GP, L.L.C., PEGASUS IGPS, LLC, IGPS
CO-INVESTMENT LLC, IGPS EMPLOYEE
PARTICIPATION, L.P., IGPS EXECUTIVE (GP) LLC,
PP IV IGPS HOLDINGS, LLC, KELSO & COMPANY,
KIA VIII (IGPS), L.P., KIA VIII (IGPS) GP, L.P., KEP VI
AIV (IGPS), LLC, KELSO GP VIII, LLC, RICH
WEINBERG, CRAIG COGUT, FRANK NICKELL, and
PHIL BERNEY,

          Defendants.
-------------------------------------------------------------------------X

        Plaintiff, Bobby L. Moore, by his attorneys Kaiser Saurborn & Mair, P.C., as and

for his Second Amended Complaint against defendants, alleges as follows:

### PARTIES, JURISDICTION, AND NATURE OF ACTION

       1.     Plaintiff, Bobby L. Moore ("plaintiff" or "Moore"), is a former Chairman of the

Board and Chief Executive Officer of IGPS Company LLC.

       2.     Upon information and belief, defendant, IGPS Company LLC ("defendant" or

"IGPS"), is a distributor of plastic pallets authorized to do business under the laws of New York

State.

       3.     Defendant, Pegasus Capital Advisors LLP ("defendant" or "Pegasus" or

collectively with all of the Pegasus related entities "Pegasus Group"), is a private equity firm and

the majority shareholder of IGPS.

4.      Defendant, Pegasus Partners III (AIV), L.P. ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a member and/or partner of Pegasus and a signatory to the LLC.

5.      Defendant, Pegasus Investors III, L.P. ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a general partner of Pegasus Partners III (AIV), L.P. and a signatory to the LLC.

6.      Defendant, Pegasus Investors III GP, L.L.C. ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a general partner of Pegasus Partners III (AIV), L.P. and a signatory to the LLC.

7.      Defendant, Pegasus IGPS, LLC ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a member and /or partner of Pegasus Capital Advisors LLP and a signatory to the LLC.

8.      Defendant, IGPS Co-Investment LLC ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a partner of Pegasus and a signatory to the Sixth Amended and Restated Limited Liability Company Agreement of IGPS Company LLC. ["LLC Agreement"]

9.      Defendant, IGPS Employee Participation, L.P. ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a member and/or partner of Pegasus and a signatory to the LLC.

10.     Defendant, IGPS Executive (GP) LLC ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a general partner of IGPS Employee Participation and a signatory to the LLC.

11.    Defendant, PP IV IGPS Holdings, LLC ("defendant" or collectively with all of the Pegasus related entities "Pegasus Group"), is a member and/or partner of Pegasus Capital Advisors.

12.    Defendant, Kelso & Company ("defendant" or "Kelso" or collectively with all of the Kelso related entities "Kelso Group"), is a private equity firm and a principle shareholder of IGPS.

13.    Defendant, KIA VIII (IGPS), L.P. ("defendant" or collectively with all of the Kelso related entities "Kelso Group"), is a member and/or partner of Kelso.

14.    Defendant, KIA VIII (IGPS) GP, L.P. ("defendant" or collectively with all of the Kelso related entities "Kelso Group"), is a member and/or partner of Kelso and a signatory to the LLC.

15.    Defendant, KEP VI AIV (IGPS), LLC ("defendant" or collectively with all of the Kelso related entities "Kelso Group"), is a member and/or partner of Kelso and a signatory to the LLC.

16.    Defendant, Kelso GP VIII, LLC ("defendant" or collectively with all of the Kelso related entities "Kelso Group"), is a member and/or partner of Kelso and a signatory of to the LLC.

17.    Defendant, Rich Weinberg ("defendant" or "Weinberg"), is an officer of all the individually named Pegasus entities and the officer who executed the LLC on behalf of the Pegasus Group.

18.    Defendant, Craig Cogut, ("defendant" or "Cogut") is the founder and owner of Pegasus.

-3-

19.    Defendant, Frank Nickell ("defendant" or "Nickell") is the Chief Executive Officer and President of Kelso.

20.    Defendant, Phil Berney ("defendant" or "Berney"), is a partner of Kelso.

21.    Venue is properly laid in this court in that the causes of action arose in New York County and further the at issue employment agreement provides for New York venue.

