# EXHIBIT C
# PART I(a)

"Value Rights Agreement" means that certain Value Rights Agreement dated as of April 15, 2008 between the Borrower and JMB, as such document may be amended, restated or otherwise modified from time to time.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02  Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.03  Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Lenders that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if any Lender notifies the Borrower that such Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

## ARTICLE II.  THE LOAN

SECTION 2.01  The Loan. The Borrower hereby acknowledges that the aggregate principal amount of the term loan originally made under the Existing Credit Agreement outstanding as of August 1, 2008 is $13,311,818.21 (the "Loan"), comprised of (i) $13,000,000 of original principal plus (ii) $311,818.21 in capitalized interest.  Amounts repaid in respect of the Loan may not be reborrowed.

SECTION 2.02  Repayment of the Loan; Evidence of Debt.

(a)    The Borrower hereby unconditionally promises to pay to each Lender for its account the then unpaid principal amount of the Loan owed to such Lender on the Maturity Date

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from the Loan made hereunder, including the amounts of principal and interest due and payable and paid to such Lender from time to time hereunder.

(c)    The entries made in the accounts maintained pursuant to paragraph (b) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loan in accordance with the terms of this Agreement.

(d)    Each Lender may request that the Loan made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form reasonably approved by such Lender. Thereafter, the Loan evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 8.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.03    Prepayment of Loan. (a) *Optional Prepayment.* The Borrower shall have the right at any time and from time to time to optionally prepay the Loan in whole or in part, subject to prior notice in accordance with paragraph (c) of this Section and the payment of accrued interest in accordance with Section 2.03(c) and any other amounts pursuant to and in accordance with this Agreement; provided, however, that each prepayment under this Section 2.03(a) shall be in a minimum amount equal to $100,000 and integral multiples of $25,000 in excess thereof.

(b)    *Mandatory Prepayment.* In the event and on each occasion that any Net Proceeds are received by or on behalf of any Loan Party in respect of any Prepayment Event, the Borrower shall, immediately after such Net Proceeds are received by such Loan Party, prepay the Obligations in an aggregate amount equal to 100% of such Net Proceeds, provided that, in the case of any event described in clause (a) or (b) of the definition of the term "Prepayment Event", if the Borrower shall deliver to the Lenders a certificate of a Financial Officer to the effect that the Loan Parties intend to apply the Net Proceeds from such event (or a portion thereof specified in such certificate), within 30 days after receipt of such Net Proceeds, to acquire (or replace or rebuild) real property, equipment or other tangible assets (excluding inventory) to be used in the business of the Loan Parties, and certifying that no Default has occurred and is continuing, then no prepayment shall be required pursuant to this paragraph in respect of the Net Proceeds specified in such certificate, provided that such Net Proceeds are so applied within such 30 day period.

(c)      The Borrower shall notify the Lenders by telephone (confirmed by facsimile) of any prepayment hereunder not later than 10:00 a.m., New York City time, three Business Days before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount to be prepaid to each Lender. Prepayments shall be accompanied by accrued interest as set forth in Section 2.05(c).

SECTION 2.04 Fees.

(a)      On the Closing Date, the Borrower shall pay to the Lenders an amendment fee (the "Amendment Fee") in the amount of $175,000.

(b)      Intentionally Omitted.

(c)      All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Lenders. Fees paid shall not be refundable under any circumstances.

SECTION 2.05 Interest. (a) The unpaid principal amount of the Loan shall bear interest beginning as of April 15, 2008 at an aggregate rate per annum equal to twenty percent (20.00%) per annum, payable as follows: (i) twelve percent (12.00%) per annum payable in cash and (ii) eight percent (8.00%) per annum payable by capitalizing such interest on the date when due and adding such capitalized amount to the outstanding principal amount of the Loan.

(b)      Notwithstanding the foregoing, during the occurrence and continuance of an Event of Default, (i) the unpaid principal amount of the Loan shall bear interest at 2% per annum plus the rate otherwise applicable to the Loan as provided in the preceding paragraph of this Section or (ii) in the case of any other amount outstanding hereunder, such amount shall accrue at 2% per annum plus the rate applicable to such fee or other obligation as provided hereunder (provided that, if this Agreement does not expressly provide for a rate applicable to such fee or other obligation, such amount outstanding hereunder shall accrue at 14% per annum). All interest accruing during the occurrence and continuance of an Event of Default pursuant to this Section 2.05(b) shall be payable in cash.

(c)      Accrued interest on the unpaid principal amount of the Loan shall be payable or capitalized, as applicable, in arrears on each Interest Payment Date; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand, and (ii) in the event of any repayment or prepayment of the Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)      All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed.

SECTION 2.06 Taxes. (a) Any and all payments by or on account of any obligation of the Borrower hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if the Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) each Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made,

(ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    The Borrower shall indemnify each Lender within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by such Lender on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by such Lender shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the applicable Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to such Lender.

SECTION 2.07 Payments Generally; Allocation of Proceeds; Sharing of Set-offs.
(a)    The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees or otherwise) prior to 11:00 a.m., New York City time, on the date when due, in immediately available funds, without set off or counterclaim. Any amounts received by any Lender after such time on any date may, in the discretion of such Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to each Lender at its address as notified to the Borrower in writing from time to time. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars.

(b)    Any proceeds of Collateral received by any Lender (i) not constituting either (A) a specific payment of principal, interest, fees or other sum payable under the Loan Documents (which shall be applied as specified by the Borrower), or (B) a mandatory prepayment (which shall be applied in accordance with Section 2.03) or (ii) after an Event of Default has occurred and is continuing and the Required Lenders so elect, shall be applied ratably first, to the payment of all amounts payable under this Agreement on account of the Collateral Agent's fees or any legal fees, costs and expenses or other liabilities of any kind incurred by the Collateral Agent or any co-agent in connection with any Loan Document, second, to pay any fees, indemnities, or expense reimbursements including amounts then due to the Lenders from the Borrower, third, interest then due and payable on the Loan, fourth, to prepay principal on the Loan, fifth, to payment of any amounts owing with respect to Swap Obligations, and sixth, to the payment of any other Obligation due to the Lenders by the Borrower. The Required Lenders shall have the continuing and exclusive right to apply and

23

reverse and reapply any and all such proceeds and payments to any portion of the Obligations. For this purpose, "proceeds" of Collateral means any and all cash, securities and other property realized from collection, foreclosure or enforcement of the Collateral Agent's Liens upon the Collateral (including distributions of Collateral in satisfaction of any Obligations).

SECTION 2.08  Indemnity for Returned Payments.  If after receipt of any payment which is applied to the payment of all or any part of the Obligations, any Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by such Lender and the Borrower shall be liable to pay such Obligations to such Lender.  The provisions of this Section 2.08 shall be and remain effective notwithstanding any contrary action which may have been taken by any Lender in reliance upon such payment or application of proceeds.  The provisions of this Section 2.08 shall survive the termination of this Agreement.

SECTION 2.09  Pro Rata Treatment.  Except to the extent otherwise provided herein, the Loan, each payment or prepayment of principal of the Loan, each payment of interest on the Loan and each payment of fees due and payable to the Lenders under the Loan Documents shall be allocated pro rata among the Lenders in accordance with the respective principal amounts of the outstanding Loan held by the Lenders. The Loan Parties hereby agree to make all such pro rata payments directly to each Lender in accordance with this Section in accordance with instructions provided by to the Borrower by such Lender.

SECTION 2.10  Effect of Amendment and Restatement.  Upon the execution and delivery of this Agreement, the indebtedness, obligations and other liabilities of each of the Loan Parties previously governed by the Existing Credit Agreement (the "Existing Obligations") shall continue in full force and effect, but shall be governed by the terms and conditions set forth in this Agreement.  The Existing Obligations shall include all interest, fees and other amounts accrued through the Closing Date.  Guaranties issued under the Existing Credit Agreement shall be deemed to be outstanding under this Agreement, except as amended on the date hereof or hereafter.  The Existing Obligations, together with any and all additional Obligations incurred by the Borrower hereunder or under any of the other Loan Documents shall continue to be secured by the assets of each Loan Party, other than the Excluded Assets, whether now existing or hereafter acquired and wheresoever located, all as more specifically set forth in the Collateral Documents.  The execution and delivery of this Agreement shall not constitute a novation or repayment of the Existing Obligations.

ARTICLE III. Representations and Warranties

Each Loan Party hereby represents and warrants to the Lenders that, as of the Closing Date:

SECTION 3.01      Organization; Powers.  Each of the Loan Parties is duly organized, validly existing and in good standing under the laws of the jurisdiction of its

organization, has all requisite power and authority to own or lease and operate its properties and carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02    Authorization; Enforceability. The Transactions are within each Loan Party's corporate, limited liability, or limited partnership powers (as applicable) and have been duly authorized by all necessary corporate and, if required, stockholder action. The Loan Documents to which each Loan Party is a party have been duly executed and delivered by such Loan Party and constitute a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms.

SECTION 3.03    Governmental Approvals; No Conflicts. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (i) the execution, delivery or performance by, or enforcement against, any Loan Party of the Credit Agreement or any other Loan Document, or for the consummation of the Transactions, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature of the Collateral as set forth in the Collateral Documents and this Agreement, other than that portion of the Collateral in which the Lien in favor of the Collateral Agent shall not be first priority as expressly set forth in Section 3.16), other than the due filing of UCC-1 financing statements and the delivery of a duly executed JAD Stock Intercreditor Agreement, or (iv) the exercise by any Lender or the Collateral Agent of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents. All applicable waiting periods in connection with the Transactions have expired without any action having been taken by any Governmental Authority restraining, preventing or imposing materially adverse conditions upon the Transactions or the rights of the Loan Parties freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them. Each Loan Party has all requisite corporate, limited liability company or partnership (as applicable) power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.

SECTION 3.04    Financial Condition; No Material Adverse Change. (a) Each of the Loan Parties has heretofore furnished to the Lender its (1) combined, audited balance sheet and statements of income, stockholders equity and cash flows (i) as of and for the fiscal year ended December 31, 2007, reported on by Coulter & Justus, P.C., independent public accountants, and (ii) reviewed, unaudited balance sheet and statements of income and cash flows as of and for the fiscal quarter and the portion of the fiscal year ended March 31, 2008, certified by a Financial Officer. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Loan Parties as of such dates and for such periods in accordance with GAAP, subject to year end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)    Except for the matters disclosed in Schedule 3.04(b), no event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect, since the date of the financial statements described in subsection (a) above.

SECTION 3.05  Properties.  (a) As of the Closing Date, Schedule 3.05 sets forth the address of each parcel of real property that is owned or leased by each Loan Party. Each of such leases and subleases is valid and enforceable in accordance with its terms and is in full force and effect, and no default by any party to any such lease or sublease exists. Each of the Loan Parties has good and indefeasible title to, or valid leasehold interests in, all its real and personal property, free of all Liens other than those permitted by Section 6.02.

(b)        Each Loan Party owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to its business as currently conducted, a correct and complete list of which, as of the Closing Date, is set forth on Schedule 3.05, and the use thereof by the Loan Parties does not infringe in any material respect upon the rights of any other Person, and the Loan Parties' rights thereto are not subject to any licensing agreement or similar arrangement.

SECTION 3.06  Litigation and Environmental Matters.  (a) Except for the Disclosed Matters, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened against or affecting the Loan Parties that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or that involve the Agreement or the Transactions.

(b)        Since April 15, 2008, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or increased the likelihood of, a Material Adverse Effect.

(c)        Except for the Disclosed Matters: (A) each Loan Party's real property has not been used by any Loan Party, and to its knowledge by any other person, as a landfill or for final disposal of waste, is free of contamination from any Hazardous Materials, except for such contamination that could not reasonably be expected to result in a Material Adverse Effect, and no such real property is the subject of any mandatory order from a Governmental Authority, nor has any Loan Party received any notice of intent to issue such an order; (B) no written notice has been received by any Loan Party identifying it as a "potentially responsible party" or a party responsible for the remediation or clean up of any Hazardous Material, or requesting information under any Environmental Law pertaining to any release of Hazardous Material, or to any contaminated site; and (C) to the knowledge of the Loan Parties, there are no facts, circumstances or conditions that could reasonably be expected to result in any Loan Party being identified as a "potentially responsible party" or a party responsible for the remediation or clean up of any Hazardous Material under any Environmental Law, except to the extent that such identification could not reasonably be expected to result in a Material Adverse Effect.

