# EXHIBIT C
# PART I

FILED: NEW YORK COUNTY CLERK 02/14/2012

NYSCEF DOC. NO. 2

INDEX NO. 650411/2012

RECEIVED NYSCEF: 02/14/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

CAMOFI MASTER LDC AND
CAMHZN MASTER, LDC,

                Plaintiffs,

             v.

U.S. COAL CORP., EAST COAST MINER, LLC,
JAD COAL COMPANY, INC., JOHN COLLINS,
DENNIS KOUTSODIMITROPOULOS,
JON WHITT, KEITH GOGGIN, MICHAEL
GOODWIN, MICHAEL WINDISCH, JULIA
MCAFEE, CARL MCAFEE, AUBRA DEAN,
FOX KNOB COAL CO., INC., SANDLICK
COAL COMPANY, LLC,

                Defendants.

------------------------------------------------------------X

Index No. _____

**COMPLAINT**

      Plaintiffs CAMOFI Master LDC ("CAMOFI") and CAMHZN Master LDC

("CAMHZN," and collectively with CAMOFI, "CAM" or "Plaintiffs"), by their attorneys Akin

Gump Strauss Hauer & Feld LLP, as and for their complaint against Defendants, allege as

follows:

<div align="center">INTRODUCTION</div>

      1.     Plaintiff CAM is the holder of certain debt and equity interests in defendants US

Coal Corp. ("US Coal" or the "Company") and JAD Coal Company, Inc. ("JAD"), a wholly-

owned subsidiary of US Coal.  CAM brings this action because Defendants have repeatedly

failed to honor their obligations to CAM and, more generally, have engaged in a course of

self-dealing and interested transactions in disregard of their contractual and fiduciary obligations

to CAM.

2.      Specifically, Defendants have caused US Coal and JAD to: (1) breach the payment obligations under a $4.8 million promissory note between CAMOFI and JAD, dated April 15, 2008 (the "JAD Equipment Note"); (2) breach US Coal's obligation to buy back an aggregate of 425,000 shares of US Coal common stock from CAM pursuant to a Rights Agreement among the parties, dated April 15, 2008 (the "Rights Agreement"); (3) violate contractual obligations to obtain CAM's consent before entering into certain significant corporate transactions; (4) violate contractual obligations to make prescribed amortization and other required payments to CAM; and (5) engage in a pattern of interested transactions and self-dealing resulting in the unfair dilution of US Coal common stock and misappropriation of corporate resources.

3.      JAD's default on the $4.8 million JAD Equipment Note is undisputed. Indeed, US Coal has acknowledged the breach in writing. The JAD Equipment Note initially called for 8% annual interest to be paid on a monthly basis, with interest increasing to 13% annually should Defendants fail to make a required payment for more than five days. In a letter agreement among CAM, US Coal and JAD dated November 18, 2009 (the "November 2009 Agreement"), US Coal and JAD: (1) acknowledged that JAD had failed to make certain required interest payments on the JAD Equipment Note; (2) agreed that the interest rate then applicable to the JAD Equipment Note was 13%, retroactive to April 1, 2008; and (3) promised to make all outstanding interest payments on or before January 1, 2010. Despite the November 2009 Agreement, JAD failed to make the required payments by January 1, 2010. In fact, JAD did not make any amortization payments at all on the JAD Equipment Note until January 2011, and the payments it has made have been woefully deficient. While failing to make payments on the JAD

Equipment Note, the Company and its subsidiaries have made payments on indebtedness owed to Defendants and their affiliates.

4.    Like the JAD Equipment Note, US Coal's breach of the Rights Agreement is undisputed. The Rights Agreement provided that CAM would have the right to "put" an aggregate of 425,0000 shares back to US Coal, provided that by April 1, 2010, US Coal had neither: (1) offered its shares in an initial public offering ("IPO"); nor (2) executed a reverse merger into a public shell company. US Coal has not satisfied either of these conditions.

5.    US Coal has similarly disregarded CAM's right to approve certain corporate actions. Specifically, the parties entered into a letter agreement dated April 14, 2008 (the "April 2008 Agreement"). The April 2008 Agreement required US Coal to receive CAM's written consent before: (1) incurring, creating or assuming debt; (2) hiring or terminating executive officers with salaries in excess of $100,000; or (3) entering into transactions with affiliates having a value in excess of $500,000.

6.    US Coal has repeatedly violated the April 2008 Agreement. Among other things, US Coal has failed to get CAM's consent before: (1) firing its Chief Executive Officer; (2) agreeing to pay the departing Chief Executive Officer severance of $1.2 million; and (3) incurring millions of dollars of indebtedness on or around December 7, 2011.

7.    Defendants have also caused US Coal to violate its contractual obligations with respect to allocating payment of outstanding debt. In September 2009, US Coal insiders formed an entity called East Coast Miner, LLC ("ECM"), which was created to refinance debt and invest in equity of US Coal and its affiliates. CAM consented to this refinancing, subject to, among other things, the parties' agreement that the debtors would pay outstanding debt pursuant to a "waterfall" formula. Under the prescribed "waterfall," ECM would receive $500,000 in monthly

3

debt payments, and other creditors including CAM would likewise receive a $500,000 monthly distribution on a *pro rata* basis. The parties documented this obligation in the First Amendment to Second Amended and Restated Credit Agreement and Value Right Agreement dated as of September 30, 2009 (the "Credit Agreement"). Shortly after its execution, however, US Coal and its affiliates decided to disregard their contractual obligations, and began paying down the debt of the ECM insiders while ignoring or short-paying the debt of CAM and the other lenders.

8.    Lastly, the directors and officers of US Coal have engaged in a pattern of self-interested actions intended to benefit ECM and its affiliates at the expense of CAM and other lenders and shareholders. These self-interested actions have diluted CAM's equity interest in US Coal.

9.    Defendants have ignored their contractual obligations, blurred distinctions between their personal interests and fiduciary obligations, and violated CAM's rights as a creditor and shareholder. CAM has suffered significant damages as a result of these actions.

## THE PARTIES

10.    Plaintiff CAMOFI is an investment fund established as a Cayman Islands Limited Duration Company with its principal place of business in the Cayman Islands.

11.    Plaintiff CAMHZN is an investment fund established as a Cayman Islands Limited Duration Company with its principal place of business in the Cayman Islands.

12.    Defendant US Coal is a Delaware corporation with its principal place of business at 2350 Regency Road, Lexington, KY 40503.

13.    Defendant JAD is a Virginia corporation with its principal place of business at 2350 Regency Road, Lexington, KY 40503. JAD is a wholly-owned subsidiary of US Coal.

14.     Defendant Fox Knob Coal Co., Inc. ("Fox Knob") is a Kentucky corporation with its principal place of business at 1990 Highway 3449, Wallins Creek, KY 40873. Fox Knob is a wholly-owned subsidiary of US Coal.

15.     Defendant Sandlick Coal Company, LLC ("Sandlick") is a Virginia limited liability company with its principal place of business at 1033 Virginia Ave. NW, Norton, VA, 24273. Sandlick is a wholly-owned subsidiary of US Coal.

16.     Defendant East Coast Miner, LLC is a Delaware limited liability company.

17.     Defendant John Collins ("Collins") is Chief Executive Officer and President of US Coal and President of US Coal's subsidiary, Licking River Resources, LLC ("Licking River"). Collins is also a member of defendant ECM.

18.     Defendant Michael Windisch ("Windisch") is Chief Financial Officer of US Coal.

19.     Defendant Dennis Koutsodimitropoulos ("Koutsodimitropoulos") is a member of the Board of Directors of US Coal. Koutsodimitropoulos is also a member of ECM.

20.     Defendant Jon Whitt ("Whitt") is a member of the Board of Directors of US Coal. Whitt is also a member of ECM.

21.     Defendant Keith Goggin ("Goggin") is a member of the Board of Directors of US Coal. Goggin is also a member of ECM.

22.     Defendant Michael Goodwin ("Goodwin," and together with Collins, Windisch, Koutsodimitropoulos, Whitt and Goggin, the "USC Individual Defendants") is a member of the Board of Directors of US Coal. Goodwin is also a member of ECM.

23.     Defendant Carl McAfee is a former owner of JAD and a party to the Subordination Agreement described below. On information and belief, defendant McAfee is also a member of ECM.

24.    Defendant Julia McAfee is a former owner of JAD and a party to the
Subordination Agreement.  On information and belief, defendant McAfee is also a member of
ECM.

25.    Defendant Aubra Dean is a former owner of JAD and a party to the Subordination
Agreement.  On information and belief, defendant Dean is also a member of ECM.

## JURISDICTION

26.    Jurisdiction is proper in this Court because the Defendants, who are signatories to
the various documents described herein, consented to the jurisdiction of this Court.  Jurisdiction
is also proper under CPLR sections 301 and 302 because the Defendants do business in New
York State and/or have conducted business in this State in connection with the acts alleged
herein.

## BACKGROUND FACTS

27.    US Coal is a coal-mining company with operations throughout eastern Kentucky.
US Coal currently controls the mining rights to more than 80,000 acres of property.  Studies have
shown evidence of approximately 70,000,000 tons of coal reserves/resources in the area.  US
Coal operates six different mines and two coal preparation facilities.  The Company recently
announced that it produced 2.3 million tons of coal during the first eleven months of 2011.

28.    Starting in 2007, CAM acquired a variety of debt and equity securities issued by
US Coal and/or its subsidiaries and affiliates.

**A.    CAM Enters Into the April 2008 Letter Agreement and the Rights Agreement**

29.    On or about June 5, 2007, CAM acquired approximately $4,500,000 of US Coal's
Series A Convertible Preferred Stock, as well as warrants to purchase shares of US Coal
common stock.

30.    In connection with this preferred stock acquisition, US Coal and CAM entered
into the April 2008 Agreement. The April 2008 Agreement provided CAM with rights of
approval over certain proposed US Coal transactions and actions. Among other things, the April
2008 Agreement required US Coal to obtain CAM's prior written consent before: (1) incurring,
creating or assuming debt; (2) hiring or terminating executive officers with a salary in excess of
$100,000; and (3) entering into transactions with affiliates having a value in excess of $500,000.
(A copy of the April 2008 Letter Agreement is attached hereto as Exhibit 1.)

31.    On April 15, 2008, CAM and US Coal entered into the Rights Agreement, which
provided CAM with the conditional right to require US Coal to purchase from CAM an
aggregate of 425,000 shares of US Coal common stock at $5.40 per share. Under the Rights
Agreement, this conditional "put" right would be triggered if, by April 1, 2010 (the "Trigger
Date"), US Coal had failed to either: (1) sell its common stock through an IPO; or (2) execute a
"reverse merger, share exchange or similar transaction involving [US Coal] and a public 'shell
company.'" (A copy of the Rights Agreement is attached hereto as Exhibit 2.)

**B.    CAM Enters Into the JAD Equipment Note**

32.    Effective April 15, 2008, CAM, US Coal and JAD entered into an Equipment
Purchase Agreement, pursuant to which CAM transferred its interest in certain mining
equipment to JAD. In consideration of such sale, CAM received the JAD Equipment Note from
JAD. (A copy of the JAD Equipment Note, as amended, is attached hereto as Exhibit 3.)

33.    The JAD Equipment Note has a maturity date of April 15, 2012, and initially
provided for interest to be paid at the rate of 8% per year. However, Section 4 of the JAD
Equipment Note provides that in the event JAD is more than five days overdue on any payment
of principal or interest, CAM can increase the interest rate to 13% per annum, and that CAM can
collect an additional 5% fee on any late payment.

7

34.     The JAD Equipment Note also contains acceleration provisions. Specifically, Section 5(a) of the JAD Equipment Note states that "[u]pon the occurrence of any Event of Default, the Holder or any subsequent holder of this note may, without notice or demand, declare all sums of principal and interest evidenced hereby to be accelerated and immediately due and payable."

35.     Section 5(a) of the JAD Equipment Note defines "Event of Default" to include, among other things: (1) a default in the payment of principal and/or interest on the JAD Equipment Note; and (2) a default or event of default under any other note held by CAM.

36.     Section 5(a) of the JAD Equipment Note also provides that upon any Event of Default, JAD agrees to pay all of CAM's collection costs, including attorney's fees, court costs and all other expenses, if CAM institutes an action to enforce the JAD Equipment Note.

**C.      The ECM Recapitalization, the Credit Agreement, and the Subordination Agreement**

37.     In or around September 2009, all of US Coal's then-directors (Robert Gabbard, Koutsodimitropoulos and Whitt), along with certain officers and shareholders, formed ECM. ECM was interested in recapitalizing US Coal by purchasing a large amount of the debt of the Company and its subsidiaries at a substantial discount. Among other things, the April 2008 Agreement required CAM's prior written approval for such a transaction.

38.     CAM was initially reluctant to approve a transaction in which key members of US Coal's Board and management would also become the primary holders of the Company's debt. Such a situation is inherently rife with potential conflicts of interests. As significant creditors, CAM was concerned that the members of ECM, as the only members of the Company's Board of Directors, might direct US Coal to pay off its loans to ECM prior to paying off other lenders, including CAM. As holders of approximately 15% of US Coal's common stock, CAM was

8

concerned that the ECM members of US Coal's Board and management might be more concerned with repaying ECM's debt than with the long-term interests of the Company.

39.    CAM therefore wanted to assure that the Company's ECM-controlled Board would not have free reign to repay ECM's debt at the expense of repaying CAM's debt. Consequently, US Coal, ECM and certain other parties and affiliates agreed to enter into the Credit Agreement. CAM is a third-party beneficiary under the Credit Agreement. (A copy of the Credit Agreement is attached hereto as Exhibit 4.)

40.    The Credit Agreement provided a "waterfall" mechanism that prescribed how the Company would allocate its monthly principal and interest payments among the Company's various lenders. Paragraphs 20-21 of the Credit Agreement require the Company to make monthly payments of $1 million on its outstanding notes: $500,000 to ECM and $500,000 to the other lenders, including CAM, on a *pro rata* basis.

41.    In consideration of the representations contained in the Credit Agreement, among other things, CAM consented to the terms proposed by ECM. Thus, in September 2009, ECM acquired $24 million of the Company's debt at a significant discount and invested an additional $3 million in the Company's equity (collectively, the "ECM Recapitalization"). The ECM debt was secured by a first priority lien on certain assets of Licking River Resources, Inc.—a wholly owned subsidiary of US Coal—as well as by third and fourth priority security interests in certain assets of JAD. ECM's security interests in JAD were junior to, and expressly subordinated to, CAM's security interests in JAD.

42.    In connection with the ECM Recapitalization, ECM added another two of its members to the Company's Board of Directors—defendants Goggin and Goodwin. Thus, at

the close of the ECM Recapitalization, <u>all</u> five members of US Coal's Board of Directors were ECM members.

43.    As a result of the ECM Recapitalization, US Coal and its subsidiaries owed millions of dollars of outstanding secured debt obligations to various lenders, including CAM. The assets of several US Coal subsidiaries—JAD, Fox Knob, and Sandlick (collectively, the "Borrowers")—secured many of these obligations, and in certain cases, the same property was used to secure multiple obligations.  Thus, simultaneous to, and in coordination with, the execution of the Credit Agreement, the various lenders, including CAM, entered into the First Amended and Restated Intercreditor and Subordination Agreement (the "Subordination Agreement") with the Borrowers.  The purpose of the Subordination Agreement was to confirm the lenders' rights and priorities in the property securing US Coal's and its subsidiaries' various debts as established in the Credit Agreement and other documents.  (A copy of the Subordination Agreement is attached hereto as Exhibit 5.)

44.    The Subordination Agreement includes a Remedy Standstill provision. Specifically, Section 4 of the Subordination Agreement provides that, without the prior written consent of the Senior Creditor, Junior Creditors such as CAM must refrain from exercising certain remedies against the Borrowers in the event of a default.  Importantly, the Subordination Agreement does not restrict Junior Creditors from exercising remedies in the event of a default on an obligation of a non-Borrower, such as US Coal.

45.    The Subordination Agreement specifically references ECM's and US Coal's obligations under the Credit Agreement, which include the commitment to make *pro rata* debt payments.  These representations and warranties provided the consideration for CAM's agreement to enter into the Subordination Agreement.  Without such representations and

warranties, CAM would not have agreed to waive its remedies in the event of a default by one of the Borrowers.

46.     Finally, as part of the ECM Recapitalization, CAM agreed on September 30, 2009 to extend the ultimate maturity dates on its debt instruments, all of which were in default at that time. But for ECM's assurances in the relevant ECM Recapitalization documents that it would make the required payments to CAM according to the agreed-upon waterfall, CAM would not have agreed to extend the maturity dates on its debt.

**D.     US Coal Disregards CAM's Rights and Provides Preferential Treatment to ECM**

47.     After securing CAM's consent to extend the maturity on all of its debt, all of which was then in default, and to waive certain default remedies, ECM began violating the relevant agreements. US Coal's directors and management have consistently flouted their contractual and fiduciary obligations to CAM, putting their own interests ahead of those of the Company, its shareholders, and its lenders.

48.     Prior to the ECM Recapitalization, JAD had fallen significantly behind in interest and amortization payments due under the JAD Equipment Note. Effective November 18, 2009, CAM, US Coal and JAD entered into the November 2009 Agreement, whereby US Coal and JAD: (1) amended the terms of the JAD Equipment Note to include the required monthly *pro rata* payments described in the Credit Agreement; (2) acknowledged that the Borrowers had defaulted under the JAD Equipment Note and that interest thereunder was accruing from April 1, 2008 at the rate of 13% annually until all amounts due and owing thereunder were paid in full; and (3) agreed to make all outstanding interest payments on the JAD Equipment Note no later than January 1, 2010. (A copy of the November 2009 Agreement is attached hereto as Exhibit 6.)

49.     Despite the commitment in the November 2009 Agreement, JAD did not make
the required payments under the JAD Equipment Note by January 1, 2010. Indeed, JAD made
no amortization payments of any kind under the JAD Equipment Note until January 2011.
Because, among other things, it failed to make required payments, JAD has defaulted on the
JAD Equipment Note, and all outstanding amounts thereunder are due and owing.

50.     In addition to the payment defaults, US Coal and/or JAD also defaulted on a
number of other debt instruments held by CAM. While two of these defaulted debt obligations
were only recently satisfied in December 2011, these various debt instruments also contained
cross-default provisions, providing that a default on one instrument would constitute a default on
all debt outstanding between US Coal or its subsidiaries and CAM. These various cross-defaults
therefore provide an additional basis for default under the JAD Equipment Note separate and
distinct from JAD's various payment failures.

51.     CAM has demanded repayment of the JAD Equipment Note on numerous
occasions. However, JAD has ignored these demands.

**E.     US Coal Refuses to Honor the Rights Agreement**

52.     As explained above, the Rights Agreement provided that US Coal would be
required to purchase 425,000 shares of its common stock held by CAM at a price of $5.40 per
share if, by the Trigger Date of April 1, 2010, US Coal had failed to either: (1) sell its common
stock in an IPO; or (2) engage in a "reverse merger" or other similar transaction.

53.     US Coal did not fulfill either of the above conditions by the Trigger Date, and in
fact still has not fulfilled either condition.

54.     Consequently, on April 6, 2010, CAM sent a letter to the Company's then-CEO,
Robert Gabbard, exercising the "put" option on its 425,000 shares of common stock.

12

55.    Mr. Gabbard did not respond to the April 6 letter. However, in an email dated April 16, 2010, US Coal's then-Chief Financial Officer, James Wolff, acknowledged receipt of the letter and the validity of US Coal's obligation under the Rights Agreement. Mr. Wolff refused to honor the Company's obligation to repurchase the shares, however, stating that US Coal did not have the money to repurchase the shares at that time. Mr. Wolff further indicated that the Company would allocate funds from a proposed refinancing to satisfy its obligation under CAM's put right. (A copy of the April 16, 2010 email is attached hereto as Exhibit 7.)

56.    On May 18, 2010, Mr. Woff sent a letter to CAM, again acknowledging that CAM's April 6 letter "satisfies the obligation to establish Put Shares at the stated price of $5.40 per share." (A copy of the May 18, 2010 letter is attached hereto as Exhibit 8.)

57.    Notwithstanding its contractual obligations and Mr. Wolff's repeated assurances, the Company still has not repurchased CAM's shares. The Company's failure to honor CAM's right is compounded by the fact that it has honored the obligations of another put holder under the Rights Agreement, repurchasing the shares of Michael Miller pursuant to the Rights Agreement.

58.    On information and belief, members of ECM have instructed US Coal not to make the repurchase payment required by the Rights Agreement until ECM's debt has been repaid in full.

**F.    US Coal Violates the "Waterfall" Provisions of the Credit Agreement**

59.    US Coal has repeatedly and willfully violated the redemption provisions contained in the Credit Agreement and CAM's other debt instruments. As explained above, the Credit Agreement required US Coal to make $1 million in monthly amortization payments— $500,000 to ECM and $500,000 to the other lenders, including CAM, on a *pro rata* basis. The parties to the Credit Agreement included these provisions to protect CAM and the other lenders

13

by requiring US Coal to make specific payments to the lenders on a monthly basis or as otherwise provided in CAM's debt instruments.

60.     Since November 2009, US Coal—at the direction of its directors—has made amortization payments to ECM in excess of those required under the applicable transaction documents, while making only a portion of the required payments to other lenders, including CAM.

61.     For example, in February 2010, April 2010, June 2010 and July 2010, US Coal made amortization payments to ECM without making any amortization payments to other lenders.  US Coal's Board of Directors authorized these payments.

62.     Thus, in several months where the Board of Directors determined that US Coal could not or would not make its required $1 million in amortization payments, members of ECM (*i.e.*, the US Coal Board members), determined to pay ECM at least $500,000 in amortization payments, while not paying the other lenders—including CAM—their pro rata share of amortization payments.

63.     Additionally, in certain other months, including November 2009, December 2009, January 2010, February 2010, March 2010, April 2010, May 2010, June 2010, November 2010, and December 2010, the Board authorized payments to ECM in excess of the amount provided for in the Credit Agreement, notwithstanding that US Coal was in arrears or default under its obligations to other lenders, including CAM.

G.     **US Coal Violates the April 2008 Agreement**

64.     As explained above, the April 2008 Agreement gives CAM the right to approve certain transactions contemplated by the Board of US Coal.  Despite the clear requirements in the April 2008 Agreement, US Coal has routinely failed to seek CAM's approval before consummating such transactions.

14

65. For example, Section 4 of the April 2008 Agreement requires US Coal to get CAM's prior written approval before "hir[ing] or terminat[ing] the employment of any executive officer of the Corporation with a salary in excess of $100,000." Despite this requirement, in May 2011, without soliciting CAM's consent, the Board removed Robert Gabbard from his position as CEO and replaced him with John Collins, a member of ECM. Both the hiring of Collins and the termination of Robert Gabbard constituted violations of Section 4 of the April 2008 Agreement.

66. After terminating Mr. Gabbard, the Board agreed to pay him $1.2 million in severance, again without CAM's consent. This severance agreement violated: (1) Section 1 of the April 2008 Agreement, which requires CAM's written approval prior to the incurrence of indebtedness; and (2) Section 12 of the April 2008 Agreement, which requires CAM's written approval prior to the Company's entering into any transaction with an affiliate in which the dollar value of the transaction exceeds $500,000.

67. In addition, on information and belief, on or about December 7, 2011, the Company: (1) incurred debt to certain officers and directors at a cost to the Company well in excess of rates which the Company could have obtained from unaffiliated third parties; and (2) modified indebtedness with ECM and other Company affiliates, including with Defendants Collins, Whitt, Goodwin, Goggin, Carl McAfee, Julia McAfee, and Aubra Dean. Each of these actions was taken without soliciting CAM's prior written consent. These related-party transactions violated Sections 1 and 12 of the April 2008 Agreement, as described above. The Company has repeatedly spurned CAM's requests to review those transaction documents.

## H. <u>The Board Has Consistently Breached its Fiduciary Duties</u>

68. The Board of US Coal has consistently violated its fiduciary duties. For example, ECM and its members and their affiliates own the vast majority of the Company's Preferred

Stock. ECM and its affiliates have used their control position with the Company to expand their equity holdings and simultaneously dilute the Company's common shareholders.

69.     Specifically, each quarter, ECM and other holders of the Company's Preferred Stock are paid a dividend in the form of common stock. To calculate the number of shares of common stock that each holder of Preferred Stock will receive, the Company's Board calculates the Fair Market Value ("FMV") of US Coal's common stock as of each quarter end. When the FMV of the common stock increases, holders of Preferred Stock receive fewer shares in respect of their dividend.

70.     Since the ECM Recapitalization, the Board has consistently undervalued the Company's FMV for purposes of calculating the Preferred Stock dividend, often ignoring independent third-party analysis of the common stock's value. This has resulted in an inflated number of new dividend shares being issued and a corresponding dilution of CAM's common equity.

71.     The Board has also repeatedly diverted Company funds to pay for ECM's legal bills in connection with various matters. This includes payment of ECM's legal fees in connection with: (1) litigation against US Coal in which ECM has intervened; (2) failed negotiations of a potential sale of CAM's debt to an affiliated party; and (3) ECM's response to letters CAM sent to US Coal's Board seeking to address issues regarding the Company's violations of CAM's rights as a debt and equity holder. US Coal has, on information and belief, paid ECM's legal fees for all of these matters, in addition to paying the fees of its own legal counsel. ECM's intervention in most, if not all, of these situations was wholly unnecessary. These payments constitute a dissipation of the Company's assets and, therefore, breaches of fiduciary duty.

I.    **US Coal Refuses to Provide CAM with Books and Records and Board Access**

72.    Pursuant to its rights under its debt instruments and related transaction documents,

CAM is entitled to audit US Coal's books and records.  In addition, pursuant to rights granted to

CAM as a holder of US Coal Series A Preferred Stock under the Certificate of Designation

relating to such Preferred Stock, CAM is entitled to observe meetings of the Company's Board

of Directors, and to receive materials distributed to the Board in connection with such meetings.

In connection with these disputes and to protect its interests, CAM has made repeated requests to

review relevant documents.  US Coal has consistently refused these requests, and with a few

exceptions, has failed to apprise CAM of the occurrence of Board meetings and failed to deliver

to CAM documents distributed in connection with such meetings.

73.    In addition, pursuant to Section 220 of the Delaware General Corporations Law

("DGCL"), CAM is entitled as a shareholder to review certain of US Coal's books and records.

On January 11, 2012, CAM sent a demand for books and records under the procedure laid out in

DGCL Section 220.  On January 17, 2012, US Coal sent a response, refusing to produce even a

single document for review, and giving specious reasons for its failure to produce any such

documents.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**(Breach of the Rights Agreement Against US Coal)**

</div>

74.    CAM repeats and realleges each and every allegation contained in paragraphs 1

through 73 as if fully set forth herein.

75.    US Coal failed to consummate an IPO and/or participate in a reverse merger by

April 1, 2010.

76.    To this day, US Coal has failed to sell its shares in an IPO or engage in a

reverse merger.

77.     Pursuant to the Rights Agreement, these failures triggered CAM's right to require US Coal to purchase CAM's 425,000 shares of common stock at a price of $5.40 per share.

78.     On April 6, 2010, CAM notified US Coal in writing that CAM was exercising its put right under the Rights Agreement.

79.     US Coal has twice acknowledged in writing that its put obligation was triggered and that it is required to purchase CAM's 425,000 shares.

80.     Despite the clear requirements of the Rights Agreement, and its satisfaction of a similar obligation to a third party, US Coal has refused to honor the put obligation.

