# EXHIBIT C
# PART II

EXHIBIT A
FORM OF
COMPLIANCE CERTIFICATE

To:    [THE LENDERS]

This Compliance Certificate is furnished pursuant to that certain Second Amended and Restated Credit Agreement dated as of August 29, 2008 (as amended, modified, renewed or extended from time to time, the "Agreement") among U.S. Coal Corporation (the "Borrower"), the other Loan Parties, as Guarantors, Wilmington Trust Company, as Collateral Agent, and the lenders party thereto, as Lenders. Unless otherwise defined herein, capitalized terms used in this Compliance Certificate have the meanings ascribed thereto in the Agreement.

THE UNDERSIGNED HEREBY CERTIFIES THAT:

1.    I am the duly elected                of the Borrower;

2.    I have reviewed the terms of the Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of the Borrower and its Subsidiaries during the accounting period covered by the attached financial statements [for quarterly financial statements add: and such financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes];

3.    The examinations described in paragraph 2 did not disclose, except as set forth below, and I have no knowledge of (i) the existence of any condition or event which constitutes a Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate or (ii) any change in GAAP or in the application thereof that has occurred since the date of the audited financial statements referred to in Section 3.04 of the Agreement;

4.    I hereby certify that no Loan Party has changed (i) its name, (ii) its chief executive office, (iii) principal place of business, (iv) the type of entity it is or (v) its state of incorporation or organization without having given the Collateral Agent and the Lenders the notice required by the Security Agreement;

5.    Schedule I attached hereto sets forth financial data and computations evidencing the Borrower's compliance with certain covenants of the Agreement, all of which data and computations are true, complete and correct; and

Described below are the exceptions, if any, to paragraph 3 by listing, in detail, the (i) nature of the condition or event, the period during which it has existed and the action which the Borrower has taken, is taking, or proposes to take with respect to each such condition or event or (i) the change in GAAP or the application thereof and the effect of such change on the attached financial statements:

1

_____

_____

_____

       The foregoing certifications, together with the computations set forth in Schedule I hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this _____ day of _____.

                       U.S. COAL CORPORATION

                       By: _____

                       Name: _____

                       Title: _____

SCHEDULE I

Compliance as of _____, _____ with
Provisions of       and       of
the Agreement

1

EXHIBIT B
FORM OF
JOINDER AGREEMENT

THIS JOINDER AGREEMENT (this "Agreement"), dated as of _____, ____, 200_, is entered into between _____, a _____ (the "New Subsidiary") and the Lenders under that certain Second Amended and Restated Credit Agreement, dated as of August 29, 2008 among U.S Coal Corporation (the "Borrower"), the other Loan Parties, as Guarantors, Wilmington Trust Company, as Collateral Agent, and the lenders party thereto, as Lenders (as the same may be amended, modified, extended or restated from time to time, the "Credit Agreement"). All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Credit Agreement.

The New Subsidiary and the Lenders, hereby agree as follows:

1.     The New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a Loan Party under the Credit Agreement and a "Guarantor" for all purposes of the Credit Agreement and shall have all of the obligations of a Loan Party and a Guarantor thereunder as if it had executed the Credit Agreement. The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Credit Agreement, including without limitation (a) all of the representations and warranties of the Loan Parties set forth in Article III of the Credit Agreement, (b) all of the covenants set forth in Articles V and VI of the Credit Agreement and (c) all of the guaranty obligations set forth in Article IX of the Credit Agreement. Without limiting the generality of the foregoing terms of this paragraph 1, the New Subsidiary, subject to the limitations set forth in Section 9.10 of the Credit Agreement, hereby guarantees, jointly and severally with the other Guarantors, to the Lenders, as provided in Article IX of the Credit Agreement, the prompt payment and performance of the Guaranteed Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise) strictly in accordance with the terms thereof and agrees that if any of the Guaranteed Obligations are not paid or performed in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise), the New Subsidiary will, jointly and severally together with the other Guarantors, promptly pay and perform the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

2.     If required, the New Subsidiary is, simultaneously with the execution of this Agreement, executing and delivering such Collateral Documents (and such other documents and instruments) as reasonably requested by the Required Lenders in accordance with the Credit Agreement.

1

     3.     The address of the New Subsidiary for purposes of Section 8.01 of the Credit Agreement is as follows:

          _____

          _____

          _____

          _____

     4.     The New Subsidiary hereby waives acceptance by the Lenders of the guaranty by the New Subsidiary upon the execution of this Agreement by the New Subsidiary.

     5.     This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same instrument.

     6.     This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without giving effect to any principles of conflicts of law thereof which would result in the application of the laws of any other jurisdiction.

     7.     IN WITNESS WHEREOF, the New Subsidiary has caused this Agreement to be duly executed by its authorized officer, and each Lender has caused the same to be accepted by its authorized officer, as of the day and year first above written.

                            [NEW SUBSIDIARY]

                            _____

                            _____

                            _____

Acknowledged and accepted:

[LENDERS]

By:_____

Name: _____

Title: _____

Exhibit A

Execution Version

## FIRST AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AGREEMENT AND VALUE RIGHT AGREEMENT

THIS FIRST AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AGREEMENT AND VALUE RIGHT AGREEMENT, dated as of September 30, 2009 (as amended, restated, supplemented or otherwise modified from time to time, this "**Amendment**"), by and among U.S. Coal Corporation, a Delaware corporation (the "**Borrower**"), Licking River Resources, Inc., a Kentucky corporation ("**LRR**"), Oak Hill Coal, Inc., a Kentucky corporation ("**OAK**"), S. M. & J., Inc., a Kentucky corporation ("**SMJ**"), J. A. D. Coal Company, Inc., a Virginia corporation ("**JAD**"), Fox Knob Coal Co., Inc., a Kentucky corporation ("**FOX**") and Sandlick Coal Company, LLC, a Virginia limited liability company ("**SCC**" and collectively with LRR, OAK, SMJ, JAD and FOX, the "**Guarantors**"), Wilmington Trust Company, as Collateral Agent (the "**Collateral Agent**"), and East Coast Miner LLC, a Delaware limited liability company ("**ECM**" and together with any successors, assigns or refinancing lenders, collectively the "**Lender**").

## W I T N E S S E T H:

WHEREAS, the Borrower is a party to that certain Second Amended and Restated Credit Agreement, dated as of August 29, 2008, among the Borrower, the Guarantors, the Collateral Agent, and JMB (collectively, the "**Existing Credit Agreement**");

WHEREAS, JMB Partners Master Fund, L.P., a limited partnership registered and organized under the laws of the Cayman Islands ("**JMB**"), assigned all of its interest in the Existing Credit Agreement and the other Loan Documents to ECM pursuant to an Assignment and Assumption, dated as of September 30, 2009 (the "**JMB Assignment**");

WHEREAS, the Borrower is also a party to that certain Value Right Agreement, dated as of April 15, 2008, among the Borrower, the Guarantors and JMB (as amended, the "**Value Right Agreement**");

WHEREAS, JMB assigned its interest in the Value Right Agreement to ECM pursuant to an Assignment and Assumption, dated as of September 30, 2009;

WHEREAS, the parties to the Existing Credit Agreement and the Value Right Agreement have agreed to amend the Existing Credit Agreement and the Value Right Agreement as set forth herein;

NOW THEREFORE, in consideration of the above premises and the agreements contained herein, and for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree to amend the Existing Credit Agreement and the Value Right Agreement as follows:

1.      The Value Right Agreement, together with all rights and obligations thereunder, is hereby terminated in its entirety in consideration of adding such amounts payable thereunder to the principal amount due under the Existing Credit Agreement, as set forth in paragraph 20 of this Amendment.

2.      Capitalized Terms not otherwise defined herein shall have the meaning set forth in the Existing Credit Agreement.

3.      The term "**Maturity Date**" in the Existing Credit Agreement is hereby amended to mean December 31, 2011.

4.      The term "**Closing Date**" in the Existing Credit Agreement is hereby amended to mean September 30, 2009.

5.      The term "**Amendment Fee**" in the Existing Credit Agreement is hereby deleted in its entirety.

6.      "**2008 Bridge Financing**" means the loan to the Borrower represented by unsecured 20% Promissory Notes Due originally due November 30, 2009 (and since extended to December 31, 2011, *provided, however,* that the 20% Promissory Note issued to CAMOFI Master LDC, dated as of December 23, 2008 (the "**Centrecourt 2008 Note**") is not extended and is due November 30, 2009) issued by the Borrower in December 2008 and January 2009 in an aggregate principal amount of $4,500,000, $4,400,000 of which remains outstanding as of the date of this Amendment.

7.      "**2008 Bridge Notes**" means the unsecured 20% Promissory Notes originally due November 30, 2009 issued by the Borrower in respect of the 2008 Bridge Financing, as amended and restated on the date hereof and now due on December 31, 2011, *provided, however,* that the Centrecourt 2008 Note is not extended and is due November 30, 2009.

8.      All references in the Existing Credit Agreement to the 2007 Bridge Financing and the 2007 Bridge Notes are hereby deleted in their entirety.

9.      The definition of the term "**JAD Notes**" is hereby amended by replacing the words, "December 1, 2009", with "December 31, 2011."

10.     Clause (z) of the term "**JAD Seller Notes**" in the Existing Credit Agreement is hereby deleted and replaced with the words "(z) December 31, 2011."

11.     The term "**LRR Seller Notes**" in the Existing Credit Agreement is hereby amended by deleting the word "Third" and inserting in its place the word "Fourth" and deleting clause (b)(i) and inserting in its place "(i) December 31, 2011 and".

12.     All references in Existing Credit Agreement to "MLCI Agreements" and "MLCI Subordination Agreement" are hereby deleted in their entirety.

2

13.    The term **"Post-Closing Agreement"** means the Agreement attached to the First Amendment as Exhibit A, as amended, restated, supplemented or otherwise modified from time to time.

14.    The term **"First Amendment"** means that certain First Amendment to Second Amended and Restated Credit Agreement and Value Right Agreement dated as of September 30, 2009 by and among the Borrower, the Guarantors, the Lender and the Collateral Agent, as amended, restated, supplemented or otherwise modified from time to time.

15.    The term **"First Security Agreement Amendment"** means that certain First Amendment to the Amended and Restated Security Agreement dated as of September 30, 2009, by and among the Borrower, the Original Coal Producers and the Collateral Agent.

