# EXHIBIT C
# PART III

FILED: NEW YORK COUNTY CLERK 10/09/2012                    INDEX NO. 650411/2012
NYSCEF DOC. NO. 40                                         RECEIVED NYSCEF: 10/09/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------X
                                               :

CAMOFI MASTER LDC AND                :
CAMHZN MASTER, LDC,                :
                                               :

              Plaintiffs,       :

                                       :          Index No. 650411/2012
        v.                         :
                                       :          **AMENDED COMPLAINT**

U.S. COAL CORP., EAST COAST MINER, LLC, :
JAD COAL COMPANY, INC.,         :
                                       :

             Defendants.     :
                                       :
-----------------------------------------------------------X

        Plaintiffs CAMOFI Master LDC ("CAMOFI") and CAMHZN Master LDC

("CAMHZN," and collectively with CAMOFI, "CAM" or "Plaintiffs"), by their attorneys Akin

Gump Strauss Hauer & Feld LLP, as and for their amended complaint against Defendants, allege

as follows:

## INTRODUCTION

        1.      Plaintiff CAM is the holder of certain debt and equity interests in defendants US

Coal Corp. ("US Coal" or the "Company") and its wholly-owned subsidiary JAD Coal

Company, Inc. ("JAD").  CAM brings this action because Defendants have repeatedly failed to

honor their obligations to CAM and, more generally, have engaged in a course of self-dealing

and interested transactions in disregard of their contractual and fiduciary obligations to CAM.

        2.      Specifically, Defendants have caused US Coal and JAD to:  (1) breach the

payment obligations under a $4.8 million promissory note between CAMOFI and JAD, dated

April 15, 2008 (the "JAD Equipment Note"); (2) breach US Coal's obligation to buy back an

aggregate of 425,000 shares of US Coal common stock from CAM pursuant to a Rights

Agreement among the parties, dated April 15, 2008 (the "Rights Agreement"); and (3) violate

contractual obligations to obtain CAM's consent before entering into certain significant corporate transactions.

3.  JAD's default on the JAD Equipment Note is undisputed.  The JAD Equipment Note matured on April 25, 2012.  JAD has failed to pay more than $4.2 million that is due and owing.

4.  Like the JAD Equipment Note, US Coal's breach of the Rights Agreement is undisputed.  The Rights Agreement provided that CAM would have the right to "put" an aggregate of 425,0000 shares back to US Coal, provided that by April 1, 2010, US Coal had neither: (1) offered its shares in an initial public offering ("IPO"); nor (2) executed a reverse merger into a public shell company.  April 1, 2010 has come and gone.  US Coal has not satisfied either of these conditions, but refuses to repurchase CAM's shares.

5.  US Coal has similarly disregarded CAM's right to approve certain corporate actions.  Specifically, the parties entered into a letter agreement dated April 14, 2008 (the "April 2008 Letter Agreement").  The April 2008 Letter Agreement required US Coal to receive CAM's written consent before: (1) incurring, creating or assuming debt; (2) hiring or terminating executive officers with salaries in excess of $100,000; or (3) entering into transactions with affiliates having a value in excess of $500,000.

6.  US Coal has repeatedly violated the April 2008 Letter Agreement.  Among other things, US Coal has failed to get CAM's consent before:  (1) incurring millions of dollars of new indebtedness and additional interest obligations on or around December 7, 2011; (2) firing its Chief Executive Officer; (3) hiring a new Chief Executive Officer; and (4) agreeing to pay the departing Chief Executive Officer severance of $1.2 million.

7.     Defendants have also caused US Coal to violate its contractual obligations with respect to allocating payment of outstanding debt. In September 2009, US Coal insiders formed an entity called East Coast Miner, LLC ("ECM"), which was created to refinance debt and invest in equity of US Coal and its affiliates.

8.     ECM and its members, who together make up the entire Board of Directors of US Coal, have engaged in a pattern of self-interested actions intended to benefit ECM and its affiliates at the expense of CAM. These self-interested actions have damaged CAM.

9.     Defendants have ignored their contractual obligations, blurred distinctions between their personal interests and fiduciary obligations, and violated CAM's rights as a creditor and shareholder. CAM has suffered significant damages as a result of these actions.

## THE PARTIES

10.     Plaintiff CAMOFI is an investment fund established as a Cayman Islands Limited Duration Company with its principal place of business in the Cayman Islands.

11.     Plaintiff CAMHZN is an investment fund established as a Cayman Islands Limited Duration Company with its principal place of business in the Cayman Islands.

12.     Defendant US Coal is a Delaware corporation with its principal place of business at 2350 Regency Road, Lexington, Kentucky.

13.     Defendant JAD is a Virginia corporation with its principal place of business at 2350 Regency Road, Lexington, Kentucky. JAD is a wholly-owned subsidiary of US Coal.

14.     Defendant ECM is a Delaware limited liability company. Upon information and belief, the members of US Coal's Board of Directors are all members of ECM.

## JURISDICTION

15.     Jurisdiction is proper in this Court because the Defendants, who are signatories to the various documents described herein, consented to the jurisdiction of this Court. Jurisdiction

3

is also proper under CPLR sections 301 and 302 because the Defendants do business in New

York State and/or have conducted business in this State in connection with the acts alleged

herein.

## BACKGROUND FACTS

16.    US Coal is a coal-mining company with operations throughout eastern Kentucky.

US Coal currently controls the mining rights to more than 80,000 acres of property.  Studies have

shown evidence of approximately 70,000,000 tons of coal reserves/resources in the area.  US

Coal operates six different mines and two coal preparation facilities.  The Company recently

announced that it produced 2.3 million tons of coal during the first eleven months of 2011.

17.    Starting in 2007, CAM acquired a variety of debt and equity securities issued by

US Coal and/or its subsidiaries and affiliates.

**A.    CAM Enters Into the April 2008 Letter Agreement and the Rights Agreement**

18.    On or about June 5, 2007, CAM acquired approximately $4,500,000 of US Coal's

Series A Convertible Preferred Stock, as well as warrants to purchase shares of US Coal

common stock.

19.    In connection with this preferred stock acquisition, US Coal and CAM entered

into an agreement providing CAM with rights of approval over certain proposed US Coal

transactions and actions.  The April 2008 Letter Agreement reaffirmed these rights.

20.    Among other things, the April 2008 Letter Agreement required US Coal to obtain

CAM's prior written consent before:  (1) incurring, creating or assuming debt; (2) hiring or

terminating executive officers with a salary in excess of $100,000; and (3) entering into

transactions with affiliates having a value in excess of $500,000.  (A copy of the April 2008

Letter Agreement is attached hereto as Exhibit 1.)

4

21.    On April 15, 2008, CAM, US Coal and JAD entered into a Securities Purchase
Agreement, pursuant to which CAM purchased a note from JAD, and received 425,000 shares of
US Coal common stock. (A copy of the Securities Purchase Agreement is attached hereto as
Exhibit 2.)

22.    On the same date, US Coal and CAM entered into the Rights Agreement, which
provided CAM with the conditional right to require US Coal to purchase CAM's 425,000 shares
of US Coal common stock at $5.40 per share. Under the Rights Agreement, this conditional
"put" right would be triggered if, by April 1, 2010 (the "Trigger Date"), US Coal had failed to
either: (1) sell its common stock through an IPO; or (2) execute a "reverse merger, share
exchange or similar transaction involving [US Coal] and a public 'shell company.'" (A copy of
the Rights Agreement is attached hereto as Exhibit 3.)

23.    Section 4.5 of the Securities Purchase Agreement requires US Coal to indemnify
CAM for collection costs, including attorney's fees, court costs and all other expenses, incurred
by CAM in connection with a breach by US Coal of any "representations, warranties, covenants
or agreements" under the Rights Agreement.

**B.    CAM Enters Into the JAD Equipment Note**

24.    Effective April 15, 2008, CAM, US Coal and JAD entered into an Equipment
Purchase Agreement, pursuant to which CAM transferred its interest in certain mining
equipment to JAD. In consideration of such sale, CAM received the JAD Equipment Note from
JAD. (A copy of the JAD Equipment Note, as amended, is attached hereto as Exhibit 4.)

25.    The JAD Equipment Note has a maturity date of April 15, 2012, and an initial
interest rate of 8% per year. However, Section 4 of the JAD Equipment Note provides that in the
event JAD is more than five days overdue on any payment of principal or interest, CAM can

5

increase the interest rate to 13% per annum, and that CAM can collect an additional 5% fee on
any late payment.

26.    Section 5(a) of the JAD Equipment Note also provides that upon any Event of
Default, JAD agrees to pay all of CAM's collection costs, including attorney's fees, court costs
and all other expenses.

**C.    The ECM Recapitalization**

27.    In or around September 2009, the three members of the Board of Directors of US
Coal, along with certain officers and shareholders, formed ECM.  ECM was interested in
recapitalizing US Coal by purchasing a large amount of the debt of the Company and its
subsidiaries at a substantial discount.  However, in order to recapitalize the Company, ECM
required CAM to extend the maturity dates on all of its then-outstanding debt.  The April 2008
Letter Agreement required CAM's prior written approval for such a transaction.

28.    CAM was concerned ECM would use its control of the US Coal Board to provide
preferential treatment to its debt over the debt of CAM and other creditors.  In response, among
other things, Defendants assured CAM that the debtors would pay outstanding debt pursuant to a
"waterfall" formula.  Under the prescribed "waterfall," ECM would receive $500,000 in monthly
debt amortization payments, and other creditors, including CAM, would likewise receive a
$500,000 monthly distribution on a *pro rata* basis.

29.    After receiving various assurances from ECM, CAM consented to the
recapitalization.  Thus, in September 2009, ECM acquired $24 million of the Company's debt at
a significant discount and invested an additional $3 million in the Company's equity
(collectively, the "ECM Recapitalization").  The ECM debt was secured by third and fourth
priority security interests in certain assets of JAD, as well as a first priority lien on certain assets
of Licking River Resources, Inc.—another wholly owned subsidiary of US Coal.  ECM's

6

security interests in JAD are junior to, and expressly subordinated to, CAM's security interests in JAD.

30.     In connection with the ECM Recapitalization, ECM added another two of its members to the Company's Board of Directors. Thus, at the close of the ECM Recapitalization, all five members of US Coal's Board of Directors were ECM members.

**D.    US Coal Defaults on the JAD Equipment Note**

31.     After securing CAM's consent to extend the maturity on all of its debt and to waive certain default remedies, ECM caused US Coal to violate the relevant agreements. US Coal's directors and management have consistently flouted their contractual and fiduciary obligations to CAM, putting their own interests as members of ECM ahead of those of the Company, its shareholders, and its lenders. The manifest conflicts of the ECM members who also serve on US Coal's Board have infected many, if not most, aspects of the Company's corporate governance and decision-making.

32.     In a letter agreement dated November 18, 2009 (the "November 2009 Agreement"), US Coal and JAD acknowledged that JAD had fallen behind on interest and amortization payments due under the JAD Equipment Note. The November 2009 Agreement stated that the interest rate applicable to the JAD Equipment Note had increased to 13%, retroactive to April 1, 2008, and required JAD to make all outstanding interest payments on or before January 1, 2010. (A copy of the November 2009 Agreement is attached hereto as Exhibit 5.) Despite the November 2009 Agreement, JAD failed to make any amortization payments on the JAD Equipment Note until January 2011. Even then, the payments it did make were woefully deficient.

33.     The JAD Equipment Note matured on April 15, 2012. There is more than $4,200,000 in outstanding principal, interest and late payment fees due on the note. CAM has

demanded repayment of the JAD Equipment Note on numerous occasions. However, JAD has ignored these demands. While failing to make payments on the JAD Equipment Note, upon information and belief, the Company and its subsidiaries have nevertheless made payments on indebtedness owed to ECM.

**E.    US Coal Refuses to Honor the Rights Agreement**

34.    As explained above, the Rights Agreement required US Coal to purchase 425,000 shares of its common stock held by CAM at a price of $5.40 per share if, by the Trigger Date of April 1, 2010, US Coal had failed to either: (1) sell its common stock in an IPO; or (2) engage in a "reverse merger" or other similar transaction.

35.    US Coal did not fulfill either of the above conditions by the Trigger Date, and in fact still has not fulfilled either condition.

36.    Consequently, on April 6, 2010, CAM sent a letter to the Company's then-Chief Executive Officer, Robert Gabbard, exercising the "put" option on its 425,000 shares of common stock.

37.    Mr. Gabbard did not respond to the April 6 letter. However, in an email dated April 16, 2010, US Coal's then-Chief Financial Officer, James Wolff, acknowledged receipt of the letter and the validity of US Coal's obligation under the Rights Agreement. Mr. Wolff refused to honor the Company's obligation to repurchase the shares, however, stating that US Coal did not have the money to repurchase the shares at that time. Mr. Wolff further indicated that the Company would allocate funds from a proposed refinancing to satisfy its obligation under CAM's put right. (A copy of the April 16, 2010 email is attached hereto as Exhibit 6.)

38.    On May 18, 2010, Mr. Wolff sent a letter to CAM, again acknowledging that CAM's April 6 letter "satisfies the obligation to establish Put Shares at the stated price of $5.40 per share." (A copy of the May 18, 2010 letter is attached hereto as Exhibit 7.)

8

39.    Notwithstanding its contractual obligations and Mr. Wolff's repeated assurances, the Company still has not repurchased CAM's shares. The Company's failure to honor CAM's right is compounded by the fact that it has honored the obligations of another put holder, Michael Miller, under the same Rights Agreement.

40.    On information and belief, members of ECM have instructed US Coal not to make the repurchase payment required by the Rights Agreement until ECM's debt has been paid in full.

**F.    US Coal Violates the April 2008 Letter Agreement**

41.    As explained above, the April 2008 Letter Agreement gives CAM the right to approve certain transactions contemplated by the Board of US Coal. Despite the clear requirements in the April 2008 Letter Agreement, US Coal has routinely failed to seek CAM's approval before consummating such transactions.

42.    For example, Section 4 of the April 2008 Letter Agreement requires US Coal to get CAM's prior written approval before "hir[ing] or terminat[ing] the employment of any executive officer of the Corporation with a salary in excess of $100,000." Despite this requirement, in May 2011, without soliciting CAM's consent, the Board removed Robert Gabbard from his position as CEO and replaced him with John Collins, a member of ECM. Both the hiring of Collins and the termination of Gabbard constituted violations of Section 4 of the April 2008 Letter Agreement.

43.    After terminating Gabbard, the Board agreed to pay him $1.2 million in severance, again without CAM's consent. This severance agreement violated: (1) Section 1 of the April 2008 Letter Agreement, which requires CAM's written approval prior to the incurrence of indebtedness; and (2) Section 12 of the April 2008 Letter Agreement, which requires CAM's

9

written approval prior to the Company's entering into any transaction with an affiliate in which the dollar value of the transaction exceeds $500,000.

