# EXHIBIT C
# PART IV

FILED: NEW YORK COUNTY CLERK 10/09/2012    INDEX NO. 650411/2012

NYSCEF DOC. NO. 43    RECEIVED NYSCEF: 10/09/2012

# Exhibit 3

## RIGHTS AGREEMENT

        RIGHTS AGREEMENT, dated as of April 15, 2008 (this "Agreement"), by and between U.S. Coal Corporation, a Delaware corporation ("USC"), on the one hand, and CAMOFI MASTER LDC ("CAMOFI"), CAMHZN MASTER LDC ("CAMHZN"), Futurtec L.P., a Delaware limited partnership ("Futurtec"), Michael Miller ("Miller") and Lawrence Kaplan ("Kaplan" and collectively with CAMOFI, CAMHZN, Futurtec and Miller, the "Investors").

### W I T N E S S E T H

        WHEREAS, pursuant to a Securities Purchase Agreement (the "SPA") dated as of April 15, 2008 among J.A.D. Coal Company, Inc., a Virginia corporation ("JAD"), Sandlick Coal Company, LLC, a Virginia limited liability company ("Sandlick"), and Fox Knob Coal Co., Inc., a Kentucky corporation ("Fox Knob" and, collectively with JAD and Sandlick, the "Borrowers"), USC, as the parent company of the Borrowers, and the Investors, the Investors purchased from the Borrowers certain promissory notes in the aggregate principal amount of $5.0 million (the "Notes"); and

        WHEREAS, USC's obligations under the SPA and the Notes (as defined in the SPA) are secured by a security interest in certain assets and properties of USC and the Borrowers pursuant to a Security Agreement (the "Security Agreement") dated as of April 15, 2008 among the Borrowers, USC and the Investors.

        WHEREAS, pursuant to the SPA, at the closing of the transactions thereunder, the Investors received an aggregate of 500,000 shares of common stock, $.001 par value per share ("Common Stock"), of USC (the "Investor Shares") as additional consideration for their purchase of the Notes, which Investor Shares were allocated pro rata among the Investors in accordance with the principal amount of their respective Notes; and

        WHEREAS, USC desires to grant certain put rights and registration rights to the Investors with respect to the Investor Shares on the terms and conditions set forth herein.

        NOW, THEREFORE, in consideration of the mutual promises and undertakings contained herein, and for other consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

        Section 1. Certain Definitions. In addition to any defined terms which may have meanings ascribed to them elsewhere in this Agreement, the following terms shall have the following meanings:

        "Put Period" means the 30-day period beginning on the date notice of the Trigger Event is first delivered to the Investors.

        "Put Shares" means such number of the Investor Shares elected to be sold by the Investors upon exercise of the Put Option (as defined in Section 2 hereof).

        "Trigger Date" means April 1, 2010.

        "Trigger Event" means the failure of USC to consummate one of the following transactions prior to the Trigger Date: (i) an underwritten initial public offering of USC's

Common Stock, or (ii) a reverse merger, share exchange or similar transaction involving USC and a public "shell company" (as defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended).

Section 2. <u>Put Right</u>. Upon the occurrence of a Trigger Event, each Investor shall have the individual right, exercisable by written notice to USC in accordance with Section 3 hereof, to require USC to purchase (the "<u>Put Option</u>") the Put Shares owned of record by such Investor at the time of delivery of such notice. The purchase price per Put Share shall be $5.40 (as adjusted to give effect to stock splits, stock dividends and the like, the "<u>Purchase Price</u>").

Section 3. <u>Exercise Procedures</u>. The Put Option shall be exercisable only by written notice from the exercising Investor to USC (the "<u>Put Notice</u>") within the Put Period and shall specify a business day as the closing date for the purchase of the Put Shares, which date shall in no event be earlier than fifteen (15) days after the date of the Put Notice or later than forty-five (45) days after the date of the Put Notice. The failure of any Investor(s) to exercise the Put Option within the Put Period shall cause the automatic termination of the Put Option and the rights and obligations of USC hereunder with respect to such Investor(s) only. This Put Option may not be exercised by an Investor more than once during the Put Period.

Section 4. <u>Closing</u>. At the closing (the "<u>Closing</u>") of the exercise of the Put Option, USC shall pay the aggregate Purchase Price in the form of cash in U.S. dollars by wire transfer of immediately available funds into an account designated by the exercising Investor in the Put Notice, and upon such payment, such Investor shall deliver to USC any and all certificates representing the Put Shares, free and clear of any and all liens, accompanied, when necessary, by stock powers duly endorsed in blank and any required stock transfer stamps affixed thereto. The closing of the exercise of the Put Option shall be held on the date specified in the Put Notice at such time and location within the city, county and state of New York as the parties to such transaction shall mutually agree. As a condition precedent to USC's obligation to purchase the Put Shares at the closing, the representations and warranties set forth in Section 7 of this Agreement shall be true and correct as of the date of Closing and, upon request by USC, the exercising Investor shall deliver to USC a certificate signed by an executive officer of such Investor certifying as to the truthfulness and correctness of such representations and warranties. Each party shall bear its own legal and other costs and expenses incurred in connection with the exercise of the Put Right and the purchase and sale of the Put Shares.

Section 5. <u>Security Interest</u>. The obligation of USC to make payment of the Purchase Price pursuant to Section 2 hereof  shall be secured by a security interest in certain assets of USC and the Borrowers pursuant to the Security Agreement; <u>provided</u>, <u>however</u>, such security interest shall not become fully granted, attached or effective and Investors shall take no action to perfect or enforce such security interest unless and until all of the obligations of USC and the Borrowers to the Credit Agreement Lenders under the Credit Agreement (as such terms are defined in the Notes) and all other Loan Documents (as such term is defined in the aforementioned Credit Agreement) have been paid in full.

Section 6. <u>Registration Rights</u>. The Investors shall have the registration rights with respect to the Investor Shares (and the other registrable securities specified therein) as set forth on <u>Annex I</u> hereto, the terms of which are incorporated herein in by reference.

Section 7. <u>Representations and Warranties</u>. Each Investor, severally, but not jointly, represents and warrants to USC that: (i) such Investor has full power and authority to enter into this Agreement; (ii) this Agreement has been duly authorized, executed and delivered

by such Investor and constitutes such Investor's valid and legally binding obligation, enforceable in accordance with its terms; (iii) none of the execution, delivery or performance by this Agreement by such Investor nor the consummation by such Investor of the transactions contemplated hereby will result in a violation of, conflict with, or result in any breach of any of the terms of, or constitute a default under, any provision of federal, state or local law to which such Investor is subject, or any mortgage, indenture, agreement, instrument, judgment, decree, order, rule or regulation or other restriction to which such Investor is a party or by which such Investor is bound; (iv) the Put Shares purported to be owned by such Investor are owned of record and beneficially by such Investor, and such Investor holds good, valid and marketable title to the Put Shares; and (v) such Investor possesses the legal right to sell, transfer and assign the entire legal and beneficial ownership of the Put Shares, free and clear of all liens, encumbrances, claims, restrictions or other similar interests.

Section 8. Miscellaneous.

(a) Entire Agreement. This Agreement (including Annexes I and II) constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the parties or any of them with respect to the subject matter hereof.

(b) Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

(c) Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of New York, without reference to its principles of conflicts of laws. Any dispute arising under this Agreement shall be adjudicated exclusively within the city, county and state of New York.

(d) Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by and against each of the parties hereto and their respective successors and assigns. This Agreement may not be assigned (i) by any Investor without the prior written consent of USC except for an assignment to their respective affiliates or (ii) by USC without the written prior consent of CAMHZN and CAMOFI; provided, however, any Investor, without the prior written consent of USC, may assign this Agreement solely as it relates to the registration rights set forth on Annex I hereto in accordance with the provisions of Section 11 of Annex I.

(e) Amendment. This Agreement may be amended, modified or supplemented only by a written agreement signed by USC, on the one hand, and CAMHZN and CAMOFI (or their successors or assigns), on the other hand, which amendment shall be binding upon all Investors; provided, that any such amendment, modification or supplement made without the signature of an Investor must apply to all Investors.

(f) Severability. The invalidity of any portion hereof shall not affect the validity, force or effect of the remaining portions hereof.

(g) Notices. All notices and other communications given pursuant to this Agreement shall be in writing and shall be deemed to have been given when personally delivered or when mailed by prepaid registered, certified or express mail, return receipt requested. Notices should be addressed as follows:

(a)     If to any Investor, then to:

> c/o Centrecourt Asset Management LLC
> 350 Madison Avenue
> 8th Floor
> New York, New York 10017

With a copy (which shall not constitute notice) to:

> Wayne A. Wald, Esq.
> Katten Muchin Rosenman LLP
> 575 Madison Avenue
> New York, NY 10022-2585

(b)     If to the Corporation, then to:

> U.S. Coal Corporation
> 444 Lewis Hargett Circle
> Suite 125
> Lexington, KY 40503
> Attention:  Mr. Robert Gabbard
>                    Chief Executive Officer

With a copy (which shall not constitute notice) to:

> Eric M. Hellige, Esq.
> Pryor Cashman LLP
> 410 Park Avenue
> New York, New York  10022

(c)     If to any Investor other than CAMHZN or CAMOFI, then to such
Investor at the address set forth on such Investor's Joinder Agreement hereto.

Such addresses for notices may be changed by any party by notice to the other party(ies) pursuant
to this Section.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

U.S. COAL CORPORATION

By: _____
    Name: Robert Gabbard
    Title: Chief Executive Officer


CAMHZN MASTER LDC


By:_____
    Name:
    Title:


CAMOFI MASTER LDC


By:_____
    Name:
    Title:


FUTURTEC L.P.


By:_____
    Name:
    Title:


_____
Michael Miller


_____
Lawrence Kaplan

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of
the day and year first written above.

U.S. COAL CORPORATION

By: _____

Name: Robert Gabbard
Title: Chief Executive Officer


CAMHZN MASTER LDC

By: _____
Name:
Title:


CAMOFI MASTER LDC

By: _____
Name:
Title:


FUTURTEC L.P.


By: _____
Name:
Title:



_____
Michael Miller


_____
Lawrence Kaplan


731247                              5

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

U.S. COAL CORPORATION

By:_____
   Name: Robert Gabbard
   Title: Chief Executive Officer


CAMHZN MASTER LDC


By:_____
   Name:
   Title:


CAMOFI MASTER LDC


By:_____
   Name:
   Title:


FUTURTEC L.P.
BY: *FUTURTEC CAPITAL CORPORATION, ITS G.P*
By: *Colo Klear, President*
   Name: *IDO KLEAR*
   Title: *PRESIDENT*


_____
Michael Miller


_____
Lawrence Kaplan

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

U.S. COAL CORPORATION

By:_____
   Name: Robert Gabbard
   Title: Chief Executive Officer


CAMHZN MASTER LDC

By:_____
   Name:
   Title:


CAMOFI MASTER LDC

By:_____
   Name:
   Title:


FUTURTEC L.P.

By:_____
   Name:
   Title:


_____
Michael Miller


_____
Lawrence Kaplan

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

U.S. COAL CORPORATION

By:_____
   Name: Robert Gabbard
   Title: Chief Executive Officer

CAMHZN MASTER LDC

By:_____
   Name:
   Title:

CAMOFI MASTER LDC

By:_____
   Name:
   Title:

FUTURTEC L.P.

By:_____
   Name:
   Title:

_____
Michael Miller

_____
Lawrence Kaplan

FILED: NEW YORK COUNTY CLERK 10/09/2012                    INDEX NO. 650411/2012

NYSCEF DOC. NO. 44                                          RECEIVED NYSCEF: 10/09/2012

# Exhibit 4

THIS CONVERTIBLE NOTE AND THE COMMON STOCK ISSUABLE UPON
CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES
ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") NOR UNDER ANY STATE
SECURITIES LAW AND MAY NOT BE PLEDGED, SOLD, ASSIGNED,
HYPOTHECATED OR OTHERWISE TRANSFERRED UNTIL (1) A REGISTRATION
STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE SECURITIES
ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR (2) U.S. COAL
CORPORATION RECEIVES AN OPINION OF COUNSEL TO THE COMPANY OR
OTHER COUNSEL TO THE HOLDER OF THIS NOTE WHICH OTHER COUNSEL IS
REASONABLY SATISFACTORY TO THE COMPANY THAT THIS NOTE AND/OR
SUCH COMMON STOCK MAY BE PLEDGED, SOLD, ASSIGNED, HYPOTHECATED
OR TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT
UNDER THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS.

## AMENDED AND RESTATED CONVERTIBLE PROMISSORY NOTE

**$4,800,000.00**

FOR VALUE RECEIVED, the undersigned, J.A.D. COAL COMPANY, INC., a Virginia corporation ("Corporation"), hereby promises and agrees to pay to the order of CAMOFI MASTER LDC, a Cayman Islands limited duration company ("Holder"), its successors and assigns, the principal sum of FOUR MILLION EIGHT HUNDRED THOUSAND DOLLARS ($4,800,000.00), or so much thereof as may be outstanding hereunder from time to time, together with all accrued interest thereon, computed and payable in the manner set forth below. U.S. COAL CORPORATION, a Delaware corporation ("U.S. Coal"), is made a party to this Note with respect to the convertible feature of this Note and certain representations and warranties related thereto, as more particularly described herein.

This amended and restated promissory Note (the "Note") has been issued pursuant to, and is the Note referenced in, that certain Equipment Transfer Agreement, dated April 15, 2008, by and among Corporation, Holder and U.S. Coal ("Equipment Transfer Agreement"). The indebtedness evidenced by this Note and the obligations created hereby are secured by, among other things, a purchase money security interest in the "Equipment", as defined in and conveyed by the Equipment Transfer Agreement and related documents. U.S. Coal owns 100% of the issued and outstanding capital stock of Corporation and will receive substantial economic benefit from (i) Corporation's use of the Equipment, and (ii) other good and valuable consideration from Holder and such other benefits provided to U.S. Coal by the Holder, the receipt and adequacy of which are hereby acknowledged by U.S. Coal. In consideration of the substantial economic benefit that U.S. Coal will receive from the Equipment, and in order to induce Holder to sell the Equipment to Corporation, without which inducement Holder would be unwilling to sell the Equipment to Corporation, U.S. Coal has agreed to make the principal amount of this Note convertible into shares of the common stock of U.S. Coal, pursuant to the terms and conditions of this Agreement.

The unpaid principal balance of, and all accrued interest on, this Note, unless sooner paid or converted into "Conversion Shares" as set forth in Section 6 of this Note, shall be due and payable in full on April 15, 2012 (the "Maturity Date"). On the Maturity Date, the entire unpaid principal balance of, and all accrued but unpaid interest on, this Note shall be finally due and payable in full, notwithstanding anything in this Note that may be interpreted to the contrary. Corporation acknowledges that Holder has not agreed to extend the Maturity Date of this Note or to refinance this Note.

Subject to the terms of Section 4.1 of the Equipment Transfer Agreement, the Corporation shall have the right to setoff the amount of any indemnity to which the Corporation is entitled from Holder under the indemnity provisions of the Equipment Transfer Agreement against any amounts payable or deliverable to Holder pursuant to or connection with the Equipment Transfer Agreement, including, without limitation, against any amounts payable to Holder under this Note.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

**1.    Interest.** The outstanding principal balance of this Note, as the same shall exist from time to time, shall bear interest from and after April 1, 2008, until this Note is paid in full or is converted into Conversion Shares as set forth in Section 6 of this Note, at a fixed rate per annum equal to eight percent (8.0%) ("Interest Rate").   Interest payments shall be made by Corporation to Holder commencing September 15, 2008, and shall be payable on the fifteenth (15th) day of each month thereafter, at Holder's sole option either in cash or in additional notes, identical in all respects to this Note except as to the principal amount thereof (each, an "additional Note", and collectively, "Additional Notes").

**2.    Payment.** Unless and until this Note is converted into Conversion Shares as set forth in Section 6 of this Note, for each ton of coal produced and/or cleaned with the Equipment during any calendar month ("Equipment Tonnage"), Corporation shall make payments on this Note to Holder equal to Four Dollars ($4.00) per Ton (the "Monthly Payments"), such payments to be made in cash.   For purposes of this Agreement, a "Ton" shall mean 2000 net pounds based on the weight of the coal prior to any production and cleaning.

The Monthly Payments shall be made on the 15th day of each month with respect to Equipment Tonnage from the preceding month.  Each payment of a Monthly Payment shall be accompanied by a certificate executed by the Corporation's Chief Financial Officer showing the Equipment Tonnage produced and cleaned during the prior month by weight based on certified scales, or other reasonable and verifiable weighing method, and the calculation of the Monthly Payment due thereon.  All cash payments to be made hereunder by Corporation to Holder shall be by wire transfer in immediately available funds to such account as Holder may from time to time designate in writing to

Corporation, or in such other manner and/or location as Holder may from time to time designate in writing.

Holder and its representatives, accountants and advisors shall have reasonable access to appropriate business records of Corporation necessary for the purpose of verifying the calculation of the Equipment Tonnage and Monthly Payments. Corporation agrees to provide such representatives, accountants and advisors access to such books and records on reasonable notification and to provide them, upon request, copies of such books and records. In the event an examination and review of Corporation's books and records reveals an overpayment or underpayment, the difference shall be paid to the party entitled to it within ten (10) days after receipt of written demand for the payment of the overpayment or underpayment, as the case may be.

3.    **Prepayment.** Subject to the last two sentences of this Section 3, U.S. Coal shall pay the Holder the amount of any Mandatory Excess Prepayments and Mandatory Refinancing Prepayments to which it is entitled pursuant to and as such terms are defined in the First Amendment to the Second Amended and Restated Credit Agreement and Value Right Agreement, dated as of September 30, 2009 (as amended, restated, supplemented or otherwise modified from time to time) (the "First Amendment"), by and among the Corporation, U.S. Coal Corporation, Licking River Resources, Inc., Oak Hill Coal, Inc., S. M. & J., Inc., Fox Knob Coal Co., Inc., Sandlick Coal Company, LLC, Wilmington Trust Company, and East Coast Miner LLC, a copy of which agreement is attached as Exhibit C hereto. In addition, subject to the last two sentences of this Section 3, this Note may be prepaid in whole or in part at any time, without premium or penalty. Any payment on this Note shall be applied first to amounts due hereunder other than principal and interest, then to accrued interest due and owing, and then to principal due. Corporation acknowledges that Corporation is not authorized to re-borrow any portion of any amount prepaid or repaid on this Note. Notwithstanding anything contained in this Note to the contrary, Holder shall have the right to convert all or any portion of this Note and any Additional Notes into Conversion Shares at the applicable Conversion Price (as such term is defined in Section 6 hereof). Corporation shall give Holder no less than ten days' notice prior to any proposed prepayments or repayments under this Note, during which time Holder shall have the right to instead convert all or any portion of this Note into Conversion Shares.

