# EXHIBIT C
# PART V

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

CAMOFI MASTER LDC AND
CAMHZN MASTER, LDC,

Plaintiffs,

- against -

U.S. COAL CORP., EAST COAST MINER, LLC, AND JAD
COAL COMPANY, INC.,

Defendants.

U.S. COAL CORPORATION, AND JAD COAL COMPANY,

Counterclaim Plaintiffs,

- against -

CAMOFI MASTER LDC AND CAMZHN MASTER LDC,

Counterclaim Defendants.

CENTRECOURT ASSET MANAGEMENT, LLC,

Additional Defendant on the Counterclaims.

Index No. 650411/12

**ANSWER TO
AMENDED
COMPLAINT AND
COUNTERCLAIMS**

Defendants-Counterclaim Plaintiffs U.S. Coal Corporation ("U.S. Coal") and JAD Coal

Company, Inc.("JAD"), by their attorneys Nixon Peabody LLP, as an for their Answer to the

Amended Complaint, Counterclaims against Plaintiffs-Counterclaim Defendants CAMOFI

MASTER LDC and CAMZEN MASTER LDC )("CAM") and claims against Additional

Defendant on the Counterclaims Centrecourt Asset Management, LLC ("Centrecourt") allege as

follows:

### ANSWER

1.     Deny the allegations of Paragraph 1, except admit that JAD is a wholly-owned

subsidiary of U.S. Coal and deny knowledge or information sufficient to form a belief as to

CAM's reasons for bringing this action.

14177395.4

2.      Deny the allegations of Paragraph 2.

3.      Deny the allegations of Paragraph 3.

4.      Deny the allegations of Paragraph 4.

5.      Deny the allegations of Paragraph 5.

6.      Deny the allegations of Paragraph 6.

7.      Deny the allegations of Paragraph 7, except admit on information and belief the existence of an entity called East Coast Miner, LLC.

8.      Deny the allegations of Paragraph 8.

9.      Deny the allegations of Paragraph 9.

10.     Deny knowledge or information sufficient to form a belief as to the allegations of Paragraph 10.

11.     Deny knowledge or information sufficient to form a belief as to the allegations of Paragraph 11.

12.     Admit the allegations of Paragraph 12.

13.     Admit the allegations of Paragraph 13.

14.     Deny the allegations of Paragraph 14, except admit on information and belief that ECM is a Delaware limited liability company.

15.     Deny the allegations of Paragraph 15, except admit the existence of documents containing choice of forum and/or choice of law clauses.

16.     Deny knowledge or information sufficient to form a belief as to the allegations of Paragraph 16, except admit that U.S. Coal is a holding company and that its subsidiaries are engaged in the business of mining coal in Kentucky and Virginia.

14177395.4

17.    Deny knowledge or information sufficient to form a belief as to the allegations of Paragraph 17.

18.    Deny the allegations of Paragraph 18, except admit that CAM acquired an equity interest in U.S. Coal.

19.    Aver that no response is required to the extent that the allegations of Paragraph 19 call for a legal conclusion, and otherwise deny the allegations of Paragraph 19.

20.    Aver that no response is required to the extent that the allegations of Paragraph 20 call for a legal conclusion, admit the existence of Exhibit 1 to the Amended Complaint, and otherwise deny the allegations of Paragraph 20.

21.    Aver that no response is required to the extent that the allegations of Paragraph 21 call for a legal conclusion, admit the existence of Exhibit 2 to the Amended Complaint, and otherwise deny the allegations of Paragraph 21.

22.    Aver that no response is required to the extent that the allegations of Paragraph 22 call for a legal conclusion, admit the existence of Exhibit 3 to the Amended Complaint, and otherwise deny the allegations of Paragraph 22.

23.    Aver that no response is required to the extent that the allegations of Paragraph 23 call for a legal conclusion, admit the existence of Exhibit 3 to the Amended Complaint, and otherwise deny the allegations of Paragraph 23.

24.    Aver that no response is required to the extent that the allegations of Paragraph 24 call for a legal conclusion, admit the existence of Exhibit 4 to the Amended Complaint, and otherwise deny the allegations of Paragraph 24.

14177395.4

25.    Aver that no response is required to the extent that the allegations of Paragraph 25 call for a legal conclusion, admit the existence of Exhibit 4 to the Amended Complaint, and otherwise deny the allegations of Paragraph 25.

26.    Aver that no response is required to the extent that the allegations of Paragraph 26 call for a legal conclusion, admit the existence of Exhibit 4 to the Amended Complaint, and otherwise deny the allegations of Paragraph 26.

27.    Deny the allegations of Paragraph 27, except admit on information and belief the existence of ECM.

28.    Deny the allegations of Paragraph 28, except deny knowledge or information sufficient to form a belief as to CAM's purported concerns.

29.    Deny the allegations of Paragraph 29, except admit on information and belief that ECM holds security interests on certain assets of JAD.

30.    Deny the allegations of Paragraph 30.

31.    Deny the allegations of Paragraph 31.

32.    Deny the allegations of Paragraph 32, except admit the existence of Exhibit 5 to the Amended Complaint.

33.    Deny the allegations of Paragraph 33.

34.    Aver that no response is required to the extent that the allegations of Paragraph 34 call for a legal conclusion, admit the existence of Exhibit 3 to the Amended Complaint, and otherwise deny the allegations of Paragraph 34.

35.    Deny the allegations of Paragraph 35.

36.    Deny the allegations of Paragraph 36.

14177395.4

37.     Deny the allegations of Paragraph 37, except admit the existence of Exhibit 6 to the Amended Complaint.

38.     Deny the allegations of Paragraph 38, except admit the existence of Exhibit 7 to the Amended Complaint.

39.     Deny the allegations of Paragraph 39.

40.     Deny the allegations of Paragraph 40.

41.     Deny the allegations of Paragraph 41.

42.     Deny the allegations of Paragraph 42, except admit the existence of Exhibit 1 to the Amended Complaint.

43.     Deny the allegations of Paragraph 43, except admit the existence of Exhibit 1 to the Amended Complaint.

44.     Deny the allegations of Paragraph 44, except admit the existence of Exhibit 8 to the Amended Complaint.

45.     Deny the allegations of Paragraph 45, except admit the existence of Exhibit 8 to the Amended Complaint.

46.     Deny the allegations of Paragraph 46, except admit the existence of Exhibit 8 to the Amended Complaint.

47.     Deny the allegations of Paragraph 47, except admit the existence of Exhibit 8 to the Amended Complaint.

48.     Deny the allegations of Paragraph 48, except admit the existence of Exhibit 8 to the Amended Complaint.

49.     Deny the allegations of Paragraph 49.

50.     Deny the allegations of Paragraph 50.

51.    Deny the allegations of Paragraph 51.

52.    Answering Paragraph 52, repeat and reallege their responses to Paragraphs 1-51
above.

53.    Admit the allegations of Paragraph 53.

54.    Admit the allegations of Paragraph 54.

55.    Deny the allegations of Paragraph 55.

56.    Deny the allegations of Paragraph 56.

57.    Deny the allegations of Paragraph 57.

58.    Deny the allegations of Paragraph 58.

59.    Deny the allegations of Paragraph 59, except deny knowledge or information
sufficient to form a belief as to why CAM instituted this action.

60.    Deny the allegations of Paragraph 60.

61.    Answering Paragraph 61, repeat and reallege their responses to Paragraphs 1-60
above.

62.    Deny the allegations of Paragraph 62.

63.    Deny the allegations of Paragraph 63, except deny knowledge or information
sufficient to form a belief as to why CAM instituted this action.

64.    Deny the allegations of Paragraph 64.

65.    Answering Paragraph 65, repeat and reallege their responses to Paragraphs 1-64
above.

66.    Deny the allegations of Paragraph 66.

67.    Deny the allegations of Paragraph 67.

68.    Deny the allegations of Paragraph 68.

14177395.4

69.     Deny the allegations of Paragraph 69.

70.     Answering Paragraph 70, repeat and reallege their responses to Paragraphs 1-69
above.

71.     Aver that no response is required as the allegations of Paragraph 71 call for a
legal conclusion.

72.     Deny knowledge or information sufficient to form a belief as to the allegations of
Paragraph 72.

73.     Deny the allegations of Paragraph 73.

74.     Deny the allegations of Paragraph 74.

75.     Deny the allegations of Paragraph 75.

76.     Answering Paragraph 76, repeat and reallege their responses to Paragraphs 1-75
above.

77.     Aver that no response is required as the allegations of Paragraph 77 call for a
legal conclusion.

78.     Deny knowledge or information sufficient to form a belief as to the allegations of
Paragraph 78.

79.     Deny the allegations of Paragraph 79.

80.     Deny the allegations of Paragraph 80.

81.     Answering Paragraph 81, repeat and reallege their responses to Paragraphs 1-80
above.

82.     Aver that no response is required as the allegations of Paragraph 82 call for a
legal conclusion.

7

83.    Deny knowledge or information sufficient to form a belief as to the allegations of Paragraph 83.

84.    Deny the allegations of Paragraph 84.

85.    Deny the allegations of Paragraph 85.

## FIRST AFFIRMATIVE DEFENSE

86.    CAM's claims are barred in whole or in part by its prior material breach of contracts with, and relating to, U.S. Coal and JAD and/or the prior material breach of and misconduct of those acting on its behalf or in its interest.

## SECOND AFFIRMATIVE DEFENSE

87.    CAM's claims are barred in whole or in part by the Remedy Standstill provisions of two Intercreditor Agreements, as more fully set forth below in the Counterclaims.

## THIRD AFFIRMATIVE DEFENSE

88.    CAM's claims are barred in whole or in part by the doctrines of collateral estoppel and res judicata.

## FOURTH AFFIRMATIVE DEFENSE

89.    CAM's claims are barred in whole or in part by waiver, estoppel, laches and by virtue of its unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

90.    CAM's claims are barred in whole or in part by setoff and recoupment.

## SIXTH AFFIRMATIVE DEFENSE

91.    CAM's claims are barred in whole or in part by payment.

## SEVENTH AFFIRMATIVE DEFENSE

92.    CAM's claims are barred in whole or in part by failure of consideration.

14177395.4

## EIGHTH AFFIRMATIVE DEFENSE

93.    The Complaint fails to state a cause of action.

## RESERVATION OF RIGHTS

94.    U.S. Coal and JAD expressly reserve the right to assert other or different

affirmative defenses, as no discovery has yet been had and as relevant information is or may be

solely in the possession of CAM or its agents and/or other third parties and not available to U.S.

Coal and JAD at the time of filing of this Answer.

## COUNTERCLAIMS

95.    U.S. Coal and JAD bring these counterclaims against CAM and Centrecourt Asset

Management, LLC ("Centrecourt") for damages, declaratory relief, disgorgement of benefits

wrongfully received and other equitable relief including an accounting.  Centrecourt, the

purported asset manager, and by extension CAM, the funds it manages and controls, have from

the outset of their dealings with U.S. Coal and JAD been utterly conflicted, and as a result have

engaged in self-dealing, breaches of contractual and other duties, and bad faith conduct.

96.    Centrecourt, while contractually obligated to act in the interests of U.S. Coal as its

strategic advisor, was all the while also acting on behalf of itself, other funds it represents, and

the CAM funds it controls and manages, in their many capacities of equity holders, potential

equity holders, creditors, and parties to purported arms' length transactions with U.S. Coal and

its subsidiaries.  All of the dealings between CAM and Centrecourt, on the one hand, and U.S.

Coal and its subsidiary JAD, on the other hand, are tainted by these conflicts of interest and

manifest self-dealing and void on that basis.

97.    CAM and Centrecourt have breached their contractual and other duties to U.S.

Coal and JAD, unjustly and wrongfully received cash, equity, debt instruments and other

consideration from U.S. Coal and JAD, have engaged in self-dealing, and have acted in bad faith.

9

Further, CAM's material breaches of agreements with and related to U.S. Coal and JAD have been tortiously induced and directed by Centrecourt.

98.    U.S. Coal is a Delaware corporation with its principal place of business in Kentucky.

99.    JAD is a Virginia corporation and a wholly-owned subsidiary of U.S. Coal.

100.    Upon information and belief, CAMOFI Master LDC and CAMHZM Master LDC (collectively "CAM") are Cayman Island investment entities established, managed and controlled by Centrecourt.

101.    Upon information and belief, Centrecourt is a Delaware limited liability company with a principal place of business in New York, New York which purports to act on behalf of and with authority from CAM, and which directs and controls CAM's actions.

102.    This Court has jurisdiction over CAM and Centrecourt under CPLR 301 and 302 because they are doing business in New York, or have transacted business in New York out of which these counterclaims arise. Further, CAM has commenced this action in Supreme Court, New York County and is therefore subject to counterclaims here, and has consented to jurisdiction in New York in agreements out of which certain of these counterclaims arise.

103.    Venue is proper under CPLR 501 because CAM has consented to venue in Supreme Court, New York County and because Centrecourt has its principal place of business within New York County.

## FACTS COMMON TO ALL COUNTERCLAIMS

104.    U.S. Coal is a holding company which was established as the vehicle to acquire and hold the stock of small, family-owned coal companies in Kentucky and Virginia. The initial promoters and incorporators of U.S. Coal included principals of or individuals associated with

entities known as TerraNova Capital Partners and/or European American Equities, Inc. who, upon information and belief, had worked closely with principals of Centrecourt in the past.

105.    On information and belief, Centrecourt, on behalf of CAM and other funds, had been involved with companies engaged in the coal business in Kentucky and Virginia before its involvement with U.S. Coal and JAD, and in particular had been involved with a corporation known as Consolidated Energy, Inc.

106.    In or around early 2007, the promoters of U.S. Coal caused it to enter into its first acquisition, the acquisition of Licking River Resources, LLC., a family-owned Kentucky company which owned and operated coal mines and mining facilities in Eastern Kentucky and had for generations. In connection with this acquisition, CAM, through Centrecourt, acquired an equity interest in U.S. Coal.

107.    On or about June 4, 2007, Centrecourt, on behalf of CAM, induced U.S. Coal to execute a letter purporting to grant CAM the right to consent to certain transactions before they were consummated by U.S. Coal. A copy of the June 4, 2007 letter is annexed hereto as Exhibit A. As its terms reflect, the letter was intended solely to protect the equity interest CAM, through Centrecourt, then had in U.S. Coal and that interest alone. It provided only for consent and not for the payment of any fee or the grant of any further rights to CAM or to Centrecourt as a condition of any consent, and such was its fundamental purpose and the expressed intention of the parties. It was further expressly and impliedly understood and agreed that CAM, through Centrecourt, would exercise consent rights in good faith, to protect its equity position, and not for the purpose of obtaining any further payments or consideration of any sort for CAM or, for that matter, for Centrecourt or any other entity for whom it might act, or for any other reason.

108.   From then on, CAM, through Centrecourt, and Centrecourt itself, were both intimately involved with U.S. Coal's operations, financing, and acquisitions or targeted acquisitions.

109.   From on or about June 4, 2007, and continuing thereafter to the present, Centrecourt and CAM, wrongfully, in bad faith and in furtherance of no legitimate economic interest, threatened to withhold consent to a variety of transactions they knew were in the best interests of U.S. Coal.  CAM and Centrecourt did this to force U.S. Coal or others to pay fees or grant further equity interests or other rights to CAM and/or Centrecourt without consideration, to obtain exorbitant returns on suspect "debt," and to cause U.S. Coal or JAD to enter into transactions which were not arms' length and were tainted by conflicts of interest, without full disclosure, all of which has resulted in the unjust enrichment of Centrecourt and/or CAM.

110.   On or about June 19, 2007, U.S. Coal entered into an agreement to purchase JAD, a family-owned and operated mining company in Virginia (the "JAD Acquisition"), and the material terms of that transaction were agreed upon and memorialized in a purchase agreement. The JAD Acquisition closed as of April 15, 2008.

111.   Even though the terms of the JAD Acquisition had long been established and the transaction was to close as of a date one month later, on or about March 1, 2008, Centrecourt induced U.S. Coal to agree that Centrecourt would provide U.S. Coal with "strategic advisory services, including without limitation, advisory services in connection with the proposed acquisitions" of JAD and another target, Rifle Coal Company.

112.   In consideration of the faithful performance of these strategic advisory services, Centrecourt was to receive, and in fact received, an immediate cash payment of $175,000 and

12

650,000 shares of U.S. Coal common stock. A copy of the March 1, 2008 letter is annexed as Exhibit B.

113.    Pursuant to the March 1, 2008 letter, Centrecourt undertook a duty to act in the best interest of U.S. Coal, not to engage in self-dealing, and to provide "strategic advisory services" in good faith, free of conflicts of interest and with full disclosure. Centrecourt assumed a duty of higher trust and confidence as to U.S. Coal, and later as to JAD, and U.S. Coal and JAD were entitled to rely, and did in fact rely, on Centrecourt well and truly providing "strategic advisor services".

114.    On about April 15, 2008, in derogation of its duties, obligations and undertakings to U.S. Coal and in breach of the trust and confidence which U.S. Coal had placed in it by virtue of the March 1, 2008 letter, Centrecourt advised U.S. Coal and JAD, without full disclosure of pertinent facts including its flagrant conflicts of interest, to enter into a series of transactions with CAM which were not fair and reasonable or in the best interests of U.S. Coal or JAD, which actually benefitted Centrecourt individually, as more fully set forth below.