22.    IGPS breached its employment agreement with Mr. Moore when it failed to compensate him consistent with the terms of his written employment agreement following his termination without cause on May 25, 2011. This breach of contract was directed by defendants, Pegasus, Kelso, and their senior partners and executives, who tortiously interfered with Mr. Moore's employment relationship with IGPS coercing IGPS to materially breach its written contract with Mr. Moore for no legitimate business purpose and to personally benefit themselves. Defendants, Pegasus, Kelso, Cogut, Nickell, and Berney, also breached their fiduciary duty to Mr. Moore by forcing a dilution of his equity stake in IGPS without his consent and employing economic coercion to require Mr. Moore to sign amended LLC agreements that resulted in a dilution of Mr. Moore's equity stake and a corresponding enrichment of their own equity stakes.

23.    Further, defendants, Pegasus Group and Kelso Group, breached the  LLC Agreement when they directed that Mr. Moore be terminated falsely for cause and denied him his accumulated equity in IGPS.

24.    Defendants' fraudulent business practices directed at Mr. Moore were typical of a larger pattern and practice of fraud in the manner in which defendants conducted their business affairs.

# BACKGROUND

## I.

## THE CREATION OF IGPS AND THE COMMENCEMENT
## OF MR. MOORE'S IGPS EMPLOYMENT

25.      In August 2005, Mr. Moore met with Mr. Cogut to discuss launching a company

that would distribute plastic pallets with Pegasus providing the principle funding.

26.      In or about October 2005, Mr. Moore and Mr. Cogut agreed to launch IGPS with

Pegasus as the majority shareholder and Mr. Moore assuming the position of IGPS's Chief

Executive Officer and Chairman.

27.      In or about December 2007, Kelso and Pegasus reached a deal allowing Kelso to

invest $250,000,000.00 in IGPS.  Pegasus, at the last possible moment, reneged on the deal, and

Kelso's investment was reduced to $125,000,000.00.

## II.

## IN CONNECTION WITH THE LAUNCH OF IGPS, MR. MOORE WAS
## AWARDED CLASS A NON-PREFERRED SHARES WHICH REPRESENTED A 6.5
## PERCENTAGE OWNERSHIP IN THE COMPANY

28.      In connection with his IGPS employment, Mr. Moore, through the issuance of

class A non-preferred shares, was awarded a 6.5 percent equity stake in IGPS.

29.      Beginning in or about December 2007, as IGPS acquired new investments, the

LLC agreement which set forth the ownership interests of all of the shareholders was amended.

30.      Mr. Moore, along with one or two other senior managers of IGPS, was sent blank

signature pages to the amended LLC agreement to sign.

31.     When Mr. Moore asked for the entire amended LLC agreement so that he could review it along with an attorney, Erica McGrady Johnson, an attorney with the law firm Akin Gump Strauss Hauer & Feld LLP, representing Pegasus and communicating on behalf of Pegasus Group and Kelso Group, refused.

32.     Further, Ms. McGrady Johnson advised him that if he did not return a signed signature page, all funding for IGPS would be cut off.

33.     Mr. Moore, as well as Rex Lowe of IGPS management, had no choice but to sign the signature pages which resulted in the LLC agreement being amended.

34.     The LLC agreement was repeatedly amended in this coerced and fraudulent manner, the most recent amendment occurring in September 2008, resulting in a Sixth Amended LLC Agreement.

35.     In May 2009, Mr. Moore learned that as a consequence of these amendments the cumulative equity stake of IGPS management was fraudulently diluted from twenty to thirteen percent. Mr. Moore's personal equity stake was diluted along with his IGPS senior management colleagues. The equity stakes of defendants, Pegasus and Kelso along with their principles, remained unchanged and undiminished.

36.     On repeated occasions, Pegasus Group and Kelso Group directed the termination of IGPS executives who challenged them on the issue concerning the dilution of IGPS's equity stake in the company.

37.     In May 2010, the management team as a group consulted a law firm that specialized in private equity to attempt to address the fraudulent dilution of their equity stake.