(d)        Except for the Disclosed Matters: (A) each Loan Party is in material compliance with all requirements of Environmental Laws; (B) each Loan Party has obtained, and is in material compliance with the requirements of all material Environmental Permits required by Environmental Laws for the operations of its businesses as presently conducted, and all such Environmental Permits are valid, uncontested and in good standing, and there is no application pending to revoke any such Environmental Permit; (C) there is no litigation arising under or related to any Environmental Laws, Environmental Permits or Hazardous materials which seeks

damages, penalties, fines, costs or expenses in an amount which could reasonably be expected to result in a Material Adverse Effect or which alleges criminal or quasi-criminal misconduct by the Borrower; (D) each Loan Party has not received written notice of any investigation or threatened investigation under any Environmental Laws, pertaining to its real property, the Environmental Permits, any Loan Party or the operations of its business, nor, to the knowledge of such Loan Party has it received, any oral notice of any such investigation, threatened investigation or evaluation; and (E) each Loan Party has provided to the Lender all existing material environmental reports or audits pertaining to its real property or the operations of its business in its possession or control.

      (e)      Each Loan Party hereby acknowledges and agrees that each Lender (A) is not now, and has not ever been, in control of any of the Loan Parties' real property or affairs; and (B) does not have the capacity through the provisions of the Loan Documents or otherwise to influence any Loan Party's conduct with respect to the ownership, operation or management of any of its real property or compliance with Environmental Laws or Environmental Permits.

      (f)      To the knowledge of the Loan Parties, no conditions exist at, on or under any real property or asset now or previously owned, leased or used by or under the control or management of any Loan Party which, with the passage of time, or the giving of notice or both, would give rise to any Environmental Liability which could reasonably be expected to have a Material Adverse Effect.

      (g)      For the purposes of this section, "knowledge" of each Loan Party means that a senior officer of such Loan Party has actual knowledge or awareness of a particular fact or circumstance or that such person, if he or she had exercised reasonable diligence, would have known or been aware of such fact or circumstance (together with such other officers or employees of such Loan Party who, or after due inquiry, should have knowledge of such fact or circumstance).

SECTION 3.07  Compliance with Laws and Agreements.  Each Loan Party is in compliance with all Requirements of Law applicable to it or its property and, other than the matters disclosed on Schedule 3.07, all indentures, agreements and other instruments binding upon it or its property, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  No Default has occurred and is continuing.

SECTION 3.08  Investment Company Status.  No Loan Party nor any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09  Taxes.  Each Loan Party has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party or such Subsidiary, as applicable, has set aside on its books adequate reserves.  No Tax liens have been filed and no claims are being asserted with respect to any such Taxes.  The New Coal Producers failed to timely file their Tax returns for the September 30, 2007 fiscal year; however, as of the Closing Date, all Tax returns

and reports for the New Coal Producers for the September 30, 2007 fiscal year have been filed and all Taxes for the September 30, 2007 fiscal year have been paid.

SECTION 3.10 <u>ERISA</u>. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect. Each Loan Party shall cause to be delivered to the Lenders all of the following: (i) a copy of each Plan (or, where such Plan is not in writing, a complete description thereof) and, if applicable, related trust agreements or other funding instruments, all amendments thereto, all written interpretations and descriptions thereof that have been distributed to employees or former employees of the Borrower or any ERISA Affiliate; (ii) the most recent determination letter issued by the Internal Revenue Service with respect to each Plan; (iii) for the three most recent plan years, Annual Reports on Form 5500 required to be filed with any governmental agency for each Plan; (iv) a listing of all Multiemployer Plans, with the aggregate amount of the most recent annual contributions required to be made by the Borrower or any ERISA Affiliate to each such Plan and copies of the collective bargaining agreements requiring such contributions; (v) any information that has been provided to the Borrower or any ERISA Affiliate regarding withdrawal liability under any Multiemployer Plan; (vi) the aggregate amount of payments made under any employee welfare benefit plan (as defined in Section 3(1) of ERISA) to any retired employees (or dependents thereof) of the Borrower or any of its Subsidiaries during the most recently completed fiscal year along with a copy or description of such employee welfare benefit plan; (vii) documents reflecting any agreements between the PBGC and the Borrower or any ERISA Affiliate with respect to any Plan, and (viii) the most recent actuarial valuation of each Plan.

SECTION 3.11 <u>Disclosure</u>. Each Loan Party has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Lenders in connection with the negotiation of the Agreement or any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, each Loan Party represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Closing Date, as of the Closing Date.

SECTION 3.12 <u>Material Agreements; Permitted/Pending Reserves</u>. All material agreements and contracts to which any Loan Party is a party or is bound as of the Closing Date are listed on Schedule 3.12 (collectively, the "<u>Material Agreements</u>"). No Loan Party is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (i) any material agreement to which it is a party or (ii) any agreement or instrument evidencing or governing Indebtedness.

SECTION 3.13 <u>Solvency</u>. (a) As of the Closing Date and after giving effect to the payment and accrual of all transaction costs in connection with the execution and delivery of this Agreement, (i) the fair value of the assets of each Loan Party, at a fair valuation, will exceed its

debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair saleable value of the property of each Loan Party will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) each Loan Party will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured, and (iv) each Loan Party will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted after the Closing Date.

(b)    No Loan Party intends to, or will permit any of its Subsidiaries to, and no Loan Party believes that it or any of its Subsidiaries will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by it or any such Subsidiary and the timing of the amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such Subsidiary.

SECTION 3.14  Insurance.  Schedule 3.14 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and the Subsidiaries as of the Closing Date. As of the Closing Date, all premiums in respect of such insurance have been paid. Each Loan Party believes that the insurance maintained by or on behalf of the Loan Parties is adequate.

SECTION 3.15  Capitalization and Subsidiaries.  Schedule 3.15 sets forth (a) a correct and complete list of the name and relationship to the Borrower of each and all of the Borrower's Subsidiaries, (b) a true and complete listing of each class of each of the Loan Party's authorized Equity Interests, of which all of such issued shares are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified on Schedule 3.15, and (c) the type of entity of each of the Loan Parties. All of the issued and outstanding Equity Interests owned by any Loan Party has been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and is fully paid and non assessable.

SECTION 3.16  Security Interest in Collateral.  The Loan Parties acknowledge and reaffirm that the provisions of the Existing Credit Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of the Collateral Agent (for the benefit of the Lenders), and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, assuming due and proper filings of all Uniform Commercial Code financing statements in the appropriate jurisdictions which remain in effect and have not been terminated or released, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of (i) Permitted Encumbrances, to the extent any such Permitted Encumbrances would have priority over the Liens in favor of the Collateral Agent (for the benefit of the Lenders) pursuant to any applicable law, (ii) the JAD Equity Interests, Liens in favor of the JAD Sellers and the Centrecourt Bridge Lenders, (iii) the Rifle Equity Interests, Liens in favor of the Rifle Sellers upon consummation of a Permitted Acquisition, (iv) any Excluded Assets, and (v) the Liens permitted under Sections 6.02(d) and (k), to the extent any such Liens would have priority over the Liens in favor of the Collateral Agent (for the benefit of the Lenders) pursuant to this Agreement and/or any applicable law (collectively, items (i) through (v) are referred to as the "Prior Liens").

SECTION 3.17  Employment Matters.  As of the Closing Date, there are no strikes, lockouts or slowdowns against any Loan Party pending or, to the knowledge of any Loan Party threatened.  The hours worked by and payments made to employees of the Loan Parties have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.  All payments due from any Loan Party, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party.

SECTION 3.18  Affiliate Transactions.  Except as set forth on Schedule 3.18, as of the Closing Date, (i) there are no existing or proposed agreements, arrangements, understandings, or transactions between any Loan Party and any of the officers, members, managers, directors, stockholders, parents, other interest holders, employees, or Affiliates (other than Loan Parties) of any Loan Party or any members of their respective immediate families, and (ii) none of the foregoing Persons are directly or indirectly indebted to or have any direct or indirect ownership, partnership, or voting interest in any Affiliate of any Loan Party or any Person with which any Loan Party has a business relationship or which competes with any Loan Party.  The Centrecourt Equipment Purchase, including the agreement in respect thereof referenced on Schedule 3.18, is for a price and on terms and conditions not less favorable to the Borrower than could be obtained on an arm's-length basis from unrelated third parties.

SECTION 3.19  Common Enterprise.  The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party.  Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrower hereunder, both in their separate capacities and as members of the group of companies.  Each Loan Party has determined that execution, delivery, and performance of the Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.20  MLCI Agreements.  As of the Closing Date, Borrower has delivered to Lenders a complete and correct copy of the MLCI Agreements (including all schedules, exhibits, amendments, supplements, modifications, assignments and all other documents or agreements delivered pursuant thereto or in connection therewith).  All Obligations constitute Indebtedness entitled to the benefits of the subordination provisions contained in the MLCI Subordination Agreement.  As of the Closing Date, the amount of cash performance assurance held by MLCI pursuant to the MLCI Agreements is $3,291,722.

ARTICLE IV. Conditions

SECTION 4.01  Closing Date.  The closing of this Agreement (the "Closing Date") shall be deemed to occur on the date on which each of the following conditions is satisfied (or waived in accordance with Section 8.02):

30

(a)    Credit Agreement and Loan Documents. The Lenders (or their counsel) shall have received (i) from each party hereto either (A) a counterpart of this Agreement signed by such party or (B) written evidence satisfactory to the Lenders (which may include facsimile transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and (ii) duly executed copies of other Loan Documents and such other certificates, documents, instruments and agreements as the Lenders shall request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including written opinions of the Loan Parties' counsel, addressed to the Lenders in form and substance reasonably satisfactory to the Lenders.

(b)    Financial Statements and Projections. The Lenders shall have received (i) audited combined financial statements of the Original Coal Producers for the December 31, 2005, 2006 and 2007 fiscal years, (ii) audited combined financial statements of the New Coal Producers for the September 30, 2005 and 2006 fiscal years, and (iii) unaudited interim combined financial statements of the Coal Producers for the three months ended March 31, 2008, and such financial statements shall not, in the reasonable judgment of the Lenders, reflect any material adverse change in the combined financial condition of the Coal Producers, as reflected in the financial statements.

(c)    Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates. The Lenders shall have received (i) a certificate of each Loan Party, dated the Closing Date and executed by its Secretary or Assistant Secretary, which shall (A) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of the Financial Officers and any other officers of such Loan Party authorized to sign the Loan Documents to which it is a party, and (C) contain appropriate attachments, including the certificate or articles of incorporation or organization of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its by laws or operating, management or partnership agreement, and (ii) a short form good standing certificate for each Loan Party from its jurisdiction of organization.

(d)    No Default Certificate. The Lenders shall have received a certificate, signed by the chief financial officer of each Loan Party, on the Closing Date (i) stating that no Default has occurred and is continuing, (ii) stating that the representations and warranties contained in Article III are true and correct as of such date, and (iii) certifying any other factual matters as may be requested by the Lenders.

(e)    Fees. The Lenders shall have received the Amendment Fee and all other fees required to be paid and all expenses (including the reasonable fees and expenses of legal counsel) on or before the Closing Date.

(f)    Lien Searches. The Lenders shall have received the results of a recent lien search in each jurisdiction requested by the Lenders (including, but not limited to, the jurisdiction of organization of each Loan Party), and such search shall reveal no liens on any of the assets of the Loan Parties except for liens permitted by Section 6.02 or discharged on or prior to the Closing Date pursuant to a pay-off letter or other documentation satisfactory to the Lenders.

(g)    Solvency. The Lenders shall have received a solvency certificate from a Financial Officer.

(h)    Pledged Stock; Stock Powers; Pledged Notes. The Lenders shall have received either (i) the certificates representing the JAD Equity Interests pledged pursuant to the Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof or (ii) the duly executed JAD Stock Intercreditor Agreement in form and substance satisfactory to the Lenders in their sole discretion, whereby the JAD Sellers and then the Centrecourt Bridge Lenders acknowledge that they are holding the JAD Equity Interests and undated stock powers for each such certificate executed in blank on behalf of the Collateral Agent and the Lenders.