81.     By reason of the foregoing, CAM is entitled to payment of $2,250,000 from US Coal, plus interest.

### SECOND CLAIM FOR RELIEF
### (Breach of the Credit Agreement Against US Coal)

82.     CAM repeats and realleges each and every allegation contained in paragraphs 1 through 73 as if fully set forth herein.

83.     As explained above, US Coal has repeatedly violated the Credit Agreement by overpaying ECM at the expense of the other lenders, including CAM.

84.     The Board of US Coal has directed the Company to make these payments to ECM in utter disregard of its contractual and fiduciary obligations.

85.     US Coal's improper payments to ECM have damaged CAM, which should have received payments on the JAD Equipment Note and its other debt obligations.

86.     By reason of the foregoing breach, CAM is entitled to payment of damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**(Breach of the Subordination Agreement Against ECM, JAD, Fox Knob, Sandlick, Carl McAfee, Julia McAfee, and Aubra Dean (collectively, the "Subordination Parties"))**

87.   CAM repeats and realleges each and every allegation contained in paragraphs 1 through 73 as if fully set forth herein.

88.   The Subordination Parties are all parties to the Subordination Agreement and, upon information and belief, the Subordination Parties are all members of ECM.

89.   US Coal and ECM needed CAM's approval to enter into the ECM Recapitalization.

90.   As part of the ECM Recapitalization, CAM agreed to extend the maturity dates on its notes and to waive certain remedial rights in the event of a default under the Subordination Agreement.

91.   In connection with the ECM Recapitalization, the parties entered into the Credit Agreement simultaneous with entry into the Subordination Agreement. The Credit Agreement required US Coal and its subsidiaries to make monthly *pro rata* debt payments to creditors, including CAM.

92.   Performance under the Credit Agreement was a material inducement and the consideration provided to CAM in exchange for its agreement to enter into the Subordination Agreement.

93.   The Credit Agreement and the Subordination Agreement were entered into for the purpose of effectuating the ECM Recapitalization, and are therefore "global transaction" documents.

94.   Almost immediately after the ECM Recapitalization, US Coal began breaching the Credit Agreement by paying ECM at the expense of other creditors.

95.     US Coal's material breach of the Credit Agreement constitutes a material breach of the Subordination Agreement, and warrants termination of the Subordination Agreement as to CAM.

### FOURTH CLAIM FOR RELIEF
### (Breach of the JAD Equipment Note Against JAD)

96.     CAM repeats and realleges each and every allegation contained in paragraphs 1 through 73 as if fully set forth herein.

97.     Under the JAD Equipment Note, upon an Event of Default, CAM could declare that all outstanding amounts were immediately due and owing. The JAD Equipment Note defined "Event of Default" to include either a failure to make payments under the JAD Equipment Note or a failure to make a required payment under any other notes held by CAM.

98.     Both of these default events occurred. JAD failed to make required payments under the JAD Equipment Note and other CAM obligations. On several occasions, CAM has declared that based upon these Events of Default, the JAD Equipment Note is immediately due and payable.

99.     To date, JAD has wrongfully refused to pay the outstanding principal and interest of approximately $4,473,000 as of February 1, 2012 on the JAD Equipment Note.

100.     CAM instituted the present action to enforce the JAD Equipment Note. Pursuant to Section 5(a) of the JAD Equipment Note, CAM is entitled to reimbursement of all attorney's fees, court costs, and all other expenses in connection with this action seeking such enforcement.

101.     By reason of the foregoing, CAM is entitled to payment of approximately $4,473,000 from JAD, plus additional costs and interest.

## FIFTH CLAIM FOR RELIEF
### (Breach of the April 2008 Agreement Against US Coal)

102.    CAM repeats and realleges each and every allegation contained in paragraphs 1 through 73 as if fully set forth herein.

103.    As explained above, US Coal has repeatedly violated the terms of the April 2008 Agreement.

104.    Specifically, US Coal: (1) terminated its CEO Robert Gabbard; (2) awarded Mr. Gabbard $1.2 million in severance; (3) hired John Collins to replace Mr. Gabbard; and (4) incurred indebtedness not approved by CAM, including without limitation, indebtedness to affiliates, in excess of $500,000.

105.    Pursuant to the terms of the April 2008 Agreement, each of these actions required the prior written approval of CAM, but CAM's approval was neither given nor requested.

106.    By reason of the foregoing, CAM is entitled to payment of damages in an amount to be determined at trial.  In addition, CAM is entitled to have the indebtedness incurred, created or assumed by the Company, on or about December 7, 2011, to affiliates of the Company or others, or any transactions with affiliates in excess of $500,000, rescinded and declared null and void.

## SIXTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against the USC Individual Defendants)

107.    CAM repeats and realleges each and every allegation contained in paragraphs 1 through 73 as if fully set forth herein.

108.    As explained above, US Coal's entire Board and its current President and Chief Executive Officer, as well as its former Chief Executive Officer and its former Chief Financial Officer, are members of ECM.  Thus, ECM controls US Coal and all of US Coal's subsidiaries.

These individuals have repeatedly placed their own interests above those of shareholders, such as CAM.

109.    By improperly undervaluing the Company's common stock when calculating the Preferred Stock dividend, the USC Individual Defendants have enriched themselves while simultaneously diluting common shareholders' equity value.

110.    Additionally, the Individual Defendants diverted Company assets to their personal use by requiring US Coal to pay the legal fees of a separate entity—ECM—in which the USC Individual Defendants are all members.

111.    The foregoing conduct constitutes a clear violation of the duty of loyalty that decreased the value of the shares of US Coal common stock held by CAM.

112.    By reason of the foregoing, CAM has been damaged by the USC Individual Defendants' conduct and is entitled to payment of damages in an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
#### (Tortious Interference With Contract Against ECM and the USC Individual Defendants)

113.    CAM repeats and realleges each and every allegation contained in paragraphs 1 through 73 as if fully set forth herein.

114.    The Rights Agreement was and is a valid contract entered into between CAM and US Coal.

115.    ECM, through its members, was aware of the Rights Agreement prior to the Trigger Date.

116.    After the Trigger Date, CAM demanded that US Coal fulfill the put obligation and repurchase CAM's 425,000 shares of US Coal common stock.

22

117.    ECM, through its members, intentionally caused US Coal to default on the Rights Agreement by, among other things, directing US Coal not to repurchase CAM's 425,000 shares.

118.    By reason of the foregoing, CAM has been damaged by ECM's conduct and is entitled to payment of damages in an amount of $2,250,000 from ECM, plus interest.

### EIGHTH CLAIM FOR RELIEF
**(Tortious Interference With Contract Against ECM, the USC Individual Defendants, Julia McAfee, Carl McAfee, and Aubra Dean)**

119.    CAM repeats and realleges each and every allegation contained in paragraphs 1 through 73 as if fully set forth herein.

120.    The JAD Equipment Note was and is a valid contract entered into among CAM, JAD and US Coal.

121.    ECM, through its members, was aware of the JAD Equipment Note and its terms.

122.    ECM, through its members, intentionally caused JAD to default on the JAD Equipment Note by, among other things, directing that JAD not make payments required under these agreements after CAM had declared a default and demanded all amounts due and owing under the JAD Equipment Note.

123.    By reason of the foregoing, CAM has been damaged by ECM's conduct and is entitled to payment in the amount of $6,723,000, plus interest.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

1. Damages in an amount to be proven at trial, but in no event less than $6,723,000, together with interest thereon;

2. Reimbursement of all fees, costs and expenses incurred by CAM in connection with enforcing its rights herein;

3. Declaratory relief as described above, including a declaration that the Subordination Agreement is null and void as to CAM;

4. Rescission of: (a) the debt incurred by the Company to affiliates of the Company or others on or about December 7, 2011, or incurred or modified after the ECM

23

Recapitalization without CAM's consent; and (b) any transactions with affiliates in excess of $500,000; and

5. Such other relief as the Court deems appropriate.

DATED:       New York, New York
             February 14, 2012

                         Respectfully submitted,


                         BY:    /s/   Douglas A. Rappaport

                         Douglas A. Rappaport
                         Robert J. Boller

                         AKIN GUMP STRAUSS HAUER & FELD LLP
                         One Bryant Park
                         New York, New York 10036
                         (212) 872-1000
                         (212) 872-1002 (facsimile)
                         *Counsel for Plaintiffs*

24

FILED: NEW YORK COUNTY CLERK 02/14/2012    INDEX NO. 650411/2012
NYSCEF DOC. NO. 3

RECEIVED NYSCEF: 02/14/2012

# Exhibit 1

**U.S. Coal Corporation**
448 Lewis Hargett Circle, Suite 240
Lexington, KY 40503

April 14, 2008

CAMOFI Master LDC
CAMHZN Master LDC
c/o CENTRECOURT ASSET MANAGEMENT LLC
350 MADISON AVENUE, 8TH FLOOR
NEW YORK, NY 10017
Attention: Michael Loew, General Counsel

Dear Michael:

Pursuant to our recent discussions, U.S. Coal Corporation, a Delaware corporation (the "Corporation"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby covenants to CAMOFI Master LDC and CAMHZN Master LDC, (each a "CAM Entity" and, together with their respective limited partners and members, the "CAM Entities") as follows:

For so long as the CAM Entities collectively own more than two percent (2%) of the outstanding shares of the Corporation's common stock, $.001 par value per share ("Common Stock"), on a fully-diluted basis (assuming conversion of all securities convertible into or exercisable or exchangeable for shares of Common Stock), the Corporation will not, without the written prior consent of the CAM Entities, take any of the following actions:

(1) create, assume or incur indebtedness for borrowed money, other than (a) indebtedness (including interest and fees) pursuant to loan or credit agreements existing on the date hereof (as renewed or extended, provided that such renewals or extensions do not increase the amount of indebtedness); (b) indebtedness incurred from time to time under the Corporation's line of credit with First Tennessee Bank, N.A., as in existence on the date hereof, provided that the proceeds are used to fund operations; (c) indebtedness on terms and conditions satisfactory to the CAM Entities in their reasonable discretion incurred in connection with the refinancing of the Corporation's secured debt existing on the date hereof or the financing of one or more additional acquisitions by the Corporation, or (d) other indebtedness incurred in the ordinary course of business not to exceed $1 million at any time outstanding;

(2) (a) enter into any strategic partnership or joint venture or (b) consummate any asset or stock acquisition of another person or entity, if, as a result of such acquisition, such asset(s) or stock would represent a material portion of the assets of the Corporation;

(3) sell, assign or transfer all or substantially all of the assets of the Corporation and its subsidiaries (taken as a whole), consummate any merger or consolidation of the

Corporation with or into another entity, or enter into any agreement to do any of the foregoing;

(4)    hire or terminate the employment of any executive officer of the Corporation with a salary in excess of $100,000, other than hiring of executive officers in connection with the JAD Acquisition;

(5)    make any expenditure for the acquisition, construction or improvement of any fixed or capital asset in an amount greater than $5 million, other than capital expenditures incurred in connection with the Corporation's acquisition of one high-wall miner, the construction and/or improvement of a coal preparation plant and capital leases assumed in the JAD Acquisition;

(6)    (a) amend, modify or alter the terms of any option, warrant or other right to purchase or acquire shares of capital stock or other equity interests of the Corporation outstanding on the date hereof or (b) amend the terms of the Corporation's existing equity incentive plan or adopt any new equity incentive plan for the benefit of the Corporation's employees;

(7)    increase or decrease the number of authorized shares of the Common Stock, or preferred stock;

(8)    create, designate or establish any class or series of capital stock, other than Common Stock, Series A Convertible Preferred Stock, $___ par value per share (the "Series A Preferred"), or the Series B Preferred;

(9)    pay or declare any dividend or make any distribution on any securities other than on the Series A Preferred or the Series B Preferred, both on the terms as the same exist on the date hereof;

(10)    declare bankruptcy, dissolve, liquidate or wind up the affairs of the Corporation or any subsidiary;

(11)    issue or sell, in a single transaction or a series of related transactions, any capital stock or other security convertible into or exercisable for capital stock of the Corporation, which, at the time of issuance, represents more than five percent (5%) of the number of the then-outstanding shares of Common Stock on a fully-diluted basis;

(12)    enter into any transaction with an affiliate of the Corporation (other than inter-company transactions) in which the dollar value of such transaction exceeds $500,000.

The Corporation's obligations hereunder will terminate at such time as the CAM Entities own less than two percent (2%) of the issued and outstanding shares of the Common Stock. In addition to the other termination provisions contained herein, this letter shall terminate as to either CAM Entity when such CAM Entity does not singly beneficially own any shares of Common Stock. The letter shall be governed by and construed in accordance with the laws of the State of New York. The rights

of the CAM Entities contained herein may not be assigned without the prior written consent of the Corporation.

This letter supersedes and replaces that certain letter agreement among the parties dated June 4, 2007.

If the foregoing is in accordance with your understanding, please confirm your acceptance by signing and returning the enclosed copy of this letter, which upon execution will constitute an agreement between us.

Sincerely,

U.S. COAL CORPORATION

By:    Robert Gabbard
Title:   Chief Executive Officer

Agreed to and accepted as of the date
first above written:

**CAMOFI MASTER LDC**

By:   Richard Smithline
Title:   Director

**CAMHZN MASTER LDC**

By:   Richard Smithline
Title:   Director

FILED: NEW YORK COUNTY CLERK 02/14/2012

INDEX NO. 650411/2012

NYSCEF DOC. NO. 4

RECEIVED NYSCEF: 02/14/2012

# Exhibit 2

# RIGHTS AGREEMENT

RIGHTS AGREEMENT, dated as of April 15, 2008 (this "Agreement"), by and between U.S. Coal Corporation, a Delaware corporation ("USC"), on the one hand, and CAMOFI MASTER LDC ("CAMOFI"), CAMHZN MASTER LDC ("CAMHZN"), Futurtec L.P., a Delaware limited partnership ("Futurtec"), Michael Miller ("Miller") and Lawrence Kaplan ("Kaplan" and collectively with CAMOFI, CAMHZN, Futurtec and Miller, the "Investors").

## W I T N E S S E T H

WHEREAS, pursuant to a Securities Purchase Agreement (the "SPA") dated as of April 15, 2008 among J.A.D. Coal Company, Inc., a Virginia corporation ("JAD"), Sandlick Coal Company, LLC, a Virginia limited liability company ("Sandlick"), and Fox Knob Coal Co., Inc., a Kentucky corporation ("Fox Knob" and, collectively with JAD and Sandlick, the "Borrowers"), USC, as the parent company of the Borrowers, and the Investors, the Investors purchased from the Borrowers certain promissory notes in the aggregate principal amount of $5.0 million (the "Notes"); and

WHEREAS, USC's obligations under the SPA and the Notes (as defined in the SPA) are secured by a security interest in certain assets and properties of USC and the Borrowers pursuant to a Security Agreement (the "Security Agreement") dated as of April 15, 2008 among the Borrowers, USC and the Investors.

WHEREAS, pursuant to the SPA, at the closing of the transactions thereunder, the Investors received an aggregate of 500,000 shares of common stock, $.001 par value per share ("Common Stock"), of USC (the "Investor Shares") as additional consideration for their purchase of the Notes, which Investor Shares were allocated pro rata among the Investors in accordance with the principal amount of their respective Notes; and

WHEREAS, USC desires to grant certain put rights and registration rights to the Investors with respect to the Investor Shares on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and undertakings contained herein, and for other consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

Section 1.  Certain Definitions.  In addition to any defined terms which may have meanings ascribed to them elsewhere in this Agreement, the following terms shall have the following meanings:

"Put Period" means the 30-day period beginning on the date notice of the Trigger Event is first delivered to the Investors.

"Put Shares" means such number of the Investor Shares elected to be sold by the Investors upon exercise of the Put Option (as defined in Section 2 hereof).

"Trigger Date" means April 1, 2010.

"Trigger Event" means the failure of USC to consummate one of the following transactions prior to the Trigger Date: (i) an underwritten initial public offering of USC's

Common Stock, or (ii) a reverse merger, share exchange or similar transaction involving USC and a public "shell company" (as defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended).

Section 2. <u>Put Right</u>. Upon the occurrence of a Trigger Event, each Investor shall have the individual right, exercisable by written notice to USC in accordance with Section 3 hereof, to require USC to purchase (the "<u>Put Option</u>") the Put Shares owned of record by such Investor at the time of delivery of such notice. The purchase price per Put Share shall be $5.40 (as adjusted to give effect to stock splits, stock dividends and the like, the "<u>Purchase Price</u>").

Section 3. <u>Exercise Procedures</u>. The Put Option shall be exercisable only by written notice from the exercising Investor to USC (the "<u>Put Notice</u>") within the Put Period and shall specify a business day as the closing date for the purchase of the Put Shares, which date shall in no event be earlier than fifteen (15) days after the date of the Put Notice or later than forty-five (45) days after the date of the Put Notice. The failure of any Investor(s) to exercise the Put Option within the Put Period shall cause the automatic termination of the Put Option and the rights and obligations of USC hereunder with respect to such Investor(s) only. This Put Option may not be exercised by an Investor more than once during the Put Period.

Section 4. <u>Closing</u>. At the closing (the "<u>Closing</u>") of the exercise of the Put Option, USC shall pay the aggregate Purchase Price in the form of cash in U.S. dollars by wire transfer of immediately available funds into an account designated by the exercising Investor in the Put Notice, and upon such payment, such Investor shall deliver to USC any and all certificates representing the Put Shares, free and clear of any and all liens, accompanied, when necessary, by stock powers duly endorsed in blank and any required stock transfer stamps affixed thereto. The closing of the exercise of the Put Option shall be held on the date specified in the Put Notice at such time and location within the city, county and state of New York as the parties to such transaction shall mutually agree. As a condition precedent to USC's obligation to purchase the Put Shares at the closing, the representations and warranties set forth in Section 7 of this Agreement shall be true and correct as of the date of Closing and, upon request by USC, the exercising Investor shall deliver to USC a certificate signed by an executive officer of such Investor certifying as to the truthfulness and correctness of such representations and warranties. Each party shall bear its own legal and other costs and expenses incurred in connection with the exercise of the Put Right and the purchase and sale of the Put Shares.

Section 5. <u>Security Interest</u>. The obligation of USC to make payment of the Purchase Price pursuant to Section 2 hereof shall be secured by a security interest in certain assets of USC and the Borrowers pursuant to the Security Agreement; <u>provided</u>, <u>however</u>, such security interest shall not become fully granted, attached or effective and Investors shall take no action to perfect or enforce such security interest unless and until all of the obligations of USC and the Borrowers to the Credit Agreement Lenders under the Credit Agreement (as such terms are defined in the Notes) and all other Loan Documents (as such term is defined in the aforementioned Credit Agreement) have been paid in full.

Section 6. <u>Registration Rights</u>. The Investors shall have the registration rights with respect to the Investor Shares (and the other registrable securities specified therein) as set forth on <u>Annex I</u> hereto, the terms of which are incorporated herein in by reference.

Section 7. <u>Representations and Warranties</u>. Each Investor, severally, but not jointly, represents and warrants to USC that: (i) such Investor has full power and authority to enter into this Agreement; (ii) this Agreement has been duly authorized, executed and delivered

2

by such Investor and constitutes such Investor's valid and legally binding obligation, enforceable in accordance with its terms; (iii) none of the execution, delivery or performance by this Agreement by such Investor nor the consummation by such Investor of the transactions contemplated hereby will result in a violation of, conflict with, or result in any breach of any of the terms of, or constitute a default under, any provision of federal, state or local law to which such Investor is subject, or any mortgage, indenture, agreement, instrument, judgment, decree, order, rule or regulation or other restriction to which such Investor is a party or by which such Investor is bound; (iv) the Put Shares purported to be owned by such Investor are owned of record and beneficially by such Investor, and such Investor holds good, valid and marketable title to the Put Shares; and (v) such Investor possesses the legal right to sell, transfer and assign the entire legal and beneficial ownership of the Put Shares, free and clear of all liens, encumbrances, claims, restrictions or other similar interests.

Section 8. Miscellaneous.

(a) Entire Agreement. This Agreement (including Annexes I and II) constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the parties or any of them with respect to the subject matter hereof.

(b) Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

(c) Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of New York, without reference to its principles of conflicts of laws. Any dispute arising under this Agreement shall be adjudicated exclusively within the city, county and state of New York.

(d) Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by and against each of the parties hereto and their respective successors and assigns. This Agreement may not be assigned (i) by any Investor without the prior written consent of USC except for an assignment to their respective affiliates or (ii) by USC without the written prior consent of CAMHZN and CAMOFI; provided, however, any Investor, without the prior written consent of USC, may assign this Agreement solely as it relates to the registration rights set forth on Annex I hereto in accordance with the provisions of Section 11 of Annex I.

(e) Amendment. This Agreement may be amended, modified or supplemented only by a written agreement signed by USC, on the one hand, and CAMHZN and CAMOFI (or their successors or assigns), on the other hand, which amendment shall be binding upon all Investors; provided, that any such amendment, modification or supplement made without the signature of an Investor must apply to all Investors.

(f) Severability. The invalidity of any portion hereof shall not affect the validity, force or effect of the remaining portions hereof.

(g) Notices. All notices and other communications given pursuant to this Agreement shall be in writing and shall be deemed to have been given when personally delivered or when mailed by prepaid registered, certified or express mail, return receipt requested. Notices should be addressed as follows:

(a)    If to any Investor, then to:

        c/o Centrecourt Asset Management LLC
        350 Madison Avenue
        8th Floor
        New York, New York 10017

With a copy (which shall not constitute notice) to:

        Wayne A. Wald, Esq.
        Katten Muchin Rosenman LLP
        575 Madison Avenue
        New York, NY 10022-2585

(b)    If to the Corporation, then to:

        U.S. Coal Corporation
        444 Lewis Hargett Circle
        Suite 125
        Lexington, KY 40503
        Attention:  Mr. Robert Gabbard
                   Chief Executive Officer

With a copy (which shall not constitute notice) to:

        Eric M. Hellige, Esq.
        Pryor Cashman LLP
        410 Park Avenue
        New York, New York  10022

(c)    If to any Investor other than CAMHZN or CAMOFI, then to such Investor at the address set forth on such Investor's Joinder Agreement hereto.

Such addresses for notices may be changed by any party by notice to the other party(ies) pursuant to this Section.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

U.S. COAL CORPORATION

By: _____
　　　Name: Robert Gabbard
　　　Title: Chief Executive Officer


CAMHZN MASTER LDC

By: _____
　　　Name:
　　　Title:


CAMOFI MASTER LDC

By: _____
　　　Name:
　　　Title:


FUTURTEC L.P.

By: _____
　　　Name:
　　　Title:


_____
　Michael Miller


_____
Lawrence Kaplan

731247                                5

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

U.S. COAL CORPORATION

By: _____
Name: Robert Gabbard
Title: Chief Executive Officer


CAMHZN MASTER LDC

By: _____
Name:
Title:


CAMOFI MASTER LDC

By: _____
Name:
Title:


FUTURTEC L.P.

By: _____
Name:
Title:


_____
Michael Miller


_____
Lawrence Kaplan

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

U.S. COAL CORPORATION

By:_____
   Name: Robert Gabbard
   Title: Chief Executive Officer

CAMHZN MASTER LDC

By:_____
   Name:
   Title:

CAMOFI MASTER LDC

By:_____
   Name:
   Title:

FUTURTEC L.P.
BY: *Futurtec Capital Corporation, ITS G.P.*
By: *Ido Klear, President*
   Name: *IDO KLEAR*
   Title: *PRESIDENT*

_____
Michael Miller

_____
Lawrence Kaplan

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

U.S. COAL CORPORATION

By:_____
    Name: Robert Gabbard
    Title: Chief Executive Officer

CAMHZN MASTER LDC

By:_____
    Name:
    Title:

CAMOFI MASTER LDC

By:_____
    Name:
    Title:

FUTURTEC L.P.

By:_____
    Name:
    Title:

_____
Michael Miller

_____
Lawrence Kaplan

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

U.S. COAL CORPORATION

By:_____
   Name: Robert Gabbard
   Title: Chief Executive Officer


CAMHZN MASTER LDC

By:_____
   Name:
   Title:


CAMOFI MASTER LDC

By:_____
   Name:
   Title:


FUTURTEC L.P.

By:_____
   Name:
   Title:


_____
Michael Miller

_____
Lawrence Kaplan

FILED: NEW YORK COUNTY CLERK 02/14/2012    INDEX NO. 650411/2012
NYSCEF DOC. NO. 5    RECEIVED NYSCEF: 02/14/2012

# Exhibit 3

THIS CONVERTIBLE NOTE AND THE COMMON STOCK ISSUABLE UPON CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") NOR UNDER ANY STATE SECURITIES LAW AND MAY NOT BE PLEDGED, SOLD, ASSIGNED, HYPOTHECATED OR OTHERWISE TRANSFERRED UNTIL (1) A REGISTRATION STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR (2) U.S. COAL CORPORATION RECEIVES AN OPINION OF COUNSEL TO THE COMPANY OR OTHER COUNSEL TO THE HOLDER OF THIS NOTE WHICH OTHER COUNSEL IS REASONABLY SATISFACTORY TO THE COMPANY THAT THIS NOTE AND/OR SUCH COMMON STOCK MAY BE PLEDGED, SOLD, ASSIGNED, HYPOTHECATED OR TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS.

## AMENDED AND RESTATED CONVERTIBLE PROMISSORY NOTE

**$4,800,000.00**

FOR VALUE RECEIVED, the undersigned, **J.A.D. COAL COMPANY, INC.**, a Virginia corporation ("Corporation"), hereby promises and agrees to pay to the order of **CAMOFI MASTER LDC**, a Cayman Islands limited duration company ("Holder"), its successors and assigns, the principal sum of FOUR MILLION EIGHT HUNDRED THOUSAND DOLLARS ($4,800,000.00), or so much thereof as may be outstanding hereunder from time to time, together with all accrued interest thereon, computed and payable in the manner set forth below. **U.S. COAL CORPORATION**, a Delaware corporation ("U.S. Coal"), is made a party to this Note with respect to the convertible feature of this Note and certain representations and warranties related thereto, as more particularly described herein.

This amended and restated promissory Note (the "Note") has been issued pursuant to, and is the Note referenced in, that certain Equipment Transfer Agreement, dated April 15, 2008, by and among Corporation, Holder and U.S. Coal ("Equipment Transfer Agreement"). The indebtedness evidenced by this Note and the obligations created hereby are secured by, among other things, a purchase money security interest in the "Equipment", as defined in and conveyed by the Equipment Transfer Agreement and related documents. U.S. Coal owns 100% of the issued and outstanding capital stock of Corporation and will receive substantial economic benefit from (i) Corporation's use of the Equipment, and (ii) other good and valuable consideration from Holder and such other benefits provided to U.S. Coal by the Holder, the receipt and adequacy of which are hereby acknowledged by U.S. Coal. In consideration of the substantial economic benefit that U.S. Coal will receive from the Equipment, and in order to induce Holder to sell the Equipment to Corporation, without which inducement Holder would be unwilling to sell the Equipment to Corporation, U.S. Coal has agreed to make the principal amount of this Note convertible into shares of the common stock of U.S. Coal, pursuant to the terms and conditions of this Agreement.

The unpaid principal balance of, and all accrued interest on, this Note, unless sooner paid or converted into "Conversion Shares" as set forth in Section 6 of this Note, shall be due and payable in full on April 15, 2012 (the "Maturity Date"). On the Maturity Date, the entire unpaid principal balance of, and all accrued but unpaid interest on, this Note shall be finally due and payable in full, notwithstanding anything in this Note that may be interpreted to the contrary. Corporation acknowledges that Holder has not agreed to extend the Maturity Date of this Note or to refinance this Note.