16.    The term **"A/R Facility"** in the Existing Credit Agreement is hereby amended by deleting the words "First Tennessee Bank" and replacing them with "Commercial Bank".

17.    All references in the Existing Credit Agreement to the "Rifle Acquisition," the "Rifle Acquisition Documents," the "Rifle Acquisition Terms," the "Rifle Companies," the "Rifle Equipment Line of Credit," the "Rifle Equity Interests," the "Rifle LOI," the "Rifle Non-Core Assets," the "Rifle Non-Core Asset Notes," the "Rifle PPE Indebtedness," the "Rifle Seller Notes," the "Rifle Sellers" the "Rifle Stock Intercreditor Agreement" and "Permitted Acquisition" are hereby deleted in their entirety.

18.    Section 2.01 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

The Loan.  The Borrower hereby acknowledges that, immediately prior to the amendments hereto effected by the First Amendment, the aggregate amount of the term loan made under the Existing Credit Agreement due and payable as of September 30, 2009 was $14,628,914.80 (the **"Credit Agreement Payable"**), the aggregate amount as of September 30, 2009 to be payable under the Value Right Agreement was $9,389,354.80 (the **"Value Right Payable"**). Immediately following the effectiveness of the First Amendment, the aggregate amount payable hereunder is the combined value of the Credit Agreement Payable and the Value Right Payable, specifically $24,018,269.60 (as so combined, the **"Loan"**). Amounts repaid in respect of the Loan may not be reborrowed.

19.    Section 2.03(b) and (c) of the Existing Credit Agreement is hereby renumbered "Section 2.03(e)" and "Section 2.03(f), respectively.

20.    A new Section 2.03(b) shall be inserted into the Existing Credit Agreement to read as follows:

3

Prepayment of Loan. (b) *Mandatory Prepayments*. The Borrower shall make a minimum payment of principal in an amount equal to $500,000 on the first Business Day of each calendar month during the term of the Loan ("**Mandatory Prepayments**").

21.    A new Section 2.03(c) shall be inserted into the Existing Credit Agreement to read as follows:

(c) *Mandatory Excess Prepayments*. In addition to the Mandatory Prepayments required pursuant to Section 2.03(b) above, the Borrower shall also make a minimum payment of principal on each of the Loan and the loans set forth on Schedule 1 to the First Amendment (each, including the Loan, an "**Existing Term Loan**" and collectively the "**Existing Term Loans**") on the first Business Day of each calendar month during the term of the Loan in an amount equal to $500,000 multiplied by a fraction consisting of a numerator equal to the then outstanding principal amount of such Existing Term Loan and a denominator equal to the then outstanding principal amount of all Existing Term Loans ("**Mandatory Excess Prepayments**").

22.    A new Section 2.03(d) shall be inserted into the Existing Credit Agreement to read as follows:

(d) *Mandatory Refinancing Prepayments*. In addition to the Mandatory Prepayments and the Mandatory Excess Prepayments required pursuant to Sections 2.03(b) and (c) above, the Borrower shall also make prepayments of principal to each Existing Term Loan from the entire Net Proceeds from any new equity or debt financing by the Borrower if such Net Proceeds are in excess of $20,000,000, in an amount equal to the amount of such Net Proceeds multiplied by a fraction consisting of a numerator equal to the then outstanding principal amount of such Existing Term Loan and a denominator equal to the then outstanding principal amount of all Existing Term Loans ( "**Mandatory Refinancing Prepayments**").

23.    Section 2.04 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

SECTION 2.04 Warrants. On the Closing Date, the Borrower will issue to the Lender warrants to purchase up to 9,500,000 shares of the common stock of the Borrower, par value $.001 per share (the "**Common Stock**"), at an initial exercise price per share equal to $.01, and warrants to purchase up to 2,000,000 shares of the Common Stock at an initial exercise price per share equal to $3.50 (the "**Warrants**"), in each case pursuant to the terms and conditions set forth in the Warrant Agreements (the "**Warrant Agreements**") attached hereto as Exhibit B, in consideration for the Amendment.

24.    Section 2.05(a) and (b) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

4

Interest. (a) The unpaid principal amount of the Loan shall bear interest beginning October 1, 2009 at a rate per annum equal to twelve percent (12.00%).

(b) Notwithstanding the foregoing clause (a), during the occurrence and continuance of an Event of Default, the unpaid principal amount of the Loan shall bear interest at a rate per annum equal to five percent (5.00%) (the "**Default Rate**") in addition to the rate otherwise applicable pursuant to the foregoing clause (a).

25.    Section 3.04(a) of the Existing Credit Agreement is hereby amended to replace the date in clause (1)(i) with December 31, 2008, and the date in clause (1)(ii) with March 31, 2009.

26.    Section 3.06 (b) of the Existing Credit Agreement is hereby amended to replace the date therein with April 15, 2009.

27.    Section 3.09 of the Existing Credit Agreement is hereby amended to delete the last sentence in its entirety.

28.    Section 3.16 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

Security Interest in Collateral. The Loan Parties acknowledge and reaffirm that the provisions of the Existing Credit Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of the Collateral Agent (for the benefit of the Lenders), and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, assuming due and proper filings of all Uniform Commercial Code financing statements in the appropriate jurisdictions which remain in effect and have not been terminated or released, deeds evidencing liens on real property have been filed in the appropriate governmental offices, the entering into of applicable control agreements and appropriate actions have been taken to establish possessory interests as set forth in Articles 8 and 9 of the Uniform Commercial Code, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of (i) Permitted Encumbrances, to the extent any such Permitted Encumbrances would have priority over the Liens in favor of the Collateral Agent (for the benefit of the Lenders) pursuant to any applicable law, (ii) the JAD Equity Interests, Liens in favor of the JAD Sellers, the Centrecourt Bridge Lenders, and CAMOFI in respect of the Centrecourt Equipment Purchase Note, (iii) any Excluded Assets, (iv) items listed on Schedule VIII to the Security Agreement and (v) the Liens permitted under Sections 6.02(d), (e) and (k), to the extent any such Liens would have priority over the Liens in favor of the Collateral Agent (for the benefit of the Lenders) pursuant to this Agreement and/or any applicable law (collectively, items (i) through (v) are referred to as the "Prior Liens").

5

29.    Section 3.20 of the Existing Credit Agreement is hereby deleted in its entirety.

30.    Sections 4.01(l), (m) and (q) of the Existing Credit Agreement are hereby deleted in their entirety

31.    Section 5.08 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

> Review of Existing Relationships.  Not later than 60 days subsequent to the Closing Date, the Board of Directors of the Borrower at a duly and properly noticed and called meeting of the Board will discuss the Borrower's existing relationships with TerraNova Capital Partners, Inc. and Pryor Cashman LLP, and any payables outstanding to either of them, and resolve whether or not it is in the Borrower's best interests to terminate its relationship with either of them.  The Borrower will provide to the Lender the minutes from such meeting not later than three weeks after the meeting takes place and any adjournments thereof.

32.    Section 5.13(d) of the Existing Credit Agreement is hereby amended by deleting the parenthetical clause "(other than any real property or improvements thereto or any interest therein)" in its entirety.

33.    Section 6.01(j) and (k) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

> (j)    Indebtedness under the A/R Facility in an aggregate principal amount not to exceed $6,000,000 (such amount to be reduced by the amount of any permanent reductions of the commitments thereunder) and the guaranty thereof by Borrower;

> (k)    Indebtedness under the 2008 Bridge Financing in an aggregate principal amount not to exceed $4,500,000 (such amount to be reduced by the amount of any principal repayments of the loans thereunder);

34.    Section 6.01(s) of the Existing Credit Agreement is hereby amended to delete clause (ii) and the word "and" preceding clause (ii) in their entirety.

35.    Section 6.08(b)(vi) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

> (vi)    Mandatory Excess Prepayments or Mandatory Refinancing Prepayments;

36.    Section 6.08(b)(vii) of the Existing Credit Agreement is hereby amended to delete clause (w) in its entirety and replace it with the following clause (w):

> "(w) any amounts payable in accordance with Sections 2.03(c) and (d) hereof;".

6

37. Section 6.08(b)(viii) of the Existing Credit Agreement is hereby deleted in its entirety.

38. Section 8.01(a)(i) and (ii) of the Existing Credit Agreement is hereby amended and restated as follows:

(i) if to any Loan Party, to the Borrower at:

U.S. Coal Corporation
448 Lewis Hargett Circle
Suite 240
Lexington, Kentucky 40503
Attention: Robert Gabbard, Chief Executive Officer
Facsimile No: (859) 219-0913

With a copy (which shall not constitute notice) to:

Pryor Cashman LLP
7 Times Square
New York, New York 10036-6569
Attention: Eric M. Hellige, Esq.
Facsimile No: (212) 326-0806

(ii) if to the Lender, to East Coast Miner LLC at:

c/o Mr. Keith Goggin, Managing Member
5 East 17th Street
Apartment 7
New York, NY 10003

With a copy (which shall not constitute notice) to

The Nelson Law Firm, LLC
White Plains Plaza
One North Broadway
White Plains, NY 10601
Attention: Stephen J. Nelson, Esq.
Facsimile No: (914) 220-1910
Email: sjnelson@nelsonlf.com

or in the case of any subsequent assignee, to the address of such assignee set forth in the relevant assignment document.

39. The first sentence of Section 8.09 (b) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

(b)     Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any U.S. Federal or State court sitting in New York, New York or Wilmington, Delaware in any action or proceeding arising out of or relating to any Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such State or, to the extent permitted by law, in such Federal court.

40.     This Amendment shall be effective upon the occurrence or waiver by the Lender of each of the following:

a.  The Lender shall have received executed counterparts of this Amendment, the First Security Agreement Amendment and the Post-Closing Agreement from each Person party thereto.

b.  The Lender shall have received the reasonable fees and expenses of legal counsel to the Lender and any legal counsel to any of the Lender's members on or before the Closing Date.

c.  The Lender shall have received (i) audited combined financial statements of the Original Coal Producers for the December 31, 2006, 2007 and 2008 fiscal years, (ii) audited combined financial statements of the New Coal Producers for the September 30, 2007 and 2008 fiscal years, and (iii) unaudited interim combined financial statements of the Coal Producers for the three months ended March 31, 2009, and such financial statements shall not, in the reasonable judgment of the Lenders, reflect any material adverse change in the combined financial condition of the Coal Producers, as reflected in the financial statements.

d.  The Lender shall have received executed copies of amendments demonstrating that the holders of (i) the 2008 Bridge Notes, *except* for the Centrecourt 2008 Note, (ii) the JAD Notes, (iii) the JAD Seller Notes and (iv) the LRR Seller Notes have agreed to extend the maturity of the obligations set forth therein to December 31, 2011.

e.  The Lender shall have received satisfactory evidence that the Coal Services Agreement and the Master Trading Agreement have been terminated.

f.  The Lender shall have received the Note duly executed by the Borrower.