44.     In addition, as reflected in US Coal's 2011 Consolidated Financial Statements, in December of 2011, US Coal executed a series of material transactions with insiders and affiliates without CAM's consent.  These transactions also violated the April 2008 Letter Agreement. (The 2011 Consolidated Financial Statements are attached hereto as Exhibit 8.)  These transactions will require US Coal to make more than $10 million in additional interest payments to insiders and creditors other than CAM.

45.     Specifically, as reflected in the 2011 Consolidated Financial Statements, US Coal entered into a transaction with ECM whereby US Coal extended the maturity date on over $7.7 million in principal of US Coal secured notes from 2011 to 2014.  (*See* Ex. 8 at 15, 18–19.)  As a result, US Coal will pay ECM almost $3 million in additional interest.

46.     In addition, US Coal issued a $6,729,423 secured note due in October 2014 to a newly formed insider entity called ECM II.  (*Id.* at 20.)  The note is secured by substantially all of US Coal's assets and bears interest at 18%, or more than $1.2 million per year.  (*See id.* at 15, 19–20, 32.)  Through maturity, US Coal will pay ECM II over $3 million of interest on this note.

47.     US Coal also agreed with directors Keith Goggin and Michael Goodwin to extend the due date on the directors' approximately $2.5 million in US Coal notes from 2011 to 2014. (*Id.* at 17.)  As a result, US Coal will pay Goodwin and Goggin more than $1.5 million in additional interest.

48.     US Coal also entered into a transaction with the prior owners of JAD (the "JAD Sellers") whereby US Coal extended the maturity date on approximately $6.7 million in US Coal secured notes from 2011 to 2014 and incurred approximately $975,000 in new debt from the

10

JAD sellers at 12% interest. (*Id.* at 15–16.) Similarly, US Coal entered into a transaction with

the prior owners of its subsidiary Licking River Resources, Inc. (the "Licking River Sellers")

whereby US Coal extended the maturity date on approximately $5.7 million in US Coal notes

from 2011 to 2014. (*Id.* at 15.) As a result, US Coal will pay each of the JAD Sellers and the

Licking River Sellers more than $1.5 million in additional interest.

49.    Despite CAM's rights under the April 2008 Letter Agreement, US Coal failed to

seek CAM's consent for any of these December 2011 transactions. In addition, US Coal refused

CAM's repeated requests for information regarding these transactions prior to providing the

2011 Consolidated Financial Statements in late-March 2012. The 2011 Consolidated Financial

Statements confirm that some of these unapproved, affiliated transactions were finalized at

interest rates well in excess of rates available to US Coal from unaffiliated third parties.

50.    On information and belief, ECM caused US Coal to enter into these transactions

and disregard its obligations under the April 2008 Letter Agreement. In doing so, ECM

members abused their authority and disregarded their obligations to US Coal.

51.    In addition to engaging in these unauthorized financing transactions, ECM has

caused US Coal to repeatedly violate the parties' waterfall payment arrangement. Indeed, since

November 2009, US Coal—at the direction of its directors—has made amortization payments to

ECM in excess of those required under the applicable transaction documents, while repeatedly

failing to make required payments to other lenders, including CAM.

## FIRST CLAIM FOR RELIEF
### (Damages Against US Coal for Breach of the Rights Agreement)

52.    CAM repeats and realleges each and every allegation contained in paragraphs 1

through 51 as if fully set forth herein.

11

53.    US Coal failed to consummate an IPO and/or participate in a reverse merger by April 1, 2010.

54.    To this day, US Coal has failed to sell its shares in an IPO or engage in a reverse merger.

55.    Pursuant to the Rights Agreement, these failures triggered CAM's right to require US Coal to purchase CAM's 425,000 shares of common stock at a price of $5.40 per share.

56.    On April 6, 2010, CAM notified US Coal in writing that CAM was exercising its put right under the Rights Agreement.

57.    US Coal has twice acknowledged in writing that its put obligation was triggered and that it is required to purchase CAM's 425,000 shares.

58.    Despite the clear requirements of the Rights Agreement, and its satisfaction of a similar obligation to a third party, US Coal has refused to honor the put obligation.

59.    CAM instituted the present action to enforce the Rights Agreement. Pursuant to Section 4.5 of the Securities Purchase Agreement, CAM is entitled to indemnification by US Coal of any and all costs and expenses incurred by it in connection with US Coal's breach of the Rights Agreement, including court costs, attorney's fees and the costs of investigation.

60.    By reason of the foregoing, CAM is entitled to payment of $2,250,000 from US Coal, plus interest, costs and expenses.

## SECOND CLAIM FOR RELIEF
### (Damages Against JAD for Breach of the JAD Equipment Note)

61.    CAM repeats and realleges each and every allegation contained in paragraphs 1 through 51 as if fully set forth herein.

62.    The JAD Equipment Note matured on April 15, 2012. The outstanding principal, interest and late payment fees due on the JAD Equipment Note equal at least $4,200,000. JAD

12

has refused to make the required payment to CAM. Based on the foregoing, and JAD's prior

failure to make required interest and amortization payments, an Event of Default has occurred

under the JAD Equipment Note.

63.    CAM instituted the present action to enforce the JAD Equipment Note. Pursuant

to Section 5(a) of the JAD Equipment Note, CAM is entitled to reimbursement of all attorney's

fees, court costs, and all other expenses in connection with this action seeking such enforcement.

64.    By reason of the foregoing, CAM is entitled to payment of at least $4,200,000

from JAD, plus additional interest, costs and expenses.

### THIRD CLAIM FOR RELIEF
### (Damages Against US Coal for Breach of the April 2008 Letter Agreement)

65.    CAM repeats and realleges each and every allegation contained in paragraphs

1 through 51 as if fully set forth herein.

66.    As explained above, US Coal has repeatedly violated the terms of the April 2008

Letter Agreement.

67.    Specifically, US Coal: (1) terminated its CEO Robert Gabbard; (2) awarded

Mr. Gabbard $1.2 million in severance; (3) hired John Collins to replace Mr. Gabbard; and (4)

incurred indebtedness not approved by CAM, including without limitation, indebtedness to

affiliates, in excess of $500,000. The transactions into which US Coal entered without CAM's

consent will cost US Coal over $10,000,000 in additional interest to creditors other than CAM.

68.    Pursuant to the terms of the April 2008 Letter Agreement, each of these actions

required the prior written approval of CAM, but CAM's approval was neither given nor

requested.

69.    By reason of the foregoing, CAM is entitled to payment of damages in an amount

to be determined at trial. In addition, CAM is entitled to have the indebtedness incurred, created

13

or assumed by the Company on or about December 7, 2011, as well as any other transactions

with affiliates in excess of $500,000, rescinded and declared null and void.

### FOURTH CLAIM FOR RELIEF
**(Damages Against ECM for Tortious Interference With the Rights Agreement)**

70.     CAM repeats and realleges each and every allegation contained in paragraphs 1

through 60 as if fully set forth herein.

71.     The Rights Agreement is a valid contract entered into between CAM and US

Coal.

72.     ECM, through its members, was aware of the Rights Agreement prior to the

Trigger Date.

73.     After the Trigger Date, CAM demanded that US Coal fulfill the put obligation

and repurchase CAM's 425,000 shares of US Coal common stock.

74.     ECM, through its members, intentionally caused US Coal to default on the Rights

Agreement by, among other things, directing US Coal to refuse to repurchase CAM's 425,000

shares. In providing this direction, members of ECM abused their authority and violated their

duties to US Coal.

75.     By reason of the foregoing, CAM has been damaged by ECM's conduct and is

entitled to payment of damages in an amount of $2,250,000 from ECM, plus interest.

### FIFTH CLAIM FOR RELIEF
**(Damages Against ECM for Tortious Interference With the JAD Equipment Note)**

76.     CAM repeats and realleges each and every allegation contained in paragraphs 1

through 51 and 61 through 64 as if fully set forth herein.

77.     The JAD Equipment Note is a valid contract entered into among CAM, JAD and

US Coal.

78.     ECM, through its members, was aware of the JAD Equipment Note and its terms.

14

79.    ECM, through its members, intentionally caused JAD to default on the JAD Equipment Note by, among other things, directing that JAD not make payments required under the JAD Equipment Note. In providing this direction, members of ECM abused their authority and violated their duties to US Coal.

80.    By reason of the foregoing, CAM has been damaged by ECM's conduct and is entitled to payment in the amount of at least $4,200,000, plus interest.

### SIXTH CLAIM FOR RELIEF
### (Damages Against ECM for Tortious Interference With the April 2008 Letter Agreement)

81.    CAM repeats and realleges each and every allegation contained in paragraphs 1 through 51 and 65 through 69 as if fully set forth herein.

82.    The April 2008 Letter Agreement is a valid contract entered into among CAM, JAD and US Coal.

83.    ECM, through its members, was aware of the April 2008 Letter Agreement and its terms.

84.    ECM, through its members, intentionally caused US Coal to breach the April 2008 Letter Agreement by, among other things, directing US Coal to enter into certain transactions without CAM's consent.  In providing this direction, members of ECM abused their authority and violated their duties to US Coal.  Moreover, certain of these transactions will directly benefit ECM and its members.

85.    By reason of the foregoing, CAM has been damaged by ECM's conduct and is entitled to payment in an amount to be determined at trial.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

1. Damages in an amount to be proven at trial, but in no event less than $6,450,000, together with interest thereon;

2. Reimbursement of all fees, costs and expenses incurred by CAM in connection with enforcing its rights herein;

3. Rescission of: (a) the debt incurred by the Company to affiliates of the Company or others on or about December 7, 2011, or incurred or modified after the ECM Recapitalization without CAM's consent; and (b) any transactions with affiliates in excess of $500,000; and

4. Such other and further relief as the Court deems appropriate.

DATED:    New York, New York
          October 9, 2012

Respectfully submitted,

BY:    /s/    Douglas A. Rappaport

Douglas A. Rappaport
Robert J. Boller
Rachel J. Presa

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000
(212) 872-1002 (facsimile)
*Counsel for Plaintiffs*

16

FILED: NEW YORK COUNTY CLERK 10/09/2012

INDEX NO. 650411/2012

NYSCEF DOC. NO. 41

RECEIVED NYSCEF: 10/09/2012

# Exhibit 1

**U.S. Coal Corporation**
448 Lewis Hargett Circle, Suite 240
Lexington, KY 40503

April 14, 2008

CAMOFI Master LDC
CAMHZN Master LDC
c/o CENTRECOURT ASSET MANAGEMENT LLC
350 MADISON AVENUE, 8TH FLOOR
NEW YORK, NY 10017
Attention: Michael Loew, General Counsel

Dear Michael:

Pursuant to our recent discussions, U.S. Coal Corporation, a Delaware corporation (the "Corporation"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby covenants to CAMOFI Master LDC and CAMHZN Master LDC, (each a "CAM Entity" and, together with their respective limited partners and members, the "CAM Entities") as follows:

For so long as the CAM Entities collectively own more than two percent (2%) of the outstanding shares of the Corporation's common stock, $.001 par value per share ("Common Stock"), on a fully-diluted basis (assuming conversion of all securities convertible into or exercisable or exchangeable for shares of Common Stock), the Corporation will not, without the written prior consent of the CAM Entities, take any of the following actions:

      (1)    create, assume or incur indebtedness for borrowed money, other than (a) indebtedness (including interest and fees) pursuant to loan or credit agreements existing on the date hereof (as renewed or extended, provided that such renewals or extensions do not increase the amount of indebtedness); (b) indebtedness incurred from time to time under the Corporation's line of credit with First Tennessee Bank, N.A., as in existence on the date hereof, provided that the proceeds are used to fund operations; (c) indebtedness on terms and conditions satisfactory to the CAM Entities in their reasonable discretion incurred in connection with the refinancing of the Corporation's secured debt existing on the date hereof or the financing of one or more additional acquisitions by the Corporation, or (d) other indebtedness incurred in the ordinary course of business not to exceed $1 million at any time outstanding;

      (2)    (a) enter into any strategic partnership or joint venture or (b) consummate any asset or stock acquisition of another person or entity, if, as a result of such acquisition, such asset(s) or stock would represent a material portion of the assets of the Corporation;

      (3)    sell, assign or transfer all or substantially all of the assets of the Corporation and its subsidiaries (taken as a whole), consummate any merger or consolidation of the

Corporation with or into another entity, or enter into any agreement to do any of the foregoing;

(4)    hire or terminate the employment of any executive officer of the Corporation with a salary in excess of $100,000, other than hiring of executive officers in connection with the JAD Acquisition;

(5)    make any expenditure for the acquisition, construction or improvement of any fixed or capital asset in an amount greater than $5 million, other than capital expenditures incurred in connection with the Corporation's acquisition of one high-wall miner, the construction and/or improvement of a coal preparation plant and capital leases assumed in the JAD Acquisition;

(6)    (a) amend, modify or alter the terms of any option, warrant or other right to purchase or acquire shares of capital stock or other equity interests of the Corporation outstanding on the date hereof or (b) amend the terms of the Corporation's existing equity incentive plan or adopt any new equity incentive plan for the benefit of the Corporation's employees;

(7)    increase or decrease the number of authorized shares of the Common Stock, or preferred stock;

(8)    create, designate or establish any class or series of capital stock, other than Common Stock, Series A Convertible Preferred Stock, $___ par value per share (the "Series A Preferred"), or the Series B Preferred;

(9)    pay or declare any dividend or make any distribution on any securities other than on the Series A Preferred or the Series B Preferred, both on the terms as the same exist on the date hereof;

(10)    declare bankruptcy, dissolve, liquidate or wind up the affairs of the Corporation or any subsidiary;

(11)    issue or sell, in a single transaction or a series of related transactions, any capital stock or other security convertible into or exercisable for capital stock of the Corporation, which, at the time of issuance, represents more than five percent (5%) of the number of the then-outstanding shares of Common Stock on a fully-diluted basis;

(12)    enter into any transaction with an affiliate of the Corporation (other than inter-company transactions) in which the dollar value of such transaction exceeds $500,000.

The Corporation's obligations hereunder will terminate at such time as the CAM Entities own less than two percent (2%) of the issued and outstanding shares of the Common Stock. In addition to the other termination provisions contained herein, this letter shall terminate as to either CAM Entity when such CAM Entity does not singly beneficially own any shares of Common Stock. The letter shall be governed by and construed in accordance with the laws of the State of New York. The rights

of the CAM Entities contained herein may not be assigned without the prior written consent of the Corporation.

This letter supersedes and replaces that certain letter agreement among the parties dated June 4, 2007.

If the foregoing is in accordance with your understanding, please confirm your acceptance by signing and returning the enclosed copy of this letter, which upon execution will constitute an agreement between us.