4.    **Late Payment.** In the event any installment of principal and/or interest on this Note is overdue for more than five (5) days past the due date thereof under the terms of this Note, the Holder may, at any time thereafter, increase the interest rate applicable to the outstanding principal balance of this Note to a rate that is five percent (5%) in excess of the rate specified above and otherwise applicable to the principal of this Note (the "Late Payment Rate"). If any installment of interest or principal on this Note is paid by a check without sufficient funds, Corporation shall pay Holder a $30.00 processing fee. If any payment due under this Note is five (5) days or more late, the Corporation shall pay five percent (5%) of the late payment as a late charge ("Late Charge"), which Late Charge shall be in addition to the Late Payment Rate. The assessment or collection of Late Payment Rate and/or the Late Charge shall not constitute a waiver of any default or event of default resulting from any failure to timely pay any payment due pursuant to this Note or otherwise.

**5.    Events of Default; Negative Covenants.** (a) If (i) there is a default in the payment of principal and/or interest as and when the same is or becomes due and payable hereunder and such default continues for a period of five (5) days following the due date thereof; (ii) the Corporation or U.S. Coal fails in the timely performance of any term, covenant or condition required to be kept, observed or performed under this Note other than as set forth in subsection (i) above and the same is not fully corrected to the complete satisfaction of the Holder within thirty (30) days after Holder has given Corporation written notice thereof; (iii) there is a default or an event of default under any note or other payment obligation that gives the Holder or payee the right to accelerate the debt; (iv) if any event of default occurs under the documents described on <u>Exhibit A</u>, attached hereto and incorporated herein by reference, or any documents related thereto; (v) Holder's security interest in the Equipment under the Security Agreement made as of April 15, 2008 by and among Corporation and the Secured Parties set forth therein shall cease to be a first priority purchase money security interest, subject to existing federal, state and local tax liens on the Equipment and the security interests in the Equipment of Truck International Fund, LP, Shelter Island Opportunity Fund, LLC and Truk Opportunity Fund, LLC; or (vi) (a) the Corporation or U.S. Coal or any of their respective subsidiaries shall commence, or there shall be commenced against the Corporation, U.S. Coal or any such subsidiary, a case under any applicable bankruptcy or insolvency laws as now or hereafter in effect or any successor thereto, or the Corporation or any subsidiary commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Corporation, or any subsidiary thereof, (b) there is commenced against the Corporation, U.S. Coal, or any subsidiary of either thereof any such bankruptcy, insolvency or other proceeding which remains undismissed for a period of 60 days, or (c) the Corporation, U.S. Coal or any subsidiary of either thereof is adjudicated by a court of competent jurisdiction insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered, (d) the Corporation, U.S. Coal or any subsidiary of either thereof suffers any appointment of any custodian or the like for it or any substantial part of its property which continues undischarged or unstayed for a period of 60 days, (e) the Corporation, U.S. Coal or any subsidiary of either thereof makes a general assignment for the benefit of creditors, (f) the Corporation, U. S. Coal or any subsidiary of either thereof shall fail to pay, or shall state that it is unable to pay, or shall be unable to pay, its debts generally as they become due, (g) the Corporation, U.S. Coal or any subsidiary of either thereof shall call a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts, (h) the Corporation, U.S. Coal or any subsidiary of either thereof shall by any act or failure to act expressly indicate its consent to, approval of or acquiescence in any of the foregoing, or (i) any corporate or other action is taken by the Corporation, U.S. Coal or any subsidiary of either thereof for the purpose of effecting any of the foregoing;

then such occurrence, or the occurrence of more than one, shall constitute an "Event of Default" under this Note. Upon the occurrence of any Event of Default, the Holder or any subsequent holder of this Note may, without notice or demand, declare all sums of principal and interest evidenced hereby to be accelerated and immediately due and payable, and the Holder may thereupon exercise all rights and remedies granted it under

4

any security instruments or available to it in law or equity. Upon any Event of Default under this Note, the undersigned Corporation agrees to pay all costs of collection, and/or costs relating to modifying or further securing the Note, when incurred by the Holder, including, but not limited to, reasonable attorneys' fees. If any suit or action is instituted to enforce this Note, the undersigned Corporation agrees to pay to the Holder, in addition to the costs and disbursements otherwise allowed by law, such sums as may be adjudged reasonable attorneys' fees, court costs, and all other expenses in collecting or attempting to collect or securing or attempting to secure this Note or in connection with any of the foregoing, provided the same is allowed by applicable law.

(b) So long as any portion of this Note remains outstanding, (i) none of U.S. Coal, the Corporation, or any of their respective subsidiaries shall enter into, create, incur, assume or suffer to exist any lien of any kind on any of the Equipment, and (ii) Corporation shall not in any manner whatsoever transfer, sell, lease, sell and leaseback, hypothecate, or otherwise dispose of or attempt to dispose of, any of the Equipment; except in each of (i) and (ii) above with respect to liens to the Senior Lender in connection with the First Amendment, First Security Agreement Amendment (as defined in the First Amendment) or Post-Closing Agreement (as defined in the First Amendment).

6.      **Conversion.**

(a)       Until all amounts outstanding under this Note or any Additional Note have been paid in full, all such amounts of this Note and any Additional Note (whether of principal, interest, or otherwise), shall be convertible into fully paid and non-assessable shares of common stock of U.S. Coal, par value $0.001 per share (the "Common Stock"), at the option of the Holder, in whole or in part at any time and from time to time (subject to the limitations on conversion set forth in Section 6(c) hereof). The Holder shall effect conversions by delivering to U.S. Coal the form of Notice of Conversion attached hereto as <u>Exhibit B</u> (a "<u>Notice of Conversion</u>"), specifying therein the amount of this Note or any Additional Note to be converted and the date on which such conversion is to be effected (a "<u>Conversion Date</u>"). If no Conversion Date is specified in a Notice of Conversion, the Conversion Date shall be the date that such Notice of Conversion is provided hereunder. To effect conversions hereunder, the Holder shall not be required to physically surrender this Note or any Additional Note to U.S. Coal unless the entire amount of this Note or any Additional Note has been so converted. Conversions hereunder shall have the effect of lowering first any outstanding amounts of interest hereunder, and then the outstanding principal amount of this Note in an amount equal to the applicable conversion. The Holder and U.S. Coal shall maintain records showing the amount converted and the date of such conversions. U.S. Coal shall deliver any objection to any Notice of Conversion within 3 business days of receipt of such notice. In the event of any dispute or discrepancy, the records of the Holder shall be controlling and determinative in the absence of manifest error. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note may be less than the amount stated on the face hereof. However, at U.S. Coal's request, the Holder shall surrender this Note to U.S.

Coal within five (5) business days following such request so that a new Note reflecting the correct principal amount may be issued to Holder. The number of shares of Common Stock into which this Note and any Additional Note may be converted ("Conversion Shares"), shall be determined by dividing the aggregate amount of this Note, and any such Additional Note to be so converted by the Conversion Price. For the purposes of this Note, the term "Conversion Price" shall initially be $1.75, subject to adjustment as set forth in Section 7 hereof.

     (b)     <u>Mechanics of Conversion</u>

          i.     (intentionally omitted).

          ii.     <u>Delivery of Certificate Upon Conversion</u>. Not later than three business days after any Conversion Date, U.S. Coal will deliver to the Holder a certificate or certificates representing the Conversion Shares which shall be free of restrictive legends and trading restrictions (other than those required hereby) representing the number of shares of Common Stock being acquired upon the conversion of Notes. U.S. Coal shall, if available and if allowed under applicable securities laws, use its best efforts to deliver any certificate or certificates required to be delivered by U.S. Coal under this Section electronically through the Depository Trust Corporation or another established clearing corporation performing similar functions.

          iii.     <u>Reservation of Shares Issuable Upon Conversion</u>. U.S. Coal covenants that it will at all times reserve and keep available out of its authorized and unissued shares of Common Stock solely for the purpose of issuance upon conversion of this Note and any Additional Notes, free from preemptive rights or any other actual contingent purchase rights of persons other than the Holders, not less than such number of shares of the Common Stock as shall be issuable (taking into account the adjustments and restrictions of Section 7) upon the conversion of the outstanding amount of this Note and any additional Notes. U.S. Coal covenants that all shares of Common Stock that shall be so issuable shall, upon issue, be duly and validly authorized, issued and fully paid, nonassessable.

          iv.     <u>Fractional Shares</u>. Upon a conversion hereunder U.S. Coal shall not be required to issue stock certificates representing fractions of shares of the Common Stock, but shall make a cash payment in respect of any final fraction of a share based on the outstanding amount of this Note that is not so converted.

          v.     <u>Transfer Taxes</u>. The issuance of certificates for shares of the Common Stock on conversion of this Note shall be made without charge to the Holder thereof for any documentary stamp or similar taxes that may be payable in respect of the issue or delivery

of such certificate, provided that U.S. Coal shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such certificate upon conversion in a name other than that of the Holder of such Note so converted and U.S. Coal shall not be required to issue or deliver such certificates unless or until the person or persons requesting the issuance thereof shall have paid to U.S. Coal the amount of such tax or shall have established to the satisfaction of U.S. Coal that such tax has been paid.

7.    **Protection Against Dilution.**  In the event that U.S. Coal shall, at any time prior to the exercise of conversion rights hereunder: (i) declare or pay to the holders of the Common Stock a dividend payable in any kind of shares of capital stock of U.S. Coal; (ii) combine, subdivide or otherwise reclassify its Common Stock into the same or a different number of shares with or without par value, or into shares of any class or classes; (iii) transfer its property as an entirety or substantially as an entirety to any other company; or (iv) make any distribution of its assets to holders of its Common Stock as a liquidation or partial liquidation dividend or by way of return of capital; then, in each case, the Conversion Price, and the number and kind of shares of Common Stock receivable upon conversion of this Note, in effect at the time of the record date for such dividend or distribution, or of the effective date of such subdivision, combination or reclassification, shall be proportionally adjusted so that the Holder upon the subsequent exercise of conversion rights, shall receive, in addition to or in substitution for the shares of Common Stock to which it would otherwise be entitled upon such exercise, such additional shares of capital stock or scrip of U.S. Coal, such reclassified shares of capital stock of U.S. Coal, such shares of the securities or property of U.S. Coal resulting from such transfer, or such assets of U.S. Coal, which it would have been entitled to receive had it exercised these conversion rights prior to the happening of any of the foregoing events.  Such adjustment shall be made successively whenever any of the foregoing events shall occur.

8.    **Certain Covenants, Representations and Warranties.**  The Corporation and U.S. Coal jointly and severally covenant and agree that, so long as any principal of, or interest on, this Note shall remain unpaid, unless the Holder shall otherwise consent in writing, they will comply with the following terms:

(i)    All shares issuable upon conversion of this Note will, when so issued, be duly authorized, validly issued, fully paid and non-assessable and free of all pre-emptive rights.  If necessary, U.S. Coal shall promptly seek stockholder approval to amend U.S. Coal's Certificate of Incorporation to increase the authorized number of shares of Common Stock of U.S. Coal by at least the number of shares necessary to provide for exercise of the entire outstanding balance under this Note and upon such approval shall cause such amendment to be filed with the Secretary of State of the State of Delaware, and thereafter U.S. Coal shall keep reserved out of its authorized but unissued shares of Common Stock a number of shares sufficient to provide for the

7

issuance of shares of Common Stock upon full conversion of the entire outstanding balance under this Note.

(ii)    Until the payment in full of this Note, Corporation and U.S. Coal shall preserve, renew and keep in full force and effect their legal existence.

(iii)    The Corporation and U.S. Coal will furnish to the Holder:

(1)    as soon as possible, and in any event within ten (10) days after obtaining knowledge of the occurrence of (A) an "Event of Default" (as defined in Section 5 hereof) or (B) an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default, the written statement of the Chief Executive Officer or the Chief Financial Officer of the Corporation or U.S. Coal, as the case may be, setting forth (x) the details of such Event of Default or other event and (y) the action which the Corporation and/or U.S. Coal proposes to take with respect thereto;

(2)    promptly after the sending or filing thereof, copies of all financial statements which the Corporation, U.S. Coal or any of their respective subsidiaries sends to the holders of its equity securities; and

(3)    promptly after the commencement thereof, notice of each action, suit or proceeding before any court or other governmental authority or other regulatory body or any arbitrator as to which there is a reasonable probability of a determination that would (A) materially and adversely impact the ability of the Corporation and/or U.S. Coal and their respective subsidiaries to conduct their business, (B) materially and adversely affect the business, operations or financial condition of the Corporation and/or U.S. Coal and their respective subsidiaries taken as a whole, or (C) impair the validity or enforceability of this Note or the ability of the Corporation and/or U.S. Coal to perform its obligations under this Note.

(iv)    The Corporation and U.S. Coal will comply, in all material respects with all applicable laws, rules, regulations and orders, except to the extent that noncompliance would not have a material adverse effect upon the business, operations or financial condition of the Corporation or U.S. Coal taken as a whole.

(v)    The Corporation and U.S. Coal will maintain and preserve, all of their properties which are necessary in the proper conduct of their respective businesses in good working order and condition, ordinary wear and tear excepted, and comply, at all times with the provisions of all leases to which they are a party as lessee or under which they occupy property, so as to prevent any forfeiture or material loss thereof or thereunder.

(vi)    The Corporation and U.S. Coal will maintain, with responsible and reputable insurers, insurance with respect to their respective properties and business, in such amounts and covering such risks, as is carried generally in accordance with sound business practice by companies in similar businesses in the same localities in which Corporation and U.S. Coal are situated.

(vii)    If, at any time while this Note is outstanding, U.S. Coal shall pay any dividend payable in cash or in Common Stock, shall offer to the holders of its Common Stock for subscription or purchase by them any shares of stock of any class or any other rights, or shall enter into an agreement to merge or consolidate with another corporation, the Corporation shall cause notice thereof to be mailed to the Holder of this Note at its address appearing on the registration books of the Corporation, at least ten (10) days prior to the record date as of which holders of Common Stock shall participate in such dividend, distribution or subscription or other rights or at least ten (10) days prior to the effective date of the merger or consolidation.

(viii)    The Corporation and U.S. Coal shall keep adequate records and books of account, with complete entries made in accordance with generally accepted accounting principles, reflecting all of its financial and other business transactions.

**9.    Assignment.**  Subject to the restrictions on transfer described in Section 12 below, the rights and obligations of the Corporation, U.S. Coal and the Holder of this Note shall be binding upon and inure to the benefit of the successors, assigns, heirs, administrators and transferees of the parties, if any.

**10.    Amendment**. Any provision of this Note may be amended or modified only upon the written consent of the Corporation, U.S. Coal and the Holder.

**11.    Waiver.**  Failure of the Holder to exercise any of its rights and remedies shall not constitute a waiver of the right to exercise the same at that or any other time. All rights and remedies of the Holder following an Event of Default hereunder or the Equipment Transfer Agreement shall be cumulative to the greatest extent permitted by law.  Time shall be of the essence in the payment of all amounts due under this Note and the performance of the Corporation's and U.S. Coal's other obligations hereunder.

The undersigned Corporation and U.S. Coal, and any endorsers or guarantors hereof, hereby expressly waives presentment, demand, notice of dishonor, protest, notice of protest and nonpayment and further waives all exemptions to which Corporation and/or U.S. Coal may now or hereafter be entitled under the laws of New York or any other state or of the United States, and further agrees that Holder or any subsequent holder hereof shall have the right, without notice, to deal in any way, at any time, with Corporation, U.S. Coal or any endorsers hereof, and to grant Corporation and/or U.S. Coal any extension of time for payment of this Note, or any other indulgence or forbearance whatsoever, and may release any security for the payment of this Note, and/or modify the terms of any of the security instruments referred to herein or otherwise securing or pertaining to this Note, and may release the Corporation, U.S. Coal or any endorser of this Note from liability for payment hereof, in every instance without the consent of the Corporation, U.S. Coal or any endorsers hereof and without in any manner affecting the liability of the Corporation or U.S. Coal hereunder, and all without waiving any rights the Holder or any subsequent holder of this Note may have hereunder or by virtue of the laws of New York or of any other state or of the United States. This Note is a full recourse obligation of Corporation.

**12.    Transfer of this Note or Securities Issuable on Conversion Hereof.**
The Holder shall not make any offers or sales of this Note, or the securities into which
this Note may be converted, other than pursuant to a registration statement under the
Securities Act or pursuant to an exemption from, or transaction not subject to, registration
under the Securities Act. This Note, if transferred, and each certificate representing the
securities thus transferred shall bear a legend similar to the legend appearing on the face
of this Note in order to ensure compliance with the Securities Act, unless in the opinion
of counsel for the Corporation such legend is not required in order to ensure compliance
with the Securities Act. Any shares of Common Stock issued upon the conversion of this
Note or any Additional Note shall be entitled to all of the registration rights set forth on
Annex I to that certain Rights Agreement, dated as of April 15, 2008, by and between
U.S. Coal, Holder, CAMHZN Master LDC, Futurtec L.P., Michael Miller and Lawrence
Kaplan, the terms of which are expressly incorporated herein by reference and made a
part hereof.

**13.    Notices.** All notices, demands, requests and other communications to be
given or delivered under or by reason of the provisions of this Note shall be in writing
and shall be deemed to have been given personally or when mailed by certified or
registered mail, return receipt requested and postage prepaid, and addressed to the
addresses of the respective parties set forth below or to such changed addresses as such
parties may have fixed by notice; provided, however, that notice of change of address
shall be effective only upon receipt:

To the Corporation:

J.A.D. Coal Company, Inc.
c/o U.S. Coal Corporation
448 Lewis Hargett Circle
Lexington, Kentucky 40503
Attn: Robert B. Gabbard
        Chief Executive Officer

To U.S. Coal

U.S. Coal Corporation
448 Lewis Hargett Circle
Lexington, Kentucky 40503
Attn: Robert B. Gabbard
        Chief Executive Officer

To the Holder:

Camofi Master LDC
c/o Centrecourt Asset Management, LLC
350 Madison Avenue, 8th Floor
New York, New York 10017
Attn: Michael Loew

General Counsel

**14.    No Stockholder Rights.** Nothing contained in this Note shall be construed as conferring upon the Holder or any other person the right to vote or to consent or to receive notice as a stockholder in respect of meetings of stockholders for the election of directors of U.S. Coal or any other matters or any rights whatsoever as a stockholder of the U.S. Coal; and no dividends shall be payable or accrued in respect of this Note or the interest represented hereby or, prior to conversion hereof, the Common Stock obtainable as a result of such conversion and then only to the extent that, this Note shall have been so converted.