115.    As of a date on or about April 15, 2008, on the strategic advice of Centrecourt pursuant to the March 1, 2008 letter, U.S. Coal and JAD entered into an Equipment Transfer Agreement (a copy of which is annexed as Exhibit C) and an Equipment Note (annexed to the Amended Complaint as Exhibit 4), pursuant to which JAD would agree to purchase certain mining equipment ("Equipment") allegedly owned by CAM for $4.8 million.

116.    On information and belief, Centrecourt affirmatively represented to U.S. Coal that the Equipment was essential to the success of the JAD Acquisition and other potential acquisitions, and to the fulfillment of U.S. Coal's other corporate objectives including its hope to complete an initial public offering or other transaction, and that it was fair and reasonable and

13

indeed essential that U.S. Coal and JAD agree to the provisions of the Equipment Transfer Agreement so that the Equipment could be obtained without delay.

117.    Centrecourt failed to disclose and on information and belief affirmatively withheld from U.S. Coal and JAD, in breach of its duties to U.S. Coal and its obligations under the March 1, 2008 letter, information within its knowledge concerning the Equipment, including without limitation: (1) the fact that Centrecourt had affirmatively stated in filed court documents its belief that the Equipment, in total, was worth no more than $2 million; (2) the fact that CAM, and other entities for whom Centrecourt was at the same time acting and who were paying fees to Centrecourt, by virtue of their claims as secured creditors as to the Equipment in a bankruptcy proceeding in the Eastern District of Kentucky, styled *In re Consolidated Energy, Inc.*, Case No., 07-70314 would obtain a tremendous windfall payment if JAD agreed to the terms of the Equipment Purchase Agreement and the Equipment Note; (3) the fact that, in that bankruptcy proceeding, evidence had been submitted on behalf of Centrecourt, and Centrecourt had affirmatively represented in written filings, that some of all of the Equipment it was to sell under the Equipment Transfer Agreement did not exist, could not be located, and was unworkable and unusable and could not be salvaged; (3) the fact that CAM, and other entities for whom Centrecourt was at the same time acting and who were paying fees to Centrecourt, would actually be paid twice for certain of the Equipment, including without limitation a "Fan" which was a listed piece of Equipment under the Equipment Transfer Agreement, but which in fact was sold through the bankruptcy proceeding for $100,000, paid to Centrecourt; and (4) the fact that the cost of recovering and refurbishing the Equipment that did exist or could be located and salvaged would exceed $2.2 million all of which would have to be borne by U.S. Coal and JAD.

14

118.    As of the filing of these Counterclaims, U.S. Coal and JAD have paid CAM
monies in excess of the value of the Equipment, and in excess of $2 million to salvage it,
unjustly enriching CAM and Centrecourt.

119.    On or about April 15, 2008, on the strategic advice of Centrecourt pursuant to the
March 1, 2008 letter, U.S. Coal and JAD entered into a Securities Purchase Agreement (annexed
to the Complaint as Exhibit 2) and a Rights Agreement (annexed to the Complaint as Exhibit 3),
under which CAM was to receive equity interests in U.S. Coal in exchange for notes bearing
interest rates, and including default rates, far exceeding rates that were otherwise available in the
market. A strategic advisor in the good faith performance of advisory services would never have
recommended this transaction to U.S. Coal and JAD, yet Centrecourt did.

120.    The Rights Agreement purported to grant to CAM the right to "put" shares
acquired under the Securities Purchase Agreement back to U.S. Coal at $5.40/share, a price far in
excess of their actual value. A strategic advisor in the good faith performance of advisory
services would never have recommended this transaction to U.S. Coal and JAD, yet Centrecourt
did.

121.    The "put" right purportedly bestowed under the Rights Agreement was to be
exercisable under certain circumstances, including the failure of U.S. Coal to complete an initial
public offering or consummate a reverse merger or other corporate transaction by a certain date.

122.    Centrecourt, under the March 1, 2008 letter, had undertaken to provide U.S. Coal
with strategic advisory services including advice on initial public offerings, reverse mergers or
other transactions which would have satisfied the conditions of the "put" right. Centrecourt
could not well and truly perform its strategic advisor services for U.S. Coal and JAD insofar as
such services involved a potential initial public offering, reverse merger, or other transaction,

14177395.4

because to do so would have defeated the "put" right it had encouraged U.S. Coal and JAD to provide to CAM, the funds Centrecourt manages and controls.

123.     On or about March 28, 2008, in breach of the provisions of the June 4, 2007 letter, and in derogation of Centrecourt's obligations to U.S. Coal and JAD on or by reason of the March 1, 2008 letter, Centrecourt purporting to act on behalf of CAM forced and induced U.S. Coal to sign a letter agreement ( the "Additional Stock Letter" ) granting  CAM an additional 600,000 shares of U.S Coal common stock in exchange for CAM's consent to two transactions: (1) the hiring of a chief financial officer; and (2) an offering of Series B preferred stock.  A copy of this letter agreement is annexed as Exhibit D.

124.     There was no consideration for these payments.  CAM has no right to payment for consent under the June 4, 2007 letter, and Centrecourt had already been paid for agreeing to provide U.S. Coal with strategic advice on transactions like this.  Once again, Centrecourt, and CAM by extension, were hopelessly conflicted and engaged in manifest self-dealing.

125.     Also in connection with the JAD Acquisition, CAM through Centrecourt, and Centrecourt itself were both intimately involved in the drafting and review of two Intercreditor and Subordination Agreements executed as conditions precedent to the Closing of the sale. Copies of these two Intercreditor and Subordination Agreements (the "Intercreditor Agreements") are annexed hereto as Exhibits E and F.

126.     The fundamental purposes of the Intercreditor Agreements was to order the priority of creditors of U.S. Coal and JAD, once it became a subsidiary of U.S. Coal, identifying the sellers of JAD as the Senior Creditors and expressly providing that the Senior Creditors must be paid in full before any other creditor could attempt to recover on any obligations owed by U.S. Coal and/or its subsidiaries.  Without the promises and undertakings contained in the two

Intercreditor Agreements, the JAD Sellers would not have consummated the sale of JAD to U.S. Coal, and on information and belief CAM, through Centrecourt, knew this.

127.    The two Intercreditor Agreements contain what are known as Remedy Standstill provisions. The Remedy Standstill provisions were intended to prevent CAM from attempting to deprive the Senior Creditors of their priority, and instead to insure that the Senior Creditors were paid in full in cash before any more junior creditor declared a default or proceeded to enforce any obligation. The Remedy Standstill provisions were therefore further intended to prevent claimed defaults, and litigation over defaults, from interfering with the financing or acquisition activities of U.S. Coal and JAD, as well as with their contracts with trade suppliers or others essential to the business of mining and selling coal.

128.    The Rights Agreement is subject to the Remedy Standstill.

129.    The Equipment Transfer Agreement and all documents to which it refers, including the Equipment Note, is subject to the Remedy Standstill.

130.    The Senior Creditors have not been paid in full in cash, and accordingly the commencement of this litigation is a breach of the Intercreditor Agreements.

131.    CAM and Centrecourt have never accounted to U.S. Coal or JAD for cash and equity interests they have wrongfully received, including the dramatic overpayments for the Equipment and the stock wrongfully granted.

132.    In an effort to allow U.S. Coal to move forward and to avoid the cost in time and effort and the distractions from running coal businesses in these difficult times, in the Fall of 2011 U.S. Coal determined to attempt to pay CAM and Centrecourt, and entered into agreements effective December 2011 pursuant to which additional debt investments were made in U.S. Coal, the due dates of the debts to ECM, the prior owners of JAD, the prior owners of Licking River

14177395.4

Resources, Keith Goggin and Michael Goodwin were extended, and sufficient funds were raised to pay the face value of CAM-related debt then due in full.

133.    Centrecourt and CAM were fully aware of this transaction and provided comments on its terms. Centrecourt and CAM were fully aware that the purpose of this proposed transaction was to provide funds to pay CAM, and nevertheless in an attempt once again to exact further unjustified and exorbitant fees or other benefits to which neither entity was entitled, Centrecourt on behalf of CAM wrongfully and in bad faith refused to consent to this transaction.

134.    With CAM and Centrecourt's fully knowledge and consent the entirety of the proceeds of the December 2011 transaction was transferred to Centrecourt and CAM.

135.    Centrecourt and CAM accepted and have distributed and used for their own purposes the proceeds of the December 2011 transaction, and have not returned this amount or offered to do so, nor have they, despite demand, returned the notes paid with the proceeds of the December 2011 transaction.

136.    The refusal of Centrecourt and CAM to consent to the transaction which was designed to pay debts ostensibly owed to CAM, while simultaneously retaining the benefit of that transaction, is bad faith conduct with no legitimate economic or contractual basis and was instead for the sole purpose of attempting to extort further payments from U.S. Coal on account of purported debts or obligations which themselves were unenforceable as the product of bad faith and breach of duty.

137.    Since receipt of the proceeds of the December 2011 transaction, Centrecourt and CAM have insisted that U.S. Coal and its other investors make further, unjustified payments to Centrecourt and CAM or face litigation crippling its efforts to continue its coal business.

14177395.4

18

## FIRST COUNTERCLAIM
### (Breach of Contract against Centrecourt)

138.    U.S. Coal and JAD repeat the allegations of Paragraphs 95-137 above.

139.    The March 1, 2008 letter is a binding agreement between U.S. Coal and Centrecourt.

140.    U.S. Coal has fully performed under the March 1, 2008 letter.

141.    Centrecourt has materially breached its obligations under the March 1, 2008 letter.

142.    By reason of the foregoing, U.S. Coal and JAD have been damaged, in an amount to be proven with specificity.

## SECOND COUNTERCLAIM
### (Breach of Contract against CAM)

143.    U.S. Coal and JAD repeat the allegations of Paragraphs 95-142 above.

144.    CAM, through Centrecourt, has willfully, unjustifiably, maliciously and in bad faith asserted that it had the right to consent to certain U.S. Coal transactions and has threatened to withhold such consent, unreasonably and for no good reason, solely in an effort to obtain payments and other consideration to which it is not entitled.

145.    CAM, through Centrecourt wrongfully withheld consent to the December 2011 transaction even though it knew that the proceeds of that transaction would be transferred to it, and knew that the terms and conditions of that transaction were beneficial to it, all in an effort to extort payments from U.S. Coal or others.

146.    This conduct was not within the legitimate economic interest of CAM and was intended instead to extort or otherwise injure U.S. Coal, JAD and others.

147.    By reason of the foregoing, U.S. Coal and JAD have been damaged, in an amount to be determined with specificity at time of trial.

### THIRD COUNTERCLAIM
### (Breach of Contract-against CAM)

148.    U.S. Coal and JAD repeat the allegations of Paragraphs 95-147 set forth above.

149.    The Intercreditor Agreements are valid and binding agreements among U.S. Coal, JAD, CAM and others.

150.    CAM has breached the Intercreditor Agreements by demanding payment, commencing this lawsuit and attempting to enforce a remedy in derogation of the letter and fundamental purposes of the Intercreditor Agreements.

151.    By reason of the foregoing, U.S. Coal and JAD have been damaged, in an amount to be proved with specificity at time of trial.

### FOURTH COUNTERCLAIM
### (Declaratory Judgment)

152.    U.S. Coal and JAD repeat the allegations of Paragraphs 95 to 151 above.

153.    The Intercreditor Agreements are valid and binding agreements between U.S. Coal, JAD, CAM and others.

154.    CAM has breached the Intercreditor Agreements by demanding payment, commencing this lawsuit and attempting to enforce a remedy in derogation of the letter and fundamental purposes of the Intercreditor Agreements.

155.    U.S. Coal and JAD are entitled to a declaration that CAM is obliged to comply with the provisions of the Intercreditor Agreements and that the prosecution of its claims in this lawsuit is barred by the Remedy Standstill provisions.

### FIFTH COUNTERCLAIM
### (Tortious Interference with the Intercreditor Agreements against Centrecourt)

156.    U.S. Coal and JAD repeat the allegations of Paragraphs 95-155 above.

157.    The Intercreditor Agreements are valid and binding agreements.

14177395.4

20

158.    Centrecourt was and is aware of the Intercreditor Agreements.

159.    Centrecourt has intentionally caused CAM to breach the Intercreditor Agreements by, *inter alia*, directing CAM to file this action. In doing so, Centrecourt abused its authority and acted outside of any legitimate economic interest.

160.    By reason of the foregoing, U.S. Coal and JAD have been damaged, in an amount to be proven with specificity at time of trial.

## SIXTH COUNTERCLAIM
### (Conversion in respect of the Proceeds of the December 2011 Transaction against CAM and Centrecourt)

161.    U.S. Coal and JAD repeat and reallege the allegations of Paragraphs 95-160 above.

162.    Payments made by U.S. Coal and JAD to Centrecourt on behalf of CAM have been wrongfully distributed by Centrecourt to itself and others.

163.    By reason of the foregoing, Centrecourt and CAM have converted U.S. Coal and JAD funds to their own use without right or justification, and U.S. Coal and JAD are entitled to damages in an amount to be proven with specificity at time of trial.

## SEVENTH COUNTERCLAIM
### (Declaration that the Rights Agreement is Void or Rescinded)

164.    U.S. Coal and JAD repeat and reallege each and every allegation in Paragraphs 95-163 above.

165.    By reason of Centrecourt's breach of its duties and obligations to U.S. Coal under the March 1, 2008 letter, and its self-dealing and manifest conflicts of interest, participated in and sanctioned by CAM, the funds it controls and operates, the Rights Agreement should in equity and good conscience be rescinded and declared void.

14177395.4

## EIGHTH COUNTERCLAIM
### (Declaration that the Equipment Note is Void or Rescinded)

166.    U.S. Coal and JAD repeat and reallege each and every allegation in Paragraphs 95-165.

167.    By reason of Centrecourt's breach of its duties and obligations to U.S. Coal and JAD under the March 1, 2008 letter, and its self-dealing and manifest conflicts of interest, participated in and sanctioned by CAM, the funds it controls and operates, the Equipment Note should in equity and good conscience be rescinded and declared void.

## NINTH COUNTERCLAIM
### (Declaration that any Consent Rights are Void or Rescinded)

168.    U.S. Coal and JAD repeat and reallege each and every allegation of Paragraphs 95-167.

169.    By reason of Centrecourt's breach of its duties and obligations to U.S. Coal and JAD under the March 1, 2008 letter, and its self-dealing and manifest conflicts of interest, participated in and sanctioned by CAM, the funds it controls and operates, any consent rights claimed by CAM and/or Centrecourt are void or should be rescinded.

## TENTH COUNTERCLAIM
### (Unjust Enrichment against Centrecourt and CAM)

170.    U.S. Coal and JAD repeat and reallege each and every allegation in Paragraphs 95-169.

171.    Centrecourt and CAM have received monies, equity, and other benefits from U.S. Coal and JAD to which they were not entitled and as to which they had no right, and have been unjustly enriched at the expense of U.S. Coal and JAD.

172.    In equity and good conscience, Centrecourt and CAM should be directed to disgorge all such benefits unjustly received.

22

## ELEVENTH COUNTERCLAIM
### (Accounting-against CAM and Centrecourt)

173.    U.S. Coal and JAD repeat and reallege each and every allegation of Paragraphs 95-172 above.

174.    CAM and Centrecourt should be required to render an accounting to U.S. Coal and JAD of all benefits wrongfully and unjustly received and obtained by them at the expense of U.S. Coal and JAD.