38.     The law firm composed a demand letter, sent under Mr. Moore's signature, to Pegasus and Kelso that resulted in a meeting to address the issue.

39.      Shortly following receipt of this letter, Chris Collins, a partner at Kelso, sent an email to  Mr. Moore which in part stated, "when I look at the list of management members you are the one most under-allocated…you should make more money if we achieve these results."

40.     Pegasus Group and Kelso Group agreed to address the inequity by fully allocating management shares to existing management members, and later taking further steps to increase management's equity stake, thereby ultimately restoring IGPS's managers' equity stake to the original agreed to level of twenty percent.

41.     Pegasus Group and Kelso Group never followed through, and at no time, was an agreement executed memorializing the deal that had been reached.

42.     As majority shareholders, defendants, Pegasus Group and Kelso Group, owed a fiduciary duty to Mr. Moore as a minority shareholder.

43.     By their concerted actions to diminish his equity stake in the Company, improperly through deception and coercion, without proportionately diminishing their own stake in the Company, they breached their fiduciary duty to Mr. Moore.

## III.

## MR. MOORE IS TERMINATED AS CEO

44.     In December 2010, Mr. Moore approached the owners of Pegasus and Kelso in an effort to encourage them to finally address the dilution of equity issue.

45.     On December 17, 2010, a meeting was arranged to address the issue. Instead of addressing the issue, Mr. Moore was terminated as CEO.

46.     Two days following his termination, he was replaced as CEO by Steve Marton, a substantially younger executive with no experience as a CEO or, in particular, any executive experience in IGPS' business.

47.     At the time of his termination, Mr. Moore's original written employment agreement had previously expired.

48.     Mr. Moore was asked to continue his employment as Chairman pending execution of a new written employment agreement.

49.     Specifically, on December 17, 2010 at IGPS' Bentonville, Arkansas office Mr. Moore  met with Mr. Berney and Mr. Weinberg.

50.     At the December 17, 2010 meeting, after advising Mr. Moore he was being terminated as CEO, Mr. Berney explicitly stated that he wanted Mr. Moore to say on as Chairman of the company.

51.     Further, Mr. Berney stated that IGPS needed Mr. Moore going forward to cultivate IGPS customers and that no one else had Mr. Moore's skill set to maintain and grow IGPS's customer base and IGPS' revenue.

52.     During the December 17, 2010 meeting Mr. Weinberg explicitly concurred with Mr. Berney's representations concerning Mr. Moore and also stated he wanted Mr. Moore to stay on as Chairman.

53.     The representations made by Mr. Berney and Mr. Weinberg at the December 17, 2010 meeting were knowingly false.

54.     At the time of the December 17, 2010 meeting both Mr. Berney and Mr. Weinberg knew that IGPS did not want Mr. Moore to continue as its Chairman.

-8-

55.    The purpose of making these false representations at the December 17, 2010 meeting was to induce Mr. Moore into signing a new four year employment agreement that contained written non-competition and non-solicitation provisions.

56.    Prior to the execution of the new written employment agreement, no written restrictive covenants existed relative to Mr. Moore's IGPS employment.

57.    During one of the many discussions concerning his new employment agreement, defendant, Mr. Berney angrily shouted at Mr. Moore, "You're too old, Bob. You're finished. This is your last gig. You will never work in this supply chain again."

## IV.

## THE NEW EMPLOYMENT AGREEMENT

58.    In early January 2011, an employment agreement was executed between Mr. Moore and IGPS for Mr. Moore to be employed as Chairman of the Company. ["the Agreement"]

59.    The Agreement was for a four-year term ending December 31, 2014.

60.    The Agreement provided that in the event Mr. Moore was terminated without cause during the Agreement's term, Mr. Moore would be entitled to the following payments:

(i)    payment of the Standard Benefit;

(ii)    the Annual Bonus for the year in which the termination occurs, prorated based on the Average Bonus and the number of days worked in the year in which termination occurs, payable by the Company in a lump sum on the first payroll date following the 60th day of termination;

(iii)    continued payment of Base Salary, in accordance with the Company's regular payroll practices, through December 31, 2014 (or the last day of the Extension Term);