(i)    Filings, Registrations and Recordings. Each document (including any Uniform Commercial Code financing statement) required by the Collateral Documents or under law or reasonably requested by the Lenders to be filed, registered or recorded in order to create in favor of the Collateral Agent (for the benefit of the Lenders), a perfected Lien on the Collateral described therein, prior and superior in right to any other Person except for the holders of Prior Liens, shall be in proper form for filing, registration or recordation.

(j)    Insurance. The Lenders shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Lenders and otherwise in compliance with the terms of the Security Agreement.

(k)    Amendment to Coal Services Agreement. The Lenders shall have received a duly executed Amendment to the Coal Services Agreement, in form and substance satisfactory to the Lenders in their sole discretion.

(l)    MLCI Subordination Agreement. The Lenders shall have received the MLCI Subordination Agreement duly executed by MLCI, in form and substance satisfactory to the Lenders in their sole discretion.

(m)    Side Letter Agreement as to Value Rights Agreement. The Lenders shall have received a side letter agreement regarding the Value Rights Agreement duly executed by the Loan Parties, in form and substance satisfactory to the Lenders in their sole discretion.

(n)    Note. The Lenders shall have received the Note duly executed by the Borrower.

(o)    Centrecourt Documents. The Lenders shall have received duly executed copies of the documents relating to the Centrecourt Bridge Financing and the Centrecourt Equipment Purchase, in form and substance reasonably satisfactory to the Lenders.

(p)    Centrecourt Amendment. The Lenders shall have received a duly executed copy of the Centrecourt Amendment in form and substance satisfactory to the Lenders in their sole discretion.

(q)    Dismissal of Complaint. The Loan Parties shall have dismissed Lenders and Collateral Agent with prejudice from the lawsuit they filed in Kentucky Civil Action No.

08-CI-00165, pursuant to the filing of a Notice of Dismissal acceptable, in form and substance, to the Lenders and Collateral Agent.

(r)    <u>Post-Closing Agreement</u>. The Lenders shall have received a duly executed copy of the Post-Closing Agreement in form and substance satisfactory to the Lenders in their sole discretion.

(s)    <u>Other Documents</u>. The Lenders shall have received such other documents as the Lenders or their counsel may have reasonably requested.

ARTICLE V. Affirmative Covenants

Until the principal of and interest on the Loan and all fees, expenses and other amounts payable hereunder shall have been paid in full, each Loan Party covenants and agrees, jointly and severally with all of the Loan Parties, with each Lender that:

SECTION 5.01    <u>Financial Statements; Other Information</u>. The Borrower will furnish to each Lender:

(a)    within 120 days after the end of each fiscal year of the Borrower, its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by independent public accountants of recognized regional standing or who is otherwise acceptable to the Required Lenders (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, accompanied by any management letter prepared by said accountants; provided, however, that the audited combined financial statements of the New Coal Producers for the September 30, 2007 fiscal year shall be furnished to each Lender no later than July 1, 2008;

(b)    within 60 days after the end of each of the first three fiscal quarters of the Borrower, its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)    within 20 days after the end of each fiscal month of the Borrower, a certificate from a financial officer of the Borrower setting forth the top lines sales, the tons of coal extracted and the tons of coal sold by the Loan Parties in the preceding month;

(d)    concurrently with any delivery of financial statements under clause (a) or (b) or (c) above, a certificate of a Financial Officer of the Borrower in substantially the form of

33

Exhibit A (i) certifying, in the case of the financial statements delivered under clause (b) or (c), as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, (ii) certifying as to whether an Event of Default has occurred and, if an Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(e)    concurrently with any delivery of financial statements under clause (a) above, a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default (which certificate may be limited to the extent required by accounting rules or guidelines);

(f)    Intentionally Omitted.

(g)    as soon as possible and in any event within 10 Business Days of filing thereof, copies of all tax returns filed by any Loan Party with the U.S. Internal Revenue Service;

(h)    promptly, and in any event within 10 Business Days of becoming aware of same, deliver to each Lender a detailed statement describing any of the following occurrences: (i) any order or judgment of any Governmental Authority requiring any Loan Party to incur Environmental Liabilities (A) in excess of $100,000 in any one instance, (B) together with all other expenditures incurred in respect of Environmental Liabilities in any Financial Year, in excess of $500,000 in the aggregate, and (ii) any state of affairs which could reasonably be expected to result in the incurrence of Environmental Liabilities (A) in excess of $100,000 in any one instance, or (B) together with all other expenditures incurred in respect of Environmental Liabilities in any Financial Year, in excess of $500,000 in the aggregate, and (C) the action taken or proposed to be taken in connection with such occurrences;

(i)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Loan Party with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed by any Loan Party to its shareholders generally, as the case may be;

(j)    promptly after delivering the same to any other creditor of the Loan Parties, copies of any other financial reports, statements and information that are provided to other creditors of the Loan Parties; and

(k)    promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary, or compliance with the terms of this Agreement, as the Required Lenders may reasonably request.

SECTION 5.02  Notices of Material Events.  Each Loan Party will furnish to each Lender prompt written notice of the following:

(a)    the occurrence of any Event of Default;

(b)    receipt of any notice of any governmental investigation or any litigation commenced or threatened against any Loan Party that (i) seeks damages in excess of $100,000, (ii) seeks injunctive relief which results in, or could reasonably be expected to result in, a Material Adverse Effect, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets which results in, or could reasonably be expected to result in, a Material Adverse Effect, (iv) alleges criminal misconduct by any Loan Party, (v) alleges the violation of any law regarding, or seeks remedies in connection with, any Environmental Laws which results in, or could reasonably be expected to result in, a Material Adverse Effect; or (vi) contests any tax, fee, assessment, or other governmental charge which results in, or could reasonably be expected to result in, a Material Adverse Effect;

(c)    to the knowledge of any Loan Party, any Lien (other than Permitted Encumbrances) or claim made or asserted against any of the Collateral;

(d)    any loss, damage, or destruction to the Collateral in the amount of $250,000 or more per occurrence or $1,000,000 or more in the aggregate, whether or not covered by insurance;

(e)    any and all default notices received under or with respect to any Indebtedness or any leased location or public warehouse where Collateral is located (which shall be delivered within two Business Days after receipt thereof);

(f)    all material amendments to any Material Agreement, together with a copy of each such amendment;

(g)    the fact that a Loan Party has entered into a Swap Agreement or an amendment to a Swap Agreement, together with copies of all agreements evidencing such Swap Agreement or amendments thereto (which shall be delivered within five Business Days);

(h)    the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to have a  Material Adverse Effect; and

(i)    any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(j)    Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03  Existence; Conduct of Business.  Each Loan Party will, and will cause each Subsidiary to, (a) do or cause to be done all things necessary to preserve, renew and

35

keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, unless otherwise (i) determined by any Loan Party upon the exercise of its reasonable business judgment or (ii) permitted by Section 6.03(a), and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted, and (b) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted as permitted by Section 6.03(b).

SECTION 5.04  Payment of Obligations. Each Loan Party will, and will cause each Subsidiary to, pay or discharge all Material Indebtedness and all other material liabilities and obligations, including Taxes, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, and (b) such Loan Party or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

SECTION 5.05  Maintenance of Properties. Each Loan Party will, and will cause each Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

SECTION 5.06  Books and Records; Inspection Rights. Each Loan Party will, and will cause each Subsidiary to, (i) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (ii) permit any representatives designated by any Lender (including employees of such Lender, or any consultants, accountants, lawyers and appraisers retained by such Lender), upon reasonable prior notice and during such Loan Party's normal business hours, to visit and inspect its properties, to examine and make extracts from its books and records, including environmental assessment reports and Phase I or Phase II studies, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested. The Loan Parties acknowledge that any Lender, after exercising its rights of inspection, may prepare certain Reports pertaining to the Loan Parties' assets for internal use by such Lender. Each Loan Party will permit one Lender to conduct field audit examinations of the Loan Party's assets, liabilities, books and records at a frequency not more than once every 90 days; provided further that the Loan Party will permit any Lender to conduct such examinations at any time and with any reasonable frequency upon the occurrence and continuation of an Event of Default.

SECTION 5.07  Compliance with Laws. Each Loan Party will, and will cause each Subsidiary to, comply in all material respects with all Requirements of Law applicable to it or its property.

SECTION 5.08  Intentionally Omitted.

SECTION 5.09  Insurance. In addition to insurance requirements set forth in the Collateral Documents, each Loan Party shall maintain, and shall cause each of its Subsidiaries to maintain, with financially sound and reputable independent insurers, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons of a similar size engaged in the same or similar business, of such types and in such

amounts as are customarily carried under similar circumstances by such other Persons; including workers' compensation insurance, public liability and property and casualty insurance which amounts shall not be reduced by any Loan Party in the absence of 30 days' prior notice to each Lender. All such insurance shall name the Collateral Agent as loss payee/mortgagee and as additional insured. Upon request of the Required Lenders, the Borrower shall furnish each Lender, at reasonable intervals (but not more than once per calendar year) a certificate of a Financial Officer of the Borrower (and, if requested by the Required Lenders, any insurance broker of the Borrower) setting forth the nature and extent of all insurance maintained by the Borrower and its Subsidiaries in accordance with this Section or any Collateral Document (and which, in the case of a certificate of a broker, were placed through such broker).

SECTION 5.10  Casualty and Condemnation.  The Borrower (a) will furnish to each Lender prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) will ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Collateral Documents.

SECTION 5.11  Environmental Compliance.  The Borrower will (i) comply in all material respects, and cause each of its Subsidiaries to comply in all material respects, with the requirements of all applicable Laws (including Environmental Laws) and duly observe in all material respects all valid requirements of any Governmental Authority as applicable to the Borrower's business and the industry of its business, and maintain the appropriate corporate or other similar registrations in each jurisdiction in which the Borrower or any of its Subsidiaries carries on business, except where the failure to be so registered would not have a Material Adverse Effect, and (ii) promptly, if the Required Lenders have a reasonable basis to believe that a discharge of a Hazardous Material has occurred or a condition exists at, on or under any of the real properties or assets now or hereafter owned, leased or used by the Borrower or under the control or management of the Borrower that individually or in the aggregate involve a "loss or potential" loss in excess of $100,000 or otherwise could reasonably be expected to have a Material Adverse Effect, cause to be conducted such environmental investigations (including without limitation, environmental site assessments and environmental compliance reviews) as are reasonably required by the Required Lenders by an environmental consultant approved by the Required Lenders, such approval not to be unreasonably withheld, and remedy any condition that could reasonably be expected, if not addressed, to have a Material Adverse Effect, and any non-compliance with Environmental Laws revealed by any such investigation. Without limiting the foregoing, upon the occurrence and continuation of an Event of Default, at request of any Lender, the Borrower shall cause to be conducted an environmental compliance audit, to be conducted by a third party reasonably satisfactory to such Lender. If the Borrower fails to provide any such report or audit referred to in this Section within 60 days of such request of any Lender, such Lender may, but shall be under no obligation to do so, conduct same, and the Borrower hereby grants each Lender and its agents and representatives access to the Real Property or any other property owned, leased or occupied by the Borrower to undertake such investigations, assessments and reviews (all of which shall be at the sole cost of the Borrower).

SECTION 5.12 <u>Governmental Authorizations</u>. Each Loan Party shall conduct its business in conformity, in all material respects, to each Governmental Authorization.

SECTION 5.13 <u>Additional Collateral; Further Assurances</u>. (a) Subject to applicable law, each Loan Party shall, unless each Lender otherwise consents, cause each Subsidiary of such Loan Party formed or acquired after the date of this Agreement in accordance with the terms of this Agreement to become a Loan Party by executing the Joinder Agreement set forth as Exhibit B hereto (the "<u>Joinder Agreement</u>"). Upon execution and delivery thereof, each such Person (i) shall automatically become a Guarantor hereunder and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the Loan Documents and (ii) will grant Liens to the Collateral Agent, for the benefit of the Lenders, in any property of such Loan Party which constitutes Collateral; <u>provided</u>, <u>however</u>, that (w) the assets of the JAD Companies, (x) upon consummation of the Permitted Acquisition, the assets of the Rifle Companies, (y) all cash collateral held by MLCI in respect of the MLCI Agreements in an amount not to exceed $5,000,000 (such amount to be reduced by any portion of such cash collateral that is set off against or applied to obligations of the Borrower under the MLCI Agreements), and (z) the assets of any Person or new Subsidiary which Person or Subsidiary was financed with Indebtedness pursuant to Section 6.01(s), will not be subject to the Liens granted to the Collateral Agent for the benefit of the Lenders (collectively, items (w) through (z) are referred to as the "<u>Excluded Assets</u>").