Subject to the terms of Section 4.1 of the Equipment Transfer Agreement, the Corporation shall have the right to setoff the amount of any indemnity to which the Corporation is entitled from Holder under the indemnity provisions of the Equipment Transfer Agreement against any amounts payable or deliverable to Holder pursuant to or connection with the Equipment Transfer Agreement, including, without limitation, against any amounts payable to Holder under this Note.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

**1.    Interest.** The outstanding principal balance of this Note, as the same shall exist from time to time, shall bear interest from and after April 1, 2008, until this Note is paid in full or is converted into Conversion Shares as set forth in Section 6 of this Note, at a fixed rate per annum equal to eight percent (8.0%) ("Interest Rate"). Interest payments shall be made by Corporation to Holder commencing September 15, 2008, and shall be payable on the fifteenth (15th) day of each month thereafter, at Holder's sole option either in cash or in additional notes, identical in all respects to this Note except as to the principal amount thereof (each, an "additional Note", and collectively, "Additional Notes").

**2.    Payment.** Unless and until this Note is converted into Conversion Shares as set forth in Section 6 of this Note, for each ton of coal produced and/or cleaned with the Equipment during any calendar month ("Equipment Tonnage"), Corporation shall make payments on this Note to Holder equal to Four Dollars ($4.00) per Ton (the "Monthly Payments"), such payments to be made in cash. For purposes of this Agreement, a "Ton" shall mean 2000 net pounds based on the weight of the coal prior to any production and cleaning.

The Monthly Payments shall be made on the 15th day of each month with respect to Equipment Tonnage from the preceding month. Each payment of a Monthly Payment shall be accompanied by a certificate executed by the Corporation's Chief Financial Officer showing the Equipment Tonnage produced and cleaned during the prior month by weight based on certified scales, or other reasonable and verifiable weighing method, and the calculation of the Monthly Payment due thereon. All cash payments to be made hereunder by Corporation to Holder shall be by wire transfer in immediately available funds to such account as Holder may from time to time designate in writing to

2

Corporation, or in such other manner and/or location as Holder may from time to time designate in writing.

Holder and its representatives, accountants and advisors shall have reasonable access to appropriate business records of Corporation necessary for the purpose of verifying the calculation of the Equipment Tonnage and Monthly Payments. Corporation agrees to provide such representatives, accountants and advisors access to such books and records on reasonable notification and to provide them, upon request, copies of such books and records. In the event an examination and review of Corporation's books and records reveals an overpayment or underpayment, the difference shall be paid to the party entitled to it within ten (10) days after receipt of written demand for the payment of the overpayment or underpayment, as the case may be.

3.     **Prepayment**. Subject to the last two sentences of this Section 3, U.S. Coal shall pay the Holder the amount of any Mandatory Excess Prepayments and Mandatory Refinancing Prepayments to which it is entitled pursuant to and as such terms are defined in the First Amendment to the Second Amended and Restated Credit Agreement and Value Right Agreement, dated as of September 30, 2009 (as amended, restated, supplemented or otherwise modified from time to time) (the "First Amendment"), by and among the Corporation, U.S. Coal Corporation, Licking River Resources, Inc., Oak Hill Coal, Inc., S. M. & J., Inc., Fox Knob Coal Co., Inc., Sandlick Coal Company, LLC, Wilmington Trust Company, and East Coast Miner LLC, a copy of which agreement is attached as Exhibit C hereto. In addition, subject to the last two sentences of this Section 3, this Note may be prepaid in whole or in part at any time, without premium or penalty. Any payment on this Note shall be applied first to amounts due hereunder other than principal and interest, then to accrued interest due and owing, and then to principal due. Corporation acknowledges that Corporation is not authorized to re-borrow any portion of any amount prepaid or repaid on this Note. Notwithstanding anything contained in this Note to the contrary, Holder shall have the right to convert all or any portion of this Note and any Additional Notes into Conversion Shares at the applicable Conversion Price (as such term is defined in Section 6 hereof). Corporation shall give Holder no less than ten days' notice prior to any proposed prepayments or repayments under this Note, during which time Holder shall have the right to instead convert all or any portion of this Note into Conversion Shares.

4.     **Late Payment.** In the event any installment of principal and/or interest on this Note is overdue for more than five (5) days past the due date thereof under the terms of this Note, the Holder may, at any time thereafter, increase the interest rate applicable to the outstanding principal balance of this Note to a rate that is five percent (5%) in excess of the rate specified above and otherwise applicable to the principal of this Note (the "Late Payment Rate"). If any installment of interest or principal on this Note is paid by a check without sufficient funds, Corporation shall pay Holder a $30.00 processing fee. If any payment due under this Note is five (5) days or more late, the Corporation shall pay five percent (5%) of the late payment as a late charge ("Late Charge"), which Late Charge shall be in addition to the Late Payment Rate. The assessment or collection of Late Payment Rate and/or the Late Charge shall not constitute a waiver of any default or event of default resulting from any failure to timely pay any payment due pursuant to this Note or otherwise.

5.    **Events of Default; Negative Covenants**. (a) If (i) there is a default in the payment of principal and/or interest as and when the same is or becomes due and payable hereunder and such default continues for a period of five (5) days following the due date thereof; (ii) the Corporation or U.S. Coal fails in the timely performance of any term, covenant or condition required to be kept, observed or performed under this Note other than as set forth in subsection (i) above and the same is not fully corrected to the complete satisfaction of the Holder within thirty (30) days after Holder has given Corporation written notice thereof; (iii) there is a default or an event of default under any note or other payment obligation that gives the Holder or payee the right to accelerate the debt; (iv) if any event of default occurs under the documents described on <u>Exhibit A</u>, attached hereto and incorporated herein by reference, or any documents related thereto; (v) Holder's security interest in the Equipment under the Security Agreement made as of April 15, 2008 by and among Corporation and the Secured Parties set forth therein shall cease to be a first priority purchase money security interest, subject to existing federal, state and local tax liens on the Equipment and the security interests in the Equipment of Truck International Fund, LP, Shelter Island Opportunity Fund, LLC and Truk Opportunity Fund, LLC; or (vi) (a) the Corporation or U.S. Coal or any of their respective subsidiaries shall commence, or there shall be commenced against the Corporation, U.S. Coal or any such subsidiary, a case under any applicable bankruptcy or insolvency laws as now or hereafter in effect or any successor thereto, or the Corporation or any subsidiary commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Corporation, or any subsidiary thereof, (b) there is commenced against the Corporation, U.S. Coal, or any subsidiary of either thereof any such bankruptcy, insolvency or other proceeding which remains undismissed for a period of 60 days, or (c) the Corporation, U.S. Coal or any subsidiary of either thereof is adjudicated by a court of competent jurisdiction insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered, (d) the Corporation, U.S. Coal  or any subsidiary of either thereof suffers any appointment of any custodian or the like for it or any substantial part of its property which continues undischarged or unstayed for a period of 60 days, (e) the Corporation, U.S. Coal or any subsidiary of either thereof makes a general assignment for the benefit of creditors, (f) the Corporation, U. S. Coal or any subsidiary of either thereof shall fail to pay, or shall state that it is unable to pay, or shall be unable to pay, its debts generally as they become due, (g) the Corporation, U.S. Coal or any subsidiary of either thereof shall call a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (h) the Corporation, U.S. Coal or any subsidiary of either thereof shall by any act or failure to act expressly indicate its consent to, approval of or acquiescence in any of the foregoing, or (i) any corporate or other action is taken by the Corporation, U.S. Coal or any subsidiary of either thereof for the purpose of effecting any of the foregoing;

then such occurrence, or the occurrence of more than one, shall constitute an "Event of Default" under this Note.  Upon the occurrence of any Event of Default, the Holder or any subsequent holder of this Note may, without notice or demand, declare all sums of principal and interest evidenced hereby to be accelerated and immediately due and payable, and the Holder may thereupon exercise all rights and remedies granted it under

4

any security instruments or available to it in law or equity.  Upon any Event of Default under this Note, the undersigned Corporation agrees to pay all costs of collection, and/or costs relating to modifying or further securing the Note, when incurred by the Holder, including, but not limited to, reasonable attorneys' fees.  If any suit or action is instituted to enforce this Note, the undersigned Corporation agrees to pay to the Holder, in addition to the costs and disbursements otherwise allowed by law, such sums as may be adjudged reasonable attorneys' fees, court costs, and all other expenses in collecting or attempting to collect or securing or attempting to secure this Note or in connection with any of the foregoing, provided the same is allowed by applicable law.

(b) So long as any portion of this Note remains outstanding, (i) none of U.S. Coal, the Corporation, or any of their respective subsidiaries shall enter into, create, incur, assume or suffer to exist any lien of any kind on any of the Equipment, and (ii) Corporation shall not in any manner whatsoever transfer, sell, lease, sell and leaseback, hypothecate, or otherwise dispose of or attempt to dispose of, any of the Equipment; except in each of (i) and (ii) above with respect to liens to the Senior Lender in connection with the First Amendment, First Security Agreement Amendment (as defined in the First Amendment) or Post-Closing Agreement (as defined in the First Amendment).

## 6.   Conversion.

(a)   Until all amounts outstanding under this Note or any Additional Note have been paid in full, all such amounts of this Note and any Additional Note (whether of principal, interest, or otherwise), shall be convertible into fully paid and non-assessable shares of common stock of U.S. Coal, par value $0.001 per share (the "Common Stock"), at the option of the Holder, in whole or in part at any time and from time to time (subject to the limitations on conversion set forth in Section 6(c) hereof). The Holder shall effect conversions by delivering to U.S. Coal the form of Notice of Conversion attached hereto as Exhibit B (a "Notice of Conversion"), specifying therein the amount of this Note or any Additional Note to be converted and the date on which such conversion is to be effected (a "Conversion Date").  If no Conversion Date is specified in a Notice of Conversion, the Conversion Date shall be the date that such Notice of Conversion is provided hereunder.  To effect conversions hereunder, the Holder shall not be required to physically surrender this Note or any Additional Note to U.S. Coal unless the entire amount of this Note or any Additional Note has been so converted. Conversions hereunder shall have the effect of lowering first any outstanding amounts of interest hereunder, and then the outstanding principal amount of this Note in an amount equal to the applicable conversion.  The Holder and U.S. Coal shall maintain records showing the amount converted and the date of such conversions. U.S. Coal shall deliver any objection to any Notice of Conversion within 3 business days of receipt of such notice.  In the event of any dispute or discrepancy, the records of the Holder shall be controlling and determinative in the absence of manifest error. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note may be less than the amount stated on the face hereof. However, at U.S. Coal's request, the Holder shall surrender this Note to U.S.

Coal within five (5) business days following such request so that a new Note reflecting the correct principal amount may be issued to Holder. The number of shares of Common Stock into which this Note and any Additional Note may be converted ("Conversion Shares"), shall be determined by dividing the aggregate amount of this Note, and any such Additional Note to be so converted by the Conversion Price. For the purposes of this Note, the term "Conversion Price" shall initially be $1.75, subject to adjustment as set forth in Section 7 hereof.

(b)      Mechanics of Conversion

i.      (intentionally omitted).

ii.      Delivery of Certificate Upon Conversion. Not later than three business days after any Conversion Date, U.S. Coal will deliver to the Holder a certificate or certificates representing the Conversion Shares which shall be free of restrictive legends and trading restrictions (other than those required hereby) representing the number of shares of Common Stock being acquired upon the conversion of Notes. U.S. Coal shall, if available and if allowed under applicable securities laws, use its best efforts to deliver any certificate or certificates required to be delivered by U.S. Coal under this Section electronically through the Depository Trust Corporation or another established clearing corporation performing similar functions.

iii.      Reservation of Shares Issuable Upon Conversion. U.S. Coal covenants that it will at all times reserve and keep available out of its authorized and unissued shares of Common Stock solely for the purpose of issuance upon conversion of this Note and any Additional Notes, free from preemptive rights or any other actual contingent purchase rights of persons other than the Holders, not less than such number of shares of the Common Stock as shall be issuable (taking into account the adjustments and restrictions of Section 7) upon the conversion of the outstanding amount of this Note and any additional Notes. U.S. Coal covenants that all shares of Common Stock that shall be so issuable shall, upon issue, be duly and validly authorized, issued and fully paid, nonassessable.

iv.      Fractional Shares. Upon a conversion hereunder U.S. Coal shall not be required to issue stock certificates representing fractions of shares of the Common Stock, but shall make a cash payment in respect of any final fraction of a share based on the outstanding amount of this Note that is not so converted.

v.      Transfer Taxes. The issuance of certificates for shares of the Common Stock on conversion of this Note shall be made without charge to the Holder thereof for any documentary stamp or similar taxes that may be payable in respect of the issue or delivery

6

of such certificate, provided that U.S. Coal shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such certificate upon conversion in a name other than that of the Holder of such Note so converted and U.S. Coal shall not be required to issue or deliver such certificates unless or until the person or persons requesting the issuance thereof shall have paid to U.S. Coal the amount of such tax or shall have established to the satisfaction of U.S. Coal that such tax has been paid.

7.      **Protection Against Dilution.**  In the event that U.S. Coal shall, at any time prior to the exercise of conversion rights hereunder: (i) declare or pay to the holders of the Common Stock a dividend payable in any kind of shares of capital stock of U.S. Coal; (ii) combine, subdivide or otherwise reclassify its Common Stock into the same or a different number of shares with or without par value, or into shares of any class or classes; (iii) transfer its property as an entirety or substantially as an entirety to any other company; or (iv) make any distribution of its assets to holders of its Common Stock as a liquidation or partial liquidation dividend or by way of return of capital; then, in each case, the Conversion Price, and the number and kind of shares of Common Stock receivable upon conversion of this Note, in effect at the time of the record date for such dividend or distribution, or of the effective date of such subdivision, combination or reclassification, shall be proportionally adjusted so that the Holder upon the subsequent exercise of conversion rights, shall receive, in addition to or in substitution for the shares of Common Stock to which it would otherwise be entitled upon such exercise, such additional shares of capital stock or scrip of U.S. Coal, such reclassified shares of capital stock of U.S. Coal, such shares of the securities or property of U.S. Coal resulting from such transfer, or such assets of U.S. Coal, which it would have been entitled to receive had it exercised these conversion rights prior to the happening of any of the foregoing events.  Such adjustment shall be made successively whenever any of the foregoing events shall occur.

8.      **Certain Covenants, Representations and Warranties.**  The Corporation and U.S. Coal jointly and severally covenant and agree that, so long as any principal of, or interest on, this Note shall remain unpaid, unless the Holder shall otherwise consent in writing, they will comply with the following terms:

(i)      All shares issuable upon conversion of this Note will, when so issued, be duly authorized, validly issued, fully paid and non-assessable and free of all pre-emptive rights.  If necessary, U.S. Coal shall promptly seek stockholder approval to amend U.S. Coal's Certificate of Incorporation to increase the authorized number of shares of Common Stock of U.S. Coal by at least the number of shares necessary to provide for exercise of the entire outstanding balance under this Note and upon such approval shall cause such amendment to be filed with the Secretary of State of the State of Delaware, and thereafter U.S. Coal shall keep reserved out of its authorized but unissued shares of Common Stock a number of shares sufficient to provide for the

issuance of shares of Common Stock upon full conversion of the entire outstanding balance under this Note.

(ii)    Until the payment in full of this Note, Corporation and U.S. Coal shall preserve, renew and keep in full force and effect their legal existence.

(iii)    The Corporation and U.S. Coal will furnish to the Holder:

(1)    as soon as possible, and in any event within ten (10) days after obtaining knowledge of the occurrence of (A) an "Event of Default" (as defined in Section 5 hereof) or (B) an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default, the written statement of the Chief Executive Officer or the Chief Financial Officer of the Corporation or U.S. Coal, as the case may be, setting forth (x) the details of such Event of Default or other event and (y) the action which the Corporation and/or U.S. Coal proposes to take with respect thereto;

(2)    promptly after the sending or filing thereof, copies of all financial statements which the Corporation, U.S. Coal or any of their respective subsidiaries sends to the holders of its equity securities; and

(3)    promptly after the commencement thereof, notice of each action, suit or proceeding before any court or other governmental authority or other regulatory body or any arbitrator as to which there is a reasonable probability of a determination that would (A) materially and adversely impact the ability of the Corporation and/or U.S. Coal and their respective subsidiaries to conduct their business, (B) materially and adversely affect the business, operations or financial condition of the Corporation and/or U.S. Coal and their respective subsidiaries taken as a whole, or (C) impair the validity or enforceability of this Note or the ability of the Corporation and/or U.S. Coal to perform its obligations under this Note.

(iv)    The Corporation and U.S. Coal will comply, in all material respects with all applicable laws, rules, regulations and orders, except to the extent that noncompliance would not have a material adverse effect upon the business, operations or financial condition of the Corporation or U.S. Coal taken as a whole.

(v)    The Corporation and U.S. Coal will maintain and preserve, all of their properties which are necessary in the proper conduct of their respective businesses in good working order and condition, ordinary wear and tear excepted, and comply, at all times with the provisions of all leases to which they are a party as lessee or under which they occupy property, so as to prevent any forfeiture or material loss thereof or thereunder.

(vi)    The Corporation and U.S. Coal will maintain, with responsible and reputable insurers, insurance with respect to their respective properties and business, in such amounts and covering such risks, as is carried generally in accordance with sound business practice by companies in similar businesses in the same localities in which Corporation and U.S. Coal are situated.

(vii)    If, at any time while this Note is outstanding, U.S. Coal shall pay any dividend payable in cash or in Common Stock, shall offer to the holders of its Common Stock for subscription or purchase by them any shares of stock of any class or any other rights, or shall enter into an agreement to merge or consolidate with another corporation, the Corporation shall cause notice thereof to be mailed to the Holder of this Note at its address appearing on the registration books of the Corporation, at least ten (10) days prior to the record date as of which holders of Common Stock shall participate in such dividend, distribution or subscription or other rights or at least ten (10) days prior to the effective date of the merger or consolidation.

(viii)    The Corporation and U.S. Coal shall keep adequate records and books of account, with complete entries made in accordance with generally accepted accounting principles, reflecting all of its financial and other business transactions.

9.    **Assignment.**  Subject to the restrictions on transfer described in Section 12 below, the rights and obligations of the Corporation, U.S. Coal and the Holder of this Note shall be binding upon and inure to the benefit of the successors, assigns, heirs, administrators and transferees of the parties, if any.

10.    **Amendment.** Any provision of this Note may be amended or modified only upon the written consent of the Corporation, U.S. Coal and the Holder.

11.    **Waiver.**  Failure of the Holder to exercise any of its rights and remedies shall not constitute a waiver of the right to exercise the same at that or any other time. All rights and remedies of the Holder following an Event of Default hereunder or the Equipment Transfer Agreement shall be cumulative to the greatest extent permitted by law.  Time shall be of the essence in the payment of all amounts due under this Note and the performance of the Corporation's and U.S. Coal's other obligations hereunder.

The undersigned Corporation and U.S. Coal, and any endorsers or guarantors hereof, hereby expressly waives presentment, demand, notice of dishonor, protest, notice of protest and nonpayment and further waives all exemptions to which Corporation and/or U.S. Coal may now or hereafter be entitled under the laws of New York or any other state or of the United States, and further agrees that Holder or any subsequent holder hereof shall have the right, without notice, to deal in any way, at any time, with Corporation, U.S. Coal or any endorsers hereof, and to grant Corporation and/or U.S. Coal any extension of time for payment of this Note, or any other indulgence or forbearance whatsoever, and may release any security for the payment of this Note, and/or modify the terms of any of the security instruments referred to herein or otherwise securing or pertaining to this Note, and may release the Corporation, U.S. Coal or any endorser of this Note from liability for payment hereof, in every instance without the consent of the Corporation, U.S. Coal or any endorsers hereof and without in any manner affecting the liability of the Corporation or U.S. Coal hereunder, and all without waiving any rights the Holder or any subsequent holder of this Note may have hereunder or by virtue of the laws of New York or of any other state or of the United States.  This Note is a full recourse obligation of Corporation.

**12.    Transfer of this Note or Securities Issuable on Conversion Hereof.** The Holder shall not make any offers or sales of this Note, or the securities into which this Note may be converted, other than pursuant to a registration statement under the Securities Act or pursuant to an exemption from, or transaction not subject to, registration under the Securities Act. This Note, if transferred, and each certificate representing the securities thus transferred shall bear a legend similar to the legend appearing on the face of this Note in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Corporation such legend is not required in order to ensure compliance with the Securities Act. Any shares of Common Stock issued upon the conversion of this Note or any Additional Note shall be entitled to all of the registration rights set forth on Annex I to that certain Rights Agreement, dated as of April 15, 2008, by and between U.S. Coal, Holder, CAMHZN Master LDC, Futurtec L.P., Michael Miller and Lawrence Kaplan, the terms of which are expressly incorporated herein by reference and made a part hereof.

**13.    Notices.** All notices, demands, requests and other communications to be given or delivered under or by reason of the provisions of this Note shall be in writing and shall be deemed to have been given personally or when mailed by certified or registered mail, return receipt requested and postage prepaid, and addressed to the addresses of the respective parties set forth below or to such changed addresses as such parties may have fixed by notice; provided, however, that notice of change of address shall be effective only upon receipt:

To the Corporation:

J.A.D. Coal Company, Inc.
c/o U.S. Coal Corporation
448 Lewis Hargett Circle
Lexington, Kentucky 40503
Attn: Robert B. Gabbard
        Chief Executive Officer


To U.S. Coal

U.S. Coal Corporation
448 Lewis Hargett Circle
Lexington, Kentucky 40503
Attn: Robert B. Gabbard
        Chief Executive Officer


To the Holder:

Camofi Master LDC
c/o Centrecourt Asset Management, LLC
350 Madison Avenue, 8th Floor
New York, New York 10017
Attn: Michael Loew

General Counsel

**14.    No Stockholder Rights.** Nothing contained in this Note shall be construed as conferring upon the Holder or any other person the right to vote or to consent or to receive notice as a stockholder in respect of meetings of stockholders for the election of directors of U.S. Coal or any other matters or any rights whatsoever as a stockholder of the U.S. Coal; and no dividends shall be payable or accrued in respect of this Note or the interest represented hereby or, prior to conversion hereof, the Common Stock obtainable as a result of such conversion and then only to the extent that, this Note shall have been so converted.

**15.    Applicable Law.** This Note shall be governed by and construed in accordance with the laws of the State of New York .

**16.    Enforceability.** The invalidity or unenforceability of any provision of this Note in general or in any particular circumstance shall not affect the validity or enforceability of any one or more of the other provisions of this Note or the validity of such provision as applied to any other circumstance. The Corporation and U.S. Coal agree that this Note and all provisions hereof shall be interpreted so as to give effect and validity to all the provisions hereof to the fullest extent permitted by law. Any references in this Note to the Equipment Transfer Agreement or any other document related to the loan evidenced hereby shall be deemed to be references to such agreements, instruments and documents as they now exist or are hereafter modified in writing by the parties thereto.

**17.    Merger.** This Note constitutes the entire agreement of the parties, and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

**18.    Heading; References.** All headings used herein are used for convenience only and shall not be used to construe or interpret this Note. Except where otherwise indicated, all references herein to Sections refer to Sections hereof.

**19.    Amendment and Restatement.** This Note amends and restates that certain Convertible Promissory Note dated April 15, 2008 made by the Corporation in favor of the Holder. This Note is not being given by the Corporation or accepted by the Holder in satisfaction of said indebtedness or as a novation with respect thereto.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Corporation and U.S. Coal have executed this Note on the date first above written.

J.A.D. COAL COMPANY, INC

By: _____

Title: _____

("Corporation")

U.S. COAL CORPORATION

By _____

Title: _____

("U.S. Coal")

12

**EXHIBIT A**

**Cross Default Documents**

## EXHIBIT B

## NOTICE OF CONVERSION

**(To Be Signed Only Upon Conversion of Note)**

The undersigned, the holder of the foregoing Note, hereby surrenders such original Note for conversion into shares shares of the Common Stock of U.S. Coal Corporation, to the extent of $_____ unpaid principal amount of such Note and requests that the certificates for such shares be issued in the name of, and delivered to, _____ whose address is _____.