41.     In order to induce ECM to enter into this Amendment, each Loan Party hereby represents and warrants as follows:

a.  Each of the Loan Parties is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to own or lease and operate its properties

8

and carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

b.  The execution, delivery and performance of this Amendment, the First Security Agreement Amendment and the Post-Closing Agreement are within each Loan Party's corporate, limited liability, or limited partnership powers (as applicable) and have been duly authorized by all necessary corporate and, if required, stockholder action. Each such Loan Document to which each Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms.

c.  The execution, delivery and performance by, or enforcement against, any Loan Party of this Amendment and the Security Agreement Amendment do not and will not (a) violate, conflict with or result in the breach of any provision of the charter or by-laws (or similar organization documents) of any Loan Party, (b) conflict with or violate in any material respect any Requirement of Law or order of any Governmental Authority applicable to any Loan Party or any of their respective assets, properties or businesses, or (c) conflict in any material respect with, result in any material breach of, constitute a material default (or event which with the giving of notice or lapse of time, or both, would become a material default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in any Lien on any material assets or properties of any Loan Party pursuant to any Material Agreement or any other material license, permit, franchise or other instrument or arrangement to which any Loan Party is a party or by which any of its assets or properties is bound or affected, *except* for the Centrecourt Bridge Notes and the letter agreement between the Borrower, CAMOFI Master LDC and MAHZN Master LDC, together with their respective limited partners and members, dated as of April 14, 2008, as amended by the Centrecourt Amendment.

d.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (i) the execution, delivery or performance by, or enforcement against, any Loan Party of this Amendment, the First Security Agreement Amendment or the Post-Closing Agreement, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the First Security Agreement Amendment, (iii) the perfection or maintenance of the Liens created under the Collateral Documents, other than the due filing of UCC-1 financing statements, actions taken to establish possessory interests as set forth in Articles 8 and 9 of the Uniform Commercial Code, the entering into of applicable control agreements and the delivery of a duly executed JAD Stock Intercreditor Agreement, or (iv) the exercise by any Lender or the Collateral Agent of

9

its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents. All applicable waiting periods in connection with the Transactions have expired without any action having been taken by any Governmental Authority restraining, preventing or imposing materially adverse conditions upon the Transactions or the rights of the Loan Parties freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

    e.   Each Loan Party has all requisite corporate, limited liability company or partnership (as applicable) power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.

    f.   No fees, commissions or other remuneration of any kind are payable by the Borrower, any Loan Party or the Lender to any finder, broker, dealer, investment banker or investment adviser in connection with the execution and delivery of this Amendment, amendments to any other Loan Document (as defined in the Existing Credit Agreement), the Transactions (as defined in the Existing Credit Agreement) or the JMB Assignment.

This Amendment modifies and amends the Existing Credit Agreement with respect to the subject matter hereof and is hereby made a part of the Existing Credit Agreement. Except to the extent this Amendment expressly and specifically modifies and amends the terms and conditions of the Existing Credit Agreement, the terms and the conditions of the Existing Credit Agreement remain applicable in their entirety, and this Amendment shall not otherwise limit or reduce Borrower's or Guarantors' duties, obligations, or responsibilities under the Existing Credit Agreement. In the event of any claim of conflict between the terms and conditions of this Amendment and the terms and conditions of any part of the Existing Credit Agreement that have not been amended hereby, the interpretation given to such terms and conditions in the Existing Credit Agreement that have not been amended shall control the meaning thereof.

At the request of the Collateral Agent pursuant to Section 10.13 of the Existing Credit Agreement, the Lender, being the sole Lender under the Existing Credit Agreement, hereby instructs the Collateral Agent to execute this Amendment and further instructs the Collateral Agent to execute the First Security Agreement Amendment. Further, pursuant to Section 10.09(b) of the Existing Credit Agreement, the Lender hereby certifies and confirms to the Collateral Agent that this Amendment and the Security Agreement Amendment are not contrary to the terms of the Existing Credit Agreement or any other Loan Document and are not otherwise contrary to law.

[Remainder of page intentionally blank.]

10

This Amendment may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

Very truly yours,

**EAST COAST MINER LLC**, as Lender

By: _____
Name: KEITH F. GOGGIN
Title: MANAGER

**U.S. COAL CORPORATION**, as Borrower

By: _____
Name: Robert Gabbard
Title:   Chief Executive Officer

**LICKING RIVER RESOURCES, INC.**, as Guarantor

By: _____
Name: Robert Gabbard
Title:   Assistant Secretary

**OAK HILL COAL, INC.**, as Guarantor

By: _____
Name: Robert Gabbard
Title:   Assistant Secretary

**S. M. & J., INC.**, as Guarantor

By: _____
Name: Robert Gabbard
Title:   Assistant Secretary

11

This Amendment may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

Very truly yours,

**EAST COAST MINER LLC**, as Lender

By:_____
Name:
Title:

**U.S. COAL CORPORATION**, as Borrower

By:
Name:  Robert Gabbard
Title:    Chief Executive Officer

**LICKING RIVER RESOURCES, INC.**, as Guarantor

By:
Name:  Robert Gabbard
Title:    Assistant Secretary

**OAK HILL COAL, INC.**, as Guarantor

By:
Name:  Robert Gabbard
Title:    Assistant Secretary

**S. M. & J., INC.**, as Guarantor

By:
Name:  Robert Gabbard
Title:    Assistant Secretary

11

**J. A. D. COAL COMPANY, INC.**, as Guarantor

By: _____
Name: Robert Gabbard
Title:   Assistant Secretary

**FOX KNOB COAL CO., INC.**, as Guarantor

By: _____
Name: Robert Gabbard
Title:   Assistant Secretary

**SANDLICK COAL COMPANY, LLC**, as Guarantor

By: _____
Name: Robert Gabbard
Title:   Assistant Secretary


AGREED TO AND ACKNOWLEDGED
AS OF THE DATE FIRST WRITTEN ABOVE BY:

**WILMINGTON TRUST COMPANY**, in its capacity as Collateral Agent


By:_____
Name:
Title:

12

**J. A. D. COAL COMPANY, INC.**, as Guarantor

By:_____
Name: Robert Gabbard
Title:   Assistant Secretary

**FOX KNOB COAL CO., INC.**, as Guarantor

By:_____
Name: Robert Gabbard
Title:   Assistant Secretary

**SANDLICK COAL COMPANY, LLC**, as Guarantor

By:_____
Name: Robert Gabbard
Title:   Assistant Secretary

AGREED TO AND ACKNOWLEDGED
AS OF THE DATE FIRST WRITTEN ABOVE BY:

**WILMINGTON TRUST COMPANY**, in its capacity as Collateral Agent

By:_____
Name:
Title:           James A. Hanley
                 Vice President

12

**EXHIBIT A**

**FORM OF POST-CLOSING AGREEMENT**

**EXHIBIT B**

**FORM OF WARRANTS**

## SCHEDULE 1

## EXISTING TERM LOANS

1.    2008 Bridge Notes

2.    Centrecourt Bridge Notes

3.    Centrecourt Equipment Purchase Note

4.    JAD Notes

5.    JAD Seller Notes

6.    LRR Seller Notes

FILED: NEW YORK COUNTY CLERK 02/14/2012

NYSCEF DOC. NO. 7

INDEX NO. 650411/2012

RECEIVED NYSCEF: 02/14/2012

# Exhibit 5

## FIRST AMENDED AND RESTATED INTERCREDITOR AND SUBORDINATION AGREEMENT

THIS FIRST AMENDED AND RESTATED INTERCREDITOR AND SUBORDINATION AGREEMENT (this "Agreement") is dated as of September 30, 2009 among J.A.D. Coal Company, Inc., a Virginia corporation ("JAD"), Sandlick Coal Company, LLC, a Virginia limited liability company, formerly known as Sandlick Coal Company, Inc., a Virginia corporation ("Sandlick"), Fox Knob Coal Co., Inc., a Kentucky corporation ("Fox Knob" and together with JAD and Sandlick, the "Borrowers"), Aubra Paul Dean ("Aubra"), Carl E. McAfee ("Carl"), Julia L. McAfee ("Julia" and together with Aubra and Carl, the "JAD Sellers"), and CAMOFI Master LDC, a Cayman Islands Limited Duration Company, as collateral agent for the various purchasers (the "Bridge Lenders") under the Bridge Purchase Agreement (as hereinafter defined) (the "Agent"), East Coast Miner LLC, a Delaware limited liability company ("ECM"), and Wilmington Trust Company, as collateral agent on behalf of ECM (the "Collateral Agent").