Sincerely,

U.S. COAL CORPORATION

By:    Robert Gabbard
Title:  Chief Executive Officer

Agreed to and accepted as of the date
first above written:

**CAMOFI MASTER LDC**

By:  Richard Smithline
Title:  Director

**CAMHZN MASTER LDC**

By:  Richard Smithline
Title:  Director

FILED: NEW YORK COUNTY CLERK 10/09/2012

NYSCEF DOC. NO. 42

INDEX NO. 650411/2012

RECEIVED NYSCEF: 10/09/2012

# Exhibit 2

EXECUTION COPY

## SECURITIES PURCHASE AGREEMENT

THIS SECURITIES PURCHASE AGREEMENT (this "Agreement") is dated as of April 15, 2008 among J.A.D. Coal Company, Inc., a Virginia corporation ("JAD"), Sandlick Coal Company, LLC, a Virginia limited liability company formerly known as "Sandlick Coal Company, Inc." ("Sandlick"), and Fox Knob Coal Co., Inc., a Kentucky corporation ("Fox Knob" which, together with JAD and Sandlick, are each sometimes referred to herein as a "Borrower" and collectively as the "Borrowers"), U.S. Coal Corporation, a Delaware corporation and parent of the Borrowers (the "Parent"), and each of the Purchaser(s) identified on the signature pages hereto (including their successors and assigns, the "Purchaser(s)").

WHEREAS, subject to the terms and conditions set forth in this Agreement and pursuant to Section 4(2) of the Securities Act and Rule 506 promulgated thereunder, the Loan Parties (as defined below) desire to issue and sell to each Purchaser, and each Purchaser, severally and not jointly, desires to purchase from the Loan Parties, securities of the Loan Parties as more fully described in this Agreement.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, each of the Loan Parties (as hereinafter defined), jointly and severally, and each Purchaser, severally and not jointly, agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions. In addition to the terms defined elsewhere in this Agreement: (a) capitalized terms that are not otherwise defined herein have the meanings given to such terms in the Notes (as defined herein), and (b) the following terms have the meanings indicated in this Section 1.1:

"2007 Bridge Financing" means the loan to the Parent represented by secured 8% Promissory Notes due October 31, 2008 issued by the Parent between October 2007 and March 2008 in an aggregate principal amount of $3,775,000, of which $2,575,000 remains outstanding as of the date of this Agreement, with a maturity date of the earlier to occur of: (i) October 31, 2008, and (ii) any or all of the Loan Parties and Subsidiaries having raised, in the aggregate, commencing on the date of issuance of such secured 8% Promissory Notes, (x) $20,000,000 of gross proceeds from the issuance of Equity Interests or (y) $30,000,000 of gross proceeds from debt financing.

"2007 Bridge Notes" shall have the meaning ascribed to such term in Section 2.3(b)(xii) hereof.

"Acquisition" means the acquisition of the Borrowers by the Parent, pursuant to the Acquisition Agreement.

"Acquisition Agreement" means the Purchase Agreement, dated June 19, 2007, between the Parent and the JAD Sellers, as amended by (i) Amendment No. 1 dated as of July 15, 2007, (ii) Amendment No. 2 dated as of August 15, 2007, (iii) Amendment No. 3 dated October 1, 2007, (iv) Amendment No. 4 dated October 17, 2007, (v) Amendment No. 5 dated as of November 30, 2007, (vi) Amendment No. 6 dated as of January 16, 2008, (vii) Amendment No. 7 dated as of February 15, 2008, (viii) Amendment No. 8 dated as of February 29, 2008, (ix) Amendment No. 9 dated as of March 7, 2008, (x) Amendment No. 10 dated as of March 14,

2008, (xi) Amendment No. 11 dated as of March 21, 2008, and (xii) Amendment No. 12 dated as of March 28, 2008, in each case between the Parent and the JAD Sellers.

"Active Operating Properties" shall mean all property covered by outstanding Environmental or Mining Permits (a) issued to any Loan Party or (b) to be transferred to any Loan Party in connection with a completed acquisition of assets or Equity Interests by any Loan Party.

"Additional Notes" means any Notes issued to the Holders (as defined in the Notes) in payment of interest.

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 144 under the Securities Act; provided, however, that the term "Affiliate" shall also include any Person that directly or indirectly owns 5% or more of any class of Equity Interests of the Person specified or that is an officer or director of the Person specified. With respect to a Purchaser, any investment fund or managed account that is managed on a discretionary basis by the same investment manager as any Purchaser will be deemed to be an Affiliate of such Purchaser.

"Agent" means CAMOFI Master LDC, in its capacity as agent of the Purchasers for the purposes of holding the Security Documents on their behalf as described in Section 5.17.

"Asset Subordination Agreement" means the Intercreditor and Subordination Agreement, dated the date hereof, among the JAD Sellers and the Purchasers.

"Black Lung Act" shall mean the Black Lung Benefits Act of 1972, 30 U.S.C. §§901, et seq., as the same may be amended from time to time.

"Black Lung Liabilities" shall mean any liability or benefit obligations related to black lung claims and benefits under the Black Lung Act, the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§801, et seq., the Black Lung Benefits Reform Act of 1977, Pub. L. No. 95-329, 92 Stat. 95 (1978) and the Black Lung Benefits Amendments of 1981, Pub. L. No. 97-119, Title 11, 95 Stat. 1643, in each case as the same may be amended from time to time, and occupational pneumoconiosis, silicosis or other lung disease liabilities and benefits arising under any applicable federal or state law.

"Business Day" means any day other than (i) Saturday, Sunday or a federal holiday or (ii) a day on which commercial banks in New York State are authorized or required to be closed.

"Capital Lease Obligations" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Change of Control" means the occurrence of any of (i) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Parent or any of the Borrowers, by contract or otherwise) of in excess of 50%

of the voting securities of the Parent or any of the Borrowers, or (ii) a sale of all or substantially all of the assets of the Parent or any Borrower, other than in connection with a merger, consolidation or reorganization of a Borrower into the Parent, another Borrower or a subsidiary of a Borrower (subject to and conditioned upon compliance with Section 4(h) of the Notes), or (iii) a replacement at one time or within a three year period of more than one-half of the members of the board of directors of the Parent which is not approved by a majority of those individuals who are members of the board of directors of the Parent, as the case may be, on the Closing Date (or by those individuals who are serving as members of the board of directors on any date whose nomination to the board of directors was approved by a majority of the members of the board of directors who are members on the Closing Date), or (iv) Robert Gabbard shall no longer be employed by the Parent as Chief Executive Officer or Jim Wolff shall no longer be employed by the Parent as Chief Financial Officer, in each case on a full time basis; provided, however, that if Mr. Gabbard and/or Mr. Wolff either dies, become incapacitated or resigns, it shall not be a Change of Control if the Parent can replace such person with an individual with comparable stature, reputation and experience in the industry within 180 days. For the avoidance of doubt, a reverse merger of the Parent with and into a public shell will not be considered a Change of Control, provided that (w) stockholders of the Parent immediately prior to such reverse merger continue to own a majority of the voting securities in such public shell immediately after the reverse merger, (x) such reverse merger does not result in the occurrence of any of the events described in any of subsections (i), (ii) and (iv) above, (y) the members of the board of directors of the Parent immediately prior to such reverse merger constitute at least a majority of the members of the board of directors of such public shell immediately after the reverse merger, and (z) there is no replacement at one time or within a three year period of more than one-half of the members of the board of directors of the public shell which is not approved by a majority of those individuals who are members of the board of directors of the public shell on the date of the reverse merger (or by those individuals who are serving as members of the board of directors on any date whose nomination to the board of directors was approved by a majority of the members of the board of directors who are members on the date of the reverse merger).

"Closing" means the closing of the purchase and sale of the Securities pursuant to Section 2.1.

"Closing Date" means the Business Day when all of the Transaction Documents have been executed and delivered by the applicable parties thereto, and all conditions precedent to (i) the Purchasers' respective obligations to pay the Subscription Amount and (ii) the Loan Parties' obligations to deliver the Securities have been satisfied or waived.

"Coal" shall mean coal owned by the Parent or any Subsidiary or coal that the Parent or any Subsidiary has the right to extract, in each case located on, under or within, or produced or severed from, Real Property owned, leased or operated by the Parent or any Subsidiary.

"Coal Agreements" shall mean those contracts now in effect or hereafter entered into by any Loan Party for the sale, purchase, exchange, processing, extracting or handling of Coal.

"Coal Services Agreement" means the Coal Services Agreement dated as of June 5, 2007 between the Parent and MLCI, as it may be amended by the Amendment to the Coal Services Agreement and Master Coal Purchase and Sale Agreement dated as of the Closing Date, in form and substance substantially identical to the draft dated June 16, 2008.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Commission" means the Securities and Exchange Commission.

"Common Stock" means the common stock of the Parent, par value $0.001 per share, and any securities into which such common stock shall hereinafter have been reclassified.

"Cumberland Agreement" shall mean the Surety Agreement for Bond for the Effects of Surface Mining issued June 22, 1998 between Cumberland Surety Incorporated and Sandlick.

"Debt Payment Escrow Agreement" shall have the meaning ascribed to such term in Section 2.3(b)(xi) hereof.

"Disclosure Schedules" shall have the meaning ascribed to such term in Section 3.1 hereof.

"Effective Date" means the date that the initial Registration Statement filed by the Parent pursuant to the Rights Agreement is first declared effective by the Commission.

"Eligible Market" means the following markets or exchanges: the Nasdaq SmallCap Market; the American Stock Exchange; the New York Stock Exchange; the Nasdaq National Market; or the OTC Bulletin Board.

"Environmental Laws" shall mean all applicable Federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders) and agreements, in each case relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"Environmental Liability" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages, remediation costs and costs associated with any Reclamation or threatened Reclamation), whether contingent or otherwise, arising out of or relating to (a) compliance or non compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental or Mining Permit" shall mean any permit, license, approval, consent, registration, notification, exemption or other authorization by or from a Governmental Authority necessary to recover Coal from any Mine operated by the Parent or any Subsidiary or for Reclamation by the Parent or any Subsidiary or otherwise required under any Environmental Law or Mining Law.

"Equipment Purchase Agreements" shall mean the Equipment Transfer Agreements, dated as of April 15, 2008, among the Parent, JAD and (i) CAMOFI Master LDC and (ii) the Other Equipment Purchase Parties, together with all documents and agreements executed by the parties in connection therewith, including (A) the Convertible Promissory Note, dated as of April 15, 2008, issued by JAD to CAMOFI Master LDC, (B) the Promissory Note, dated as of April 15, 2008, issued by JAD to the Other Equipment Purchase Parties, (C) the Transfer Statement,

dated as of April 15, 2008, between CAMOFI Master LDC and JAD, (D) the Transfer Statement, dated as of April 15, 2008, between the Other Equipment Purchase Parties and JAD and (E) the Security Agreement, dated as of April 15, 2008, among CAMOFI Master LDC the Other Equipment Purchase Parties, JAD and Centrecourt, pursuant to which JAD shall purchase two underground continuous miners spreads of equipment (Joy Manufacturing) and supporting equipment, Model 1410.

"Equity Financing" shall mean the equity issuance by the Parent, whether on or after the Funding Date, of the Series B Convertible Preferred Stock of the Parent.

"Equity Interests" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person, and any option, warrant or other right entitling the holder thereof to purchase or otherwise acquire any such equity interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with the Parent, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Fair Labor Standards Act" shall mean the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201, et seq. and the regulations promulgated thereunder, in each case, as the same may be amended from time to time.

"Funding Date" shall mean April 15, 2008, the date that the Purchasers delivered the Subscription Amount to the Borrowers.

"GAAP" shall mean United States generally accepted accounting principles applied on a consistent basis.

"Governmental Authority" shall mean any Federal, state, local or applicable foreign court or governmental agency, authority, instrumentality or regulatory body.

"Guarantee" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; provided, however, that

the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Materials" shall mean (a) any petroleum products or byproducts and all other hydrocarbons, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"Hedging Agreement" shall mean any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"Improvements" shall mean all buildings, structures and other improvements now or at any time situated, placed or constructed upon Real Property.

"Indebtedness" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid (excluding trade accounts payable that are less than 90 days past due, accrued obligations, operating lease obligations, customer deposits and deferred liabilities other than for borrowed money, all incurred in the ordinary course of business), (d) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable that are less than 90 days past due, accrued obligations, operating lease obligations, customer deposits and deferred liabilities other than for borrowed money, all incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such person, whether or not the obligations secured thereby have been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such person, (i) all obligations of such Person as an account party in respect of letters of credit, (j) all obligations of such Person in respect of bankers' acceptances and (k) all obligations under any Hedging Agreement to the extent required to be reflected on a balance sheet of such person. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner.

"Issued Shares" means collectively the shares of Common Stock to be issued by the Parent and delivered to the Purchasers at the Closing in accordance with Section 2.2(a) hereof.

"JAD Sellers" means Carl E. McAfee, Julia L. McAfee and Aubra Paul Dean, and for the purposes of the JAD Notes and the JAD Seller Notes, shall also include the heirs, successors and assigns of each.

"JMB" means JMB Capital Partners Master Fund, L.P.

"Licking River" means Licking River Resources, Inc., a Kentucky corporation and a Subsidiary.

"Liens" means with respect to any asset, including, without limitation, securities (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge or security interest in or on such asset,

(b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) only in the case of securities, any purchase option, right of first refusal, preemptive right or other restriction, call or similar right of a third party with respect to such securities.

"Loan Parties" means, collectively, the Parent and the Borrowers.

"Loan Parties Counsel" means Pryor Cashman LLP.

"Material Adverse Effect" shall have the meaning assigned to such term in Section 3.1(a) hereof.

"Mines" shall mean any excavation or opening into the earth now or hereafter made from which Coal or other minerals are or can be extracted on or from any Real Properties in which the Parent or any Subsidiary holds an ownership, leasehold or other interest, including, without limitation, the mines described in the Reserve Reports, together with all appurtenances, fixtures, structures, Improvements and all tangible property of whatsoever kind of nature in connection therewith.

"Mining Laws" shall mean any and all applicable federal, state, local and applicable foreign statutes, laws, regulations, guidance, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or other governmental restrictions or common law causes of action relating to mining operations and activities. Mining Laws shall include, but not be limited to, the Federal Coal Leasing Amendments Act, all Reclamation Laws, all other land reclamation and use statutes and regulations relating to coal mining, the Federal Coal Mine Health and Safety Act, the Black Lung Act and the Coal Act, the Mine Safety and Health Act and the Occupational Safety and Health Act, each as amended, and their state and local counterparts or equivalents.