**15.    Applicable Law.** This Note shall be governed by and construed in accordance with the laws of the State of New York .

**16.    Enforceability.** The invalidity or unenforceability of any provision of this Note in general or in any particular circumstance shall not affect the validity or enforceability of any one or more of the other provisions of this Note or the validity of such provision as applied to any other circumstance. The Corporation and U.S. Coal agree that this Note and all provisions hereof shall be interpreted so as to give effect and validity to all the provisions hereof to the fullest extent permitted by law. Any references in this Note to the Equipment Transfer Agreement or any other document related to the loan evidenced hereby shall be deemed to be references to such agreements, instruments and documents as they now exist or are hereafter modified in writing by the parties thereto.

**17.    Merger.** This Note constitutes the entire agreement of the parties, and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

**18.    Heading; References.** All headings used herein are used for convenience only and shall not be used to construe or interpret this Note. Except where otherwise indicated, all references herein to Sections refer to Sections hereof.

**19.    Amendment and Restatement.** This Note amends and restates that certain Convertible Promissory Note dated April 15, 2008 made by the Corporation in favor of the Holder. This Note is not being given by the Corporation or accepted by the Holder in satisfaction of said indebtedness or as a novation with respect thereto.

[Remainder of Page Intentionally Left Blank]

11

IN WITNESS WHEREOF, the Corporation and U.S. Coal have executed this Note on the date first above written.

J.A.D. COAL COMPANY, INC

By: _____

Title: _____

("Corporation")

U.S. COAL CORPORATION

By _____

Title: _____

("U.S. Coal")

12

# EXHIBIT A

## Cross Default Documents

## EXHIBIT B

## NOTICE OF CONVERSION

### (To Be Signed Only Upon Conversion of Note)

The undersigned, the holder of the foregoing Note, hereby surrenders such original Note for conversion into shares shares of the Common Stock of U.S. Coal Corporation, to the extent of $_____ unpaid principal amount of such Note and requests that the certificates for such shares be issued in the name of, and delivered to, _____ whose address is _____.

Dated:_____

_____

(Signature must conform in all respects to the name of the Holder as specified on the face of the Note)

_____

(Address)

**EXHIBIT C**

**FIRST AMENDMENT**

(See Attached)

FILED: NEW YORK COUNTY CLERK 10/09/2012

INDEX NO. 650411/2012

NYSCEF DOC. NO. 45

RECEIVED NYSCEF: 10/09/2012

# Exhibit 5

EXECUTION VERSION

## U.S. COAL CORPORATION
### 448 Lewis Hargett Circle, Suite 240
### Lexington, KY 40503

November 18, 2009

CAMOFI Master LDC
CAMHZN Master LDC
C/O CENTRECOURT ASSET MANAGEMENT LLC
350 MADISON AVENUE, 8TH FLOOR
NEW YORK, NY 10017
Attention: Michael Loew
            General Counsel

Dear Michael:

Reference is hereby made to (i) the Senior Secured Notes dated as of April 15, 2008 and the Additional Notes dated as of July 10, 2008 and September 11, 2008, each executed by U.S. Coal Corporation (the "Corporation"), J. A. D. Coal Company, Inc., a Virginia corporation ("JAD"), Fox Knob Coal Co., Inc., a Kentucky corporation ("Fox Knob"), Sandlick Coal Company, LLC, a Virginia limited liability company ("Sandlick"; and together with JAD and Fox Knob, the "Borrowers") in favor of CAMOFI Master LDC ("CAMOFI") and CAMHZN Master LDC ("CAMHZN"), Futurtec, L.P., a Delaware limited partnership ("Futurtec"), Michael Miller ("Miller"), and Lawrence Kaplan ("Kaplan", and together with CAMOFI, CAMHZN, Futurtec, Miller and Kaplan, collectively the "Purchasers"), respectively (as amended from time to time, collectively, the "Notes"); (ii) the Security Agreement dated as of April 15, 2008 (as amended from time to time, the "Security Agreement") among the Borrowers, the Corporation and CAMOFI, as agent for the Purchasers (in such capacity, the "Agent") and (iii) the letter agreement entered into on April 14, 2008, by and between the Corporation, CAMOFI and CAMHZN, as amended on August 29, 2008, (the "Letter Agreement").

(A)    This Letter hereby Amends the Notes. The Borrowers, the Corporation and the Purchasers, individually and as the Holders of a majority of the outstanding principal amount of Notes, hereby agree to amend, effective as of September 30, 2009, each of the Notes as set forth below.

(i)    All references to "October 1, 2009" in each of the Notes shall be deleted and shall be replaced with "December 31, 2011".

(ii)    The definition of "Equipment Purchase Notes" in Section 1 of each of the Notes is hereby deleted in its entirety and in substitution thereof the following new definition of "Equipment Purchase Note" is hereby added in proper alphabetical order:

"Equipment Purchase Note" means the Amended and Restated Convertible Promissory Note, originally issued on April 15, 2008 by JAD to CAMOFI Master LDC.";

(iii)    The definition of "JAD Notes" in Section 1 of each of the Notes is hereby deleted in its entirety and in substitution thereof the following new definition of "JAD Notes" is hereby added in proper alphabetical order:

"JAD Notes" means the Amended and Restated Promissory Notes dated September 30, 2009 issued by the Borrowers to the JAD Sellers, having an original aggregate principal amount of $1,000,000 and maturing on December 31, 2011.";

(iv)    The definition of "JAD Seller Notes" in Section 1 of each of the Notes is hereby deleted in its entirety and in substitution thereof the following new definition of "JAD Seller Notes" is hereby added in proper alphabetical order:

"JAD Seller Notes" means the two Amended and Restated Convertible Promissory Notes dated September 30, 2009 issued by the Parent to Aubra Paul Dean and to Carl E. McAfee and Julia L. McAfee, each having an original aggregate principal amount of $3,500,000 and maturing on December 31, 2011.";

(v)    The definition of "LRR Seller Notes" in Section 1 of each of the Notes is hereby deleted in its entirety and in substitution thereof the following new definition of "LRR Seller Notes" is hereby added in proper alphabetical order:

"LRR Seller Notes" means the Fourth Amended and Restated Promissory Notes issued by the Parent to Kenneth Whitt, John Collins, John Whitt, Linda Whitt, Stephanie Lacy, Melissa Lewis and Jonathan Whitt, in connection with the acquisition of the Equity Interests of Licking River, Oak Hill Coal, Inc. and S. M. & J., Inc., originally dated January 5, 2007, as amended and restated on April 14, 2008, as amended and restated on May 30, 2008, as amended and restated on June 14, 2008 and as amended and restated on September 30, 2009, in an aggregate principal amount of $10,000,000 and maturing on December 31, 2011.";

(vi)    [Intentionally Omitted];

(vii)    Section 2(f)(i) of each of the Notes is hereby deleted in its entirety and in substitution thereof the following new Section 2(f)(i) is hereby added:

"i.    [Intentionally Omitted];"

(viii)    Section 2(g)(iii) of each of the Notes is hereby deleted in its entirety and in substitution thereof the following new Section 2(g)(iii) is hereby added:

"iii.    [Intentionally Omitted];"

(ix)    The following Section 2(h) is hereby added to each of the Notes:

"h)    Excess Prepayment.    In addition to the prepayment provisions set forth in Sections 2(f) and 2(g), Parent shall pay the Holder the amount of any Mandatory Excess Prepayments and Mandatory Refinancing Prepayments to which they are entitled pursuant to and as such terms are defined in the First Amendment to the Second Amended and Restated Credit Agreement and Value Right Agreement, dated as of September 30, 2009 (as amended, restated, supplemented or otherwise modified from time to time), by and among Parent, Licking River Resources, Inc., Oak Hill Coal, Inc., S. M. & J., Inc., the Borrowers, Wilmington Trust Company, and East Coast Miner LLC (the "First Amendment"), a copy of which agreement is attached as Exhibit A hereto; provided, however, that the definitions of Mandatory Excess Prepayments and Mandatory Refinancing Prepayments, and all of the provisions of Sections 2.03(c) and (d) of the First Amendment shall not be amended, restated, supplemented or otherwise modified without the prior written consent of the Holder."

(x)    Each Note is hereby amended to attach Exhibit A, attached hereto, as a Exhibit A to each Note; and

(xi)    The signature page to each Note is hereby amended by deleting the words "Agreed with respect to Sections 4 and 5" and replacing such words with "Agreed with respect to Sections 2(h), 4 and 5".

The Notes remain in full force and effect and, except as expressly provided herein, are not otherwise amended, modified, or affected by this letter.

(B)    This Letter Hereby Amends the Security Agreement.    The Borrowers, the Corporation and the Purchasers, individually and as the Holders of a majority of the outstanding principal amount of Notes, hereby agree that the Security Agreement is amended, effective as of September 30, 2009, by deleting "October 1, 2009" in the first paragraph of the Security Agreement and replacing it with "December 31, 2011".

(C)    Waivers Under this Letter.    The Purchasers as the Holders of a majority of the outstanding principal amount of Notes hereby waive any and all Defaults or Events of Default under the Notes, including, without limitation, any that have arisen pursuant to sections 4(a), 4(b), 4(d), 4(g), 4(i), 4(k), 4(l), 4(m), 6(a)(v) and 6(a)(xi), solely to the extent they arise from the transactions contemplated by the (i) First Amendment to the Second Amended and Restated Credit Agreement and Value Right Agreement, dated as of September 30, 2009, by and among the Corporation, Licking River Resources, Inc., Oak Hill Coal, Inc., S. M. & J., Inc., the Borrowers, Wilmington Trust Company and East Coast Miner LLC, (the "First Amendment"); (ii) Second Amendment to the Second Amended and Restated Credit Agreement and Value Right Agreement, dated as of November 18, 2009, by and among the Corporation, Licking River Resources, Inc., Oak Hill Coal, Inc., S. M. & J., Inc., Licking River Mining LLC, the Borrowers, Wilmington Trust Company and East Coast Miner LLC, (the "Second Amendment"); (iii) First Amendment to the Amended and Restated Security Agreement, dated as of September 30, 2009, by and among Corporation, Licking River Resources, Inc., Oak Hill Coal, Inc., S. M. & J., Inc., the Borrowers, Wilmington Trust Company and East Coast Miner LLC, (the "First Security Amendment"); or (iv) the Post-Closing Letter, dated September 30, 2009, by and among Corporation, Licking River Resources, Inc., Oak Hill Coal, Inc., S. M. & J., Inc., the Borrowers and East Coast Miner LLC (the "Post-Closing Letter"). Notwithstanding anything contained herein to the contrary, CAMOFI is expressly not waiving any Event of Default which has occurred and is continuing under the Amended and Restated Convertible Promissory Note, originally issued on April 15, 2008 by JAD to CAMOFI (the "Equipment Purchase Note"), and

the Corporation hereby agrees and acknowledges that interest is accruing on such Equipment Purchase Note at the annual rate of thirteen percent (13%) from April 1, 2008 until such time as all outstanding interest payments are brought current by the Corporation.

(D)     CAMOFI and CAMHZN each hereby consent to the transactions contemplated by the First Amendment, the Second Amendment, the First Security Amendment and the Post-Closing Letter; provided, however, that such consent is expressly conditioned upon and subject to (i) CAMOFI and CAMHZN having had the opportunity to review the execution versions of each thereof, (ii) all holders of the Corporation's or any of the Corporation's subsidiaries' debt securities (other than other holders of the Notes) having agreed to extend the maturity date of such debt securities to December 31, 2011, and (iii) neither the Corporation nor any affiliate thereof, directly or indirectly, paying or offering to pay to any other holder of any of the Corporation's or any of the Corporation's subsidiaries' securities, any consideration of any nature whatsoever for waiving any Event of Default or Default, or consenting to any of the transactions contemplated by the First Amendment, the First Security Amendment or the Post-Closing Letter, without also offering such consideration to CAMOFI and CAMHZN.

(E)     It is hereby agreed that any provision in any agreement that would require a waiver or consent by any of the Purchasers to permit East Coast Miner LLC ("ECM") to waive a default or provide any consent under the First Amendment, the Existing Credit Agreement (as defined in the First Amendment), as modified by the First Amendment, or any further amendment, supplement or modification thereto (collectively, the "Credit Agreement"), any Loan Document (as such term is defined in the Credit Agreement), the First Security Amendment or the Post-Closing Letter is hereby waived for that particular instance, subject to and expressly on the condition that (i) ECM actually grants the consent or waiver so requested, and (ii) neither ECM nor any other person or entity shall receive, directly or indirectly, any consideration of any nature whatsoever for waiving such default or granting such consent without such consideration also being offered to each of CAMOFI and CAMHZN.

(F)     It is hereby agreed that any provision that would require the payment of a fee (other than late or penalty fees or interest, or liquidated damages), in connection with the grant of a waiver or consent under the Credit Agreement, any Loan Document (as defined in the Credit Agreement), the First Amendment, the First Security Amendment, or the Post-Closing Letter or any other agreement to which any of the Corporation (and/or its subsidiaries) and CAMOFI or CAMHZN, or any Purchaser, are parties, is hereby waived, subject to and expressly on the condition that neither ECM nor any other person or entity shall receive, directly or indirectly, any consideration of any nature whatsoever for granting such waiver or consent without such consideration also being offered to each of CAMOFI and CAMHZN.

(G)     Notwithstanding anything contained in this Letter to the contrary, all of the parties hereto acknowledge and agree that except as expressly modified by this Letter, the letter agreement dated April 14, 2008 by and between the Corporation, CAMOFI and CAMHZN (the "Parties"), as such letter was amended by that certain letter agreement dated August 29, 2008 by and among the Parties and the Borrowers, shall remain unchanged and in full force and effect.

(H)     The representations and warranties made by the Corporation to ECM pursuant to Section 43a-f of the First Amendment are incorporated herein by reference and shall be deemed made to the Purchasers as if fully made herein.

(I)     The Corporation covenants and agrees that on or prior to January 1, 2010, it shall make all interest payments due and payable under the terms of the Equipment Purchase Note.

The Corporation further covenants and agrees that on or prior to December 1, 2009, it shall issue all Additional Notes (as such term is defined in the Notes).

If the foregoing is in accordance with your understanding, please confirm your acceptance by signing and returning the enclosed copy of this letter, which upon execution will constitute an agreement among us.

[Remainder of page intentionally blank]

971030

5

EXECUTION VERSION

Sincerely,

U.S. COAL CORPORATION.

By:     Robert Gabbard
Title:   Chief Executive Officer

J. A. D. COAL COMPANY, INC.

By:
Name:  Robert Gabbard
Title:   President

FOX KNOB COAL CO., INC.

By:
Name:  Robert Gabbard
Title:   President

SANDLICK COAL COMPANY, LLC

By:
Name:  Robert Gabbard
Title:   Manager

Agreed to and accepted as of the date
first above written:

CAMOFI MASTER LDC

By:           Michael Loew
Title:        General Counsel

CAMHZN MASTER LDC

By:
Title:        Michael Loew
              General Counsel

FUTURTEC, L.P.

By:
Title:

971030

_____
Michael Miller


_____
Lawrence Kaplan

Exhibit A

Exhibit A

Execution Version

### FIRST AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AGREEMENT AND VALUE RIGHT AGREEMENT

THIS FIRST AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AGREEMENT AND VALUE RIGHT AGREEMENT, dated as of September 30, 2009 (as amended, restated, supplemented or otherwise modified from time to time, this "Amendment"), by and among U.S. Coal Corporation, a Delaware corporation (the "Borrower"), Licking River Resources, Inc., a Kentucky corporation ("LRR"), Oak Hill Coal, Inc., a Kentucky corporation ("OAK"), S. M. & J., Inc., a Kentucky corporation ("SMJ"), J. A. D. Coal Company, Inc., a Virginia corporation ("JAD"), Fox Knob Coal Co., Inc., a Kentucky corporation ("FOX") and Sandlick Coal Company, LLC, a Virginia limited liability company ("SCC" and collectively with LRR, OAK, SMJ, JAD and FOX, the "Guarantors"), Wilmington Trust Company, as Collateral Agent (the "Collateral Agent"), and East Coast Miner LLC, a Delaware limited liability company ("ECM" and together with any successors, assigns or refinancing lenders, collectively the "Lender").

W I T N E S S E T H:

WHEREAS, the Borrower is a party to that certain Second Amended and Restated Credit Agreement, dated as of August 29, 2008, among the Borrower, the Guarantors, the Collateral Agent, and JMB (collectively, the "Existing Credit Agreement");

WHEREAS, JMB Partners Master Fund, L.P., a limited partnership registered and organized under the laws of the Cayman Islands ("JMB"), assigned all of its interest in the Existing Credit Agreement and the other Loan Documents to ECM pursuant to an Assignment and Assumption, dated as of September 30, 2009 (the "JMB Assignment");

WHEREAS, the Borrower is also a party to that certain Value Right Agreement, dated as of April 15, 2008, among the Borrower, the Guarantors and JMB (as amended, the "Value Right Agreement");

WHEREAS, JMB assigned its interest in the Value Right Agreement to ECM pursuant to an Assignment and Assumption, dated as of September 30, 2009;

WHEREAS, the parties to the Existing Credit Agreement and the Value Right Agreement have agreed to amend the Existing Credit Agreement and the Value Right Agreement as set forth herein;

NOW THEREFORE, in consideration of the above premises and the agreements contained herein, and for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree to amend the Existing Credit Agreement and the Value Right Agreement as follows:

1.    The Value Right Agreement, together with all rights and obligations thereunder, is hereby terminated in its entirety in consideration of adding such amounts payable thereunder to the principal amount due under the Existing Credit Agreement, as set forth in paragraph 20 of this Amendment.