WHEREFORE, U.S. Coal and JAD demand judgment:

1.    Dismissing the Amended Complaint with prejudice;

2.    Granting U.S. Coal and JAD money damages according to the proof against CAM and Centrecourt;

3.    Declaring that the Intercreditor Agreements are valid and binding;

4.    Declaring that the Rights Agreement is rescinded, void and of no force and effect;

5.    Declaring that the Equipment Note is rescinded, void and of no force and effect;

6.    Declaring that any consent rights claimed by CAM and/or Centrecourt are rescinded, void and of no force and effect;

7.    Directing that CAM and Centrecourt render an account for and thereafter disgorge monies and equity interests converted and unjustly obtained from U.S. Coal and JAD;

14177395.4

8.    Granting such other relief as is just, including costs and attorneys' fees.

Dated: New York, New York
         November 5, 2012

                                   NIXON PEABODY LLP

                                   By: _____
                                        Frank H. Penski
                                        Abigail T. Reardon
                                   *Attorneys for U.S. Coal Corporation and*
                                   *JAD Coal Company*
                                   437 Madison Avenue
                                   New York, New York 10022
                                   (212) 940-3000

14177395.4

FILED: NEW YORK COUNTY CLERK 11/05/2012

NYSCEF DOC. NO. 55

INDEX NO. 650411/2012

RECEIVED NYSCEF: 11/05/2012

# EXHIBIT A

**U.S. Coal Acquisition Corp.**
**17838 U.S. Route 23**
**Catlettsburg, KY 41129**

June 4, 2007

CAMOFI Master LDC
CAMHZN Master LDC
c/o CENTRECOURT ASSET MANAGEMENT
350 MADISON AVENUE, 8TH FLOOR
NEW YORK, NY 10017
Attention:  Keith D. Wellner, General Counsel

Dear Keith:

Pursuant to our recent discussions, U.S. Coal Acquisition Corp., a Delaware corporation (the "Corporation"), hereby covenants to CAMOFI Master LDC and CAMHZN Master LDC (each a "CAM Entity" and, collectively, the "CAM Entities") as follows:

For so long as the CAM Entities collectively own more than five percent (5%) of the outstanding shares of the Corporation's common stock, $.001 par value per share ("Common Stock"), on a fully-diluted basis (assuming conversion of all securities convertible into or exercisable for the purchase of Common Stock), the Corporation will not, without the written prior consent of the CAM Entities, take any of the following actions:

(1)    create, assume or incur indebtedness for borrowed money, other than (a) indebtedness (including interest and fees) pursuant to loan or credit agreements existing on the date hereof (as renewed or extended, provided that such renewals or extensions do not increase the amount of indebtedness); (b) indebtedness incurred from time to time under the Corporation's line of credit with First Tennessee Bank, N.A., as in existence on the date hereof, provided that the proceeds of which are used to fund operations; (c) indebtedness of up to $100 million, on terms and conditions satisfactory to the CAM Entities in their reasonable discretion, provided such indebtedness is incurred in connection with (w) the financing of the acquisition of J.A.D. Coal Company (or its affiliates) (the "JAD Acquisition"), (x) the assumption of indebtedness by the Corporation in the JAD Acquisition; (y) the refinancing of the Corporation's secured debt existing on the date hereof and (z) the financing of one or more additional acquisitions by the Corporation, or (d) other indebtedness incurred in the ordinary course of business not to exceed $1 million at any time outstanding;

(2)    (a) enter into any strategic partnership or joint venture or (b) other than in connection with the JAD Acquisition, consummate any asset or stock acquisition of another person or entity, if, as a result of such acquisition, such asset(s) or stock would represent a material portion of the assets of the Corporation;

(3)     sell, assign or transfer all or substantially all of the assets of the Corporation and its subsidiaries (taken as a whole), consummate any merger or consolidation of the Corporation with or into another entity, or enter into any agreement to do any of the foregoing, other than such of the foregoing as it may relate to a merger or acquisition involving the Corporation and a public "shell" corporation as currently contemplated by the Corporation (a "Shell Merger");

(4)     hire or terminate the employment of any executive officer of the Corporation with a salary in excess of $100,000, other than hiring of executive officers in connection with the JAD Acquisition;

(5)     make any expenditure for the acquisition, construction or improvement of any fixed or capital asset in an amount greater than $5 million, other than capital expenditures incurred in connection with the Corporation's acquisition of one high-wall miner, the construction and/or improvement of a coal preparation plant and capital leases assumed in the JAD Acquisition;

(6)     (a) amend, modify or alter the terms of any option, warrant or other right to purchase or acquire shares of capital stock or other equity interests of the Corporation outstanding on the date hereof or (b) amend the terms of the Corporation's existing equity incentive plan or adopt any new equity incentive plan for the benefit of the Corporation's employees;

(7)     increase or decrease the number of authorized shares of the Common Stock, or Preferred Stock, other than the designation of 16.2 million shares of the Corporation's preferred stock as Series A Convertible Preferred Stock, $.001 par value per share (the "Series A Preferred") in connection with the Corporation's proposed sale of the Series A Preferred;

(8)     create, designate or establish any class or series of capital stock, other than Common Stock or the Series A Preferred;

(9)     pay or declare any dividend or make any distribution on any securities other than on the Series A Preferred;

(10)    declare bankruptcy, dissolve, liquidate or wind up the affairs of the Corporation or any subsidiary;

(11)    issue or sell, in a single transaction or a series of related transactions, any capital stock or other security convertible into or exercisable for capital stock of the Corporation, which, at the time of issuance, represents more than five percent (5%) of the number of the then-outstanding shares of Common Stock on a fully-diluted basis, other than issuance in connection with the JAD Acquisition or the Shell Merger;

(12)    enter into any transaction with an affiliate of the Corporation (other than inter-company transactions) which the dollar value of such transaction exceeds $500,000.

The Corporation's obligations hereunder will terminate upon the consummation by the Corporation of either (i) the Corporation's first underwritten public offering of Common Stock pursuant to a registration statement filed under the Securities Act of 1933, as amended (the "Act"), or (ii) a Shell Merger in which the securities issued in exchange for shares of Common Stock is registered under the Act. Without limiting the foregoing, this letter shall terminate as to either CAM Entity when such CAM Entity does not singly beneficially own any shares of Common Stock. The letter shall be governed by and construed in accordance with the laws of the State of New York.

If the foregoing is in accordance with your understanding, please confirm your acceptance by signing and returning the enclosed copy of this letter, which upon execution will constitute an agreement between us.

Sincerely,

U.S. COAL ACQUISITION CORP.

By:      Robert Gabbard
Title:   Chief Executive Officer

Agreed to and accepted as of the date
first above written:

**CAMOFI MASTER LDC**

By:
Title:

**CAMHZN MASTER LDC**

By:
Title:

The Corporation's obligations hereunder will terminate upon the consummation by the Corporation of either (i) the Corporation's first underwritten public offering of Common Stock pursuant to a registration statement filed under the Securities Act of 1933, as amended (the "Act"), or (ii) a Shell Merger in which the securities issued in exchange for shares of Common Stock is registered under the Act. Without limiting the foregoing, this letter shall terminate as to either CAM Entity when such CAM Entity does not singly beneficially own any shares of Common Stock. The letter shall be governed by and construed in accordance with the laws of the State of New York.

If the foregoing is in accordance with your understanding, please confirm your acceptance by signing and returning the enclosed copy of this letter, which upon execution will constitute an agreement between us.

Sincerely,

U.S. COAL ACQUISITION CORP.

By:    Robert Gabbard
Title:   Chief Executive Officer

Agreed to and accepted as of the date first above written:

CAMOFI MASTER LDC

By:    Jeffrey M. Haas
Title:    Authorized Signatory

CAMHZN MASTER LDC

By:    Jeffrey M. Haas
Title:    Authorized Signatory

FILED: NEW YORK COUNTY CLERK 11/05/2012

NYSCEF DOC. NO. 56

INDEX NO. 650411/2012

RECEIVED NYSCEF: 11/05/2012

# EXHIBIT B

March 1, 2008

U.S. Coal Corporation
448 Lewis Hargett Circle, Suite 240
Lexington, KY 40503
Attention: Robert Gabbard
            Chief Executive Officer

Dear Mr. Gabbard:

This letter agreement (this "Agreement"), when executed by the parties hereto, will memorialize our understanding and constitute an agreement between U.S. Coal Corporation, a Delaware corporation (the "Company"), and Centrecourt Asset Management LLC, a Delaware limited liability company ("Centrecourt"), pursuant to which the Company agrees to retain Centrecourt and Centrecourt agrees to be retained by the Company under the terms and conditions set forth below:

1.    The Company hereby retains Centrecourt to provide it with strategic advisory services, including without limitation, advisory services in connection with the proposed acquisitions (the "Acquisitions") by the Company of (i) J.A.D. Coal Company, Inc. ("JAD"), and (ii) Rifle Coal Company and Associated Contracting LLC ("Rifle"). The term of this Agreement shall be for a period of twelve months commencing on the date hereof and ending on February 28, 2009. As compensation for the services to be provided by Centrecourt to the Company pursuant to this Agreement, the Company shall pay Centrecourt (i) simultaneously with the consummation of the first Acquisition, a cash fee of $175,000, and (ii) on or before March 31, 2008, 650,000 shares of the Company's common stock, par value $0.001 per share.

2.    The Company shall reimburse Centrecourt for any and all reasonable expenses incurred by Centrecourt in the performance of its duties hereunder, and Centrecourt shall account for such expenses to the Company by submission of vouchers reasonably satisfactory to the Company setting forth in reasonable detail the amount and reason for such cost or expense.

3.    All obligations of Centrecourt contained in this Agreement shall be subject to Centrecourt's reasonable availability for such performance, in view of the nature of the requested service and the amount of notice received. Centrecourt shall devote such time and effort to the performance of its duties hereunder as Centrecourt shall determine is reasonably necessary for such performance. Centrecourt may look to such others for such factual information, investment recommendations, economic advice and/or research, upon which to base its advice to the Company hereunder, as it shall deem appropriate. The Company shall furnish to Centrecourt all information relevant to the performance by Centrecourt of its obligations under this Agreement, or particular projects as to which Centrecourt is acting as advisor, which will permit Centrecourt to know all facts material to the advice to be rendered, and all materials or information reasonably requested by Centrecourt. In the event that the Company fails or refuses to furnish any such material or information reasonably requested by Centrecourt, and thus prevents or impedes Centrecourt's performance hereunder, any inability of Centrecourt to perform shall not be a breach of its obligations hereunder.

1 of 5

4.    Nothing contained in this Agreement shall limit or restrict the right of Centrecourt or of any partner, affiliate, employee, agent or representative of Centrecourt, to be a partner, director, officer, employee, agent or representative of, or to engage in, any other business, whether or not of a similar nature to the Company's business, nor to limit or restrict the right of Centrecourt to render services of any kind to any other corporation, firm, individual or association.

5.    The Company agrees that it will not provide any material non-public information to Centrecourt.

6.    Because Centrecourt will be acting on your behalf, it is Centrecourt's practice to receive indemnification.    A copy of Centrecourt's standard indemnification provisions (the "Indemnification Provisions") is attached to this Agreement and is incorporated herein and made a part hereof.

7.    This Agreement may not be transferred, assigned or delegated by any of the parties hereto without the prior written consent of the other party hereto.

8.    The failure or neglect of the parties hereto to insist, in any one or more instances, upon the strict performance of any of the terms or conditions of this Agreement, or their waiver of strict performance of any of the terms or conditions of this Agreement, shall not be construed as a waiver or relinquishment in the future of such term or condition, but the same shall continue in full force and effect.

9.    Any notices hereunder shall be sent to the Company and to Centrecourt at their respective addresses. Any notice shall be given by hand delivery, facsimile transmission or overnight delivery or courier service, against receipt therefor, and shall be deemed to have been given when received.  Either party may designate any other address to which notice shall be given. by giving written notice to the other of such change of address in the manner herein provided.

10.    This Agreement has been made in the State of New York and shall be construed and governed in accordance with the laws thereof without giving effect to principles governing conflicts of law.

11.    This Agreement contains the entire agreement between the parties, may not be altered or modified, except in writing, and signed by the party to be charged thereby, and supersedes any and all previous agreements between the parties relating to the subject matter hereof.

12.    This Agreement shall be binding upon the parties hereto and their respective heirs, administrators, successors and permitted assigns.

If you are in agreement with the foregoing, please execute two copies of this letter in the space provided below and return them to the undersigned.

Yours truly,

**Centrecourt Asset Management LLC**

By: _Richard Smithe_
Name: Richard Smithe
Title: CEO

ACCEPTED AND AGREED TO
AS OF THE DATE FIRST ABOVE
WRITTEN:

**U.S. Coal Corporation**

By: _Robert B. Gabbard_
Name: Robert B. Gabbard
Title: C.E.O.

## INDEMNIFICATION PROVISIONS

U.S. Coal Corporation, a Delaware corporation (the "Company"), agrees to indemnify and hold harmless Centrecourt Asset Management LLC, a Delaware limited liability company ("Centrecourt"), and each of its members, officers, directors and affiliates from and against any and all losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements (and any and all actions, suits, proceedings and investigations in respect thereof and any and all legal and other costs, expenses and disbursements in giving testimony or furnishing documents in response to a subpoena or otherwise are each a "Liability"), including, without limitation, the costs, expenses and disbursements, as and when incurred, of investigating, preparing or defending any such action, suit, proceeding or investigation (whether or not in connection with litigation in which Centrecourt is a party), directly or indirectly, relating to, based upon, arising out of, or in connection with, its acting for the Company under the Agreement, dated as of March 1, 2008, between the Company and Centrecourt to which these indemnification provisions are attached and form a part (the "Agreement"), except to the extent that any such Liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from Centrecourt's gross negligence or willful misconduct. The Company also agrees that Centrecourt shall not have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with the engagement of Centrecourt, except to the extent that any such liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from Centrecourt's gross negligence or willful misconduct.

The indemnification provisions contained herein shall be in addition to any liability which the Company may otherwise have to Centrecourt or the persons identified below in this sentence and shall extend to the following: Centrecourt, its affiliated entities, partners, employees, legal counsel, agents and controlling persons (within the meaning of the federal securities laws), and the officers, directors, employees, legal counsel, agents and controlling persons of any of them. All references to Centrecourt in these indemnification provisions shall be understood to include any and all of the foregoing.

If any action, suit, proceeding or investigation is commenced, as to which Centrecourt proposes to demand indemnification, it shall notify the Company with reasonable promptness (but any failure by Centrecourt to notify the Company shall not relieve the Company from its obligations hereunder); and the Company shall promptly assume the defense of such action, suit, proceeding or investigation, including the employment of counsel (reasonably satisfactory to Centrecourt) and payment of fees and expenses. Notwithstanding the foregoing sentence, Centrecourt shall have the right to retain counsel of its own choice to represent it and such counsel shall, to the extent consistent with its professional responsibilities, cooperate with the Company and any counsel designated by the Company, but the fees and expenses of such counsel employed by Centrecourt shall be at the expense of Centrecourt unless (i) the employment of such counsel shall have been authorized in writing by the Company in connection with the defense of such action, (ii) the Company shall not have promptly employed counsel reasonably satisfactory to Centrecourt, or (iii) Centrecourt shall have reasonably concluded that there may be one or more legal defenses available to it which are different from or additional to those available to the Company, in any of which events such fees and expenses shall be borne by the Company and the Company shall not have the right to direct the defense of such action on behalf of Centrecourt. The Company shall be liable for any settlement of any claim against Centrecourt made with the Company's written consent, which consent shall not be unreasonably withheld. The Company shall not, without the prior written consent of Centrecourt, settle or compromise any claim, or permit a default or consent to the entry of any judgment in respect thereof, unless such settlement,

4 of 5

compromise or consent includes, as unconditional term thereof, the giving by the claimant to Centrecourt of an unconditional release from all liability in respect of such claim.

In order to provide for just and equitable contribution, if a claim for indemnification pursuant to these indemnification provisions is made but it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that such indemnification may not be enforced in such case, even though the express provisions hereof provide for indemnification in such case, then the Company, on the one hand, and Centrecourt, on the other hand, shall contribute to the losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses, and disbursements to which the indemnified persons may be subject in accordance with the relative benefits received by the Company, on the one hand, and Centrecourt, on the other hand, and also the relative fault of the Company, on the one hand, and Centrecourt, on the other hand, in connection with the statements, acts or omissions which resulted in such losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses or disbursements and all relevant equitable considerations shall also be considered. No person found liable for a fraudulent misrepresentation shall be entitled to contribution from any person who is also found liable for such fraudulent misrepresentation. Notwithstanding the foregoing, Centrecourt shall not be obligated to contribute any amount hereunder that exceeds the amount of fees previously received by Centrecourt pursuant to the Agreement.

Neither termination nor completion of the engagement of Centrecourt referred to above shall affect these indemnification provisions which shall then remain operative and in full force and effect.

FILED: NEW YORK COUNTY CLERK 11/05/2012

NYSCEF DOC. NO. 57

INDEX NO. 650411/2012

RECEIVED NYSCEF: 11/05/2012

# EXHIBIT C

# EQUIPMENT TRANSFER AGREEMENT

THIS EQUIPMENT TRANSFER AGREEMENT ("Agreement") is made effective as of the 15th day of April, 2008, by and among (i) CAMOFI MASTER LDC, a Cayman Islands limited duration company ("Transferor"), (ii) J.A.D. COAL COMPANY, INC., a Virginia corporation ("Transferee"), and (iii) U.S. COAL CORPORATION, a Delaware corporation ("US Coal").

RECITALS:

A.     This Agreement is the "Equipment Purchase Agreement" described in Section 2.2 of that certain Securities Purchase Agreement dated April 15, 2008, by and among Transferee, Transferor, US Coal and certain other "Borrowers" and "Purchasers" defined therein ("Securities Purchase Agreement").

B.     Transferor has the only first priority security interest in the mining equipment more particularly described on Exhibit A, attached hereto and incorporated herein by reference ("Equipment"). Consolidated Energy, Inc., Eastern Consolidated energy, Inc., Eastern Consolidated Oil and Gas, Inc., Morgan Mining, Inc., Warfield Processing, Inc., and Eastern Coal Energies, Inc., (collectively, "Debtor") has defaulted in its obligations owed to Transferor. Transferor intends to exercise its post-default remedies by disposing of the Equipment as permitted by §9-610 of the Kentucky Uniform Commercial Code ("Uniform Commercial Code") and causing all of Debtor's rights in the Equipment to be transferred to Transferee pursuant to Uniform Commercial Code §9-615.

C.     Transferee desires to acquire all of Transferor's rights, if any, and all of Debtor's rights in the Equipment on the terms and conditions set forth herein.

D.     The Equipment is currently in possession of various third parties (collectively, "Refurbishment Agent"), which is performing repair and maintenance necessary to make the Equipment ready for Transferee's use.

E.     US Coal owns 100% of the issued and outstanding capital stock of Transferee and will receive substantial economic benefit from Transferee's use of the Equipment.

F.     In consideration of the substantial economic benefit that US Coal will receive from the Equipment, and in order to induce Transferor to sell the Equipment to Transferee, without which inducement Transferor would be unwilling to sell the Equipment to Transferee, US Coal has agreed to execute the "Note" defined herein, which is convertible into shares of the common stock of U.S. Coal, as more particularly described therein.