(b)      Each Loan Party will cause 100% of the issued and outstanding Equity Interests of each of its Subsidiaries to be subject at all times to a first priority, perfected Lien in favor of the Collateral Agent (for the benefit of the Lenders) pursuant to the terms and conditions of the Loan Documents or other security documents as any Lender shall reasonably request; provided, however, that (i) the pledge to the Collateral Agent of all of the Equity Interests in the JAD Companies will be subordinate to the pledge of such Equity Interests to (x) the JAD Sellers, until the termination of the JAD Seller Guaranties, as security for the obligations of Borrower under the JAD Seller Notes and the JAD Seller Guaranties, and (y) the Centrecourt Bridge Lenders as security for the obligations of the Borrower under the Centrecourt Bridge Financing, in accordance with the terms of the JAD Stock Intercreditor Agreement; (ii) the pledge to the Collateral Agent of all of the Equity Interests in the Rifle Companies upon consummation of the Permitted Acquisition will be subordinate to the pledge of such Equity Interests to the Rifle Sellers, as security for the obligations of the Borrower under the Rifle Seller Notes in accordance with the terms of the Rifle Stock Intercreditor Agreement; and (iii) the pledge to the Collateral Agent of all of the Equity Interests in any Person or new Subsidiary financed pursuant to Section 6.01(s) hereof to acquire assets which constitute a business unit will be subordinate to the pledge of such Equity Interests to the seller(s) of such Person or business unit, as security for the obligations of the Borrower under any promissory notes issued to such seller(s) in accordance with the terms of an intercreditor agreement to be entered into among the Lenders and such seller(s) in form and substance satisfactory to the Lenders in their reasonable discretion.

(c)      Without limiting the foregoing, each Loan Party will, and will cause each Subsidiary to, execute and deliver, or cause to be executed and delivered, to any Lender such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings and other documents

38

and such other actions or deliveries of the type required by Section 4.01, as applicable), which may be required by law or which any Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents, all at the expense of the Loan Parties; provided, however, that the Borrower shall not be required to deliver the stock certificates and powers for (i) the JAD Equity Interests for so long as the JAD Seller Notes and the Centrecourt Bridge Notes are outstanding, (ii) upon consummation of the Permitted Acquisition, the Rifle Equity Interests, for so long as the Rifle Seller Notes are outstanding, and (iii) upon consummation of the acquisition of any Person or new Subsidiary financed pursuant to Section 6.01(s) hereof to acquire assets which constitute a business unit, the Equity Interests of such Person and/or new Subsidiary, for so long as the seller note(s) related to such acquisition (x) are secured by such Equity Interests and (y) remain outstanding.

(d)    If any material assets (other than any real property or improvements thereto or any interest therein) are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Agreement that become subject to the Lien in favor of the Collateral Agent for the benefit of the Lenders upon acquisition thereof), such Loan Party will notify each Lender and the Collateral Agent and will cause such assets to be subjected to a Lien securing the Obligations and will take, and cause its Subsidiaries to take, such actions as shall be necessary or reasonably requested by any Lender to grant and perfect such Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties.

SECTION 5.14  Compliance with Terms of Leaseholds.  Unless otherwise determined by any Loan Party upon the exercise of its reasonable business judgment and so long as the failure to do any of the following could not reasonably be expected to have a Material Adverse Effect, each Loan Party shall make all payments and otherwise perform all obligations in respect of all leases of real property material to the conduct of its business to which any Loan Party is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled, notify each Lender of any default by any party with respect to such leases and cooperate with each Lender in all respects to cure any such default, and cause each of its Subsidiaries to do so.

ARTICLE VI. Negative Covenants

Until the principal of and interest on the Loan and all fees, expenses and other amounts payable under any Loan Document have been paid in full, the Loan Parties covenant and agree, jointly and severally, with each Lender that:

SECTION 6.01    Indebtedness.  No Loan Party will, nor will it permit any Subsidiary to, create, incur or suffer to exist any Indebtedness, except:

(a)    the Obligations;

(b)        Indebtedness existing on the Closing Date and set forth in Schedule 6.01 and extensions, renewals and replacements of any such Indebtedness in accordance with clause (f) hereof;

(c)        Indebtedness of (i) the Borrower to any Subsidiary, (ii) of any First Lien Subsidiary to the Borrower or any other Subsidiary, and (iii) of any Subordinated Lien Subsidiary to the Borrower or any other Subsidiary; provided, that: (A) each Loan Party shall have executed and delivered to each other Loan Party, on the Closing Date, a demand note (collectively, the "Intercompany Notes") to evidence any such intercompany Indebtedness owing at any time by such Loan Party to such other Loan Parties, which Intercompany Notes shall be in form and substance reasonably satisfactory to Lenders and shall be pledged and delivered to Collateral Agent pursuant to the Security Agreement as additional collateral security for the Obligations; (B) each Loan Party shall record all intercompany transactions on its books and records in a manner reasonably satisfactory to Lenders; (C) the obligations of Borrower under any such Intercompany Notes shall be subordinated to the Obligations of Borrower hereunder in a manner reasonably satisfactory to Lenders; (D) at the time any such intercompany loan or advance is made by Borrower to any other Loan Party and after giving effect thereto, Borrower shall be solvent; (E) no Default or Event of Default would occur and be continuing after giving effect to any such proposed intercompany loan; and (F) the aggregate amount of all Subordinated Lien Subsidiary Transactions shall not exceed $10,000,000 at any time.

(d)        Guarantees by (i) the Borrower of Indebtedness of any First Lien Subsidiary or any Subordinated Lien Subsidiary and (ii) by any Subsidiary of Indebtedness of the Borrower or any other First Lien Subsidiary or Subordinated Lien Subsidiary, provided that (x) the Indebtedness so Guaranteed is permitted by this Section 6.01, and (y) the aggregate amount of all Subordinated Lien Subsidiary Transactions shall not exceed $10,000,000 at any time;

(e)        Indebtedness of the Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets (whether or not constituting purchase money Indebtedness), including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Indebtedness in accordance with clause (f) hereof; provided that such Indebtedness is incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement;

(f)        Indebtedness which represents an extension, refinancing, or renewal of any of the Indebtedness described in clauses (b), (e), (j) and (p) hereof; provided that, (i) the principal amount or interest rate of such Indebtedness is not increased, (ii) any Liens securing such Indebtedness are not extended to any additional property of any Loan Party, (iii) no Loan Party that is not originally obligated with respect to repayment of such Indebtedness is required to become obligated with respect thereto, (iv) such extension, refinancing or renewal does not result in a shortening of the average weighted maturity of the Indebtedness so extended, refinanced or renewed, (v) the terms of any such extension, refinancing, or renewal are not less favorable to the obligor thereunder than the original terms of such Indebtedness and (vi) if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to

40

the Obligations, then the terms and conditions of the refinancing, renewal, or extension Indebtedness must include subordination terms and conditions that are at least as favorable to each Lender as those that were applicable to the refinanced, renewed, or extended Indebtedness;

      (g)      Indebtedness owed to any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such person, in each case incurred in the ordinary course of business;

      (h)      Indebtedness of the Borrower or any Subsidiary in respect of performance bonds, reclamation bonds, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the ordinary course of business;

      (i)      Indebtedness of the Borrower or any Subsidiary to any lessor pursuant to any real property leases;

      (j)      Indebtedness under the A/R Facility in an aggregate principal amount not to exceed $6,000,000 (such amount to be reduced by the amount of any permanent reductions of the commitments thereunder);

      (k)      Indebtedness under the 2007 Bridge Financing in an aggregate principal amount not to exceed $1,616,450 (such amount to be reduced by the amount of any principal repayments of the loans thereunder);

      (l)      Indebtedness under the Centrecourt Bridge Financing in an aggregate principal amount not to exceed $5,000,000, plus the amount of any additional notes representing deferred or "PIK" interest issued pursuant to the terms of the Centrecourt Bridge Notes (such amount to be reduced by the amount of any principal repayments of the loans thereunder);

      (m)      Indebtedness under the Centrecourt Equipment Purchase Note in a principal amount not to exceed $4,800,000 (such amount to be reduced by the amount of any principal repayments of the loan thereunder);

      (n)      Indebtedness under the Rifle Non-Core Asset Notes upon consummation of the Permitted Acquisition, provided that the Rifle Non-Core Asset Notes shall be cancelled contemporaneously with the closing of the Permitted Acquisition;

      (o)      Indebtedness under (i) the LRR Seller Notes, (ii) the JAD Notes, (iii) the JAD Seller Notes and (iv) upon consummation of the Permitted Acquisition, the Rifle Seller Notes;

      (p)      upon consummation of the Permitted Acquisition, the Rifle Equipment Line of Credit and extensions, renewals or replacements of any such Indebtedness in accordance with clause (f) hereof;

      (q)      Indebtedness under the MLCI Agreements;

(r)        Indebtedness, and Guaranties thereof, under any Coal Agreements incurred in the ordinary course of business;

(s)        Indebtedness of the Borrower incurred to finance the purchase or acquisition of all, or substantially all, of the Equity Interests or assets of any other Person constituting a business unit (whether via merger, creation of a new subsidiary or otherwise) and/or Indebtedness of such acquired Person or attaching to such acquired assets existing at the time of the acquisition thereof which transaction shall be on terms reasonably acceptable to the Lenders, provided that (i) all of such Equity Interests so acquired or the Equity Interests in any new Subsidiary formed to acquire such assets shall at all times be subject to the perfected Lien in favor of Collateral Agent for the benefit of the Lenders, in accordance with the provisions of Section 5.13 hereof and (ii) if, prior to the consummation of such transaction, Borrower delivers to the Lenders a "fairness" opinion from a reputable investment advisor that is unaffiliated with any of the Loan Parties or holders of their Equity Interests stating that the terms of such purchase or acquisition are fair to the Borrower, the consent of Lenders to the terms of such Indebtedness shall not be required;

(t)        Other unsecured Indebtedness, not to exceed $1,000,000 in the aggregate amount outstanding at any one time; and

(u)        unsecured indebtedness to the Centrecourt Bridge Lenders in respect of the Centrecourt Put Right and the Centrecourt Equity Registration Claim; provided that, pursuant to the Centrecourt Rights Agreement, the Centrecourt Put Right may become subject to a lien in favor of the Centrecourt Bridge Lenders after payment in full of the Obligations.