Dated:_____

_____

(Signature must conform in all respects to the name of the Holder as specified on the face of the Note)

_____

(Address)

**EXHIBIT C**

**FIRST AMENDMENT**

(See Attached)

FILED: NEW YORK COUNTY CLERK 02/14/2012

NYSCEF DOC. NO. 6

INDEX NO. 650411/2012

RECEIVED NYSCEF: 02/14/2012

# Exhibit 4

EXECUTION VERSION

## SECOND AMENDED AND RESTATED CREDIT AGREEMENT

dated as of

August 29, 2008

among

### U.S. COAL CORPORATION,
as Borrower,

and

### THE SUBSIDIARIES OF THE BORROWER FROM TIME TO TIME PARTY HERETO,
as Guarantors,

and

### WILMINGTON TRUST COMPANY,
as Collateral Agent,

and

### JMB CAPITAL PARTNERS MASTER FUND, L.P.,
as Lender

# TABLE OF CONTENTS

Page

ARTICLE I.      Definitions...................................................................................... 1
    SECTION 1.01      Defined Terms ................................................................. 1
    SECTION 1.02      Terms Generally............................................................ 20
    SECTION 1.03      Accounting Terms; GAAP.............................................. 20

ARTICLE II.     THE LOAN ..................................................................................... 20
    SECTION 2.01      The Loan.......................................................................... 20
    SECTION 2.02      Repayment of the Loan; Evidence of Debt.................... 20
    SECTION 2.03      Prepayment of Loan....................................................... 21
    SECTION 2.04      Fees.................................................................................. 22
    SECTION 2.05      Interest............................................................................. 22
    SECTION 2.06      Taxes................................................................................ 22
    SECTION 2.07      Payments Generally; Allocation of Proceeds; Sharing of
                     Set-offs............................................................................ 23
    SECTION 2.08      Indemnity for Returned Payments ................................ 24
    SECTION 2.09      Pro Rata Treatment........................................................ 24
    SECTION 2.10      Effect of Amendment and Restatement. ....................... 24

ARTICLE III.    Representations and Warranties....................................................... 24
    SECTION 3.01      Organization; Powers..................................................... 24
    SECTION 3.02      Authorization; Enforceability. ...................................... 25
    SECTION 3.03      Governmental Approvals; No Conflicts. ....................... 25
    SECTION 3.04      Financial Condition; No Material Adverse Change...... 25
    SECTION 3.05      Properties. ...................................................................... 26
    SECTION 3.06      Litigation and Environmental Matters .......................... 26
    SECTION 3.07      Compliance with Laws and Agreements. ...................... 27
    SECTION 3.08      Investment Company Status. ......................................... 27
    SECTION 3.09      Taxes................................................................................ 27
    SECTION 3.10      ERISA.............................................................................. 28
    SECTION 3.11      Disclosure........................................................................ 28
    SECTION 3.12      Material Agreements; Permitted/Pending Reserves .... 28
    SECTION 3.13      Solvency.......................................................................... 28
    SECTION 3.14      Insurance......................................................................... 29
    SECTION 3.15      Capitalization and Subsidiaries..................................... 29
    SECTION 3.16      Security Interest in Collateral ....................................... 29
    SECTION 3.17      Employment Matters...................................................... 30
    SECTION 3.18      Affiliate Transactions.................................................... 30
    SECTION 3.19      Common Enterprise........................................................ 30
    SECTION 3.20      MLCI Agreements .......................................................... 30

ARTICLE IV.    Conditions ....................................................................................... 30
    SECTION 4.01      Closing Date.................................................................... 30

ARTICLE V.     Affirmative Covenants.................................................................... 33
    SECTION 5.01      Financial Statements; Other Information....................... 33
    SECTION 5.02      Notices of Material Events............................................. 35

i

## TABLE OF CONTENTS

**Page**

SECTION 5.03    Existence; Conduct of Business. ................................... 35
SECTION 5.04    Payment of Obligations. ............................................... 36
SECTION 5.05    Maintenance of Properties ........................................... 36
SECTION 5.06    Books and Records; Inspection Rights.. ...................... 36
SECTION 5.07    Compliance with Laws. ................................................ 36
SECTION 5.08    Intentionally Omitted. .................................................. 36
SECTION 5.09    Insurance ...................................................................... 36
SECTION 5.10    Casualty and Condemnation.. ..................................... 37
SECTION 5.11    Environmental Compliance. ......................................... 37
SECTION 5.12    Governmental Authorizations. ..................................... 38
SECTION 5.13    Additional Collateral; Further Assurances. .................. 38
SECTION 5.14    Compliance with Terms of Leaseholds. ........................ 39

ARTICLE VI    Negative Covenants .............................................................. 40
SECTION 6.01    Indebtedness. ............................................................... 39
SECTION 6.02    Liens. ............................................................................ 42
SECTION 6.03    Fundamental Changes. ................................................. 44
SECTION 6.04    Investments, Loans, Advances, Guarantees and
                Acquisitions.: ............................................................... 44
SECTION 6.05    Asset Sales ................................................................... 45
SECTION 6.06    Sale and Leaseback Transactions. ................................ 46
SECTION 6.07    Swap Agreements.. ...................................................... 46
SECTION 6.08    Restricted Payments; Certain Payments of Indebtedness. . ........ 46
SECTION 6.09    Transactions with Affiliates. ........................................ 48
SECTION 6.10    Restrictive Agreements. ............................................... 48
SECTION 6.11    Amendment of Material Documents. ............................ 49
SECTION 6.12    Intentionally Omitted. .................................................. 49

ARTICLE VII.    Events of Default ............................................................... 49

ARTICLE VIII.    Miscellaneous ................................................................... 52
SECTION 8.01    Notices ......................................................................... 52
SECTION 8.02    Waivers; Amendments. ................................................. 54
SECTION 8.03    Expenses; Indemnity; Damage Waiver. ....................... 54
SECTION 8.04    Successors and Assigns. .............................................. 56
SECTION 8.05    Survival. ....................................................................... 57
SECTION 8.06    Counterparts; Integration; Effectiveness. .................... 57
SECTION 8.07    Severability .................................................................. 57
SECTION 8.08    Right of Setoff. ............................................................. 57
SECTION 8.09    Governing Law; Jurisdiction; Consent to Service of
                Process. ....................................................................... 58
SECTION 8.10    WAIVER OF JURY TRIAL. ........................................ 58
SECTION 8.11    Headings. ..................................................................... 59
SECTION 8.12    Confidentiality. ............................................................ 59
SECTION 8.13    Violation of Law. .......................................................... 59
SECTION 8.14    USA PATRIOT ACT. ................................................... 59

ii

# TABLE OF CONTENTS

**Page**

SECTION 8.15          Disclosure.. ....................................................................... 59
SECTION 8.16          Interest Rate Limitation. ..................................................... 59
SECTION 8.17          Release.. ............................................................................ 60
ARTICLE IX.           LOAN GUARANTY ............................................................ 60
SECTION 9.01          Guaranty. ........................................................................... 60
SECTION 9.02          Guaranty of Payment.. ....................................................... 61
SECTION 9.03          No Discharge or Diminishment of Loan Guaranty. .................. 61
SECTION 9.04          Defenses Waived. .............................................................. 62
SECTION 9.05          Rights of Subrogation.. ...................................................... 62
SECTION 9.06          Reinstatement; Stay of Acceleration. ................................. 62
SECTION 9.07          Information. ....................................................................... 62
SECTION 9.08          Reserved. ........................................................................... 63
SECTION 9.09          Taxes. ................................................................................. 63
SECTION 9.10          Maximum Liability. ........................................................... 63
SECTION 9.11          Contribution. ..................................................................... 63
SECTION 9.12          Liability Cumulative.. ........................................................ 64
ARTICLE X.       THE COLLATERAL AGENT ......................................... 64
SECTION 10.01         Authorization and Action. ................................................. 64
SECTION 10.02         Collateral Agent's Reliance, Etc. ...................................... 65
SECTION 10.03         Indemnification. ................................................................. 66
SECTION 10.04         Successor Collateral Agent. .............................................. 66
SECTION 10.05         Limitation on Duty of Collateral Agent in Respect of
                      Collateral. .......................................................................... 67
SECTION 10.06         No Discretion.. ................................................................... 67
SECTION 10.07         No Representations or Warranties as to the Collateral or
                      Loan Documents.. .............................................................. 67
SECTION 10.08         No Segregation of Monies; No Interest.. ........................... 68
SECTION 10.09         Action upon Instructions. .................................................. 68
SECTION 10.10         Doing Business in Other Jurisdictions. .............................. 69
SECTION 10.11         Rights; Powers; Litigation. ................................................ 69
SECTION 10.12         Limitation on Damages. ..................................................... 69
SECTION 10.13         Amendments; Modifications; Waivers. ............................. 69
SECTION 10.14         Independent Credit Investigation. ..................................... 70
SECTION 10.15         The Collateral Agent in Its Individual Capacity. ............... 70
SECTION 10.16         Knowledge of Default, etc.. ............................................... 70
SECTION 10.17         No Duty to Provide Additional Credit Information; No
                      Responsibility for Perfection or Priority of Liens, etc. ........... 70
SECTION 10.18         Fees; Expenses. ................................................................. 70
SECTION 10.19         Force Majeure. ................................................................... 71
SECTION 10.20         Merger of Collateral Agent. .............................................. 71

iii

## SECOND AMENDED AND RESTATED CREDIT AGREEMENT

**THIS SECOND AMENDED AND RESTATED CREDIT AGREEMENT** dated as of August 29, 2008 (this "Agreement"), by and between U.S. COAL CORPORATION, a Delaware corporation formerly known as "U.S. Coal Acquisition Corp.", as borrower (the "Borrower"), the Guarantors (as defined herein), WILMINGTON TRUST COMPANY, as Collateral Agent, and JMB CAPITAL PARTNERS MASTER FUND, L.P., a limited partnership registered and organized under the laws of the Cayman Islands (in its individual capacity, "JMB") (successor in interest to FURSA Master Global Event Driven Fund L.P. ("FURSA") and Grand Central Asset Trust, MLN Series ("GCAT" and, collectively with FURSA, the "Prior Lenders")), as Lender, and the other Lenders signatory hereto from time to time.

## WITNESSETH

**WHEREAS**, the Borrower is party to that certain Amended and Restated Credit Agreement, dated as of February 16, 2007, as amended by that certain Amendment dated as of February 28, 2007, that certain Second Amendment to Credit Agreement dated as of March 5, 2007, that certain Third Amendment to Credit Agreement dated as of April 13, 2007 and that certain Fourth Amendment to Credit Agreement dated as of November 16, 2007, among the Borrower, the Guarantors, the Collateral Agent and the Prior Lenders, and as further amended by that certain Waiver and Restatement Agreement dated as of April 15, 2007, among the Borrower, the Guarantors, the Collateral Agent, the Lender and MLCI (as defined below) (collectively, the "Existing Credit Agreement");

**WHEREAS**, GCAT assigned its interest in the Existing Credit Agreement and the other Loan Documents to FURSA, which subsequently assigned all of its interest in the Existing Credit Agreement and the other Loan Documents to Guggenheim Capital Markets, LLC, which subsequently assigned all of its interest in the Existing Credit Agreement and the other Loan Documents to JMB pursuant to an Assignment and Assumption, dated as of March 5, 2008;

**WHEREAS**, the parties to the Existing Credit Agreement have agreed to amend and restate the Existing Credit Agreement as set forth herein;

**NOW, THEREFORE, IN CONSIDERATION** of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

ARTICLE I.   Definitions

SECTION 1.01      Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"2007 Bridge Financing" means the loan to the Borrower represented by secured 8% Promissory Notes Due October 31, 2008 issued by the Borrower between October 2007 and March 2008 in an aggregate principal amount of $3,775,000, of which $1,616,450 remains outstanding as of the date of this Agreement, with a maturity date of the earlier to occur of: (i) October 31, 2008, and (ii) any or all of the Loan Parties having raised, in the aggregate, commencing on the date of issuance of such secured 8% Promissory Notes, (x) $20,000,000 of

gross proceeds from the issuance of Equity Interests or (y) $30,000,000 of gross proceeds from debt financing.

"2007 Bridge Notes" means the secured 8% Promissory Notes Due October 31, 2008 issued by the Borrower between October 2007 and March 2008 in respect of the 2007 Bridge Financing.

"Account" has the meaning assigned to such term in Section 9-102(a)(2) of the UCC.

"Account Debtor" means any Person obligated on an Account.

"Act" has the meaning assigned to such term in Section 8.14.

"Acquisition" means any transaction, or any series of related transactions, consummated on or after the date of this Agreement, by which any Loan Party (a) acquires any going business or all or substantially all of the assets of any Person, whether through purchase of assets, merger or otherwise or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the Equity Interests of a Person which has ordinary voting power for the election of directors or other similar management personnel of a Person (other than Equity Interests having such power only by reason of the happening of a contingency) or a majority of the outstanding Equity Interests of a Person.

"Additional Indebtedness" has the meaning assigned to such term in Section 6.01.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" has the meaning assigned to such term in the preamble.

"Amendment Fee" has the meaning assigned to such term in Section 2.04(a).

"Applicable Percentage" has the meaning assigned to such term in Section 9.11.

"A/R Facility" means the Loan Parties' $6,000,000 secured revolving line of credit with First Tennessee Bank, as described in the commitment letter and term sheet dated November 30, 2006.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning assigned to such term in the preamble.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Wilmington, Delaware are authorized or required by law to remain closed.

2

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Equivalents" means (a) securities issued or directly and fully guaranteed or insured by the United States of America and having a maturity of not more than 365 days from the date of acquisition; (b) certificates of deposit, time deposits and eurodollar time deposits with maturities of 365 days or less from the date of acquisition, bankers' acceptances with maturities not exceeding 365 days and overnight bank deposits, in each case, (i) with any Lenders, (ii) with any domestic office of Central Bank and Trust Co., or (iii) with any domestic commercial bank organized under the laws of the United States of America or any state thereof, in each case having a rating of not less than A or its equivalent by S&P or any successor and having capital and surplus in excess of $1,000,000,000; (c) repurchase obligations with a term of not more than seven (7) days for underlying securities of the types described in clauses (a) and (b) above; (d) any commercial paper or finance company paper issued by (i) any Lender or any holding company controlling any Lender or (ii) any other Person that is rated not less than "P-1" or "A-1" or their equivalents by Moody's or S&P or their successors; and (e) investments, classified in accordance with GAAP as current assets of the Borrower or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to investments of the character, quality and maturity described in clauses (a), (b), (c) and (d) of this definition.

"Centrecourt Amendment" means that certain Letter Agreement dated of even date herewith between the Loan Parties, CAMOFI Master LDC, a Cayman Islands limited duration company, and CAMHZN Master LDC, a Cayman Islands limited duration company, pursuant to which, among other things, CAMOFI Master LDC and CAMHZN Master LDC, individually and as holders of a majority of the outstanding principal amount of the Centrecourt Bridge Notes, (i) irrevocably amend that certain side letter between CAMOFI Master LDC and CAMHZN Master LDC and the Borrower dated as of April 14, 2008 such that the consent of CAMOFI Master LDC and CAMHZN Master LDC shall not be required for the Lenders to loan additional funds to the Borrower (ii) agree to certain amendments to the Centrecourt Securities Purchase Agreement, the Centrecourt Bridge Notes and the Centrecourt Security Agreement, (iii) consent to the execution of this Agreement, the Value Rights Agreement, and the other Loan Documents and (iv) waive any event of default under the Centrecourt Securities Purchase Agreement, the Centrecourt Bridge Notes and any other Transaction Document (as defined in the Centrecourt Securities Purchase Agreement) arising as a result of that certain Notice of Default dated July 1, 2008 issued by the Lender to the Borrower.

"Centrecourt Bridge Financing" means the secured bridge loan to the JAD Companies from the Centrecourt Bridge Lenders on April 15, 2008 in an aggregate initial principal amount of $5,000,000, plus the principal amount of any additional notes representing deferred or "PIK" interest, which amounts are guaranteed by the Borrower (such guarantee by Borrower being secured solely by a lien on the JAD Equity Interests) and mature on the earlier to occur of (i) the

consummation of an equity financing or a debt financing by Borrower (other than the Series B Offering and the Rifle Acquisition), which financing results in gross proceeds to Borrower of at least $20,000,000, (ii) the consummation of an initial public offering of Borrower's common stock, (iii) a "change of control" (as defined in the Centrecourt Bridge Notes), (iv) the disposition by the JAD Companies of the collateral in which the JAD Companies have granted a security interest to the Centrecourt Bridge Lenders pursuant to the Centrecourt Security Agreement, and (v) October 1, 2009.

"Centrecourt Bridge Lenders" means, collectively, (i) CAMOFI Master LDC, a Cayman Islands limited duration company, (ii) CAMHZN Master LDC, a Cayman Islands limited duration company, (iii) Futurtec, L.P., a Delaware limited partnership, (iv) Michael Miller and (v) Lawrence Kaplan, and the successors and assigns of each.

"Centrecourt Bridge Notes" means the secured notes issued by the JAD Companies to the Centrecourt Bridge Lenders in respect of the Centrecourt Bridge Financing, including any notes representing deferred or "PIK" interest issued pursuant to the terms thereof.

"Centrecourt Equipment" means the two (2) underground continuous miner spreads of equipment (Joy Manufacturing) and supporting equipment, as more particularly defined in Schedule 1.01 annexed hereto.

"Centrecourt Equipment Purchase" means the purchase by the JAD Companies of the Centrecourt Equipment, in consideration for the issuance of the Centrecourt Equipment Purchase Note.

"Centrecourt Equipment Purchase Note" means the Convertible Promissory Note in the principal amount of $4,800,000, dated as of April 15, 2008 and maturing on April 15, 2012, issued by J.A.D. Coal Company, Inc., a Virginia corporation, in respect of the Centrecourt Equipment Purchase in favor of CAMOFI Master LDC, a Cayman Islands limited duration company, and to which the Borrower is made a party thereto with respect to the convertible feature of the note and certain representations and warranties related thereto.

"Centrecourt Equity Registration Claim" means the claim of the Centrecourt Bridge Lenders, pursuant to the Centrecourt Rights Agreement, for up to $500,000 for potential damages if the Borrower fails to timely register such Equity Interests upon the happening of certain conditions, which right is unsecured.

"Centrecourt Guarantee" means the Guarantee dated as of April 15, 2008 by Borrower in favor of the Centrecourt Bridge Lenders.

"Centrecourt Put Right" means the right of the Centrecourt Bridge Lenders, pursuant to the Centrecourt Rights Agreement, to cause the Borrower to buy back from the Centrecourt Bridge Lenders certain Equity Interests in Borrower for an aggregate price of $2,700,000, which right is unsecured during both the term of this Agreement and the term of the Value Rights Agreement.

"Centrecourt Rights Agreement" means the Rights Agreement dated as of April 15, 2008 among the Borrower and the Centrecourt Bridge Lenders, pursuant to which the Centrecourt

4

Bridge Lenders have (i) the Centrecourt Put Right and (ii) the Centrecourt Equity Registration Claim.

"Centrecourt Securities Purchase Agreement" means the Securities Purchase Agreement dated as of April 15, 2008 among the Borrower, the JAD Companies and the Centrecourt Bridge Lenders in respect of the issuance of the issuance of the Centrecourt Bridge Notes.

"Centrecourt Security Agreement" means the Security Agreement dated as of April 15, 2008, among the Borrower, the JAD Companies and CAMOFI Master LDC, as Agent for the Centrecourt Bridge Lenders.

"Change in Control" means any of the following: (i) the Borrower shall cease to own, free and clear of all Liens or other encumbrances, at least 100% of the outstanding voting Equity Interests of the Coal Producers on a fully diluted basis, (ii) the sale, exchange or transfer, directly or indirectly, by any of the Borrower's stockholders, in a single transaction or series of related transactions to one or more unaffiliated third parties, of capital stock representing a majority of the voting power at elections of directors of the Borrower, other than a Reverse Merger upon consummation of which the current shareholders of the Borrower continue to own not less than 66 2/3rd % of the outstanding voting Equity Interests of Borrower, or (iii) the Employment Agreement dated as of January 5, 2007, between the Borrower and Robert Gabbard (the "Executive") is terminated without Cause (as such term is defined in such Employment Agreement) or by the Executive for Good Reason (as such term is defined in such Employment Agreement).

"Change in Law" means (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date.

"Charges" has the meaning assigned to such term in Section 8.16.

"Closing Date" means August 29, 2008.

"Coal Agreement" means those contracts now in effect or hereafter entered into by any Loan Party in the ordinary course of business for the sale, purchase, exchange, processing, extracting or handling of coal.

"Coal Producers" means, collectively, the Original Coal Producers and the New Coal Producers.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all property owned, leased or operated by a Person covered by the Collateral Documents and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Collateral Agent, for the benefit of the Lenders, to secure the Obligations, other than the Excluded Assets.

"Collateral Agent" has the meaning assigned to it in the Security Agreement.

"Collateral Documents" means, collectively, the Security Agreement and any other documents granting a Lien upon the Collateral as security for payment of the Obligations.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Disclosed Matters" means the actions, suits and proceedings and the Environmental matters disclosed in Schedule 3.06.

"dollars" or "$" refers to lawful money of the United States of America.

"Environment" means environment or natural environment as defined in any Environmental Law and includes soil, land surface or subsurface strata, surface waters (including navigable waters), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life and any other environmental medium or natural resource, the environment in the workplace, and any sewer system.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the Environment, preservation the management, release or threatened release of any Hazardous Material or to health and safety matters and all common laws now or hereafter in effect under which Environmental liabilities can arise.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of Environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law or Occupational Health and Safety Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the Environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permits" means all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

6

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the failure to make a required installment or other payment to a Plan which gives rise to liability under Section 302(f) of ERISA; (e) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; (f) a notice under Section 4010 of ERISA has been or is required to be filed with the PBGC with respect to any Plan; (g) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (h) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (i) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (j) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excluded Assets" has the meaning assigned to such term in Section 5.13.

"Excluded Taxes" means, with respect to any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of such Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located.

"Existing Credit Agreement" has the meaning assigned to such term in the preamble.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"First Lien Subsidiaries" means Subsidiaries that are or become Loan Parties whose Equity Interests are secured by a first priority Lien in favor of Collateral Agent for the benefit of the Lenders.

"GAAP" means generally accepted accounting principles in the United States of America consistent with those applied in the preparation of the financial statements referred to in Section 3.04.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Authorization" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guaranteed Obligations" has the meaning assigned to such term in Section 9.01.

"Guarantor" means each Loan Party (other than the Borrower).

"Hazardous Materials" means all contaminants, pollutants, explosive or radioactive substances or wastes and all hazardous or toxic substances, or wastes, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid (excluding current accounts payable, accrued obligations, operating lease obligations, customer deposits and

deferred liabilities other than for borrowed money, all incurred in the ordinary course of business), (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable, accrued obligations, operating lease obligations, customer deposits and deferred liabilities other than for borrowed money, all incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) obligations under any liquidated earn-out and (l) obligations of such Person to purchase securities or other property arising out of or in connection with the sale of the same or substantially similar securities or property or any other Off-Balance Sheet Liability.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Interest Expense" means, with reference to any period, the interest expense (including that attributable to Capital Lease Obligations) of the Loan Parties for such period with respect to all outstanding Indebtedness of the Loan Parties (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Swap Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP), calculated on a consolidated basis for the Loan Parties for such period in accordance with GAAP.

"Interest Payment Date" means the first Business Day of each calendar month and the Maturity Date.

"Inventory" has the meaning assigned to such term in the Security Agreement.

"JAD Companies" means J.A.D. Coal Company, Inc., a Virginia corporation, Fox Knob Coal Co., Inc., a Kentucky corporation and Sandlick Coal Company, LLC, a Virginia limited liability company.

"JAD Equity Interests" means all of the Equity Interests in each of the JAD Companies.

"JAD Notes" means the Promissory Notes dated October 15, 2007 issued by the JAD Companies (i) to Aubra Paul Dean in the original principal amount of $500,000  and (ii) to Carl E. McAfee and Julia L. McAfee as tenants by the entirety in the original principal amount of $500,000, each  maturing on December 1, 2009.

"JAD PPE Indebtedness" means the existing Indebtedness of the JAD Companies with various lenders as set forth on Schedule 6.01(b), which is secured by the plant, property and equipment of the JAD Companies.

"JAD Seller Guaranties" means the personal guaranties of the JAD Sellers issued pursuant to the Surety Agreement for Bond for the Effects of Surface Mining issued June 22, 1998 between Cumberland Surety Incorporated and Sandlick Coal Company, Inc.

"JAD Seller Notes" means the Convertible Promissory Notes dated April 15, 2008 issued by Borrower (i) to Aubra Paul Dean in the original principal amount of $3,500,000 and (ii) to Carl E. McAfee and Julia L. McAfee as tenants in the entirety in the original principal amount of $3,500,000, each maturing on the earlier to occur of (x) Borrower refinancing its Indebtedness in an amount equal to or greater than $35,000,000, (y) the consummation of an initial public offering of Borrower's common stock and (z) April 1, 2011.

"JAD Sellers" means Carl E. McAfee, Julia L. McAfee and Aubra Paul Dean, and for the purposes of the JAD Notes and the JAD Seller Notes, shall also include the heirs, successors and assigns of each.

"JAD Stock Intercreditor Agreement" means the Intercreditor Agreement dated as of April 15, 2008 among the JAD Sellers, the Centrecourt Bridge Lenders, the Lenders and MLCI, which, among other things, sets forth the priorities of the various parties in the Equity Interests of the JAD Companies.

"Joinder Agreement" has the meaning assigned to such term in Section 5.13.

"Lenders" means JMB, the other Lenders named on the signatory pages of this Agreement and, if any Lender shall decide to assign all or any portion of the Obligations, such term shall include any assignee of such Lender. For the purposes of the Security Agreement, the term "Lender" shall mean the Lenders.

"Lien" means, with respect to any asset, (a) any mortgage (including any leasehold mortgage), deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan" has the meaning assigned to such term in Section 2.01.

"Loan Documents" means this Agreement, the Note or any other promissory notes issued pursuant to this Agreement, the Collateral Documents, the Value Rights Agreement, the MLCI Subordination Agreement, the JAD Stock Intercreditor Agreement, upon consummation of the Permitted Acquisition the Rifle Stock Intercreditor Agreement, and all other agreements, instruments, documents and certificates identified in Section 4.01 executed and delivered to, or in favor of, any Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, letter of credit agreements and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any

10

Loan Party, and delivered to any Lender in connection with the Agreement or the transactions contemplated thereby. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to the Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative. Notwithstanding anything to the contrary contained herein, as used in Article III and Section 4.01(a), the term "Loan Documents" shall have the meaning set forth in the Existing Credit Agreement.

"Loan Guaranty" means Article IX of this Agreement.

"Loan Parties" means the Borrower, the Borrower's Subsidiaries and any other Person (other than the Collateral Agent and the Lenders) who becomes a party to this Agreement pursuant to a Joinder Agreement and their successors and assigns.

"LRR Seller Notes" means the Third Amended and Restated Promissory Notes issued by the Borrower to Kenneth Whitt, John Collins, John Whitt, Linda Whitt, Stephanie Lacy, Melissa Lewis and Jonathan Whitt, in connection with the acquisition of the Equity Interests of Licking River Resources, Inc., Oak Hill Coal, Inc. and S.M.& J., Inc., originally dated January 5, 2007, as amended and restated on June 14, 2008, in an aggregate principal amount of $10,000,000, of which (a) $3,333,333 in principal was due on July 15, 2008 and was paid on July 2, 2008 and (b) the remainder principal amount (i.e., $6,666,667) is due on the earlier of (i) October 31, 2009 and (ii) the consummation of an initial public offering of the Borrower's common stock. Each of the LRR Seller Notes bears interest at the rate of 5% per annum until July 15, 2008 and thereafter at 10% per annum until maturity.

"Management Team" means Robert Gabbard, John Collins, John Whitt and Kenneth Whitt.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Loan Parties taken as a whole, (b) the ability of any Loan Party to perform any of its obligations under the Loan Documents to which it is a party, (c) the Collateral, or the Collateral Agent's Liens (for the benefit of the Lenders) on the Collateral or the priority of such Liens, or (d) the rights of or benefits available to any Lender thereunder.

"Material Agreements" has the meaning assigned to such term in Section 3.12.

"Material Indebtedness" means Indebtedness (other than the Loan), or obligations in respect of one or more Swap Agreements, of any one or more of the Loan Parties in an aggregate principal amount exceeding $100,000. For purposes of determining Material Indebtedness, the "obligations" of any Loan Party in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Loan Party would be required to pay if such Swap Agreement were terminated at such time.

"Maturity Date" means March 31, 2009; provided, however, that so long as no Event of Default has occurred which has not been waived by the Lender, the Borrower shall have six separate options (each an "Extension Option") to extend the Maturity Date by a period of one

11

month (each an "Extension Period") immediately following March 31, 2009, subject to the following terms:

   (i) the Borrower shall exercise each Extension Option by delivery to Lender of written notice exercising the Extension Option not less than thirty (30) days prior to the then current Maturity Date;

   (ii) upon exercising an Extension Option, the Borrower shall pay to the Lender in cash an Extension Fee with respect to the relevant Extension Period in the amount of one percent (1%) of the then outstanding amount of principal and interest under the Loan; and

   (iii) in no event shall the Maturity Date be extended pursuant to the Extension Options beyond September 30, 2009.

  "Maximum Liability" has the meaning assigned to such term in Section 9.10.

  "MLCI" means Merrill Lynch Commodities, Inc., a Delaware corporation.

  "MLCI Agreements" means (i) that certain Coal Services Agreement dated as of June 5, 2007 between the Borrower and MLCI, (the "Coal Services Agreement"), and (ii) that certain Master Coal Purchase and Sale Agreement dated as of June 5, 2007 between the Borrower and MLCI (the "Master Trading Agreement"), as said agreements are amended by that certain Amendment to the Coal Services Agreement and Master Coal Purchase and Sale Agreement dated as of the date hereof.

  "MLCI Subordination Agreement" means the Intercreditor and Subordination agreement dated as of the date hereof executed by MLCI in favor of the Collateral Agent and the Lenders.

  "Moody's" means Moody's Investors Service, Inc.

  "Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

  "Net Proceeds" means, with respect to any event, (a) the sum of cash proceeds and Cash Equivalents received in respect of such event including (i) any cash and Cash Equivalents received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable and customary fees and out-of-pocket expenses paid by any Loan Party to third parties (other than Affiliates) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than the Loan) secured by such asset subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable prior to the Maturity Date, in each case

during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer).

"New Coal Producers" means, collectively, J. A. D. Coal Company, Inc., Fox Knob Coal Co., Inc. and Sandlick Coal Company, LLC.