## RECITALS

WHEREAS, the Borrowers requested that the Bridge Lenders make, and the Bridge Lenders made, a $5,000,000 bridge loan to the Borrowers on the terms set forth in Senior Secured Notes, dated as of April 15, 2008 and due December 31, 2011 (the "Bridge Notes");

WHEREAS, the Bridge Notes are subject to the terms of the Securities Purchase Agreement, dated as of April 15, 2008 (the "Bridge Purchase Agreement"), by and among the Borrowers, U.S. Coal Corporation, a Delaware corporation and parent of the Borrowers (the "Parent"), and the Bridge Lenders, and are secured by the collateral set forth in the Security Agreement (the "Centrecourt Collateral"), the terms and priority of which are as set forth in this Agreement;

WHEREAS, the Borrowers' obligations under the Bridge Notes, the Bridge Purchase Agreement and the other Borrower Transaction Documents (as hereinafter defined) are guaranteed by the Parent pursuant to the Guarantee, dated as of April 15, 2008 (the "Guarantee"), made by the Parent in favor of the Bridge Lenders;

WHEREAS, on or prior to April 15, 2008, the Parent and the JAD Sellers entered into a Purchase Agreement, dated as of June 19, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "JAD Purchase Agreement"), pursuant to which the Parent purchased (the "JAD Acquisition") all of the outstanding equity interests of the Borrowers;

WHEREAS, pursuant to the JAD Purchase Agreement, the Borrowers issued Convertible Notes, dated as of April 15, 2008, to the JAD Sellers in the total aggregate principal amount of $7,000,000 (the "JAD Notes") to finance the JAD Acquisition;

WHEREAS, in accordance with the terms of the JAD Purchase Agreement, the JAD Sellers were granted by the Parent (i) a second lien security interest in all right, title and interest

in and to all equipment and interests in real property owned by the Borrowers on April 15, 2008 in which the Borrowers have previously granted a first priority security interest (the "Existing Lender Collateral") to First Tennessee National Bank, CIT Financial, Powell Valley National Bank and their assignees (collectively, the "Existing Lenders"), (ii) a first lien security interest in all of Borrowers' right, title and interest in and to all equipment, fixtures and other personal property and coal reserves owned by the Borrowers on April 15, 2008 in which it has not previously granted a security interest to any third party (the "Unencumbered Collateral") and, (iii) in accordance with the terms of that certain security agreement dated as of April 15, 2008, made by and between the Borrowers and the JAD Sellers (the "JAD Security Agreement"), the right to receive a first lien security interest in the Other Collateral (as defined therein the "Other Collateral" and together with the Existing Lender Collateral and the Unencumbered Collateral, the "JAD Collateral"), to secure their rights and interests under (i) the JAD Notes, (ii) the Parent's obligations with respect to the Cumberland Surety Agreement for Bond for the Surface Effects of Surface Mining issued June 22, 1998, by Cumberland Surety Incorporated (the "Cumberland Surety") on behalf of Sandlick and (iii) the Parent's obligations with respect to their other personal guarantee obligations assumed by the Parent pursuant to the JAD Purchase Agreement;

WHEREAS, pursuant to that certain Assignment and Assumption dated as of September 30, 2009 between JMB Capital Partners Master Fund, L.P. ("JMB"), and ECM, ECM irrevocably purchased and assumed from JMB, all of JMB's rights and obligations in its capacity as a lender under that certain Second Amended and Restated Credit Agreement, dated August 29, 2008 by and between Parent, as Borrower, the Guarantors (as defined therein), the Collateral Agent, and JMB, as successor in interest to FURSA Master Global Event Driven Fund L.P. and Grand Central Asset Trust, MLN Series, as such credit agreement was amended by that certain First Amendment to Second Amended and Restated Credit Agreement and Value Right Agreement dated as of September 30, 2009 by and among Parent, the Guarantors, the Collateral Agent, and ECM (as amended from time to time the "Credit Agreement"), and the other transaction documents executed and delivered in connection therewith, including without limitation, that certain Amended and Restated Security Agreement dated as of August 29, 2008 made by Grantors (as defined therein the "Grantors") to the Collateral Agent, as the same was amended by that certain First Amendment to the Amended and Restated Security Agreement dated as of September 30, 2009 made by Parent, the Grantors, and the Collateral Agent (the "Amended Security Agreement");

WHEREAS, the Amended Security Agreement grants to the Collateral Agent, for the benefit of ECM, a security interest in each Grantor's right, title and interest in and to all of such Grantor's property and assets, whether now owned or thereafter existing or arising, including, without limitation, the coal preparation and wash plant at JAD (the "JAD Wash Plant", which, for the avoidance of doubt, does not include any portion of the coal preparation and wash plant consisting of an interest in real property) and the highwall miner, serial number _____, located at JAD (collectively, the "ECM Collateral");

WHEREAS, the Borrowers, the JAD Sellers, the Bridge Lenders, the Collateral Agent and ECM desire to enter into this Agreement to, among other things, confirm the relative priorities of and rights in the security interests in the JAD Collateral and the Atlas Drill;

NOW, THEREFORE, in consideration of the above recitals and the provisions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, intending to be legally bound:

## AGREEMENT

**Section 1.**   **Definitions.**   In addition to the terms defined elsewhere in this Agreement, the following terms have the meanings indicated in this Section 1:

"Additional Notes" shall mean any Bridge Notes issued to the holders of the Bridge Notes in payment of interest.

"Atlas Drill" shall mean that certain Atlas Drill, serial number 8836, acquired by the Borrowers subsequent to April 15, 2008, in which Agent holds a security interest under the Security Agreement, and which comprises part of the Centrecourt Collateral.

"Borrower Transaction Documents" shall mean the Bridge Purchase Agreement, the Bridge Notes, the Additional Notes (if any), the Security Agreement, the Guarantee, the Rights Agreement (only as it relates to the Parent's obligations under Section 2 of the Rights Agreement) and the Subordination Agreements (as they relate to enforcement costs thereunder).

"Default" shall mean a default or event of default under any instrument or agreement evidencing any of the Junior Creditor Debt.

"Encumbered Centrecourt Collateral" shall mean the portion of the Existing Lender Collateral in which Agent holds a security interest under the Security Agreement.

"Encumbered ECM Collateral" shall mean all Existing Lender Collateral other than the Encumbered Centrecourt Collateral.

"Exclusive ECM Collateral" shall mean all ECM Collateral other than: (i) property acquired by the Grantors subsequent to April 15, 2008 and (ii) the Centrecourt Collateral.

"First Priority Creditor" shall mean the JAD Sellers.

"First Priority Creditor Obligations" shall mean all debts, liabilities, obligations, covenants and duties owing to the First Priority Creditor by (i) the Borrowers under or in connection with the JAD Notes and (ii) the Parent under and in connection with the First Priority Senior Obligation, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

"First Priority Senior Obligation" shall mean all debts, liabilities, obligations, covenants and duties owing to the First Priority Creditor under or in connection with the JAD Notes, the Cumberland Surety and such other personally guaranteed debts of the First Priority Creditor to First Tennessee National Bank, Powell Valley National Bank and CIT Financial, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

3

"Junior Creditor Debt" shall mean all indebtedness, obligations, and liabilities of the Borrowers to either of the Junior Creditors, under any agreement of any kind, including, without limitation, all principal and interest (including, without limitation, any interest accruing after the filing of any petition in bankruptcy or the commencement of any Proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such Proceeding) and late fees payable thereunder.

"Junior Creditor Documents" shall mean any all documents evidencing the Junior Creditor Debt.

"Junior Creditors" shall mean (i) the Second Priority Creditor, to the extent such Second Priority Creditor shall not be a Senior Creditor pursuant to the terms of this Agreement, and (ii) the Third Priority Creditor, to the extent such Third Priority Creditor shall not be a Senior Creditor pursuant to the terms of this Agreement.

"Person" shall mean any corporation, association, joint venture, partnership, limited liability company, organization, business, individual, trust, government or agency or political subdivision thereof, or any other legal entity.

"Proceeding" shall mean (a) any insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, readjustment, composition, or other similar proceeding relating to the Borrowers or any of their respective properties, whether under any bankruptcy, reorganization, or insolvency laws or any law relating to relief of debtors, readjustment of indebtedness, reorganization, composition, or extension; (b) any proceeding for the liquidation, liquidating distribution, dissolution, or other winding up of the Borrowers, voluntary or involuntary, whether or not involving insolvency or bankruptcy proceedings; (c) any assignment for the benefit of creditors of the Borrowers; or (d) any other marshalling of the assets of the Borrowers.

"Remedy" shall mean, with respect to a Default, the acceleration of any Junior Creditor Debt or the exercise of any remedies in respect of such Default (including, without limitation, the right to sue the Borrowers, to exercise any right of set off, and to file or participate in any involuntary bankruptcy proceeding against the Borrowers, and explicitly including the imposition of default rate interest).

"Rights Agreement" shall mean the Rights Agreement, dated as of April 15, 2008, among the Parent, CAMOFI Master LDC, CAMHZN Master LDC, Futurtec, L.P., Lawrence Kaplan and Michael Miller.

"Second Priority Creditor" shall mean the Agent, on behalf of the Bridge Lenders.

"Second Priority Creditor Obligations" shall mean all debts, liabilities, obligations, covenants and duties owing by the Borrowers to the Second Priority Creditor under or in connection with the Bridge Notes, the Bridge Purchase Agreement and any other Borrower Transaction Documents, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

4

"Security Agreement" shall mean the Security Agreement, dated as of April 15, 2008, among the Borrowers, the Parent and the Agent, on behalf of the Bridge Lenders, as amended by Amendment No. 1 to Security Agreement, dated as of the date hereof.

"Senior Creditor" shall initially mean the First Priority Creditor unless and until such time as it is joined or replaced by the Second Priority Creditor and/or the Third Party Creditor pursuant to the terms of this Agreement.

"Senior Creditor Debt" shall mean all indebtedness, obligations, and liabilities owing by the Borrowers to a Senior Creditor, under the Senior Creditor Documents, including, without limitation, all principal and interest (including, without limitation, any interest accruing after the filing of any petition in bankruptcy or the commencement of any Proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such Proceeding) and late fees payable thereunder.

"Senior Creditor Documents" shall mean any all documents evidencing (i) if the First Priority Creditor is a Senior Creditor, the First Priority Creditor Obligations, (ii) if the Second Priority Creditor is a Senior Creditor, the Second Priority Creditor Obligations and (iii) if the Third Priority Creditor is a Senior Creditor, the Third Party Creditor Obligations.

"Senior Creditor Event of Default" shall mean a default or event of default under any instrument or agreement evidencing the Senior Creditor Debt.

"Stock Subordination Agreement" shall mean the Intercreditor and Subordination Agreement, dated April 15, 2008, among the Parent, the JAD Sellers, the Agent on behalf of the Bridge Lenders, JMB, and Merrill Lynch Commodities, Inc., a Delaware corporation.

"Subordination Agreements" shall mean, collectively, the Stock Subordination Agreement and this Agreement.

"Third Priority Creditor" shall mean the Collateral Agent, as collateral agent on behalf of ECM and ECM.

"Third Priority Creditor Documents" shall mean all documents evidencing the Third Priority Creditor Obligations.

"Third Priority Creditor Obligations" shall mean all debts, liabilities, obligations, covenants and duties owing by Parent and the Guarantors under or in connection with the Credit Agreement, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

"Unencumbered Centrecourt Collateral" shall mean the portion of the Unencumbered Collateral and Other Collateral in which Agent holds a security interest under the Security Agreement.

"Unencumbered ECM Collateral" shall mean all Unencumbered Collateral and Other Collateral other than the Unencumbered Centrecourt Collateral.