"Mining Lease" shall mean a lease, license or other use agreement which provides the Parent or any Subsidiary the real property and water rights, other interests in land, including coal, mining and surface rights, easements, rights of way and options, and rights to timber and natural gas (including coalbed methane and gob gas) necessary to recover coal from any Mine (i) currently operated by any Loan Party or (ii) part of any of the Parent's or any Subsidiary 's mine plans. Leases which provide the Parent or any Subsidiary the right to construct and operate a preparation plant and related facilities on the surface of the Real Property containing such reserves shall also be deemed a Mining Lease.

"Mining Title" shall mean fee simple title to surface and/or Coal or an undivided interest in fee simple title thereto or a leasehold interest in all or an undivided interest in surface and/or Coal, together with no less than those real properties, easements, licenses, privileges, rights and appurtenances as are necessary to mine, remove, process and transport Coal in the manner presently operated.

"MLCI" means Merrill Lynch Commodities, Inc.

"Notes" means the Senior Secured Notes, dated as of the Funding Date and due, subject to the terms therein, October 1, 2009, issued by the Borrowers to each of the Purchasers hereunder, in the form of Exhibit A hereto and any Additional Notes issued to the Holders in payment of interest pursuant thereto.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Other Equipment Purchase Parties" means Truk International Fund, LP, Shelter Island Opportunity Fund, LLC, a Delaware limited liability company, and Truk Opportunity Fund, LLC, a Delaware limited liability company.

"Parent Guarantee" means the Guarantee, dated the date hereof, between the Parent and the Purchasers, in the form of Exhibit D attached hereto.

"Parent Properties" shall mean the owned Real Properties and leasehold and subleasehold interests of the Parent and the Subsidiaries specified on Schedule 3.1(m)(v).

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, Governmental Authority or other entity of any kind.

"Plan" means an employee pension benefit plan which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code and is either (a) maintained by the Parent or any ERISA Affiliate for employees of the Parent or any ERISA Affiliate or (b) maintained pursuant to a collective bargaining agreement or any other arrangement under which more than one employer makes contributions and to which the Parent or any ERISA Affiliate is then making or accruing an obligation to make contributions or has within the preceding five plan years made contributions.

"Prep Plant Lease" shall mean each lease entered in by the Parent or any Subsidiary in respect of a preparation plant and/or related property or Real Property on which a preparation plant is situated. Any Prep Plant Lease that also provides the Parent or any Subsidiary with the right to mine Coal reserves shall also be considered a Mining Lease.

"Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"Real Property" shall mean, collectively, all right, title and interest of the Parent or any Subsidiary (including, without limitation, any leasehold or mineral estate) in and to any and all parcels of real property owned or operated by the Parent or any Subsidiary, whether by lease, license or other use agreement, together with, in each case, all Improvements and appurtenant fixtures (including, without limitation, all preparation plants or other Coal processing facilities and loadout and other transportation facilities), equipment, personal property, easements and other property and rights incidental to the ownership, lease or operation thereof.

"Reclamation" shall mean the reclamation and restoration of land, water and Mines as required pursuant to Mining Laws.

"Reclamation Laws" shall mean all applicable laws relating to mining reclamation or reclamation liabilities, including the Surface Mining Control and Reclamation Act of 1977, as amended, and state and local counterparts or equivalents.

"Registration Statement" means a registration statement meeting the requirements set forth in the Rights Agreement and covering the resale of the Issued Shares by any Purchaser as provided for in the Rights Agreement.

- 8 -

"Release" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"Reserve Reports" shall mean, collectively, (a) the Licking River Resources, Inc. Reserve Evaluation dated February 21, 2008 by Norwest Corporation and (b) the J. A. D. Coal Company, Inc. Reserve Evaluation dated March 12, 2008 by Norwest Corporation.

"Rights Agreement" means the Rights Agreement, dated the date hereof, among the Parent, the Purchasers and the other parties thereto, in the form of Exhibit B attached hereto.

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Sanctioned Person" means (a) an agency of the government of, (b) an organization directly or indirectly controlled by, or (c) a person resident in a country that is subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/enforcement/ofac/programs, or as otherwise published from time to time as such program may be applicable to such agency, organization or person.

"Sanctioned Entity" means a person named on the list of Specially Designated Nationals of Blocked Persons maintained by OFAC available at http://treas.gov/offices/enforcement/ofac/sdn/index.html, or as otherwise published from time to time.

"Securities" means, collectively, the Notes and the Issued Shares.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Agreement" means the Security Agreement, dated the date hereof, among the Loan Parties and the Agent, on behalf of the Purchasers, in the form of Exhibit C attached hereto.

"Security Documents" means the Security Agreement, the Parent Guarantee and any other documents and filings required thereunder in order to grant the Agent (on behalf of the Purchasers) a perfected security interest in certain assets of the Loan Parties, as specified in the Security Documents, including all UCC-1 filing receipts and mortgages on the real property.

"State Acts" means applicable state securities laws.

"Stock Subordination Agreement" means the Intercreditor and Subordination Agreement, dated the date hereof, among JMB, MLCI, the JAD Sellers and the Purchasers.

"Subordination Agreements" means, collectively, the Asset Subordination Agreement and the Stock Subordination Agreement.

"Subscription Amount" means, as to any Purchaser, the aggregate amount to be paid for the Notes and the Issued Shares purchased hereunder, as specified below such Purchaser's name on the signature page of this Agreement, in United States Dollars and in immediately available funds.

"Subsidiary" means any direct or indirect subsidiary of the Parent.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, penalties, charges or withholdings imposed by any Governmental Authority.

"Trading Day" means a day on which the Common Stock is traded on a Trading Market.

"Trading Market" means the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the Nasdaq SmallCap Market; the American Stock Exchange; the New York Stock Exchange; the Nasdaq National Market; or the OTC Bulletin Board.

"Transactions" means, collectively, the transactions contemplated by this Agreement and the Waiver.

"Transaction Documents" means this Agreement, the Notes, the Additional Notes (if any), the Security Agreement, the Parent Guarantee, the Rights Agreement, the Subordination Agreements, the Equipment Purchase Agreements and any other documents or agreements executed in connection with the transactions contemplated hereunder.

"Value Right Agreement" the proposed Value Rights Agreement, dated as of April 15, 2008, which may be entered into among JMB, the Loan Parties and the Licking River Companies.

"Waiver" means the Waiver and Restatement Agreement, dated as of April 15, 2008, among the Parent, Licking River, Oak Hill Coal, Inc., S.M.& J., Inc., JMB, Wilmington Trust Company, as collateral agent, and MLCI, as amended by the Amendment to Waiver and Restatement Agreement dated as of May 16, 2008, the Second Amendment to Waiver and Restatement Agreement dated as of May 30, 2008, the Third Amendment to Waiver and Restatement Agreement dated as of June 6, 2008 and the Fourth Amendment to Waiver and Restatement Agreement dated as of June 13, 2008.

## ARTICLE II
## PURCHASE AND SALE

2.1    Closing.  On the Closing Date, upon the terms and subject to the conditions set forth herein, concurrent with the execution and delivery of this Agreement by the parties hereto, the Borrowers agree, jointly and severally, to sell, and each of the Purchasers severally (and not jointly) agrees to purchase the principal amount of the Notes set forth as the "Subscription Amount" on such Purchaser's signature page to this Agreement (not to exceed $5,000,000 in the aggregate principal amount), secured by the Liens described in the Security Agreement.  The Notes will be issued to each Purchaser based on such Purchaser's respective Subscription Amount.  It is hereby acknowledged that each Purchaser has previously delivered on the Funding Date to the Borrowers in immediately available funds its respective Subscription Amount, which amount equals $5,000,000 in the aggregate.

At the Closing, (i) the Parent shall deliver to each Purchaser its Issued Shares as determined pursuant to Section 2.2(a) and (ii) the Borrowers shall deliver to each Purchaser its Note and the other items set forth in Section 2.2 issuable at the Closing.  Upon satisfaction of the conditions set forth in Section 2.2, the Closing shall occur at the offices of the Loan Parties Counsel, or such other location as the parties shall mutually agree.

2.2    Deliveries.

a)    On the Closing Date, the Borrowers and the Parent, as the case may be, shall deliver to each Purchaser the following:

(i)    this Agreement duly executed by the Loan Parties;

(ii)    a duly executed Note with a principal amount equal to such Purchaser's Subscription Amount, registered in the name of such Purchaser;

(iii)    a duly executed Additional Note with a principal amount equal to the amount of interest accrued on the Notes issued to such Purchaser from and including the Funding Date through and including the Closing Date;

(iv)    a duly executed certificate, registered in the name of such Purchaser, for the number of Issued Shares indicated on such Purchaser's signature page hereto;

(v)    the Rights Agreement duly executed by the Parent and any other Persons party thereto;

(vi)    the Security Agreement, duly executed by the Loan Parties, together with the Security Documents, duly executed by the Loan Parties party thereto;

(vii)    the Parent Guarantee, duly executed by the Parent;

(viii)    UCC-1 financing statements naming the Agent on behalf of the Purchasers as secured parties to be filed prior to or simultaneously with the Closing; prior to the Closing the Purchasers shall have received evidence satisfactory to them that there are no liens on the assets of the Loan Parties constituting collateral under the Security Documents other than Liens identified in the Subordination Agreements or Permitted Liens;

(ix)    the Equipment Purchase Agreements, duly executed by the Parent and JAD;

(x)    the Stock Subordination Agreement, duly executed by the JAD Sellers;

(xi)    the Asset Subordination Agreement, duly executed by JAD and the JAD Sellers;

(xii)    the LRR Seller Notes, duly executed by the parties thereto, in form and substance satisfactory to the Purchasers;

(xiii)    a copy of all agreements and documents required to be executed in connection with the Waiver, duly executed or consented to by each of the parties signatory thereto;

(xiv)    a legal opinion of Loan Parties Counsel (and, as applicable, reasonably acceptable local counsel) in the form of Exhibit E hereto; and

(xv)    (i) a certificate of each Loan Party, dated the Closing Date and executed

- 11 -

by its Secretary or Assistant Secretary, which shall (A) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Transaction Documents to which it is a party, (B) identify by name and title and bear the signatures of the officers of such Loan Party authorized to sign the Transaction Documents to which it is a party, and (C) contain appropriate attachments, including the certificate or articles of incorporation or organization of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its bylaws or operating, management or partnership agreement, and (ii) a short form good standing certificate for each Loan Party from its jurisdiction of organization.

(xvi)    such other documents and certificates consistent with the terms of this Agreement and relating to the transactions contemplated hereby as the Purchasers or counsel to the Purchasers may reasonably request.

b)    On the Closing Date, each Purchaser shall deliver or cause to be delivered to the Borrowers the following:

(i)    this Agreement duly executed by such Purchaser;

(ii)    the Rights Agreement duly executed by such Purchaser; and

(iii)    the Security Agreement, duly executed by the Agent, on behalf of the Purchasers;

(iv)    the Equipment Purchase Agreements, duly executed by CAMOFI Master LDC and Shelter Island Opportunity Fund, LLC;

(v)    the Stock Subordination Agreement, duly executed by the Agent on behalf of the Purchasers; and

(vi)    the Asset Subordination Agreement, duly executed by the Agent on behalf of the Purchasers.

2.3    Closing Conditions.

a)    The obligations of the Parent and the Borrowers hereunder in connection with the Closing are subject to the following conditions being met:

(i)    the accuracy as of the Funding Date of the representations and warranties of the Purchasers contained herein;

(ii)    all obligations, covenants and agreements of each Purchaser required to be performed at or prior to the Closing Date shall have been performed; and

(iii)    the delivery by each Purchaser of the items set forth in Section 2.2(b) of this Agreement.

b)    ·  The respective obligations of each Purchaser hereunder in connection with the Closing and the purchases contemplated herein and in the Transaction

Documents are subject to the following conditions being met:

(i)     the accuracy as of the Funding Date of the representations and warranties of the Loan Parties contained herein;

(ii)    all obligations, covenants and agreements of the Loan Parties required to be performed at or prior to the Closing Date shall have been performed;

(iii)   such Purchaser shall be satisfied with the quality and amount of the collateral as identified in the Security Documents and the priority of its security interest thereon;

(iv)    no statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by any Governmental Authority that prohibits the consummation of any of the transactions contemplated by the Transaction Documents or the Waiver;

(v)     each Loan Party shall have obtained Board approval relating to the issuance of the Securities to the Purchasers under the Transaction Documents and the execution and delivery of all Transaction Documents to which it is a party and all other documents executed in connection with the Transaction and the Waiver;

(vi)    the delivery by the Parent and the Borrowers of the items set forth in Section 2.2(a) of this Agreement;

(vii)   none of the Loan Parties shall have any outstanding indebtedness for borrowed money, other than (A) that in favor of the Purchasers pursuant to the Notes and (B) any other Permitted Indebtedness;

(viii)  such Purchaser shall be satisfied that not more than 50% of the outstanding cash investment banking fees or legal fees (other than the legal fees and expenses of the Purchasers pursuant to Section 5.1 of this Agreement and of the Lenders (as defined in the Credit Agreement) pursuant to Section 4.1(e) of the Credit Agreement) have been paid by the Loan Parties in connection with the transactions contemplated hereby and by the Waiver;

(ix)    such Purchaser shall be satisfied with the terms of the LRR Seller Notes;

(x)     since the Funding Date (x) all distributions pursuant to the Escrow Agreement, dated as of April 15, 2008, between the Parent and the Bank of New York (the "Debt Payment Escrow Agreement") shall have been made only in accordance therewith, and (y) the Debt Payment Escrow Agreement shall not have been amended or modified, other than pursuant to the amendment thereto, dated May 12, 2008, between the Parent and the Bank of New York and shall continue to be in full force and effect, and all funds required to be deposited in escrow thereunder shall continue to be on deposit in escrow in accordance with the terms thereof;

(xi)    there shall be outstanding no more than $2.575 million aggregate principal amount of 8% Bridge Notes due October 31, 2008 (the "2007 Bridge Notes") issued by the Parent to the purchasers thereof in connection with the 2007 Bridge

- 13 -

Financing;

(xii)   the Loan Parties shall have paid the reasonable legal fees and expenses of counsel for Centrecourt in connection with the Transactions ; and

(xiii)  such Purchaser shall be satisfied with the terms of any other Transaction Documents.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

3.1    Representations and Warranties of the Borrowers. Each of the Loan Parties hereby jointly and severally represents and warrants on and as of the Funding Date (except for the representation and warranty made in Section 3.1(mm), which shall be made on and as of the Closing Date) as set forth below to each Purchaser.

(a)    Authority. Each Loan Party is a corporation or limited liability company, duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation or formation, as the case may be, and has all requisite right, power and authority to execute, deliver and perform this Agreement and the other Transaction Documents. Each Loan Party is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would (a) have a material adverse effect on the business, assets, liabilities, operations, condition (financial or otherwise), operating results or prospects of the Parent and its Subsidiaries taken as a whole or (b) impair such Loan Party's ability to perform its obligations under the Transaction Documents ((a) and (b) collectively, a "Material Adverse Effect").