2.    Capitalized Terms not otherwise defined herein shall have the meaning set forth in the Existing Credit Agreement.

3.    The term "**Maturity Date**" in the Existing Credit Agreement is hereby amended to mean December 31, 2011.

4.    The term "**Closing Date**" in the Existing Credit Agreement is hereby amended to mean September 30, 2009.

5.    The term "**Amendment Fee**" in the Existing Credit Agreement is hereby deleted in its entirety.

6.    "**2008 Bridge Financing**" means the loan to the Borrower represented by unsecured 20% Promissory Notes Due originally due November 30, 2009 (and since extended to December 31, 2011, *provided, however*, that the 20% Promissory Note issued to CAMOFI Master LDC, dated as of December 23, 2008 (the "**Centrecourt 2008 Note**") is not extended and is due November 30, 2009) issued by the Borrower in December 2008 and January 2009 in an aggregate principal amount of $4,500,000, $4,400,000 of which remains outstanding as of the date of this Amendment.

7.    "**2008 Bridge Notes**" means the unsecured 20% Promissory Notes originally due November 30, 2009 issued by the Borrower in respect of the 2008 Bridge Financing, as amended and restated on the date hereof and now due on December 31, 2011, *provided, however,* that the Centrecourt 2008 Note is not extended and is due November 30, 2009.

8.    All references in the Existing Credit Agreement to the 2007 Bridge Financing and the 2007 Bridge Notes are hereby deleted in their entirety.

9.    The definition of the term "**JAD Notes**" is hereby amended by replacing the words, "December 1, 2009", with "December 31, 2011."

10.    Clause (z) of the term "**JAD Seller Notes**" in the Existing Credit Agreement is hereby deleted and replaced with the words "(z) December 31, 2011."

11.    The term "**LRR Seller Notes**" in the Existing Credit Agreement is hereby amended by deleting the word "Third" and inserting in its place the word "Fourth" and deleting clause (b)(i) and inserting in its place "(i) December 31, 2011 and".

12.    All references in Existing Credit Agreement to "MLCI Agreements" and "MLCI Subordination Agreement" are hereby deleted in their entirety.

2

13.     The term **"Post-Closing Agreement"** means the Agreement attached to the First Amendment as Exhibit A, as amended, restated, supplemented or otherwise modified from time to time.

14.     The term **"First Amendment"** means that certain First Amendment to Second Amended and Restated Credit Agreement and Value Right Agreement dated as of September 30, 2009 by and among the Borrower, the Guarantors, the Lender and the Collateral Agent, as amended, restated, supplemented or otherwise modified from time to time.

15.     The term **"First Security Agreement Amendment"** means that certain First Amendment to the Amended and Restated Security Agreement dated as of September 30, 2009, by and among the Borrower, the Original Coal Producers and the Collateral Agent.

16.     The term **"A/R Facility"** in the Existing Credit Agreement is hereby amended by deleting the words "First Tennessee Bank" and replacing them with "Commercial Bank".

17.     All references in the Existing Credit Agreement to the "Rifle Acquisition," the "Rifle Acquisition Documents," the "Rifle Acquisition Terms," the "Rifle Companies," the "Rifle Equipment Line of Credit," the "Rifle Equity Interests," the "Rifle LOI," the "Rifle Non-Core Assets," the "Rifle Non-Core Asset Notes," the "Rifle PPE Indebtedness," the "Rifle Seller Notes," the "Rifle Sellers" the "Rifle Stock Intercreditor Agreement" and "Permitted Acquisition" are hereby deleted in their entirety.

18.     Section 2.01 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

The Loan.  The Borrower hereby acknowledges that, immediately prior to the amendments hereto effected by the First Amendment, the aggregate amount of the term loan made under the Existing Credit Agreement due and payable as of September 30, 2009 was $14,628,914.80 (the **"Credit Agreement Payable"**), the aggregate amount as of September 30, 2009 to be payable under the Value Right Agreement was $9,389,354.80 (the **"Value Right Payable"**). Immediately following the effectiveness of the First Amendment, the aggregate amount payable hereunder is the combined value of the Credit Agreement Payable and the Value Right Payable, specifically $24,018,269.60 (as so combined, the **"Loan"**). Amounts repaid in respect of the Loan may not be reborrowed.

19.     Section 2.03(b) and (c) of the Existing Credit Agreement is hereby renumbered "Section 2.03(e)" and "Section 2.03(f), respectively.

20.     A new Section 2.03(b) shall be inserted into the Existing Credit Agreement to read as follows:

Prepayment of Loan. (b) *Mandatory Prepayments*. The Borrower shall make a minimum payment of principal in an amount equal to $500,000 on the first Business Day of each calendar month during the term of the Loan ("**Mandatory Prepayments**").

21.    A new Section 2.03(c) shall be inserted into the Existing Credit Agreement to read as follows:

(c) *Mandatory Excess Prepayments*. In addition to the Mandatory Prepayments required pursuant to Section 2.03(b) above, the Borrower shall also make a minimum payment of principal on each of the Loan and the loans set forth on Schedule 1 to the First Amendment (each, including the Loan, an "**Existing Term Loan**" and collectively the "**Existing Term Loans**") on the first Business Day of each calendar month during the term of the Loan in an amount equal to $500,000 multiplied by a fraction consisting of a numerator equal to the then outstanding principal amount of such Existing Term Loan and a denominator equal to the then outstanding principal amount of all Existing Term Loans ("**Mandatory Excess Prepayments**").

22.    A new Section 2.03(d) shall be inserted into the Existing Credit Agreement to read as follows:

(d) *Mandatory Refinancing Prepayments*. In addition to the Mandatory Prepayments and the Mandatory Excess Prepayments required pursuant to Sections 2.03(b) and (c) above, the Borrower shall also make prepayments of principal to each Existing Term Loan from the entire Net Proceeds from any new equity or debt financing by the Borrower if such Net Proceeds are in excess of $20,000,000, in an amount equal to the amount of such Net Proceeds multiplied by a fraction consisting of a numerator equal to the then outstanding principal amount of such Existing Term Loan and a denominator equal to the then outstanding principal amount of all Existing Term Loans ("**Mandatory Refinancing Prepayments**").

23.    Section 2.04 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

SECTION 2.04 Warrants. On the Closing Date, the Borrower will issue to the Lender warrants to purchase up to 9,500,000 shares of the common stock of the Borrower, par value $.001 per share (the "**Common Stock**"), at an initial exercise price per share equal to $.01, and warrants to purchase up to 2,000,000 shares of the Common Stock at an initial exercise price per share equal to $3.50 (the "**Warrants**"), in each case pursuant to the terms and conditions set forth in the Warrant Agreements (the "**Warrant Agreements**") attached hereto as Exhibit B, in consideration for the Amendment.

24.    Section 2.05(a) and (b) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

4

Interest. (a) The unpaid principal amount of the Loan shall bear interest beginning October 1, 2009 at a rate per annum equal to twelve percent (12.00%).

(b) Notwithstanding the foregoing clause (a), during the occurrence and continuance of an Event of Default, the unpaid principal amount of the Loan shall bear interest at a rate per annum equal to five percent (5.00%) (the "**Default Rate**") in addition to the rate otherwise applicable pursuant to the foregoing clause (a).

25.    Section 3.04(a) of the Existing Credit Agreement is hereby amended to replace the date in clause (1)(i) with December 31, 2008, and the date in clause (1)(ii) with March 31, 2009.

26.    Section 3.06 (b) of the Existing Credit Agreement is hereby amended to replace the date therein with April 15, 2009.

27.    Section 3.09 of the Existing Credit Agreement is hereby amended to delete the last sentence in its entirety.

28.    Section 3.16 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

Security Interest in Collateral.  The Loan Parties acknowledge and reaffirm that the provisions of the Existing Credit Agreement and other Loan Documents create legal and valid Liens on all the Collateral in favor of the Collateral Agent (for the benefit of the Lenders), and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, assuming due and proper filings of all Uniform Commercial Code financing statements in the appropriate jurisdictions which remain in effect and have not been terminated or released, deeds evidencing liens on real property have been filed in the appropriate governmental offices, the entering into of applicable control agreements and appropriate actions have been taken to establish possessory interests as set forth in Articles 8 and 9 of the Uniform Commercial Code, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of (i) Permitted Encumbrances, to the extent any such Permitted Encumbrances would have priority over the Liens in favor of the Collateral Agent (for the benefit of the Lenders) pursuant to any applicable law, (ii) the JAD Equity Interests, Liens in favor of the JAD Sellers, the Centrecourt Bridge Lenders, and CAMOFI in respect of the Centrecourt Equipment Purchase Note, (iii) any Excluded Assets, (iv) items listed on Schedule VIII to the Security Agreement and (v) the Liens permitted under Sections 6.02(d), (e) and (k), to the extent any such Liens would have priority over the Liens in favor of the Collateral Agent (for the benefit of the Lenders) pursuant to this Agreement and/or any applicable law (collectively, items (i) through (v) are referred to as the "Prior Liens").

5

29.    Section 3.20 of the Existing Credit Agreement is hereby deleted in its entirety.

30.    Sections 4.01(l), (m) and (q) of the Existing Credit Agreement are hereby deleted in their entirety

31.    Section 5.08 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

Review of Existing Relationships.  Not later than 60 days subsequent to the Closing Date, the Board of Directors of the Borrower at a duly and properly noticed and called meeting of the Board will discuss the Borrower's existing relationships with TerraNova Capital Partners, Inc. and Pryor Cashman LLP, and any payables outstanding to either of them, and resolve whether or not it is in the Borrower's best interests to terminate its relationship with either of them.  The Borrower will provide to the Lender the minutes from such meeting not later than three weeks after the meeting takes place and any adjournments thereof.

32.    Section 5.13(d) of the Existing Credit Agreement is hereby amended by deleting the parenthetical clause "(other than any real property or improvements thereto or any interest therein)" in its entirety.

33.    Section 6.01(j) and (k) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

(j)    Indebtedness under the A/R Facility in an aggregate principal amount not to exceed $6,000,000 (such amount to be reduced by the amount of any permanent reductions of the commitments thereunder) and the guaranty thereof by Borrower;

(k)    Indebtedness under the 2008 Bridge Financing in an aggregate principal amount not to exceed $4,500,000 (such amount to be reduced by the amount of any principal repayments of the loans thereunder);

34.    Section 6.01(s) of the Existing Credit Agreement is hereby amended to delete clause (ii) and the word "and" preceding clause (ii) in their entirety.

35.    Section 6.08(b)(vi) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

(vi)    Mandatory Excess Prepayments or Mandatory Refinancing Prepayments;

36.    Section 6.08(b)(vii) of the Existing Credit Agreement is hereby amended to delete clause (w) in its entirety and replace it with the following clause (w):

"(w) any amounts payable in accordance with Sections 2.03(c) and (d) hereof;".

6

37.    Section 6.08(b)(viii) of the Existing Credit Agreement is hereby deleted in its entirety.

38.    Section 8.01(a)(i) and (ii) of the Existing Credit Agreement is hereby amended and restated as follows:

(i)    if to any Loan Party, to the Borrower at:

U.S. Coal Corporation
448 Lewis Hargett Circle
Suite 240
Lexington, Kentucky 40503
Attention: Robert Gabbard, Chief Executive Officer
Facsimile No: (859) 219-0913

With a copy (which shall not constitute notice) to:

Pryor Cashman LLP
7 Times Square
New York, New York 10036-6569
Attention: Eric M. Hellige, Esq.
Facsimile No: (212) 326-0806

(ii)    if to the Lender, to East Coast Miner LLC at:

c/o Mr. Keith Goggin, Managing Member
5 East 17th Street
Apartment 7
New York, NY 10003

With a copy (which shall not constitute notice) to

The Nelson Law Firm, LLC
White Plains Plaza
One North Broadway
White Plains, NY 10601
Attention: Stephen J. Nelson, Esq.
Facsimile No: (914) 220-1910
Email: sjnelson@nelsonlf.com

or in the case of any subsequent assignee, to the address of such assignee set forth in the relevant assignment document.

39.    The first sentence of Section 8.09 (b) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

7

(b)      Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any U.S. Federal or State court sitting in New York, New York or Wilmington, Delaware in any action or proceeding arising out of or relating to any Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such State or, to the extent permitted by law, in such Federal court.

40.    This Amendment shall be effective upon the occurrence or waiver by the Lender of each of the following:

a.  The Lender shall have received executed counterparts of this Amendment, the First Security Agreement Amendment and the Post-Closing Agreement from each Person party thereto.

b.  The Lender shall have received the reasonable fees and expenses of legal counsel to the Lender and any legal counsel to any of the Lender's members on or before the Closing Date.

c.  The Lender shall have received (i) audited combined financial statements of the Original Coal Producers for the December 31, 2006, 2007 and 2008 fiscal years, (ii) audited combined financial statements of the New Coal Producers for the September 30, 2007 and 2008 fiscal years, and (iii) unaudited interim combined financial statements of the Coal Producers for the three months ended March 31, 2009, and such financial statements shall not, in the reasonable judgment of the Lenders, reflect any material adverse change in the combined financial condition of the Coal Producers, as reflected in the financial statements.

d.  The Lender shall have received executed copies of amendments demonstrating that the holders of (i) the 2008 Bridge Notes, *except* for the Centrecourt 2008 Note, (ii) the JAD Notes, (iii) the JAD Seller Notes and (iv) the LRR Seller Notes have agreed to extend the maturity of the obligations set forth therein to December 31, 2011.

e.  The Lender shall have received satisfactory evidence that the Coal Services Agreement and the Master Trading Agreement have been terminated.

f.  The Lender shall have received the Note duly executed by the Borrower.

41.    In order to induce ECM to enter into this Amendment, each Loan Party hereby represents and warrants as follows:

a.  Each of the Loan Parties is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to own or lease and operate its properties

8

and carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

b. The execution, delivery and performance of this Amendment, the First Security Agreement Amendment and the Post-Closing Agreement are within each Loan Party's corporate, limited liability, or limited partnership powers (as applicable) and have been duly authorized by all necessary corporate and, if required, stockholder action. Each such Loan Document to which each Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms.

c. The execution, delivery and performance by, or enforcement against, any Loan Party of this Amendment and the Security Agreement Amendment do not and will not (a) violate, conflict with or result in the breach of any provision of the charter or by-laws (or similar organization documents) of any Loan Party, (b) conflict with or violate in any material respect any Requirement of Law or order of any Governmental Authority applicable to any Loan Party or any of their respective assets, properties or businesses, or (c) conflict in any material respect with, result in any material breach of, constitute a material default (or event which with the giving of notice or lapse of time, or both, would become a material default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in any Lien on any material assets or properties of any Loan Party pursuant to any Material Agreement or any other material license, permit, franchise or other instrument or arrangement to which any Loan Party is a party or by which any of its assets or properties is bound or affected, *except* for the Centrecourt Bridge Notes and the letter agreement between the Borrower, CAMOFI Master LDC and MAHZN Master LDC, together with their respective limited partners and members, dated as of April 14, 2008, as amended by the Centrecourt Amendment.

d. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (i) the execution, delivery or performance by, or enforcement against, any Loan Party of this Amendment, the First Security Agreement Amendment or the Post-Closing Agreement, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the First Security Agreement Amendment, (iii) the perfection or maintenance of the Liens created under the Collateral Documents, other than the due filing of UCC-1 financing statements, actions taken to establish possessory interests as set forth in Articles 8 and 9 of the Uniform Commercial Code, the entering into of applicable control agreements and the delivery of a duly executed JAD Stock Intercreditor Agreement, or (iv) the exercise by any Lender or the Collateral Agent of

9

its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents. All applicable waiting periods in connection with the Transactions have expired without any action having been taken by any Governmental Authority restraining, preventing or imposing materially adverse conditions upon the Transactions or the rights of the Loan Parties freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

e.  Each Loan Party has all requisite corporate, limited liability company or partnership (as applicable) power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.

f.  No fees, commissions or other remuneration of any kind are payable by the Borrower, any Loan Party or the Lender to any finder, broker, dealer, investment banker or investment adviser in connection with the execution and delivery of this Amendment, amendments to any other Loan Document (as defined in the Existing Credit Agreement), the Transactions (as defined in the Existing Credit Agreement) or the JMB Assignment.

This Amendment modifies and amends the Existing Credit Agreement with respect to the subject matter hereof and is hereby made a part of the Existing Credit Agreement. Except to the extent this Amendment expressly and specifically modifies and amends the terms and conditions of the Existing Credit Agreement, the terms and the conditions of the Existing Credit Agreement remain applicable in their entirety, and this Amendment shall not otherwise limit or reduce Borrower's or Guarantors' duties, obligations, or responsibilities under the Existing Credit Agreement. In the event of any claim of conflict between the terms and conditions of this Amendment and the terms and conditions of any part of the Existing Credit Agreement that have not been amended hereby, the interpretation given to such terms and conditions in the Existing Credit Agreement that have not been amended shall control the meaning thereof.

At the request of the Collateral Agent pursuant to Section 10.13 of the Existing Credit Agreement, the Lender, being the sole Lender under the Existing Credit Agreement, hereby instructs the Collateral Agent to execute this Amendment and further instructs the Collateral Agent to execute the First Security Agreement Amendment. Further, pursuant to Section 10.09(b) of the Existing Credit Agreement, the Lender hereby certifies and confirms to the Collateral Agent that this Amendment and the Security Agreement Amendment are not contrary to the terms of the Existing Credit Agreement or any other Loan Document and are not otherwise contrary to law.

[Remainder of page intentionally blank.]