AGREEMENT:

NOW, THEREFORE, for the consideration described in the Recitals which are a material part of this Agreement, and the mutual promises, releases and covenants

contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1. TRANSFER OF EQUIPMENT.

*1.1 Agreement to Transfer and Acquire.* Transferor agrees to transfer, and Transferee agrees to acquire, the Equipment on the terms and conditions contained herein.

*1.2 Purchase Price.* The total purchase price ("Purchase Price") to be delivered by Transferee to Transferor for the Equipment shall be paid by Transferee on the date hereof by the execution and delivery of a promissory note payable to Transferor in the face principal amount of FOUR MILLION EIGHT HUNDRED THOUSAND AND NO/100 DOLLARS ($4,800,000.00), which is convertible into shares of common stock in US Coal, a form of which is attached hereto as Exhibit B and incorporated herein by reference ("Note"); and

*1.3 Security Interest.* Repayment of the Note and performance of all obligations required by this Agreement shall be secured by, and Transferee hereby grants, a security interest in the Equipment and products and proceeds thereof. This security interest shall be evidenced by the Security Agreement attached hereto as Exhibit C and incorporated herein by reference.

## 2. DELIVERY AND REFURBISHMENT OF EQUIPMENT.

*2.1 Notice.* Transferor has notified all parties entitled to notice pursuant to §9-611, et. seq. of the Uniform Commercial Code regarding the transfer contemplated by this Agreement (the "Notice").

*2.2 Closing.* The closing of the transactions contemplated in this Agreement ("Closing"), shall occur upon: (i) ten (10) days passing from the date of the Notice with no objection or other response calling into question the validity of the transfer; (ii) execution of this Agreement and any other document reasonably required by Transferor; and (iii) delivery of the Purchase Price. Notwithstanding the date of the Closing, this Agreement shall be deemed effective April 15, 2008.

*2.3 Title; Possession.* Title shall pass from Debtor to Transferee at the Closing. Further, Transferee shall be deemed to take possession of the Equipment at Closing, notwithstanding actual possession of the Equipment by Refurbishing Agent.

*2.4 Prior Use of Equipment.* The Equipment has been previously used and is not new.

*2.5 Delivery Documents.*

(a) On the date of Closing, Transferor shall provide and convey to Transferee the following items:

2

*(1)* A Transfer Statement executed in favor of Transferee or its designee, the form of which is attached hereto as <u>Exhibit D</u> and incorporated herein by reference;

*(2)* Assignment of any agreements, such as license or maintenance agreements, that may be required by third parties in connection with the sale of the Equipment; and

*(3)* Such other documents as may be reasonably necessary to effect the Closing.

*(b)* On the date of Closing, Transferee shall provide and convey to Transferor the following items:

*(1)* The original executed Note; and

*(2)* Such other documents as may be reasonably necessary to effect the Closing.

**2.6 Risk of Loss.**  Title to and risk of loss, damage or destruction to the Equipment by fire or other casualty or occurrence shall be assumed by Transferee upon delivery of title to the Equipment by Transferor to Transferee at the Closing.

**2.7 Refurbishment of Equipment.**  Transferee shall bear all of the cost and expense of repairing or refurbishing the Equipment for Transferee's use.

3. REPRESENTATIONS AND WARRANTIES.

**3.1 By Transferor.**  Transferor hereby represents and warrants to Transferee as follows:

*(a)* Transferor is a limited duration company validly existing and in good standing under the laws of the Cayman Islands and has the power and authority to carry on its business and to enter into and perform its obligations under this Agreement and each document delivered hereunder.

*(b)* This Agreement and each document delivered or to be delivered by Transferor hereunder have been duly authorized by all necessary company action on the part of Transferor.

*(c)* The execution, delivery and performance by Transferor of this Agreement and any related documents to which it is a party (i) do not violate any federal, state or local law and (ii) do not and will not violate or result in a material breach of or constitute (with due notice or lapse of time or both) a default under any contract, lease, loan agreement, mortgage, security agreement, trust indenture or other agreement or instrument to which Transferor is a party or by which it is bound or to which any of the Equipment is subject.

3

(d) No representation or warranty of Transferor contained in this Agreement and no statement contained in this Agreement or in any certificate or other instrument furnished or to be furnished to Transferee hereunder contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements contained herein or therein not misleading.

3.2 By Transferee.    Transferee hereby represents and warrants to Transferor as follows:

(a) Transferee is a corporation duly incorporated, validly existing and in good standing under the laws of the Commonwealth of Virginia and has the power and authority to carry on its business and to enter into and perform its obligations under this Agreement and each document delivered hereunder.

(b) This Agreement and each document delivered or to be delivered by Transferee hereunder have been duly authorized by all necessary corporate action on the part of Transferee.

(c) The execution, delivery and performance by Transferee of this Agreement and any related documents to which it is a party (i) do not violate any federal, state or local law and (ii) do not and will not violate or result in a material breach of or constitute (with due notice or lapse of time or both) a default under any contract, lease, loan agreement, mortgage, security agreement, trust indenture or other agreement or instrument to which Transferee is a party or by which it is bound or to which any of the Equipment is subject.

(d) No representation or warranty of Transferee contained in this Agreement and no statement contained in this Agreement or in any certificate or other instrument furnished or to be furnished to Transferor hereunder contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements contained herein or therein not misleading.

3.3 By US Coal.

(a) US Coal is a corporation duly incorporated, validly existing and in good standing under the laws of the state of Delaware and has the power and authority to carry on its business and to enter into and perform its obligations under this Agreement and each document delivered hereunder.

(b) The execution, delivery and performance by US Coal of this Agreement and any related documents to which it is a party (i) do not violate any federal, state or local law and (ii) do not and will not violate or result in a material breach of or constitute (with due notice or lapse of time or both) a default under any contract, lease, loan agreement, mortgage, security agreement, trust indenture or other agreement or instrument to which US Coal is a party or by which it is bound or to which any of the Equipment is subject.

4

**3.4 Disclaimer.** EXCEPT FOR THE EXPRESS WARRANTIES AND REPRESENTATIONS MADE BY TRANSFEROR HEREUNDER, TRANSFEREE ACKNOWLEDGES AND AGREES THAT TRANSFEROR HAS NOT MADE, AND DOES NOT HEREBY MAKE, ANY REPRESENTATION, WARRANTY OR COVENANT, EXPRESS OR IMPLIED, WITH RESPECT TO THE MERCHANTABILITY, CONDITION, QUALITY, DURABILITY, DESIGN, OPERATION, FITNESS FOR USE, OR SUITABILITY OF THE EQUIPMENT, ANY COMPONENT THEREOF, OR ANY OTHER ASSET IN ANY RESPECT WHATSOEVER OR IN CONNECTION WITH OR FOR THE PURPOSES AND USES OF TRANSFEREE, AS TO THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, OR ANY OTHER REPRESENTATION, WARRANTY OR COVENANT OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT THERETO. TRANSFEREE IS PURCHASING THE EQUIPMENT, ALL COMPONENTS THEREOF, AND ALL OTHER ASSETS "AS IS, WHERE IS, AND WITH ALL FAULTS," AND TRANSFEROR SHALL NOT BE LIABLE FOR ANY ACTUAL, INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES OF OR TO ANY PERSON WHATSOEVER.

**4.1 Indemnity; Right Of Setoff.**

**(a)** Transferor shall indemnify and hold harmless Transferee, its successors and their respective equity holders, directors, managers, employees, agents, representatives, and affiliates (collectively, the "Indemnified Persons") from and against the amount of any loss, liability, claim, damage or expense incurred by the Indemnified Persons, whether or not involving a third-party claim, arising, directly from or in connection with (i) any breach by Transferor of any of the recitals, representations, warranties, covenants and agreements contained in this Agreement, or (ii) the liens for federal, state or local taxes set forth in Exhibit E attached hereto, or the enforcement or threatened enforcement of said liens, which may affect or encumber the Equipment.

**(b)** Promptly after receipt by any Indemnified Person of notice of the commencement or proposed commencement of any claim, action or proceeding (a "Claim"), to recover any amounts owing in respect of (i) any alleged breach of any of the representations, warranties, covenants and agreements contained in this Agreement, or (ii) any Taxes allegedly due and owing relating to any of the Equipment, such Indemnified Person shall, if a claim in respect thereof is to be made against Transferor pursuant to Section 4.1(a) hereof, promptly notify Transferor in writing of the commencement thereof, such notice to include all material details of the Claim. Transferor shall have the right to assume the defense of any Claim with counsel of its choice, which counsel shall be subject to the consent of the Indemnified Person, provided that such consent shall not be unreasonably conditioned, withheld or delayed. Should Transferor fail to assume the defense of any Claim, then the Indemnified Person shall have the right to undertake the control, conduct or settlement of such Claim through their own counsel at Transferor's reasonable expense, and may settle such matters without the consent of Transferor at Transferor's sole expense. Neither the giving of notice, the failure to give notice or to assert a right of set-ff shall constitute an election of remedies

5

or limit Transferee in any manner in the enforcement of any other remedies that may be available to it.

(c) Once a Claim has been finally, judicially adjudicated, from which no further appeal may be taken, if such adjudication results in a finding of monetary damages against Transferee, Transferee may elect to (i) pay such amount and be entitled to set-off such amount against amounts due and owing under the Note, or (ii) have Transferor pay such amounts directly to the party to which such amount is owed. The indemnities and covenants contained in this Section 4.1 shall survive the discharge of the Note, whether through full payment of the Note, or otherwise, until the expiration of the original maturity date of the Note.

## 5. MISCELLANEOUS.

**5.1 Taxes.** Transferee shall execute any required tax exemption certificates and pay any and all taxes, duties or fees assessed or levied by any U.S. Federal, State or local taxing authority as a result of this sale, delivery, registration or ownership of the Equipment by Transferee (excluding taxes on net or gross income or gain realized by Transferor).

**5.2 Indemnification.** On the date hereof, subject to Section 4.1 hereof, Transferee will assume all liability of any nature whatsoever arising out of the use or possession by Transferee of the Equipment and agrees to indemnify, protect, defend and save harmless Transferor, and its affiliates, officers, directors, shareholders, members, managers, employees, successors and assigns with respect to any claim, suit, action or judgment of any kind arising out of Transferee's use or possession of the Equipment.

**5.3 Entire Agreement.** Transferee and Transferor warrant that the terms and conditions of this Agreement including the exhibits attached hereto were fully read and constitute the entire Agreement between the parties and supersede all prior negotiations or agreements.

**5.4 Severability.** If any provision of this Agreement, or the application thereof to any person, entity or circumstances, shall be invalid or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to other persons, entities or circumstances, shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

**5.5 Binding Agreement.** Except as otherwise provided herein, this Agreement shall be binding upon, and inure to the benefit of, the parties hereto, and their respective successors and assigns.

**5.6 Further Assurance.** Transferee and Transferor each hereby agree that it will take, or cause to be taken, such reasonable actions (excluding the payment of money or other further consideration), and will execute and deliver, or cause to be executed and delivered, such additional documents and instruments, and will do, or cause

6

to be done, all such things as are necessary, proper or advisable under the provisions of this Agreement and applicable law to consummate and make effective all of the transactions contemplated by this Agreement.

**5.7  *Applicable Law and Forum.*** This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Kentucky without regard to its conflict of laws rules. Each of the parties consents and voluntarily submits to personal jurisdiction in the Commonwealth of Kentucky and in the courts in such state located in Fayette County, Kentucky and the United States District Court for the Eastern District of Kentucky in any proceeding arising out of or relating to this Agreement, and agrees that all claims raised in such proceeding may be heard and determined in such court.

**5.8  *Brokers.*** Each of Transferor and Transferee mutually represent and warrant that it has dealt with no broker or finder in connection with this transaction and no other person is entitled to any commission or fee therefrom. Each party agrees to indemnify the other party for, and hold the other party harmless from, any loss, liability or expense as a result of any breach by such party of this warranty.

**5.9  *Execution in Counterparts.*.** This Agreement may be executed in counterparts, each of which shall constitute an original document.

**5.10  *Assignment.*** Except for an assignment to an affiliate, neither Transferee nor Transferor may assign its rights hereunder without the prior written consent of the other. Assignment shall not release the assigning party from its obligations under this Agreement.

**5.11  *Survival.*** Except as otherwise expressly stated herein, all representations and warranties contained in this Agreement by any party to this Agreement and any certificate or other instrument delivered by or on behalf of any party pursuant to this Agreement shall be continuous and shall survive the Closing and the covenants and agreements contained herein for one (1) year from the date hereof.

*Remainder of page intentionally left blank.*

*Signature page to follow.*

7

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their authorized representatives.

CAMOFI MASTER LDC

BY: _____

TITLE: _____

("Transferor")


J.A.D. COAL COMPANY, INC.

BY: _____

TITLE: _____

("Transferee")


U.S. COAL CORPORATION

BY: _____

TITLE: _____

("U.S. Coal")

30492686.4
8/29/2008 4:01 PM

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their authorized representatives.

CAMOFI MASTER LDC

BY: _____

TITLE: _____
      ("Transferor")

J.A.D. COAL COMPANY, INC.

BY: _____

TITLE: _C.E.O._____
      ("Transferee")

U.S. COAL CORPORATION

BY: _____

TITLE: _C.E.O._____
      ("U.S. Coal")

# EXHIBIT A

## EQUIPMENT LIST

Continuous Miner
Rood Ranger II roof bolter
Schroder Feeder
Allowance to rebuild existing scoop
Single personnel carrier
Cable Allowance
SC 21 shuttle cars
SC 21 shuttle cars
SC 21 shuttle cars
SC 21 shuttle cars
SC 21 shuttle cars
Roof Ranger II roof bolter
Belthead
Diesel personnel carrier

Stoney Fork (Joy 1410-AA SN JM4747)
Stoney Fork (Fletcher R-R-2 SN 8702)
Stoney Fork (Stamler SN 43040)
Stoney Fork (S&S 488 SN 4881896)
Stoney Fork (S&S 480 SN 480-100)
Star Fire Enterprises, 500ft of new cable
Stoney Fork (Joy SC 21 SN ET – 14305)
Stoney Fork (Joy SC 21 SN ET – 14304)
Stoney Fork (Joy SC 21 SN ET – 12333)
Bentley Equipment Rebuilt
Bentley Equipment Rebuilt
StarFire Enterprises (DDO – 13ECF SN 92307/84034)
*****B&F Parts and Service
Stoney Fork (S&S 786 SN 270-A)

Joy 14 CM 10 A Miner
Underground Power Center
Transformer boxes
Transformer boxes
2/0 Highline cable [allowance]
Cable Allowance
Fan
Permissible single personnel carriers
Belthead
Belthead
Roof Ranger II roof bolter
Roof Ranger II roof bolter

Joy 1410-AA (SN JM 4587) Sam Blankinship
Stoney Fork (7200V/22 50KVA)
****B&F Parts and Service
****B&F Parts and Service

Pauls Fan and Repair Shop
Stoney Fork (S&S 484 SN 4841331)
*****B&F Parts and Service
*****B&F Parts and Service
River Creek Equipment Outfitters, LLC
*****B&F Parts and Service

**EXHIBIT B**

NOTE

**EXHIBIT C**

**SECURITY AGREEMENT**

EXHIBIT D

TRANSFER STATEMENT

## EXHIBIT E

### Tax Liens

1.      Federal Tax Lien against Eastern Consolidated Energy, Inc., Notice of which was filed on June 18, 2004, in Lis Pendens Book 39, page 381, in the office of County Clerk of Martin County, Kentucky.

2.      Federal Tax Lien against Eastern Consolidated Energy, Inc., Notice of which was filed on September 20, 2004, in Lis Pendens Book 27, page 287, in the office of County Clerk of Floyd County, Kentucky.

3.      Federal Tax Lien against Eastern Consolidated Energy, Inc., Notice of which was filed on February 22, 2005, in Lis Pendens Book 40, page 154, in the office of County Clerk of Martin County, Kentucky.

4.      Kentucky State Tax Lien against Morgan Mining, Inc., Notice of which was filed on June 26, 2006, in Lis Pendens Book 32, page 615, in the office of County Clerk of Floyd County, Kentucky.

5.      Kentucky State Tax Lien against Consolidated Energy, Inc., Notice of which was filed on May 15, 2007, in Lis Pendens Book 36, page 435, in the office of County Clerk of Floyd County, Kentucky.

6.      Kentucky State Tax Lien against Eastern Consolidated Energy, Inc., Notice of which was filed by the Commonwealth of Kentucky, Office of Employment Training Division of Unemployment Insurance on April 9, 2007, in Lis Pendens Book 42, page 120, in the office of County Clerk of Martin County, Kentucky.