SECTION 6.02    Liens.  No Loan Party will, nor will it permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)        Liens created pursuant to any Loan Document;

(b)        Permitted Encumbrances;

(c)        any Lien on any property or asset of the Borrower or any Subsidiary existing on the Closing Date and set forth in Schedule 6.02; provided that (i) such Lien shall not apply to any other property or asset of the Borrower or Subsidiary and (ii) such Lien shall secure only those obligations which it secures on the Closing Date;

(d)        Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any Subsidiary; provided that (i) such security interests secure Indebtedness permitted by clause (e) of Section 6.01, (ii) such security interests and the Indebtedness secured thereby are incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement (other than Indebtedness in respect of the JAD PPE Indebtedness and, upon consummation of the Permitted Acquisition, the Rifle Equipment Line of Credit) and (iii) such security interests shall not apply to any other property or assets of the Borrower or any Subsidiary;

42

(e)        Liens on the Loan Parties' accounts receivables and on the deposit accounts into which payments relating thereto are made, in each case securing Indebtedness under the A/R Facility;

(f)        Liens on (i) the JAD Equity Interests in favor of (x) the Centrecourt Bridge Lenders securing the Borrower's obligations under the Centrecourt Guarantee in respect of the Centrecourt Bridge Notes, the Centrecourt Securities Purchase Agreement and the Centrecourt Security Agreement only and (y) the JAD Sellers until the termination of the JAD Seller Guaranties, securing the JAD Seller Notes and the Borrower's obligations under the JAD Sellers Guaranties, and (ii) the assets of the JAD Companies in favor of (x) the Centrecourt Bridge Lenders securing the JAD Companies' obligations under the Centrecourt Bridge Notes, the Centrecourt Guarantee, the Centrecourt Securities Purchase Agreement and the Centrecourt Security Agreement and (y) the JAD Sellers securing the JAD Seller Notes, the Borrower's obligations under the JAD Sellers Guaranties and the JAD Companies' obligations under the JAD Sellers' guaranties of the JAD PPE Indebtedness;

(g)        Liens in favor of the holders of the 2007 Bridge Notes securing the 2007 Bridge Financing;

(h)        Liens in favor of MLCI on (i) a cash collateral account in an amount not to exceed $5,000,000 (such amount to be reduced by any portion of such cash collateral that is set off against or applied to obligations of the Borrower under the MLCI Agreements), and (ii) the assets of the Loan Parties that are subject to Liens in favor of the Collateral Agent for the benefit of the Lenders (including, without limitation, on the JAD Equity Interests and, upon consummation of the Permitted Acquisition, the Rifle Equity Interests); provided, that such Liens in subclause (ii) shall be subordinated to the Lien in favor of Collateral Agent pursuant to the terms of the MLCI Subordination Agreement;

(i)        Upon consummation of the Permitted Acquisition, Liens in favor of the Rifle Sellers securing the Rifle Seller Notes;

(j)        Liens securing the JAD PPE Indebtedness and, upon the consummation of the Permitted Acquisition, Liens securing the Rifle Equipment Line of Credit, provided that such Liens apply only to the property, plant and equipment financed thereby;

(k)        Liens for Indebtedness permitted pursuant to Section 6.01(h) and deposits, certificates of deposit, cash collateral accounts, cash reserves and/or cash escrows required, directly or indirectly, under any Coal Agreements in the ordinary course of business;

(l)        Liens in favor of the sellers of the Equity Interests or assets of any Person or new Subsidiary constituting a business unit acquired by the Loan Parties on such acquired Equity Interests or assets, or new Subsidiary created to make such acquisition, acquired with financing in compliance with Section 6.01(s) hereof.

(m)        Notwithstanding the foregoing, none of the Liens permitted pursuant to this Section 6.02 may at any time attach to any Loan Party's (1) Accounts, other than those permitted under clause (a) of the definition of Permitted Encumbrance and clauses (e) and (g) above, and (2) Inventory, other than those permitted under clauses (a) and (b) of the definition of

43

Permitted Encumbrance and clauses (a) and (g) above; provided, however, that (I) the Liens permitted by clause (f) above may cover Accounts and Inventory of the JAD Companies, (II) the Liens permitted by clause (i) above may cover Accounts and Inventory of the Rifle Companies, (III) the Liens permitted by clause (h) above may cover Accounts and Inventory of the Borrower and the Original Coal Producers, and (IV) the Liens permitted by clause (l) above may cover Accounts and Inventory of the Person so acquired or the newly created Subsidiary so formed to make such acquisition.

SECTION 6.03  Fundamental Changes.  (a) No Loan Party will, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, other than (i) a merger, consolidation or reorganization of a First Lien Subsidiary with any other First Lien Subsidiary, (ii) a merger of a Subsidiary into the Borrower or a First Lien Subsidiary, (iii) a merger, consolidation or reorganization of a Subordinated Lien Subsidiary with any other Subordinated Lien Subsidiary, or (iv) a Reverse Merger upon consummation of which the current shareholders of the Borrower continue to own not less than 66 2/3rd % of the outstanding voting Equity Interests of Borrower.

(b)        No Loan Party will, nor will it permit any of its Subsidiaries to, engage in any business other than businesses of the type conducted by the Borrower and its Subsidiaries on the Closing Date and businesses reasonably related or incidental thereto; provided, however, that upon consummation of the Permitted Acquisition, the Loan Parties may own and operate coal mines and preparation plants, related equipment and employ employees for mining purposes in connection with the operation of the business engaged in by the Rifle Companies.

SECTION 6.04  Investments, Loans, Advances, Guarantees and Acquisitions.  No Loan Party will, nor will it permit any Subsidiary to, purchase, hold or acquire any capital stock, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except:

(a)        Permitted Investments, subject to control agreements in favor of the Lenders or otherwise subject to a perfected security interest in favor of the Lenders;

(b)        investments in existence on the date of this Agreement and described in Schedule 6.04;

(c)        investments by the Borrower and the Subsidiaries in Equity Interests in their respective First Lien Subsidiaries or in their respective Subordinated Lien Subsidiaries, provided that (i) any such Equity Interests held by a Loan Party shall be pledged pursuant to the Security Agreement, and (ii) the aggregate amount of all Subordinated Lien Subsidiary Transactions at any time shall not exceed $10,000,000;

(d)        loans or advances made by the Borrower to any First Lien Subsidiary or Subordinated Lien Subsidiary and made by any Subsidiary to the Borrower or any other First

Lien Subsidiary or Subordinated Lien Subsidiary, provided that (i) any such loans and advances made by a Loan Party shall be evidenced by a promissory note pledged pursuant to the Security Agreement and (ii) the aggregate amount of all Subordinated Lien Subsidiary Transactions at any time shall not exceed $10,000,000;

(e)    Loans or advances made by Borrower to its directors, officers or employees of reasonable fees and costs pursuant to indemnification provisions of Borrower's Certificate of Incorporation or By-laws, in an aggregate amount not exceeding $100,000;

(f)    Guarantees constituting Indebtedness permitted by Section 6.01;

(g)    investments in the form of Swap Agreements permitted by Section 6.07;

(h)    investments received in connection with the dispositions of assets permitted by Section 6.05;

(i)    investments constituting deposits described in clauses (c) and (d) of the definition of the term "Permitted Encumbrances;"

(j)    the Centrecourt Equipment Purchase;

(k)    the Permitted Acquisition; and

(l)    the purchase or acquisition of Equity Interests or assets constituting a business unit of any other Person permitted pursuant to clause (s) of Section 6.01.

SECTION 6.05  Asset Sales.  Other than the grant of the Liens on the Loan Parties' accounts receivables and deposit accounts securing indebtedness under the A/R Facility and any transfer or disposition of such collateral in connection with the exercise of the lienholder's remedies with respect thereto, no Loan Party will, nor will it permit any Subsidiary to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Borrower permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than to the Borrower or to another First Lien Subsidiary, or, from a Subordinated Lien Subsidiary to another Subordinated Lien Subsidiary, in each case in compliance with Section 6.04), except:

(a)    sales, transfers and dispositions of (i) inventory in the ordinary course of business and (ii) used, obsolete, worn out or surplus equipment or property in the ordinary course of business;

(b)    sales, transfers and dispositions to the Borrower or any Subsidiary, provided that any such sales, transfers or dispositions involving a Subsidiary that is not a First Lien Subsidiary shall be made in compliance with Section 6.09;

(c)    sales, transfers and dispositions of accounts receivable in connection with the compromise, settlement or collection thereof;

45

(d)      sales, transfers and dispositions of investments permitted by clause (h) of Section 6.04;

(e)      dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Subsidiary;

(f)      the resale of the Rifle Non-Core Assets upon consummation of the Permitted Acquisition, as contemplated by the Rifle LOI;

(g)      the leasing of equipment to the Rifle Companies and any other contract miner working on any real property owned or leased by a Loan Party on market terms and in the ordinary course of business; and

(h)      the subleasing of leasehold real property by the Borrower or any Subsidiary to a third party on market terms and in the ordinary course of business, provided that all rent or other proceeds payable in respect of each such sublease are payable solely to the Borrower or to the Subsidiary that is the holder of such leasehold,

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by paragraphs (b) and (f) above) shall be made for fair value and for cash consideration.

SECTION 6.06  Sale and Leaseback Transactions.  No Loan Party will, nor will it permit any Subsidiary to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

SECTION 6.07  Swap Agreements.  No Loan Party will, nor will it permit any Subsidiary to, enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which such Loan Party has actual exposure (other than those in respect of Equity Interests of the Borrower or any of its Subsidiaries), and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of such Loan Party.

SECTION 6.08  Restricted Payments; Certain Payments of Indebtedness.  (a) No Loan Party will, nor will it permit any Subsidiary to, declare or make, or agree to pay prior to the payment in full of all Obligations or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) the Borrower may declare and pay dividends (A) with respect to its common stock payable solely in additional shares of its common stock, and (B) with respect to its preferred stock, payable solely in additional shares of such preferred stock or in shares of its common stock, and (ii) Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests.

(b)      No Loan Party will, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities

or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i)    payment of Indebtedness created under the Loan Documents;

(ii)    payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness permitted by Section 6.01, other than payments in respect of the Subordinated Indebtedness prohibited by the subordination provisions thereof;

(iii)    refinancings of Indebtedness to the extent permitted by Section 6.01(f);

(iv)    payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(v)    payment to MLCI on or before September 30, 2008 of a deposit representing additional cash collateral in an amount up to $1,708,278 to secure the Borrower's "Performance Assurance" obligations under the MLCI Agreements; provided, however, that in no event shall the total amount deposited with MLCI as Performance Assurance under the MLCI Agreements exceed $5,000,000 (such amount to be reduced by any portion of such cash collateral that is set off against or applied to obligations of the Borrower under the MLCI Agreements);

(vi)    the payment on July 2, 2008 of principal and interest in the amount of $4,117,471.30 to the holders of the LRR Seller Notes solely from the proceeds of the sale by the Borrower of Equity Interests for aggregate consideration of $5,005,000 pursuant to Securities Purchase Agreements dated July 1, 2008, true and complete copies of which have been delivered to the Lenders;

(vii)    prepayment of principal under the Centrecourt Bridge Notes only with (w) the net cash proceeds from the Series B Offering and any other new equity or debt financing by Borrower (other than (1) a financing solely to fund the Permitted Acquisition or (2) the sale by Borrower of Equity Interests described in clause (vi) above) if such net cash proceeds are in excess of $20,000,000 and are not otherwise applied pursuant to clauses (vi) and (viii), up to a maximum aggregate amount of $2,500,000 plus fifty percent (50%) of the outstanding principal amount of any Centrecourt Bridge Notes issued in payment of deferred or "PIK" Interest, (x) the net cash proceeds from the refinancing of any of the assets of the JAD Companies that are not otherwise applied pursuant to clause (viii), (y) fifty percent (50%) of the positive monthly operating margin (i.e., the sales revenue for a particular month from tons produced at the Harlan mine minus the direct cash operating cost actually incurred in such month, including the selling, general and administrative expense allocated to the Harlan mine and minus any regularly scheduled payments applied to principal or interest on the JAD Seller Notes and/or the Equipment Purchase Note) from the Harlan surface mine to be opened in the third quarter of 2008, as set forth in the financial model delivered to Lender prior to execution of this Agreement (provided that (1) Borrower is able to meet its ordinary course obligations for the

period of ninety (90) days after the proposed date of making of such prepayment, and (2) the applicable Loan Party and/or Borrower would not be rendered insolvent), and (z) the incremental increases in working capital as a result of any release by MLCI of all or a portion of the cash performance assurance provided by Borrower to MLCI pursuant to the MLCI Agreements; provided that (i) in respect of each prepayment under subclauses (w), (x) and (z) above, the Loan Parties shall furnish to the Lenders a certificate certified as true and correct by the Chief Financial Officer of the Borrower, setting forth a detailed calculation of the amount of such prepayment and certifying that such prepayment is permitted under the provisions of this Section 6.08(b)(vii)(w), (x) or (z), as applicable and (ii) in respect of subclause (y) above, the Loan Parties shall furnish to the Lenders, not later than the 20th day of each calendar month, a certificate (the "Monthly Harlan Report"), certified as true and correct by the Chief Financial Officer of the Borrower, setting forth a detailed calculation of the monthly operating margin for the calendar month preceding the calendar month in which the Monthly Harlan Report is delivered and the amount of any such proposed prepayment and certifying that such prepayment is permitted under the provisions of this Section 6.08(b)(vii)(y); and

(viii)    prepayment of principal under the JAD Seller Notes only with (y) net cash proceeds from the Series B Offering and any other new equity or debt financing by Borrower (other than (1) a financing solely to fund the Permitted Acquisition or (2) the sale by Borrower of Equity Interests described in clause (vi) above) that are in excess of $20,000,000 and are not otherwise applied pursuant to clauses (vi) or (vii), or (z) the net cash proceeds of any refinancing of assets of the JAD Companies that are not otherwise applied pursuant to clause (vii); provided that in respect of each prepayment hereunder, the Loan Parties shall furnish to the Lenders a certificate certified as true and correct by the Chief Financial Officer of the Borrower, setting forth a detailed calculation of the amount of such prepayment and certifying that such prepayment is permitted under the provisions of this Section 6.08(b)(viii)(y) or (z), as applicable.