"Non-Paying Guarantor" has the meaning assigned to such term in Section 9.11.

"Note" means the promissory note of the Borrower in form and substance satisfactory to Lenders, issued to evidence the Loan.

"Obligated Party" has the meaning assigned to such term in Section 9.02.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loan, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations of the Loan Parties to the Lenders or any indemnified party arising under the Loan Documents. Obligations shall also include all Swap Obligations owing to any Lender or its Affiliates.

"Occupational Safety and Health Law" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices, or binding agreements issued, promulgated or entered into by any Governmental Authority designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, including the Occupational Safety and Health Act, and any program, whether governmental or private (such as those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

"Off-Balance Sheet Liability" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any sale and leaseback transaction which is not a Capital Lease Obligation, (c) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (d) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheets of such Person (other than operating leases).

"Original Coal Producers" means, collectively, Licking River Resources, Inc., Oak Hill Coal, Inc. and S. M. & J., Inc.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement.

"Paying Guarantor" has the meaning assigned to such term in Section 9.11.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Acquisition" means the Rifle Acquisition, so long as all of the following conditions are satisfied as of the time of the consummation thereof:

(a)     the Loan Parties shall have provided the Lenders with prior written notice of the Rifle Acquisition not less than twenty (20) days prior to the anticipated closing date thereof together with such documentation that the Lenders may reasonably require demonstrating that the terms of the Rifle Acquisition will be in compliance with the Rifle Acquisition Terms:

(b)     concurrently with delivery of the notice referred to in the preceding clause (a), the Borrower shall have delivered to the Lenders, in form and substance reasonably satisfactory to the Lenders a certificate of an Authorized Officer of the Borrower to the effect that each Loan Party (after taking into consideration all rights of contribution and indemnity such Loan Party has against each other Loan Party) will be solvent upon the consummation of the Rifle Acquisition;

(c)     as soon as practicable prior to the closing date of the Rifle Acquisition (but in no event less than five (5) Business Days before such date), the Borrower shall have provided the Lenders with copies of the Rifle Acquisition Documents, each of which shall be in form and substance reasonably satisfactory to the Lenders for purposes of ascertaining that the Rifle Acquisition Documents (i) are in compliance with the Rifle Acquisition Terms and (ii) do not contain any terms or provisions that could reasonably be expected to result in a Material Adverse Effect, together with a certificate of an Authorized Officer certifying each such document as being a true, correct and complete copy thereof and in full force and effect;

(d)     no Default or Event of Default shall have occurred and be continuing or would result from or exist upon the consummation of the Rifle Acquisition; and

(e)     On or prior to the closing date of the Rifle Acquisition, (i) the Borrower shall have caused the Rifle Sellers to execute and deliver the Rifle Stock Intercreditor Agreement and (ii) the Borrower shall have caused the Rifle Companies to execute and deliver a Joinder Agreement in order to make such Person a Guarantor hereunder, together with any and all other Loan Documents and other documentation reasonably requested by the Lenders in order to cause the Rifle Companies to be obligated with respect to the Obligations and to include the Equity Interests of the Rifle Companies within the Collateral hypothecated under the Loan Documents, and all Disclosure Schedules shall be updated to reflect information relating to the Rifle Companies so that all representations and warranties herein and in all other Loan Documents shall continue to be true and correct after taking into account the Rifle Acquisition.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.04;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlord's and other like Liens imposed by law or contract, arising in the ordinary course of business and securing obligations that are not overdue by more than 45 days or are being contested in compliance with Section 5.04;

(c)      pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)      deposits, certificates of deposit, cash collateral accounts and/or cash reserves to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)      judgment liens in respect of judgments that do not constitute an Event of Default under Section 7.01(l); and

(f)      easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Investments" means:

(a)      direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)      investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)      investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of Central Bank and Trust Co. or any other commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)      fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e)      investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (d) above; and

(f)      tax exempt securities rated A or higher by Moody's or A+ or higher by Standard & Poor's.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Prepayment Event" means:

(a)        any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any property or asset of any Loan Party, other than dispositions described in Sections 6.05(a), 6.05 (b) (only in respect of sales, transfers or dispositions to Subsidiaries that are Loan Parties whose assets are secured by a first priority Lien in favor of Collateral Agent for the benefit of the Lenders), or 6.05 (c); or

(b)        any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Loan Party with a fair value immediately prior to such event equal to or greater than $100,000; or

(c)        the incurrence by any Loan Party of any Indebtedness, other than Indebtedness permitted under Section 6.01.

"Prior Lenders" has the meaning assigned to such term in the preamble.

"Prior Liens" has the meaning assigned to such term in Section 3.16.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Report" means reports prepared by any Lender or another Person showing the results of appraisals, field examinations or audits pertaining to the Borrower's assets from information furnished by or on behalf of the Borrower, after such Lender has exercised its rights of inspection pursuant to this Agreement.

"Required Lenders" means, at any time, the Lenders holding in the aggregate at least a majority of the aggregate principal amount of the Loan outstanding at such time.

"Requirement of Law" as to any Person, the Certificate of Incorporation and By Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in any Loan Party, or any

payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests.

"Reverse Merger" means a reverse merger, share exchange or similar transaction with a public "shell" corporation (or the shareholders thereof) which results in the Borrower becoming a direct or indirect, wholly-owned subsidiary of such public "shell" company and subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act of 1934, as amended.

"Rifle Acquisition" means the purchase by the Borrower of all the Equity Interests of the Rifle Companies.

"Rifle Acquisition Documents" means the purchase agreement and all related documents and agreements evidencing the Rifle Acquisition.

"Rifle Acquisition Terms" means the terms and conditions set forth in the Rifle LOI.

"Rifle Companies" means Rifle Coal Company, a Kentucky limited liability company, and Associated Contracting LLC, a Kentucky limited liability company.

"Rifle Equipment Line of Credit" means a proposed line of credit with Caterpillar Industries, Inc. or another lender reasonably acceptable to Lender in an aggregate principal amount not to exceed $25,000,000 comprised of (i) the Rifle PPE Indebtedness and (ii) up to an additional $10,000,000 of credit to finance the acquisition of equipment for the Rifle Companies and the Borrower, so long as such indebtedness is secured solely by the equipment financed thereby.

"Rifle Equity Interests" means all of the Equity Interests in each of the Rifle Companies.

"Rifle LOI" means that certain confidential, letter of intent, dated as of March 31, 2008, previously furnished to the Lenders setting forth the Rifle Acquisition Terms.

"Rifle Non-Core Assets" means the Road-Building Assets and the Farming Assets (as such terms are defined in the Rifle LOI) which are to be purchased by Borrower in consideration for the issuance to Rifle Sellers of the Rifle Non-Core Asset Notes and contemporaneously resold to the Rifle Sellers at the closing of the Permitted Acquisition, whereupon the Rifle Non-Core Asset Notes shall be cancelled.

"Rifle Non-Core Asset Notes" means the demand promissory notes in the principal amount of $3,000,000 to be issued to the Rifle Sellers and contemporaneously cancelled upon the closing of the Permitted Acquisition.

"Rifle PPE Indebtedness" means the indebtedness of the Rifle Companies with various lenders, currently in an aggregate principal amount not in excess of $1,700,000, which indebtedness is secured solely by the plant, property and equipment of the Rifle Companies and which may be refinanced in connection with the consummation of the Permitted Acquisition so

that upon consummation of the Permitted Acquisition the aggregate principal amount of Rifle PPE Indebtedness shall not exceed $15,000,000.

"Rifle Seller Notes" means the Promissory Notes to be issued by the Borrower to each of the Rifle Sellers in a Permitted Acquisition, having an original aggregate principal amount not to exceed $3,000,000 and on terms no less favorable to the Borrower or the Lenders than the terms specified in the Rifle LOI.

"Rifle Sellers" means Barrett Frederick, Randolph Frederick, Grover Frederick, James Frederick and Anthony Frederick.

"Rifle Stock Intercreditor Agreement" means the Intercreditor Agreement to be entered into upon consummation of the Permitted Acquisition among the Rifle Sellers and the Lenders in form and substance satisfactory to the Lenders in their reasonable discretion, which shall, among other things, shall set forth the priorities of the parties in the Equity Interests of the Rifle Companies.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc.

"Security Agreement" means that certain Amended and Restated Security Agreement, dated as of the Closing Date, among the Loan Parties and the Collateral Agent, and any other pledge or security agreement entered into, after the date of this Agreement by any other Loan Party (as required by this Agreement or any other Loan Document), or any other Person, as the same may be amended, restated or otherwise modified from time to time.

"Series B Documents" means collectively (i) the Subscription Agreements, (ii) the Amended and Restated Registration Rights Agreement, (iii) the Warrants and (iv) the Certificate of Designations, each in the form previously delivered to the Lenders.

"Series B Offering" means the issuance from time to time by the Borrower of shares of its Series B Preferred Stock pursuant to the Series B Documents.

"Subordinated Indebtedness" of a Person means any Indebtedness of such Person the payment of which is subordinated to payment of the Obligations to the written satisfaction of the Required Lenders.

"Subordinated Lien Subsidiaries" means Subsidiaries that are or become Loan Parties whose Equity Interests are secured by a Lien in favor of Collateral Agent for the benefit of the Lenders that is not a first priority lien.

"Subordinated Lien Subsidiary Transactions" means collectively, (i) all Indebtedness of any Subordinated Lien Subsidiary owed to the Borrower and/or any First Lien Subsidiary pursuant to Section 6.01(c), (ii) all Guarantees by the Borrower and/or any First Lien Subsidiary of Indebtedness of any Subordinated Lien Subsidiary pursuant to Section 6.01(d), (iii) all investments made by the Borrower and/or any First Lien Subsidiary into any Subordinated Lien Subsidiary pursuant to Section 6.04(c), and (iv) all loans or advances made by the Borrower

and/or any First Lien Subsidiary to any Subordinated Lien Subsidiary permitted pursuant to Section 6.04(d).

"subsidiary" means, with respect to Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of the Borrower or a Loan Party, as applicable.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Swap Obligations" of a Person means any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Swap Agreements, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings (including penalties) imposed by any Governmental Authority.

"Total Indebtedness" means, at any date, the aggregate principal amount of all Indebtedness of the Borrower and its Subsidiaries at such date, determined on a consolidated basis in accordance with GAAP.

"Transactions" means the execution, delivery and performance by the Loan Parties of the Credit Agreement, the borrowing of the Loan and the use of the proceeds thereof.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"Value Rights Agreement" means that certain Value Rights Agreement dated as of April 15, 2008 between the Borrower and JMB, as such document may be amended, restated or otherwise modified from time to time.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02  Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.03  Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Lenders that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if any Lender notifies the Borrower that such Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

## ARTICLE II.  THE LOAN

SECTION 2.01  The Loan.  The Borrower hereby acknowledges that the aggregate principal amount of the term loan originally made under the Existing Credit Agreement outstanding as of August 1, 2008 is $13,311,818.21 (the "Loan"), comprised of (i) $13,000,000 of original principal plus (ii) $311,818.21 in capitalized interest.  Amounts repaid in respect of the Loan may not be reborrowed.

SECTION 2.02  Repayment of the Loan; Evidence of Debt.

(a)    The Borrower hereby unconditionally promises to pay to each Lender for
its account the then unpaid principal amount of the Loan owed to such Lender on the Maturity
Date

(b)    Each Lender shall maintain in accordance with its usual practice an
account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from
the Loan made hereunder, including the amounts of principal and interest due and payable and
paid to such Lender from time to time hereunder.

(c)    The entries made in the accounts maintained pursuant to paragraph (b) of
this Section shall be prima facie evidence of the existence and amounts of the obligations
recorded therein; provided that the failure of any Lender to maintain such accounts or any error
therein shall not in any manner affect the obligation of the Borrower to repay the Loan in
accordance with the terms of this Agreement.

(d)    Each Lender may request that the Loan made by it be evidenced by a
promissory note. In such event, the Borrower shall prepare, execute and deliver to such Lender a
promissory note payable to the order of such Lender (or, if requested by such Lender, to such
Lender and its registered assigns) and in a form reasonably approved by such Lender.
Thereafter, the Loan evidenced by such promissory note and interest thereon shall at all times
(including after assignment pursuant to Section 8.04) be represented by one or more promissory
notes in such form payable to the order of the payee named therein (or, if such promissory note is
a registered note, to such payee and its registered assigns).

SECTION 2.03  Prepayment of Loan. (a) *Optional Prepayment.* The Borrower
shall have the right at any time and from time to time to optionally prepay the Loan in whole or
in part, subject to prior notice in accordance with paragraph (c) of this Section and the payment
of accrued interest in accordance with Section 2.03(c) and any other amounts pursuant to and in
accordance with this Agreement; provided, however, that each prepayment under this Section
2.03(a) shall be in a minimum amount equal to $100,000 and integral multiples of $25,000 in
excess thereof.

(b)    *Mandatory Prepayment.* In the event and on each occasion that any Net
Proceeds are received by or on behalf of any Loan Party in respect of any Prepayment Event, the
Borrower shall, immediately after such Net Proceeds are received by such Loan Party, prepay the
Obligations in an aggregate amount equal to 100% of such Net Proceeds, provided that, in the
case of any event described in clause (a) or (b) of the definition of the term "Prepayment Event",
if the Borrower shall deliver to the Lenders a certificate of a Financial Officer to the effect that
the Loan Parties intend to apply the Net Proceeds from such event (or a portion thereof specified
in such certificate), within 30 days after receipt of such Net Proceeds, to acquire (or replace or
rebuild) real property, equipment or other tangible assets (excluding inventory) to be used in the
business of the Loan Parties, and certifying that no Default has occurred and is continuing, then
no prepayment shall be required pursuant to this paragraph in respect of the Net Proceeds
specified in such certificate, provided that such Net Proceeds are so applied within such 30 day
period.

(c)    The Borrower shall notify the Lenders by telephone (confirmed by facsimile) of any prepayment hereunder not later than 10:00 a.m., New York City time, three Business Days before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount to be prepaid to each Lender. Prepayments shall be accompanied by accrued interest as set forth in Section 2.05(c).

SECTION 2.04  Fees.

(a)    On the Closing Date, the Borrower shall pay to the Lenders an amendment fee (the "Amendment Fee") in the amount of $175,000.

(b)    Intentionally Omitted.

(c)    All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Lenders. Fees paid shall not be refundable under any circumstances.

SECTION 2.05  Interest. (a) The unpaid principal amount of the Loan shall bear interest beginning as of April 15, 2008 at an aggregate rate per annum equal to twenty percent (20.00%) per annum, payable as follows: (i) twelve percent (12.00%) per annum payable in cash and (ii) eight percent (8.00%) per annum payable by capitalizing such interest on the date when due and adding such capitalized amount to the outstanding principal amount of the Loan.

(b)    Notwithstanding the foregoing, during the occurrence and continuance of an Event of Default, (i) the unpaid principal amount of the Loan shall bear interest at 2% per annum plus the rate otherwise applicable to the Loan as provided in the preceding paragraph of this Section or (ii) in the case of any other amount outstanding hereunder, such amount shall accrue at 2% per annum plus the rate applicable to such fee or other obligation as provided hereunder (provided that, if this Agreement does not expressly provide for a rate applicable to such fee or other obligation, such amount outstanding hereunder shall accrue at 14% per annum). All interest accruing during the occurrence and continuance of an Event of Default pursuant to this Section 2.05(b) shall be payable in cash.

(c)    Accrued interest on the unpaid principal amount of the Loan shall be payable or capitalized, as applicable, in arrears on each Interest Payment Date; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand, and (ii) in the event of any repayment or prepayment of the Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)    All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed.

SECTION 2.06  Taxes. (a) Any and all payments by or on account of any obligation of the Borrower hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if the Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) each Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made,

(ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     The Borrower shall indemnify each Lender within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by such Lender on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by such Lender shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the applicable Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to such Lender.

SECTION 2.07  Payments Generally; Allocation of Proceeds; Sharing of Set-offs.
(a)     The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees or otherwise) prior to 11:00 a.m., New York City time, on the date when due, in immediately available funds, without set off or counterclaim. Any amounts received by any Lender after such time on any date may, in the discretion of such Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to each Lender at its address as notified to the Borrower in writing from time to time. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars.

(b)     Any proceeds of Collateral received by any Lender (i) not constituting either (A) a specific payment of principal, interest, fees or other sum payable under the Loan Documents (which shall be applied as specified by the Borrower), or (B) a mandatory prepayment (which shall be applied in accordance with Section 2.03) or (ii) after an Event of Default has occurred and is continuing and the Required Lenders so elect, shall be applied ratably first, to the payment of all amounts payable under this Agreement on account of the Collateral Agent's fees or any legal fees, costs and expenses or other liabilities of any kind incurred by the Collateral Agent or any co-agent in connection with any Loan Document, second, to pay any fees, indemnities, or expense reimbursements including amounts then due to the Lenders from the Borrower, third, interest then due and payable on the Loan, fourth, to prepay principal on the Loan, fifth, to payment of any amounts owing with respect to Swap Obligations, and sixth, to the payment of any other Obligation due to the Lenders by the Borrower. The Required Lenders shall have the continuing and exclusive right to apply and

reverse and reapply any and all such proceeds and payments to any portion of the Obligations. For this purpose, "proceeds" of Collateral means any and all cash, securities and other property realized from collection, foreclosure or enforcement of the Collateral Agent's Liens upon the Collateral (including distributions of Collateral in satisfaction of any Obligations).

SECTION 2.08  Indemnity for Returned Payments.  If after receipt of any payment which is applied to the payment of all or any part of the Obligations, any Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by such Lender and the Borrower shall be liable to pay such Obligations to such Lender.  The provisions of this Section 2.08 shall be and remain effective notwithstanding any contrary action which may have been taken by any Lender in reliance upon such payment or application of proceeds.  The provisions of this Section 2.08 shall survive the termination of this Agreement.

SECTION 2.09  Pro Rata Treatment.  Except to the extent otherwise provided herein, the Loan, each payment or prepayment of principal of the Loan, each payment of interest on the Loan and each payment of fees due and payable to the Lenders under the Loan Documents shall be allocated pro rata among the Lenders in accordance with the respective principal amounts of the outstanding Loan held by the Lenders. The Loan Parties hereby agree to make all such pro rata payments directly to each Lender in accordance with this Section in accordance with instructions provided by to the Borrower by such Lender.

SECTION 2.10  Effect of Amendment and Restatement.  Upon the execution and delivery of this Agreement, the indebtedness, obligations and other liabilities of each of the Loan Parties previously governed by the Existing Credit Agreement (the "Existing Obligations") shall continue in full force and effect, but shall be governed by the terms and conditions set forth in this Agreement.  The Existing Obligations shall include all interest, fees and other amounts accrued through the Closing Date.  Guaranties issued under the Existing Credit Agreement shall be deemed to be outstanding under this Agreement, except as amended on the date hereof or hereafter.  The Existing Obligations, together with any and all additional Obligations incurred by the Borrower hereunder or under any of the other Loan Documents shall continue to be secured by the assets of each Loan Party, other than the Excluded Assets, whether now existing or hereafter acquired and wheresoever located, all as more specifically set forth in the Collateral Documents.  The execution and delivery of this Agreement shall not constitute a novation or repayment of the Existing Obligations.

ARTICLE III. Representations and Warranties

Each Loan Party hereby represents and warrants to the Lenders that, as of the Closing Date:

SECTION 3.01       Organization; Powers.  Each of the Loan Parties is duly organized, validly existing and in good standing under the laws of the jurisdiction of its

organization, has all requisite power and authority to own or lease and operate its properties and carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02    Authorization; Enforceability.  The Transactions are within each Loan Party's corporate, limited liability, or limited partnership powers (as applicable) and have been duly authorized by all necessary corporate and, if required, stockholder action. The Loan Documents to which each Loan Party is a party have been duly executed and delivered by such Loan Party and constitute a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms.

SECTION 3.03  Governmental Approvals; No Conflicts.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (i) the execution, delivery or performance by, or enforcement against, any Loan Party of the Credit Agreement or any other Loan Document, or for the consummation of the Transactions, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature of the Collateral as set forth in the Collateral Documents and this Agreement, other than that portion of the Collateral in which the Lien in favor of the Collateral Agent shall not be first priority as expressly set forth in Section 3.16), other than the due filing of UCC-1 financing statements and the delivery of a duly executed JAD Stock Intercreditor Agreement, or (iv) the exercise by any Lender or the Collateral Agent of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents.  All applicable waiting periods in connection with the Transactions have expired without any action having been taken by any Governmental Authority restraining, preventing or imposing materially adverse conditions upon the Transactions or the rights of the Loan Parties freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.  Each Loan Party has all requisite corporate, limited liability company or partnership (as applicable) power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.

SECTION 3.04  Financial Condition; No Material Adverse Change.  (a) Each of the Loan Parties has heretofore furnished to the Lender its (1) combined, audited balance sheet and statements of income, stockholders equity and cash flows (i) as of and for the fiscal year ended December 31, 2007, reported on by Coulter & Justus, P.C., independent public accountants, and (ii) reviewed, unaudited balance sheet and statements of income and cash flows as of and for the fiscal quarter and the portion of the fiscal year ended March 31, 2008, certified by a Financial Officer.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Loan Parties as of such dates and for such periods in accordance with GAAP, subject to year end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)    Except for the matters disclosed in Schedule 3.04(b), no event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect, since the date of the financial statements described in subsection (a) above.

25

SECTION 3.05  Properties.  (a) As of the Closing Date, Schedule 3.05 sets forth the address of each parcel of real property that is owned or leased by each Loan Party.  Each of such leases and subleases is valid and enforceable in accordance with its terms and is in full force and effect, and no default by any party to any such lease or sublease exists.  Each of the Loan Parties has good and indefeasible title to, or valid leasehold interests in, all its real and personal property, free of all Liens other than those permitted by Section 6.02.

(b)        Each Loan Party owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to its business as currently conducted, a correct and complete list of which, as of the Closing Date, is set forth on Schedule 3.05, and the use thereof by the Loan Parties does not infringe in any material respect upon the rights of any other Person, and the Loan Parties' rights thereto are not subject to any licensing agreement or similar arrangement.

SECTION 3.06  Litigation and Environmental Matters.  (a) Except for the Disclosed Matters, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened against or affecting the Loan Parties that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or that involve the Agreement or the Transactions.

(b)        Since April 15, 2008, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or increased the likelihood of, a Material Adverse Effect.

(c)        Except for the Disclosed Matters: (A) each Loan Party's real property has not been used by any Loan Party, and to its knowledge by any other person, as a landfill or for final disposal of waste, is free of contamination from any Hazardous Materials, except for such contamination that could not reasonably be expected to result in a Material Adverse Effect, and no such real property is the subject of any mandatory order from a Governmental Authority, nor has any Loan Party received any notice of intent to issue such an order; (B) no written notice has been received by any Loan Party identifying it as a "potentially responsible party" or a party responsible for the remediation or clean up of any Hazardous Material, or requesting information under any Environmental Law pertaining to any release of Hazardous Material, or to any contaminated site; and (C) to the knowledge of the Loan Parties, there are no facts, circumstances or conditions that could reasonably be expected to result in any Loan Party being identified as a "potentially responsible party" or a party responsible for the remediation or clean up of any Hazardous Material under any Environmental Law, except to the extent that such identification could not reasonably be expected to result in a Material Adverse Effect.

(d)        Except for the Disclosed Matters: (A) each Loan Party is in material compliance with all requirements of Environmental Laws; (B) each Loan Party has obtained, and is in material compliance with the requirements of all material Environmental Permits required by Environmental Laws for the operations of its businesses as presently conducted, and all such Environmental Permits are valid, uncontested and in good standing, and there is no application pending to revoke any such Environmental Permit; (C) there is no litigation arising under or related to any Environmental Laws, Environmental Permits or Hazardous materials which seeks

damages, penalties, fines, costs or expenses in an amount which could reasonably be expected to result in a Material Adverse Effect or which alleges criminal or quasi-criminal misconduct by the Borrower; (D) each Loan Party has not received written notice of any investigation or threatened investigation under any Environmental Laws, pertaining to its real property, the Environmental Permits, any Loan Party or the operations of its business, nor, to the knowledge of such Loan Party has it received, any oral notice of any such investigation, threatened investigation or evaluation; and (E) each Loan Party has provided to the Lender all existing material environmental reports or audits pertaining to its real property or the operations of its business in its possession or control.

(e)     Each Loan Party hereby acknowledges and agrees that each Lender (A) is not now, and has not ever been, in control of any of the Loan Parties' real property or affairs; and (B) does not have the capacity through the provisions of the Loan Documents or otherwise to influence any Loan Party's conduct with respect to the ownership, operation or management of any of its real property or compliance with Environmental Laws or Environmental Permits.

(f)     To the knowledge of the Loan Parties, no conditions exist at, on or under any real property or asset now or previously owned, leased or used by or under the control or management of any Loan Party which, with the passage of time, or the giving of notice or both, would give rise to any Environmental Liability which could reasonably be expected to have a Material Adverse Effect.

(g)     For the purposes of this section, "knowledge" of each Loan Party means that a senior officer of such Loan Party has actual knowledge or awareness of a particular fact or circumstance or that such person, if he or she had exercised reasonable diligence, would have known or been aware of such fact or circumstance (together with such other officers or employees of such Loan Party who, or after due inquiry, should have knowledge of such fact or circumstance).

SECTION 3.07  Compliance with Laws and Agreements.  Each Loan Party is in compliance with all Requirements of Law applicable to it or its property and, other than the matters disclosed on Schedule 3.07, all indentures, agreements and other instruments binding upon it or its property, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  No Default has occurred and is continuing.

SECTION 3.08  Investment Company Status.  No Loan Party nor any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09  Taxes.  Each Loan Party has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party or such Subsidiary, as applicable, has set aside on its books adequate reserves.  No Tax liens have been filed and no claims are being asserted with respect to any such Taxes.  The New Coal Producers failed to timely file their Tax returns for the September 30, 2007 fiscal year; however, as of the Closing Date, all Tax returns

27

and reports for the New Coal Producers for the September 30, 2007 fiscal year have been filed
and all Taxes for the September 30, 2007 fiscal year have been paid.

SECTION 3.10 <u>ERISA</u>. No ERISA Event has occurred or is reasonably expected
to occur that, when taken together with all other such ERISA Events for which liability is
reasonably expected to occur, could reasonably be expected to result in a Material Adverse
Effect. Each Loan Party shall cause to be delivered to the Lenders all of the following: (i) a
copy of each Plan (or, where such Plan is not in writing, a complete description thereof) and, if
applicable, related trust agreements or other funding instruments, all amendments thereto, all
written interpretations and descriptions thereof that have been distributed to employees or former
employees of the Borrower or any ERISA Affiliate; (ii) the most recent determination letter
issued by the Internal Revenue Service with respect to each Plan; (iii) for the three most recent
plan years, Annual Reports on Form 5500 required to be filed with any governmental agency for
each Plan; (iv) a listing of all Multiemployer Plans, with the aggregate amount of the most recent
annual contributions required to be made by the Borrower or any ERISA Affiliate to each such
Plan and copies of the collective bargaining agreements requiring such contributions; (v) any
information that has been provided to the Borrower or any ERISA Affiliate regarding withdrawal
liability under any Multiemployer Plan; (vi) the aggregate amount of payments made under any
employee welfare benefit plan (as defined in Section 3(1) of ERISA) to any retired employees
(or dependents thereof) of the Borrower or any of its Subsidiaries during the most recently
completed fiscal year along with a copy or description of such employee welfare benefit plan;
(vii) documents reflecting any agreements between the PBGC and the Borrower or any ERISA
Affiliate with respect to any Plan, and (viii) the most recent actuarial valuation of each Plan.