5

**Section 2.**    <u>Priority.</u>

As between the parties, the priority of the security interest in the JAD Collateral, and the Atlas Drill, are as set forth in this Section 2 of the Agreement:

(i)    the First Priority Creditor, as the initial Senior Creditor, shall hold a second priority security interest in the Existing Lender Collateral (junior only to the lien of each Existing Lender) and a first priority security interest in the Unencumbered Collateral and the Other Collateral, the Second Priority Creditor shall hold a third priority security interest in the Encumbered Centrecourt Collateral (junior only to (a) the lien of each Existing Lender and (b) the lien of the First Priority Creditor), a second priority security interest in the Unencumbered Centrecourt Collateral (junior only to the lien of the First Priority Creditor), and a first priority security interest in the Atlas Drill, and the Third Priority Creditor shall hold a fourth priority security interest in the Encumbered Centrecourt Collateral (junior only to (a) the lien of each Existing Lender, (b) the lien of the First Priority Creditor and (c) the lien of the Second Priority Creditor), a third priority security interest in the Encumbered ECM Collateral (junior only to (a) the lien of the each Existing Lenders and (b) the lien of the First Priority Creditor), a third priority security interest in the Unencumbered Centrecourt Collateral (junior only to (a) the lien of the First Priority Creditor and (b) the lien of the Second Priority Creditor), a second priority security interest in the Unencumbered ECM Collateral and the JAD Wash Plant (junior only to the lien of the First Priority Creditor), and a first priority security interest in all ECM Collateral other than JAD Collateral;

(ii)    at such time as the First Priority Senior Obligation is fully satisfied, the Second Priority Creditor shall, without further action, become an additional Senior Creditor and shall hold, solely with respect to Second Priority Creditor Obligations relating to an aggregate of up to $2,500,000 principal amount of Bridge Notes (including, without limitation, any interest, fees, or other liabilities or obligations thereon and relating thereto), (x) a first priority security interest in the Unencumbered Centrecourt Collateral <u>pari passu</u> with the First Priority Creditor, (y) a second priority security interest in the Encumbered Centrecourt Collateral (junior only to the lien of each Existing Lender) <u>pari passu</u> with the First Priority Creditor, and (z) a first priority security interest in the Atlas Drill, and, upon full satisfaction of the remaining First Priority Creditor Obligations, the First Priority Creditor shall no longer be a Senior Creditor and the Second Priority Creditor shall be the sole Senior Creditor with respect to all Second Priority Creditor Obligations;

(iii)    Upon full satisfaction of the remaining First Priority Creditor Obligations, the First Priority Creditor shall no longer be a Senior Creditor and the Third Priority Creditor shall be the sole Senior Creditor with respect to all Third Priority Creditor Obligations; and

(iv)    at such time as the First Priority Senior Obligation and the Second Priority Creditor Obligations are fully satisfied in cash, the Third Priority Creditor shall hold,

6

solely with respect to the Third Priority Creditor Obligations, (x) a second priority security interest in the Unencumbered ECM Collateral and the Unencumbered Centrecourt Collateral (junior only to the lien of the First Priority Creditor) and (y) a third priority security interest in the Encumbered ECM Collateral and the Encumbered Centrecourt Collateral (in each case junior only to (a) the lien of each Existing Lender and (b) the lien of the First Priority Creditor), and upon full satisfaction of the remaining First Priority Creditor Obligations, the First Priority Creditor shall no longer be a Senior Creditor and the Third Party Creditor shall be the sole Senior Creditor with respect to all Third Party Creditor Obligations.

**Section 3.    <u>Subordination in the Event of a Proceeding.</u>**

For so long as there is a Junior Creditor hereunder, upon any distribution of the Centrecourt Collateral or the proceeds of any sale thereof, upon any Proceeding, the Senior Creditors shall first be entitled to receive payments in full account of the Senior Creditor Debt in cash before the Junior Creditors are entitled to receive any payment on account of the Junior Creditor Debt and the Second Priority Creditor shall be entitled to receive payments in full account of the Second Priority Creditor Obligations in cash before the Third Priority Creditor is entitled to receive any payment on account of the Third Priority Creditor Obligations. Notwithstanding anything contained in this Section 3 to the contrary, upon any distribution of the Atlas Drill or the proceeds of any sale thereof, upon any Proceeding, the Second Priority Creditor shall first be entitled to receive any payments in full account of the Second Priority Creditor Obligations in cash before either the First Priority Creditor or the Third Priority Creditor are entitled to receive any payments on account of the First Priority Creditor Obligations or the Third Priority Creditor Obligations, respectively;

For so long as there is a Junior Creditor hereunder, upon any distribution of the Exclusive ECM Collateral, or the proceeds of any sale thereof, upon any Proceeding, the Senior Creditors shall first be entitled to receive payments in full account of the Senior Creditor Debt in cash before the Junior Creditors are entitled to receive any payment on account of the Junior Creditor Debt and the Third Priority Creditor shall be entitled to receive payments in full account of the Third Priority Creditor Obligations in cash before the Second Priority Creditor is entitled to receive any payment on account of the Second Priority Creditor Obligations.

For so long as there is a Junior Creditor hereunder, upon any distribution of the JAD Collateral or the proceeds of any sale thereof, upon any Proceeding:

(i)    any payment or distribution of assets of any of the Borrowers of any kind or character, whether in cash, property, or securities to which either Junior Creditor would be entitled except for the provisions of this Agreement, shall be paid by the liquidating trustee or agent or other Person making such a payment or distribution, directly to the Senior Creditors, to the extent necessary to pay the Senior Creditor Debt in full after giving effect to all concurrent payments and distributions;

(ii)    in the event that, notwithstanding the foregoing, any payment or distribution of assets of any of the Borrowers of any kind or character, whether in cash, property, or securities to which either Junior Creditor would be entitled except for the

7

provisions of this Agreement, shall be received by either Junior Creditor on account of any Junior Creditor Debt before the Senior Creditor Debt is paid in full in cash, such payment or distribution shall be received and held in trust by such Junior Creditor for the benefit of the Senior Creditor, to the extent necessary to pay the Senior Creditor Debt in full in cash after giving effect to all concurrent payments and distributions; and

(iii)    notwithstanding anything contained herein to the contrary, upon any distribution of the JAD Wash Plant or the proceeds of any sale thereof upon any Proceeding, the First Priority Creditor shall be entitled to receive payments in full account of the First Priority Creditor Obligations before the Junior Creditors are entitled to receive any payment on account of the Junior Creditor Debt, and the Third Priority Creditor shall be entitled to receive payments in full account of the Third Priority Creditor Obligations before the Second Priority Creditor shall be entitled to receive any payment on account of the Second Priority Creditor Obligations.

The Borrowers shall give written notice to the Senior Creditors and the Junior Creditors within three days of receipt of notice of any Proceeding.

Section 4.    Remedy Standstill.

(a) For so long as there is a Junior Creditor hereunder, until the date the Senior Creditor Debt has been paid in full in cash, no Junior Creditor shall, without the prior written consent of the Senior Creditor (i) exercise any Remedy in respect of any Default, or (ii) commence or join with any other creditor in commencing any bankruptcy, reorganization or insolvency proceeding, with respect to the JAD Collateral.

(b) Until the date on which all Second Priority Creditor Obligations have been paid in full in cash, (A) the Third Priority Creditor shall not, without the prior written consent of the Second Priority Creditor (i) exercise any Remedy in respect of any Default, or (ii) commence or join with any other creditor in commencing any bankruptcy, reorganization or insolvency proceeding, in the case of either (i) or (ii) above, solely to the extent that any such action would relate to the Atlas Drill, and (B) the Third Priority Creditor shall not, without the prior written consent of the Second Priority Creditor (i) exercise any Remedy in respect of any Default, or (ii) commence or join with any other creditor in commencing any bankruptcy, reorganization or insolvency proceeding, in the case of either (i) or (ii) above, solely to the extent that any such action would relate to any Centrecourt Collateral.

(c) Until the date on which the Third Priority Creditor Obligations are paid in full, the Second Priority Creditor shall not, without the prior written consent of the Third Priority Creditor (i) exercise any Remedy in respect of any Default, or (ii) commence or join with any other creditor in commencing any bankruptcy, reorganization or insolvency proceeding, in the case of either (i) or (ii) above, solely to the extent that any such action would relate to any Exclusive ECM Collateral or the JAD Wash Plant.

Section 5.    Payments Held in Trust, Subrogation, Right to Cure and Purchase.

For so long as there is a Junior Creditor hereunder:

8

(i)       If any payment or distribution of assets on account of any Junior Creditor Debt shall be made by any of the Borrowers or received by either Junior Creditor holding such Junior Creditor Debt at a time when such payment or distribution was prohibited by the provisions of this Agreement, then such payment or distribution shall be received and held in trust by such Junior Creditor for the benefit of the Senior Creditors and shall be paid or delivered by such Junior Creditor to the Senior Creditors to the extent necessary to enable payment in full of the Senior Creditor Debt in cash.

(ii)      After the payment in full of all Senior Creditor Debt in cash, each Junior Creditor shall be subrogated to the rights of the holders of such Senior Creditor Debt to receive payments or distributions on the JAD Collateral applicable to the Senior Creditor Debt until all amounts owing on the Junior Creditor Debt shall be paid in full, and for the purpose of such subrogation no such payments or distributions to the holders of the Senior Creditor Debt by or on behalf of any of the Borrowers, or by or on behalf of each Junior Creditor by virtue of this Agreement, that otherwise would have been made to the Second Priority Creditor shall, as between any of the Borrowers and each Junior Creditor, be deemed to be payment by such Borrower to or on account of the Senior Creditor Debt in respect thereof, it being understood that the provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of each Junior Creditor, on the one hand, and the holders of such Senior Creditor Debt, on the other hand. If any payment or distribution to which any Junior Creditor would otherwise have been entitled but for the provisions of this Agreement shall have been applied, pursuant to the provisions of this Agreement, to the payment of amounts payable under the Senior Creditor Debt, then such Junior Creditor shall be entitled to receive from the holders of the Senior Creditor Debt any payments or distributions received by such holders of the Senior Creditor Debt in excess of the amount sufficient to pay all amounts payable under or in respect of such Senior Creditor Debt in full.

(iii)     The Senior Creditors hereby grant the Junior Creditors the right, but not the obligation, to cure any and all defaults under the Senior Creditor Debt (to the extent any such defaults are curable) within the same period of time afforded the Borrowers for curing such defaults before the same become Senior Creditor Events of Default. The Senior Creditors shall have no obligation hereunder, however, to provide notice of any Senior Creditor Event of Default to the Junior Creditors, and the lack of any such notice shall not affect the existence or occurrence of any Senior Creditor Event of Default.