(b)    Enforceability. The execution, delivery and performance by the Loan Parties and any other Subsidiary party thereto of the Transaction Documents and the documents executed in connection with the Waiver have been duly authorized by all requisite corporate action, and each Loan Party has full power and authority to execute and deliver this Agreement and the other Transaction Documents and the documents executed in connection with the Waiver to which it is a party and to perform its obligations hereunder and thereunder. This Agreement and the other Transaction Documents and the documents executed in connection with the Waiver have been duly executed and delivered by the applicable Loan Parties, and, upon their execution by the Purchaser or any other party thereto other than the Parent or any Subsidiary, shall constitute the legal, valid and binding obligation of each such Loan Party (or other Subsidiary), enforceable in accordance with its terms, except to the extent that its enforceability is limited by bankruptcy, insolvency, reorganization or other laws relating to or affecting the enforcement of creditors' rights generally and by general principles of equity.

(c)    No Violations. The execution, delivery and performance of this Agreement and the other Transaction Documents by the Loan Parties do not, and will not, (i) violate or conflict with any provision of any Loan Party's Certificate of Incorporation or Bylaws, Operating Agreement or other similar organizational or governing documents, as the case may be, (ii) with or without the passage of time or the giving of notice, result in the breach of, constitute a default under, cause the acceleration of performance of, require any consent under (except such consents as have been obtained as of the date hereof), or result in the creation of any lien, charge or encumbrance upon any property or assets of any the Parent or any Subsidiary pursuant to any material instrument or agreement to which the Parent or any Subsidiary is a party or by which the

Parent or any Subsidiary or its properties are bound, or (iii) result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any Governmental Authority to which the Parent or any Subsidiary is subject (including federal and state securities laws and regulations), or by which any property or asset of the Parent or any Subsidiary is bound.

    (d)    <u>Capitalization.</u>

        (i)    The authorized, issued and outstanding capital stock of the Parent consists of (i) a total of 40,000,000 shares of preferred stock, par value $0.001 per share, of which (x) 16,600,000 shares have been designated as Series A Preferred Stock, $.001 par value per share ("Series A Preferred Stock"), and 15,080,590 are issued and outstanding, (y) 21,600,000 shares have been designated as Series B Preferred Stock, $.001 par value per share, and 11,428,520 are issued and outstanding and (z) 1,800,000 are undesignated shares of preferred stock, $.001 par value per share, and (ii) a total of 135,000,000 shares of Common Stock, of which 23,064,406 shares are issued and outstanding. A total of 3,000,000 shares of Common Stock have been reserved for issuance under the Parent's equity incentive plans, 1,125,000 of which are outstanding and 312,500 of which have vested immediately prior to the date hereof. Warrants for the purchase of a total of 10,764,095 shares of Common Stock, of which 2,774,749 are warrants to purchase shares of Common Stock at a purchase price of $0.01 per share, 5,453,274 are warrants to purchase shares of Common Stock at a purchase price of $2.50, 348,572 are warrants to purchase shares of Common Stock at a purchase price of $1.75 per share and 2,187,500 are warrants to purchase shares of Common Stock at a purchase price of $1.50 per share, are outstanding. Warrants to purchase a total of 241,289 units, each unit consisting of five shares of Series A Preferred Stock and a warrant to purchase one share of Common Stock, at a purchase price of $7.50 per unit, warrants to purchase a total of 86,287 units, each unit consisting of 10 shares of Series B Preferred Stock and a warrant to purchase 2.2 shares of Common Stock, at a purchase price of $17.50 per unit and warrants to purchase a total of 5,143 units, each unit consisting of 10 shares of Series B Preferred Stock and a warrant to purchase 1 share of Common Stock, at a purchase price of $17.50 per unit also are outstanding. The Parent may grant to JMB, the Parent's senior secured lender, the Value Right. Pursuant to this Agreement, the Parent has an obligation to issue the Issued Shares to the Purchasers. Pursuant to the Consent to Debt Repayment and Issuance of Common Stock by CAMOFI Master LDC and CAMHZN Master LDC dated as of June 30, 2008, an aggregate 928,571 shares of Common Stock will be issued by the Parent as consideration therefore. Pursuant to the Equipment Purchase Agreements, CAMOFI Master LDC has an option to convert its Promissory Note into shares of Common Stock at a conversion rate of $1.75 per share. Upon the consummation of an initial public offering of the Common Stock, the JAD Sellers have the right to convert up to one-half of the principal amount of the JAD Seller Notes into shares of Common Stock at a conversion price that is 15% less than the selling price of the Common Stock in the initial public offering. Except as set forth herein, as of the Funding Date, there will be no other issued or outstanding capital stock, other equity interests, outstanding options, warrants or other rights to purchase or to acquire shares of capital stock or other equity interests of the Parent or any Subsidiary.

        (ii)    Upon issuance in accordance with the terms of this Agreement, the Issued Shares

- 15 -

will be duly and validly issued, fully paid and nonassessable with no personal liability attaching to the ownership thereof, and free and clear of all Liens imposed by or through the Parent, and, assuming the accuracy of the representations and warranties of the Purchasers on the Funding Date, will be issued in accordance with a valid exemption from the registration or qualification provisions of the Securities Act and any applicable State Acts. The Parent is not a party or subject to any agreement or understanding which affects or relates to the voting or giving of written consents with respect to any security or by a director of the Parent.

(e)    Approvals. The execution, delivery and performance by the Loan Parties of this Agreement and the other Transaction Documents and by the Parent or any Subsidiary of any document or agreement in connection with the Waiver, and the transactions contemplated hereby and thereby require no consent of, action by or in respect of, or filing with, any person, other than those consents that have been obtained and filings that have been made pursuant to applicable state securities laws and post-transaction filings pursuant to applicable state and federal securities laws, which the Loan Parties jointly and severally undertake to file within the applicable time period.

(f)    Certain Fees. No brokerage or finder's fees or commissions are or will be payable by any Loan Party to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the Securities to be issued pursuant to this Agreement, other than fees payable to the Purchasers, Centrecourt (as hereinafter defined) or any Affiliate thereof. The Purchasers shall have no obligation with respect to any placement agent fees or with respect to any claims (other than such fees or commissions owed by a Purchaser pursuant to written agreements executed by the Purchaser which fees or commissions shall be the sole responsibility of such Purchaser) made by or on behalf of other persons for fees of a type contemplated in this Section that may be due in connection with the transactions contemplated by this Agreement.

(g)    Certain Registration Matters. Assuming the accuracy of the Purchasers' representations and warranties set forth in Section 3.2, no registration under the Securities Act or any State Acts is required for the offer and sale of the Securities. None of the Loan Parties has sold any of the Securities as a result of any advertisement, article, notice or other communication regarding any of the Securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

(h)    Investment Company. Each Loan Party is not, and is not an "affiliate" of, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(i)    No Additional Agreements. None of the Loan Parties has any agreement or understanding with any Purchaser with respect to the transactions contemplated by this Agreement on terms that differ from those set forth in this Agreement.

(j)    Foreign Corrupt Practices Act. Neither the Parent, any Subsidiary nor, to the knowledge of any Loan Party, any agent or other Person acting on behalf of any Loan Party, has, directly or indirectly, (i) used any funds, or will use any proceeds from the sale of the Securities, for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate

- 16 -

funds, (iii) failed to disclose fully any contribution made by the Parent or any Subsidiary (or made by any Person acting on their behalf of which any Loan Party is aware) which is in violation of law, or (iv) violated, in any material respect, any provision of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

    (k)    <u>Financial Statements.</u>

        (i)    The Parent has heretofore furnished to the Purchasers its consolidated balance sheets and related statements of income, stockholder's equity and cash flows (i) as of and for the fiscal year ended December 31, 2007, audited by and accompanied by the opinion of Coulter & Justus, independent public accountants, and (ii) as of and for the fiscal quarter ended March 31, 2008, certified by its chief financial officer. Such financial statements present fairly the financial condition and results of operations and cash flows of the Parent and its consolidated Subsidiaries as of such dates and for such periods. Such balance sheets and the notes thereto disclose all material liabilities, direct or contingent, of the Parent and its consolidated Subsidiaries as of the dates thereof. Such financial statements were prepared in accordance with GAAP applied on a consistent basis, subject, in the case of unaudited financial statements, to year-end audit adjustments and the absence of footnotes. To the extent required by GAAP, the Parent and the Subsidiaries maintain adequate reserves for future costs associated with any Black Lung Liabilities, retiree and health care benefits, any Reclamation and any other Environmental Liabilities.

        (ii)    The Parent has heretofore delivered or otherwise made available to the Purchasers its unaudited pro forma consolidated balance sheet and related pro forma statements of income, stockholder's equity and cash flows as of December 31, 2007, prepared giving effect to the Transactions as if they had occurred, with respect to such balance sheet, on such date and, with respect to such other financial statements, on the first day of the 12-month period ending on such date. Such pro forma financial statements have been prepared in good faith by the Parent, are based on the best information available to the Parent as of the date of delivery thereof, accurately reflect all adjustments required to be made to give effect to the Transactions and present fairly on a pro forma basis the estimated consolidated financial position of the Parent and its consolidated Subsidiaries as of such date and for such period, assuming that the Transactions had actually occurred at such date or at the beginning of such period, as the case may be.

    (l)    <u>No Material Adverse Change.</u> Except as set forth on Schedule 3.1(l), no event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect on the business, assets, liabilities, operations, condition (financial or otherwise), operating results or prospects of the Parent and the Subsidiaries, taken as a whole, since December 31, 2007.

    (m)    <u>Title to Properties; Possession Under Leases.</u>

        (i)    Each of the Parent and the Subsidiaries has good and marketable title to, or valid leasehold interests in, all of its material properties and assets, except for minor defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes, and each of the Parent and the Subsidiaries

has Mining Title to all Active Operating Properties to the extent necessary to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes. The Parent and the Subsidiaries have maintained, in all material respects and in accordance with normal mining industry practice, ordinary wear and tear excepted, all of the machinery, equipment, vehicles, preparation plants or other coal processing facilities, loadout and other transportation facilities and other tangible personal property now owned or leased by the Parent and the Subsidiaries that is necessary to conduct their business as it is now conducted, other than the equipment to be purchased under the Equipment Purchase Agreements. All such material properties and assets are free and clear of Liens, other than Liens as set forth on Schedule 3.1(m)(i).

(ii)  Each of the Parent and the Subsidiaries has complied in all material respects with all obligations under all material leases (including all Mining Leases) to which it is a party and all such leases are in full force and effect. Each of the Parent and the Subsidiaries enjoys peaceful and undisturbed possession under all such material leases (including all Mining Leases).

(iii) As of the Funding Date, neither the Parent nor any Subsidiary has received any notice of, nor has any knowledge of, any pending or contemplated condemnation proceeding affecting the Parent Properties or any sale or disposition thereof in lieu of condemnation.

(iv)  As of the Funding Date, neither the Parent nor any Subsidiary is obligated under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Parent Property or any interest therein, except as set forth on Schedule 3.1(m)(iv).

(v)   As of the Funding Date, the estate, title and interest of the Parent and the Subsidiaries in the Real Properties set forth on Schedule 3.1(m)(v) constitute all of the estate, title and interest in Real Properties necessary for the conduct of the business and operations of the Parent and the Subsidiaries as currently conducted. As of the Funding Date, the Real Properties constitute substantially all of the coal reserves and related surface Improvements owned and leased by the Parent and the Subsidiaries. As of the Funding Date, neither the Parent nor any Subsidiary owns or leases any material coal reserves in jurisdictions other than the State of Kentucky and the State of Virginia.

(vi)  As of the Funding Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Equity Interests of any of the Parent or any Subsidiary, except as set forth on Schedule 3.1(m)(vi).

(vii) With respect to each Real Property interest on which significant surface Improvements are located, there are no rights or claims of partners in possession not shown by the public records, encroachments, overlaps, boundary line disputes or other matters which would be disclosed by an accurate survey or inspection of the premises, except as could not reasonably

- 18 -

be expected to have, individually or in the aggregate, a Material Adverse Effect.

(n)    Subsidiaries. Schedule 3.1(n) sets forth as of the Funding Date a list of all Subsidiaries and the percentage ownership interest of the Parent therein. The shares of capital stock or other ownership interests so indicated on Schedule 3.1(n) are fully paid and non-assessable and are owned by the Parent, directly or indirectly, free and clear of all Liens (other than Liens set forth on Schedule 3.1(m)(vi)).

(o)    Litigation; Compliance With Laws.

(i)    Except as set forth on Schedule 3.1(o), there are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of any Loan Party, threatened against or affecting the Parent or any Subsidiary or any business, property or rights of any such Person (i) that involve the Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(ii)    Since the Funding Date, there has been no change in the status of the matters disclosed on Schedule 3.1(o) that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

(iii)    Neither the Parent nor any of the Subsidiaries nor any of their respective material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, Environmental Law, ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting the Parent Properties, and neither the Parent nor any of the Subsidiaries is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(iv)    Certificates of occupancy and permits, including, but not limited to, all necessary Environmental or Mining Permits, are in effect for each Real Property as currently constructed, and true and complete copies of such certificates of occupancy and permits have been delivered or otherwise made available to the Purchaser with respect to each Real Property. Neither the Parent nor any Subsidiary has been notified in writing, or, to the knowledge of any Loan Party, otherwise notified, by the Federal Office of Surface Mining or the agency of any state administering the Reclamation Laws that it is: (i) ineligible to receive additional surface mining permits; or (ii) under investigation to determine whether its eligibility to receive any Environmental or Mining Permit should be revoked, i.e., "permit blocked." To the knowledge of each Loan Party, no facts exist that presently or upon the giving of notice or the lapse of time or otherwise would render the Parent or any Subsidiary ineligible to receive surface mining permits.

(p)    Agreements.

(i)    Neither the Parent nor any Subsidiary is a party to any agreement or instrument

- 19 -

or subject to any corporate or limited liability company restriction that has
resulted or could reasonably be expected to result in a Material Adverse Effect.

    (ii)  Neither the Parent nor any Subsidiary is in default in any manner under any
provision of any indenture, guarantee or other material agreement or instrument
evidencing Indebtedness, or any other material agreement or instrument to which
it is a party or by which it or any of its properties or assets are or may be bound,
where such default could reasonably be expected to result in a Material Adverse
Effect, other than (I) the technical change of control default of the Cumberland
Agreement caused by the Acquisition, which surety agreement is in the process
of being replaced with a new agreement with CERIA; (II) the Notice of Event of
Default delivered by the Credit Agreement Lender on July 1, 2008 alleging a
violation of the June 30, 2008 Leverage Ratio; (III) the potential cross default
under the 2007 Bridge Notes resulting from such alleged Leverage Ratio event of
default; and (IV) the potential cross default under the A/R Facility resulting from
such alleged Leverage Ratio event of default.