This Amendment may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

Very truly yours,

**EAST COAST MINER LLC**, as Lender

By: _____
Name: KEITH F. GOGGIN
Title: MANAGER

**U.S. COAL CORPORATION**, as Borrower

By: _____
Name: Robert Gabbard
Title:   Chief Executive Officer

**LICKING RIVER RESOURCES, INC.**, as Guarantor

By: _____
Name: Robert Gabbard
Title:   Assistant Secretary

**OAK HILL COAL, INC.**, as Guarantor

By: _____
Name: Robert Gabbard
Title:   Assistant Secretary

**S. M. & J., INC.**, as Guarantor

By: _____
Name: Robert Gabbard
Title:   Assistant Secretary

11

This Amendment may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

Very truly yours,

**EAST COAST MINER LLC**, as Lender

By:_____
Name:
Title:

**U.S. COAL CORPORATION**, as Borrower

By:_____
Name: Robert Gabbard
Title:   Chief Executive Officer

**LICKING RIVER RESOURCES, INC.**, as Guarantor

By:_____
Name: Robert Gabbard
Title:   Assistant Secretary

**OAK HILL COAL, INC.**, as Guarantor

By:_____
Name: Robert Gabbard
Title:   Assistant Secretary

**S. M. & J., INC**, as Guarantor

By:_____
Name: Robert Gabbard
Title:   Assistant Secretary

11

**J. A. D. COAL COMPANY, INC.,** as Guarantor

By:
Name: Robert Gabbard
Title:   Assistant Secretary


**FOX KNOB COAL CO., INC.,** as Guarantor

By:
Name: Robert Gabbard
Title:   Assistant Secretary


**SANDLICK COAL COMPANY, LLC,** as Guarantor

By:
Name: Robert Gabbard
Title:   Assistant Secretary


AGREED TO AND ACKNOWLEDGED
AS OF THE DATE FIRST WRITTEN ABOVE BY:

**WILMINGTON TRUST COMPANY,** in its capacity as Collateral Agent


By:_____
Name:
Title:

12

**J. A. D. COAL COMPANY, INC.**, as Guarantor

By:_____
Name: Robert Gabbard
Title:   Assistant Secretary


**FOX KNOB COAL CO., INC.**, as Guarantor

By:_____
Name: Robert Gabbard
Title:   Assistant Secretary


**SANDLICK COAL COMPANY, LLC**, as Guarantor

By:_____
Name: Robert Gabbard
Title:   Assistant Secretary


AGREED TO AND ACKNOWLEDGED
AS OF THE DATE FIRST WRITTEN ABOVE BY:

**WILMINGTON TRUST COMPANY**, in its capacity as Collateral Agent

By:_____
Name:
Title:          James A. Hanley
                    Vice President

12

**EXHIBIT A**

**FORM OF POST-CLOSING AGREEMENT**

**EXHIBIT B**

**FORM OF WARRANTS**

## SCHEDULE 1

### EXISTING TERM LOANS

1.    2008 Bridge Notes

2.    Centrecourt Bridge Notes

3.    Centrecourt Equipment Purchase Note

4.    JAD Notes

5.    JAD Seller Notes

6.    LRR Seller Notes

FILED: NEW YORK COUNTY CLERK 10/09/2012

NYSCEF DOC. NO. 46

INDEX NO. 650411/2012

RECEIVED NYSCEF: 10/09/201Z

# Exhibit 6

**Michael Loew**

| | |
|---|---|
| **From:** | Jim Wolff [Jwolff@uscoalinc.com] |
| **Sent:** | Friday, April 16, 2010 8:44 AM |
| **To:** | Michael Loew |
| **Cc:** | Richard Smithline |
| **Subject:** | RE: certified letter |

No, we don't have the money. We will allocate funds from the refinancing currently underway with Credit Suisse. The target closing date is end of May. I sent Richard a note to that effect several days ago.

**From:** Michael Loew [mailto:mloew@centrecourtam.com]
**Sent:** Thursday, April 15, 2010 6:22 PM
**To:** Jim Wolff
**Cc:** Richard Smithline
**Subject:** RE: certified letter

Jim:

All kidding aside, I assume the April 26 closing is a go. We're making a quarterly payment to our investors at the end of the month and need to have an idea of what we will be able to pay out. Thanks in advance.


Regards,

Michael Loew
General Counsel
Centrecourt Asset Management, LLC
350 Madison Avenue, 8th Floor
New York, New York 10017
(646) 758-6755 (P)
(646) 758-6751 (F)
MLoew@Centrecourtam.com

**From:** Jim Wolff [mailto:Jwolff@uscoalinc.com]
**Sent:** Friday, April 09, 2010 5:23 PM
**To:** Michael Loew
**Subject:** RE: certified letter

Yes, that is a fair assumption

**From:** Michael Loew [mailto:mloew@centrecourtam.com]
**Sent:** Friday, April 09, 2010 5:24 PM
**To:** Jim Wolff
**Subject:** RE: certified letter

I assume you're putting me on. It's a 1 page letter, shouldn't be unopenable. In any event, it also went out by certified mail, so you'll get the actual letter in the mail.

Michael Loew
General Counsel
Centrecourt Asset Management, LLC
350 Madison Avenue, 8th Floor
New York, New York 10017

10/14/2011

(646) 758-6755 (P)
(646) 758-6751 (F)
MLoew@Centrecourtam.com

**From:** Jim Wolff [mailto:Jwolff@uscoalinc.com]
**Sent:** Friday, April 09, 2010 5:19 PM
**To:** Michael Loew
**Subject:** RE: certified letter

I can't open this one either...I guess the request is just too large to register in our systems.

**From:** Michael Loew [mailto:mloew@centrecourtam.com]
**Sent:** Friday, April 09, 2010 3:22 PM
**To:** Jim Wolff
**Subject:** RE: certified letter

I pdf'ed a copy to Bob on Tuesday. Here is another copy.

Regards,

Michael Loew
General Counsel
Centrecourt Asset Management, LLC
350 Madison Avenue, 8th Floor
New York, New York 10017
(646) 758-6755 (P)
(646) 758-6751 (F)
MLoew@Centrecourtam.com

**From:** Jim Wolff [mailto:Jwolff@uscoalinc.com]
**Sent:** Friday, April 09, 2010 2:59 PM
**To:** Michael Loew
**Subject:** certified letter

Michael,

We lost your certified PUT letter. I'm not sure what happened to it but just thought I would let you know

FILED: NEW YORK COUNTY CLERK 10/09/2012

NYSCEF DOC. NO. 47

INDEX NO. 650411/2012

RECEIVED NYSCEF: 10/09/2012

# Exhibit 7



448 Lewis Hargett Circle, Suite 240, Lexington, KY 40503
T: 859-223-8820    F: 859-224-9919

May 18, 2010

Michael Loew
General Counsel
CAMOFI Master LDC
CAMHZN Master LDC
350 Madison Avenue
New York, NY 10017

RE: Rights Agreement

Dear Michael:

In reference to that certain Rights Agreement (the "Agreement") dated April 15, 2008 by and among U.S. Coal Corporation (the "Company"), CAMOFI Master LDC, CAMHZN Master LDC, Futuretec L.P., Michael Miller and Lawrence Kaplan, the Company acknowledges receipt of documentation dated April 6, 2010. Pursuant to Sections 2 and 3 of the Agreement, the documentation received by U.S. Coal Corporation satisfies the obligation to establish Put Shares at the stated price of $5.40 per share.

The Company anticipates funding this obligation through the issuance of a $100,000,000 bond facility anticipated to be complete by the end of June 2010. If for some reason that funding does not occur, would you be willing to exchange the obligation for common shares at a lesser price? If so, we would like to discuss alternatives.

Sincerely,

James J. Wolff
Chief Financial Officer

JJW/slw

FILED: NEW YORK COUNTY CLERK 10/09/2012                    INDEX NO. 650411/2012
NYSCEF DOC. NO. 48                                        RECEIVED NYSCEF: 10/09/2012

# Exhibit 8

Consolidated Financial Statements

U.S. Coal Corporation

*Years ended December 31, 2011, 2010 and 2009*
*with Report of Independent*
*Registered Public Accounting Firm*

U.S. Coal Corporation

Consolidated Financial Statements

Years ended December 31, 2011, 2010 and 2009

## Contents

Report of Independent Registered Public Accounting Firm..........................................................1

Audited Consolidated Financial Statements

Consolidated Balance Sheets.................................................................................................2
Consolidated Statements of Operations.................................................................................4
Consolidated Statements of Stockholders' Equity.................................................................5
Consolidated Statements of Cash Flows................................................................................7
Notes to Consolidated Financial Statements.........................................................................9



9717 Cogdill Road
Suite 201
Knoxville, TN 37932

phone: (865) 637-4161
fax: (865) 524-2952
web: cj-pc.com

# Report of Independent Registered Public Accounting Firm

Board of Directors and Stockholders
U.S. Coal Corporation

We have audited the accompanying consolidated balance sheets of U.S. Coal Corporation (the "Company"), as of December 31, 2011 and 2010, and the related consolidated statements of operations, stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2011. The Company's management is responsible for these consolidated financial statements. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of U.S. Coal Corporation as of December 31, 2011 and 2010 and the consolidated results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2011, in conformity with accounting principles generally accepted in the United States of America.

*Coulter & Justus, P.C.*

Knoxville, Tennessee
February 16, 2012

1

# U.S. Coal Corporation

## Consolidated Balance Sheets

|  | December 31 | |
|---|---|---|
|  | **2011** | 2010 |
| **Assets** | | |
| Current assets: | | |
| Cash | $ **799,359** | $ 124,580 |
| Trade accounts receivable | **5,560,617** | 10,299,162 |
| Inventories | **3,556,589** | 1,491,684 |
| Current portion of deferred income taxes | **865,980** | 777,313 |
| Deposits on capital lease arrangements | **680,275** | 1,163,069 |
| Other current assets | **922,406** | 1,406,269 |
| Total current assets | **12,385,226** | 15,262,077 |
|  | | |
| Deferred financing costs, net | **585,328** | 1,097,812 |
| Property, plant and equipment, net | **191,984,212** | 180,580,075 |
| Deposits on capital lease agreements | **58,269** | – |
| Intangible assets, net | **–** | 101,684 |
| Restricted cash | **4,016,930** | 3,893,268 |
| Recoupable royalties | **3,063,858** | 1,902,664 |
| Other noncurrent assets | **1,787,976** | 1,738,044 |
|  | | |
| Total assets | **$213,881,799** | $204,575,624 |

U.S. Coal Corporation

Consolidated Balance Sheets (continued)

|  | December 31 | |
|  | 2011 | 2010 |
| --- | ---: | ---: |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ 27,171,833 | $ 14,854,638 |
| Deferred revenues | 3,451,505 | 7,146,000 |
| Accrued interest, related parties | 341,291 | 528,891 |
| Accrued interest, other | 42,408 | 236,593 |
| Income taxes payable | 75,747 | 38,497 |
| Current portion of below market coal supply agreements | – | 580,135 |
| Current portion of asset retirement obligations | 1,161,802 | 642,428 |
| Current portion of capital lease obligations | 4,480,788 | 7,594,091 |
| Current portion of notes payable, net of discounts, related parties | 15,568,436 | 32,974,353 |
| Current portion of notes payable, net of discounts, other | 9,975,007 | 17,091,393 |
| Total current liabilities | 62,268,817 | 81,687,019 |
| | | |
| Capital lease obligations, less current portion | 5,791,401 | 6,585,120 |
| Long-term portion of notes payable, net of discounts, related parties | 18,871,754 | 4,800,000 |
| Long-term portion of notes payable, net of discounts, other | 16,434,400 | 11,268,827 |
| Mandatorily redeemable common stock | 2,565,000 | 2,565,000 |
| Asset retirement obligations | 7,037,207 | 4,790,564 |
| Deferred income taxes, less current portion | 38,392,238 | 35,946,972 |
| Total liabilities | 151,360,817 | 147,643,502 |
| | | |
| Stockholders' equity: | | |
| Series A convertible preferred stock, $0.001 par value; 16,600,000 shares authorized; 15,080,590 shares in 2011 and 2010 issued and outstanding | 15,081 | 15,081 |
| Series B convertible preferred stock, $0.001 par value; 21,600,000 shares authorized; 11,428,520 shares in 2011 and 2010 issued and outstanding | 11,429 | 11,429 |
| Common stock, $0.001 par value; 135,000,000 shares authorized; 50,239,476 shares in 2011 and 43,059,756 shares in 2010 issued and outstanding | 50,239 | 43,060 |
| Additional paid-in capital | 77,342,139 | 77,314,168 |
| Stock dividends to be distributed | 657,779 | 657,930 |
| Accumulated deficit | (15,555,685) | (21,109,546) |
| Net stockholders' equity | 62,520,982 | 56,932,122 |
| Total liabilities and stockholders' equity | $213,881,799 | $204,575,624 |

*See accompanying Notes to Consolidated Financial Statements.*

3

# U.S. Coal Corporation

## Consolidated Statements of Operations

| | Year ended December 31 | | |
| --- | --- | --- | --- |
| | **2011** | **2010** | **2009** |
| Coal sales | **$217,051,749** | $167,544,524 | $153,616,130 |
| Amortization of coal supply agreements | **580,135** | 5,916,040 | 9,987,050 |
| Royalty income | **93,797** | 21,555 | 122,899 |
| Total revenues | **217,725,681** | 173,482,119 | 163,726,079 |
| Cost of coal sales | **169,406,217** | 126,171,299 | 129,089,869 |
| Gross profit | **48,319,464** | 47,310,820 | 34,636,210 |
| | | | |
| General and administrative expenses | **11,151,381** | 8,729,902 | 8,638,396 |
| Accretion of asset retirement obligations | **325,983** | 323,070 | 211,757 |
| Depreciation and depletion | **17,471,575** | 12,639,697 | 9,673,594 |
| Operating income | **19,370,525** | 25,618,151 | 16,112,463 |
| | | | |
| Other income (expense): | | | |
| Gain (loss) on sale of assets | **(904)** | 56,039 | (275,029) |
| Interest expense: | | | |
| Amortization of original issue discount: | | | |
| Related parties | **(1,667,421)** | (1,334,370) | (2,827,364) |
| Other | **(99,032)** | (84,669) | (824,742) |
| Other interest expense: | | | |
| Related parties | **(5,249,383)** | (5,495,330) | (4,694,509) |
| Other | **(3,278,468)** | (3,230,751) | (7,169,249) |
| Total interest expense | **(10,294,304)** | (10,145,120) | (15,515,864) |
| Amortization of deferred financing costs: | | | |
| Related parties | **(1,097,812)** | (232,123) | (51,495) |
| Other | **–** | (865,722) | (4,024,547) |
| Total amortization of deferred financing costs | **(1,097,812)** | (1,097,845) | (4,076,042) |
| (Loss) gain on coal supply agreements | **(80,290)** | (255,750) | 165,451 |
| Gain on coal services agreement | **–** | – | 1,785,875 |
| Other | **112,701** | 143,623 | 186,816 |
| Net other expense | **(11,360,609)** | (11,299,053) | (17,728,793) |
| Income (loss) before income taxes | **8,009,916** | 14,319,098 | (1,616,330) |
| | | | |
| Provision for income tax expense (benefit): | | | |
| Current | **99,456** | (569,747) | (298,427) |
| Deferred | **2,356,599** | 6,385,552 | 1,663,518 |
| Net provision for income tax expense | **2,456,055** | 5,815,805 | 1,365,091 |
| Net income (loss) | **$ 5,553,861** | $8,503,293 | $(2,981,421) |
| | | | |
| Weighted average basic shares outstanding | **46,096,751** | 40,900,271 | 31,584,782 |
| Basic earnings (loss) per share | **$0.06** | $0.14 | $(0.18) |
| Weighted average diluted shares outstanding | **47,311,313** | 45,614,833 | 31,584,782 |
| Diluted earnings (loss) per share | **$0.06** | $0.13 | $(0.18) |

*See accompanying Notes to Consolidated Financial Statements.*

## U.S. Coal Corporation

### Consolidated Statements of Stockholders' Equity

| | Convertible Preferred Stock | | Common Stock | | Additional Paid-in Capital | Stock Dividends to be Distributed | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance as of January 1, 2009 | 26,509,110 | $26,510 | 29,855,333 | $29,855 | $70,407,545 | $657,667 | $(24,806,418) | $46,315,159 |
| Additional issuance costs paid related to 2008 sale of preferred stock | — | — | — | — | (295,000) | — | — | (295,000) |
| Issuance to investors, net of issuance costs | — | — | 6,300,000 | 6,300 | 3,938,700 | — | — | 3,945,000 |
| Issuance of warrants to investors | — | — | — | — | 452,269 | — | — | 452,269 |
| Issuance to finance company | — | — | 250,000 | 250 | 787,250 | — | — | 787,500 |
| Issuance of warrants to finance company | — | — | — | — | 2,482,373 | — | — | 2,482,373 |
| Issuance for professional services rendered | — | — | — | — | 130,209 | — | — | 130,209 |
| Stock based compensation expense | — | — | — | — | 169,972 | — | — | 169,972 |
| Issuance of common stock for preferred stock dividends | — | — | 1,935,004 | 1,935 | (1,935) | — | — | — |
| Common stock to be distributed for preferred stock dividends | — | — | — | — | (112) | 112 | — | — |
| Net loss | — | — | — | — | — | — | (2,981,421) | (2,981,421) |
| Balance as of December 31, 2009 | 26,509,110 | 26,510 | 38,340,337 | 38,340 | 78,071,271 | 657,779 | (27,787,839) | 51,006,061 |
| Net reclassification of shares to mandatorily redeemable common stock | — | — | (500,000) | (500) | (874,500) | — | (1,825,000) | (2,700,000) |
| Stock based compensation expense | — | — | — | — | 122,768 | — | — | 122,768 |
| Issuance of common stock for preferred stock dividends | — | — | 5,219,419 | 5,220 | (5,220) | — | — | — |
| Common stock to be distributed for preferred stock dividends | — | — | — | — | (151) | 151 | — | — |
| Net income | — | — | — | — | — | — | 8,503,293 | 8,503,293 |
| Balance as of December 31, 2010 | 26,509,110 | $26,510 | 43,059,756 | $43,060 | $77,314,168 | $657,930 | $(21,109,546) | $56,932,122 |

5

U.S. Coal Corporation

Consolidated Statements of Stockholders' Equity (continued)

| | Convertible Preferred Stock | | Common Stock | | Additional Paid-in Capital | Stock Dividends to be Distributed | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Issuance of common stock for preferred stock dividends | — | $ — | 3,679,720 | $ 3,680 | $ (3,680) | $ — | $ — | $ — |
| Common stock to be distributed for preferred stock dividends | — | — | — | — | 151 | (151) | — | — |
| Issuance for exercised warrants | — | — | 3,500,000 | 3,500 | 31,500 | — | — | 35,000 |
| Net income | — | — | — | — | — | — | 5,553,861 | 5,553,861 |
| Balance as of December 31, 2011 | 26,509,110 | $26,510 | 50,239,476 | $50,239 | $77,342,139 | $657,779 | $(15,555,685) | $62,520,982 |