FILED: NEW YORK COUNTY CLERK 11/05/2012

NYSCEF DOC. NO. 58

INDEX NO. 650411/2012

RECEIVED NYSCEF: 11/05/2012

# EXHIBIT D

U.S. Coal Acquisition Corp.
448 Lewis Hargett Circle, Suite 240
Lexington, Kentucky 40503

March 28, 2008

**VIA HAND DELIVERY**
CAMOFI Master LDC
CAMHZN Master LDC
c/o CENTRECOURT ASSET MANAGEMENT
350 Madison Avenue, 8th Floor
New York, NY 10017
Attention:  Richard L. Smithline, Chairman and CEO

Re:  Series B Offering; other matters

Dear Mr. Smithline:

Reference is hereby made to that certain Side Letter (the "Side Letter"), dated June 4, 2007, by
and between U.S. Coal Corporation, f/k/a U.S. Coal Acquisition Corp. (the "Company"), CAMOFI
Master LDC ("CAMOFI") and CAMHZN Master LDC, ("CAMHZN" and together with CAMOFI, the
"Approving Investors"). Capitalized terms used but not defined herein shall have the meanings ascribed
to such terms in the Side Letter.

Pursuant to our recent discussions about various proposed corporate actions by the Company (as
more particularly described below)(the "Corporate Matters"), the Company has requested that the
Approving Investors give their consent to the Company's consummation of the Proposed Matters. The
Proposed Matters are as follows:

1.  Series B Preferred.  The Company commenced an offering of Units, each unit consisting of ten
shares of Series B Preferred Stock and a warrant to purchase common stock at $2.50 per share (or in the
case of investors in the first closing, a warrant to purchase 2.2 shares of common stock) for gross
proceeds of up to $30,000,000 (subject to a $5,000,000 over-allotment option). In connection with the
closing of the sale of Units, the Company intends to designate up to 21,600,000 shares of its blank check
preferred stock as Series B Preferred Stock.  The basic terms of the Series B Preferred and the terms of
the offer and sale of the units are described in the Company's Term Sheet, dated March 28, 2008, a copy
of which was previously provided to the Approving Investors.

2.  Chief Financial Officer.  The Company hired James Wolff as its chief financial officer on or
about January 1, 2008. The Company offered a competitive compensation package which the Company
believes is in line with industry compensation norms.  The Company entered into an employment
agreement with Mr. Wolff, a copy of which is attached hereto.

Consent and Waiver

Notwithstanding the terms of the Side Letter, in consideration of the issuance of 600,000 shares
of the Company's common stock, $.001 par value per share, the Approving Investors do hereby consent
to the Company's consummation of the Corporate Matters on substantially the terms and conditions
described above and in the documents referenced above, with such changes as Company management

703640

may reasonably make in the exercise of its good faith judgment, and do hereby waive any breach of the Side Letter, as amended, which may exist immediately prior to the execution of this letter. The consent of Approving Investors pursuant to this letter is limited only to the transactions as described above.

Except as expressly set forth herein and in the consent letters dated November 14, 2007 and January 31, 2008, there are no amendments, modifications or waivers to the Side Letter, and all of the other forms, terms and provisions of the Side Letter remain in full force and effect.

703840

Please indicate your agreement to the terms of this letter by countersigning this letter in the space provided below and returning your original signed letter to the Company.

Very truly yours,

Robert Gabbard

ACKNOWLEDGED AND AGREED:

GAMOFI MASTER LDC

By: _____
Name: Richard Smithhe
Title: Director

CAMHZN MASTER LDC

By: _____
Name: Richard Smithhe
Title: Director

703740

FILED: NEW YORK COUNTY CLERK 11/05/2012

NYSCEF DOC. NO. 59

INDEX NO. 650411/2012

RECEIVED NYSCEF: 11/05/2012

# EXHIBIT E

EXECUTION COPY

## INTERCREDITOR AND SUBORDINATION AGREEMENT

THIS INTERCREDITOR AND SUBORDINATION AGREEMENT (this "Agreement")
is dated as of April 15, 2008, among U.S. Coal Corporation, a Delaware corporation and parent
of the Borrowers (as hereinafter defined) (the "Parent"), Aubra Paul Dean ("Aubra"), Carl B.
McAfee ("Carl"), Julia L. McAfee· ("Julia" and together with Aubra and Carl, the "JAD
Sellers"), CAMOFI Master LDC, a Cayman Islands Limited Duration Company, as collateral
agent for the various purchasers (the "Bridge Lenders") under the Bridge Purchase Agreement
(as hereinafter defined) (the "Agent"), JMB Capital Partners Master Fund, L.P., a limited
partnership registered and organized under the laws of the Cayman Islands ("JMB"), and Merrill
Lynch Commodities, Inc., a Delaware corporation ("MLCI").

## RECITALS

WHEREAS, the J.A.D. Coal Company, Inc., a Virginia corporation ("JAD"), Sandlick
Coal Company, LLC, a Virginia limited liability company, formerly known as Sandlick Coal
Company, Inc., a Virginia corporation ("Sandlick"), Fox Knob Coal Co., Inc., a Kentucky
corporation ("Fox Knob" and together with JAD and Sandlick, the "Borrowers"), have requested
that the Bridge Lenders make, and the Bridge Lenders have made, a $5,000,000 bridge loan to
the Borrowers on the terms set forth in Senior Secured Notes, dated as of April 15, 2008 and due
October 1, 2009 (the "Bridge Notes");

WHEREAS, the Bridge Notes are subject to the terms of the Securities Purchase
Agreement, dated as of the date hereof (the "Bridge Purchase Agreement"), by and among the
Borrowers, the Parent and the Bridge Lenders, and are to be secured by, among other things, the
Borrower Stock (as hereinafter defined), the terms and priority of which are as set forth in this
Agreement;

WHEREAS, the Borrowers' obligations under the Bridge Notes, the Bridge Purchase
Agreement and the other Transaction Documents (as hereinafter defined) are guaranteed by the
Parent pursuant to the Guarantee, dated as of the date hereof (the "Guarantee"), made by the
Parent in favor of the Bridge Lenders;

WHEREAS, on or prior to the effective date hereof, the Parent, certain subsidiaries of the
Parent (the "Subsidiaries" and together with the Parent, the "Loan Parties"), JMB, MLCI and
Wilmington Trust Company entered into a Waiver and Restatement Agreement dated as of April
15, 2008 (the "Waiver");

WHEREAS, pursuant to the Waiver, JMB, among other things, (i) agreed to waive
certain events of default under the Amended and Restated Credit Agreement, dated as of
February 16, 2007 (as amended, restated, supplemented or otherwise modified from time to time,
the "Credit Agreement"), by and among the Loan Parties, Wilmington Trust Company, and, by
way of assignment, JMB, (ii) consented to that certain Purchase Agreement, dated as of June 19,
2007 (as amended, restated, supplemented or otherwise modified from time to time, the "JAD
Purchase Agreement"), by and among the Parent and the JAD Sellers pursuant to which the
Parent purchased (the "JAD Acquisition") all of the outstanding equity interests of the Borrowers

(the "Borrower Stock"), and (iii) was granted by the Parent a security interest in the Borrower Stock, the terms and priority of which are as set forth in this Agreement;

WHEREAS, pursuant to the Waiver, MLCI, among other things, (i) agreed to amend certain provisions of that certain Coal Services Agreement, dated as of June 5, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "Coal Services Agreement"), by and between the Parent and MLCI, and that certain Master Coal Purchase and Sale Agreement, dated as of June 5, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "Master Trading Agreement"; and together with the Coal Services Agreement, the "MLCI Agreements"), by and between the Parent and MLCI, and (ii) was granted a security interest by the Parent in the Borrower Stock, the terms and priority of which are as set forth in this Agreement;

WHEREAS, pursuant to the JAD Purchase Agreement, the Borrowers issued Convertible Notes, dated as of the date hereof, to the JAD Sellers in the total aggregate principal amount of $7,000,000 (the "JAD Notes") to finance the JAD Acquisition;

WHEREAS, in accordance with the terms of the JAD Purchase Agreement, the JAD Sellers were granted a first lien security interest by the Parent in the Borrower Stock to secure their rights and interests under (i) the JAD Notes, (ii) the Parent's obligations with respect to the Cumberland Surety Agreement for Bond for the Surface Effects of Surface Mining issued June 22, 1998, by Cumberland Surety Incorporated (the "Cumberland Surety") on behalf of Sandlick and (iii) the Parent's obligations with respect to their other personal guarantee obligations assumed by the Parent pursuant to the JAD Purchase Agreement;

WHEREAS, the Parent, the JAD Sellers, the Bridge Lenders, JMB and MLCI desire to enter into this Agreement to, among other things, confirm the relative priorities of and rights in the security interests in the Borrower Stock;

NOW, THEREFORE, in consideration of the above recitals and the provisions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, intending to be legally bound:

## AGREEMENT

Section 1.    Definitions. In addition to the terms defined elsewhere in this Agreement, the following terms have the meanings indicated in this Section 1:

"Additional Notes" shall mean any Bridge Notes issued to the holders of the Bridge Notes in payment of interest.

"Asset Subordination Agreement" shall mean the Intercreditor and Subordination Agreement, dated the date hereof, among the Borrowers, the JAD Sellers and the Agent on behalf of the Bridge Lenders.

"Collateral" shall mean the Borrower Stock.

2

"Default" shall mean a default or event of default under any instrument or agreement evidencing the Junior Creditor Debt.

"First Priority Creditor" shall mean the JAD Sellers.

"First Priority Creditor Obligations" shall mean all debts, liabilities, obligations, covenants and duties owing to the First Priority Creditor by the Parent under or in connection with (i) the JAD Notes and the JAD Purchase Agreement and (ii) the First Priority Senior Obligation, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

"First Priority Senior Obligation" shall mean all debts, liabilities, obligations, covenants and duties owing to the First Priority Creditor under or in connection with the Cumberland Surety, the JAD Notes and such other personally guaranteed debts of the First Priority Creditor to First Tennessee Bank, Powell Valley National Bank and CIT Financial, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

"Fourth Priority Creditor" shall mean MLCI.

"Fourth Priority Creditor Obligations" shall mean all debts, liabilities, obligations, covenants and duties owing by the Parent to the Fourth Priority Creditor under or in connection with the MLCI Agreements and the Waiver, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

"Junior Creditor Debt" shall mean all indebtedness, obligations, and liabilities of the Parent to any Junior Creditor, under any agreement of any kind, including, without limitation, all principal and interest (including, without limitation, any interest accruing after the filing of any petition in bankruptcy or the commencement of any Proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such Proceeding) and late fees payable thereunder.

"Junior Creditor Documents" shall mean any all documents evidencing the Junior Creditor Debt.

"Junior Creditors" shall mean the Second Priority Creditor, the Third Priority Creditor and the Fourth Priority Creditor, unless and until such time as such Second Priority Creditor, Third Priority Creditor or Fourth Priority Creditor, as the case may be, shall become a Senior Creditor pursuant to the terms of this Agreement.

"Person" shall mean any corporation, association, joint venture, partnership, limited liability company, organization, business, individual, trust, government or agency or political subdivision thereof, or any other legal entity.

"Proceeding" shall mean (a) any insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, readjustment, composition, or other similar proceeding relating to the Parent or any of its properties, whether under any bankruptcy, reorganization, or insolvency laws or any law relating to relief of debtors, readjustment of indebtedness, reorganization, composition, or extension; (b) any proceeding for the liquidation, liquidating distribution,

3

dissolution, or other winding up of the Parent, voluntary or involuntary, whether or not involving insolvency or bankruptcy proceedings; (c) any assignment for the benefit of creditors of the Parent; or (d) any other marshalling of the assets of the Parent; or (e) any other sale or disposition of the Collateral.

"Remedy" shall mean, with respect to a Default, any action to foreclose on the Collateral.

"Rights Agreement" shall mean the Rights Agreement, dated as of the date hereof, among the Parent, CAMOFI Master LDC, CAMHZN Master LDC, Futurtec, L.P., Lawrence Kaplan and Michael Miller.

"Second Priority Creditor" shall mean the Agent, on behalf of the Bridge Lenders.

"Second Priority Creditor Obligations" shall mean (x) until the Third Priority Creditor Obligations are fully satisfied, all debts, liabilities, obligations, covenants and duties owing by the Parent to the Second Priority Creditor under or in connection with the Bridge Notes, the Bridge Purchase Agreement and any other Transaction Documents (other than obligations pursuant to the Rights Agreement and the guaranty of such obligations pursuant to the Guarantee) and guaranteed by the Parent pursuant to the Guarantee, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due and (y) after the Third Priority Creditor Obligations are fully satisfied, all debts, liabilities, obligations, covenants and duties owing by the Parent to the Second Priority Creditor under or in connection with the Bridge Notes, the Bridge Purchase Agreement and any other Transaction Documents (including, without limitation, obligations pursuant to Section 2 of the Rights Agreement and the guaranty of such obligations pursuant to the Guarantee) and guaranteed by the Parent pursuant to the Guarantee, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

"Security Agreement" shall mean the Security Agreement, dated as of the date hereof, among the Borrowers, the Parent and the Agent, on behalf of the Bridge Lenders.

"Senior Creditor" shall initially mean the First Priority Creditor unless and until such time as it is joined or replaced by one of the Junior Creditors pursuant to the terms of this Agreement.

"Senior Creditor Debt" shall mean all indebtedness, obligations, and liabilities owing by the Parent to the Senior Creditor, under any agreement of any kind, including, without limitation, all principal and interest (including, without limitation, any interest accruing after the filing of any petition in bankruptcy or the commencement of any Proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such Proceeding) and late fees payable thereunder.

"Senior Creditor Documents" shall mean any all documents evidencing the Senior Creditor Debt.

"Senior Creditor Event of Default" shall mean a default or event of default under any instrument or agreement evidencing the Senior Creditor Debt.

4

"Subordination Agreements" shall mean, collectively, the Asset Subordination Agreement and this Agreement.

"Third Priority Creditor" shall mean JMB (which may act directly or through Wilmington Trust Company, the collateral agent under the Credit Agreement).

"Third Priority Creditor Obligations" shall mean all debts, liabilities, obligations, covenants and duties owing by the Parent to the Third Priority Creditor under or in connection with the Credit Agreement, the Waiver and the other Loan Documents (as defined in the Credit Agreement), whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

"Transaction Documents" shall mean the Bridge Purchase Agreement, the Bridge Notes, the Additional Notes (if any), the Security Agreement, the Guarantee, the Rights Agreement (only as it relates to the Parent's obligations under Section 2 of the Rights Agreement) and the Subordination Agreements (only as they relate to enforcement costs thereunder).

Section 2.    Priority.

The priority of the security interest in the Borrower Stock are as set forth in this Section 2 of the Agreement:

(i)    the First Priority Creditor, as the initial Senior Creditor, shall hold a first priority security interest in the Borrower Stock, the Second Priority Creditor shall hold a second priority security interest in the Borrower Stock, the Third Priority Creditor shall hold a third priority security interest in the Borrower Stock, and the Fourth Priority Creditor shall hold a fourth priority security interest in the Borrower Stock;

(ii)    at such time as the First Priority Senior Obligation is fully satisfied, the Second Priority Creditor shall, without further action, become an additional Senior Creditor and shall hold, solely with respect to Second Priority Creditor Obligations relating to an aggregate of up to $2,500,000 principal amount of Bridge Notes (including, without limitation, any interest, fees or other liabilities or obligations thereon and relating thereto), a first priority security interest in the Borrower Stock pari passu with the First Priority Creditor, and, upon full satisfaction of the remaining First Priority Creditor Obligations, the First Priority Creditor shall no longer be a Senior Creditor and the Second Priority Creditor shall be the sole Senior Creditor with respect to all Second Priority Creditor Obligations; the Third Priority Creditor and the Fourth Priority Creditor shall continue to be Junior Creditors, holding second and third priority security interests, respectively, in the Borrower Stock;

(iii)    at such time as the remaining First Priority Creditor Obligations and the Second Priority Creditor Obligations are fully satisfied, the First Priority Creditor and the Second Priority Creditor shall no longer be Senior Creditors and the Third Priority Creditor shall, without further action, become the Senior Creditor and shall hold a first priority security interest in the Borrower Stock; the Fourth Priority Creditor shall continue to be a Junior Creditor, holding a second priority security interest in the Borrower Stock; and

5

(iv)    at such time as the Third Priority Creditor Obligations are fully satisfied, the Third Priority Creditor shall no longer be a Senior Creditor and the Fourth Priority Creditor shall become the Senior Creditor and shall hold a first priority security interest in the Borrower Stock.

## Section 3.    Possession of Stock Certificates.

Each of the First Priority Creditor, the Second Priority Creditor, the Third Priority Creditor and the Fourth Priority Creditor acknowledges and agrees that, so long as such party is the Senior Creditor, it shall take delivery and possession of and hold the stock certificates evidencing the Borrower Stock, together with stock powers endorsed in blank relating to such certificates, for itself and the Junior Creditors for purposes of perfecting the security interests of such parties in such Borrower Stock.  At such time as any such party ceases to be a Senior Creditor, it shall deliver such certificates and stock powers to the immediately succeeding Senior Creditor and such Senior Creditor shall take delivery thereof for itself and the Junior Creditors for purposes of maintaining such perfection in accordance with this Agreement.