SECTION 6.09  Transactions with Affiliates.  Except as set forth in Schedule 3.18, no Loan Party will, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) any investment permitted by Sections 6.04(c) or 6.04(d), (c) any Indebtedness permitted under Section 6.01(c), (d) any Restricted Payment permitted by Section 6.08, (e) the payment of reasonable fees to directors of the Borrower or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrower or its Subsidiaries in the ordinary course of business and (f) any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans approved by the Borrower's board of directors.

SECTION 6.10  Restrictive Agreements.  No Loan Party will, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with

48

respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the Closing Date identified on Schedule 6.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (v) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.11  Amendment of Material Documents. No Loan Party will, nor will it permit any Subsidiary to, without the prior written consent of the Required Lenders amend or modify, or waive any of its rights under, (a) any agreement relating to any Subordinated Indebtedness, (b) the MLCI Agreements, (c) the 2007 Bridge Notes, (d) the Centrecourt Bridge Notes, the Centrecourt Guarantee, the Centrecourt Security Agreement (other than the amendments to the such documents pursuant to the Centrecourt Amendment) and the Centrecourt Amendment, (e) the Centrecourt Rights Agreement, (f) the Centrecourt Equipment Purchase Note, (g) the JAD Seller Guaranties, (h) the LRR Seller Notes, (i) the JAD Seller Notes, (j) the Rifle Seller Notes, (k) notes issued to the sellers of Equity Interests or assets pursuant to Section 6.01(s)hereof, or (l) its certificate of incorporation, by-laws, operating, management or partnership agreement or other organizational documents; provided, however, that simultaneous with the closing of the Permitted Acquisition, Borrower may amend its certificate of incorporation, by-laws, or other organizational documents to the extent reasonably necessary to implement the terms set forth in the Rifle LOI.

SECTION 6.12    Intentionally Omitted.


ARTICLE VII.        Events of Default

SECTION 7.01    If any of the following events ("Events of Default") shall occur:

(a)        the Borrower shall fail to pay any principal of any Loan (or any interest or other amounts due under Section 2.03(c)) when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)        the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, for a period of three days after the same shall become due and payable;

(c)        any representation or warranty made or deemed made by or on behalf of any Loan Party in or in connection with this Agreement or any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial

statement or other document furnished pursuant to or in connection with this Agreement or any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been materially incorrect when made or deemed made;

(d)      any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a), 5.03 (with respect to a Loan Party's existence), 5.08 or in Article VI;

(e)      any Loan Party shall fail to observe or perform any material covenant, condition or agreement contained in Section 5.01 or 5.02(b), and such failure shall continue unremedied for a period of 10 days after the earlier of knowledge by any officer of any Loan Party of such breach or notice thereof from any Lender;

(f)      any Loan Party shall fail to observe or perform any other covenant, condition or agreement contained in this Agreement (other than those which constitute a default under another Section of this Article), and such failure shall continue unremedied for a period of 30 days after the earlier of knowledge of such breach or notice thereof from any Lender;

(g)      any Loan Party shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (subject to any and all cure periods under the terms of such Material Indebtedness);

(h)      any event or condition occurs that results in (i) any Material Indebtedness or (ii) any other Indebtedness in an amount in excess of $100,000 in the aggregate that is secured by a lien that has priority over any of the Liens granted to Collateral Agent for the benefit of the Lenders and (including, without limitation, the Centrecourt Bridge Financing, the JAD Seller Notes or, upon consummation of the Permitted Acquisition, the Rifle Seller Notes) becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or such other Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness or such other Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity (other than a prepayment under the Centrecourt Bridge Notes (x) to the extent permitted pursuant to the provisions of Section 6.08(b)(vii) or (y) upon the occurrence of any of the events enumerated as items (i) through (iv) in the definition of Centrecourt Bridge Financing); provided, however, that if such event or condition is cured or waived by the applicable parties thereto prior to the later to occur of (i) the acceleration by Lender of the Loan pursuant to the provisions of this Article VII and (ii) fifteen (15) days after such event of default under such Indebtedness, then the Event of Default under this clause (h) shall immediately and automatically be deemed to have been cured or waived;

(i)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Loan Party of any Loan Party or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of its assets, and, in any such case, such proceeding or

50

petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(j)    any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(k)    any Loan Party shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(l)    one or more judgments for the payment of money in an aggregate amount in excess of $500,000 shall be rendered against any Loan Party, any Subsidiary of any Loan Party or any combination thereof which judgments are not adequately covered by insurance and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party to enforce any such judgment or any Loan Party shall fail within 30 days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

(m)    an ERISA Event shall have occurred that, in the opinion of any Lender, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(n)    a Change in Control shall occur;

(o)    the occurrence of any "default", as defined in any Loan Document (other than this Agreement) or the breach of any of the terms or provisions of any Loan Document (other than this Agreement), which default or breach continues beyond any period of grace therein provided;

(p)    the Loan Guaranty shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty, or any Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty to which it is a party, or any Guarantor shall deny that it has any further liability under the Loan Guaranty to which it is a party, or shall give notice to such effect;

(q)    (I) any Collateral Document shall for any reason fail to create a valid and perfected first priority security interest in any Collateral purported to be covered thereby, except (a) Permitted Encumbrances or (b) as permitted by the terms of any Collateral Document, or (II) any Collateral Document shall fail to remain in full force or effect, except where such failure

shall have primarily resulted from the acts or omissions of the Collateral Agent or any Lender, or any action, other than actions of the Collateral Agent or any Lender, shall be taken to discontinue or to assert the invalidity or unenforceability of any Collateral Document, or (III) any Loan Party shall fail to comply with any of the terms or provisions of any Collateral Document; or

(r)     any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms);

(s)     any Loan Party or any member of the Management Team is criminally convicted of any felony crime; provided, however, in the case of a member of the Management Team, such crime is related to the operation of the business of any Loan Party; or

(t)     an event of default under the MLCI Agreement which is not cured prior to the expiration of any applicable grace and cure periods thereunder; provided, however, that if such event of default under the MLCI Agreement is cured or waived by MLCI prior to the later to occur of (i) acceleration by Lender of the Loan pursuant to the provisions of this Article VII and (ii) fifteen (15) days after such event of default under the MLCI Agreement, then the Event of Default under this clause (t) shall be immediately and automatically be deemed to have been cured or waived;

then, and in every such event (other than an event with respect to the Borrower described in clause (i) or (j) of this Article), and at any time thereafter during the continuance of such event, the Required Lenders may, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) declare the Loan then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loan so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (i) or (j) of this Article, the principal of the Loan then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.  Upon the occurrence and the continuance of an Event of Default, the Required Lenders may increase the rate of interest applicable to the Loan and other Obligations as set forth in this Agreement and exercise any rights and remedies provided to the Lenders under the Loan Documents or at law or equity, including all remedies provided under the UCC.

ARTICLE VIII.     Miscellaneous

SECTION 8.01  Notices.  (a) Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other

52

communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

(i)    if to any Loan Party, to the Borrower at:

U.S. Coal Corporation
448 Lewis Hargett Circle
Suite 240
Lexington, Kentucky 40503
Attention: Robert Gabbard, Chief Executive Officer
Facsimile No: (859) 219-0913

With a copy (which shall not constitute notice) to:

Pryor Cashman LLP
410 Park Avenue
10th Floor
New York, New York 10022
Attention: Eric M. Hellige, Esq.
Facsimile No: (212) 326-0806

(ii)    if to the Lenders, to JMB Capital Partners Master Fund, L.P. at:

c/o JMB Capital Partners, L.P.
1999 Avenue of the Stars
Suite 2040
Los Angeles, California 90087
Attention: Alan Fragen
Facsimile No: (310) 286-6662

with a copy (which shall not constitute notice) to:

Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019
Attention: Michael D. Rosenbloom, Esq.
Facsimile No.: (212) 506-1800

or, in the case of any subsequent assignee, to the address of such assignee set forth in the relevant assignment agreement.

(iii)    if to the Collateral Agent, to Wilmington Trust Company at:

1100 North Market Street
Wilmington, Delaware 19890
Attention: Corporate Trust Administration – US Coal

Collateral Agency
Facsimile No.: (302) 636-4140

with a copy (which shall not constitute notice) to:

Morris James LLP
500 Delaware Avenue
Suite 1500
Wilmington, DE  19801-1494
Attention:  Ross Antonacci, Esq.
Facsimile No. (302) 888-6989

All such notices and other communications shall be deemed to have been given when received.

(b)        Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

SECTION 8.02    Waivers; Amendments.  (a) No failure or delay by any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of the Loan shall not be construed as a waiver of any Event of Default, regardless of whether any Lender may have had notice or knowledge of such Event of Default at the time.

(b)        Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower, the Collateral Agent and the Lenders, or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Lenders and the Loan Party or Loan Parties that are parties thereto.

SECTION 8.03  Expenses; Indemnity; Damage Waiver.  (a) The Borrower shall pay (i) all out of pocket expenses incurred by each Lender and its Affiliates, including the reasonable fees, charges and disbursements of counsel for such Lender (whether outside counsel or the allocated costs of its internal legal department), in connection with the credit facilities provided for herein, the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by any Lender,  including the fees, charges and disbursements of any counsel for such Lender (whether outside counsel or the allocated costs of its internal legal

54

department), in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loan made hereunder, including all such out-of pocket expenses incurred during any workout, restructuring or negotiations in respect of the Loan. Expenses being reimbursed by the Borrower under this Section include, without limiting the generality of the foregoing, costs and expenses incurred in connection with:

        (i)       appraisals and insurance reviews;

        (ii)     field examinations and the preparation of Reports based on the fees charged by a third party retained by any Lender or the internally allocated fees for each Person employed by any Lender with respect to each field examination;

        (iii)     background checks regarding senior management (including but not limited to, members of the Management Team) and/or key investors, as deemed necessary or appropriate in the sole discretion of any Lender;

        (iv)     taxes, fees and other charges for (A) lien searches and (B) filing financing statements and continuations, and other actions to perfect, protect, and continue the Liens of the Collateral Agent (for the benefit of the Lenders);

        (v)     sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and

        (vi)     costs and expenses of preserving and protecting the Collateral.

       (b)      The Borrower shall indemnify each Lender, the Collateral Agent and each Related Party of each Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party, or any Environmental Liability related in any way to any Loan Party, or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

       (c)      The relationship between any Loan Party on the one hand and each Lender on the other hand shall be solely that of debtor and creditor. None of the Lenders nor the Collateral Agent (i) shall have any fiduciary responsibilities to any Loan Party or (ii) will

undertake any responsibility to any Loan Party to review or inform such Loan Party of any matter in connection with any phase of any Loan Party's business or operations. To the extent permitted by applicable law, no Loan Party shall assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions or the other transactions contemplated hereby, or the Loan or the use of the proceeds thereof.

(d)     All amounts due under this Section shall be payable as promptly as practicable (but in any event not later than three days) after written demand therefor.

SECTION 8.04 Successors and Assigns. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lenders (and any attempted assignment or transfer by the Borrower without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     The Lender, acting solely for this purpose as agent of the Borrower, shall maintain a copy of each assignment agreement delivered to it and a register for the recordation of the name and address of each Lender, and principal amounts of the Obligations owing to each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower and each Lender may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and each Lender, at any reasonable time and from time to time upon reasonable prior notice.