SECTION 3.11 <u>Disclosure</u>. Each Loan Party has disclosed to the Lenders all
agreements, instruments and corporate or other restrictions to which it is subject, and all other
matters known to it, that, individually or in the aggregate, could reasonably be expected to result
in a Material Adverse Effect. None of the reports, financial statements, certificates or other
information furnished by or on behalf of any Loan Party to the Lenders in connection with the
negotiation of the Agreement or any other Loan Document (as modified or supplemented by
other information so furnished) contains any material misstatement of fact or omits to state any
material fact necessary to make the statements therein, in the light of the circumstances under
which they were made, not misleading; provided that, with respect to projected financial
information, each Loan Party represents only that such information was prepared in good faith
based upon assumptions believed to be reasonable at the time delivered and, if such projected
financial information was delivered prior to the Closing Date, as of the Closing Date.

SECTION 3.12 <u>Material Agreements; Permitted/Pending Reserves</u>. All material
agreements and contracts to which any Loan Party is a party or is bound as of the Closing Date
are listed on Schedule 3.12 (collectively, the "<u>Material Agreements</u>"). No Loan Party is in
default in the performance, observance or fulfillment of any of the obligations, covenants or
conditions contained in (i) any material agreement to which it is a party or (ii) any agreement or
instrument evidencing or governing Indebtedness.

SECTION 3.13 <u>Solvency</u>. (a) As of the Closing Date and after giving effect to the
payment and accrual of all transaction costs in connection with the execution and delivery of this
Agreement, (i) the fair value of the assets of each Loan Party, at a fair valuation, will exceed its

debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair saleable value of the property of each Loan Party will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) each Loan Party will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured, and (iv) each Loan Party will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted after the Closing Date.

(b)    No Loan Party intends to, or will permit any of its Subsidiaries to, and no Loan Party believes that it or any of its Subsidiaries will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by it or any such Subsidiary and the timing of the amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such Subsidiary.

SECTION 3.14  Insurance.  Schedule 3.14 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and the Subsidiaries as of the Closing Date.  As of the Closing Date, all premiums in respect of such insurance have been paid.  Each Loan Party believes that the insurance maintained by or on behalf of the Loan Parties is adequate.

SECTION 3.15  Capitalization and Subsidiaries.  Schedule 3.15 sets forth (a) a correct and complete list of the name and relationship to the Borrower of each and all of the Borrower's Subsidiaries, (b) a true and complete listing of each class of each of the Loan Party's authorized Equity Interests, of which all of such issued shares are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified on Schedule 3.15, and (c) the type of entity of each of the Loan Parties.  All of the issued and outstanding Equity Interests owned by any Loan Party has been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and is fully paid and non assessable.

SECTION 3.16  Security Interest in Collateral.  The Loan Parties acknowledge and reaffirm that the provisions of the Existing Credit Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of the Collateral Agent (for the benefit of the Lenders), and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, assuming due and proper filings of all Uniform Commercial Code financing statements in the appropriate jurisdictions which remain in effect and have not been terminated or released, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of (i) Permitted Encumbrances, to the extent any such Permitted Encumbrances would have priority over the Liens in favor of the Collateral Agent (for the benefit of the Lenders) pursuant to any applicable law, (ii) the JAD Equity Interests, Liens in favor of the JAD Sellers and the Centrecourt Bridge Lenders, (iii) the Rifle Equity Interests, Liens in favor of the Rifle Sellers upon consummation of a Permitted Acquisition, (iv) any Excluded Assets, and (v) the Liens permitted under Sections 6.02(d) and (k), to the extent any such Liens would have priority over the Liens in favor of the Collateral Agent (for the benefit of the Lenders) pursuant to this Agreement and/or any applicable law (collectively, items (i) through (v) are referred to as the "Prior Liens").

SECTION 3.17  Employment Matters.  As of the Closing Date, there are no strikes, lockouts or slowdowns against any Loan Party pending or, to the knowledge of any Loan Party threatened.  The hours worked by and payments made to employees of the Loan Parties have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.  All payments due from any Loan Party, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party.

SECTION 3.18  Affiliate Transactions.  Except as set forth on Schedule 3.18, as of the Closing Date, (i) there are no existing or proposed agreements, arrangements, understandings, or transactions between any Loan Party and any of the officers, members, managers, directors, stockholders, parents, other interest holders, employees, or Affiliates (other than Loan Parties) of any Loan Party or any members of their respective immediate families, and (ii) none of the foregoing Persons are directly or indirectly indebted to or have any direct or indirect ownership, partnership, or voting interest in any Affiliate of any Loan Party or any Person with which any Loan Party has a business relationship or which competes with any Loan Party.  The Centrecourt Equipment Purchase, including the agreement in respect thereof referenced on Schedule 3.18, is for a price and on terms and conditions not less favorable to the Borrower than could be obtained on an arm's-length basis from unrelated third parties.

SECTION 3.19  Common Enterprise.  The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party.  Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrower hereunder, both in their separate capacities and as members of the group of companies.  Each Loan Party has determined that execution, delivery, and performance of the Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.20  MLCI Agreements.  As of the Closing Date, Borrower has delivered to Lenders a complete and correct copy of the MLCI Agreements (including all schedules, exhibits, amendments, supplements, modifications, assignments and all other documents or agreements delivered pursuant thereto or in connection therewith).  All Obligations constitute Indebtedness entitled to the benefits of the subordination provisions contained in the MLCI Subordination Agreement.  As of the Closing Date, the amount of cash performance assurance held by MLCI pursuant to the MLCI Agreements is $3,291,722.

ARTICLE IV. Conditions

SECTION 4.01  Closing Date.  The closing of this Agreement (the "Closing Date") shall be deemed to occur on the date on which each of the following conditions is satisfied (or waived in accordance with Section 8.02):

(a)    <u>Credit Agreement and Loan Documents</u>. The Lenders (or their counsel) shall have received (i) from each party hereto either (A) a counterpart of this Agreement signed by such party or (B) written evidence satisfactory to the Lenders (which may include facsimile transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and (ii) duly executed copies of other Loan Documents and such other certificates, documents, instruments and agreements as the Lenders shall request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including written opinions of the Loan Parties' counsel, addressed to the Lenders in form and substance reasonably satisfactory to the Lenders.

(b)    <u>Financial Statements and Projections</u>. The Lenders shall have received (i) audited combined financial statements of the Original Coal Producers for the December 31, 2005, 2006 and 2007 fiscal years, (ii) audited combined financial statements of the New Coal Producers for the September 30, 2005 and 2006 fiscal years, and (iii) unaudited interim combined financial statements of the Coal Producers for the three months ended March 31, 2008, and such financial statements shall not, in the reasonable judgment of the Lenders, reflect any material adverse change in the combined financial condition of the Coal Producers, as reflected in the financial statements.

(c)    <u>Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates</u>. The Lenders shall have received (i) a certificate of each Loan Party, dated the Closing Date and executed by its Secretary or Assistant Secretary, which shall (A) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of the Financial Officers and any other officers of such Loan Party authorized to sign the Loan Documents to which it is a party, and (C) contain appropriate attachments, including the certificate or articles of incorporation or organization of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its by laws or operating, management or partnership agreement, and (ii) a short form good standing certificate for each Loan Party from its jurisdiction of organization.

(d)    <u>No Default Certificate</u>. The Lenders shall have received a certificate, signed by the chief financial officer of each Loan Party, on the Closing Date (i) stating that no Default has occurred and is continuing, (ii) stating that the representations and warranties contained in Article III are true and correct as of such date, and (iii) certifying any other factual matters as may be requested by the Lenders.

(e)    <u>Fees</u>. The Lenders shall have received the Amendment Fee and all other fees required to be paid and all expenses (including the reasonable fees and expenses of legal counsel) on or before the Closing Date.

(f)    <u>Lien Searches</u>. The Lenders shall have received the results of a recent lien search in each jurisdiction requested by the Lenders (including, but not limited to, the jurisdiction of organization of each Loan Party), and such search shall reveal no liens on any of the assets of the Loan Parties except for liens permitted by Section 6.02 or discharged on or prior to the Closing Date pursuant to a pay-off letter or other documentation satisfactory to the Lenders.

(g)     Solvency.  The Lenders shall have received a solvency certificate from a Financial Officer.

(h)     Pledged Stock; Stock Powers; Pledged Notes.  The Lenders shall have received either (i) the certificates representing the JAD Equity Interests pledged pursuant to the Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof or (ii) the duly executed JAD Stock Intercreditor Agreement in form and substance satisfactory to the Lenders in their sole discretion, whereby the JAD Sellers and then the Centrecourt Bridge Lenders acknowledge that they are holding the JAD Equity Interests and undated stock powers for each such certificate executed in blank on behalf of the Collateral Agent and the Lenders.

(i)     Filings, Registrations and Recordings.  Each document (including any Uniform Commercial Code financing statement) required by the Collateral Documents or under law or reasonably requested by the Lenders to be filed, registered or recorded in order to create in favor of the Collateral Agent (for the benefit of the Lenders), a perfected Lien on the Collateral described therein, prior and superior in right to any other Person except for the holders of Prior Liens, shall be in proper form for filing, registration or recordation.

(j)     Insurance.  The Lenders shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Lenders and otherwise in compliance with the terms of the Security Agreement.

(k)     Amendment to Coal Services Agreement.  The Lenders shall have received a duly executed Amendment to the Coal Services Agreement, in form and substance satisfactory to the Lenders in their sole discretion.

(l)     MLCI Subordination Agreement.  The Lenders shall have received the MLCI Subordination Agreement duly executed by MLCI, in form and substance satisfactory to the Lenders in their sole discretion.

(m)     Side Letter Agreement as to Value Rights Agreement.  The Lenders shall have received a side letter agreement regarding the Value Rights Agreement duly executed by the Loan Parties, in form and substance satisfactory to the Lenders in their sole discretion.

(n)     Note.  The Lenders shall have received the Note duly executed by the Borrower.

(o)     Centrecourt Documents.  The Lenders shall have received duly executed copies of the documents relating to the Centrecourt Bridge Financing and the Centrecourt Equipment Purchase, in form and substance reasonably satisfactory to the Lenders.

(p)     Centrecourt Amendment.  The Lenders shall have received a duly executed copy of the Centrecourt Amendment in form and substance satisfactory to the Lenders in their sole discretion.

(q)     Dismissal of Complaint.  The Loan Parties shall have dismissed Lenders and Collateral Agent with  prejudice from the lawsuit they filed in Kentucky Civil Action No.

08-CI-00165, pursuant to the filing of a Notice of Dismissal acceptable, in form and substance,
to the Lenders and Collateral Agent.

      (r)      <u>Post-Closing Agreement</u>.  The Lenders shall have received a duly
executed copy of the Post-Closing Agreement in form and substance satisfactory to the Lenders
in their sole discretion.

      (s)      <u>Other Documents</u>.  The Lenders shall have received such other documents
as the Lenders or their counsel may have reasonably requested.

<div align="center">ARTICLE V.  Affirmative Covenants</div>

      Until the principal of and interest on the Loan and all fees, expenses and other amounts
payable hereunder shall have been paid in full, each Loan Party covenants and agrees, jointly and
severally with all of the Loan Parties, with each Lender that:

      SECTION 5.01      <u>Financial Statements; Other Information</u>.  The Borrower
will furnish to each Lender:

      (a)      within 120 days after the end of each fiscal year of the Borrower, its
audited consolidated balance sheet and related statements of operations, stockholders' equity and
cash flows as of the end of and for such year, setting forth in each case in comparative form the
figures for the previous fiscal year, all reported on by independent public accountants of
recognized regional standing or who is otherwise acceptable to the Required Lenders (without a
"<u>going concern</u>" or like qualification or exception and without any qualification or exception as
to the scope of such audit) to the effect that such consolidated financial statements present fairly
in all material respects the financial condition and results of operations of the Borrower and its
consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied,
accompanied by any management letter prepared by said accountants; provided, however, that
the audited combined financial statements of the New Coal Producers for the September 30,
2007 fiscal year shall be furnished to each Lender no later than July 1, 2008;

      (b)      within 60 days after the end of each of the first three fiscal quarters of the
Borrower, its consolidated balance sheet and related statements of operations, stockholders'
equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of
the fiscal year, setting forth in each case in comparative form the figures for the corresponding
period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal
year, all certified by one of its Financial Officers as presenting fairly in all material respects the
financial condition and results of operations of the Borrower and its consolidated Subsidiaries on
a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end
audit adjustments and the absence of footnotes;

      (c)      within 20 days after the end of each fiscal month of the Borrower, a
certificate from a financial officer of the Borrower setting forth the top lines sales, the tons of
coal extracted and the tons of coal sold by the Loan Parties in the preceding month;

      (d)      concurrently with any delivery of financial statements under clause (a) or
(b) or (c) above, a certificate of a Financial Officer of the Borrower in substantially the form of

Exhibit A (i) certifying, in the case of the financial statements delivered under clause (b) or (c), as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, (ii) certifying as to whether an Event of Default has occurred and, if an Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(e)        concurrently with any delivery of financial statements under clause (a) above, a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default (which certificate may be limited to the extent required by accounting rules or guidelines);

(f)        Intentionally Omitted.

(g)        as soon as possible and in any event within 10 Business Days of filing thereof, copies of all tax returns filed by any Loan Party with the U.S. Internal Revenue Service;

(h)        promptly, and in any event within 10 Business Days of becoming aware of same, deliver to each Lender a detailed statement describing any of the following occurrences: (i) any order or judgment of any Governmental Authority requiring any Loan Party to incur Environmental Liabilities (A) in excess of $100,000 in any one instance, (B) together with all other expenditures incurred in respect of Environmental Liabilities in any Financial Year, in excess of $500,000 in the aggregate, and (ii) any state of affairs which could reasonably be expected to result in the incurrence of Environmental Liabilities (A) in excess of $100,000 in any one instance, or (B) together with all other expenditures incurred in respect of Environmental Liabilities in any Financial Year, in excess of $500,000 in the aggregate, and (C) the action taken or proposed to be taken in connection with such occurrences;

(i)        promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Loan Party with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed by any Loan Party to its shareholders generally, as the case may be;

(j)        promptly after delivering the same to any other creditor of the Loan Parties, copies of any other financial reports, statements and information that are provided to other creditors of the Loan Parties; and

(k)        promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary, or compliance with the terms of this Agreement, as the Required Lenders may reasonably request.

SECTION 5.02  Notices of Material Events.  Each Loan Party will furnish to each Lender prompt written notice of the following:

(a)       the occurrence of any Event of Default;

(b)       receipt of any notice of any governmental investigation or any litigation commenced or threatened against any Loan Party that (i) seeks damages in excess of $100,000, (ii) seeks injunctive relief which results in, or could reasonably be expected to result in, a Material Adverse Effect, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets which results in, or could reasonably be expected to result in, a Material Adverse Effect, (iv) alleges criminal misconduct by any Loan Party, (v) alleges the violation of any law regarding, or seeks remedies in connection with, any Environmental Laws which results in, or could reasonably be expected to result in, a Material Adverse Effect; or (vi) contests any tax, fee, assessment, or other governmental charge which results in, or could reasonably be expected to result in, a Material Adverse Effect;

(c)       to the knowledge of any Loan Party, any Lien (other than Permitted Encumbrances) or claim made or asserted against any of the Collateral;

(d)       any loss, damage, or destruction to the Collateral in the amount of $250,000 or more per occurrence or $1,000,000 or more in the aggregate, whether or not covered by insurance;

(e)       any and all default notices received under or with respect to any Indebtedness or any leased location or public warehouse where Collateral is located (which shall be delivered within two Business Days after receipt thereof);

(f)       all material amendments to any Material Agreement, together with a copy of each such amendment;

(g)       the fact that a Loan Party has entered into a Swap Agreement or an amendment to a Swap Agreement, together with copies of all agreements evidencing such Swap Agreement or amendments thereto (which shall be delivered within five Business Days);

(h)       the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to have a Material Adverse Effect; and

(i)       any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(j)       Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03  Existence; Conduct of Business.  Each Loan Party will, and will cause each Subsidiary to, (a) do or cause to be done all things necessary to preserve, renew and

35

keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, unless otherwise (i) determined by any Loan Party upon the exercise of its reasonable business judgment or (ii) permitted by Section 6.03(a), and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted, and (b) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted as permitted by Section 6.03(b).

SECTION 5.04  Payment of Obligations.  Each Loan Party will, and will cause each Subsidiary to, pay or discharge all Material Indebtedness and all other material liabilities and obligations, including Taxes, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, and (b) such Loan Party or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

SECTION 5.05  Maintenance of Properties.  Each Loan Party will, and will cause each Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

SECTION 5.06  Books and Records; Inspection Rights.  Each Loan Party will, and will cause each Subsidiary to, (i) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (ii) permit any representatives designated by any Lender (including employees of such Lender, or any consultants, accountants, lawyers and appraisers retained by such Lender), upon reasonable prior notice and during such Loan Party's normal business hours, to visit and inspect its properties, to examine and make extracts from its books and records, including environmental assessment reports and Phase I or Phase II studies, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.  The Loan Parties acknowledge that any Lender, after exercising its rights of inspection, may prepare certain Reports pertaining to the Loan Parties' assets for internal use by such Lender. Each Loan Party will permit one Lender to conduct field audit examinations of the Loan Party's assets, liabilities, books and records at a frequency not more than once every 90 days; provided further that the Loan Party will permit any Lender to conduct such examinations at any time and with any reasonable frequency upon the occurrence and continuation of an Event of Default.

SECTION 5.07  Compliance with Laws.  Each Loan Party will, and will cause each Subsidiary to, comply in all material respects with all Requirements of Law applicable to it or its property.

SECTION 5.08  Intentionally Omitted.

SECTION 5.09  Insurance.  In addition to insurance requirements set forth in the Collateral Documents, each Loan Party shall maintain, and shall cause each of its Subsidiaries to maintain, with financially sound and reputable independent insurers, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons of a similar size engaged in the same or similar business, of such types and in such

amounts as are customarily carried under similar circumstances by such other Persons; including workers' compensation insurance, public liability and property and casualty insurance which amounts shall not be reduced by any Loan Party in the absence of 30 days' prior notice to each Lender. All such insurance shall name the Collateral Agent as loss payee/mortgagee and as additional insured. Upon request of the Required Lenders, the Borrower shall furnish each Lender, at reasonable intervals (but not more than once per calendar year) a certificate of a Financial Officer of the Borrower (and, if requested by the Required Lenders, any insurance broker of the Borrower) setting forth the nature and extent of all insurance maintained by the Borrower and its Subsidiaries in accordance with this Section or any Collateral Document (and which, in the case of a certificate of a broker, were placed through such broker).

SECTION 5.10  Casualty and Condemnation.  The Borrower (a) will furnish to each Lender prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) will ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Collateral Documents.

SECTION 5.11  Environmental Compliance.  The Borrower will (i) comply in all material respects, and cause each of its Subsidiaries to comply in all material respects, with the requirements of all applicable Laws (including Environmental Laws) and duly observe in all material respects all valid requirements of any Governmental Authority as applicable to the Borrower's business and the industry of its business, and maintain the appropriate corporate or other similar registrations in each jurisdiction in which the Borrower or any of its Subsidiaries carries on business, except where the failure to be so registered would not have a Material Adverse Effect, and (ii) promptly, if the Required Lenders have a reasonable basis to believe that a discharge of a Hazardous Material has occurred or a condition exists at, on or under any of the real properties or assets now or hereafter owned, leased or used by the Borrower or under the control or management of the Borrower that individually or in the aggregate involve a "loss or potential" loss in excess of $100,000 or otherwise could reasonably be expected to have a Material Adverse Effect, cause to be conducted such environmental investigations (including without limitation, environmental site assessments and environmental compliance reviews) as are reasonably required by the Required Lenders by an environmental consultant approved by the Required Lenders, such approval not to be unreasonably withheld, and remedy any condition that could reasonably be expected, if not addressed, to have a Material Adverse Effect, and any non-compliance with Environmental Laws revealed by any such investigation. Without limiting the foregoing, upon the occurrence and continuation of an Event of Default, at request of any Lender, the Borrower shall cause to be conducted an environmental compliance audit, to be conducted by a third party reasonably satisfactory to such Lender.  If the Borrower fails to provide any such report or audit referred to in this Section within 60 days of such request of any Lender, such Lender may, but shall be under no obligation to do so, conduct same, and the Borrower hereby grants each Lender and its agents and representatives access to the Real Property or any other property owned, leased or occupied by the Borrower to undertake such investigations, assessments and reviews (all of which shall be at the sole cost of the Borrower).

SECTION 5.12  <u>Governmental Authorizations</u>.  Each Loan Party shall conduct its
business in conformity, in all material respects, to each Governmental Authorization.

SECTION 5.13  <u>Additional Collateral; Further Assurances</u>.  (a)  Subject to
applicable law, each Loan Party shall, unless each Lender otherwise consents, cause each
Subsidiary of such Loan Party formed or acquired after the date of this Agreement in accordance
with the terms of this Agreement to become a Loan Party by executing the Joinder Agreement
set forth as Exhibit B hereto (the "<u>Joinder Agreement</u>").  Upon execution and delivery thereof,
each such Person (i) shall automatically become a Guarantor hereunder and thereupon shall have
all of the rights, benefits, duties, and obligations in such capacity under the Loan Documents and
(ii) will grant Liens to the Collateral Agent, for the benefit of the Lenders, in any property of
such Loan Party which constitutes Collateral; <u>provided</u>, <u>however</u>, that (w) the assets of the JAD
Companies, (x) upon consummation of the Permitted Acquisition, the assets of the Rifle
Companies, (y) all cash collateral held by MLCI in respect of the MLCI Agreements in an
amount not to exceed $5,000,000 (such amount to be reduced by any portion of such cash
collateral that is set off against or applied to obligations of the Borrower under the MLCI
Agreements), and (z) the assets of any Person or new Subsidiary which Person or Subsidiary was
financed with Indebtedness pursuant to Section 6.01(s), will not be subject to the Liens granted
to the Collateral Agent for the benefit of the Lenders (collectively, items (w) through (z) are
referred to as the "<u>Excluded Assets</u>").

(b)    Each Loan Party will cause 100% of the issued and outstanding Equity
Interests of each of its Subsidiaries to be subject at all times to a first priority, perfected Lien in
favor of the Collateral Agent (for the benefit of the Lenders) pursuant to the terms and conditions
of the Loan Documents or other security documents as any Lender shall reasonably request;
provided, however, that (i) the pledge to the Collateral Agent of all of the Equity Interests in the
JAD Companies will be subordinate to the pledge of such Equity Interests to (x) the JAD Sellers,
until the termination of the JAD Seller Guaranties, as security for the obligations of Borrower
under the JAD Seller Notes and the JAD Seller Guaranties, and (y) the Centrecourt Bridge
Lenders as security for the obligations of the Borrower under the Centrecourt Bridge Financing,
in accordance with the terms of the JAD Stock Intercreditor Agreement; (ii) the pledge to the
Collateral Agent of all of the Equity Interests in the Rifle Companies upon consummation of the
Permitted Acquisition will be subordinate to the pledge of such Equity Interests to the Rifle
Sellers, as security for the obligations of the Borrower under the Rifle Seller Notes in accordance
with the terms of the Rifle Stock Intercreditor Agreement; and (iii) the pledge to the Collateral
Agent of all of the Equity Interests in any Person or new Subsidiary financed pursuant to Section
6.01(s) hereof to acquire assets which constitute a business unit will be subordinate to the pledge
of such Equity Interests to the seller(s) of such Person or business unit, as security for the
obligations of the Borrower under any promissory notes issued to such seller(s) in accordance
with the terms of an intercreditor agreement to be entered into among the Lenders and such
seller(s) in form and substance satisfactory to the Lenders in their reasonable discretion.

(c)    .    Without limiting the foregoing, each Loan Party will, and will cause each
Subsidiary to, execute and deliver, or cause to be executed and delivered, to any Lender such
documents, agreements and instruments, and will take or cause to be taken such further actions
(including the filing and recording of financing statements, fixture filings and other documents

and such other actions or deliveries of the type required by Section 4.01, as applicable), which may be required by law or which any Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents, all at the expense of the Loan Parties; provided, however, that the Borrower shall not be required to deliver the stock certificates and powers for (i) the JAD Equity Interests for so long as the JAD Seller Notes and the Centrecourt Bridge Notes are outstanding, (ii) upon consummation of the Permitted Acquisition, the Rifle Equity Interests, for so long as the Rifle Seller Notes are outstanding, and (iii) upon consummation of the acquisition of any Person or new Subsidiary financed pursuant to Section 6.01(s) hereof to acquire assets which constitute a business unit, the Equity Interests of such Person and/or new Subsidiary, for so long as the seller note(s) related to such acquisition (x) are secured by such Equity Interests and (y) remain outstanding.

(d)      If any material assets (other than any real property or improvements thereto or any interest therein) are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Agreement that become subject to the Lien in favor of the Collateral Agent for the benefit of the Lenders upon acquisition thereof), such Loan Party will notify each Lender and the Collateral Agent and will cause such assets to be subjected to a Lien securing the Obligations and will take, and cause its Subsidiaries to take, such actions as shall be necessary or reasonably requested by any Lender to grant and perfect such Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties.

SECTION 5.14 Compliance with Terms of Leaseholds. Unless otherwise determined by any Loan Party upon the exercise of its reasonable business judgment and so long as the failure to do any of the following could not reasonably be expected to have a Material Adverse Effect, each Loan Party shall make all payments and otherwise perform all obligations in respect of all leases of real property material to the conduct of its business to which any Loan Party is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled, notify each Lender of any default by any party with respect to such leases and cooperate with each Lender in all respects to cure any such default, and cause each of its Subsidiaries to do so.

ARTICLE VI. Negative Covenants

Until the principal of and interest on the Loan and all fees, expenses and other amounts payable under any Loan Document have been paid in full, the Loan Parties covenant and agree, jointly and severally, with each Lender that:

SECTION 6.01      Indebtedness. No Loan Party will, nor will it permit any Subsidiary to, create, incur or suffer to exist any Indebtedness, except:

(a)      the Obligations;

(b)      Indebtedness existing on the Closing Date and set forth in Schedule 6.01 and extensions, renewals and replacements of any such Indebtedness in accordance with clause (f) hereof;

(c)      Indebtedness of (i) the Borrower to any Subsidiary, (ii) of any First Lien Subsidiary to the Borrower or any other Subsidiary, and (iii) of any Subordinated Lien Subsidiary to the Borrower or any other Subsidiary; provided, that: (A) each Loan Party shall have executed and delivered to each other Loan Party, on the Closing Date, a demand note (collectively, the "Intercompany Notes") to evidence any such intercompany Indebtedness owing at any time by such Loan Party to such other Loan Parties, which Intercompany Notes shall be in form and substance reasonably satisfactory to Lenders and shall be pledged and delivered to Collateral Agent pursuant to the Security Agreement as additional collateral security for the Obligations; (B) each Loan Party shall record all intercompany transactions on its books and records in a manner reasonably satisfactory to Lenders; (C) the obligations of Borrower under any such Intercompany Notes shall be subordinated to the Obligations of Borrower hereunder in a manner reasonably satisfactory to Lenders; (D) at the time any such intercompany loan or advance is made by Borrower to any other Loan Party and after giving effect thereto, Borrower shall be solvent; (E) no Default or Event of Default would occur and be continuing after giving effect to any such proposed intercompany loan; and (F) the aggregate amount of all Subordinated Lien Subsidiary Transactions shall not exceed $10,000,000 at any time.