**Section 6.       No Prejudice or Impairment.**

Nothing contained in this Agreement, is intended to or shall impair, as between the Borrowers and the Junior Creditors, the obligation of the Borrowers, which is absolute and unconditional, to pay to the Junior Creditors the Junior Creditor Debt as and when the same shall become due and payable in accordance with its terms, or is intended to or shall affect the relative rights of the Junior Creditors and creditors of the Borrowers (other than the holders of the Senior Creditor Debt).

**Section 7.       Proofs of Claim.**

9

In connection with any Proceeding involving any of the Borrowers, the Junior Creditors are entitled to file proofs of claim in respect of the Junior Creditor Debt. Upon the failure of the either Junior Creditor to take any such action as of the fifteenth Business Day preceding the bar date for the filing of proofs of claims, the Senior Creditors are hereby irrevocably authorized and empowered, but shall have no obligation to file proofs of claim with respect to the Junior Creditor Debt. Notwithstanding the foregoing, the Senior Creditors shall not have any right whatsoever to vote any claim that either Junior Creditor may have in the Proceeding to accept or reject any plan or partial or complete liquidation, reorganization, arrangement, composition, or extension; provided, that, the Junior Creditors shall not vote with respect to any such plan or take any other action in any way so as to contest (i) the relative rights and duties of the Senior Creditors under the Senior Creditor Documents with respect to any collateral or guaranties or (ii) the Junior Creditors' respective obligations and agreements set forth in this Agreement.

**Section 8.**     **Benefit of Agreement; Amendments of Certain Documents; etc.**

This Agreement shall constitute a continuing offer to all Persons who, in reliance upon such provisions, become a Senior Creditor, and such provisions are made for the benefit of each subsequent Senior Creditor and each of them may enforce such provisions.

The Senior Creditor Documents may be amended, supplemented, waived, altered, modified, or otherwise changed in any manner approved by the Senior Creditors, the Parent and the Borrowers without the consent or approval of the Junior Creditors.

The Senior Creditors shall have no obligation to preserve rights in the JAD Collateral against any prior parties or to marshal any of the JAD Collateral for the benefit of any Person. No failure to exercise, and no delay in exercising on the part of any party hereto, any right, power, or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power, or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided in this Agreement are cumulative and shall not be exclusive of any rights or remedies provided by law.

Except as expressly set forth herein, there shall be no third party beneficiaries of this Agreement.

**Section 9.**     **Further Agreements Concerning the Collateral and Senior Creditor Debt.**

(a) Each Junior Creditor, severally and not jointly, agrees that (i) it will not at any time contest the validity, perfection, priority or enforceability of the security interests and liens granted by the Borrowers to the Senior Creditors in the JAD Collateral; (ii) the Senior Creditors may administer the Senior Creditor Debt and any of the Senior Creditors' agreements with the Borrowers in any way the Senior Creditors deem appropriate consistent with the terms and provisions of the Senior Creditor Documents, without regard to the Junior Creditors or the Junior Creditor Debt; (iii) the Senior Creditors shall have no obligation to preserve rights in the JAD Collateral against any prior parties or to marshal any of the JAD Collateral for the benefit of any Person; (iv) nothing in this Agreement shall impair or adversely affect the manner or timing with

10

which the Senior Creditors enforce any of their security; (vi) nothing in this Agreement shall impair or adversely affect any right, privilege, power or remedy of the Senior Creditors with respect to the Senior Creditor Debt, the Borrowers, or any JAD Collateral, including without limitation, the Senior Creditors' right to (x) waive or release any of the Senior Creditors' security or rights, (y) waive or ignore any defaults by the Borrowers; and/or (z) restructure, renew, modify, or supplement the Senior Creditor Debt or any portion thereof or any agreement with the Borrowers relating to the Senior Creditor Debt or to increase the outstanding principal amount of the Senior Creditor Debt by extending additional credit to the Borrowers; and (vi) nothing contained herein is intended to alter or deprive the Senior Creditors of any of their rights as the senior secured creditors of the Borrowers to collect or otherwise foreclose upon any of the JAD Collateral.

(b)    The Third Priority Creditor agrees that (i) it will not at any time contest the validity, perfection, priority or enforceability of the security interests and liens granted by the Borrowers to the Second Priority Creditor in the Centrecourt Collateral; (ii) the Second Priority Creditor may administer the Second Priority Creditor Obligations and any of the Second Priority Creditor's agreements with the Borrowers in any way the Second Priority Creditor deems appropriate consistent with the terms and provisions of the Borrower Transaction Documents, without regard to the Third Priority Creditor or the Third Priority Creditor Obligations or the Third Priority Creditor Documents; (iii) the Second Priority Creditor shall have no obligation to preserve rights in the Centrecourt Collateral against any prior parties or to marshal any of the Centrecourt Collateral for the benefit of any Person; (iv) nothing in this Agreement shall impair or adversely affect the manner or timing with which the Second Priority Creditor enforces any of its security; (v) nothing in this Agreement shall impair or adversely affect any right, privilege, power or remedy of the Second Priority Creditor with respect to the Second Priority Creditor Obligations, the Borrowers, or any Centrecourt Collateral, including without limitation, the Second Priority Creditor's right to (x) waive or release any of the Second Priority Creditor's security or rights, (y) waive or ignore any defaults by the Borrowers; and/or (z) restructure, renew, modify, or supplement the Second Priority Creditor Obligations or any portion thereof or any agreement with the Borrowers relating to the Second Priority Creditor Obligations or to increase the outstanding principal amount of the Second Priority Creditor Obligations by extending additional credit to the Borrowers; and (vi) nothing contained herein is intended to alter or deprive the Second Priority Creditor of any of its rights to collect or otherwise foreclose upon any of the Centrecourt Collateral.

(c)    The Second Priority Creditor agrees that (i) it will not at any time contest the validity, perfection, priority or enforceability of the security interests and liens granted by the Grantors to the Third Priority Creditor in the Exclusive ECM Collateral and the JAD Wash Plant; (ii) the Third Priority Creditor shall have no obligation to preserve rights in the Exclusive ECM Collateral or the JAD Wash Plant against any prior parties or to marshal any of the Exclusive ECM Collateral or the JAD Wash Plant for the benefit of any Person; (iii) nothing in this Agreement shall impair or adversely affect the manner or timing with which the Third Priority Creditor enforces any of its security in the Exclusive ECM Collateral or the JAD Wash Plant; (iv) nothing in this Agreement shall impair or adversely affect any right, privilege, power or remedy of the Third Priority Creditor with respect to the Third Priority Creditor Obligations, the Borrowers, any Exclusive ECM Collateral or the JAD Wash Plant, including without limitation, the Third Priority Creditor's right to (x) waive or release any of the Third Priority Creditor's

11

security or rights, (y) waive or ignore any defaults by the Borrowers; and/or (z) restructure, renew, modify, or supplement the Third Priority Creditor Obligations or any portion thereof or any agreement with the Borrowers relating to the Third Priority Creditor Obligations or to increase the outstanding principal amount of the Third Priority Creditor Obligations by extending additional credit to the Borrowers; and (v) nothing contained herein is intended to alter or deprive the Second Priority Creditor of any of its rights or otherwise foreclose upon any of the Exclusive ECM Collateral or the JAD Wash Plant.

**Section 10.    Representations and Warranties.** Each of the parties hereto hereby represents and warrants that (i) it has full power, authority and legal right to make and perform this Agreement and (ii) this Agreement is its legal, valid, and binding obligation, enforceable against it in accordance with its terms.

**Section 11.    Amendment.** Neither this Agreement nor any of the terms hereof may be amended, waived, discharged, or terminated unless such amendment, waiver, discharge, or termination is in writing signed by the Senior Creditors and the Junior Creditors.

**Section 12.    Successors and Assigns.** This Agreement and the terms, covenants, and conditions hereof shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns, and neither the Senior Creditor Debt nor the Junior Creditor Debt shall be sold, assigned, or transferred unless the assignee or transferee thereof expressly takes such debt subject to and agrees to be bound by the terms and conditions of this Agreement.

**Section 13.    Governing Law.** This Agreement will be construed in accordance with and governed by the law of the State of New York, without regard to the choice of law principles thereof.

**Section 14.    Notices.** Whenever it is provided herein that any notice, demand, request, consent, approval, declaration, or other communication shall or may be given to or served upon any of the parties by another, or whenever any of the parties desires to give or serve upon another any such communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration, or other communication shall be in writing and shall be deemed to have been duly given and received, for purposes hereof, when (i) delivered by hand, (ii) four days after being deposited in the mail, postage prepaid, and (iii) one Business Day after having been sent by reputable overnight courier, in each case addressed as set forth on the signature pages attached hereto or at such address as may be substituted by notice given as herein provided. Failure to delay in delivering copies of any communication to the persons designated to receive copies shall in no way adversely affect the effectiveness of such communication.

**Section 15.    Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 16.    Final Agreement.** THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES.

**Section 17.   WAIVER OF JURY TRIAL.**   TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE SENIOR CREDITORS, THE JUNIOR CREDITORS, THE BORROWERS AND THE JAD SELLERS HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED THEREBY OR THE ACTIONS OF THE SENIOR CREDITORS OR THE JUNIOR CREDITORS IN THE NEGOTIATION, ADMINISTRATION OR ENFORCEMENT HEREOF.

**Section 18.   Action by the Collateral Agent.**   At the request of the Collateral Agent pursuant to Section 10.13 of the Credit Agreement, ECM, being the sole Lender (as defined in the Credit Agreement) under the Credit Agreement, hereby instructs the Collateral Agent to execute this Agreement.  Further, pursuant to Section 10.09(b) of the Credit Agreement, the Lender hereby certifies and confirms to the Collateral Agent that this Agreement is not contrary to the terms of the Credit Agreement or any other Loan Document (as defined in the Credit Agreement) and is not otherwise contrary to law.  Absent receipt of appropriate written instructions from ECM under the Credit Agreement, Wilmington Trust Company shall have no duty or obligation to take any action hereunder and no liability to any other party hereto or any other person claiming by, through or under any such party.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY; SIGNATURE PAGES FOLLOW.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their proper and duly authorized officers as of the day and year first above written.