    (q)    <u>Tax Returns</u>.  Subject to the last sentence herein, the Parent and each Subsidiary
has timely filed or caused to be filed all Federal, state, local and applicable foreign tax returns or
materials required to have been filed by them and has paid or caused to be paid all taxes due and
payable by each of them and all assessments received by them, except taxes that are being
contested in good faith by appropriate proceedings and for which such the Parent or such
Subsidiary, as applicable, shall have set aside on its books adequate reserves.  No Tax liens have
been filed and no claims are being asserted with respect to any such Taxes.  The Borrowers failed
to timely file their Tax returns for the September 30, 2007 fiscal year; however, as of the Closing
Date, all Tax returns and reports for the Borrowers for the September 30, 2007 fiscal year have
been filed and all Taxes for the September 30, 2007 fiscal year have been paid.

    (r)    <u>No Material Misstatements</u>.  No information, report, financial statement, exhibit
or schedule furnished by or on behalf of any Loan Party or any other Subsidiary to any Purchaser
in connection with the negotiation of any Transaction Document or included therein or delivered
pursuant thereto contained, contains or will contain any material misstatement of fact or omitted,
omits or will omit to state any material fact necessary to make the statements therein, in the light
of the circumstances under which they were, are or will be made, not misleading; provided that to
the extent any such information, report, financial statement, exhibit or schedule was based upon
or constitutes a forecast or projection, each Loan Party represents only that it acted in good faith
and utilized reasonable assumptions (based upon accounting principles consistent with the
historical audited financial statements of the Parent) and due care in the preparation of such
information, report, financial statement, exhibit or schedule.

    (s)    <u>Employee Benefit Plans</u>.  Neither the Parent nor any Subsidiary nor any of their
ERISA Affiliates has during the past five years maintained, contributed to or had an obligation to
contribute to any Plan or has any present intention to do so.

    (t)    <u>Environmental Matters</u>.

    (i)  Except as set forth in Schedule 3.1(t) and except with respect to any other matters
that, individually or in the aggregate, could not reasonably be expected to result
in a Material Adverse Effect, neither the Parent nor any Subsidiary (i) has failed
to comply with any Environmental Law or to obtain, maintain or comply with
any permit (including, but not limited to, Environmental or Mining Permits),

license or other approval required under any Environmental Law, (ii) has become
subject to any Environmental Liability, (iii) has received notice of any claim with
respect to any Environmental Liability or (iv) knows of any basis for any
Environmental Liability.

(ii)  The Parent and the Subsidiaries have obtained, and are in compliance with, all
Environmental or Mining Permits required for the conduct of their businesses
and operations, and the ownership, occupation, operation and use of their Real
Property and other property, under Environmental Laws, and all such
Environmental or Mining Permits are valid and in good standing, except any
such failure to obtain, non-compliance or failure to be valid and in good standing
as would not reasonably be expected to result in a Material Adverse Effect. All
permits necessary for the operation of the Borrowers' business (including, but not
limited to, any Environmental or Mining Permits) owned or held by the JAD
Sellers or by any Affiliate of a Borrower that have not been or are not being
acquired by a Loan Party in connection with the Acquisition will be transferred
to a Loan Party within six months from the Funding Date. To the knowledge of
each Loan Party, no material operational or budgetary adjustments will be
required in order for the Parent or any Subsidiary to remain in compliance with
applicable Environmental Laws or Environmental or Mining Permits. To the
knowledge of each Loan Party, there is no existing reason why any
Environmental or Mining Permits necessary to be obtained for future operations
or expansions (including any renewals of existing Environmental or Mining
Permits) on the Real Properties or any existing Mining Lease will not be
obtainable in the ordinary course of the relevant Governmental Authorities'
permitting processes and in a timely manner consistent with the currently
effective business plan of the Parent and the Subsidiaries.

(iii)  Neither the Parent nor any Subsidiary has been barred for a period in excess of
14 consecutive days from receiving surface or underground Environmental or
Mining Permits pursuant to the permit blockage provisions of any Reclamation
Laws.

(iv)  There are no Black Lung Liabilities pending or, to the knowledge of any Loan
Party, threatened against any the Parent or any Subsidiary, except any Black
Lung Liabilities that would not reasonably be expected to result in a Material
Adverse Effect.

(u)     Insurance.  Schedule 3.1(u) sets forth a true, complete and correct description of
all insurance maintained by the Parent or any Subsidiary as of the Funding Date. As of such date,
such insurance is in full force and effect and all premiums have been duly paid. The Parent and
the Subsidiaries have insurance in such amounts and covering such risks and liabilities as are in
accordance with normal industry practice.

(v)     Location of Real Property and Leased Premises.

(i)  Schedule 3.1(v)(i) lists completely and correctly as of the Funding Date all Real
Property owned by the Parent and the Subsidiaries and the addresses thereof.
The Parent and the Subsidiaries own in fee all the Real Property set forth on
Schedule 3.1(v)(i).

- 21 -

(ii) Schedule 3.1(v)(ii) lists completely and correctly as of the Funding Date all Real Property leased by the Parent and the Subsidiaries and the addresses thereof and describes the type of interest held therein, whether such lease or sublease is a Mining Lease or a Prep Plant Lease and, whether such lease, sublease or other instrument contains any restrictions on change of control or requires the consent of the landlord thereunder or other parties thereto to the Transactions. The Parent and the Subsidiaries have valid leases in all the Real Property set forth on Schedule 3.1(v)(ii).

(w)    Labor Matters.  As of the Funding Date, there are no strikes, lockouts or slowdowns against the Parent or any Subsidiary pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Parent or any Subsidiary have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or applicable foreign law dealing with such matters. All payments due from the Parent or any Subsidiary, or for which any claim may be made against the Parent or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Parent or such Subsidiary. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Parent or any Subsidiary is bound.

(x)    Solvency.  Immediately after the consummation of the Transactions to occur on the Funding Date, (a) the fair value of the assets of each of the Loan Parties or any other Subsidiary, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of each Loan Party and any other Subsidiary will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) each Loan Party and each other Subsidiary will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) none of the Loan Parties or any other Subsidiary will have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted following the Funding Date.

(y)    Transaction Documents.  The Parent has delivered or otherwise made available to the Purchaser a complete and correct copy of the Acquisition Agreement (including all schedules, exhibits, amendments, supplements and modifications thereto) and all documents executed in connection therewith. Neither the Parent nor any Subsidiary nor, to the knowledge of any Loan Party, any other Person party thereto is in default in the performance or compliance in any material respects with any material provisions thereof. The Acquisition Agreement complies in all material respects with all applicable laws. All representations and warranties of the Parent and the Borrowers set forth in the Acquisition Agreement were true and correct in all material respects at the time as of which such representations and warranties were made (or deemed made).

(z)    Coal Agreements, Mining Leases and Prep Plant Leases.  Schedule 3.1(z) hereof lists completely and correctly as of the Funding Date all Coal Agreements, Mining Leases and Prep Plant Leases to which the Parent or any Subsidiary is a party and, if applicable, the addresses thereof and describes the type of interest held therein and whether such Coal Agreement, Mining Lease or Prep Plant Lease requires the consent of the counterparty or landlord thereunder, as applicable, or of any other parties thereto.

- 22 -

(aa)    Reserve Reports. The Reserve Reports include all current reserve reports made by or for the benefit of the Parent or the Subsidiaries in connection with the Transactions or the Acquisition. To the knowledge of the Loan Parties, such Reserve Reports have been prepared in good faith and do not contain any untrue statement of a material fact or omit to state a material fact in order to make the statements contained therein not materially misleading in light of the circumstances under which they were made.

(bb)    Material Contracts. Schedule 3.1(bb) hereof contains a true, accurate and complete list as of the Funding Date of all the agreements of the Parent and the Subsidiaries that represent, in the aggregate, at least 80% of the aggregate annual revenue of the Parent and the Subsidiaries for the calendar year 2007.

(cc)    Existing Indebtedness. Schedule 3.1(cc) hereof contains a true, accurate and complete list of all Indebtedness of the Parent and the Subsidiaries as of the Funding Date.

(dd)    Working Capital. As of the close of business on April 8, 2008, the Parent, together with its Subsidiaries, had approximately (i) $1.5 million of working capital, comprised of $820,000 in cash, $4.4 million in accounts receivable and $850,000 in inventory less $3.3 million in accounts payable and $1.27 million drawn on the Parent's $6 million secured revolving line of credit with First Tennessee Bank (the "Revolver"), (ii) $2.47 million of borrowing availability under the Revolver and (iii) as of the close of business on April 7, 2008, the Borrowers had approximately $2.0 million of working capital, comprised of $0.65 in cash, $2.3 million in accounts receivable and $1.52 million in inventory less $2.47 million in accounts payable.

(ee)    Pro Forma Capitalization. Schedule 3.1(ee) hereof contains a summary pro forma capitalization table for the Parent and the Subsidiaries after giving effect to the Transactions. Schedule 3.1(ee) hereof sets forth, a true and complete list, by class of security, of the name and amount of each security of the Parent and the Subsidiaries that will be issued and outstanding immediately following the Funding Date.

(ff)    Intellectual Property. The Parent and the Subsidiaries have, or have rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, licenses and other similar rights necessary or material for use in connection with their respective businesses and which the failure to so have could have a Material Adverse Effect (collectively, the "Intellectual Property Rights"). Neither the Parent nor any Subsidiary has received a written notice that the Intellectual Property Rights used by the Parent or any Subsidiary violates or infringes upon the rights of any Person. To the knowledge of the Loan Parties, all such Intellectual Property Rights are enforceable and there is no existing infringement by another Person of any of the Intellectual Property Rights of others.

(gg)    Transactions With Affiliates and Employees. Except as set forth on Schedule 3.1(gg) hereof, none of the officers or directors of the Parent or any Subsidiary and, to the knowledge of each Loan Party, none of the employees of the Parent or any Subsidiary, is presently a party to any transaction with any the Parent or any Subsidiary (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of any Loan Party, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $25,000 per year other than (i) for payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Parent or any Subsidiary and

- 23 -

(iii) for other employee benefits, including stock option agreements under any stock option plan
of the Parent.

(hh)    Seniority.  Except as set forth on Schedule 3.1(hh) hereof, as of the Funding
Date, no Indebtedness, equity or other security of the Parent or any Subsidiary is senior to the
Notes or the Parent Guarantee, as the case may be, in right of payment, whether with respect to
interest or upon liquidation or dissolution, or otherwise, other than indebtedness in favor of the
Purchasers pursuant to the Notes.

(ii)    No Disagreements with Accountants and Lawyers.  There are no disagreements
of any kind presently existing, or reasonably anticipated by any Loan Party to arise, between the
accountants and lawyers formerly or presently employed by the Parent or any Subsidiary and,
except as required by Section 4(j) of the Notes or as set forth in Schedule 3.1(ii) hereof, each of
the Parent and the Subsidiaries is current with respect to any fees owed to its accountants and
lawyers.  By making this representation, none of the Loan Parties in any manner waives the
attorney/client privilege or the confidentiality of the communications between itself or any other
Subsidiary and its lawyers.

(jj)    Governmental Approvals.  Except as set forth on Schedule 3.1(jj), no action,
consent or approval of, registration or filing with or any other action by any Governmental
Authority is or will be required in connection with the Transactions.

(kk)    Use of Proceeds.  The Parent and the Borrowers have used the net proceeds from
the sale of the Notes hereunder solely for the Acquisition and fees and expenses relating to the
Acquisition.

(ll)    OFAC.

(i)    None of the Parent, the Subsidiaries or any of their respective Affiliates is a
Sanctioned Person or a Sanctioned Entity.

(ii)    None of the Parent, the Subsidiaries or, to the knowledge of the Parent or the
Subsidiaries, any of their Affiliates is in violation of (i) the Trading with the
Enemy Act (12 U.S.C. 95, as amended or modified from time to time), (ii) any of
the foreign assets control regulations of the United States Treasury Department
(31 CFR, Subtitle B, Chapter V, as amended or modified from time to time) or
any enabling legislation or executive order relating thereto or (iii) the USA
Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001, as
amended from time to time)).

(mm)    From and after the Funding Date through and including the Closing Date, no
event or series of events shall have occurred that reasonably could be expected to have or result in
a Material Adverse Effect, other than (I) the Notice of Event of Default delivered by the Credit
Agreement Lender on July 1, 2008 alleging a violation of the June 30, 2008 Leverage Ratio; (II)
the potential cross default under the 2007 Bridge Notes resulting from such alleged Leverage
Ratio event of default; and (III) the potential cross default under the A/R Facility resulting from
such alleged Leverage Ratio event of default.

3.2    Representations and Warranties of the Purchasers. Each Purchaser hereby, for itself and
for no other Purchaser, represents and warrants as of the Funding Date to the Parent and the Borrowers as
follows:

    (a)    <u>Authority</u>. If a corporation, partnership, limited partnership, limited liability company or other form of entity, the Purchaser is duly organized or formed, as the case may be, validly existing, and in good standing under the laws of its jurisdiction of organization or formation, as the case may be. The Purchaser has all requisite individual or entity right, power and authority to execute, deliver and perform this Agreement.

    (b)    <u>Enforceability</u>. The execution, delivery and performance of this Agreement by the Purchaser have been duly authorized by all requisite partnership or corporate action, as the case may be. This Agreement has been duly executed and delivered by the Purchaser, and, upon its execution by the Loan Parties, shall constitute the legal, valid and binding obligation of the Purchaser, enforceable in accordance with its terms, except to the extent that its enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting the enforcement of creditors' rights generally and by general principles of equity.

    (c)    <u>No Violations</u>. The execution, delivery and performance of this Agreement by the Purchaser do not and will not, with or without the passage of time or the giving of notice, result in the breach of, or constitute a default under, cause the acceleration of performance of, or require any consent under, or result in the creation of any lien, charge or encumbrance upon any property or assets of the Purchaser pursuant to, any material instrument or agreement to which the Purchaser is a party or by which the Purchaser or its properties may be bound or affected, and, do not or will not violate or conflict with any provision of the articles of incorporation or bylaws, partnership agreement, operating agreement, trust agreement or similar organizational or governing document of the Purchaser, as applicable.

    (d)    <u>Knowledge of Investment and its Risks</u>. The Purchaser has knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of Purchaser's investment in the Securities. The Purchaser understands that an investment in the Securities represents a high degree of risk and there is no assurance that the Loan Parties' business or operations will be successful. The Purchaser has considered carefully the risks attendant to an investment in the Loan Parties, and that, as a consequence of such risks, the Purchaser could lose its entire investment in the Loan Parties.