*See accompanying Notes to Consolidated Financial Statements.*

6

# U.S. Coal Corporation

## Consolidated Statements of Cash Flows

|  | Year ended December 31 | | |
|---|---|---|---|
|  | **2011** | 2010 | 2009 |
| **Operating activities** | | | |
| Net income (loss) | $ **5,553,861** | $ 8,503,293 | $ (2,981,421) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Gain (loss) on sale of assets | **904** | (56,039) | 275,029 |
| Depreciation, depletion, accretion and amortization, related parties | **2,864,265** | 1,238,567 | 1,612,432 |
| Depreciation, depletion, accretion and amortization, other | **17,899,242** | 14,589,713 | 16,949,654 |
| Amortization of below market coal supply agreements | **(580,135)** | (5,916,040) | (11,804,050) |
| Gain on coal supply agreement | **–** | – | (1,785,875) |
| Deferred income taxes | **2,356,599** | 6,385,552 | 1,663,518 |
| Stock based compensation expense | **–** | 122,768 | 169,972 |
| Issuance of common stock and warrants for services rendered | **–** | – | 1,369,978 |
| Changes in operating assets and liabilities: | | | |
| Trade accounts receivable | **4,738,545** | (5,568,857) | (964,227) |
| Inventories | **(2,064,905)** | 3,129,147 | (41,426) |
| Other assets | **433,931** | (135,605) | (1,741,330) |
| Deposit on capital lease arrangement | **(58,269)** | (94,065) | (780,780) |
| Income taxes recoverable | **–** | 142,134 | (142,134) |
| Recoupable royalties | **(1,161,194)** | (692,196) | (362,587) |
| Accounts payable and accrued expenses | **12,317,195** | 2,189,345 | (152,244) |
| Deferred revenue | **(3,694,495)** | 1,176,000 | 5,970,000 |
| Accrued interest, related parties | **(1,371,945)** | (1,207,729) | 946,481 |
| Accrued interest, other | **(369,976)** | 895,613 | 2,303,197 |
| Income taxes payable | **37,250** | 38,497 | (288,652) |
| Asset retirement obligations settled | **(569,569)** | (1,187,418) | (1,474,989) |
| Net cash provided by operating activities | **36,331,304** | 23,552,680 | 8,740,546 |
| | | | |
| **Investing activities** | | | |
| Proceeds from sale of equipment | **231,672** | 299,199 | – |
| Purchases of property, plant and equipment | **(22,437,512)** | (16,857,844) | (4,784,649) |
| Change in restricted cash | **(123,662)** | (695,780) | 331,986 |
| Net cash used in investing activities | **(22,329,502)** | (17,254,425) | (4,452,663) |

# U.S. Coal Corporation

## Consolidated Statements of Cash Flows (continued)

| | Year ended December 31 | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| **Financing activities** | | | |
| Proceeds from issuance of notes payable | $ 23,063,756 | $ 13,155,823 | $ 9,777,435 |
| Proceeds from exercised warrants | 35,000 | – | – |
| Repayments on notes payable, related parties | (13,814,003) | (8,244,208) | (1,448,473) |
| Repayments on notes payable, other | (14,941,046) | (7,150,314) | (8,238,250) |
| Principal payments on capital lease obligations | (7,085,402) | (3,982,037) | (3,393,779) |
| Payments for deferred financing costs | (585,328) | – | (1,495,298) |
| Payments for preferred stock issuance costs | – | – | (295,000) |
| Payments for repurchase of mandatorily redeemable common stock | – | (135,000) | – |
| Net cash used in financing activities | (13,327,023) | (6,355,736) | (5,093,365) |
| Net increase (decrease) in cash | 674,779 | (57,481) | (805,482) |
| Cash at beginning of year | 124,580 | 182,061 | 987,543 |
| Cash at end of year | $ 799,359 | $ 124,580 | $ 182,061 |
| | | | |
| **Supplemental disclosure of noncash activities** | | | |
| Incurrence of asset retirement obligations | $ 3,009,603 | $ 912,851 | $2,512,718 |
| Incurrence of capital lease obligations for equipment | 3,661,175 | 12,940,333 | 941,053 |
| Mandatorily redeemable common stock exercised | – | 2,700,000 | – |
| Interest incurred as additional notes payable, related parties | 1,207,723 | 384,419 | 359,641 |
| Interest incurred as additional notes payable, other | 152,413 | 347,228 | 2,513,953 |
| Preferred stock dividends declared | 2,609,667 | 2,609,969 | 2,609,667 |
| Issuance of common stock | 2,609,818 | 2,609,818 | 6,554,555 |
| Issuance of common stock warrants | – | – | 2,482,373 |
| Note payable converted to capital lease | – | – | 5,065,921 |
| Deposit applied against capital lease obligation | 482,794 | 3,280,780 | 2,500,000 |

In connection with the 2009 acquisition, the Company acquired assets with a fair value of $92,884,064 and assumed liabilities with a fair value of $58,022,003. During 2010, the mineral rights and deferred income tax liabilities were reduced by $383,627 in connection with the change in estimate disclosed in Note 16.

In connection with a contract miner filing for bankruptcy during 2010, the Company assumed asset retirement obligations of $606,502 and accrued expenses of $417,438, acquired mine development costs of $1,615,945, and wrote-off related accounts receivable of $995,348 and corresponding accounts payable of $403,343.

| **Supplemental disclosure of cash flow information** | | | |
|---|---|---|---|
| Interest paid | $ 8,909,636 | $ 9,038,197 | $8,161,811 |
| Income taxes paid (received) | 62,206 | (750,378) | 45,600 |

*See accompanying Notes to Consolidated Financial Statements.*

8

U.S. Coal Corporation

Notes to Consolidated Financial Statements

December 31, 2011

## 1. Description of Business

The Company was formed to acquire coal assets. The Company began operations at Licking River (as defined below) by utilizing contract miners on its existing mineral leases and purchased and remarketed coal from third parties. With the acquisition of JAD (as defined below), the Company began mining operations for its own account. Subsequently, the Company also began mining operations for its own account at Licking River in August 2009. The business activities of the Company are presently located in eastern Kentucky.

The accompanying consolidated financial statements include the accounts of U.S. Coal Corporation and its wholly-owned subsidiaries (collectively referred to herein as the "Company" unless otherwise noted), S. M. & J., Inc. ("SM&J"), Oak Hill Coal Corporation ("Oak Hill"), Licking River Mining, LLC ("LRM"), Licking River Resources, Inc. ("Licking River"), as well as Fox Knob Coal Company, Inc. ("Fox Knob"), Sandlick Coal Company, LLC ("Sandlick") and J.A.D. Coal Company, Inc. ("JAD"). All significant intercompany accounts and transactions have been eliminated.

## 2. Summary of Significant Accounting Policies

**Revenues**

The Company recognizes coal revenues when title or risk of loss passes to the carrier or customer. This generally occurs at the time of shipment. Shipping and handling costs are classified as a component of cost of coal sales.

During December 2011, two customers made prepayments totaling $2,481,318, and during December 2010, one customer made a prepayment of $7,146,000 for future coal shipments scheduled through the end of each of the respective subsequent years. Additionally, during June 2011, the Company received an advance royalty payment of $1,000,000. The amounts for which revenues have not yet been recognized have been recorded as deferred revenues in the accompanying consolidated balance sheets. The deferred revenues will be recognized as revenue at the time the related shipments are made.

The Company's largest customers individually accounted for approximately 27% and 23% of the Company's sales during 2011, 37%, 22% and 14% in 2010 and 35%, 17%, and 15% during 2009.

The Company has an agreement to deliver coal to a third-party that in turn blends the coal with existing coal and delivers equivalent tons to the Company (or to another destination as determined by the Company). As a result of this arrangement, the Company earns a premium as well as certain other economic benefits. Total premiums earned were $2,499,221 in 2011 and $965,285 in 2010, which have been included in coal sales on the accompanying consolidated statements of operations.

9

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

**2.  Summary of Significant Accounting Policies (continued)**

**Trade Accounts Receivable**

Trade accounts receivable consists primarily of receivables from coal sales to the Company's customers under contracts. Four customers accounted for 48%, 15%, 12% and 11% of accounts receivable at December 31, 2011, and three customers accounted for 36%, 21% and 13% of accounts receivable at December 31, 2010. It is the Company's policy not to require collateral on trade accounts receivable. Accounts, which are determined to be past due based on contractual terms, are charged to bad debt expense as they are determined to be uncollectible based upon a review of aging and collections. There have been no credit losses during 2011, 2010, or 2009.

**Inventories**

Coal inventories and supplies are valued at the lower of cost or market using the weighted-average method. Raw coal inventories at the wash plants are adjusted for anticipated recovery levels, as well as processing and transportation costs. As of December 31, 2011 and 2010, inventories consisted of $1,862,566 and $414,052 of coal, respectively, and $1,694,023 and $1,077,632 of supplies, respectively. Coal is classified as inventory at the time the coal is extracted and removed from the mine.

**Recoupable Royalties**

The Company has various arrangements to pay royalties related to properties with coal reserves based on coal production. For certain of these arrangements, the Company makes royalty prepayments, which are then recouped by the Company as coal production progresses. The recoupable royalties recorded under these arrangements are routinely evaluated by management to ensure all amounts recorded are expected to be recouped.

**Property, Plant and Equipment**

Property, plant and equipment is stated at cost. Additions and improvements that significantly add to productive capacity or extend the useful lives of assets are capitalized. Maintenance and repair costs are expensed as incurred. Depreciation is based on estimated useful lives of the assets and is computed by the straight-line method.

Mineral rights and mine development costs are recorded at cost. The Company's mine development costs and mineral rights are controlled through leasing arrangements which generally last until the recoverable reserves are depleted. Depletion of reserves and amortization of mine development costs are computed using the units of production method over estimated total recoverable tons.

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Intangible Assets**

The Company's intangible assets relate to the fair value assigned to the key executives obtained as part of prior business acquisitions and are being amortized on a straight-line basis over 36 months. During 2011, 2010 and 2009, the Company recognized $101,684, $348,629 and $948,629, respectively, in amortization expense relating to these intangible assets.

**Deferred Financing Costs**

Deferred financing costs represent capitalized amounts paid in connection with the issuance of notes payable. These costs are being amortized using the interest method over the term of the associated note payable.

**Asset Retirement Obligations**

The Company's mining activities are subject to various federal and state laws and regulations governing the protection of the environment. These laws and regulations are continually changing and are generally becoming more restrictive. The Company conducts its operations to protect the public health and environment and believes its operations are in material compliance with all applicable laws and regulations. The Company made, and expects to make in the future, expenditures to comply with such laws and regulations, but cannot predict the exact amount of such future expenditures. Estimated future reclamation costs are based principally on legal and regulatory requirements.

Accounting Standard Codification ("ASC") Topic 410, *Asset Retirement and Environmental Obligations*, addresses financial accounting and reporting for obligations associated with the retirement of tangible long-lived asset and the associated asset retirement costs. The Company's asset retirement obligations ("ARO") liabilities primarily consist of estimated costs related to reclaiming surface land and support facilities at its mines in accordance with federal and state reclamation laws as defined by each mining permit.

The Company estimates its ARO liabilities for final reclamation and mine closure based upon detailed engineering calculations of the amount and timing of future costs for third parties to perform the required work. Cost estimates are escalated for inflation, and then discounted at the credit-adjusted risk-free rate. The Company records a capital asset retirement cost associated with the initial recorded liability. The capital asset retirement cost is amortized based on the units of production method over the estimated recoverable, proven and probable reserves at the related mine, and the ARO liability is accreted to the projected settlement date. Changes in estimates could occur due to revisions of mine plans, changes in estimated costs, and changes in timing of the performance of reclamation activities.

11

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Asset Retirement Obligations (continued)**

The Company is required by authoritative agencies to provide collateral in the form of reclamation bonds to ensure the completion of future reclamation. At December 31, 2011 and 2010, the Company had $4,011,892 and $3,890,925, respectively, of restricted cash for this collateral purpose.

Prior to August 2009 the Company's contract miners were responsible for completing all reclamation at the Company's Licking River operation. The Company, as owner of the mining permits, was contingently liable for any incomplete reclamation work. The Company had the ability to transfer the permits and related liabilities to the contract miners at its discretion.

In August 2009, a significant contract miner filed for bankruptcy and ceased operations. As a result, the Company assumed asset retirement obligations of $606,502 and accrued expenses of $417,438, and acquired mine development costs of $1,615,945, which was determined by a third-party engineering firm. Also, in connection with the contract miner ceasing operations, the Company wrote-off related accounts receivable of $995,348 and corresponding accounts payable of $403,343. No gain or loss was recognized as a result of this event.

**Income Taxes**

The Company accounts for income taxes in accordance with ASC Topic 740, *Income Taxes*. The provision for income taxes includes federal, state and local income taxes currently payable and deferred taxes arising from temporary differences between the financial statement and tax basis of assets and liabilities recognized using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. ASC Topic 740 also requires that deferred tax assets be reduced by a valuation allowance if it is more likely than not that some portion or all of the deferred tax asset will not be realized. In evaluating the need for a valuation allowance, the Company takes into account various factors, including the expected level of future taxable income and available tax planning strategies. If actual results differ from the assumptions made in the evaluation of valuation allowances, a change in valuation allowance is recorded through income tax expense in the period such determination is made.

**Accounting for Stock Based Compensation**

The Company has an Equity Incentive Plan (the "Plan"), which authorizes up to 3,000,000 shares of Company stock for grants of incentive awards as defined in the agreement. The fair value of each option to purchase shares is estimated on the date of the grant using the Black-Scholes pricing model and is recorded as compensation expense over the service period.

12

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

**2. Summary of Significant Accounting Policies (continued)**

**Net Earnings (Loss) per Share**

The Company computes basic earnings (loss) per share by dividing net income (loss) attributable to common stockholders by the weighted average number of shares outstanding during the period. Diluted earnings (loss) per share is computed by dividing net income (loss) attributable to common stockholders by diluted weighted average shares outstanding. Potentially dilutive shares include the assumed exercise of stock options and warrants and the assumed vesting of stock option grants (using the treasury stock method), if dilutive.

**Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates. The most significant estimates include, but are not limited to, asset retirement obligations, stock based compensation and provision for income taxes.

**Reclassifications**

Certain amounts in 2010 and 2009 have been reclassified to conform with 2011 classifications.

**3. Property, Plant and Equipment**

Property, plant and equipment consist of the following as of December 31:

|  | **2011** | **2010** |
|---|---|---|
| Land | $ **3,198,099** | $ 3,145,169 |
| Buildings and improvements | **6,822,054** | 6,490,204 |
| Mining and transportation equipment | **93,360,100** | 69,090,878 |
| Construction in progress | **208,617** | 211,224 |
| Capitalized asset retirement costs | **7,367,535** | 4,357,932 |
| Mine development costs | **5,682,891** | 4,779,163 |
| Mineral rights and timbers | **119,609,729** | 119,589,729 |
| Equipment not currently used in operations | **828,031** | 760,081 |
|  | **237,077,056** | 208,424,380 |
| Less allowance for depreciation and depletion | **(45,092,844)** | (27,844,305) |
| Net property, plant and equipment | **$191,984,212** | $180,580,075 |

Depreciation expense was $12,446,038 in 2011, $8,951,314 in 2010 and $5,505,070 in 2009. Depletion expense was $5,025,537 in 2011, $3,688,383 in 2010 and $4,168,524 in 2009.

13

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

**3. Property, Plant and Equipment (continued)**

The Company has capitalized certain mine development costs on properties not yet mined; accordingly, these amounts have been included in construction in progress and mine development costs.

**4. Coal Preparation Plant Operating and Royalty Agreements**

During 2008, Licking River and a separate company (the "Plant Owner") contracted with a third company (the "Operator") for the construction of a preparation plant on land leased by Licking River. Under the terms of the contract, Licking River agreed to perform certain site preparation work related to the plant. The plant, the construction of which was paid for by the Plant Owner, was completed in January 2009. Under a separate agreement, the Operator entered into a lease arrangement with the Plant Owner for use of the plant.

The Operator operates the preparation plant in exchange for compensation from Licking River under certain operating and royalty agreements, which, unless renewed by Licking River, expire in February 2018. Under these agreements, Licking River is required to make monthly payments based on the tons of coal processed at the plant; however, minimum monthly payments are approximately $136,000 under the operating agreement and $125,000 under the royalty agreement.

In connection with the royalty agreement, the Company was required to make an accrued deficiency payment equal to $125,000 per month from the time the agreement was executed in March 2008 through the mechanical completion date in January 2009. The Company will recoup these royalty advances each month that royalty payments due exceed $125,000, through February 2018. Net royalty advances related to this accrued deficiency payment amounted to $1,145,833 as of December 31, 2011 and 2010, which have been included in other noncurrent assets on the accompanying consolidated balance sheet.

Effective January 2009, JAD also entered into a similar agreement with the Operator to operate its existing preparation plant through December 2011; however, subsequent to year end this agreement was renewed through December 2012. Under this agreement, JAD is required to pay a fixed monthly fee and a variable cost based on the tons of coal processed at the plant; however, minimum monthly payments are approximately $103,457. This agreement is cancellable in thirty days by the Company in the event of nonperformance.

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

### 5. Notes Payable and Interest Expense

Notes payable consist of the following as of December 31:

|  | 2011 | 2010 |
|---|---|---|
| Line of credit | $ 1,888,256 | $ 5,707,673 |
| Notes payable to Licking River sellers | 5,718,017 | 6,666,667 |
| Notes payable to JAD sellers | 7,680,184 | 7,837,510 |
| Notes payable to investors, net of unamortized discount of $582,542 in 2010 | 2,549,418 | 9,554,514 |
| Notes payable to East Coast Miner LLC, net of unamortized discount of $1,183,911 in 2010 | 7,743,950 | 13,478,194 |
| Note payable to East Coast Miner II LLC | 6,729,423 | — |
| Equipment and vehicle notes payable | 28,540,349 | 22,890,015 |
| Total notes payable, net of unamortized discounts | 60,849,597 | 66,134,573 |
| Less current portion of notes payable, net of unamortized discounts | 25,543,443 | 50,065,746 |
| Long-term portion of notes payable, net of unamortized discounts | $35,306,154 | $16,068,827 |

#### *Line of Credit*

In November 2011, Licking River renewed and increased its existing revolving working capital line of credit agreement with a financial institution to provide for maximum borrowings of $10,000,000. The Company had $1,888,256 and $5,707,673 drawn on this facility at December 31, 2011 and 2010, respectively. Under the terms of the agreement, interest accrues on any outstanding advances at the greater of 6.5% or a variable rate of prime plus 1% and is payable monthly. Any advances under the agreement are secured by a lien on trade accounts receivables of the Company. The agreement expires in November 2012.