## Section 4.    Subordination in the Event of a Proceeding.

Upon any distribution of the Collateral or the proceeds of any sale thereof, upon any Proceeding:

(i)    the Senior Creditors shall first be entitled to receive payments from the Collateral in full account of the Senior Creditor Debt in cash before any Junior Creditor is entitled to receive any payment from the Collateral on account of the Junior Creditor Debt;

(ii)    any payment or distribution with respect to the Collateral, whether in cash, property, or securities to which any Junior Creditor would be entitled except for the provisions of this Agreement, shall be paid by the liquidating trustee or agent or other Person making such a payment or distribution, directly to the Senior Creditors, to the extent necessary to pay the Senior Creditor Debt in full in after giving effect to all concurrent payments and distributions; and

(iii)    in the event that, notwithstanding the foregoing, any payment or distribution of proceeds of the Collateral, of any kind or character, whether in cash, property, or securities to which any Junior Creditor would be entitled except for the provisions of this Agreement, shall be received by the Junior Creditors on account of the Junior Creditor Debt before the Senior Creditor Debt is paid in full in cash, such payment or distribution shall be received and held in trust by the Junior Creditors for the benefit of the Senior Creditors, to the extent necessary to pay the Senior Creditor Debt in full in cash after giving effect to all concurrent payments and distributions.

The Parent shall give written notice to the Senior Creditors and the Junior Creditors within three days of receipt of notice of any Proceeding.

## Section 5.    Remedy Standstill.

6

Until the date the Senior Creditor Debt has been paid in full in cash, the Junior Creditors shall not, without the prior written consent of the Senior Creditors exercise any Remedy as to the Collateral in respect of any Default, whether prior to or after the filing of any bankruptcy, reorganization or insolvency proceeding.

**Section 6.    Payments Held in Trust, Subrogation, Right to Cure and Purchase.**

(i)    If any payment or distribution from the proceeds of the Collateral on account of any Junior Creditor Debt shall be made by the Parent or received by the Junior Creditor holding such Junior Creditor Debt at a time when such payment or distribution was prohibited by the provisions of this Agreement, then such payment or distribution shall be received and held in trust by such Junior Creditor for the benefit of the Senior Creditors and shall be paid or delivered by such Junior Creditor to the Senior Creditors to the extent necessary to enable payment in full of the Senior Creditor Debt in cash.

(ii)    After the payment in full of all Senior Creditor Debt in cash, the Junior Creditors shall be subrogated to the rights of the holders of such Senior Creditor Debt to receive payments or distributions on the Collateral applicable to the Senior Creditor Debt until all amounts owing on the Junior Creditor Debt shall be paid in full, and for the purpose of such subrogation no such payments or distributions to the holders of the Senior Creditor Debt by or on behalf of the Parent, or by or on behalf of the Junior Creditors by virtue of this Agreement, that otherwise would have been made to the Junior Creditors shall, as between the Parent and the Junior Creditors, be deemed to be payment by the Parent to or on account of the Senior Creditor Debt in respect thereof, it being understood that the provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the Junior Creditors, on the one hand, and the holders of such Senior Creditor Debt, on the other hand. As to the Collateral or proceeds therefrom, if any payment or distribution to which the Junior Creditors would otherwise have been entitled but for the provisions of this Agreement shall have been applied, pursuant to the provisions of this Agreement, to the payment of amounts payable under the Senior Creditor Debt, then the Junior Creditors shall be entitled to receive from the holders of the Senior Creditor Debt any payments or distributions received by such holders of the Senior Creditor Debt in excess of the amount sufficient to pay all amounts payable under or in respect of such Senior Creditor Debt in full.

(iii)    The Senior Creditors hereby grant the Junior Creditors the right, but not the obligation, to cure any and all defaults under the Senior Creditor Debt (to the extent any such defaults are curable) within the same period of time afforded the Parent for curing such defaults before the same become Senior Creditor Events of Default. The Senior Creditors shall have no obligation hereunder, however, to provide notice of any Senior Creditor Event of Default to the Junior Creditors, and the lack of any such notice shall not affect the existence or occurrence of any Senior Creditor Event of Default.

**Section 7.    No Prejudice or Impairment.**

Nothing contained in this Agreement, is intended to or shall impair, as between the Parent (and its subsidiaries) and the Junior Creditors, the obligation of the Parent (and its subsidiaries),

7

which is absolute and unconditional, to pay to the Junior Creditors the Junior Creditor Debt as and when the same shall become due and payable in accordance with its terms, or is intended to or shall affect the relative rights of the Junior Creditors and creditors of the Parent (other than the holders of the Senior Creditor Debt).

Section 8.    **Proofs of Claim.**

In connection with any Proceeding involving the Parent and/or any of its subsidiaries, the Junior Creditors are entitled to file proofs of claim in respect of the Junior Creditor Debt. The Senior Creditors shall not have any right whatsoever to vote any claim that the Junior Creditors may have in the Proceeding to accept or reject any plan or partial or complete liquidation, reorganization, arrangement, composition, or extension; provided, that, the Junior Creditors shall not vote with respect to any such plan or take any other action in any way so as to contest (i) the relative rights and duties of the Senior Creditors under the Senior Creditor Documents with respect to any collateral or guaranties or (ii) the Junior Creditors' obligations and agreements set forth in this Agreement.

Section 9.    **Benefit of Agreement; Amendments of Certain Documents; etc.**

This Agreement shall constitute a continuing offer to all Persons who, in reliance upon such provisions, become a Senior Creditor, and such provisions are made for the benefit of each subsequent Senior Creditor and each of them may enforce such provisions.

Except as otherwise provided in the Junior Creditor Documents, and without limiting any rights of the Junior Creditors thereunder, the Senior Creditor Documents may be amended, supplemented, waived, altered, modified, or otherwise changed in any manner approved by the Senior Creditors and the Parent without the consent or approval of the Junior Creditors.

Except with respect to possession of the stock certificates and stock powers constituting Collateral in accordance with Section 3, the Senior Creditors shall have no obligation to preserve rights in the Collateral against any prior parties or to marshal any of the Collateral for the benefit of any Person. No failure to exercise, and no delay in exercising on the part of any party hereto, any right, power, or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power, or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided in this Agreement are cumulative and shall not be exclusive of any rights or remedies provided by law.

Except as expressly set forth herein, there shall be no third party beneficiaries of this Agreement.

Section 10.    **Further Agreements Concerning the Collateral and Senior Creditor Debt.**

Junior Creditors agree that (i) they will not at any time contest the validity, perfection, priority or enforceability of the security interests and liens granted by the Parent to the Senior Creditors in the Collateral; (ii) except as otherwise provided in the Junior Creditor Documents, and without limiting any rights of the Junior Creditors thereunder, the Senior Creditors may

administer the Senior Creditor Debt and any of the Senior Creditors' agreements with the Parent in any way the Senior Creditors deem appropriate consistent with the terms and provisions of the Senior Creditor Documents, without regard to the Junior Creditors or the Junior Creditor Debt; (iii) the Senior Creditors shall have no obligation to preserve rights in the Collateral against any prior parties or to marshal any of the Collateral for the benefit of any Person; (iv) nothing in this Agreement shall impair or adversely affect the manner or timing with which the Senior Creditors enforce any of their security; (v) except as otherwise provided in the Junior Creditor Documents, and without limiting any rights of the Junior Creditors thereunder, nothing in this Agreement shall impair or adversely affect any right, privilege, power or remedy of the Senior Creditors with respect to the Senior Creditor Debt, the Parent, or any Collateral, including without limitation, the Senior Creditors' right to (x) waive or release any of the Senior Creditors' security or rights, (y) waive or ignore any defaults by the Parent; and/or (z) restructure, renew, modify, or supplement the Senior Creditor Debt or any portion thereof or any agreement with the Parent relating to the Senior Creditor Debt or to increase the outstanding principal amount of the Senior Creditor Debt by extending additional credit to the Parent; and (vi) nothing contained herein is intended to alter or deprive the Senior Creditors of any of their rights as the senior secured creditors of the Parent as to the Collateral to collect or otherwise foreclose upon any of the Collateral.

**Section 11.    Representations and Warranties.** Each of the parties hereto hereby represents and warrants that (i) it has full power, authority and legal right to make and perform this Agreement and (ii) this Agreement is its legal, valid, and binding obligation, enforceable against it in accordance with its terms.

**Section 12.    Amendment.** Neither this Agreement nor any of the terms hereof may be amended, waived, discharged, or terminated unless such amendment, waiver, discharge, or termination is in writing signed by the Senior Creditors and the Junior Creditors.

**Section 13.    Successors and Assigns.** This Agreement and the terms, covenants, and conditions hereof shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns, and neither the Senior Creditor Debt nor the Junior Creditor Debt shall be sold, assigned, or transferred unless the assignee or transferee thereof expressly takes such debt subject to and agrees to be bound by the terms and conditions of this Agreement.

**Section 14.    Governing Law.** This Agreement will be construed in accordance with and governed by the law of the State of New York, without regard to the choice of law principles thereof.

**Section 15.    Notices.** Whenever it is provided herein that any notice, demand, request, consent, approval, declaration, or other communication shall or may be given to or served upon any of the parties by another, or whenever any of the parties desires to give or serve upon another any such communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration, or other communication shall be in writing and shall be deemed to have been duly given and received, for purposes hereof, when (i) delivered by hand, (ii) four days after being deposited in the mail, postage prepaid, and (iii) one Business Day after having been sent by reputable overnight courier, in each case addressed as set forth on the signature pages attached hereto or at such address as may be substituted by notice given as herein

provided. Failure to delay in delivering copies of any communication to the persons designated to receive copies shall in no way adversely affect the effectiveness of such communication.

Section 16.    <u>Counterparts.</u>  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 17.    <u>Final Agreement.</u>  THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES.

Section 18.    <u>WAIVER OF JURY TRIAL.</u>    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE SENIOR CREDITORS, THE JUNIOR CREDITORS, THE PARENT, THE JAD SELLERS, JMB AND MLCI HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED THEREBY OR THE ACTIONS OF THE SENIOR CREDITORS OR THE JUNIOR CREDITORS IN THE NEGOTIATION, ADMINISTRATION OR ENFORCEMENT HEREOF.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY; SIGNATURE PAGES FOLLOW.]

IN WITNESS WHEREOF, the parties hereto have caused this Subordination Agreement to be duly executed by their proper and duly authorized officers as of the day and year first above written.

**U.S. COAL CORPORATION**

By: *Robert B. Gobble*
Its: *CEO*

Address for Notice:
448 Hargett Circle
Suite 240
Lexington, KY 40503

**CAMOFI MASTER LDC, as Agent
for the Bridge Lenders**

By: _____
Its: _____

Address for Notice:
_____
_____
_____

**JMB CAPITAL PARTNERS MASTER FUND, L.P.**

By: _____
Its: _____

Address for Notice:
_____
_____
_____

**MERRILL LYNCH COMMODITIES, INC.**

By: _____
Its: _____

Address for Notice:
20 E Greenway Plaza
Suite 700
Houston TX 77046
Attn: Contract Admin./Legal

_____
**Aubra Paul Dean**

Address for Notice:
_____
_____
_____

_____
**Carl E. McAfee**

Address for Notice:
_____
_____
_____

IN WITNESS WHEREOF, the parties hereto have caused this Subordination Agreement to be duly executed by their proper and duly authorized officers as of the day and year first above written.

**U.S. COAL CORPORATION**

By:_____
Its:_____

Address for Notice:
_____
_____
_____


**CAMOFI MASTER LDC, as Agent
for the Bridge Lenders**

By: _Richard Smithline_
Its: _Director_

Address for Notice:
c/o Centrecourt Asset Management
350 Madison Ave. 8th Floor
NY, NY 10017


**JMB CAPITAL PARTNERS MASTER FUND, L.P.**

By:_____
Its:_____

Address for Notice:
1999 Avenue of the Stars
Suite 2040
Los Angeles, California
Attn: Alan Fragan


**MERRILL LYNCH COMMODITIES, INC.**

By:_____
Its:_____

Address for Notice:
20 E Greenway Plaza
Suite 700
Houston TX 77046
Attn: Contract Admin./Legal


_____
Aubra Paul Dean

Address for Notice:
_____
_____
_____


_____
Carl E. McAfee

Address for Notice:
_____
_____
_____

IN WITNESS WHEREOF, the parties hereto have caused this Subordination Agreement to be duly executed by their proper and duly authorized officers as of the day and year first above written.

**U.S. COAL CORPORATION**

By:_____

Its:_____

Address for Notice:
_____
_____
_____

**CAMOFI MASTER LDC, as Agent
for the Bridge Lenders**

By:_____

Its:_____

Address for Notice:
_____
_____
_____

**JMB CAPITAL PARTNERS MASTER FUND, L.P.**

By: _Cyrus Haledi____

Its: _Partner____

Address for Notice:
1999 Avenue of the Stars
Suite 2040
Los Angeles, California
Attn: Alan Fragan

**MERRILL LYNCH COMMODITIES, INC.**

By:_____

Its:_____

Address for Notice:
20 E Greenway Plaza
Suite 700
Houston TX 77046
Attn: Contract Admin./Legal

_____
Aubra Paul Dean

Address for Notice:
_____
_____
_____

_____
Carl E. McAfee

Address for Notice:
_____
_____
_____

NYC01_84294375v12_332313-00020 8/29/2008 10:11 AM

IN WITNESS WHEREOF, the parties hereto have caused this Subordination Agreement
to be duly executed by their proper and duly authorized officers as of the day and year first above
written.

**U.S. COAL CORPORATION**

By: _____
Its: _____

Address for Notice:

_____
_____
_____


**CAMOFI MASTER LDC, as Agent
for the Bridge Lenders**

By: _____
Its: _____

Address for Notice:

_____
_____
_____


**JMB CAPITAL PARTNERS MASTER FUND, L.P.**

By: _____
Its: _____

Address for Notice:

_____
_____
_____


**MERRILL LYNCH COMMODITIES, INC.**

By: _____
Its: _____
      Dennis Albrecht
      Chief Operating Officer

Address for Notice:
20 E Greenway Plaza
Suite 700
Houston TX 77046
Attn: Contract Admin./Legal

_____
      Aubra Paul Dean

Address for Notice:

_____
_____
_____


_____
      Carl E. McAfee

Address for Notice:

_____
_____
_____

IN WITNESS WHEREOF, the parties hereto have caused this Subordination Agreement to be duly executed by their proper and duly authorized officers as of the day and year first above written.

**U.S. COAL CORPORATION**

By:_____
Its:_____

Address for Notice:
_____
_____
_____

**CAMOFI MASTER LDC, as Agent
for the Bridge Lenders**

By:_____
Its:_____

Address for Notice:
_____
_____
_____

**JMB CAPITAL PARTNERS MASTER FUND, L.P.**

By:_____
Its:_____

Address for Notice:
1999 Avenue of the Stars
Suite 2040
Los Angeles, California
Attn: Alan Fragan

**MERRILL LYNCH COMMODITIES, INC.**

By:_____
Its:_____

Address for Notice:
20 E Greenway Plaza
Suite 700
Houston TX 77046
Attn: Contract Admin./Legal

_____
Aubra Paul Dean

Address for Notice:
Carl E. McAfee, PC
1033 Virginia Avenue NW
P.O. Box 321
Norton, VA 24273
Attn: Julia McAfee

_____
        Carl E. McAfee

Address for Notice:
Carl E. McAfee, PC
1033 Virginia Avenue NW
P.O. Box 321
Norton, VA 24273
Attn: Julia McAfee


_____
        Julia L. McAfee

Address for Notice:
Carl E. McAfee, PC
1033 Virginia Avenue NW
P.O. Box 321
Norton, VA 24273
Attn: Julia McAfee

12

FILED: NEW YORK COUNTY CLERK 11/05/2012

NYSCEF DOC. NO. 60

INDEX NO. 650411/2012

RECEIVED NYSCEF: 11/05/2012

# EXHIBIT F

# FIRST AMENDED AND RESTATED INTERCREDITOR AND SUBORDINATION AGREEMENT

THIS FIRST AMENDED AND RESTATED INTERCREDITOR AND SUBORDINATION AGREEMENT (this "Agreement") is dated as of September 30, 2009 among J.A.D. Coal Company, Inc., a Virginia corporation ("JAD"), Sandlick Coal Company, LLC, a Virginia limited liability company, formerly known as Sandlick Coal Company, Virginia corporation ("Sandlick"), Fox Knob Coal Co., Inc., a Kentucky corporation ("Fox Knob" and together with JAD and Sandlick, the "Borrowers"), Aubra Paul Dean ("Aubra"), Carl E. McAfee ("Carl"), Julia L. McAfee ("Julia" and together with Aubra and Carl, the "JAD Sellers"), and CAMOFI Master LDC, a Cayman Islands Limited Duration Company, as collateral agent for the various purchasers (the "Bridge Lenders") under the Bridge Purchase Agreement (as hereinafter defined) (the "Agent"), East Coast Miner LLC, a Delaware limited liability company ("ECM"), and Wilmington Trust Company, as collateral agent on behalf of ECM (the "Collateral Agent").