(c)     Each Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loan at the time owing to it); provided, however, that any such assignment shall assign (i) an amount equal to or greater than $5,000,000 of the Loan or (ii) if less than $5,000,000, an amount equal to all of the Loan then owing to such assigning Lender (and any attempted assignment or transfer by a Lender in violation of this proviso shall be null and void). The assignee shall be a party hereto and, to the extent of the interest assigned, have the rights and obligations of a Lender under this Agreement, and the assigning Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement (and, in the case of an assignment covering all of such Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.06 and Section 8.03). Each Loan Party hereby agrees to execute any amendment and/or any other document that may be reasonably necessary to effectuate such an assignment.

(d)     Each Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including

56

any pledge or assignment to secure obligations to a Federal Reserve Lender, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 8.05  Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of the Loan regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Lender may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid.  The provisions of Section 2.06 and ARTICLE VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loan or the termination of this Agreement or any provision hereof.

SECTION 8.06  Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to any Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by each Lender and when each Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 8.07  Severability.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.08  Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower or such Guarantor against any of and all the Obligations held by such Lender, irrespective of whether or not such Lender shall have made any demand under the Loan Documents and although such

obligations may be unmatured. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 8.09  Governing Law; Jurisdiction; Consent to Service of Process.  (a) This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without giving effect to any principles of conflicts of law thereof which would result in the application of the laws of any other jurisdiction.

(b)        Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any U.S. Federal or New York State court sitting in New York, New York in any action or proceeding arising out of or relating to any Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c)        Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)        Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 8.10  WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 8.11 Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 8.12 Confidentiality. Each Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or to any assignee of such Lender, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to such Lender on a non-confidential basis from a source other than the Borrower. For the purposes of this Section, "Information" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to any Lender on a non-confidential basis prior to disclosure by the Borrower; provided that, in the case of information received from the Borrower after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 8.13 Violation of Law. Anything contained in this Agreement to the contrary notwithstanding, no Lender shall be obligated to extend credit to the Borrower in violation of any limitation or prohibition provided by any applicable statute or regulation.

SECTION 8.14 USA PATRIOT ACT. Each Lender is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") and hereby notifies the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.

SECTION 8.15 Disclosure. Each Loan Party hereby acknowledges and agrees that each Lender and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

SECTION 8.16 Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Loan, together with all fees, charges and other amounts which are treated as interest on the Loan under applicable law (collectively the

59

"Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by any Lender holding the Loan in accordance with applicable law, the rate of interest payable in respect of the Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate.

SECTION 8.17  Release. Each of the Loan Parties acknowledges that Lender has acted in good faith in connection with this Agreement and the Loan Documents. Each of the Loan Parties, for itself and on behalf of its successors, assigns, and officers, directors, employees, agents and attorneys, and any Person acting for or on behalf of, or claiming through it, hereby fully, finally and forever release and discharge the Lenders and each Lenders' past and present officers, directors, managers, limited partners, general partners, investors, employees, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Lender Released Parties") of and from any and all past and present causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including without limitation those arising under 11 U.S.C. §§ 541-550 and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties) (collectively, "Claims"), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, matured or unmatured, liquidated or unliquidated, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Lender Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to the Loan Documents, and this Agreement and other financial accommodations made thereunder, the collateral security given in connection therewith, or any related discussions or negotiations, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

Each Loan Party waives any and all claims, rights and benefits it may have under any law of any jurisdiction that would render ineffective a release made by a creditor of claims that the creditor does not know or suspect to exist in its favor at the time of executing the release and that, if known by it, would have materially affected its settlement with the applicable debtor. Each Loan Party acknowledges that (a) it has been represented by independent legal counsel of its own choice throughout all of the negotiation that preceded the execution of this Agreement and that it has executed this Agreement after receiving the advice of such independent legal counsel, and (b) such Person and its respective counsel have had an adequate opportunity to make whatever investigation or inquiry they deem necessary or desirable in connection with the release contained in this Section 8.17.

## ARTICLE IX. LOAN GUARANTY

SECTION 9.01  Guaranty. Each Guarantor hereby agrees that it is jointly and severally liable for, and, as primary obligor and not merely as surety, absolutely and unconditionally guarantees to each Lender the prompt payment when due, whether at stated

60

maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by such Lender in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, the Borrower, any Guarantor or any other guarantor of all or any part of the Obligations (such costs and expenses, together with the Obligations, collectively the "Guaranteed Obligations"). Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of each Lender.

SECTION 9.02 <u>Guaranty of Payment</u>. This Loan Guaranty is a guaranty of payment and not of collection. Each Guarantor waives any right to require any Lender to sue the Borrower, any Guarantor, any other guarantor, or any other person obligated for all or any part of the Guaranteed Obligations (each, an "<u>Obligated Party</u>"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

SECTION 9.03 <u>No Discharge or Diminishment of Loan Guaranty</u>. (a) Except as otherwise provided for herein, the obligations of Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Borrower or any other guarantor of or other person liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Guarantor may have at any time against any Obligated Party, Lender, or any other person, whether in connection herewith or in any unrelated transactions.

(b)    The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)    Further, the obligations of any Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of any Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other person liable for any of the Guaranteed Obligations; (iv) any action or failure to act by any Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise,

61

in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

SECTION 9.04  Defenses Waived. To the fullest extent permitted by applicable law, each Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower or any Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against any Obligated Party, or any other person. Any Lender may, at its election, foreclose on any Collateral held by it or the Collateral Agent by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Guarantor under this Loan Guaranty except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash. To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Obligated Party or any security.

SECTION 9.05  Rights of Subrogation. No Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Loan Parties and the Guarantors have fully performed all their obligations to each Lender.

SECTION 9.06  Reinstatement; Stay of Acceleration. If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of the Borrower or otherwise, each Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not any Lender is in possession of this Loan Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by any Lender.

SECTION 9.07  Information. Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Loan

Guaranty, and agrees that no Lender shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

SECTION 9.08  Reserved.

SECTION 9.09  Taxes.  All payments of the Guaranteed Obligations will be made by each Guarantor free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if any Guarantor shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) each Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Guarantor shall make such deductions and (iii) such Guarantor shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

SECTION 9.10  Maximum Liability.  The provisions of this Loan Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Loan Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Loan Guaranty, then, notwithstanding any other provision of this Loan Guaranty to the contrary, the amount of such liability shall, without any further action by the Guarantors or any Lender, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "Maximum Liability". This Section with respect to the Maximum Liability of each Guarantor is intended solely to preserve the rights of each Lender to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other person or entity shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law. Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Loan Guaranty or affecting the rights and remedies of any Lender hereunder, provided that, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

SECTION 9.11  Contribution.  In the event any Guarantor (a "Paying Guarantor") shall make any payment or payments under this Loan Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Loan Guaranty, each other Guarantor (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Applicable Percentage" of such payment or payments made, or losses suffered, by such Paying Guarantor. For purposes of this Article IX, each Non-Paying Guarantor's "Applicable Percentage" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from

the Borrower after the Closing Date (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantor, the aggregate amount of all monies received by such Guarantors from the Borrower after the Closing Date (whether by loan, capital infusion or by other means). Nothing in this provision shall affect any Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Guarantor's Maximum Liability). Each of the Guarantors covenants and agrees that its right to receive any contribution under this Loan Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations. This provision is for the benefit of each Lender and the Guarantors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

SECTION 9.12  Liability Cumulative.  The liability of each Loan Party as a Guarantor under this Article IX is in addition to and shall be cumulative with all liabilities of each Loan Party to each Lender under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

## ARTICLE X.  THE COLLATERAL AGENT

SECTION 10.01  Authorization and Action.  (a) Each Lender hereby appoints and authorizes the Collateral Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents to which the Collateral Agent is a party as are delegated to the Collateral Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto. Each Lender further authorizes and instructs the Collateral Agent to execute and deliver the Security Agreement, the MLCI Subordination Agreement and the JAD Stock Intercreditor Agreement. As to any matters not expressly provided for by the Loan Documents to which the Collateral Agent is a party, the enforcement or collection of any Obligation or any matter requiring the Collateral Agent to exercise discretion, the Collateral Agent shall not be required to act, enforce or collect upon any Obligation or exercise any discretion , but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders; provided, however, that the Collateral Agent shall not be required to take any action that exposes the Collateral Agent to personal liability or that is contrary to this Agreement or applicable law.

(b)    In furtherance of the foregoing, each Lender hereby appoints and authorizes the Collateral Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers as are reasonably incidental thereto.

(c)    The Collateral Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to

64

such duties. The Collateral Agent shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the opinion or advice of any such counsel, consultants or experts as long as no officer of the Collateral Agent has any actual knowledge that such opinion or advice is inappropriate or based on incorrect information. Notwithstanding any other provision of this Agreement to the contrary, at any time or times, in the event that the Collateral Agent or any Lender shall deem it necessary or prudent in order to conform to the legal requirements of any jurisdiction in which any part of the Collateral may at such time or times be located to make any claim or bring any suit with respect to the Collateral or any Loan Document, or the Collateral Agent or any Lender shall be advised by counsel satisfactory to it that it is so necessary or prudent, the Collateral Agent shall execute and deliver an agreement supplemental hereto and all other instruments and agreements, and shall take all other action necessary or proper to constitute one or more persons, who need not meet any requirements of the Collateral Agent contained herein (and the Collateral Agent may appoint one or more of its officers), either as co collateral agent or co-collateral agents jointly with the Collateral Agent of all or any part of the Collateral, or as separate collateral agent or separate collateral agents of all or any part of the Collateral (each, a "Supplemental Collateral Agent"), and to vest in such persons, in such capacity, such title to the Collateral or any part thereof and such rights powers, privileges or duties as may be necessary or desirable, all for such period and under such terms and conditions as are satisfactory to the Collateral Agent and Required Lenders. In case any Supplemental Collateral Agent shall die, become incapable of acting, resign or be removed, the title to the Collateral and all rights powers, privileges and duties of such Supplemental Collateral Agent, so far as permitted by law, vest in and be exercised by the Collateral Agent, without the appointment of a successor to such Supplemental Collateral Agent. Should any instrument in writing from the Borrower or any other Loan Party be required by any Supplemental Collateral Agent so appointed by the Collateral Agent to more fully or certainly vest in and confirm to such Supplemental Collateral Agent such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Collateral Agent. No Agent shall be responsible for the negligence or misconduct of any agent, attorney-in-fact or Supplemental Collateral Agent that it selects in accordance with the foregoing provisions of this Section 10.01(c) in the absence of such Agent's gross negligence or willful misconduct.

SECTION 10.02 Collateral Agent's Reliance, Etc. Neither the Collateral Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct. Without limitation of the generality of the foregoing, the Collateral Agent: (a) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other experts selected by it at the expense of the Borrower and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (c) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of any Loan Party; (d) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness,

sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (e) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy or electronic communication) believed by it to be genuine and signed or sent by the proper party or parties.

SECTION 10.03 <u>Indemnification</u>. (a) Each Lender jointly and severally agrees to indemnify the Collateral Agent, any Supplemental Collateral Agent and their respective officers, directors, employees, stockholders agents and advisors (each, an "<u>Indemnified Party</u>") (to the extent not promptly reimbursed by the Borrower) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and expenses of counsel) that may be imposed on, incurred by, or asserted or awarded against any Indemnified Party in any way relating to or arising out of the Loan Documents or any action taken or omitted by the Collateral Agent under the Loan Documents (collectively, the "<u>Indemnified Costs</u>"); provided, however, that such Lender shall not be liable for any portion of such Indemnified Costs resulting from any Indemnified Party's own gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. The agreements in this Section 10.03 shall survive the resignation or removal of the Collateral Agent and each Supplemental Collateral Agent and the termination of this Agreement.

SECTION 10.04 <u>Successor Collateral Agent</u>. The Collateral Agent may resign at any time by giving written notice thereof to each Lender and the Borrower and may be removed at any time with or without cause by the Required Lenders provided, however, that any removal of the Collateral Agent will not be effective until it has received all of the compensation and any Indemnified Costs due and owing to it and it has been released from all of its obligations hereunder. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Collateral Agent. If no successor Collateral Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Collateral Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Collateral Agent, then the retiring or removed Collateral Agent may apply to any court of competent jurisdiction to appoint a successor Collateral Agent (the costs of which shall be borne by the Borrower) to act until such time, if any, as a successor shall have been appointed and shall have accepted its appointment as provided above. Upon the acceptance of any appointment as Collateral Agent hereunder by a successor Collateral Agent and upon the execution and filing or recording by the Borrower of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, such successor Collateral Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Collateral Agent, and the retiring Collateral Agent shall be discharged from its duties and obligations under the Loan Documents. If within 45 days after written notice is given of the retiring Collateral Agent's resignation or

removal under this Section no successor Collateral Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (or the next succeeding Business Day) (a) the retiring Collateral Agent's resignation or removal shall become effective, (b) the retiring Collateral Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (c) the Required Lenders shall thereafter perform all duties of the retiring Collateral Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Collateral Agent as provided above. After any retiring Collateral Agent's resignation or removal hereunder as Collateral Agent shall have become effective, and thereafter following the termination of this Agreement, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent under this Agreement.