(d)      Guarantees by (i) the Borrower of Indebtedness of any First Lien Subsidiary or any Subordinated Lien Subsidiary and (ii) by any Subsidiary of Indebtedness of the Borrower or any other First Lien Subsidiary or Subordinated Lien Subsidiary, provided that (x) the Indebtedness so Guaranteed is permitted by this Section 6.01, and (y) the aggregate amount of all Subordinated Lien Subsidiary Transactions shall not exceed $10,000,000 at any time;

(e)      Indebtedness of the Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets (whether or not constituting purchase money Indebtedness), including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Indebtedness in accordance with clause (f) hereof; provided that such Indebtedness is incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement;

(f)      Indebtedness which represents an extension, refinancing, or renewal of any of the Indebtedness described in clauses (b), (e), (j) and (p) hereof; provided that, (i) the principal amount or interest rate of such Indebtedness is not increased, (ii) any Liens securing such Indebtedness are not extended to any additional property of any Loan Party, (iii) no Loan Party that is not originally obligated with respect to repayment of such Indebtedness is required to become obligated with respect thereto, (iv) such extension, refinancing or renewal does not result in a shortening of the average weighted maturity of the Indebtedness so extended, refinanced or renewed, (v) the terms of any such extension, refinancing, or renewal are not less favorable to the obligor thereunder than the original terms of such Indebtedness and (vi) if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to

40

the Obligations, then the terms and conditions of the refinancing, renewal, or extension Indebtedness must include subordination terms and conditions that are at least as favorable to each Lender as those that were applicable to the refinanced, renewed, or extended Indebtedness;

(g)      Indebtedness owed to any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such person, in each case incurred in the ordinary course of business;

(h)      Indebtedness of the Borrower or any Subsidiary in respect of performance bonds, reclamation bonds, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the ordinary course of business;

(i)      Indebtedness of the Borrower or any Subsidiary to any lessor pursuant to any real property leases;

(j)      Indebtedness under the A/R Facility in an aggregate principal amount not to exceed $6,000,000 (such amount to be reduced by the amount of any permanent reductions of the commitments thereunder);

(k)      Indebtedness under the 2007 Bridge Financing in an aggregate principal amount not to exceed $1,616,450 (such amount to be reduced by the amount of any principal repayments of the loans thereunder);

(l)      Indebtedness under the Centrecourt Bridge Financing in an aggregate principal amount not to exceed $5,000,000, plus the amount of any additional notes representing deferred or "PIK" interest issued pursuant to the terms of the Centrecourt Bridge Notes (such amount to be reduced by the amount of any principal repayments of the loans thereunder);

(m)      Indebtedness under the Centrecourt Equipment Purchase Note in a principal amount not to exceed $4,800,000 (such amount to be reduced by the amount of any principal repayments of the loan thereunder);

(n)      Indebtedness under the Rifle Non-Core Asset Notes upon consummation of the Permitted Acquisition, provided that the Rifle Non-Core Asset Notes shall be cancelled contemporaneously with the closing of the Permitted Acquisition;

(o)      Indebtedness under (i) the LRR Seller Notes, (ii) the JAD Notes, (iii) the JAD Seller Notes and (iv) upon consummation of the Permitted Acquisition, the Rifle Seller Notes;

(p)      upon consummation of the Permitted Acquisition, the Rifle Equipment Line of Credit and extensions, renewals or replacements of any such Indebtedness in accordance with clause (f) hereof;

(q)      Indebtedness under the MLCI Agreements;

41

(r)        Indebtedness, and Guaranties thereof, under any Coal Agreements incurred in the ordinary course of business;

(s)        Indebtedness of the Borrower incurred to finance the purchase or acquisition of all, or substantially all, of the Equity Interests or assets of any other Person constituting a business unit (whether via merger, creation of a new subsidiary or otherwise) and/or Indebtedness of such acquired Person or attaching to such acquired assets existing at the time of the acquisition thereof which transaction shall be on terms reasonably acceptable to the Lenders, provided that (i) all of such Equity Interests so acquired or the Equity Interests in any new Subsidiary formed to acquire such assets shall at all times be subject to the perfected Lien in favor of Collateral Agent for the benefit of the Lenders, in accordance with the provisions of Section 5.13 hereof and (ii) if, prior to the consummation of such transaction, Borrower delivers to the Lenders a "fairness" opinion from a reputable investment advisor that is unaffiliated with any of the Loan Parties or holders of their Equity Interests stating that the terms of such purchase or acquisition are fair to the Borrower, the consent of Lenders to the terms of such Indebtedness shall not be required;

(t)        Other unsecured Indebtedness, not to exceed $1,000,000 in the aggregate amount outstanding at any one time; and

(u)        unsecured indebtedness to the Centrecourt Bridge Lenders in respect of the Centrecourt Put Right and the Centrecourt Equity Registration Claim; provided that, pursuant to the Centrecourt Rights Agreement, the Centrecourt Put Right may become subject to a lien in favor of the Centrecourt Bridge Lenders after payment in full of the Obligations.

SECTION 6.02    Liens. No Loan Party will, nor will it permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)        Liens created pursuant to any Loan Document;

(b)        Permitted Encumbrances;

(c)        any Lien on any property or asset of the Borrower or any Subsidiary existing on the Closing Date and set forth in Schedule 6.02; provided that (i) such Lien shall not apply to any other property or asset of the Borrower or Subsidiary and (ii) such Lien shall secure only those obligations which it secures on the Closing Date;

(d)        Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any Subsidiary; provided that (i) such security interests secure Indebtedness permitted by clause (e) of Section 6.01, (ii) such security interests and the Indebtedness secured thereby are incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement (other than Indebtedness in respect of the JAD PPE Indebtedness and, upon consummation of the Permitted Acquisition, the Rifle Equipment Line of Credit) and (iii) such security interests shall not apply to any other property or assets of the Borrower or any Subsidiary;

(e)      Liens on the Loan Parties' accounts receivables and on the deposit accounts into which payments relating thereto are made, in each case securing Indebtedness under the A/R Facility;

(f)      Liens on (i) the JAD Equity Interests in favor of (x) the Centrecourt Bridge Lenders securing the Borrower's obligations under the Centrecourt Guarantee in respect of the Centrecourt Bridge Notes, the Centrecourt Securities Purchase Agreement and the Centrecourt Security Agreement only and (y) the JAD Sellers until the termination of the JAD Seller Guaranties, securing the JAD Seller Notes and the Borrower's obligations under the JAD Sellers Guaranties, and (ii) the assets of the JAD Companies in favor of (x) the Centrecourt Bridge Lenders securing the JAD Companies' obligations under the Centrecourt Bridge Notes, the Centrecourt Guarantee, the Centrecourt Securities Purchase Agreement and the Centrecourt Security Agreement and (y) the JAD Sellers securing the JAD Seller Notes, the Borrower's obligations under the JAD Sellers Guaranties and the JAD Companies' obligations under the JAD Sellers' guaranties of the JAD PPE Indebtedness;

(g)      Liens in favor of the holders of the 2007 Bridge Notes securing the 2007 Bridge Financing;

(h)      Liens in favor of MLCI on (i) a cash collateral account in an amount not to exceed $5,000,000 (such amount to be reduced by any portion of such cash collateral that is set off against or applied to obligations of the Borrower under the MLCI Agreements), and (ii) the assets of the Loan Parties that are subject to Liens in favor of the Collateral Agent for the benefit of the Lenders (including, without limitation, on the JAD Equity Interests and, upon consummation of the Permitted Acquisition, the Rifle Equity Interests); provided, that such Liens in subclause (ii) shall be subordinated to the Lien in favor of Collateral Agent pursuant to the terms of the MLCI Subordination Agreement;

(i)      Upon consummation of the Permitted Acquisition, Liens in favor of the Rifle Sellers securing the Rifle Seller Notes;

(j)      Liens securing the JAD PPE Indebtedness and, upon the consummation of the Permitted Acquisition, Liens securing the Rifle Equipment Line of Credit, provided that such Liens apply only to the property, plant and equipment financed thereby;

(k)      Liens for Indebtedness permitted pursuant to Section 6.01(h) and deposits, certificates of deposit, cash collateral accounts, cash reserves and/or cash escrows required, directly or indirectly, under any Coal Agreements in the ordinary course of business;

(l)      Liens in favor of the sellers of the Equity Interests or assets of any Person or new Subsidiary constituting a business unit acquired by the Loan Parties on such acquired Equity Interests or assets, or new Subsidiary created to make such acquisition, acquired with financing in compliance with Section 6.01(s) hereof.

(m)      Notwithstanding the foregoing, none of the Liens permitted pursuant to this Section 6.02 may at any time attach to any Loan Party's (1) Accounts, other than those permitted under clause (a) of the definition of Permitted Encumbrance and clauses (e) and (g) above, and (2) Inventory, other than those permitted under clauses (a) and (b) of the definition of

Permitted Encumbrance and clauses (a) and (g) above; provided, however, that (I) the Liens permitted by clause (f) above may cover Accounts and Inventory of the JAD Companies, (II) the Liens permitted by clause (i) above may cover Accounts and Inventory of the Rifle Companies, (III) the Liens permitted by clause (h) above may cover Accounts and Inventory of the Borrower and the Original Coal Producers, and (IV) the Liens permitted by clause (l) above may cover Accounts and Inventory of the Person so acquired or the newly created Subsidiary so formed to make such acquisition.

SECTION 6.03  Fundamental Changes.  (a) No Loan Party will, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, other than (i) a merger, consolidation or reorganization of a First Lien Subsidiary with any other First Lien Subsidiary, (ii) a merger of a Subsidiary into the Borrower or a First Lien Subsidiary, (iii) a merger, consolidation or reorganization of a Subordinated Lien Subsidiary with any other Subordinated Lien Subsidiary, or (iv) a Reverse Merger upon consummation of which the current shareholders of the Borrower continue to own not less than 66 2/3rd % of the outstanding voting Equity Interests of Borrower.

(b)        No Loan Party will, nor will it permit any of its Subsidiaries to, engage in any business other than businesses of the type conducted by the Borrower and its Subsidiaries on the Closing Date and businesses reasonably related or incidental thereto; provided, however, that upon consummation of the Permitted Acquisition, the Loan Parties may own and operate coal mines and preparation plants, related equipment and employ employees for mining purposes in connection with the operation of the business engaged in by the Rifle Companies.

SECTION 6.04  Investments, Loans, Advances, Guarantees and Acquisitions.  No Loan Party will, nor will it permit any Subsidiary to, purchase, hold or acquire any capital stock, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except:

(a)        Permitted Investments, subject to control agreements in favor of the Lenders or otherwise subject to a perfected security interest in favor of the Lenders;

(b)        investments in existence on the date of this Agreement and described in Schedule 6.04;

(c)        investments by the Borrower and the Subsidiaries in Equity Interests in their respective First Lien Subsidiaries or in their respective Subordinated Lien Subsidiaries, provided that (i) any such Equity Interests held by a Loan Party shall be pledged pursuant to the Security Agreement, and (ii) the aggregate amount of all Subordinated Lien Subsidiary Transactions at any time shall not exceed $10,000,000;

(d)        loans or advances made by the Borrower to any First Lien Subsidiary or Subordinated Lien Subsidiary and made by any Subsidiary to the Borrower or any other First

44

Lien Subsidiary or Subordinated Lien Subsidiary, provided that (i) any such loans and advances made by a Loan Party shall be evidenced by a promissory note pledged pursuant to the Security Agreement and (ii) the aggregate amount of all Subordinated Lien Subsidiary Transactions at any time shall not exceed $10,000,000;

(e)       Loans or advances made by Borrower to its directors, officers or employees of reasonable fees and costs pursuant to indemnification provisions of Borrower's Certificate of Incorporation or By-laws, in an aggregate amount not exceeding $100,000;

(f)       Guarantees constituting Indebtedness permitted by Section 6.01;

(g)       investments in the form of Swap Agreements permitted by Section 6.07;

(h)       investments received in connection with the dispositions of assets permitted by Section 6.05;

(i)       investments constituting deposits described in clauses (c) and (d) of the definition of the term "Permitted Encumbrances;"

(j)       the Centrecourt Equipment Purchase;

(k)       the Permitted Acquisition; and

(l)       the purchase or acquisition of Equity Interests or assets constituting a business unit of any other Person permitted pursuant to clause (s) of Section 6.01.

SECTION 6.05  Asset Sales.  Other than the grant of the Liens on the Loan Parties' accounts receivables and deposit accounts securing indebtedness under the A/R Facility and any transfer or disposition of such collateral in connection with the exercise of the lienholder's remedies with respect thereto, no Loan Party will, nor will it permit any Subsidiary to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Borrower permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than to the Borrower or to another First Lien Subsidiary, or, from a Subordinated Lien Subsidiary to another Subordinated Lien Subsidiary, in each case in compliance with Section 6.04), except:

(a)       sales, transfers and dispositions of (i) inventory in the ordinary course of business and (ii) used, obsolete, worn out or surplus equipment or property in the ordinary course of business;

(b)       sales, transfers and dispositions to the Borrower or any Subsidiary, provided that any such sales, transfers or dispositions involving a Subsidiary that is not a First Lien Subsidiary shall be made in compliance with Section 6.09;

(c)       sales, transfers and dispositions of accounts receivable in connection with the compromise, settlement or collection thereof;

45

(d)     sales, transfers and dispositions of investments permitted by clause (h) of Section 6.04;

(e)     dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Subsidiary;

(f)     the resale of the Rifle Non-Core Assets upon consummation of the Permitted Acquisition, as contemplated by the Rifle LOI;

(g)     the leasing of equipment to the Rifle Companies and any other contract miner working on any real property owned or leased by a Loan Party on market terms and in the ordinary course of business; and

(h)     the subleasing of leasehold real property by the Borrower or any Subsidiary to a third party on market terms and in the ordinary course of business, provided that all rent or other proceeds payable in respect of each such sublease are payable solely to the Borrower or to the Subsidiary that is the holder of such leasehold,

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by paragraphs (b) and (f) above) shall be made for fair value and for cash consideration.

SECTION 6.06  Sale and Leaseback Transactions.  No Loan Party will, nor will it permit any Subsidiary to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

SECTION 6.07  Swap Agreements.  No Loan Party will, nor will it permit any Subsidiary to, enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which such Loan Party has actual exposure (other than those in respect of Equity Interests of the Borrower or any of its Subsidiaries), and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of such Loan Party.

SECTION 6.08  Restricted Payments; Certain Payments of Indebtedness.  (a) No Loan Party will, nor will it permit any Subsidiary to, declare or make, or agree to pay prior to the payment in full of all Obligations or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) the Borrower may declare and pay dividends (A) with respect to its common stock payable solely in additional shares of its common stock, and (B) with respect to its preferred stock, payable solely in additional shares of such preferred stock or in shares of its common stock, and (ii) Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests.

(b)     No Loan Party will, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities

46

or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i)      payment of Indebtedness created under the Loan Documents;

(ii)      payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness permitted by Section 6.01, other than payments in respect of the Subordinated Indebtedness prohibited by the subordination provisions thereof;

(iii)      refinancings of Indebtedness to the extent permitted by Section 6.01(f);

(iv)      payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(v)      payment to MLCI on or before September 30, 2008 of a deposit representing additional cash collateral in an amount up to $1,708,278 to secure the Borrower's "Performance Assurance" obligations under the MLCI Agreements; provided, however, that in no event shall the total amount deposited with MLCI as Performance Assurance under the MLCI Agreements exceed $5,000,000 (such amount to be reduced by any portion of such cash collateral that is set off against or applied to obligations of the Borrower under the MLCI Agreements);

(vi)      the payment on July 2, 2008 of principal and interest in the amount of $4,117,471.30 to the holders of the LRR Seller Notes solely from the proceeds of the sale by the Borrower of Equity Interests for aggregate consideration of $5,005,000 pursuant to Securities Purchase Agreements dated July 1, 2008, true and complete copies of which have been delivered to the Lenders;

(vii)      prepayment of principal under the Centrecourt Bridge Notes only with (w) the net cash proceeds from the Series B Offering and any other new equity or debt financing by Borrower (other than (1) a financing solely to fund the Permitted Acquisition or (2) the sale by Borrower of Equity Interests described in clause (vi) above) if such net cash proceeds are in excess of $20,000,000 and are not otherwise applied pursuant to clauses (vi) and (viii), up to a maximum aggregate amount of $2,500,000 plus fifty percent (50%) of the outstanding principal amount of any Centrecourt Bridge Notes issued in payment of deferred or "PIK" Interest, (x) the net cash proceeds from the refinancing of any of the assets of the JAD Companies that are not otherwise applied pursuant to clause (viii), (y) fifty percent (50%) of the positive monthly operating margin (i.e., the sales revenue for a particular month from tons produced at the Harlan mine minus the direct cash operating cost actually incurred in such month, including the selling, general and administrative expense allocated to the Harlan mine and minus any regularly scheduled payments applied to principal or interest on the JAD Seller Notes and/or the Equipment Purchase Note) from the Harlan surface mine to be opened in the third quarter of 2008, as set forth in the financial model delivered to Lender prior to execution of this Agreement (provided that (1) Borrower is able to meet its ordinary course obligations for the

period of ninety (90) days after the proposed date of making of such prepayment, and (2) the applicable Loan Party and/or Borrower would not be rendered insolvent), and (z) the incremental increases in working capital as a result of any release by MLCI of all or a portion of the cash performance assurance provided by Borrower to MLCI pursuant to the MLCI Agreements; provided that (i) in respect of each prepayment under subclauses (w), (x) and (z) above, the Loan Parties shall furnish to the Lenders a certificate certified as true and correct by the Chief Financial Officer of the Borrower, setting forth a detailed calculation of the amount of such prepayment and certifying that such prepayment is permitted under the provisions of this Section 6.08(b)(vii)(w), (x) or (z), as applicable and (ii) in respect of subclause (y) above, the Loan Parties shall furnish to the Lenders, not later than the 20th day of each calendar month, a certificate (the "Monthly Harlan Report"), certified as true and correct by the Chief Financial Officer of the Borrower, setting forth a detailed calculation of the monthly operating margin for the calendar month preceding the calendar month in which the Monthly Harlan Report is delivered and the amount of any such proposed prepayment and certifying that such prepayment is permitted under the provisions of this Section 6.08(b)(vii)(y); and

(viii)    prepayment of principal under the JAD Seller Notes only with (y) net cash proceeds from the Series B Offering and any other new equity or debt financing by Borrower (other than (1) a financing solely to fund the Permitted Acquisition or (2) the sale by Borrower of Equity Interests described in clause (vi) above) that are in excess of $20,000,000 and are not otherwise applied pursuant to clauses (vi) or (vii), or (z) the net cash proceeds of any refinancing of assets of the JAD Companies that are not otherwise applied pursuant to clause (vii); provided that in respect of each prepayment hereunder, the Loan Parties shall furnish to the Lenders a certificate certified as true and correct by the Chief Financial Officer of the Borrower, setting forth a detailed calculation of the amount of such prepayment and certifying that such prepayment is permitted under the provisions of this Section 6.08(b)(viii)(y) or (z), as applicable.

SECTION 6.09    Transactions with Affiliates. Except as set forth in Schedule 3.18, no Loan Party will, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) any investment permitted by Sections 6.04(c) or 6.04(d), (c) any Indebtedness permitted under Section 6.01(c), (d) any Restricted Payment permitted by Section 6.08, (e) the payment of reasonable fees to directors of the Borrower or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrower or its Subsidiaries in the ordinary course of business and (f) any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans approved by the Borrower's board of directors.

SECTION 6.10    Restrictive Agreements. No Loan Party will, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with

48

respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the Closing Date identified on Schedule 6.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (v) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.11  Amendment of Material Documents. No Loan Party will, nor will it permit any Subsidiary to, without the prior written consent of the Required Lenders amend or modify, or waive any of its rights under, (a) any agreement relating to any Subordinated Indebtedness, (b) the MLCI Agreements, (c) the 2007 Bridge Notes, (d) the Centrecourt Bridge Notes, the Centrecourt Guarantee, the Centrecourt Security Agreement (other than the amendments to the such documents pursuant to the Centrecourt Amendment) and the Centrecourt Amendment, (e) the Centrecourt Rights Agreement, (f) the Centrecourt Equipment Purchase Note, (g) the JAD Seller Guaranties, (h) the LRR Seller Notes, (i) the JAD Seller Notes, (j) the Rifle Seller Notes, (k) notes issued to the sellers of Equity Interests or assets pursuant to Section 6.01(s)hereof, or (l) its certificate of incorporation, by-laws, operating, management or partnership agreement or other organizational documents; provided, however, that simultaneous with the closing of the Permitted Acquisition, Borrower may amend its certificate of incorporation, by-laws, or other organizational documents to the extent reasonably necessary to implement the terms set forth in the Rifle LOI.

SECTION 6.12  Intentionally Omitted.


ARTICLE VII.    Events of Default

SECTION 7.01    If any of the following events ("Events of Default") shall occur:

(a)     the Borrower shall fail to pay any principal of any Loan (or any interest or other amounts due under Section 2.03(c)) when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)     the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, for a period of three days after the same shall become due and payable;

(c)     any representation or warranty made or deemed made by or on behalf of any Loan Party in or in connection with this Agreement or any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial

statement or other document furnished pursuant to or in connection with this Agreement or any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been materially incorrect when made or deemed made;

(d)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a), 5.03 (with respect to a Loan Party's existence), 5.08 or in Article VI;

(e)    any Loan Party shall fail to observe or perform any material covenant, condition or agreement contained in Section 5.01 or 5.02(b), and such failure shall continue unremedied for a period of 10 days after the earlier of knowledge by any officer of any Loan Party of such breach or notice thereof from any Lender;

(f)    any Loan Party shall fail to observe or perform any other covenant, condition or agreement contained in this Agreement (other than those which constitute a default under another Section of this Article), and such failure shall continue unremedied for a period of 30 days after the earlier of knowledge of such breach or notice thereof from any Lender;

(g)    any Loan Party shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (subject to any and all cure periods under the terms of such Material Indebtedness);

(h)    any event or condition occurs that results in (i) any Material Indebtedness or (ii) any other Indebtedness in an amount in excess of $100,000 in the aggregate that is secured by a lien that has priority over any of the Liens granted to Collateral Agent for the benefit of the Lenders and (including, without limitation, the Centrecourt Bridge Financing, the JAD Seller Notes or, upon consummation of the Permitted Acquisition, the Rifle Seller Notes) becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or such other Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness or such other Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity (other than a prepayment under the Centrecourt Bridge Notes (x) to the extent permitted pursuant to the provisions of Section 6.08(b)(vii) or (y) upon the occurrence of any of the events enumerated as items (i) through (iv) in the definition of Centrecourt Bridge Financing); provided, however, that if such event or condition is cured or waived by the applicable parties thereto prior to the later to occur of (i) the acceleration by Lender of the Loan pursuant to the provisions of this Article VII and (ii) fifteen (15) days after such event of default under such Indebtedness, then the Event of Default under this clause (h) shall immediately and automatically be deemed to have been cured or waived;

(i)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Loan Party of any Loan Party or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of its assets, and, in any such case, such proceeding or

petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(j)      any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(k)      any Loan Party shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(l)      one or more judgments for the payment of money in an aggregate amount in excess of $500,000 shall be rendered against any Loan Party, any Subsidiary of any Loan Party or any combination thereof which judgments are not adequately covered by insurance and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party to enforce any such judgment or any Loan Party shall fail within 30 days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

(m)      an ERISA Event shall have occurred that, in the opinion of any Lender, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(n)      a Change in Control shall occur;

(o)      the occurrence of any "default", as defined in any Loan Document (other than this Agreement) or the breach of any of the terms or provisions of any Loan Document (other than this Agreement), which default or breach continues beyond any period of grace therein provided;

(p)      the Loan Guaranty shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty, or any Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty to which it is a party, or any Guarantor shall deny that it has any further liability under the Loan Guaranty to which it is a party, or shall give notice to such effect;

(q)      (I) any Collateral Document shall for any reason fail to create a valid and perfected first priority security interest in any Collateral purported to be covered thereby, except (a) Permitted Encumbrances or (b) as permitted by the terms of any Collateral Document, or (II) any Collateral Document shall fail to remain in full force or effect, except where such failure

51

shall have primarily resulted from the acts or omissions of the Collateral Agent or any Lender, or any action, other than actions of the Collateral Agent or any Lender, shall be taken to discontinue or to assert the invalidity or unenforceability of any Collateral Document, or (III) any Loan Party shall fail to comply with any of the terms or provisions of any Collateral Document; or

(r)    any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms);

(s)    any Loan Party or any member of the Management Team is criminally convicted of any felony crime; provided, however, in the case of a member of the Management Team, such crime is related to the operation of the business of any Loan Party; or

(t)    an event of default under the MLCI Agreement which is not cured prior to the expiration of any applicable grace and cure periods thereunder; provided, however, that if such event of default under the MLCI Agreement is cured or waived by MLCI prior to the later to occur of (i) acceleration by Lender of the Loan pursuant to the provisions of this Article VII and (ii) fifteen (15) days after such event of default under the MLCI Agreement, then the Event of Default under this clause (t) shall be immediately and automatically be deemed to have been cured or waived;

then, and in every such event (other than an event with respect to the Borrower described in clause (i) or (j) of this Article), and at any time thereafter during the continuance of such event, the Required Lenders may, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) declare the Loan then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loan so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (i) or (j) of this Article, the principal of the Loan then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. Upon the occurrence and the continuance of an Event of Default, the Required Lenders may increase the rate of interest applicable to the Loan and other Obligations as set forth in this Agreement and exercise any rights and remedies provided to the Lenders under the Loan Documents or at law or equity, including all remedies provided under the UCC.

ARTICLE VIII.    Miscellaneous

SECTION 8.01 Notices. (a) Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other

52

communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

(i)        if to any Loan Party, to the Borrower at:

U.S. Coal Corporation
448 Lewis Hargett Circle
Suite 240
Lexington, Kentucky  40503
Attention: Robert Gabbard, Chief Executive Officer
Facsimile No:  (859) 219-0913

With a copy (which shall not constitute notice) to:

Pryor Cashman LLP
410 Park Avenue
10th Floor
New York, New York  10022
Attention: Eric M. Hellige, Esq.
Facsimile No:  (212) 326-0806

(ii)       if to the Lenders, to JMB Capital Partners Master Fund, L.P. at:

c/o JMB Capital Partners, L.P.
1999 Avenue of the Stars
Suite 2040
Los Angeles, California 90087
Attention:  Alan Fragen
Facsimile No: (310) 286-6662

with a copy (which shall not constitute notice) to:

Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY  10019
Attention:  Michael D. Rosenbloom, Esq.
Facsimile No.:  (212) 506-1800

or, in the case of any subsequent assignee, to the address of such assignee set forth in the relevant assignment agreement.

(iii)      if to the Collateral Agent, to Wilmington Trust Company at:

1100 North Market Street
Wilmington, Delaware  19890
Attention:  Corporate Trust Administration – US Coal

Collateral Agency
Facsimile No.: (302) 636-4140

with a copy (which shall not constitute notice) to:

Morris James LLP
500 Delaware Avenue
Suite 1500
Wilmington, DE  19801-1494
Attention:  Ross Antonacci, Esq.
Facsimile No. (302) 888-6989

All such notices and other communications shall be deemed to have been given when received.