**J. A. D. COAL COMPANY, INC.**

By: _____

Its: _____

Address for Notice:
_____
_____
_____

**SANDLICK COAL COMPANY, LLC**

By: _____

Its: _____

Address for Notice:
_____
_____
_____

**FOX KNOB COAL CO., INC.**

By: _____

Its: _____

Address for Notice:
_____
_____
_____

**CAMOFI MASTER LDC, as Agent for the Bridge Lenders**

By: _____

Its: _____

Address for Notice:
_____
_____
_____

_____
     **Aubra Paul Dean**

Address for Notice:
_____
_____
_____

_____
     **Carl E. McAfee**

Address for Notice:
_____
_____
_____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their proper and duly authorized officers as of the day and year first above written.

**J. A. D. COAL COMPANY, INC.**

Address for Notice:

By:_____
Its:_____

**SANDLICK COAL COMPANY, LLC**

Address for Notice:

By:_____
Its:_____

**FOX KNOB COAL CO., INC.**

Address for Notice:

By:_____
Its:_____

**CAMOFI MASTER LDC, as Agent
for the Bridge Lenders**

Address for Notice:

By:_____
Its:_____Michael Loew_____
General Counsel

_____
**Aubra Paul Dean**

Address for Notice:

_____
**Carl E. McAfee**

Address for Notice:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their proper and duly authorized officers as of the day and year first above written.


**J. A. D. COAL COMPANY, INC.**                    Address for Notice:

By:_____
Its:_____


**SANDLICK COAL COMPANY, LLC**                    Address for Notice:

By:_____
Its:_____


**FOX KNOB COAL CO., INC.**                    Address for Notice:

By:_____
Its:_____


**CAMOFI MASTER LDC, as Agent
for the Bridge Lenders**                    Address for Notice:

By:_____
Its:_____


_Aubra Paul Dean_ By _Jeffrey Dean_         Address for Notice:
Aubra Paul Dean / Attorney in Fact


_Carl E. McAfee_                    Address for Notice:
Carl E. McAfee                     P.O. Box 321
                                   Norton, VA 24273

_Julia L. McAfee_

Julia L. McAfee

Address for Notice:

P.O. Box 321

Norton, VA 24273

**WILMINGTON TRUST COMPANY, as**
**Collateral Agent for East Coast Miner LLC**

Address for Notice:

By: _____
Its: _____

**EAST COAST MINER LLC**

Address for Notice:

By: _____
Its: _____

15

---

Julia L. McAfee

Address for Notice:

_____

_____

_____


**WILMINGTON TRUST COMPANY, as
Collateral Agent for East Coast Miner LLC**

By:_____
Its:_____
    James A. Hanley
    Vice President

Address for Notice:

_____

_____

_____


**EAST COAST MINER LLC**

By:_____
Its:_____

Address for Notice:

_____

_____

_____


15

_____          Address for Notice:
      Julia L. McAfee                             _____
                                        _____
                                        _____

**WILMINGTON TRUST COMPANY, as**          Address for Notice:
**Collateral Agent for East Coast Miner LLC**
                                        _____
                                        _____
By:_____       _____
Its:_____

**EAST COAST MINER LLC**                   Address for Notice:
                                        5 East 17th St.
By: _____      Apartment 7
Its: _MANAGER_____       New York, NY 10003

15

FILED: NEW YORK COUNTY CLERK 02/14/2012

NYSCEF DOC. NO. 8

INDEX NO. 650411/2012

RECEIVED NYSCEF: 02/14/2012

# Exhibit 6

**U.S. COAL CORPORATION**
**448 Lewis Hargett Circle, Suite 240**
**Lexington, KY 40503**

November 18, 2009

CAMOFI Master LDC
CAMHZN Master LDC
c/o CENTRECOURT ASSET MANAGEMENT LLC
350 MADISON AVENUE, 8ᵀᴴ FLOOR
NEW YORK, NY 10017
Attention: Michael Loew
             General Counsel

Dear Michael:

Reference is hereby made to (i) the Senior Secured Notes dated as of April 15, 2008 and the Additional Notes dated as of July 10, 2008 and September 11, 2008, each executed by U.S. Coal Corporation (the "Corporation"), J. A. D. Coal Company, Inc., a Virginia corporation ("JAD"), Fox Knob Coal Co., Inc., a Kentucky corporation ("Fox Knob"), Sandlick Coal Company, LLC, a Virginia limited liability company ("Sandlick"; and together with JAD and Fox Knob, the "Borrowers") in favor of CAMOFI Master LDC ("CAMOFI") and CAMHZN Master LDC ("CAMHZN"), Futurtec, L.P., a Delaware limited partnership ("Futurtec"), Michael Miller ("Miller"), and Lawrence Kaplan ("Kaplan", and together with CAMOFI, CAMHZN, Futurtec, Miller and Kaplan, collectively the "Purchasers"), respectively (as amended from time to time, collectively, the "Notes"); (ii) the Security Agreement dated as of April 15, 2008 (as amended from time to time, the "Security Agreement") among the Borrowers, the Corporation and CAMOFI, as agent for the Purchasers (in such capacity, the "Agent") and (iii) the letter agreement entered into on April 14, 2008, by and between the Corporation, CAMOFI and CAMHZN, as amended on August 29, 2008, (the "Letter Agreement").

(A)    This Letter hereby Amends the Notes. The Borrowers, the Corporation and the Purchasers, individually and as the Holders of a majority of the outstanding principal amount of Notes, hereby agree to amend, effective as of September 30, 2009, each of the Notes as set forth below.

(i)    All references to "October 1, 2009" in each of the Notes shall be deleted and shall be replaced with "December 31, 2011".

(ii)    The definition of "Equipment Purchase Notes" in Section 1 of each of the Notes is hereby deleted in its entirety and in substitution thereof the following new definition of "Equipment Purchase Note" is hereby added in proper alphabetical order:

"Equipment Purchase Note" means the Amended and Restated Convertible Promissory Note, originally issued on April 15, 2008 by JAD to CAMOFI Master LDC.";

(iii)    The definition of "JAD Notes" in Section 1 of each of the Notes is hereby deleted in its entirety and in substitution thereof the following new definition of "JAD Notes" is hereby added in proper alphabetical order:

"JAD Notes" means the Amended and Restated Promissory Notes dated September 30, 2009 issued by the Borrowers to the JAD Sellers, having an original aggregate principal amount of $1,000,000 and maturing on December 31, 2011.";

(iv)    The definition of "JAD Seller Notes" in Section 1 of each of the Notes is hereby deleted in its entirety and in substitution thereof the following new definition of "JAD Seller Notes" is hereby added in proper alphabetical order:

"JAD Seller Notes" means the two Amended and Restated Convertible Promissory Notes dated September 30, 2009 issued by the Parent to Aubra Paul Dean and to Carl E. McAfee and Julia L. McAfee, each having an original aggregate principal amount of $3,500,000 and maturing on December 31, 2011.";

(v)    The definition of "LRR Seller Notes" in Section 1 of each of the Notes is hereby deleted in its entirety and in substitution thereof the following new definition of "LRR Seller Notes" is hereby added in proper alphabetical order:

"LRR Seller Notes" means the Fourth Amended and Restated Promissory Notes issued by the Parent to Kenneth Whitt, John Collins, John Whitt, Linda Whitt, Stephanie Lacy, Melissa Lewis and Jonathan Whitt, in connection with the acquisition of the Equity Interests of Licking River, Oak Hill Coal, Inc. and S. M. & J., Inc., originally dated January 5, 2007, as amended and restated on April 14, 2008, as amended and restated on May 30, 2008, as amended and restated on June 14, 2008 and as amended and restated on September 30, 2009, in an aggregate principal amount of $10,000,000 and maturing on December 31, 2011.";

(vi)    [Intentionally Omitted];

(vii)    Section 2(f)(i) of each of the Notes is hereby deleted in its entirety and in substitution thereof the following new Section 2(f)(i) is hereby added:

"i.    [Intentionally Omitted];"

(viii)    Section 2(g)(iii) of each of the Notes is hereby deleted in its entirety and in substitution thereof the following new Section 2(g)(iii) is hereby added:

"iii.    [Intentionally Omitted];"

(ix)    The following Section 2(h) is hereby added to each of the Notes:

"h)    Excess Prepayment.    In addition to the prepayment provisions set forth in Sections 2(f) and 2(g), Parent shall pay the Holder the amount of any Mandatory Excess Prepayments and Mandatory Refinancing Prepayments to which they are entitled pursuant to and as such terms are defined in the First Amendment to the Second Amended and Restated Credit Agreement and Value Right Agreement, dated as of September 30, 2009 (as amended, restated, supplemented or otherwise modified from time to time), by and among Parent, Licking River Resources, Inc., Oak Hill Coal, Inc., S. M. & J., Inc., the Borrowers, Wilmington Trust Company, and East Coast Miner LLC (the "First Amendment"), a copy of which agreement is attached as Exhibit A hereto; provided, however, that the definitions of Mandatory Excess Prepayments and Mandatory Refinancing Prepayments, and all of the provisions of Sections 2.03(c) and (d) of the First Amendment shall not be amended, restated, supplemented or otherwise modified without the prior written consent of the Holder."

(x)    Each Note is hereby amended to attach Exhibit A, attached hereto, as a Exhibit A to each Note; and

(xi)    The signature page to each Note is hereby amended by deleting the words "Agreed with respect to Sections 4 and 5" and replacing such words with "Agreed with respect to Sections 2(h), 4 and 5".

The Notes remain in full force and effect and, except as expressly provided herein, are not otherwise amended, modified, or affected by this letter.

(B)    This Letter Hereby Amends the Security Agreement.    The Borrowers, the Corporation and the Purchasers, individually and as the Holders of a majority of the outstanding principal amount of Notes, hereby agree that the Security Agreement is amended, effective as of September 30, 2009, by deleting "October 1, 2009" in the first paragraph of the Security Agreement and replacing it with "December 31, 2011".