    (e)    <u>Investment Intent</u>. The Purchaser hereby represents and warrants that (i) the Securities purchased by the Purchaser pursuant to this Agreement are being acquired for investment for the Purchaser's own account, and not as a nominee or agent and not with a view to the resale or distribution of all or any part of the Securities, and the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing any of the Securities, within the meaning of the Securities Act, (ii) the Securities purchased by the Purchaser pursuant to this Agreement are being acquired in the ordinary course of the Purchaser's business, and (iii) the Purchaser does not have any contracts, understandings, agreements or arrangements, directly or indirectly, with any Person and/or entity to distribute, sell, transfer or grant participations to such Person and/or entity with respect to, any of such Securities. Subject to the immediately preceding sentence, nothing contained herein shall be deemed a representation or warranty by the Purchaser to hold the Securities for any period of time. The Purchaser is not purchasing such Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

    (f)    <u>Purchaser Status</u>. The Purchaser is an "Accredited Investor" as that term is defined by Rule 501 of Regulation D promulgated under the Securities Act.

(g)   Disclosure.   The Loan Parties have provided the Purchaser with all of the information that the Purchaser has requested in connection with its decision to purchase the Securities.   The Purchaser further represents that the Purchaser has had an opportunity to ask questions and receive answers from the Loan Parties regarding the business, properties, prospects and financial condition of the Loan Parties. All such questions have been answered to the full satisfaction of the Purchaser. Neither such inquiries nor any other investigation conducted by or on behalf of the Purchaser or its representatives or counsel shall modify, amend or affect the Purchaser's right to rely on the truth, accuracy and completeness of the disclosure materials.

(h)   No Registration.   The Purchaser understands that the Purchaser may be required to bear the economic risk of the Purchaser's investment in the Loan Parties for an indefinite period of time.   The Purchaser further understands that (i) neither the offering nor the sale of the Securities has been registered under the Securities Act or any applicable State Acts in reliance upon exemptions from the registration requirements of such laws, (ii) the Securities must be held by the Purchaser indefinitely unless the sale or transfer thereof is subsequently registered under the Securities Act and any applicable State Acts, or an exemption from such registration requirements is available, (iii) except as set forth in the Rights Agreement, the Loan Parties are under no obligation to register any of the Securities on the Purchaser's behalf or to assist the Purchaser in complying with any exemption from registration, and (iv) the Loan Parties will rely upon the representations and warranties made by the Purchaser in this Agreement in order to establish such exemptions from the registration requirements of the Securities Act and any applicable State Acts.

(i)   Transfer Restrictions.   The Purchaser will not transfer any of the Securities unless such transfer is registered or exempt from registration under the Securities Act and such State Acts, and, if requested by the Parent in the case of an exempt transaction, the Purchaser has furnished an opinion of counsel reasonably satisfactory to the Parent that such transfer is so exempt; provided, however, that the Purchaser shall not be required to furnish the Parent with an opinion of counsel for transfers to an Affiliate.  The Purchaser understands and agrees that (i) the certificates evidencing the Securities will bear appropriate legends indicating such transfer restrictions placed upon the Securities, (ii) the Loan Parties shall have no obligation to honor transfers of any of the Securities in violation of such transfer restrictions, and (iii) the Loan Parties shall be entitled to instruct any transfer agent or agents for the securities of the Loan Parties to refuse to honor such transfers.

(j)   Principal Address.   The Purchaser's principal residence, if an individual, or principal executive office, if an entity, is set forth on its signature page of this Agreement.

The Parent and the Borrowers acknowledge and agree that the Purchasers do not make or have not made any representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in this Section 3.2.

## ARTICLE IV
## OTHER AGREEMENTS OF THE PARTIES

4.1   Transfer Restrictions.

(a)   The Securities may only be disposed of in compliance with state and federal securities laws.  In connection with any transfer of Securities other than pursuant to an effective registration statement or Rule 144, to the Parent, to an affiliate of a Purchaser or in connection with a pledge as contemplated in Section 4.1(b), the Parent may require the transferor thereof to

provide to the Parent an opinion of counsel selected by the transferor and reasonably acceptable to the Parent, the form and substance of which opinion shall be reasonably satisfactory to the Parent, to the effect that such transfer does not require registration of such transferred Securities under the Securities Act. As a condition of transfer, any such transferee shall agree in writing to be bound by the terms of this Agreement and shall have the rights of a Purchaser under this Agreement, the Security Documents and the Rights Agreement.

(b)    The Purchasers agree to the imprinting, so long as is required by this Section 4.1(b), of a legend on any of the Securities in the following form:

THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THESE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY SUCH SECURITIES.

The Parent acknowledges and agrees that a Purchaser may from time to time pledge pursuant to a bona fide margin agreement with a registered broker-dealer or grant a security interest in some or all of the Securities to a financial institution that is an "accredited investor" as defined in Rule 501(a) under the Securities Act and who agrees to be bound by the provisions of this Agreement and the Rights Agreement and, if required under the terms of such arrangement, the Purchasers may transfer pledged or secured Securities to the pledgees or secured parties. Such a pledge or transfer would not be subject to approval of the Parent and no legal opinion of legal counsel of the pledgee, secured party or pledgor shall be required in connection therewith. Further, no notice shall be required of such pledge. At the appropriate Purchaser's expense, the Parent will execute and deliver such reasonable documentation as a pledgee or secured party of Securities may reasonably request in connection with a pledge or transfer of the Securities, including, if the Securities are subject to registration pursuant to the Rights Agreement, the preparation and filing of any required prospectus supplement under Rule 424(b)(3) under the Securities Act or other applicable provision of the Securities Act to appropriately amend the list of sellers of the Securities thereunder.

4.2    Integration. The Parent shall not, and shall use its best efforts to ensure that no Affiliate of the Parent shall, sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in Section 2 of the Securities Act) that would be integrated with the offer or sale of the Securities in a manner that would require the registration under the Securities Act of the sale of the Securities to the Purchasers.

4.3    Publicity. The Parent and the Purchasers shall consult with each other in issuing any press releases with respect to the transactions contemplated hereby, and neither the Loan Parties nor the Purchasers shall issue any such press release or otherwise make any such public statement without the prior consent of the Parent, with respect to any press release of the Purchasers, or without the prior consent of the Purchaser, with respect to any press release of the Loan Parties, which consent shall not unreasonably be withheld, except if such disclosure is required by law, in which case the disclosing party shall promptly provide the other party with prior notice of such public statement or communication.

Notwithstanding the foregoing, no Loan Party shall publicly disclose the name of any Purchaser, or include the name of any Purchaser in any filing with the Commission or any regulatory agency or Trading Market, without the prior written consent of such Purchaser, except (i) as required by federal securities law and (ii) to the extent such disclosure is required by law or Trading Market regulations, in which case the Parent shall provide such Purchaser with prior notice of such disclosure permitted under subclause (i) or (ii).

    4.4    <u>Shareholder Rights Plan</u>.  No claim will be made or enforced by the Parent or, to the knowledge of the Parent, any other Person that any Purchaser is an "Acquiring Person" under any shareholder rights plan or similar plan or arrangement in effect or hereafter adopted by the Parent, or that any Purchaser could be deemed to trigger the provisions of any such plan or arrangement, by virtue of receiving Securities under the Transaction Documents or under any other agreement between the Parent and any Purchaser.  The Parent shall conduct its business and the business of the Subsidiaries in a manner so that it will not become subject to the Investment Company Act.

    4.5    <u>Indemnification of Purchasers</u>.

        (i)    Subject to the provisions of this Section 4.5, each of the Loan Parties (each an "Indemnifying Party" and collectively, the "Indemnifying Parties"), jointly and severally, will indemnify and hold each Purchaser and its directors, officers, shareholders, partners, employees and agents (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title), each Person who controls such Purchaser (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, shareholders, agents, members, partners or employees (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title) of such controlling Person (each, a "Purchaser Party") harmless from any and all losses, liabilities, obligations, claims, contingencies, damages, costs and expenses, including all judgments, amounts paid in settlements, court costs and reasonable attorneys' fees and costs of investigation (collectively, "Losses") that any Purchaser Party may suffer or incur as a result of, arising from, or relating to (a) any breach of any of the representations, warranties, covenants or agreements made by any of the Loan Parties in this Agreement or in the other Transaction Documents (or any allegation by a third-party that, if true would constitute such a breach) or (b) any action instituted against a Purchaser, or any of them or their respective Affiliates, by any stockholder of the Parent who is not an Affiliate of such Purchaser or any other Party, with respect to any of the transactions contemplated by the Transaction Documents (unless such action is found by a court of competent jurisdiction in a judgment not subject to further appeal to have arisen solely from (i) a breach of such Purchaser's representation, warranties or covenants under the Transaction Documents or any agreements or understandings any Purchasers may have with any such stockholder or (ii) any violations by such Purchaser of state or federal securities laws or any conduct by such Purchaser which constitutes fraud, gross negligence or willful misconduct (each, a "Purchaser Fault")).  If any action shall be brought against any Purchaser Party in respect of which indemnity may be sought pursuant to this Agreement, the Purchaser Party shall promptly notify the Parent in writing, and the Parent shall have the right to assume the defense thereof, on behalf of the Loan Parties, with counsel of its own choosing.  Any Purchaser Party shall have the right to employ separate counsel in any such action and participate in the defense thereof,

- 28 -

but the fees and expenses of such counsel shall be at the expense of the Purchaser
Party except to the extent that (i) the employment thereof has been specifically
authorized by the Parent in writing, (ii) the Parent has failed after a reasonable
period of time to assume such defense and to employ counsel or (iii) in such
action there is, in the reasonable opinion of such separate counsel, (x) a conflict
on any material issue between the position of the Loan Parties and the position of
the Purchaser Party or (y) one or more defenses available to any Purchaser Party
which are not available to such Loan Parties. The Loan Parties will not be liable
to any Purchaser Party under this Agreement (i) for any settlement by a
Purchaser Party effected without the Parent's prior written consent, which shall
not be unreasonably conditioned, withheld or delayed; or (ii) to the extent, but
only to the extent that a loss, claim, damage or liability is attributable solely to a
Purchaser Fault.

(ii)    Unless solely due to a Purchaser Fault, if a claim for indemnification under
subsection (i) of this Section 4.5 is unavailable to a Purchaser Party (by reason of
public policy or otherwise), then each Indemnifying Party, in lieu of
indemnifying such Purchaser Party, shall contribute to the amount paid or
payable by such Purchaser Party as a result of such Losses, in such proportion as
is appropriate to reflect the relative fault of the Indemnifying Party and Purchaser
Party in connection with the actions, statements or omissions that resulted in such
Losses as well as any other relevant equitable considerations. The relative fault
of such Indemnifying Party and Purchaser Party shall be determined by reference
to, among other things, whether any action in question, including any untrue or
alleged untrue statement of a material fact or omission or alleged omission of a
material fact, has been taken or made by, or relates to information supplied by,
such Indemnifying Party or Purchaser Party, and the parties' relative intent,
knowledge, access to information and opportunity to correct or prevent such
action, statement or omission. The amount paid or payable by a party as a result
of any Losses shall be deemed to include, subject to the limitations set forth in
this Agreement, any reasonable attorneys' or other reasonable fees or expenses
incurred by such party in connection with any Proceeding to the extent such party
would have been indemnified for such fees or expenses if the indemnification
provided for in this Section 4.5 was available to such party in accordance with its
terms. The parties hereto agree that it would not be just and equitable if
contribution pursuant to this Section 4.5 were determined by pro rata allocation
or by any other method of allocation that does not take into account the equitable
considerations referred to in this subsection (ii) of Section 4.5.

4.6    Form D; Blue Sky Filings. The Parent, on behalf of the Loan Parties, agrees to timely
file a Form D with respect to the Securities as required under Regulation D and to provide a copy thereof,
promptly upon request of any Purchaser. The Loan Parties shall take such action as they shall reasonably
determine is necessary in order to obtain an exemption for, or to qualify the Securities for, sale to the
Purchasers at the Closing under applicable securities or "Blue Sky" laws of the states of the United States,
and shall provide evidence of such actions promptly upon request of any Purchaser.

4.7    Audit and Collateral Monitoring Fees. Representatives of the Purchasers may visit the
Parent or the Subsidiaries or conduct audits, inspections or field examinations of the Parent or the
Subsidiaries and valuations or appraisals of any or all of the collateral or business or enterprise valuations
of the Parent or the Subsidiaries at any reasonable time and from time to time in a reasonable manner
during normal business hours and upon reasonable notice so as not to unduly disrupt the business of

Parent or the Subsidiaries. The Loan Parties agree, jointly and severally, to pay (i) $1,500 per day per examiner plus all of the examiner's out of pocket costs and reasonable expenses incurred in connection with all such visits, audits, inspections, valuations and field examinations and (ii) the reasonable cost of all audits, appraisals and business valuations (including enterprise valuation appraisals) conducted by third party auditors or appraisers on behalf of the Purchasers; provided that so long as no default or Event of Default has occurred and is continuing, the Loan Parties shall not be obligated to pay for more than one such audit and field examination in any calendar year.

**ARTICLE V**
**MISCELLANEOUS**

    5.1    Fees. At the Closing, the Loan Parties have agreed, jointly and severally, to reimburse Centrecourt Asset Management LLC ("Centrecourt") for its reasonable legal fees and expenses of counsel, including, without limitation, any local counsel retained in connection with the Transactions. Except as expressly set forth in the preceding sentence and in the Transaction Documents to the contrary, each party shall pay the fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement and the other Transaction Documents. The Loan Parties shall, jointly and severally, pay all transfer agent fees, stamp taxes and other similar taxes and duties levied in connection with the issuance of any Securities.

    5.2    Entire Agreement. The Transaction Documents, together with the exhibits and schedules thereto, contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.

    5.3    Notices. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (a) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on a Business Day, (b) the next Business Day after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number set forth on the signature pages attached hereto on a day that is not a Business Day or later than 5:30 p.m. (New York City time) on any Business Day, (c) the next Business Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service, if next Business Day delivery is selected and all charges are prepaid or (d) upon actual receipt by the party to whom such notice is required to be given. The address for such notices and communications shall be as set forth on the signature pages attached hereto.

    5.4    Amendments; Waivers. No provision of this Agreement, the Notes or any other Transaction Document may be waived or amended except in a written instrument signed by the Parent (to the extent the Parent is a party thereto), the Borrowers (to the extent the Borrowers are a party thereto) and Purchasers holding a majority of the principal amount of Notes then outstanding. No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of either party to exercise any right hereunder in any manner impair the exercise of any such right.