#### *Notes Payable to Licking River Sellers*

During 2007, in connection with its business acquisitions, the Company issued unsecured promissory notes totaling $10,000,000 to the sellers of the three Licking River acquired entities. The notes bear interest at an annual rate of 10%. All outstanding principal and interest totaling $5,718,017 as of December 2011, in the aggregate, was originally due in December 2011. Effective in December 2011, the due date was extended to the earlier of October 2014 or the date on which the Company consummates an initial public offering of its common stock. The final payment is subordinate to certain other notes acquired by the Company in connection with the JAD acquisition and certain notes payable to investors.

15

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

**5. Notes Payable and Interest Expense (continued)**

*Notes Payable to Licking River Sellers (continued)*

In connection with the original financing of the $10,000,000 promissory notes, the Company issued 1,000,000 shares of its common stock, with an estimated value of $1,000,000. The $1,000,000 was recorded as a discount on the notes payable. The discount was fully amortized during 2009. The Company recorded amortization related to this discount of $308,904 in 2009.

The Company incurred interest expense on these sellers' notes payable of $611,928 in 2011 and $666,667 in both 2010 and 2009, of which $48,588 and $499,080 was accrued at December 31, 2011 and 2010, respectively.

*Notes Payable to JAD Sellers*

In connection with the acquisition of the JAD entities, the Company issued unsecured non-interest bearing promissory notes totaling $1,000,000 to the JAD sellers. In 2008, in connection with its business acquisition, the Company issued additional convertible promissory notes totaling $7,000,000 to the sellers of the three JAD acquired entities. These notes are secured by a lien on substantially all property, plant and equipment of the JAD entities and the stock of the JAD entities, but are subject to certain higher priority liens in some cases. The notes bear interest at an annual rate of 8%. All outstanding principal and interest totaling $6,705,156 as of December 2011 was originally due in December 31, 2011. Effective in December 2011, the due dates were extended to the earlier of October 2014 or the date on which the Company consummates an initial public offering of its common stock. Up to $3,500,000 of principal is convertible into common stock of the Company at the option of the note holders. In the event the conversion occurs at the time of an initial public offering, the conversion price shall be the sale price of the common stock, less a 15% discount per share.

During December 2011, a limited liability company consisting of certain JAD Sellers advanced an additional $975,028 to the Company in the form of a note payable. The note bears interest at a rate of 12%, is due in monthly installments through October 2014 and is secured by certain assets of the Company that are subject to higher priority liens.

The Company incurred interest expense on these sellers' notes payable of $503,587 in 2011 $567,604 in 2010 and $560,000 in 2009, of which $47,447 was accrued at December 31, 2011.

16

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

**5. Notes Payable and Interest Expense (continued)**

*Notes Payable to Investors (April 2008)*

JAD previously issued a total of $5,000,000 in notes payable to a group of investors, collateralized by certain equipment, inventory and property. These notes bear interest at a rate of 20%, which is compounded monthly and due with the principal at maturity. Beginning after October 2009, interest is payable monthly, although the Company has the option to pay only 12% monthly with the remaining 8% being compounded monthly and due with the principal at maturity. At December 31, 2010, the original principal and additional interest totaled $5,787,414. All outstanding principal and interest was paid in full during December 2011 with proceeds from the ECM II note issuance (discussed subsequently in this note).

In connection with this financing, the Company issued 500,000 shares of common stock (the "Put Shares"), with an estimated value of $875,000. Terms of the Rights Agreement provide that if the Company does not consummate an initial public offering or reverse merger prior to April 1, 2010, then each investor had the right to require the Company to purchase their Put Shares for the purchase price of $5.40 per share. The $875,000 was recorded as a discount on the notes payable. The discount was fully amortized during 2009. In April 2010, all the investors sent notice of exercise of their Put Right with respect to all of their Put Shares, for an aggregate of 500,000 Put Shares and at an aggregate purchase price of $2,700,000. Accordingly, in accordance with accounting principles generally accepted in the United States of America, the shares became mandatorily redeemable and the 500,000 shares were reclassified from stockholders' equity to liabilities on the accompanying consolidated balance sheet. In June, 2010, the Company paid $135,000 to one investor as the repurchase price for such investor's 25,000 Put Shares. As a result of a court determination, the remaining amounts are due following the payment in full of the more senior secured notes payable, which is scheduled to be in October 2014; therefore, the remaining $2,565,000 outstanding as of December 31, 2011 and 2010 has been classified as long-term in the accompanying consolidated balance sheets. The Company is in the process of evaluating, among other things, the ultimate payment of the purchase price of the Put Shares.

*Notes Payable to Investors (December 2008 to January 2009)*

In December 2008 and January 2009, the Company issued a total of $4,500,000 in unsecured notes payable to various investors. These notes, which were originally due in November 2009, bear interest at a rate of 20%, of which 15% is payable monthly, while the remaining 5% is compounded monthly and due with the principal at maturity. All outstanding principal and interest was subsequently due in December 2011. During 2009, one of these notes payable, in the amount of $100,000, owed to a member of a professional services firm that provides legal services to the Company, was repaid in full. Effective in December 2011, certain notes in the aggregate amount of $2,549,418 were extended to the earlier of October 2014 or the date on which the Company consummates an initial public offering of its common stock. The remaining notes were paid in full during December 2011 with proceeds from the ECM II note issuance. At December 31, 2011 and 2010, the original principal and additional interest totaled $2,549,418 and $4,349,642, respectively.

17

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

**5. Notes Payable and Interest Expense (continued)**

*Notes Payable to Investors (December 2008 to January 2009) (continued)*

In connection with these financings, the Company issued 300,000 shares of common stock in 2009, with an estimated total value of $945,000, which was recorded as a discount on the notes payable.

*Notes Payable to Investors (Other)*

In 2008, $200,000 was capitalized as deferred financing costs related to the December 2008 to January 2009 financing. In 2009, an additional $75,000 was capitalized related to the December 2008 to January 2009 financing. Also, as consideration for their consent to the December 2008 and 2009 financing, the Company issued to other lenders in January 2009 a total of 250,000 shares of common stock and 56,250 shares of common stock purchase warrants at an exercise price of $1.75 per share and expire in January 2016. The value of these common stock shares and common stock purchase warrants were estimated to be $787,500 and $130,209, respectively, and were capitalized as deferred financing costs. As of December 31, 2010, unamortized deferred financing costs totaled $91,314.

In February 2009, the Company issued 202,059 common stock purchase warrants to the remaining investors from a previous financing, in consideration for extending the maturity of these financings. These warrants, valued at $452,269, have an exercise price of $1.50 per share and expire in February 2014.

*Note Payable to Fursa Alternative Strategies, LLC/JMB Capital Partners Master Fund, L.P./East Coast Miner LLC*

An existing $13,000,000 senior secured note payable and $7,000,000 contingent value right agreement to JMB Capital Partners Master Fund, L.P. ("JMB") was acquired by East Coast Miner LLC ("ECM") in September 2009. ECM was formed by a subset of existing shareholders, additional investors and certain executives of the Company to acquire the JMB note prior to maturity. The executives contributed $1,400,000 composed of $600,000 in cash and $800,000 representing a grant from the Company to further fund the capital interest in ECM. The grant was comprised of $100,000 for each of the 8 executives. Two executives terminated employment in 2011 and forfeited their interests to the other members of the executive group. The interests vested in December 2011.

18

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

**5. Notes Payable and Interest Expense (continued)**

*Note Payable to Fursa Alternative Strategies, LLC/JMB Capital Partners Master Fund,
L.P./East Coast Miner LLC (continued)*

As a result of the ECM acquisition, the note and the contingent value right were amended, restated and consolidated into one instrument. The restatement included an original extension of the maturity to December 2011. As a condition to this amendment, the Company issued 3,500,000 shares of common stock purchase warrants valued at $1,717,172 with an exercise price of $0.01 per share, which were exercised on October 31, 2011 for consideration of $35,000. In addition, 2,000,000 common stock purchase warrants valued at $274,902 were issued to ECM with an exercise price of $3.50 per share expiring in September 2016. The Company also issued 1,000,000 shares of common stock purchase warrants valued at $490,299 with an exercise price of $0.01 per shares, expiring September 2014 to JMB to facilitate this transaction. The aggregate value of these warrants issued was $2,482,373, which has been recorded as a discount on the note payable.

Effective in December 2011, the due date was extended to October 2014. The note calls for $500,000 of amortization per month plus a prorated amortization of an additional $500,000 per month (to be increased to $1,000,000 per month following payment in full of ECM note, which is scheduled to fully amortize in January 2013) spread ratably between the ECM note and various other notes including ECM II, the two seller notes, and the remaining notes to investors. The note bears an annual interest at a rate of 12%, which is paid monthly in arrears, and is secured by substantively all assets of the Company. At December 31, 2011 and 2010, the outstanding principal totaled $7,743,950 and $14,662,105, respectively.

Since the ECM acquisition, the Company incurred interest expense of $1,314,189 in 2011, $2,256,923 in 2010, and $729,131 in 2009, and had accrued interest in the amount of $80,229 as of December 31, 2011. In addition, the Company made principal payments to ECM totaling $6,918,155 in 2011, $7,921,918 in 2010, and $1,434,246 in 2009.

During 2007, total deferred financing costs of $1,695,243 were capitalized as part of this financing. During 2008, an additional $7,724,634 in deferred financing costs was capitalized as part of this financing. During 2009, total deferred financing costs of $502,589 were capitalized as part of this financing. As of December 31, 2010 unamortized deferred financing costs were $1,006,498. These costs were fully amortized during 2011.

19

# U.S. Coal Corporation

## Notes to Consolidated Financial Statements (continued)

### 5. Notes Payable and Interest Expense (continued)

*East Coast Miner II LLC*

During December 2011, the Company issued a note payable in the amount of $6,729,423 to East Coast Miner II ("ECM II") LLC, which was formed by a subset of existing shareholders and additional investors of the Company. The proceeds were used to pay in full the remaining outstanding balances of certain notes payable to investors (both the April 2008 and December 2008 to January 2009 financings). This note bears interest at a rate of 18% and is due in monthly installments through October 2014. At December 31, 2011, the outstanding principal totaled $6,729,423.

This note is subject to higher priority liens including the ECM note and other notes in certain cases, but otherwise is secured by substantially all assets of the Company.

The Company incurred interest expense of $88,745 in 2011 and had accrued interest in the amount of $88,745 as of December 31, 2011.

Total deferred financing costs of $585,328 were capitalized as part of this financing.

*Equipment and Vehicle Notes Payable*

The Company had numerous equipment and vehicle notes totaling $28,540,349 and $22,890,015 as of December 31, 2011 and 2010, respectively. These notes bear interest at fixed rates ranging from non-interest bearing to 13% and are due in various monthly payments through 2017. All these loans are secured by liens on the related equipment and vehicles.

*Scheduled Maturities of Notes Payable*

Aggregate maturities of notes payable are as follows as of December 31, 2011:

| | |
|---|---:|
| 2012 | $25,543,443 |
| 2013 | 17,921,095 |
| 2014 | 12,573,291 |
| 2015 | 4,105,705 |
| 2016 | 705,412 |
| Thereafter | 651 |
| Total notes payable | $60,849,597 |

# U.S. Coal Corporation

## Notes to Consolidated Financial Statements (continued)

### 6. Asset Retirement Obligations

Changes in the Company's ARO are summarized as follows for the year ended December 31:

|  | 2011 | 2010 |
|---|---|---|
| Assets retirement obligations, beginning of year | $5,432,992 | $5,384,489 |
| Liabilities incurred and assumed | 3,009,603 | 912,851 |
| Accretion expense | 325,983 | 323,070 |
| Revisions to estimated cash flows | (285,881) | (478,149) |
| Liabilities settled | (283,688) | (709,269) |
| Asset retirement obligations, end of year | 8,199,009 | 5,432,992 |
| Current portion | 1,161,802 | 642,428 |
| Asset retirement obligations, end of year noncurrent | $7,037,207 | $4,790,564 |

### 7. Capital Leases

The Company leases certain equipment under capital lease arrangements. At December 31, 2011 and 2010, equipment under capital leases had a total cost of $17,850,274 and $24,355,807, respectively. Amortization of equipment under capital leases is included with depreciation expense in the accompanying consolidated financial statements.

In connection with certain of these leasing arrangements, the Company was required to make deposits as collateral that will be applied as payments at the end of the respective leases. Future minimum lease payments under these capital lease agreements are as follows as of December 31, 2011:

| | |
|---|---|
| 2012 | $ 5,023,804 |
| 2013 | 3,003,135 |
| 2014 | 3,079,833 |
| 2015 | 402,184 |
| Total minimum lease payments | 11,508,956 |
| Amount representing interest | (1,236,767) |
| Present value of minimum lease payments (including $4,480,788 classified as current) | $10,272,189 |

21

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

## 8. Operating Leases

The Company has numerous operating leases that expire on various dates through 2018. Certain of these leases have renewal options for periods of three or more years. Lease expense totaled $3,799,367 in 2011, $6,575,910 in 2010 and $5,265,443 in 2009.

Future minimum lease payments under operating leases (excluding renewal options), including minimum payments related to the coal preparation plant operating agreements discussed in Note 4, at December 31, 2011 are as follows:

| | |
|---|---:|
| 2012 | $ 2,054,653 |
| 2013 | 1,802,286 |
| 2014 | 1,701,016 |
| 2015 | 1,633,716 |
| 2016 | 1,633,716 |
| Thereafter | 1,906,002 |
| Total minimum lease payments | $10,731,389 |

## 9. Royalty Agreements

The Company leases certain land under agreements that call for royalties to be paid as the coal is mined. Royalty expense totaled $14,349,995 in 2011, $10,662,282 in 2010 and $7,606,334 in 2009. Certain agreements require minimum annual royalties to be paid regardless of the amount of coal mined during the year.

Noncancelable future minimum royalty payments, including minimum payments related to the coal preparation plant royalty agreement discussed in Note 4, at December 31, 2011 are as follows:

| | |
|---|---:|
| 2012 | $ 1,635,000 |
| 2013 | 1,635,000 |
| 2014 | 1,635,000 |
| 2015 | 1,635,000 |
| 2016 | 1,635,000 |
| Thereafter | 2,500,000 |
| Total minimum lease payments | $10,675,000 |

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

**10. Preferred Stock Offerings**

*Series A Convertible Preferred Stock*

The Company previously issued an aggregate 3,016,118 units, each unit consisting of five shares of Series A convertible preferred stock and warrant to purchase one share of common stock, at a price of $7.50 per unit, for aggregate proceeds of $22,620,885. In connection with this offering, the Company issued an aggregate 15,080,590 shares of Series A convertible preferred stock and warrants to purchase an aggregate 3,016,118 shares of common stock at an original exercise price of $2.50 per share, expiring in June 2012. As a result of certain additional stock issuances (*see Note* 5), consistent with the terms of the Preferred Stock Certificates of Designation, the exercise price of the warrants was reduced from $2.50 per share to $1.90 per share in 2009, then to $1.76 per share in 2010 and the conversion price of the preferred stock was reduced from $1.50 per share to $1.23 per share in 2009, then to $1.14 in 2010.

In accordance with the Series A convertible preferred stock agreements, the Company declared dividends in the amount of 8% of the original issue price. As of December 31, 2008, $456,079 of common stock to be distributed was unissued, which was paid in 2009 through the issuance of 144,787 shares of common stock. During 2009, preferred stock dividends in the amount of $1,809,671 were declared, of which $1,353,535 was paid through the issuance of 1,197,087 shares of common stock. As of December 31, 2009, $456,136 of common stock to be distributed remained unissued, which was paid in 2010 through the issuance of 912,251 shares of common stock. During 2010, preferred stock dividends in the amount of $1,809,671 were declared, of which $1,353,535 was paid through the issuance of 2,706,998 shares of common stock. As of December 31, 2010 $456,136 of common stock to be distributed remained unissued and was paid in 2011 through the issuance of 912,243 shares of common stock. During 2011, preferred stock dividends in the amount of $1,809,670 were declared, of which $1,353,534 was paid through the issuance of 1,639,302 shares of common stock. As of December 31, 2011 $456,136 of common stock to be distributed remains unissued.

*Series B Convertible Preferred Stock*

The Company previously issued an aggregate 1,142,852 units, each unit consisting of ten shares of Series B convertible preferred stock and warrant to purchase one share of common stock (provided, however, that investors in the first closing of the offering received a warrant to purchase 2.2 shares of common stock), at a price of $17.50 per unit, for aggregate proceeds of $19,999,910. In connection with this offering, the Company issued an aggregate 11,428,520 shares of Series B convertible preferred stock and warrants to purchase an aggregate 2,437,156 shares of common stock at an original exercise price of $2.50 per share, expiring at various dates between April and June 2013. As a result of certain additional stock issuances (*see Note* 5), consistent with the terms of the Preferred Stock Certificates of Designation, the exercise price of the warrants was reduced from $2.50 per share to $2.02 per share in 2009 and the conversion price of the preferred stock was reduced from $1.75 per share to $1.41 per share in 2009 then to $1.33 per share in 2010.

23

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

### 10. Preferred Stock Offerings (continued)

*Series B Convertible Preferred Stock (continued)*

The Company also issued an aggregate of 91,429 unit warrants to the placement agent, each unit warrant consisting of ten shares of Series B convertible preferred stock and warrant to purchase one share of common stock (provided, however, that unit warrants issued pursuant to the first closing of the offering consisted of ten shares of Series B convertible preferred stock and a warrant to purchase 2.2 shares of common stock). The exercise price for each such unit warrant is $17.50 and the unit warrants expire at various dates between April and June 2013.