## RECITALS

WHEREAS, the Borrowers requested that the Bridge Lenders make, and the Bridge Lenders made, a $5,000,000 bridge loan to the Borrowers on the terms set forth in Senior Secured Notes, dated as of April 15, 2008 and due December 31, 2011 (the "Bridge Notes");

WHEREAS, the Bridge Notes are subject to the terms of the Securities Purchase Agreement, dated as of April 15, 2008 (the "Bridge Purchase Agreement"), by and among the Borrowers, U.S. Coal Corporation, a Delaware corporation and parent of the Borrowers (the "Parent"), and the Bridge Lenders, and are secured by the collateral set forth in the Security Agreement (the "Centrecourt Collateral"), the terms and priority of which are as set forth in this Agreement;

WHEREAS, the Borrowers' obligations under the Bridge Notes, the Bridge Purchase Agreement and the other Borrower Transaction Documents (as hereinafter defined) are guaranteed by the Parent pursuant to the Guarantee, dated as of April 15, 2008 (the "Guarantee"), made by the Parent in favor of the Bridge Lenders;

WHEREAS, on or prior to April 15, 2008, the Parent and the JAD Sellers entered into a Purchase Agreement, dated as of June 19, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "JAD Purchase Agreement"), pursuant to which the Parent purchased (the "JAD Acquisition") all of the outstanding equity interests of the Borrowers;

WHEREAS, pursuant to the JAD Purchase Agreement, the Borrowers issued Convertible Notes, dated as of April 15, 2008, to the JAD Sellers in the total aggregate principal amount of $7,000,000 (the "JAD Notes") to finance the JAD Acquisition;

WHEREAS, in accordance with the terms of the JAD Purchase Agreement, the JAD Sellers were granted by the Parent (i) a second lien security interest in all right, title and interest

in and to all equipment and interests in real property owned by the Borrowers on April 15, 2008 in which the Borrowers have previously granted a first priority security interest (the "Existing Lender Collateral") to First Tennessee National Bank, CIT Financial, Powell Valley National Bank and their assignees (collectively, the "Existing Lenders"), (ii) a first lien security interest in all of Borrowers' right, title and interest in and to all equipment, fixtures and other personal property and coal reserves owned by the Borrowers on April 15, 2008 in which it has not previously granted a security interest to any third party (the "Unencumbered Collateral") and, (iii) in accordance with the terms of that certain security agreement dated as of April 15, 2008, made by and between the Borrowers and the JAD Sellers (the "JAD Security Agreement"), the right to receive a first lien security interest in the Other Collateral (as defined therein the "Other Collateral" and together with the Existing Lender Collateral and the Unencumbered Collateral, the "JAD Collateral"), to secure their rights and interests under (i) the JAD Notes, (ii) the Parent's obligations with respect to the Cumberland Surety Agreement for Bond for the Surface Effects of Surface Mining issued June 22, 1998, by Cumberland Surety Incorporated (the "Cumberland Surety") on behalf of Sandlick and (iii) the Parent's obligations with respect to their other personal guarantee obligations assumed by the Parent pursuant to the JAD Purchase Agreement;

WHEREAS, pursuant to that certain Assignment and Assumption dated as of September 30, 2009 between JMB Capital Partners Master Fund, L.P. ("JMB"), and ECM, ECM irrevocably purchased and assumed from JMB, all of JMB's rights and obligations in its capacity as a lender under that certain Second Amended and Restated Credit Agreement, dated August 29, 2008 by and between Parent, as Borrower, the Guarantors (as defined therein), the Collateral Agent, and JMB, as successor in interest to FURSA Master Global Event Driven Fund L.P. and Grand Central Asset Trust, MLN Series, as such credit agreement was amended by that certain First Amendment to Second Amended and Restated Credit Agreement and Value Right Agreement dated as of September 30, 2009 by and among Parent, the Guarantors, the Collateral Agent, and ECM (as amended from time to time the "Credit Agreement"), and the other transaction documents executed and delivered in connection therewith, including without limitation, that certain Amended and Restated Security Agreement dated as of August 29, 2008 made by Grantors (as defined therein the "Grantors") to the Collateral Agent, as the same was amended by that certain First Amendment to the Amended and Restated Security Agreement dated as of September 30, 2009 made by Parent, the Grantors, and the Collateral Agent (the "Amended Security Agreement");

WHEREAS, the Amended Security Agreement grants to the Collateral Agent, for the benefit of ECM, a security interest in each Grantor's right, title and interest in and to all of such Grantor's property and assets, whether now owned or thereafter existing or arising, including, without limitation, the coal preparation and wash plant at JAD (the "JAD Wash Plant", which, for the avoidance of doubt, does not include any portion of the coal preparation and wash plant consisting of an interest in real property) and the highwall miner, serial number _____, located at JAD (collectively, the "ECM Collateral");

WHEREAS, the Borrowers, the JAD Sellers, the Bridge Lenders, the Collateral Agent and ECM desire to enter into this Agreement to, among other things, confirm the relative priorities of and rights in the security interests in the JAD Collateral and the Atlas Drill;

2

NOW, THEREFORE, in consideration of the above recitals and the provisions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, intending to be legally bound:

## AGREEMENT

Section 1.    Definitions. In addition to the terms defined elsewhere in this Agreement, the following terms have the meanings indicated in this Section 1:

"Additional Notes" shall mean any Bridge Notes issued to the holders of the Bridge Notes in payment of interest.

"Atlas Drill" shall mean that certain Atlas Drill, serial number 8836, acquired by the Borrowers subsequent to April 15, 2008, in which Agent holds a security interest under the Security Agreement, and which comprises part of the Centrecourt Collateral.

"Borrower Transaction Documents" shall mean the Bridge Purchase Agreement, the Bridge Notes, the Additional Notes (if any), the Security Agreement, the Guarantee, the Rights Agreement (only as it relates to the Parent's obligations under Section 2 of the Rights Agreement) and the Subordination Agreements (as they relate to enforcement costs thereunder).

"Default" shall mean a default or event of default under any instrument or agreement evidencing any of the Junior Creditor Debt.

"Encumbered Centrecourt Collateral" shall mean the portion of the Existing Lender Collateral in which Agent holds a security interest under the Security Agreement.

"Encumbered ECM Collateral" shall mean all Existing Lender Collateral other than the Encumbered Centrecourt Collateral.

"Exclusive ECM Collateral" shall mean all ECM Collateral other than: (i) property acquired by the Grantors subsequent to April 15, 2008 and (ii) the Centrecourt Collateral.

"First Priority Creditor" shall mean the JAD Sellers.

"First Priority Creditor Obligations" shall mean all debts, liabilities, obligations, covenants and duties owing to the First Priority Creditor by (i) the Borrowers under or in connection with the JAD Notes and (ii) the Parent under and in connection with the First Priority Senior Obligation, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

"First Priority Senior Obligation" shall mean all debts, liabilities, obligations, covenants and duties owing to the First Priority Creditor under or in connection with the JAD Notes, the Cumberland Surety and such other personally guaranteed debts of the First Priority Creditor to First Tennessee National Bank, Powell Valley National Bank and CIT Financial, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

3

"Junior Creditor Debt" shall mean all indebtedness, obligations, and liabilities of the Borrowers to either of the Junior Creditors, under any agreement of any kind, including, without limitation, all principal and interest (including, without limitation, any interest accruing after the filing of any petition in bankruptcy or the commencement of any Proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such Proceeding) and late fees payable thereunder.

"Junior Creditor Documents" shall mean any all documents evidencing the Junior Creditor Debt.

"Junior Creditors" shall mean (i) the Second Priority Creditor, to the extent such Second Priority Creditor shall not be a Senior Creditor pursuant to the terms of this Agreement, and (ii) the Third Priority Creditor, to the extent such Third Priority Creditor shall not be a Senior Creditor pursuant to the terms of this Agreement.

"Person" shall mean any corporation, association, joint venture, partnership, limited liability company, organization, business, individual, trust, government or agency or political subdivision thereof, or any other legal entity.

"Proceeding" shall mean (a) any insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, readjustment, composition, or other similar proceeding relating to the Borrowers or any of their respective properties, whether under any bankruptcy, reorganization, or insolvency laws or any law relating to relief of debtors, readjustment of indebtedness, reorganization, composition, or extension; (b) any proceeding for the liquidation, liquidating distribution, dissolution, or other winding up of the Borrowers, voluntary or involuntary, whether or not involving insolvency or bankruptcy proceedings; (c) any assignment for the benefit of creditors of the Borrowers; or (d) any other marshalling of the assets of the Borrowers.

"Remedy" shall mean, with respect to a Default, the acceleration of any Junior Creditor Debt or the exercise of any remedies in respect of such Default (including, without limitation, the right to sue the Borrowers, to exercise any right of set off, and to file or participate in any involuntary bankruptcy proceeding against the Borrowers, and explicitly including the imposition of default rate interest).

"Rights Agreement" shall mean the Rights Agreement, dated as of April 15, 2008, among the Parent, CAMOFI Master LDC, CAMHZN Master LDC, Futurtec, L.P., Lawrence Kaplan and Michael Miller.

"Second Priority Creditor" shall mean the Agent, on behalf of the Bridge Lenders.

"Second Priority Creditor Obligations" shall mean all debts, liabilities, obligations, covenants and duties owing by the Borrowers to the Second Priority Creditor under or in connection with the Bridge Notes, the Bridge Purchase Agreement and any other Borrower Transaction Documents, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

4

"Security Agreement" shall mean the Security Agreement, dated as of April 15, 2008, among the Borrowers, the Parent and the Agent, on behalf of the Bridge Lenders, as amended by Amendment No. 1 to Security Agreement, dated as of the date hereof.

"Senior Creditor" shall initially mean the First Priority Creditor unless and until such time as it is joined or replaced by the Second Priority Creditor and/or the Third Party Creditor pursuant to the terms of this Agreement.

"Senior Creditor Debt" shall mean all indebtedness, obligations, and liabilities owing by the Borrowers to a Senior Creditor, under the Senior Creditor Documents, including, without limitation, all principal and interest (including, without limitation, any interest accruing after the filing of any petition in bankruptcy or the commencement of any Proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such Proceeding) and late fees payable thereunder.

"Senior Creditor Documents" shall mean any all documents evidencing (i) if the First Priority Creditor is a Senior Creditor, the First Priority Creditor Obligations, (ii) if the Second Priority Creditor is a Senior Creditor, the Second Priority Creditor Obligations and (iii) if the Third Priority Creditor is a Senior Creditor, the Third Party Creditor Obligations.

"Senior Creditor Event of Default" shall mean a default or event of default under any instrument or agreement evidencing the Senior Creditor Debt.

"Stock Subordination Agreement" shall mean the Intercreditor and Subordination Agreement, dated April 15, 2008, among the Parent, the JAD Sellers, the Agent on behalf of the Bridge Lenders, JMB, and Merrill Lynch Commodities, Inc., a Delaware corporation.

"Subordination Agreements" shall mean, collectively, the Stock Subordination Agreement and this Agreement.

"Third Priority Creditor" shall mean the Collateral Agent, as collateral agent on behalf of ECM and ECM.

"Third Priority Creditor Documents" shall mean all documents evidencing the Third Priority Creditor Obligations.

"Third Priority Creditor Obligations" shall mean all debts, liabilities, obligations, covenants and duties owing by Parent and the Guarantors under or in connection with the Credit Agreement, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

"Unencumbered Centrecourt Collateral" shall mean the portion of the Unencumbered Collateral and Other Collateral in which Agent holds a security interest under the Security Agreement.

"Unencumbered ECM Collateral" shall mean all Unencumbered Collateral and Other Collateral other than the Unencumbered Centrecourt Collateral.

5

## Section 2.    Priority.

As between the parties, the priority of the security interest in the JAD Collateral, and the Atlas Drill, are as set forth in this Section 2 of the Agreement:

(i)    the First Priority Creditor, as the initial Senior Creditor, shall hold a second priority security interest in the Existing Lender Collateral (junior only to the lien of each Existing Lender) and a first priority security interest in the Unencumbered Collateral and the Other Collateral, the Second Priority Creditor shall hold a third priority security interest in the Encumbered Centrecourt Collateral (junior only to (a) the lien of each Existing Lender and (b) the lien of the First Priority Creditor), a second priority security interest in the Unencumbered Centrecourt Collateral (junior only to the lien of the First Priority Creditor), and a first priority security interest in the Atlas Drill, and the Third Priority Creditor shall hold a fourth priority security interest in the Encumbered Centrecourt Collateral (junior only to (a) the lien of each Existing Lender, (b) the lien of the First Priority Creditor and (c) the lien of the Second Priority Creditor), a third priority security interest in the Encumbered ECM Collateral (junior only to (a) the lien of the each Existing Lenders and (b) the lien of the First Priority Creditor), a third priority security interest in the Unencumbered Centrecourt Collateral (junior only to (a) the. lien of the First Priority Creditor and (b) the lien of the Second Priority Creditor), a second priority security interest in the Unencumbered ECM Collateral and the JAD Wash Plant (junior only to the lien of the First Priority Creditor), and a first priority security interest in all ECM Collateral other than JAD Collateral;

(ii)    at such time as the First Priority Senior Obligation is fully satisfied, the Second Priority Creditor shall, without further action, become an additional Senior Creditor and shall hold, solely with respect to Second Priority Creditor Obligations relating to an aggregate of up to $2,500,000 principal amount of Bridge Notes (including, without limitation, any interest, fees, or other liabilities or obligations thereon and relating thereto), (x) a first priority security interest in the Unencumbered Centrecourt Collateral pari passu with the First Priority Creditor, (y) a second priority security interest in the Encumbered Centrecourt Collateral (junior only to the lien of each Existing Lender) pari passu with the First Priority Creditor, and (z) a first priority security interest in the Atlas Drill, and, upon full satisfaction of the remaining First Priority Creditor Obligations, the First Priority Creditor shall no longer be a Senior Creditor and the Second Priority Creditor shall be the sole Senior Creditor with respect to all Second Priority Creditor Obligations;

(iii)    Upon full satisfaction of the remaining First Priority Creditor Obligations, the First Priority Creditor shall no longer be a Senior Creditor and the Third Priority Creditor shall be the sole Senior Creditor with respect to all Third Priority Creditor Obligations; and

(iv)    at such time as the First Priority Senior Obligation and the Second Priority Creditor Obligations are fully satisfied in cash, the Third Priority Creditor shall hold,

6

solely with respect to the Third Priority Creditor Obligations, (x) a second priority security interest in the Unencumbered ECM Collateral and the Unencumbered Centrecourt Collateral (junior only to the lien of the First Priority Creditor) and (y) a third priority security interest in the Encumbered ECM Collateral and the Encumbered Centrecourt Collateral (in each case junior only to (a) the lien of each Existing Lender and (b) the lien of the First Priority Creditor), and upon full satisfaction of the remaining First Priority Creditor Obligations, the First Priority Creditor shall no longer be a Senior Creditor and the Third Party Creditor shall be the sole Senior Creditor with respect to all Third Party Creditor Obligations.

**Section 3.**    <u>**Subordination in the Event of a Proceeding.**</u>

For so long as there is a Junior Creditor hereunder, upon any distribution of the Centrecourt Collateral or the proceeds of any sale thereof, upon any Proceeding, the Senior Creditors shall first be entitled to receive payments in full account of the Senior Creditor Debt in cash before the Junior Creditors are entitled to receive any payment on account of the Junior Creditor Debt and the Second Priority Creditor shall be entitled to receive payments in full account of the Second Priority Creditor Obligations in cash before the Third Priority Creditor is entitled to receive any payment on account of the Third Priority Creditor Obligations. Notwithstanding anything contained in this Section 3 to the contrary, upon any distribution of the Atlas Drill or the proceeds of any sale thereof, upon any Proceeding, the Second Priority Creditor shall first be entitled to receive any payments in full account of the Second Priority Creditor Obligations in cash before either the First Priority Creditor or the Third Priority Creditor are entitled to receive any payments on account of the First Priority Creditor Obligations or the Third Priority Creditor Obligations, respectively;

For so long as there is a Junior Creditor hereunder, upon any distribution of the Exclusive ECM Collateral, or the proceeds of any sale thereof, upon any Proceeding, the Senior Creditors shall first be entitled to receive payments in full account of the Senior Creditor Debt in cash before the Junior Creditors are entitled to receive any payment on account of the Junior Creditor Debt and the Third Priority Creditor shall be entitled to receive payments in full account of the Third Priority Creditor Obligations in cash before the Second Priority Creditor is entitled to receive any payment on account of the Second Priority Creditor Obligations.

For so long as there is a Junior Creditor hereunder, upon any distribution of the JAD Collateral or the proceeds of any sale thereof, upon any Proceeding:

    (i)    any payment or distribution of assets of any of the Borrowers of any kind or character, whether in cash, property, or securities to which either Junior Creditor would be entitled except for the provisions of this Agreement, shall be paid by the liquidating trustee or agent or other Person making such a payment or distribution, directly to the Senior Creditors, to the extent necessary to pay the Senior Creditor Debt in full after giving effect to all concurrent payments and distributions;

    (ii)    in the event that, notwithstanding the foregoing, any payment or distribution of assets of any of the Borrowers of any kind or character, whether in cash, property, or securities to which either Junior Creditor would be entitled except for the

7

provisions of this Agreement, shall be received by either Junior Creditor on account of any Junior Creditor Debt before the Senior Creditor Debt is paid in full in cash, such payment or distribution shall be received and held in trust by such Junior Creditor for the benefit of the Senior Creditor, to the extent necessary to pay the Senior Creditor Debt in full in cash after giving effect to all concurrent payments and distributions; and

(iii)    notwithstanding anything contained herein to the contrary, upon any distribution of the JAD Wash Plant or the proceeds of any sale thereof upon any Proceeding, the First Priority Creditor shall be entitled to receive payments in full account of the First Priority Creditor Obligations before the Junior Creditors are entitled to receive any payment on account of the Junior Creditor Debt, and the Third Priority Creditor shall be entitled to receive payments in full account of the Third Priority Creditor Obligations before the Second Priority Creditor shall be entitled to receive any payment on account of the Second Priority Creditor Obligations.