SECTION 10.05  <u>Limitation on Duty of Collateral Agent in Respect of Collateral</u>. (a) Beyond the exercise of reasonable care in the custody thereof, the Collateral Agent shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Collateral Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Collateral Agent shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent in good faith.

(b)      The Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Collateral Agent, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any Loan Party to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Collateral Agent shall be under no duty or responsibility to any Lender to ascertain or to inquire into the performance or observance by any Loan Party of any of the provisions of any Loan Document.

SECTION 10.06  <u>No Discretion</u>. In any circumstance where the Collateral Agent is required to exercise discretion, approve documentation or distribute proceeds, the Collateral Agent may, at its option, seek to obtain instructions or directions from the Required Lenders with respect to such action. If the Collateral Agent so elects, then it may refrain from taking such action until such directions or instructions are received and shall have no liability to anyone for so refraining.

SECTION 10.07  <u>No Representations or Warranties as to the Collateral or Loan Documents</u>. NEITHER WILMINGTON TRUST COMPANY NOR THE COLLATERAL

AGENT (i) WILL MAKE AN INSPECTION OF THE COLLATERAL OR ANY PART THEREOF, (ii) MAKES OR SHALL BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO THE TITLE, CONDITION, VALUE, DESIGN, OPERATION, MERCHANTABILITY OR FITNESS FOR USE FOR ANY PARTICULAR PURPOSE OF THE COLLATERAL OR ANY PART THEREOF, AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP WITH RESPECT TO THE COLLATERAL OR ANY PART THEREOF, AS TO THE ABSENCE OF LATENT OR OTHER DEFECTS WHETHER OR NOT DISCOVERABLE, AS TO THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT, AS TO THE ABSENCE OF OBLIGATIONS BASED ON STRICT LIABILITY IN TORT OR AS TO TITLE OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE COLLATERAL OR ANY PART THEREOF, OR (III) MAKES OR SHALL BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY AS TO THE VALIDITY, LEGALITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT TO WHICH THE COLLATERAL AGENT IS A PARTY, OR ANY OTHER DOCUMENT OR INSTRUMENT, OR AS TO THE CORRECTNESS OF ANY STATEMENT CONTAINED IN ANY THEREOF.

SECTION 10.08  No Segregation of Monies; No Interest.  Except as otherwise expressly provided herein, monies received by the Collateral Agent hereunder or under any Loan Document to which it is a party need not be segregated in any manner, except to the extent required by law, and may be deposited under such general conditions as may be prescribed by law, and neither Wilmington Trust Company nor the Collateral Agent shall be liable for any interest thereon, except as may be expressly agreed to by Wilmington Trust Company or the Collateral Agent in writing.

SECTION 10.09  Action upon Instructions.  (a) The Required Lenders may by joint written instruction direct the Collateral Agent in the administration of the Collateral and any matter affecting the Collateral.

(b)      Notwithstanding the foregoing, the Collateral Agent shall not be required to take any action hereunder or under any other Loan Document at the request of the Required Lenders or otherwise if the Collateral Agent shall have reasonably determined, or shall have been advised by counsel, that such action is likely to result in liability on the part of the Collateral Agent or is contrary to the terms hereof or of any other Loan Document or is otherwise contrary to law; provided, however, that the Collateral Agent shall have no obligation to make any such determination.

(c)      Whenever the Collateral Agent is unable to decide between alternative courses of action permitted or required by the terms of this Agreement or under any other Loan Document, or in the event that the Collateral Agent is unsure as to the application of any provision of this Agreement or any other Loan Document, or believes any such provision is ambiguous as to its application, or is, or appears to be, in conflict with any other applicable provision, or in the event that this Agreement or any other Loan Document permits any determination or discretion by the Collateral Agent or is silent or is incomplete as to the course of action that the Collateral Agent is required to take with respect to a particular set of facts, the

Collateral Agent shall promptly give notice (in such form as shall be appropriate under the circumstances) to each Lender requesting instruction as to the course of action to be adopted, and to the extent the Collateral Agent acts in good faith in accordance with any written instructions received from the Required Lenders, the Collateral Agent shall not be liable on account of such action to any person. If the Collateral Agent shall not have received appropriate instruction within 10 days of such notice (or such shorter period as reasonably may be specified in such notice or as may be necessary under the circumstances) it may, but shall be under no duty to, take or refrain from taking such action as it shall deem to be in the best interests of the Lenders; and the Collateral Agent shall have no liability to any person for such action or inaction.

SECTION 10.10  Doing Business in Other Jurisdictions.  Notwithstanding anything contained herein or elsewhere to the contrary, neither Wilmington Trust Company nor the Collateral Agent shall be required to take any action in any jurisdiction other than in the State of Delaware if the taking of such action will, even after the appointment of a Supplemental Collateral Agent in accordance with Section 10.01(c), (i) require the Collateral Agent in its individual capacity to obtain the consent, approval, authorization or order of or the giving of notice to, or the registration with, or taking of any action in respect of, any state or other governmental authority or agency other than the State of Delaware; (ii) result in any fee, tax or other governmental charge under the laws of any jurisdiction other than the State of Delaware becoming payable by the Collateral Agent in its individual capacity, or (iii) subject the Collateral Agent in its individual capacity to personal jurisdiction in any jurisdiction other than the State of Delaware for causes of action arising from acts unrelated to the consummation of the transactions by the Collateral Agent contemplated hereby.

SECTION 10.11  Rights; Powers; Litigation.  The Collateral Agent shall be under no obligation to exercise any right or power vested in it or duty imposed upon it by this Agreement, or to institute, conduct or defend any litigation under this Agreement or otherwise or in relation to this Agreement or any other Loan Document, either at the request, order or direction of any Lender, unless such Lender shall have offered the Collateral Agent security or indemnity satisfactory to it against the costs, expenses and liabilities that may be incurred by the Collateral Agent therein or thereby. The right of the Collateral Agent to perform any discretionary act enumerated in this Agreement or in any other Loan Document shall not be construed as a duty, and the Collateral Agent shall not be answerable to any Lender or other person for other than its gross negligence, bad faith or willful misconduct in the performance of any such act.

SECTION 10.12  Limitation on Damages.  In no event shall the Collateral Agent be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

SECTION 10.13  Amendments; Modifications; Waivers.  Notwithstanding anything herein or elsewhere to the contrary, in the event that the Collateral Agent is asked to execute any amendment, modification or waiver to this or any other Loan Document to which it is a party, or consent to any such amendment, modification or waiver, the Collateral Agent shall be entitled to request and conclusively rely upon the written instructions of the Required Lenders and shall

have no duty or obligation to execute any such amendment, modification or waiver or consent to the same absent receipt of such written instructions.

SECTION 10.14  Independent Credit Investigation.  Each Lender expressly acknowledges that the Collateral Agent has not made any representations or warranties to it and that no act taken by the Collateral Agent shall be deemed to constitute any representation or warranty by the Collateral Agent to any Lender.  Each Lender acknowledges that it has taken and will continue to take such actions and to make such investigations as it deems necessary to inform itself of the affairs of the Loan Parties, and each Lender acknowledges that it has made and will continue to make its own independent investigation of the creditworthiness and the business and operations of the Loan Parties, and that, in entering into this Agreement and the Loan Documents, as applicable, it has not relied and will not rely upon any information or representations furnished or given by the Collateral Agent.  .

SECTION 10.15  The Collateral Agent in Its Individual Capacity.  Wilmington Trust Company, in its individual capacity, and its affiliates may accept deposits from, lend money to, and generally engage in any kind of business with any Loan Party and any of their respective Affiliates as though Wilmington Trust Company were not the Collateral Agent hereunder.

SECTION 10.16  Knowledge of Default, etc.  The Collateral Agent shall be entitled to assume that no Default, Event of Default or Material Adverse Effect or development in the perfection of the security interest of the Collateral Agent in the Collateral exists, unless the officers of the Collateral Agent immediately responsible for matters concerning this Agreement shall have obtained actual knowledge of such Default, Event of Default or Material Adverse Effect or development through the performance of the Collateral Agent's duties hereunder and under the Loan Documents to which it is a party or shall have been notified in writing by any Loan Party or any Lender that it considers that a Default, Event of Default or such Material Adverse Effect or development exists and specifying the general nature thereof.

SECTION 10.17  No Duty to Provide Additional Credit Information; No Responsibility for Perfection or Priority of Liens, etc.  The Collateral Agent shall not have any duty or responsibility to provide any Lender with any credit information concerning the affairs, financial condition or business of any Loan Party which may at any time come into the possession of the Collateral Agent or any responsibility for the perfection or priority of any lien.

SECTION 10.18  Fees; Expenses.  The Borrower shall pay to the Collateral Agent within 10 Business Days of its demand the amount of any and all reasonable costs and expenses, including the reasonable fees and expenses of its counsel, that the Collateral Agent may incur in connection with (i) the acceptance and administration of this Agreement and its duties as Collateral Agent hereunder, (ii) the custody or preservation of, or the sale of, collection from or other realization upon, any of the Collateral or (iii) the exercises and enforcements of any rights of the Collateral Agent hereunder or under the Loan Documents to which it is a party.  The fees discussed in clause (i) of this Section shall be set forth in a separate agreement between the Collateral Agent and the Borrower. The provisions of this Section 10.18 shall survive the termination of this Agreement and the resignation or removal of the Collateral Agent.

70

SECTION 10.19  Force Majeure.  The Collateral Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation:  acts of God; earthquakes; fires; floods; wars; civil or military disturbances; sabotage; act of terrorism, epidemics; riots; interruptions, loss or malfunctions of utilities, computer hardware, software or communications service; accidents; labor disputes; or acts of civil or military authority or governmental actions; it being understood that the Collateral Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

SECTION 10.20  Merger of Collateral Agent.  Any corporation or other entity into which the Collateral Agent may be merged or converted or with which it may be consolidated, or any corporation or other entity resulting from any merger, conversion or consolidation to which the Collateral Agent shall be a party, or any corporation or other entity to which substantially all the corporate trust business of the Collateral Agent may be transferred, shall be the collateral agent under this Agreement without further act.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**U.S. COAL CORPORATION,**
as Borrower

By: _____
Name: Robert Gabbard
Title: Chief Executive Officer


**LICKING RIVER RESOURCES, INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**OAK HILL COAL, INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**S. M. & J., INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**J.A.D. COAL COMPANY, INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary

72

**FOX KNOB COAL CO., INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**SANDLICK COAL COMPANY, LLC,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**WILMINGTON TRUST COMPANY,** as
Collateral Agent


By: _____
Name: _____
Title: _____


**JMB CAPITAL PARTNERS MASTER FUND,**
**L.P.,** as Lender


By: _____
Name: _____
Title: _____


73

**FOX KNOB COAL CO., INC.,**
as Guarantor

By:_____
Name: Robert Gabbard
Title: Assistant Secretary


**SANDLICK COAL COMPANY, LLC,**
as Guarantor

By:_____
Name: Robert Gabbard
Title: Assistant Secretary


**WILMINGTON TRUST COMPANY,** as
Collateral Agent

By:_____
Name:_____Joseph B. Feil_____
Title:_____Vice President_____


**JMB CAPITAL PARTNERS MASTER FUND,**
**L.P.,** as Lender


By:_____
Name:_____
Title:_____

73

**FOX KNOB COAL CO., INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**SANDLICK COAL COMPANY, LLC,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**WILMINGTON TRUST COMPANY,** as
Collateral Agent

By: _____
Name: _____
Title: _____


**JMB CAPITAL PARTNERS MASTER FUND,**
L.P., as Lender

By: _Cyrus Hadidi_____
Name: _Cyrus Hadidi_____
Title: _Partner_____

73