(b)     Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

SECTION 8.02     Waivers; Amendments.  (a) No failure or delay by any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of the Loan shall not be construed as a waiver of any Event of Default, regardless of whether any Lender may have had notice or knowledge of such Event of Default at the time.

(b)     Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower, the Collateral Agent and the Lenders, or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Lenders and the Loan Party or Loan Parties that are parties thereto.

SECTION 8.03  Expenses; Indemnity; Damage Waiver.  (a) The Borrower shall pay (i) all out of pocket expenses incurred by each Lender and its Affiliates, including the reasonable fees, charges and disbursements of counsel for such Lender (whether outside counsel or the allocated costs of its internal legal department), in connection with the credit facilities provided for herein, the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by any Lender,  including the fees, charges and disbursements of any counsel for such Lender (whether outside counsel or the allocated costs of its internal legal

department), in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loan made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Loan. Expenses being reimbursed by the Borrower under this Section include, without limiting the generality of the foregoing, costs and expenses incurred in connection with:

(i)      appraisals and insurance reviews;

(ii)     field examinations and the preparation of Reports based on the fees charged by a third party retained by any Lender or the internally allocated fees for each Person employed by any Lender with respect to each field examination;

(iii)    background checks regarding senior management (including but not limited to, members of the Management Team) and/or key investors, as deemed necessary or appropriate in the sole discretion of any Lender;

(iv)    taxes, fees and other charges for (A) lien searches and (B) filing financing statements and continuations, and other actions to perfect, protect, and continue the Liens of the Collateral Agent (for the benefit of the Lenders);

(v)     sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and

(vi)    costs and expenses of preserving and protecting the Collateral.

(b)      The Borrower shall indemnify each Lender, the Collateral Agent and each Related Party of each Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party, or any Environmental Liability related in any way to any Loan Party, or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c)      The relationship between any Loan Party on the one hand and each Lender on the other hand shall be solely that of debtor and creditor. None of the Lenders nor the Collateral Agent (i) shall have any fiduciary responsibilities to any Loan Party or (ii) will

undertake any responsibility to any Loan Party to review or inform such Loan Party of any matter in connection with any phase of any Loan Party's business or operations. To the extent permitted by applicable law, no Loan Party shall assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions or the other transactions contemplated hereby, or the Loan or the use of the proceeds thereof.

(d)     All amounts due under this Section shall be payable as promptly as practicable (but in any event not later than three days) after written demand therefor.

SECTION 8.04  Successors and Assigns.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lenders (and any attempted assignment or transfer by the Borrower without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     The Lender, acting solely for this purpose as agent of the Borrower, shall maintain a copy of each assignment agreement delivered to it and a register for the recordation of the name and address of each Lender, and principal amounts of the Obligations owing to each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower and each Lender may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and each Lender, at any reasonable time and from time to time upon reasonable prior notice.

(c)     Each Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loan at the time owing to it); provided, however, that any such assignment shall assign (i) an amount equal to or greater than $5,000,000 of the Loan or (ii) if less than $5,000,000, an amount equal to all of the Loan then owing to such assigning Lender (and any attempted assignment or transfer by a Lender in violation of this proviso shall be null and void). The assignee shall be a party hereto and, to the extent of the interest assigned, have the rights and obligations of a Lender under this Agreement, and the assigning Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement (and, in the case of an assignment covering all of such Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.06 and Section 8.03). Each Loan Party hereby agrees to execute any amendment and/or any other document that may be reasonably necessary to effectuate such an assignment.

(d)     Each Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including

56

any pledge or assignment to secure obligations to a Federal Reserve Lender, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 8.05 Survival. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of the Loan regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Lender may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid. The provisions of Section 2.06 and ARTICLE VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loan or the termination of this Agreement or any provision hereof.

SECTION 8.06 Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to any Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by each Lender and when each Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 8.07 Severability. Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.08 Right of Setoff. If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower or such Guarantor against any of and all the Obligations held by such Lender, irrespective of whether or not such Lender shall have made any demand under the Loan Documents and although such

obligations may be unmatured. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 8.09  Governing Law; Jurisdiction; Consent to Service of Process.  (a) This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without giving effect to any principles of conflicts of law thereof which would result in the application of the laws of any other jurisdiction.

(b)     Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any U.S. Federal or New York State court sitting in New York, New York in any action or proceeding arising out of or relating to any Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c)     Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 8.10  WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 8.11  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 8.12  Confidentiality.  Each Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or to any assignee of such Lender, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to such Lender on a non-confidential basis from a source other than the Borrower.  For the purposes of this Section, "Information" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to any Lender on a non-confidential basis prior to disclosure by the Borrower; provided that, in the case of information received from the Borrower after the Closing Date, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 8.13  Violation of Law.  Anything contained in this Agreement to the contrary notwithstanding, no Lender shall be obligated to extend credit to the Borrower in violation of any limitation or prohibition provided by any applicable statute or regulation.

SECTION 8.14  USA PATRIOT ACT.  Each Lender is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") and hereby notifies the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.

SECTION 8.15  Disclosure.  Each Loan Party hereby acknowledges and agrees that each Lender and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

SECTION 8.16  Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Loan, together with all fees, charges and other amounts which are treated as interest on the Loan under applicable law (collectively the

59

"Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by any Lender holding the Loan in accordance with applicable law, the rate of interest payable in respect of the Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate.

SECTION 8.17  Release. Each of the Loan Parties acknowledges that Lender has acted in good faith in connection with this Agreement and the Loan Documents. Each of the Loan Parties, for itself and on behalf of its successors, assigns, and officers, directors, employees, agents and attorneys, and any Person acting for or on behalf of, or claiming through it, hereby fully, finally and forever release and discharge the Lenders and each Lenders' past and present officers, directors, managers, limited partners, general partners, investors, employees, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Lender Released Parties") of and from any and all past and present causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including without limitation those arising under 11 U.S.C. §§ 541-550 and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties) (collectively, "Claims"), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, matured or unmatured, liquidated or unliquidated, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Lender Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to the Loan Documents, and this Agreement and other financial accommodations made thereunder, the collateral security given in connection therewith, or any related discussions or negotiations, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

Each Loan Party waives any and all claims, rights and benefits it may have under any law of any jurisdiction that would render ineffective a release made by a creditor of claims that the creditor does not know or suspect to exist in its favor at the time of executing the release and that, if known by it, would have materially affected its settlement with the applicable debtor. Each Loan Party acknowledges that (a) it has been represented by independent legal counsel of its own choice throughout all of the negotiation that preceded the execution of this Agreement and that it has executed this Agreement after receiving the advice of such independent legal counsel, and (b) such Person and its respective counsel have had an adequate opportunity to make whatever investigation or inquiry they deem necessary or desirable in connection with the release contained in this Section 8.17.

## ARTICLE IX. LOAN GUARANTY

SECTION 9.01  Guaranty. Each Guarantor hereby agrees that it is jointly and severally liable for, and, as primary obligor and not merely as surety, absolutely and unconditionally guarantees to each Lender the prompt payment when due, whether at stated

maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by such Lender in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, the Borrower, any Guarantor or any other guarantor of all or any part of the Obligations (such costs and expenses, together with the Obligations, collectively the "Guaranteed Obligations"). Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of each Lender.

SECTION 9.02   Guaranty of Payment.  This Loan Guaranty is a guaranty of payment and not of collection. Each Guarantor waives any right to require any Lender to sue the Borrower, any Guarantor, any other guarantor, or any other person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

SECTION 9.03   No Discharge or Diminishment of Loan Guaranty.  (a) Except as otherwise provided for herein, the obligations of Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Borrower or any other guarantor of or other person liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Guarantor may have at any time against any Obligated Party, Lender, or any other person, whether in connection herewith or in any unrelated transactions.

(b)        The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)        Further, the obligations of any Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of any Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other person liable for any of the Guaranteed Obligations; (iv) any action or failure to act by any Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise,

61

in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

SECTION 9.04  Defenses Waived.  To the fullest extent permitted by applicable law, each Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower or any Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against any Obligated Party, or any other person.  Any Lender may, at its election, foreclose on any Collateral held by it or the Collateral Agent by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Guarantor under this Loan Guaranty except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash.  To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Obligated Party or any security.

SECTION 9.05  Rights of Subrogation.  No Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Loan Parties and the Guarantors have fully performed all their obligations to each Lender.

SECTION 9.06  Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of the Borrower or otherwise, each Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not any Lender is in possession of this Loan Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by any Lender.

SECTION 9.07  Information.  Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Loan

Guaranty, and agrees that no Lender shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

SECTION 9.08  Reserved.

SECTION 9.09  Taxes.  All payments of the Guaranteed Obligations will be made by each Guarantor free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if any Guarantor shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) each Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Guarantor shall make such deductions and (iii) such Guarantor shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

SECTION 9.10  Maximum Liability.  The provisions of this Loan Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Loan Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Loan Guaranty, then, notwithstanding any other provision of this Loan Guaranty to the contrary, the amount of such liability shall, without any further action by the Guarantors or any Lender, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "Maximum Liability". This Section with respect to the Maximum Liability of each Guarantor is intended solely to preserve the rights of each Lender to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other person or entity shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law. Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Loan Guaranty or affecting the rights and remedies of any Lender hereunder, provided that, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

SECTION 9.11  Contribution.  In the event any Guarantor (a "Paying Guarantor") shall make any payment or payments under this Loan Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Loan Guaranty, each other Guarantor (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Applicable Percentage" of such payment or payments made, or losses suffered, by such Paying Guarantor. For purposes of this Article IX, each Non-Paying Guarantor's "Applicable Percentage" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from

the Borrower after the Closing Date (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantor, the aggregate amount of all monies received by such Guarantors from the Borrower after the Closing Date (whether by loan, capital infusion or by other means). Nothing in this provision shall affect any Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Guarantor's Maximum Liability). Each of the Guarantors covenants and agrees that its right to receive any contribution under this Loan Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations. This provision is for the benefit of each Lender and the Guarantors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

SECTION 9.12  Liability Cumulative. The liability of each Loan Party as a Guarantor under this Article IX is in addition to and shall be cumulative with all liabilities of each Loan Party to each Lender under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

## ARTICLE X.  THE COLLATERAL AGENT

SECTION 10.01  Authorization and Action. (a) Each Lender hereby appoints and authorizes the Collateral Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents to which the Collateral Agent is a party as are delegated to the Collateral Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto. Each Lender further authorizes and instructs the Collateral Agent to execute and deliver the Security Agreement, the MLCI Subordination Agreement and the JAD Stock Intercreditor Agreement. As to any matters not expressly provided for by the Loan Documents to which the Collateral Agent is a party, the enforcement or collection of any Obligation or any matter requiring the Collateral Agent to exercise discretion, the Collateral Agent shall not be required to act, enforce or collect upon any Obligation or exercise any discretion , but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders; provided, however, that the Collateral Agent shall not be required to take any action that exposes the Collateral Agent to personal liability or that is contrary to this Agreement or applicable law.

(b)      In furtherance of the foregoing, each Lender hereby appoints and authorizes the Collateral Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers as are reasonably incidental thereto.

(c)      The Collateral Agent may execute any of its duties under this Agreement or any other Loan Document  by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to

64

such duties.  The Collateral Agent shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the opinion or advice of any such counsel, consultants or experts as long as no officer of the Collateral Agent has any actual knowledge that such opinion or advice is inappropriate or based on incorrect information.  Notwithstanding any other provision of this Agreement to the contrary, at any time or times, in the event that the Collateral Agent or any Lender shall deem it necessary or prudent in order to conform to the legal requirements of any jurisdiction in which any part of the Collateral may at such time or times be located to make any claim or bring any suit with respect to the Collateral or any Loan Document, or the Collateral Agent or any Lender shall be advised by counsel satisfactory to it that it is so necessary or prudent, the Collateral Agent shall execute and deliver an agreement supplemental hereto and all other instruments and agreements, and shall take all other action necessary or proper to constitute one or more persons, who need not meet any requirements of the Collateral Agent contained herein (and the Collateral Agent may appoint one or more of its officers), either as co collateral agent or co-collateral agents jointly with the Collateral Agent of all or any part of the Collateral, or as separate collateral agent or separate collateral agents of all or any part of the Collateral (each, a "Supplemental Collateral Agent"), and to vest in such persons, in such capacity, such title to the Collateral or any part thereof and such rights powers, privileges or duties as may be necessary or desirable, all for such period and under such terms and conditions as are satisfactory to the Collateral Agent and Required Lenders.  In case any Supplemental Collateral Agent shall die, become incapable of acting, resign or be removed, the title to the Collateral and all rights powers, privileges and duties of such Supplemental Collateral Agent, so far as permitted by law, vest in and be exercised by the Collateral Agent, without the appointment of a successor to such Supplemental Collateral Agent.  Should any instrument in writing from the Borrower or any other Loan Party be required by any Supplemental Collateral Agent so appointed by the Collateral Agent to more fully or certainly vest in and confirm to such Supplemental Collateral Agent such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Collateral Agent.  No Agent shall be responsible for the negligence or misconduct of any agent, attorney-in-fact or Supplemental Collateral Agent that it selects in accordance with the foregoing provisions of this Section 10.01(c) in the absence of such Agent's gross negligence or willful misconduct.

SECTION 10.02  Collateral Agent's Reliance, Etc.  Neither the Collateral Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct.  Without limitation of the generality of the foregoing, the Collateral Agent:  (a) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other experts selected by it at the expense of the Borrower and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (c) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of any Loan Party; (d) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness,

sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (e) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy or electronic communication) believed by it to be genuine and signed or sent by the proper party or parties.

SECTION 10.03 <u>Indemnification</u>. (a) Each Lender jointly and severally agrees to indemnify the Collateral Agent, any Supplemental Collateral Agent and their respective officers, directors, employees, stockholders agents and advisors (each, an "<u>Indemnified Party</u>") (to the extent not promptly reimbursed by the Borrower) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and expenses of counsel) that may be imposed on, incurred by, or asserted or awarded against any Indemnified Party in any way relating to or arising out of the Loan Documents or any action taken or omitted by the Collateral Agent under the Loan Documents (collectively, the "<u>Indemnified Costs</u>"); provided, however, that such Lender shall not be liable for any portion of such Indemnified Costs resulting from any Indemnified Party's own gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. The agreements in this Section 10.03 shall survive the resignation or removal of the Collateral Agent and each Supplemental Collateral Agent and the termination of this Agreement.

SECTION 10.04 <u>Successor Collateral Agent</u>. The Collateral Agent may resign at any time by giving written notice thereof to each Lender and the Borrower and may be removed at any time with or without cause by the Required Lenders provided, however, that any removal of the Collateral Agent will not be effective until it has received all of the compensation and any Indemnified Costs due and owing to it and it has been released from all of its obligations hereunder. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Collateral Agent. If no successor Collateral Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Collateral Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Collateral Agent, then the retiring or removed Collateral Agent may apply to any court of competent jurisdiction to appoint a successor Collateral Agent (the costs of which shall be borne by the Borrower) to act until such time, if any, as a successor shall have been appointed and shall have accepted its appointment as provided above. Upon the acceptance of any appointment as Collateral Agent hereunder by a successor Collateral Agent and upon the execution and filing or recording by the Borrower of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, such successor Collateral Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Collateral Agent, and the retiring Collateral Agent shall be discharged from its duties and obligations under the Loan Documents. If within 45 days after written notice is given of the retiring Collateral Agent's resignation or

removal under this Section no successor Collateral Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (or the next succeeding Business Day) (a) the retiring Collateral Agent's resignation or removal shall become effective, (b) the retiring Collateral Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (c) the Required Lenders shall thereafter perform all duties of the retiring Collateral Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Collateral Agent as provided above. After any retiring Collateral Agent's resignation or removal hereunder as Collateral Agent shall have become effective, and thereafter following the termination of this Agreement, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent under this Agreement.

SECTION 10.05  <u>Limitation on Duty of Collateral Agent in Respect of Collateral</u>. (a) Beyond the exercise of reasonable care in the custody thereof, the Collateral Agent shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Collateral Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Collateral Agent shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent in good faith.

(b)     The Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Collateral Agent, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any Loan Party to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Collateral Agent shall be under no duty or responsibility to any Lender to ascertain or to inquire into the performance or observance by any Loan Party of any of the provisions of any Loan Document.

SECTION 10.06  <u>No Discretion</u>. In any circumstance where the Collateral Agent is required to exercise discretion, approve documentation or distribute proceeds, the Collateral Agent may, at its option, seek to obtain instructions or directions from the Required Lenders with respect to such action. If the Collateral Agent so elects, then it may refrain from taking such action until such directions or instructions are received and shall have no liability to anyone for so refraining.

SECTION 10.07  <u>No Representations or Warranties as to the Collateral or Loan Documents</u>. NEITHER WILMINGTON TRUST COMPANY NOR THE COLLATERAL

AGENT (i) WILL MAKE AN INSPECTION OF THE COLLATERAL OR ANY PART THEREOF, (ii) MAKES OR SHALL BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO THE TITLE, CONDITION, VALUE, DESIGN, OPERATION, MERCHANTABILITY OR FITNESS FOR USE FOR ANY PARTICULAR PURPOSE OF THE COLLATERAL OR ANY PART THEREOF, AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP WITH RESPECT TO THE COLLATERAL OR ANY PART THEREOF, AS TO THE ABSENCE OF LATENT OR OTHER DEFECTS WHETHER OR NOT DISCOVERABLE, AS TO THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT, AS TO THE ABSENCE OF OBLIGATIONS BASED ON STRICT LIABILITY IN TORT OR AS TO TITLE OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE COLLATERAL OR ANY PART THEREOF, OR (III) MAKES OR SHALL BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY AS TO THE VALIDITY, LEGALITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT TO WHICH THE COLLATERAL AGENT IS A PARTY, OR ANY OTHER DOCUMENT OR INSTRUMENT, OR AS TO THE CORRECTNESS OF ANY STATEMENT CONTAINED IN ANY THEREOF.

SECTION 10.08  No Segregation of Monies; No Interest.  Except as otherwise expressly provided herein, monies received by the Collateral Agent hereunder or under any Loan Document to which it is a party need not be segregated in any manner, except to the extent required by law, and may be deposited under such general conditions as may be prescribed by law, and neither Wilmington Trust Company nor the Collateral Agent shall be liable for any interest thereon, except as may be expressly agreed to by Wilmington Trust Company or the Collateral Agent in writing.

SECTION 10.09  Action upon Instructions.  (a) The Required Lenders may by joint written instruction direct the Collateral Agent in the administration of the Collateral and any matter affecting the Collateral.

(b)  Notwithstanding the foregoing, the Collateral Agent shall not be required to take any action hereunder or under any other Loan Document at the request of the Required Lenders or otherwise if the Collateral Agent shall have reasonably determined, or shall have been advised by counsel, that such action is likely to result in liability on the part of the Collateral Agent or is contrary to the terms hereof or of any other Loan Document or is otherwise contrary to law; provided, however, that the Collateral Agent shall have no obligation to make any such determination.

(c)  Whenever the Collateral Agent is unable to decide between alternative courses of action permitted or required by the terms of this Agreement or under any other Loan Document, or in the event that the Collateral Agent is unsure as to the application of any provision of this Agreement or any other Loan Document, or believes any such provision is ambiguous as to its application, or is, or appears to be, in conflict with any other applicable provision, or in the event that this Agreement or any other Loan Document permits any determination or discretion by the Collateral Agent or is silent or is incomplete as to the course of action that the Collateral Agent is required to take with respect to a particular set of facts, the

68

Collateral Agent shall promptly give notice (in such form as shall be appropriate under the circumstances) to each Lender requesting instruction as to the course of action to be adopted, and to the extent the Collateral Agent acts in good faith in accordance with any written instructions received from the Required Lenders, the Collateral Agent shall not be liable on account of such action to any person. If the Collateral Agent shall not have received appropriate instruction within 10 days of such notice (or such shorter period as reasonably may be specified in such notice or as may be necessary under the circumstances) it may, but shall be under no duty to, take or refrain from taking such action as it shall deem to be in the best interests of the Lenders; and the Collateral Agent shall have no liability to any person for such action or inaction.

SECTION 10.10  Doing Business in Other Jurisdictions. Notwithstanding anything contained herein or elsewhere to the contrary, neither Wilmington Trust Company nor the Collateral Agent shall be required to take any action in any jurisdiction other than in the State of Delaware if the taking of such action will, even after the appointment of a Supplemental Collateral Agent in accordance with Section 10.01(c), (i) require the Collateral Agent in its individual capacity to obtain the consent, approval, authorization or order of or the giving of notice to, or the registration with, or taking of any action in respect of, any state or other governmental authority or agency other than the State of Delaware; (ii) result in any fee, tax or other governmental charge under the laws of any jurisdiction other than the State of Delaware becoming payable by the Collateral Agent in its individual capacity, or (iii) subject the Collateral Agent in its individual capacity to personal jurisdiction in any jurisdiction other than the State of Delaware for causes of action arising from acts unrelated to the consummation of the transactions by the Collateral Agent contemplated hereby.

SECTION 10.11  Rights; Powers; Litigation. The Collateral Agent shall be under no obligation to exercise any right or power vested in it or duty imposed upon it by this Agreement, or to institute, conduct or defend any litigation under this Agreement or otherwise or in relation to this Agreement or any other Loan Document, either at the request, order or direction of any Lender, unless such Lender shall have offered the Collateral Agent security or indemnity satisfactory to it against the costs, expenses and liabilities that may be incurred by the Collateral Agent therein or thereby. The right of the Collateral Agent to perform any discretionary act enumerated in this Agreement or in any other Loan Document shall not be construed as a duty, and the Collateral Agent shall not be answerable to any Lender or other person for other than its gross negligence, bad faith or willful misconduct in the performance of any such act.

SECTION 10.12  Limitation on Damages. In no event shall the Collateral Agent be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

SECTION 10.13  Amendments; Modifications; Waivers. Notwithstanding anything herein or elsewhere to the contrary, in the event that the Collateral Agent is asked to execute any amendment, modification or waiver to this or any other Loan Document to which it is a party, or consent to any such amendment, modification or waiver, the Collateral Agent shall be entitled to request and conclusively rely upon the written instructions of the Required Lenders and shall

have no duty or obligation to execute any such amendment, modification or waiver or consent to the same absent receipt of such written instructions.

SECTION 10.14 <u>Independent Credit Investigation</u>. Each Lender expressly acknowledges that the Collateral Agent has not made any representations or warranties to it and that no act taken by the Collateral Agent shall be deemed to constitute any representation or warranty by the Collateral Agent to any Lender. Each Lender acknowledges that it has taken and will continue to take such actions and to make such investigations as it deems necessary to inform itself of the affairs of the Loan Parties, and each Lender acknowledges that it has made and will continue to make its own independent investigation of the creditworthiness and the business and operations of the Loan Parties, and that, in entering into this Agreement and the Loan Documents, as applicable, it has not relied and will not rely upon any information or representations furnished or given by the Collateral Agent. .

SECTION 10.15 <u>The Collateral Agent in Its Individual Capacity</u>. Wilmington Trust Company, in its individual capacity, and its affiliates may accept deposits from, lend money to, and generally engage in any kind of business with any Loan Party and any of their respective Affiliates as though Wilmington Trust Company were not the Collateral Agent hereunder.

SECTION 10.16 <u>Knowledge of Default, etc</u>. The Collateral Agent shall be entitled to assume that no Default, Event of Default or Material Adverse Effect or development in the perfection of the security interest of the Collateral Agent in the Collateral exists, unless the officers of the Collateral Agent immediately responsible for matters concerning this Agreement shall have obtained actual knowledge of such Default, Event of Default or Material Adverse Effect or development through the performance of the Collateral Agent's duties hereunder and under the Loan Documents to which it is a party or shall have been notified in writing by any Loan Party or any Lender that it considers that a Default, Event of Default or such Material Adverse Effect or development exists and specifying the general nature thereof.

SECTION 10.17 <u>No Duty to Provide Additional Credit Information; No Responsibility for Perfection or Priority of Liens, etc</u>. The Collateral Agent shall not have any duty or responsibility to provide any Lender with any credit information concerning the affairs, financial condition or business of any Loan Party which may at any time come into the possession of the Collateral Agent or any responsibility for the perfection or priority of any lien.

SECTION 10.18 <u>Fees; Expenses</u>. The Borrower shall pay to the Collateral Agent within 10 Business Days of its demand the amount of any and all reasonable costs and expenses, including the reasonable fees and expenses of its counsel, that the Collateral Agent may incur in connection with (i) the acceptance and administration of this Agreement and its duties as Collateral Agent hereunder, (ii) the custody or preservation of, or the sale of, collection from or other realization upon, any of the Collateral or (iii) the exercises and enforcements of any rights of the Collateral Agent hereunder or under the Loan Documents to which it is a party. The fees discussed in clause (i) of this Section shall be set forth in a separate agreement between the Collateral Agent and the Borrower. The provisions of this Section 10.18 shall survive the termination of this Agreement and the resignation or removal of the Collateral Agent.

SECTION 10.19 <u>Force Majeure</u>.  The Collateral Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation:  acts of God; earthquakes; fires; floods; wars; civil or military disturbances; sabotage; act of terrorism, epidemics; riots; interruptions, loss or malfunctions of utilities, computer hardware, software or communications service; accidents; labor disputes; or acts of civil or military authority or governmental actions; it being understood that the Collateral Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

SECTION 10.20 <u>Merger of Collateral Agent</u>.  Any corporation or other entity into which the Collateral Agent may be merged or converted or with which it may be consolidated, or any corporation or other entity resulting from any merger, conversion or consolidation to which the Collateral Agent shall be a party, or any corporation or other entity to which substantially all the corporate trust business of the Collateral Agent may be transferred, shall be the collateral agent under this Agreement without further act.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**U.S. COAL CORPORATION,**
as Borrower

By: _____
Name: Robert Gabbard
Title: Chief Executive Officer


**LICKING RIVER RESOURCES, INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**OAK HILL COAL, INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**S. M. & J., INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**J.A.D. COAL COMPANY, INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary

**FOX KNOB COAL CO., INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**SANDLICK COAL COMPANY, LLC,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**WILMINGTON TRUST COMPANY,** as
Collateral Agent


By: _____
Name: _____
Title: _____


**JMB CAPITAL PARTNERS MASTER FUND,
L.P.,** as Lender


By: _____
Name: _____
Title: _____

73

**FOX KNOB COAL CO., INC.,**
as Guarantor

By:_____
Name: Robert Gabbard
Title: Assistant Secretary


**SANDLICK COAL COMPANY, LLC,**
as Guarantor

By:_____
Name: Robert Gabbard
Title: Assistant Secretary


**WILMINGTON TRUST COMPANY,** as
Collateral Agent

By:_____
Name:_____Joseph B. Feil_____
Title:_____Vice President_____


**JMB CAPITAL PARTNERS MASTER FUND,**
**L.P.,** as Lender


By:_____
Name:_____
Title:_____

73

**FOX KNOB COAL CO., INC.,**
as Guarantor

By:_____
Name: Robert Gabbard
Title: Assistant Secretary


**SANDLICK COAL COMPANY, LLC,**
as Guarantor

By:_____
Name: Robert Gabbard
Title: Assistant Secretary


**WILMINGTON TRUST COMPANY,** as
Collateral Agent

By:_____
Name: _____
Title:_____


**JMB CAPITAL PARTNERS MASTER FUND,**
L.P., as Lender

By:  _Cyrus Hadidi_____
Name:  _Cyrus Hadidi_____
Title:  _Partner_____

73