(C)    Waivers Under this Letter.    The Purchasers as the Holders of a majority of the outstanding principal amount of Notes hereby waive any and all Defaults or Events of Default under the Notes, including, without limitation, any that have arisen pursuant to sections 4(a), 4(b), 4(d), 4(g), 4(i), 4(k), 4(l), 4(m), 6(a)(v) and 6(a)(xi), solely to the extent they arise from the transactions contemplated by the (i) First Amendment to the Second Amended and Restated Credit Agreement and Value Right Agreement, dated as of September 30, 2009, by and among the Corporation, Licking River Resources, Inc., Oak Hill Coal, Inc., S. M. & J., Inc., the Borrowers, Wilmington Trust Company and East Coast Miner LLC, (the "First Amendment"); (ii) Second Amendment to the Second Amended and Restated Credit Agreement and Value Right Agreement, dated as of November 18, 2009, by and among the Corporation, Licking River Resources, Inc., Oak Hill Coal, Inc., S. M. & J., Inc., Licking River Mining LLC, the Borrowers, Wilmington Trust Company and East Coast Miner LLC, (the "Second Amendment"); (iii) First Amendment to the Amended and Restated Security Agreement, dated as of September 30, 2009, by and among Corporation, Licking River Resources, Inc., Oak Hill Coal, Inc., S. M. & J., Inc., the Borrowers, Wilmington Trust Company and East Coast Miner LLC, (the "First Security Amendment"); or (iv) the Post-Closing Letter, dated September 30, 2009, by and among Corporation, Licking River Resources, Inc., Oak Hill Coal, Inc., S. M. & J., Inc., the Borrowers and East Coast Miner LLC (the "Post-Closing Letter"). Notwithstanding anything contained herein to the contrary, CAMOFI is expressly not waiving any Event of Default which has occurred and is continuing under the Amended and Restated Convertible Promissory Note, originally issued on April 15, 2008 by JAD to CAMOFI (the "Equipment Purchase Note"), and

the Corporation hereby agrees and acknowledges that interest is accruing on such Equipment Purchase Note at the annual rate of thirteen percent (13%) from April 1, 2008 until such time as all outstanding interest payments are brought current by the Corporation.

(D)     CAMOFI and CAMHZN each hereby consent to the transactions contemplated by the First Amendment, the Second Amendment, the First Security Amendment and the Post-Closing Letter; provided, however, that such consent is expressly conditioned upon and subject to (i) CAMOFI and CAMHZN having had the opportunity to review the execution versions of each thereof, (ii) all holders of the Corporation's or any of the Corporation's subsidiaries' debt securities (other than other holders of the Notes) having agreed to extend the maturity date of such debt securities to December 31, 2011, and (iii) neither the Corporation nor any affiliate thereof, directly or indirectly, paying or offering to pay to any other holder of any of the Corporation's or any of the Corporation's subsidiaries' securities, any consideration of any nature whatsoever for waiving any Event of Default or Default, or consenting to any of the transactions contemplated by the First Amendment, the First Security Amendment or the Post-Closing Letter, without also offering such consideration to CAMOFI and CAMHZN.

(E)     It is hereby agreed that any provision in any agreement that would require a waiver or consent by any of the Purchasers to permit East Coast Miner LLC ("ECM") to waive a default or provide any consent under the First Amendment, the Existing Credit Agreement (as defined in the First Amendment), as modified by the First Amendment, or any further amendment, supplement or modification thereto (collectively, the "Credit Agreement"), any Loan Document (as such term is defined in the Credit Agreement), the First Security Amendment or the Post-Closing Letter is hereby waived for that particular instance, subject to and expressly on the condition that (i) ECM actually grants the consent or waiver so requested, and (ii) neither ECM nor any other person or entity shall receive, directly or indirectly, any consideration of any nature whatsoever for waiving such default or granting such consent without such consideration also being offered to each of CAMOFI and CAMHZN.

(F)     It is hereby agreed that any provision that would require the payment of a fee (other than late or penalty fees or interest, or liquidated damages), in connection with the grant of a waiver or consent under the Credit Agreement, any Loan Document (as defined in the Credit Agreement), the First Amendment, the First Security Amendment, or the Post-Closing Letter or any other agreement to which any of the Corporation (and/or its subsidiaries) and CAMOFI or CAMHZN, or any Purchaser, are parties, is hereby waived, subject to and expressly on the condition that neither ECM nor any other person or entity shall receive, directly or indirectly, any consideration of any nature whatsoever for granting such waiver or consent without such consideration also being offered to each of CAMOFI and CAMHZN.

(G)     Notwithstanding anything contained in this Letter to the contrary, all of the parties hereto acknowledge and agree that except as expressly modified by this Letter, the letter agreement dated April 14, 2008 by and between the Corporation, CAMOFI and CAMHZN (the "Parties"), as such letter was amended by that certain letter agreement dated August 29, 2008 by and among the Parties and the Borrowers, shall remain unchanged and in full force and effect.

(H)     The representations and warranties made by the Corporation to ECM pursuant to Section 43a-f of the First Amendment are incorporated herein by reference and shall be deemed made to the Purchasers as if fully made herein.

(I)     The Corporation covenants and agrees that on or prior to January 1, 2010, it shall make all interest payments due and payable under the terms of the Equipment Purchase Note.

The Corporation further covenants and agrees that on or prior to December 1, 2009, it shall issue all Additional Notes (as such term is defined in the Notes).

If the foregoing is in accordance with your understanding, please confirm your acceptance by signing and returning the enclosed copy of this letter, which upon execution will constitute an agreement among us.

[Remainder of page intentionally blank]

971030                                5

**EXECUTION VERSION**

Sincerely,

**U.S. COAL CORPORATION.**

By:      Robert Gabbard
Title:   Chief Executive Officer

**J. A. D. COAL COMPANY, INC.**

By
Name:  Robert Gabbard
Title:   President

**FOX KNOB COAL CO., INC.**

By:
Name:  Robert Gabbard
Title:   President

**SANDLICK COAL COMPANY, LLC**

By:
Name:  Robert Gabbard
Title:   Manager

Agreed to and accepted as of the date
first above written:

**CAMOFI MASTER LDC**

By:          Michael Loew
Title:       General Counsel

**CAMHZN MASTER LDC**

By:          Michael Loew
Title:       General Counsel

**FUTURTEC, L.P.**

By:
Title:

971030

_____
Michael Miller


_____
Lawrence Kaplan

971030                                    2

Exhibit A

FILED: NEW YORK COUNTY CLERK 02/14/2012

NYSCEF DOC. NO. 9

INDEX NO. 650411/2012

RECEIVED NYSCEF: 02/14/2012

# Exhibit 7

**Michael Loew**

| | |
|---|---|
| **From:** | Jim Wolff [Jwolff@uscoalinc.com] |
| **Sent:** | Friday, April 16, 2010 8:44 AM |
| **To:** | Michael Loew |
| **Cc:** | Richard Smithline |
| **Subject:** | RE: certified letter |

No, we don't have the money. We will allocate funds from the refinancing currently underway with Credit Suisse. The target closing date is end of May. I sent Richard a note to that effect several days ago.

---

**From:** Michael Loew [mailto:mloew@centrecourtam.com]
**Sent:** Thursday, April 15, 2010 6:22 PM
**To:** Jim Wolff
**Cc:** Richard Smithline
**Subject:** RE: certified letter

Jim:

All kidding aside, I assume the April 26 closing is a go. We're making a quarterly payment to our investors at the end of the month and need to have an idea of what we will be able to pay out. Thanks in advance.


Regards,

Michael Loew
General Counsel
Centrecourt Asset Management, LLC
350 Madison Avenue, 8th Floor
New York, New York 10017
(646) 758-6755 (P)
(646) 758-6751 (F)
MLoew@Centrecourtam.com

**From:** Jim Wolff [mailto:Jwolff@uscoalinc.com]
**Sent:** Friday, April 09, 2010 5:23 PM
**To:** Michael Loew
**Subject:** RE: certified letter

Yes, that is a fair assumption

---

**From:** Michael Loew [mailto:mloew@centrecourtam.com]
**Sent:** Friday, April 09, 2010 5:24 PM
**To:** Jim Wolff
**Subject:** RE: certified letter

I assume you're putting me on. It's a 1 page letter, shouldn't be unopenable. In any event, it also went out by certified mail, so you'll get the actual letter in the mail.

Michael Loew
General Counsel
Centrecourt Asset Management, LLC
350 Madison Avenue, 8th Floor
New York, New York 10017

10/14/2011

(646) 758-6755 (P)
(646) 758-6751 (F)
MLoew@Centrecourtam.com

---

**From:** Jim Wolff [mailto:Jwolff@uscoalinc.com]
**Sent:** Friday, April 09, 2010 5:19 PM
**To:** Michael Loew
**Subject:** RE: certified letter

I can't open this one either...I guess the request is just too large to register in our systems.

---

**From:** Michael Loew [mailto:mloew@centrecourtam.com]
**Sent:** Friday, April 09, 2010 3:22 PM
**To:** Jim Wolff
**Subject:** RE: certified letter

I pdf'ed a copy to Bob on Tuesday. Here is another copy.

Regards,

Michael Loew
General Counsel
Centrecourt Asset Management, LLC
350 Madison Avenue, 8th Floor
New York, New York 10017
(646) 758-6755 (P)
(646) 758-6751 (F)
MLoew@Centrecourtam.com

---

**From:** Jim Wolff [mailto:Jwolff@uscoalinc.com]
**Sent:** Friday, April 09, 2010 2:59 PM
**To:** Michael Loew
**Subject:** certified letter

Michael,

We lost your certified PUT letter. I'm not sure what happened to it but just thought I would let you know

FILED: NEW YORK COUNTY CLERK 02/14/2012

INDEX NO. 650411/2012

NYSCEF DOC. NO. 10

RECEIVED NYSCEF: 02/14/2012

# Exhibit 8



448 Lewis Hargett Circle, Suite 240, Lexington, KY 40503
T: 859-223-8820    F: 859-224-9919

May 18, 2010

Michael Loew
General Counsel
CAMOFI Master LDC
CAMHZN Master LDC
350 Madison Avenue
New York, NY  10017

RE:  Rights Agreement

Dear Michael:

In reference to that certain Rights Agreement (the "Agreement") dated April 15, 2008 by and among U.S. Coal Corporation (the "Company"), CAMOFI Master LDC, CAMHZN Master LDC, Futuretec L.P., Michael Miller and Lawrence Kaplan, the Company acknowledges receipt of documentation dated April 6, 2010.  Pursuant to Sections 2 and 3 of the Agreement, the documentation received by U.S. Coal Corporation satisfies the obligation to establish Put Shares at the stated price of $5.40 per share.

The Company anticipates funding this obligation through the issuance of a $100,000,000 bond facility anticipated to be complete by the end of June 2010.   If for some reason that funding does not occur, would you be willing to exchange the obligation for common shares at a lesser price?  If so, we would like to discuss alternatives.

Sincerely,

James J. Wolff
Chief Financial Officer

JJW/slw