    5.5    Construction. The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

- 30 -

5.6    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns. The Loan Parties may not assign this Agreement or any rights or obligations hereunder without the prior written consent of Purchasers holding a majority of the principal amount of Notes then outstanding. Any Purchaser may assign any or all of its rights under this Agreement to any Person to whom such Purchaser assigns or transfers any Securities, provided such transferee agrees in writing to be bound, with respect to the transferred Securities, by the provisions hereof that apply to such "Purchaser."

5.7    No Third-Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, except as otherwise set forth in Section 4.5.

5.8    Governing Law. All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and any other Transaction Documents (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state or federal courts sitting in the City of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith, or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery), postage and charges prepaid, to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. The parties hereby waive all rights to a trial by jury. If either party shall commence an action or proceeding to enforce any provisions of the Transaction Documents, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding.

5.9    Survival. The representations and warranties contained herein shall survive the Closing, and the delivery of the Securities for the applicable statue of limitations.

5.10    Execution. This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile signature page or data file were an original thereof.

5.11    Severability. If any provision of this Agreement is held to be invalid or unenforceable in any respect, the validity and enforceability of the remaining terms and provisions of this Agreement shall not in any way be affected or impaired thereby and the parties will attempt to agree upon a valid and

- 31 -

enforceable provision that is a reasonable substitute therefor, and upon so agreeing, shall incorporate such substitute provision in this Agreement.

5.12    Replacement of Securities.  If any certificate or instrument evidencing any Securities is mutilated, lost, stolen or destroyed, the Parent shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof, or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to the Parent of such loss, theft or destruction and customary and reasonable indemnity, if requested.  The applicants for a new certificate or instrument under such circumstances shall also pay any reasonable third-party costs associated with the issuance of such replacement Securities.

5.13    Remedies.  In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of the Purchasers will be entitled to specific performance under the Transaction Documents.  The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations described in the foregoing sentence and hereby agrees to waive in any action for specific performance of any such obligation the defense that a remedy at law would be adequate.

5.14    Payment Set Aside.  To the extent that the Loan Parties make a payment or payments to any Purchaser pursuant to any Transaction Document or a Purchaser enforces or exercises its rights thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Loan Parties, a trustee, receiver or any other Person under any law (including, without limitation, any bankruptcy law, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

5.15    Usury.  To the extent they may lawfully do so, the Loan Parties hereby agree not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any claim, action or proceeding that may be brought by any Purchaser in order to enforce any right or remedy under any Transaction Document.  Notwithstanding any provision to the contrary contained in any Transaction Document, it is expressly agreed and provided that the total liability of the Loan Parties under the Transaction Documents for payments in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "Maximum Rate"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums in the nature of interest that the Loan Parties may be obligated to pay under the Transaction Documents exceed such Maximum Rate.  It is agreed that if the maximum contract rate of interest allowed by law and applicable to the Transaction Documents is increased or decreased by statute or any official governmental action subsequent to the date hereof, the new maximum contract rate of interest allowed by law will be the Maximum Rate applicable to the Transaction Documents from the effective date forward, unless such application is precluded by applicable law.  If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Loan Parties to any Purchaser with respect to indebtedness evidenced by the Transaction Documents, such excess shall be applied by the Purchasers to the unpaid principal balance of any such indebtedness or be refunded to the Loan Parties, the manner of handling such excess to be at the Purchasers' election.

5.16    Liquidated Damages.  The Loan Parties' obligations to pay any partial liquidated damages or other amounts owing under the Transaction Documents is a continuing obligation of the Loan Parties and shall not terminate until all unpaid partial liquidated damages and other amounts have been

paid notwithstanding the fact that the instrument or security pursuant to which such partial liquidated damages or other amounts are due and payable shall have been canceled.

5.17    Agent

(a)    Authorization of Action. Each Purchaser hereby appoints and authorizes CAMOFI Master LDC (the "Agent") to be its agent in its name and on its behalf and to exercise such rights or powers granted to the Agent or the Purchasers under the Security Documents to the extent specifically provided therein and on the terms thereof, together with such rights, powers and discretions as are reasonably incidental thereto. As to any matters not expressly provided for by the Security Documents, the Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Purchasers holding a majority of the outstanding principal amount of the Notes, and any action so taken or not so taken by the Agent shall be binding upon all Purchasers; provided, however, that the Agent shall not be required to take any action which exposes the Agent to liability in such capacity, which could result in the Agent incurring any costs and expenses or which is contrary to this Agreement or applicable law.

(b)    Indemnification. Each Purchaser hereby agrees to indemnify and hold harmless the Agent from and against any and all liabilities, obligations, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent (in its capacity as agent for the Purchasers) in any way relating to or arising out of the Security Documents or any action taken or admitted by the Agent under or in respect of the Security Documents; provided that no Purchaser shall be liable for any portion of such liabilities, obligations, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross negligence or willful misconduct. Without limiting the generality of the foregoing, each Purchaser agrees to reimburse the Agent promptly upon demand on a pro rata basis in accordance with the then outstanding indebtedness, liabilities and obligations owing to such Purchaser by the Borrowers in respect of any out-of-pocket expenses (including counsel fees) incurred by the Agent in connection with the preservation of any rights of the Agent or the Purchasers under, the enforcement of, or legal advice in respect of the rights or responsibilities under, the Security Documents, to the extent that the Agent is not reimbursed for such expenses by the Loan Parties.

(c)    Successor Agent. The Agent may, as hereinafter provided, resign at any time by giving not less than 30 days' written notice thereof to the Purchasers and the Parent, on behalf of the Loan Parties. Upon any such resignation, the Purchasers shall have the right to appoint a successor Agent (the "Successor Agent"), which shall be a Purchaser and which shall be acceptable to the Parent, acting reasonably. Upon the acceptance of any appointment as Agent hereunder by a Successor Agent, such Successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent and the retiring Agent shall thereupon be discharged from its further duties and obligations as Agent under the Security Documents. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 5.17 shall continue to inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under the Security Documents. Absent such a resignation by the Agent, the Agent's appointment shall continue until revoked in writing by Purchasers holding a majority of the outstanding principal amount of the Notes, at which time such Purchasers shall appoint a new Agent.

(d)    Taking and Enforcement of Remedies. Each of the Purchasers hereby acknowledges that, to the extent permitted by applicable law, the remedies provided under the Security Documents to the Purchasers are for the benefit of the Purchasers collectively and acting together and not severally and further acknowledges that its rights under the Security Documents are to be exercised not

severally, but collectively by the Agent upon the decision of the Purchasers; accordingly, notwithstanding any of the provisions contained in any of the Transaction Documents, each of the Purchasers hereby covenants and agrees that it shall not be entitled to take any action with respect to the Security Documents, including, without limitation, any acceleration of the indebtedness, liabilities or obligations of the Loan Parties, but that any such action shall be taken only by the Agent with the prior written agreement of the Purchasers holding a majority of the principal amount of the Notes, provided that, notwithstanding the foregoing:

    (i)  in the absence of instructions from such Purchasers and where in the sole opinion of the Agent the exigencies of the situation warrant such action, the Agent may without notice to or consent of the Purchasers take such action on behalf of the Purchasers as it deems appropriate or desirable in the interest of the Purchasers; and

    (ii)  the commencement of litigation before any court shall be made in the name of each Purchaser individually unless the laws of the jurisdiction of such court permit such litigation to be commenced in the name of the Agent on behalf of the Purchasers (whether pursuant to a specific power of attorney in favor of the Agent or otherwise) and the Agent agrees to commence such litigation in its name; provided, however, that no litigation shall be commenced in the name of any Purchaser without the prior written consent of such Purchaser;

    (iii)  each of the Purchasers hereby further covenants and agrees that it shall co-operate fully with the Agent to the extent requested by the Agent in the collective realization, including, without limitation, the appointment of a receiver and manager to act for their collective benefit; and each Purchaser covenants and agrees to do all acts and things to make, execute and deliver all agreements and other instruments, including, without limitation, any instruments necessary to effect any registrations, so as to fully carry out the intent and purpose of this Section 5.17; and each of the Purchasers hereby covenants and agrees that it has not heretofore and shall not seek, take, accept or receive any security for any of the obligations and liabilities of the Loan Parties under the Transaction Documents or under any other document, instrument, writing or agreement ancillary thereto other than such security as is provided hereunder or thereunder and shall not enter into any agreement with any of the Loan Parties relating in any manner whatsoever to the transactions contemplated hereunder, unless all of the Purchasers shall at the same time obtain the benefit of any such security or agreement, as the case may be.

    (iv)  Notwithstanding any other provision contained in the Transaction Documents, no Purchaser shall be required to be joined as a party to any litigation commenced against any of the Loan Parties by the Agent under the Transaction Documents (unless otherwise required by any court of competent jurisdiction) if it elects not to be so joined in which event any such litigation shall not include claims in respect of the rights of such Purchaser against the Loan Parties under the Transaction Documents until such time as such Purchaser does elect to be so joined; provided that if at the time of such subsequent election it is not possible or practicable for such Purchaser to be so joined, then such Purchaser may commence proceedings in its own name in respect of its rights against any of the Loan Parties.

- 34 -

5.18    Independent Nature of Purchasers' Obligations and Rights.  The obligations of each Purchaser under any Transaction Document are several and not joint with the obligations of any other Purchaser, and no Purchaser shall be responsible in any way for the performance or non-performance of the obligations of any other Purchaser under any Transaction Document.  Nothing contained herein or in any other Transaction Document, and no action taken by any Purchaser pursuant thereto, shall be deemed to constitute the Purchasers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Purchasers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents.  Each Purchaser shall be entitled to independently protect and enforce its rights, including without limitation the rights arising out of this Agreement or out of the other Transaction Documents, and it shall not be necessary for any other Purchaser to be joined as an additional party in any proceeding for such purpose.  Each Purchaser has been represented by its own separate legal counsel in their review and negotiation of the Transaction Documents.  The Loan Parties have elected to provide all Purchasers with the same terms and Transaction Documents for the convenience of the Loan Parties and not because they were required or requested to do so by the Purchasers.

*[Remainder of Page Intentionally Left Blank]*

- 35 -

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**J.A.D. COAL COMPANY, INC.**

Address for Notice:

c/o U.S. Coal Corporation
448 Lewis Hargett Circle, Suite 240
Lexington, Kentucky 40503
Attn:  Robert Gabbard,
       President

By: _____
Name:  Robert Gabbard
Title: President

Telephone:     (859) 223-8820
Facsimile:     (859) 219-0913


**SANDLICK COAL COMPANY, LLC**

Address for Notice:

c/o U.S. Coal Corporation
448 Lewis Hargett Circle, Suite 240
Lexington, Kentucky 40503
Attn:  Robert Gabbard,
       Manager

By: _____
Name:  Robert Gabbard
Title: Manager

Telephone:     (859) 223-8820
Facsimile:     (859) 219-0913


**FOX KNOB COAL CO., INC.**

Address for Notice:

c/o U.S. Coal Corporation
448 Lewis Hargett Circle, Suite 240
Lexington, Kentucky 40503
Attn:  Robert Gabbard,
       President

- 36 -

By:

Name:  Robert Gabbard

Title:  President

Telephone:    (859) 223-8820

Facsimile:    (859) 219-0913

- 37 -

**U.S. COAL CORPORATION**

<u>Address for Notice:</u>

U.S. Coal Corporation
448 Lewis Hargett Circle, Suite 240
Lexington, Kentucky 40503
Attn:   Robert Gabbard,
        Chief Executive Officer

By: _/s/ Robert B. Gabbard_
Name:  Robert Gabbard
Title:  Chief Executive Officer

Telephone:   (859) 223-8820
Facsimile:   (859) 219-0913

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOR PURCHASER(S) FOLLOWS]

- 38 -

[PURCHASER SIGNATURE PAGES TO PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Investing Entity: CAMOFI Master LDC
Signature of Authorized Signatory of Investing Entity: _Richard Smithline_
Name of Authorized Signatory: Richard Smithline
Title of Authorized Signatory: Director
Email Address of Authorized Entity: _____

Address for Notice of Investing Entity:
CAMOFI Master LDC
c/o Centrecourt Asset Management LLC
350 Madison Avenue, 8th Floor
New York, New York 10017

Address for Delivery of Securities for Investing Entity (if not same as above):

Subscription Amount: $3,000,000
Issued Shares: 300,000
EIN Number: _____
                              [SIGNATURE PAGES CONTINUE]

[PURCHASER SIGNATURE PAGES TO PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Investing Entity: <u>CAMHZN Master LDC</u>
*Signature of Authorized Signatory of Investing Entity:* _Richard Smithline_
Name of Authorized Signatory: <u>Richard Smithline</u>
Title of Authorized Signatory: <u>Director</u>
Email Address of Authorized Entity: _____

Address for Notice of Investing Entity:
CAMHZN Master LDC
c/o Centrecourt Asset Management LLC
350 Madison Avenue, 8th Floor
New York, New York 10017


Address for Delivery of Securities for Investing Entity (if not same as above):



Subscription Amount: $1,250,000
Issued Shares: 125,000
EIN Number: _____

[SIGNATURE PAGES CONTINUE]

[PURCHASER SIGNATURE PAGES TO PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase Agreement to be duly
executed by their respective authorized signatories as of the date first indicated above.

Name of Investing Person: ___ Lawrence Kaplan _____

Signature : _____ *Lawrence Kesler* _____

Email Address of Investing Person: ____ Lkaplan467@aol.com _____

Address for Notice of Investing Person:
17 Riverview Terrace
Smithtown, NY 11787

Address for Delivery of Securities for Investing Entity (if not same as above):

Subscription Amount: $250,000
Issued Shares: 25,000
EIN Number: _____

[PURCHASER SIGNATURE PAGES TO PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Investing Entity:    Michael Miller
*Signature* :
Email Address of Investing Person:    mmillerinv@aol.com

Address for Notice of Investing Entity:
31 Pierce Lane
Norwich, VT  05055

Address for Delivery of Securities for Investing Entity (if not same as above):

Subscription Amount: $250,000
Issued Shares: 25,000
EIN Number:    062 36 1780

[SIGNATURE PAGES CONTINUE]

[PURCHASER SIGNATURE PAGES TO PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Investing Entity: _____Futurtec, L.P._____
By: ____Futurtec Capital Corporation (its general partner)____
Signature of Authorized Signatory: ____Ido Klear, President____
Name of Authorized Signatory: _____Ido Klear_____
Title of Authorized Signatory: _____President_____
Email Address of Authorized Entity: ____IJK118@gmail.com____

Address for Notice of Investing Entity:
c/o Ido Klear
18 Briarfield Drive
Great Neck, NY  11020


Address for Delivery of Securities for Investing Entity (if not same as above):


Subscription Amount: $250,000
Issued Shares: 25,000
EIN Number: _11-3155090_

[SIGNATURE PAGES CONTINUE]