In accordance with the Series B convertible preferred stock agreements, the Company declared common stock dividends in the amount of 4% of the original issue price. As of December 31, 2008, $201,588 of common stock to be distributed was unissued, which was paid in 2009 through the issuance of 63,996 shares of common stock. During 2009, preferred stock dividends in the amount of $799,996 were declared, of which $598,354 was paid through the issuance of 529,134 shares of common stock. As of December 31, 2009, $201,642 of common stock to be distributed remained unissued, which was paid in 2010 through the issuance of 403,253 shares of common stock. During 2010, preferred stock dividends in the amount of $800,299 were declared, of which $598,505 was paid through the issuance of 1,196,917 shares of common stock. As of December 31, 2010, $201,794 of common stock to be distributed remained unissued which was paid in 2011 through the issuance of 403,552 shares of common stock. During 2011, preferred stock dividends in the amount of $799,997 were declared, of which $598,354 was paid through the issuance of 724,623 shares of common stock. As of December 31, 2011 $201,643 of common stock to be distributed remains unissued.

The Company has 40,000,000 shares of preferred stock authorized, of which 16,600,000 are designated as Series A, 21,600,000 are designated as Series B, and 1,800,000 are undesignated as of December 31, 2011 and 2010.

### 11. Common Stock Offerings

In connection with the ECM Acquisition of the senior secured note payable (*see Note 5*) and assumption of a coal service agreement (*see Note 18*), in September 2009, the Company issued 6,000,000 shares of common stock at $0.50 per share for total proceeds of $3,000,000.

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

### 12. Stock Options

A summary of options outstanding as of December 31, 2011 and changes during 2011, 2010 and 2009 are as follows:

| | Options Outstanding | Weighted Average Exercise Price | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Outstanding at January 1, 2009 (775,000 exercisable) | 1,875,000 | $1.75 | $0.58 |
| Outstanding at December 31, 2009 (1,141,667 exercisable) | 1,875,000 | $1.75 | $0.58 |
| Outstanding at December 31, 2010 (1,358,333 exercisable) | 1,875,000 | $1.75 | $0.58 |
| Forfeited in 2011 | (150,000) | $1.75 | $0.58 |
| Outstanding at December 31, 2011 (1,575,000 exercisable) | 1,725,000 | $1.75 | $0.58 |

The following table summarizing information about stock options outstanding as of December 31, 2011 is presented below:

| | Options Outstanding | Options Exercisable | Exercise Price | Weighted Average Grant Date Fair Value | Weighted Average Remaining Contractual Life (months) |
|---|---|---|---|---|---|
| Options granted in January 2007 | 625,000 | 625,000 | $1.75 | $0.36 | 60 |
| Options granted in February 2008 | 350,000 | 350,000 | $1.75 | $0.34 | 73 |
| Options granted in April 2008 | 300,000 | 300,000 | $1.75 | $1.08 | 76 |
| Options granted in July 2008 | 450,000 | 300,000 | $1.75 | $0.83 | 78 |
| | 1,725,000 | 1,575,000 | | $0.58 | |

25

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

## 13. Common Stock Purchase Warrants

Summarized information about warrants to purchase common stock from January 1, 2009 to December 31, 2011, is as follows:

|  | Number of Warrants |
|---|---|
| Outstanding at January 1, 2009 | 10,844,789 |
| Issued to investors in 2009 | 6,861,855 |
| Outstanding at December 31, 2009 and 2010 | 17,706,644 |
| Exercised in 2011 | (3,500,000) |
| Outstanding at December 31, 2011 | 14,206,644 |

Of the warrants outstanding at December 31, 2011, 5,418,180 warrants expire in 2012, 4,082,421 warrants expire in 2013, 2,649,793 warrants expire in 2014 and 2,056,250 warrants expire in 2016.

## 14. Equity Valuations

Valuations for common stock issued were estimated based on private offering prices of the Company's stock around the same time period.

In order to determine the valuation of its common stock purchase warrants, which were estimated at the date of issuance, the Company used the Black-Scholes pricing model with the following weighted average assumptions in 2009:

| | | | |
|---|---|---|---|
| Expected term (years) | 4.00 | - | 7.00 |
| Risk-free interest rates | 0.13% | - | 5.14% |
| Expected volatility | 49.28% | - | 85.19% |
| Weighted-average volatility | 54.18% | - | 62.74% |

The risk-free interest rate is based on the U.S. Treasury rate for the expected life at the time of grant, volatility is based on the average long-term implied volatilities of peer companies as the Company's trading history is limited, and the expected term is determined using the simplified method.

## 15. Earnings (Loss) Per Share Data

Basic earnings (loss) per share is computed by dividing earnings (loss) available to common stockholders by the weighted average number of common stock outstanding during each period. Diluted earnings per share reflect, in periods in which they have a dilutive effect, the effect of common shares issuable upon the exercise of stock warrants, using the treasury stock method of computing such effects and contingent shares, or conversion of convertible debt. As a result of the Company's net loss in 2009, the effect of the outstanding stock warrants and convertible debt had an antidilutive effect.

26

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

**15. Earnings (Loss) Per Share Data (continued)**

The following table sets forth the computation of income (loss) per share for the years ended December 31:

| | 2011 | 2010 | 2009 |
|---|---|---|---|
| Basic: | | | |
| Net income (loss) | $ 5,553,861 | $ 8,503,293 | $(2,981,421) |
| Preferred stock dividends | (2,609,667) | (2,609,968) | (2,609,667) |
| Net income (loss) available to common stockholders | 2,944,194 | 5,893,325 | (5,591,088) |
| Average shares outstanding | 46,096,751 | 40,900,271 | 31,584,782 |
| Basic earnings (loss) per share | $    0.06 | $    0.14 | $    (0.18) |
| | | | |
| Diluted: | | | |
| Net income (loss) | $ 5,553,861 | $8,503,293 | $(2,981,421) |
| Preferred stock dividends | (2,609,667) | (2,609,968) | (2,609,667) |
| Net income (loss) available to common stockholders | 2,944,194 | 5,893,325 | (5,591,088) |
| Average shares outstanding | 46,096,751 | 40,900,271 | 31,584,782 |
| Effect of dilutive warrants | 1,214,562 | 4,714,562 | – |
| | 47,311,313 | 45,614,833 | 31,584,782 |
| Diluted earnings (loss) per share | $    0.06 | $    0.13 | $    (0.18) |

**16. Income Taxes**

Significant components of the provision for income tax expense (benefit) are as follows for the year ended December 31:

| | 2011 | 2010 | 2009 |
|---|---|---|---|
| Current: | | | |
| Federal | $         – | $ (671,958) | $  (82,323) |
| State | 99,456 | 102,211 | (216,104) |
| Total current | 99,456 | (569,747) | (298,427) |
| | | | |
| Deferred: | | | |
| Federal | 1,780,911 | 5,400,922 | 1,523,807 |
| State | 575,688 | 984,630 | 139,711 |
| Total deferred | 2,356,599 | 6,385,552 | 1,663,518 |
| Net provision for income tax expense | $2,456,055 | $5,815,805 | $1,365,091 |

27

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

### 16. Income Taxes (continued)

The 2009 net provision for income tax expense reflects an increase of $1,273,732 as a result of a change in the percentage depletion deduction previously estimated as of December 31, 2008.

The reconciliation of income taxes calculated at the statutory federal income tax rate to the net provision for income taxes included in the consolidated statements of operations is as follows for the year ended December 31:

|  | 2011 | 2010 | 2009 |
|---|---|---|---|
| Federal income taxes at U.S. statutory rate | $ 2,803,296 | $ 5,011,684 | $ (549,552) |
| State income taxes | 438,521 | 706,443 | (50,419) |
| Percentage depletion | (1,450,544) | (1,189,894) | 625,813 |
| Amortization discount | 618,259 | 501,456 | 1,232,908 |
| Deferred rate change | – | 1,137,357 | – |
| Other | 46,523 | (351,241) | 106,341 |
| Net provision for income tax expense | $ 2,456,055 | $ 5,815,805 | $1,365,091 |

Deferred income taxes reflect the tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred income taxes are as follows as of December 31:

|  | 2011 | 2010 |
|---|---|---|
| Deferred tax assets: |  |  |
| Below-market contracts | $ – | $ 221,902 |
| Accrued reclamation and closure | 3,136,120 | 2,078,120 |
| Accrued employee benefits | 421,591 | 315,907 |
| Net operating loss carryovers | 18,752,172 | 16,502,988 |
| AMT credit and other credit carryovers | 289,734 | 289,734 |
| Other | 621,111 | 539,111 |
| Total deferred tax assets | 23,220,728 | 19,947,762 |
| Deferred tax liabilities: |  |  |
| Mineral rights acquired | 38,762,643 | 40,676,571 |
| Property, equipment and development costs | 21,984,343 | 14,401,956 |
| Intangible asset--key executives acquired | – | 38,894 |
| Total deferred tax liabilities | 60,746,986 | 55,117,421 |
| Net deferred tax liabilities | 37,526,258 | 35,169,659 |
| Less portion classified as current asset | (865,980) | (777,313) |
| Portion classified at long-term liability | $38,392,238 | $35,946,972 |

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

### 16. Income Taxes (continued)

The Company has net operating loss ("NOL") carryovers which are available to offset future federal and state taxable income. The federal NOL carryovers are approximately $49,000,000 and $45,000,000 as of December 31, 2011 and 2010, respectively, and the state NOL carryovers are approximately $24,500,000 and $23,000,000 as of December 31, 2011 and 2010, respectively. Included with the federal and state NOL carryovers are approximately $1,400,000 NOL carryovers acquired from JAD. These NOL's will be subject to an annual limitation pursuant to IRC Section 382. Collectively, the losses expire between 2019 and 2031. Deferred tax assets also include alternative minimum tax ("AMT") credits of $18,541 as of December 31, 2011 and 2010. The AMT credits have no expiration date.

The provisions of ASC Topic 740, *Income Taxes*, relating to unrecognized tax benefits, which did not have an impact on the financial statements, were issued to create a single model to address accounting for uncertainty in income tax positions, clarify the accounting for income taxes by prescribing a minimum recognition threshold that a tax position is required to meet before being recognized in the financial statements, and provide guidance on derecognition, measurement, classification, interest and penalties, accounting in interim periods, disclosure and transition. The Company did not have a liability for unrecognized benefits recorded at the date of adoption or through December 31, 2011. The Company does not anticipate any significant change during the next twelve months. The Company reports any tax-related interest and penalties as a component of income tax expense.

The Company files income tax returns in the United States federal and various state jurisdictions, including Kentucky and Virginia. The Company remains open to federal and state examination from the Company's formation through 2011. As a result of the business acquisitions, the Company also remains open to federal and state examination generally for tax years 2007 through returns filed prior to the business acquisitions. The Company is not currently under examination by the Internal Revenue Service, state or local tax authorities.

### 17. Long-term Coal Supply Agreements

In order to hedge against the risk of falling coal prices, the Company periodically enters into long-term sales contracts. As of December 31, 2011, the Company has various existing sales contracts which provide for the Company to deliver a specified amount of coal through 2013. Company management has evaluated and concluded that the Company has the capacity to fulfill these obligations without purchasing coal from a third-party and does not anticipate sustaining any losses from the inability to fulfill these sales commitments.

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

### 17. Long-term Coal Supply Agreements (continued)

The Company had a previous agreement that committed the Company to ship coal during 2009. During November 2008, the Company decided to opt out of these minimum shipments and as a result, the Company and this customer negotiated a settlement which included a provision to sell the customer additional tons of coal in 2009 at a price that was lower than market. The Company recorded a corresponding liability of $4,774,000 for below market priced coal supply agreements that was amortized into coal sales based on tons sold under this contract during 2009.

The Company had a separate agreement that committed the Company to ship certain tonnage of coal through 2009. In December 2008, the contract miner, which the Company utilized to mine coal sold under this contract, declared bankruptcy. As a result, the Company incurred additional costs using a replacement contract miner that resulted in a loss under this contract of approximately $1,817,000. The Company recognized this loss during 2008 and recorded a corresponding liability for below market priced coal supply agreements that was amortized into coal sales based on tons sold under this contract during 2009.

The application of purchase accounting related to the acquisition of JAD resulted in the recognition of a liability in the amount of $22,872,262 for below market priced coal supply agreements in relation to the market prices at the date of acquisition. The amortization of the liability for these agreements was $580,135 in 2011, $5,916,040 in 2010 and $9,987,050 in 2009. As shipments on these agreements were completed, the liability balance, which totaled $580,135 as of December 31, 2010, diminished through 2011 when these coal supply agreements were completed.

### 18. Coal Services Agreement

The Company previously entered into a coal services agreement with a third-party (the "Agent") whereby the Agent served as a marketing agent for the Company. Terms of the agreement included minimum annual tons of coal for which the Company was to utilize the services of the Agent through 2011. During 2009, this agreement was assumed by ECM and terminated, resulting in a gain of $1,785,875.

### 19. Financial Instruments

The estimated fair value of financial instruments has been determined by the Company using available market information. The carrying value of the Company's financial instruments listed as either current assets or current liabilities in the accompanying consolidated balance sheets approximates their fair value due to the short-term nature of these items. The estimated fair value of the Company's long-term notes payable also approximates their carrying values because the effective interest rates are not significantly different from market rates.

30

# U.S. Coal Corporation

## Notes to Consolidated Financial Statements (continued)

### 20. Other Related Party Transactions

#### *Placement Agent*

A former director of the Company is associated with the placement agent for certain of the Company's prior debt and equity offerings. During 2009, the Company made payments to this placement agent totaling $774,005. In addition, the director participated in the Company's health care, dental care, short term disability, and life insurance plans. Also, during 2009, the Company issued to this placement agent 56,250 common stock warrants valued at $130,209.

#### *Significant Investor*

A certain group of investors ("Significant Investor") holds a significant interest (approximately 15% on a fully diluted basis) in the Company. As of December 31, 2011 and 2010, the Company had various outstanding notes payable (principal and additional interest) to the Significant Investor totaling $3,980,181 and $9,568,873, respectively. The Company incurred interest expense and amortization of discount on these notes payable of approximately $2,210,000 in 2011, $1,491,000 in 2010 and $2,152,000 in 2009, of which approximately $47,000 and $30,000 was accrued at December 31, 2011 and 2010, respectively.

During 2009, the Company issued to the Significant Investor 250,000 shares of common stock valued at $787,500, which was capitalized as deferred financing costs.

#### *Directors*

Notes payable to investors includes notes payable to certain directors with principal amounts outstanding in the aggregate of $2,549,418 and $2,867,830 as of December 31, 2011 and 2010, respectively. The Company incurred interest expense and amortization of discount on these notes payable of $915,257, $923,726 and $1,853,477 in 2011, 2010 and 2009, respectively.

The Company paid $916,839 in 2011 to a certain entity, which is owned by a relative of a director, for reclamation related services.

#### *East Coast Miner LLC (ECM)*

A subset of existing shareholders, other investors and executives formed ECM to acquire the JMB note payable and the coal services agreement (*see Notes 5 and 19*). Subsequent to that acquisition, two investors in ECM became directors of the Company. The Company also made payments for professional fees in the amount of $40,847, $252,660 and $197,846 on behalf of ECM in 2011, 2010 and 2009, respectively.

31

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

**20. Other Related Party Transactions (continued)**

*East Coast Miner II LLC (ECM II)*

A subset of existing shareholders, certain directors and additional investors formed ECM II to advance the Company $6,729,423 under a note payable, proceeds of which the Company used to repay in full the remaining outstanding balances of certain notes payable to investors. The Company made payments for professional fees in the amount of $252,901 on behalf of ECM II in 2011.

*Tender Offer*

Pursuant to an Offer to Purchase, dated November 29, 2010, and the related Letter of Transmittal (collectively, the "Tender Offer"), USC Consolidated Purchase Group, LLC, and Delaware limited liability company (the "Offeror"), on behalf of nine individuals (the "Offering Group"), offered to purchase up to an aggregate of $4,000,000 of the outstanding capital stock of the Company at a price of (i) $0.50 per share of Common Stock, (ii) $0.75 per share of Series A Preferred Stock, and (iii) $0.60 per share of Series B Preferred Stock, subject to the terms and conditions set forth in the Tender Offer. The Offering Group included two directors, one of which is a beneficial owner of 10% or more of the Company's outstanding capital stock, and one officer of the Company. On December 10, 2010, the Company sent a recommendation statement to its shareholders and the Offeror which, among other things, expressed no opinion with respect to the Tender Offer. The Company was advised that the Offeror acquired (i) 612,975 shares of common stock, (ii) no shares of Series A Preferred Stock and (iii) 570,000 shares of Series B Preferred Stock on the terms set forth in the Tender Offer.

**21. Retirement Plan**

The Company has established a 401(k) and profit sharing plan covering substantially all employees. The Company recorded total contribution expense, including plan administrative expenses, of $422,609 in 2011, $313,381 in 2010 and $191,509 in 2009.

**22. Financial Institution Credit Risks**

Periodically, the Company has cash on deposit with financial institutions, which exceeds Federal Deposit Insurance Corporation ("FDIC") limits. Balances in excess of the insurance limits are subject to the risk that the financial institution will not pay upon demand. At December 31, 2011, the Company's total balance on hand with financial institutions exceeded the FDIC coverage by approximately $4,000,000.

32

U.S. Coal Corporation

Notes to Consolidated Financial Statements (continued)

### 23. Indemnification

The Company is a party to a variety of agreements pursuant to which it may be obligated to indemnify the other party with respect to certain matters. Typically, these obligations arise in the context of contracts entered into by the Company, under which the Company customarily agrees to hold the other party harmless against losses arising from a breach of representations and covenants related to such matters as title to assets sold, certain IP rights, specified environmental matters, third-party performance of nonfinancial contractual obligations and certain income taxes. In each of these circumstances, payment by the Company is conditioned on the other party making a claim pursuant to the procedures specified in the particular contract, which procedures typically allow the Company to challenge the other party's claims. While typically indemnification provisions do not include a contractual maximum on the Company's payment, the Company's obligations under these agreements may be limited in terms of time and/or nature of claim, and in some instances the Company may have recourse against third parties for certain payments made by the Company. It is not possible to predict the maximum potential amount of future payments under these or similar agreements due to the conditional nature of the Company's obligations and the unique facts and circumstances involved in each particular agreement. Historically, payments made by the Company under these agreements have not had a material effect on the Company's business, financial condition or results of operations.

### 24. Contingencies

The Company is involved in various claims and other legal actions arising in the ordinary course of business.  In the opinion of management, the ultimate disposition of these matters will not have a material adverse effect on the Company's consolidated financial position, consolidated results of operations or consolidated cash flows.

### 25. Subsequent Events

In preparation of the accompanying consolidated financial statements, management has evaluated events that have occurred subsequent to the balance sheet date through February 16, 2012, the date the consolidated financial statements were available for issuance.