The Borrowers shall give written notice to the Senior Creditors and the Junior Creditors within three days of receipt of notice of any Proceeding.

Section 4.    **Remedy Standstill.**

(a) For so long as there is a Junior Creditor hereunder, until the date the Senior Creditor Debt has been paid in full in cash, no Junior Creditor shall, without the prior written consent of the Senior Creditor (i) exercise any Remedy in respect of any Default, or (ii) commence or join with any other creditor in commencing any bankruptcy, reorganization or insolvency proceeding, with respect to the JAD Collateral.

(b) Until the date on which all Second Priority Creditor Obligations have been paid in full in cash, (A) the Third Priority Creditor shall not, without the prior written consent of the Second Priority Creditor (i) exercise any Remedy in respect of any Default, or (ii) commence or join with any other creditor in commencing any bankruptcy, reorganization or insolvency proceeding, in the case of either (i) or (ii) above, solely to the extent that any such action would relate to the Atlas Drill, and (B) the Third Priority Creditor shall not, without the prior written consent of the Second Priority Creditor (i) exercise any Remedy in respect of any Default, or (ii) commence or join with any other creditor in commencing any bankruptcy, reorganization or insolvency proceeding, in the case of either (i) or (ii) above, solely to the extent that any such action would relate to any Centrecourt Collateral.

(c) Until the date on which the Third Priority Creditor Obligations are paid in full, the Second Priority Creditor shall not, without the prior written consent of the Third Priority Creditor (i) exercise any Remedy in respect of any Default, or (ii) commence or join with any other creditor in commencing any bankruptcy, reorganization or insolvency proceeding, in the case of either (i) or (ii) above, solely to the extent that any such action would relate to any Exclusive ECM Collateral or the JAD Wash Plant.

Section 5.    **Payments Held in Trust, Subrogation, Right to Cure and Purchase.**

For so long as there is a Junior Creditor hereunder:

8

(i)      If any payment or distribution of assets on account of any Junior Creditor Debt shall be made by any of the Borrowers or received by either Junior Creditor holding such Junior Creditor Debt at a time when such payment or distribution was prohibited by the provisions of this Agreement, then such payment or distribution shall be received and held in trust by such Junior Creditor for the benefit of the Senior Creditors and shall be paid or delivered by such Junior Creditor to the Senior Creditors to the extent necessary to enable payment in full of the Senior Creditor Debt in cash.

(ii)      After the payment in full of all Senior Creditor Debt in cash, each Junior Creditor shall be subrogated to the rights of the holders of such Senior Creditor Debt to receive payments or distributions on the JAD Collateral applicable to the Senior Creditor Debt until all amounts owing on the Junior Creditor Debt shall be paid in full, and for the purpose of such subrogation no such payments or distributions to the holders of the Senior Creditor Debt by or on behalf of any of the Borrowers, or by or on behalf of each Junior Creditor by virtue of this Agreement, that otherwise would have been made to the Second Priority Creditor shall, as between any of the Borrowers and each Junior Creditor, be deemed to be payment by such Borrower to or on account of the Senior Creditor Debt in respect thereof, it being understood that the provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of each Junior Creditor, on the one hand, and the holders of such Senior Creditor Debt, on the other hand.  If any payment or distribution to which any Junior Creditor would otherwise have been entitled but for the provisions of this Agreement shall have been applied, pursuant to the provisions of this Agreement, to the payment of amounts payable under the Senior Creditor Debt, then such Junior Creditor shall be entitled to receive from the holders of the Senior Creditor Debt any payments or distributions received by such holders of the Senior Creditor Debt in excess of the amount sufficient to pay all amounts payable under or in respect of such Senior Creditor Debt in full.

(iii)      The Senior Creditors hereby grant the Junior Creditors the right, but not the obligation, to cure any and all defaults under the Senior Creditor Debt (to the extent any such defaults are curable) within the same period of time afforded the Borrowers for curing such defaults before the same become Senior Creditor Events of Default.  The Senior Creditors shall have no obligation hereunder, however, to provide notice of any Senior Creditor Event of Default to the Junior Creditors, and the lack of any such notice shall not affect the existence or occurrence of any Senior Creditor Event of Default.

Section 6.      **No Prejudice or Impairment.**

Nothing contained in this Agreement, is intended to or shall impair, as between the Borrowers and the Junior Creditors, the obligation of the Borrowers, which is absolute and unconditional, to pay to the Junior Creditors the Junior Creditor Debt as and when the same shall become due and payable in accordance with its terms, or is intended to or shall affect the relative rights of the Junior Creditors and creditors of the Borrowers (other than the holders of the Senior Creditor Debt).

Section 7.      **Proofs of Claim.**

9

In connection with any Proceeding involving any of the Borrowers, the Junior Creditors are entitled to file proofs of claim in respect of the Junior Creditor Debt. Upon the failure of the either Junior Creditor to take any such action as of the fifteenth Business Day preceding the bar date for the filing of proofs of claims, the Senior Creditors are hereby irrevocably authorized and empowered, but shall have no obligation to file proofs of claim with respect to the Junior Creditor Debt. Notwithstanding the foregoing, the Senior Creditors shall not have any right whatsoever to vote any claim that either Junior Creditor may have in the Proceeding to accept or reject any plan or partial or complete liquidation, reorganization, arrangement, composition, or extension; provided, that, the Junior Creditors shall not vote with respect to any such plan or take any other action in any way so as to contest (i) the relative rights and duties of the Senior Creditors under the Senior Creditor Documents with respect to any collateral or guaranties or (ii) the Junior Creditors' respective obligations and agreements set forth in this Agreement.

**Section 8.**    **Benefit of Agreement; Amendments of Certain Documents; etc.**

This Agreement shall constitute a continuing offer to all Persons who, in reliance upon such provisions, become a Senior Creditor, and such provisions are made for the benefit of each subsequent Senior Creditor and each of them may enforce such provisions.

The Senior Creditor Documents may be amended, supplemented, waived, altered, modified, or otherwise changed in any manner approved by the Senior Creditors, the Parent and the Borrowers without the consent or approval of the Junior Creditors.

The Senior Creditors shall have no obligation to preserve rights in the JAD Collateral against any prior parties or to marshal any of the JAD Collateral for the benefit of any Person. No failure to exercise, and no delay in exercising on the part of any party hereto, any right, power, or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power, or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided in this Agreement are cumulative and shall not be exclusive of any rights or remedies provided by law.

Except as expressly set forth herein, there shall be no third party beneficiaries of this Agreement.

**Section 9.**    **Further Agreements Concerning the Collateral and Senior Creditor Debt.**

(a) Each Junior Creditor, severally and not jointly, agrees that (i) it will not at any time contest the validity, perfection, priority or enforceability of the security interests and liens granted by the Borrowers to the Senior Creditors in the JAD Collateral; (ii) the Senior Creditors may administer the Senior Creditor Debt and any of the Senior Creditors' agreements with the Borrowers in any way the Senior Creditors deem appropriate consistent with the terms and provisions of the Senior Creditor Documents, without regard to the Junior Creditors or the Junior Creditor Debt; (iii) the Senior Creditors shall have no obligation to preserve rights in the JAD Collateral against any prior parties or to marshal any of the JAD Collateral for the benefit of any Person; (iv) nothing in this Agreement shall impair or adversely affect the manner or timing with

10

which the Senior Creditors enforce any of their security; (vi) nothing in this Agreement shall impair or adversely affect any right, privilege, power or remedy of the Senior Creditors with respect to the Senior Creditor Debt, the Borrowers, or any JAD Collateral, including without limitation, the Senior Creditors' right to (x) waive or release any of the Senior Creditors' security or rights, (y) waive or ignore any defaults by the Borrowers; and/or (z) restructure, renew, modify, or supplement the Senior Creditor Debt or any portion thereof or any agreement with the Borrowers relating to the Senior Creditor Debt or to increase the outstanding principal amount of the Senior Creditor Debt by extending additional credit to the Borrowers; and (vi) nothing contained herein is intended to alter or deprive the Senior Creditors of any of their rights as the senior secured creditors of the Borrowers to collect or otherwise foreclose upon any of the JAD Collateral.

(b)    The Third Priority Creditor agrees that (i) it will not at any time contest the validity, perfection, priority or enforceability of the security interests and liens granted by the Borrowers to the Second Priority Creditor in the Centrecourt Collateral; (ii) the Second Priority Creditor may administer the Second Priority Creditor Obligations and any of the Second Priority Creditor's agreements with the Borrowers in any way the Second Priority Creditor deems appropriate consistent with the terms and provisions of the Borrower Transaction Documents, without regard to the Third Priority Creditor or the Third Priority Creditor Obligations or the Third Priority Creditor Documents; (iii) the Second Priority Creditor shall have no obligation to preserve rights in the Centrecourt Collateral against any prior parties or to marshal any of the Centrecourt Collateral for the benefit of any Person; (iv) nothing in this Agreement shall impair or adversely affect the manner or timing with which the Second Priority Creditor enforces any of its security; (v) nothing in this Agreement shall impair or adversely affect any right, privilege, power or remedy of the Second Priority Creditor with respect to the Second Priority Creditor Obligations, the Borrowers, or any Centrecourt Collateral, including without limitation, the Second Priority Creditor's right to (x) waive or release any of the Second Priority Creditor's security or rights, (y) waive or ignore any defaults by the Borrowers; and/or (z) restructure, renew, modify, or supplement the Second Priority Creditor Obligations or any portion thereof or any agreement with the Borrowers relating to the Second Priority Creditor Obligations or to increase the outstanding principal amount of the Second Priority Creditor Obligations by extending additional credit to the Borrowers; and (vi) nothing contained herein is intended to alter or deprive the Second Priority Creditor of any of its rights to collect or otherwise foreclose upon any of the Centrecourt Collateral.

(c)    The Second Priority Creditor agrees that (i) it will not at any time contest the validity, perfection, priority or enforceability of the security interests and liens granted by the Grantors to the Third Priority Creditor in the Exclusive ECM Collateral and the JAD Wash Plant; (ii) the Third Priority Creditor shall have no obligation to preserve rights in the Exclusive ECM Collateral or the JAD Wash Plant against any prior parties or to marshal any of the Exclusive ECM Collateral or the JAD Wash Plant for the benefit of any Person; (iii) nothing in this Agreement shall impair or adversely affect the manner or timing with which the Third Priority Creditor enforces any of its security in the Exclusive ECM Collateral or the JAD Wash Plant; (iv) nothing in this Agreement shall impair or adversely affect any right, privilege, power or remedy of the Third Priority Creditor with respect to the Third Priority Creditor Obligations, the Borrowers, any Exclusive ECM Collateral or the JAD Wash Plant, including without limitation, the Third Priority Creditor's right to (x) waive or release any of the Third Priority Creditor's

11

security or rights, (y) waive or ignore any defaults by the Borrowers; and/or (z) restructure, renew, modify, or supplement the Third Priority Creditor Obligations or any portion thereof or any agreement with the Borrowers relating to the Third Priority Creditor Obligations or to increase the outstanding principal amount of the Third Priority Creditor Obligations by extending additional credit to the Borrowers; and (v) nothing contained herein is intended to alter or deprive the Second Priority Creditor of any of its rights or otherwise foreclose upon any of the Exclusive ECM Collateral or the JAD Wash Plant.

**Section 10.    Representations and Warranties.** Each of the parties hereto hereby represents and warrants that (i) it has full power, authority and legal right to make and perform this Agreement and (ii) this Agreement is its legal, valid, and binding obligation, enforceable against it in accordance with its terms.

**Section 11.    Amendment.** Neither this Agreement nor any of the terms hereof may be amended, waived, discharged, or terminated unless such amendment, waiver, discharge, or termination is in writing signed by the Senior Creditors and the Junior Creditors.

**Section 12.    Successors and Assigns.** This Agreement and the terms, covenants, and conditions hereof shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns, and neither the Senior Creditor Debt nor the Junior Creditor Debt shall be sold, assigned, or transferred unless the assignee or transferee thereof expressly takes such debt subject to and agrees to be bound by the terms and conditions of this Agreement.

**Section 13.    Governing Law.** This Agreement will be construed in accordance with and governed by the law of the State of New York, without regard to the choice of law principles thereof.

**Section 14.    Notices.** Whenever it is provided herein that any notice, demand, request, consent, approval, declaration, or other communication shall or may be given to or served upon any of the parties by another, or whenever any of the parties desires to give or serve upon another any such communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration, or other communication shall be in writing and shall be deemed to have been duly given and received, for purposes hereof, when (i) delivered by hand, (ii) four days after being deposited in the mail, postage prepaid, and (iii) one Business Day after having been sent by reputable overnight courier, in each case addressed as set forth on the signature pages attached hereto or at such address as may be substituted by notice given as herein provided. Failure to delay in delivering copies of any communication to the persons designated to receive copies shall in no way adversely affect the effectiveness of such communication.

**Section 15.    Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 16.    Final Agreement.** THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES.

**Section 17.   WAIVER OF JURY TRIAL.**   TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE SENIOR CREDITORS, THE JUNIOR CREDITORS, THE BORROWERS AND THE JAD SELLERS HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED THEREBY OR THE ACTIONS OF THE SENIOR CREDITORS OR THE JUNIOR CREDITORS IN THE NEGOTIATION, ADMINISTRATION OR ENFORCEMENT HEREOF.

**Section 18.   Action by the Collateral Agent.**   At the request of the Collateral Agent pursuant to Section 10.13 of the Credit Agreement, ECM, being the sole Lender (as defined in the Credit Agreement) under the Credit Agreement, hereby instructs the Collateral Agent to execute this Agreement.   Further, pursuant to Section 10.09(b) of the Credit Agreement, the Lender hereby certifies and confirms to the Collateral Agent that this Agreement is not contrary to the terms of the Credit Agreement or any other Loan Document (as defined in the Credit Agreement) and is not otherwise contrary to law.   Absent receipt of appropriate written instructions from ECM under the Credit Agreement, Wilmington Trust Company shall have no duty or obligation to take any action hereunder and no liability to any other party hereto or any other person claiming by, through or under any such party.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY; SIGNATURE PAGES FOLLOW.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly
executed by their proper and duly authorized officers as of the day and year first above written.

J. A. D. COAL COMPANY, INC.

By: _____

Its: _____

Address for Notice:
_____
_____
_____

SANDLICK COAL COMPANY, LLC

By: _____

Its: _____

Address for Notice:
_____
_____
_____

FOX KNOB COAL CO., INC.

By: _____

Its: _____

Address for Notice:
_____
_____
_____

CAMOFI MASTER LDC, as Agent
for the Bridge Lenders

By: _____

Its: _____

Address for Notice:
_____
_____
_____


_____
Aubra Paul Dean

Address for Notice:
_____
_____
_____


_____
Carl E. McAfee

Address for Notice:
_____
_____
_____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their proper and duly authorized officers as of the day and year first above written.

**J. A. D. COAL COMPANY, INC.**

Address for Notice:

By: _____

Its: _____

**SANDLICK COAL COMPANY, LLC**

Address for Notice:

By: _____

Its: _____

**FOX KNOB COAL CO., INC.**

Address for Notice:

By: _____

Its: _____

**CAMOFI MASTER LDC, as Agent for the Bridge Lenders**

Address for Notice:

By: _____

Its: _____

Michael Loew
General Counsel

_____

Aubra Paul Dean

Address for Notice:

_____

Carl E. McAfee

Address for Notice:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their proper and duly authorized officers as of the day and year first above written.

**J. A. D. COAL COMPANY, INC.**

By: _____

Its: _____

Address for Notice:

_____
_____
_____

**SANDLICK COAL COMPANY, LLC**

By: _____

Its: _____

Address for Notice:

_____
_____
_____

**FOX KNOB COAL CO., INC.**

By: _____

Its: _____

Address for Notice:

_____
_____
_____

**CAMOFI MASTER LDC, as Agent
for the Bridge Lenders**

By: _____

Its: _____

Address for Notice:

_____
_____
_____

Aubra Paul Dean *(by Attorney in Fact)*

Address for Notice:

_____
_____
_____

Carl E. McAfee

Address for Notice:

P.O. Box 321
Norton, VA 24273
_____

_Julia L. McAfee_
Julia L. McAfee

Address for Notice:
P. O. Box 321
Norton, VA 24273

**WILMINGTON TRUST COMPANY, as
Collateral Agent for East Coast Miner LLC**

By:_____
Its:_____

Address for Notice:
_____
_____

**EAST COAST MINER LLC**

By:_____
Its:_____

Address for Notice:
_____
_____

15

_____          Address for Notice:
      Julia L. McAfee                     _____
                                          _____
                                          _____


**WILMINGTON TRUST COMPANY, as**          Address for Notice:
**Collateral Agent for East Coast Miner LLC**   _____
                                          _____
By:_____       _____
Its:_____
      James A. Hanley
      Vice President


**EAST COAST MINER LLC**                  Address for Notice:
                                          _____
                                          _____
By:_____       _____
Its:_____


15

_____
Julia L. McAfee

Address for Notice:
_____
_____
_____

**WILMINGTON TRUST COMPANY, as
Collateral Agent for East Coast Miner LLC**

By: _____
Its: _____

Address for Notice:
_____
_____
_____

**EAST COAST MINER LLC**

By: _____
Its: MANAGER

Address for Notice:
5 East 17th St.
Apartment 7
New York, NY 10003

15