# EXHIBIT C
# PART VI

FILED: NEW YORK COUNTY CLERK 11/05/2012          INDEX NO. 650411/2012
NYSCEF DOC. NO. 49                               RECEIVED NYSCEF: 11/05/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

CAMOFI MASTER LDC AND
CAMHZN MASTER, LDC,

    Plaintiffs,

    v.

U.S. COAL CORP., EAST COAST MINER LLC,
JAD COAL COMPANY, INC.,

    Defendants.

EAST COAST MINER LLC,

    Counterclaim Plaintiff,

    v.

CAMOFI MASTER LDC AND
CAMHZN MASTER, LDC,

    Counterclaim Defendants.

------------------------------------------------------------X

Index No. 650411/2012
Hon. Jeffery K. Oing

**DEFENDANT'S ANSWER
TO AMENDED COMPLAINT
AND COUNTERCLAIM**

Defendant-Counterclaim Plaintiff East Coast Miner LLC ("ECM" or "Defendant") by

and through its undersigned counsel, states for its answer to the Amended Complaint (the

"Complaint") filed by Plaintiffs-Counterclaim Defendants CAMOFI Master LDC ("CAMOFI")

and CAMHZN Master LDC ("CAMZHN," and, together with CAMOFI, "CAM" or

"Plaintiffs"), as follows:

## INTRODUCTION

1. Defendant denies the allegations set forth in Paragraph 1 of the Complaint, except that

Defendant admits that, upon information and belief, Plaintiffs are the holders of debt and equity interests in US Coal Corp. ("US Coal") and JAD Coal Company, Inc. ("JAD").

2. Defendant states that the allegations set forth in Paragraph 2 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 2.

3. Defendant states that the allegations set forth in Paragraph 3 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 3.

4. Defendant states that the allegations set forth in Paragraph 4 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 4, except that Defendant admits that April 1, 2010 has passed.

5. Defendant states that the allegations set forth in Paragraph 5 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 5.

6. Defendant states that the allegations set forth in Paragraph 6 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 6, except that Defendant admits that, (i) upon information and belief, US Coal refinanced certain of its indebtedness on or around December 7, 2011, and (ii) upon information and belief, US Coal hired a chief executive officer.

7. Defendant denies the allegations set forth in Paragraph 7 of the Complaint, except that Defendant admits that an entity known as East Coast Miner LLC was formed as a limited

liability company in September 2009.

8. Defendant denies the allegations set forth in Paragraph 8 of the Complaint.

9. Defendant denies the allegations set forth in Paragraph 9 of the Complaint.

## THE PARTIES

10. Defendant lacks sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 10 of the Complaint, and therefore denies the same, except that, upon information and belief, CAMOFI is a Cayman Islands Limited Duration Company with its principal place of business in the Cayman Islands.

11. Defendant lacks sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 11 of the Complaint, and therefore denies the same, except that, upon information and belief, CAMHZN is a Cayman Islands Limited Duration Company with its principal place of business in the Cayman Islands.

12. Defendant lacks sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 12 of the Complaint, and therefore denies the same, except that Defendant admits that, upon information and belief, US Coal is a Delaware corporation with its principal place of business at 2350 Regency Road, Lexington, Kentucky.

13. Defendant lacks sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 13 of the Complaint, and therefore denies the same, except that Defendant admits that, (i) upon information and belief, JAD is a Virginia corporation with its principal place of business at 2350 Regency Road, Lexington, Kentucky, and (ii) upon information and belief, JAD is a subsidiary of US Coal.

14. Defendant denies the allegations set forth in Paragraph 14 of the Complaint, except

that Defendant admits that ECM is a Delaware limited liability company.

## JURISDICTION

15. Defendant states that the allegations set forth in Paragraph 15 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 15, except that Defendant admits having a mailing address in New York State.

## BACKGROUND FACTS

16. Defendant denies the allegations set forth in Paragraph 16 of the Complaint, except that it admits that, upon information or belief, US Coal is a coal-mining company.

17. Defendant denies the allegations set forth in Paragraph 17 of the Complaint.

18. Defendant denies the allegations set forth in Paragraph 18 of the Complaint.

19. Defendant denies the allegations set forth in Paragraph 19 of the Complaint.

20. Defendant states that the allegations set forth in Paragraph 20 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 20 of the Complaint.

21. Defendant denies the allegations set forth in Paragraph 21 of the Complaint.

22. Defendant states that the allegations set forth in Paragraph 22 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 22 of the Complaint.

23. Defendant states that the allegations set forth in Paragraph 23 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any

response is required, Defendant denies the allegations set forth in Paragraph 23 of the Complaint.

24. Defendant states that the allegations set forth in Paragraph 24 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 24 of the Complaint.

25. Defendant states that the allegations set forth in Paragraph 25 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 25 of the Complaint.

26. Defendant states that the allegations set forth in Paragraph 26 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 26 of the Complaint.

27. Defendant denies the allegations set forth in Paragraph 27 of the Complaint, except that it admits that (i) ECM was formed as a limited liability company in September 2009, (ii) ECM purchased debt of US Coal and its subsidiaries and (iii) the purchase of such debt was conditioned, among other things, on the extension of the maturity dates on some, but not all, of the indebtedness of US Coal to Plaintiffs.

28. Defendant denies the allegations set forth in Paragraph 28 of the Complaint.

29. Defendant denies the allegations set forth in Paragraph 29 of the Complaint, except that it admits that (i) ECM acquired approximately $24 million of debt and $3 million of equity in US Coal in September 2009 (collectively, the "ECM Recapitalization"), and (ii) ECM holds a first priority security interest in all property and assets of Licking River Resources, Inc. and security interests in all property and assets of JAD.

30. Defendant denies the allegations set forth in Paragraph 30 of the Complaint, except Defendant admits that certain members of ECM served as directors of US Coal subsequent to

September 2009.

    31. Defendant denies the allegations set forth in Paragraph 31 of the Complaint.

    32. Defendant denies the allegations set forth in Paragraph 32 of the Complaint.

    33. Defendant denies the allegations set forth in Paragraph 33 of the Complaint.

    34. Defendant states that the allegations set forth in Paragraph 34 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 34 of the Complaint.

    35. Defendant denies the allegations set forth in Paragraph 35 of the Complaint.

    36. Defendant denies the allegations set forth in Paragraph 36 of the Complaint.

    37. Defendant denies the allegations set forth in Paragraph 37 of the Complaint.

    38. Defendant denies the allegations set forth in Paragraph 38 of the Complaint.

    39. Defendant denies the allegations set forth in Paragraph 39 of the Complaint.

    40. Defendant denies the allegations set forth in Paragraph 40 of the Complaint.

    41. Defendant states that the allegations set forth in Paragraph 41 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 41 of the Complaint.

    42. Defendant states that the allegations set forth in Paragraph 42 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 42 of the Complaint.

    43. Defendant states that the allegations set forth in Paragraph 43 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 43 of the Complaint.

    44. Defendant denies allegations set forth in Paragraph 44 of the Complaint.

45. Defendant denies the allegations in Paragraph 45 of the Complaint, except that

Defendant admits that, (i) on or about December 7, 2011, Defendant consented to the extension

of the maturity on US Coal's indebtedness, which was then in default, and (ii) the terms of the

extension require US Coal to pay interest to Defendant during the term of the indebtedness.

46. Defendant denies the allegations set forth in Paragraph 46 of the Complaint.

47. Defendant denies the allegations set forth in Paragraph 47 of the Complaint.

48. Defendant denies the allegations set forth in Paragraph 48 of the Complaint.

49. Defendant denies the allegations set forth in Paragraph 49 of the Complaint.

50. Defendant denies the allegations set forth in Paragraph 50 of the Complaint.

51. Defendant denies the allegations set forth in Paragraph 51 of the Complaint.

## FIRST CLAIM FOR RELIEF

52. In response to the allegations set forth in Paragraph 52 of the Complaint, Defendant

repeats and realleges each and every response to Paragraphs 1 through 51 of the Complaint, as if

fully set forth herein.

53. Defendant denies the allegations set forth in Paragraph 53 of the Complaint.

54. Defendant denies the allegations set forth in Paragraph 54 of the Complaint.

55. Defendant denies the allegations set forth in Paragraph 55 of the Complaint.

56. Defendant denies the allegations set forth in Paragraph 56 of the Complaint.

57. Defendant denies the allegations set forth in Paragraph 57 of the Complaint.

58. Defendant denies the allegations set forth in Paragraph 58 of the Complaint.

59. Defendant states that the allegations set forth in Paragraph 59 of the Complaint are

conclusions of law as to which no responsive pleading is necessary, but to the extent any

response is required, Defendant denies the allegations set forth in Paragraph 59 of the Complaint.

60. Defendant denies the allegations set forth in Paragraph 60 of the Complaint.

## SECOND CLAIM FOR RELIEF

61. In response to the allegations set forth in Paragraph 61 of the Complaint, Defendant repeats and realleges each and every response to Paragraphs 1 through 60 of the Complaint, as if fully set forth herein.

62. Defendant denies the allegations set forth in Paragraph 62 of the Complaint.

63. Defendant states that the allegations set forth in Paragraph 63 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 63 of the Complaint.

64. Defendant denies the allegations set forth in Paragraph 64 of the Complaint.

## THIRD CLAIM FOR RELIEF

65. In response to the allegations set forth in Paragraph 65 of the Complaint, Defendant repeats and realleges each and every response to Paragraphs 1 through 64 of the Complaint, as if fully set forth herein.

66. Defendant denies the allegations set forth in Paragraph 66 of the Complaint.

67. Defendant denies the allegations set forth in Paragraph 67 of the Complaint.

68. Defendant states that the allegations set forth in Paragraph 68 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 68 of the Complaint.

69. Defendant denies the allegations set forth in Paragraph 69 of the Complaint.

## FOURTH CLAIM FOR RELIEF

70. In response to the allegations set forth in Paragraph 70 of the Complaint, Defendant repeats and realleges each and every response to Paragraphs 1 through 69 of the Complaint, as if fully set forth herein.

71. Defendant states that the allegations set forth in Paragraph 71 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 71 of the Complaint.

72. Defendant denies the allegations set forth in Paragraph 72 of the Complaint.

73. Defendant denies the allegations set forth in Paragraph 73 of the Complaint.

74. Defendant denies the allegations set forth in Paragraph 74 of the Complaint.

75. Defendant denies the allegations set forth in Paragraph 75 of the Complaint.

## FIFTH CLAIM FOR RELIEF

76. In response to the allegations set forth in Paragraph 76 of the Complaint, Defendant repeats and realleges each and every response to Paragraphs 1 through 75 of the Complaint, as if fully set forth herein.

77. Defendant states that the allegations set forth in Paragraph 77 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 77 of the Complaint.

78. Defendant denies the allegations set forth in Paragraph 78 of the Complaint.

79. Defendant denies the allegations set forth in Paragraph 79 of the Complaint.

80. Defendant denies the allegations set forth in Paragraph 80 of the Complaint.

## SIXTH CLAIM FOR RELIEF

81. In response to the allegations set forth in Paragraph 81 of the Complaint, Defendant repeats and realleges each and every response to Paragraphs 1 through 80 of the Complaint, as if fully set forth herein.

82. Defendant states that the allegations set forth in Paragraph 82 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but to the extent any response is required, Defendant denies the allegations set forth in Paragraph 82 of the Complaint.

83. Defendant denies the allegations set forth in Paragraph 83 of the Complaint.

84. Defendant denies the allegations set forth in Paragraph 84 of the Complaint.

85. Defendant denies the allegations set forth in Paragraph 85 of the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Cause of Action)

86. The Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE
### (Economic Interest)

87. Plaintiffs' claims for tortious interference fail by reason of Defendant's privilege to engage in conduct that is in its own economic interest.

### THIRD AFFIRMATIVE DEFENSE
### (Causation)

88. The Complaint is barred in whole or in part because the actions or omissions of ECM were not the direct, proximate, or actual cause of any injuries or damages allegedly sustained by

Plaintiffs.

## FOURTH AFFIRMATIVE DEFENSE
### (Documentary Evidence)

89. The Complaint is barred in whole or in part because it is contradicted by documentary

evidence.

## FIFTH AFFIRMATIVE DEFENSE
### (Waiver, Estoppel and Unclean Hands)

90. The Complaint is barred in whole or in part by the doctrines of waiver, estoppel and

unclean hands.

## SIXTH AFFIRMATIVE DEFENSE
### (Res Judicata)

91. The Complaint is barred in whole or in part because of the doctrine of res judicata.

## SEVENTH AFFIRMATIVE DEFENSE
### (Collateral Estoppel)

92. The Complaint is barred in whole or in part because of the doctrine of collateral

estoppel.

## EIGHTH AFFIRMATIVE DEFENSE
### (Ongoing Litigation)

93. The Complaint should be dismissed because there is another action pending between

the same parties for the same cause of action in another court.

## NINTH AFFIRMATIVE DEFENSE
### (Contractual Standstill Provision)

94. The Complaint is barred in whole or in part because the commencement of this action

by Plaintiffs violates the terms of an intercreditor agreement, dated April 15, 2008, as amended

and restated by the First Amended and Restated Intercreditor and Subordination Agreement,

dated September 30, 2009 ("Amended Intercreditor Agreement") (annexed as Ex. 1 hereto), to

which Plaintiffs are a party.

### TENTH AFFIRMATIVE DEFENSE
### (The Rights Agreement is Unenforceable)

95. Plaintiffs' Fourth Cause of Action is barred because the Rights Agreement between

US Coal, CAM, and other parties, dated April 15, 2008 (the "Rights Agreement") is

unenforceable.

### ELEVENTH AFFIRMATIVE DEFENSE
### (The JAD Equipment Note is Unenforceable)

96. Plaintiffs' Fifth Cause of Action is barred because the $4.8 million promissory note

between CAMOFI and JAD, dated April 15, 2008 (the "JAD Equipment Note") is

unenforceable.

### TWELFTH AFFIRMATIVE DEFENSE
### (The April 2008 Letter Agreement is Void)

97. Plaintiffs' Sixth Cause of Action is barred because the April 14, 2008 Letter

Agreement between CAM and US Coal (the "April 2008 Letter Agreement") is void.

### DEFENSES RESERVED

Defendant ECM hereby gives notice that it intends to rely on other defenses that may

become available or apparent during discovery proceedings in this matter, and hereby reserves its

right to amend its Answer and to assert any such defense.

### DEFENDANT-COUNTERCLAIM PLAINTIFF EAST COAST MINER LLC'S

### COUNTERCLAIM

ECM by and through its undersigned counsel, states for its counterclaim against CAM as

follows:

## PARTIES

1. ECM is a Delaware limited liability company with its principal place of business in
New York.

2. On information and belief, CAMOFI is a Cayman Islands Limited Duration Company
with its principle place of business in the Cayman Islands.

3. On information and belief, CAMHZN is a Cayman Islands Limited Duration Company
with its principle place of business in the Cayman Islands.

4. On information and belief, US Coal is a Delaware corporation with its principal place
of business in Lexington, Kentucky.

5. On information and belief, JAD is a Virginia corporation, Sandlick Coal Company,
LLC is a Virginia limited liability company ("Sandlick") and Fox Knob Coal Co., Inc. is a
Kentucky corporation ("Fox Knob"), and each of JAD, Sandlick and Fox Knob is a subsidiary of
US Coal (collectively, the "JAD Subsidiaries").

## JURISDICTION

6. This Court has jurisdiction over counterclaims pursuant to New York Civil Practice
Law and Rules section 601(a).

7. CAMOFI and CAMHZN are subject to the jurisdiction of the courts of the State of
New York because both have consented to the jurisdiction of this Court.

## PRELIMINARY STATEMENT

8. Plaintiffs' efforts to recover amounts payable to them by JAD under the JAD Equipment Note and by US Coal under the Rights Agreement are barred by the provisions of the Amended Intercreditor Agreement. The Amended Intercreditor Agreement, to which Plaintiffs are parties, bars any action to enforce the Rights Agreement and the JAD Equipment Note unless and until certain senior creditors either (i) are paid in full, or (ii) have given their consent. Those senior creditors have not been paid in full and have not consented to Plaintiffs' action. Accordingly, the instant action by Plaintiffs constitutes a clear breach of the Amended Intercreditor Agreement and ECM has suffered significant damages as a result of these actions.

## FACTS

9. In September 2009, pursuant to an assignment and assumption agreement, ECM purchased approximately $24 million of previously issued and outstanding debt of US Coal (the "JMB Loan") that was held by JMB Partners Master Fund, L.P. ("JMB"), a Cayman Islands hedge fund, pursuant to a Second Amended and Restated Credit Agreement and Value Right Agreement, each dated as of August 29, 2008 (collectively, the "Credit Agreements")(annexed as Ex. 2 hereto). Under the Credit Agreements, JMB held a first priority security interest in all of the property of Licking River Resources, Inc., Oak Hill Coal, Inc. and S. M. & J., Inc., each of which were subsidiaries of US Coal (the "Licking River Subsidiaries").

10. The JMB Loan was due and payable on September 30, 2009. US Coal lacked the resources to repay the JMB Loan on its due date and had been unsuccessful in its effort to obtain financing. Keith Goggin, a shareholder and creditor of US Coal, agreed to organize ECM and seek investors willing to purchase interests in ECM, with a view to purchasing the JMB Loan and extending its maturity to December 31, 2011. However, Mr. Goggin was not willing to

organize ECM to purchase the JMB Loan unless the other creditors of US Coal holding

indebtedness maturing prior to December 31, 2011, agreed to extend the maturity dates on such

indebtedness to December 31, 2011. Plaintiffs and other creditors of US Coal agreed, and ECM

purchased the JMB Loan.

     11.  The Credit Agreements were thereafter combined and amended pursuant to a First

Amendment to Second Amended and Restated Credit Agreement and Value Right Agreement,

dated September 30, 2009 (the "Amended Credit Agreement") (annexed as Ex. 3 hereto). ECM

wished to avoid another debt refinancing crisis for US Coal on December 31, 2011, when the

JMB Loan, as amended, and the loans to Plaintiffs and other creditors of US Coal became due

and payable. Accordingly, the Amended Credit Agreement required US Coal to repay principal

on the JMB Loan and the loans to other creditors each month in equal payments sufficient to

repay all of these loans in full on December 31, 2011.

     12.  To induce ECM to purchase the JMB Loan, among other things, US Coal granted to

ECM a security interest in all of the property and assets of the JAD Subsidiaries in addition to

JMB's existing security interest in the property and assets of the Licking River Subsidiaries.

Plaintiffs and Aubra Paul Dean ("Dean"), Carl E. McAfee ("Carl") and Julia L. McAfee ("Julia"

and together with Dean and Carl, the "JAD Sellers"), each of whom were existing creditors of

US Coal and the JAD Subsidiaries, required ECM to join their existing intercreditor agreements

to preclude ECM from taking legal and other actions to enforce the terms of the Amended Credit

Agreement against JAD, unless Plaintiffs and the JAD Senior Creditors consented to such

actions or had been paid in full. Accordingly, the existing intercreditor agreement was amended

to include ECM as a party. No other substantive amendments were made to the intercreditor

agreement. As amended to include ECM as a party, the intercreditor agreement is herein

referred to as the "Amended Intercreditor Agreement."

13. The JAD Companies are defined as the "Borrowers" in the first paragraph of the

Amended Intercreditor Agreement. Plaintiffs are "Second Priority Creditors," as defined in

Section 1 of the Amended Intercreditor Agreement. Plaintiffs, as a Second Priority Creditor, are

a "Junior Creditor," as defined in Section 1 of the Amended Intercreditor Agreement. "Junior

Creditor Debt" is defined, in relevant part, as "all indebtedness, obligations and liabilities of the

Borrowers to the Junior Creditors under any agreement of any kind, . . ."

14. The Equipment Note is an indebtedness owed by the Borrowers to Plaintiffs, Junior

Creditors, and is therefore Junior Creditor Debt as defined in the Amended Intercreditor

Agreement.

15. The term "Second Priority Creditor Obligations" is defined to include all obligations

owed by the Borrowers to Plaintiffs as Second Priority Creditors under the "Borrower

Transaction Documents, whether now existing or hereafter arising, direct or indirect, contingent

or non-contingent, secured or unsecured, due or not due." Since US Coal is a holding company,

and derives all of its income and means of payment from the JAD Companies and its other

subsidiaries, obligations of US Coal to Plaintiffs would be indirect obligations of the Borrowers.

The term "Borrower Transaction Documents" is therefore defined to include US Coal's

obligation to make payments under Section 2 of the Rights Agreement. These payment

obligations are described by Plaintiffs in paragraph 38 of the Complaint as "put rights."

16. US Coal's obligation to make payments under Section 2 of the Rights Agreement is

an obligation indirectly owed by the Borrowers, as defined by the term "Borrower Transaction

Documents," and is therefore a "Second Priority Creditor Obligation" and "Junior Creditor

Debt," each as defined in the Amended Intercreditor Agreement.

17. Section 4(a) of the Amended Intercreditor Agreement prohibits Plaintiffs, as Junior

Creditors, from exercising "any Remedy in respect of any Default." The term "Default" is

defined to mean "a default or event of default under any instrument or agreement evidencing any

of the Junior Creditor Debt." The term "Remedy" is defined to include "the exercise of any

remedies in respect of such Default . . ." The Senior Creditor is defined as the "First Priority

Creditor," which in turn is defined as the "JAD Sellers."

18. Since the Equipment Note and the payment obligations of US Coal under the Rights

Agreement are each Junior Creditor Debt, Plaintiffs, as Junior Creditors, are prohibited under the

terms of the Amended Intercreditor Agreement from exercising any Remedy with respect to their

Default, until the Senior Creditor Debt has been paid in full in cash, unless the prior written

consent of the Senior Creditor has been obtained.

19. The Senior Creditor Debt has not been paid in full in cash.

20. The Senior Creditor has not consented to the exercise of any Remedy by Plaintiffs.

21. On February 14, 2012, Plaintiffs commenced this suit in respect of a Default of the

payment obligations under the Rights Agreement and the Equipment Note. The instant action is

the exercise of a Remedy with respect to a Default on the Junior Creditor Debt, as defined under

the Amended Intercreditor Agreement.

## FIRST COUNTERCLAIM
### (Breach of the Asset Subordination Agreement)

22. ECM repeats and realleges Paragraphs 1 through 21 of this counterclaim, as if fully

set forth herein.

23. The commencement of Plaintiffs' action is a breach by Plaintiffs of the Amended

Intercreditor Agreement.

    24. As a result of Plaintiffs' breaches, ECM has been damaged by, among other things,

being forced to incur legal and other expenses to enforce its rights under the Amended

Intercreditor Agreement in an amount to be determined at trial.

    WHEREFORE, Defendant ECM respectfully requests judgment in its favor as follows:

    a) Dismissal of the Complaint in its entirety with prejudice, or, in the alternative, granting judgment on all counts of the Complaint in favor of the Defendants;

    b) On Defendant's Counterclaim, recovery of all damages, including all fees, costs and disbursements that Defendant incurs in connection with defending this Complaint; and

    c) Such other and further relief as the Court may deem appropriate and proper to award to Defendant.

Dated: New York, New York                          Respectfully submitted,
       November 5, 2012

                                      /s/ Stephen J. Nelson
                                      Stephen J. Nelson
                                      Mary Anne Mayo
                                      Scott M. Dubowsky
                                        Samuel B. Litton

                                        THE NELSON LAW FIRM, LLC
                                        White Plains Plaza
                                        One North Broadway
                                        White Plains, New York 10601
                                        Telephone: (914) 220-1900
                                        Facsimilie: (914) 220-1910
                                        E-mail: sjnelson@nelsonlf.com

                                        *Attorneys for Defendant*
                                        *East Coast Miner LLC*

TO:

Douglas A. Rappaport
Robert J. Boller
Rachel J. Presa
AIKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000

*Attorneys for Plaintiffs*
*CAMOFI Master LDC*
*CAMHZN Master LDC*

Frank H. Penski
Abigail T. Reardon
NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
(212) 940-3000

*Attorneys for Defendants*
*U.S. Coal Corp.*
*JAD Coal Co.*
*Fox Knob Coal Co.*
*Sandlick Coal Co.*

FILED: NEW YORK COUNTY CLERK 11/05/2012                    INDEX NO. 650411/2012

NYSCEF DOC. NO. 50                                          RECEIVED NYSCEF: 11/05/2012

**Exhibit 1**

**Amended Intercreditor Agreement**

## FIRST AMENDED AND RESTATED INTERCREDITOR AND SUBORDINATION AGREEMENT

THIS FIRST AMENDED AND RESTATED INTERCREDITOR AND SUBORDINATION AGREEMENT (this "Agreement") is dated as of September 30, 2009 among J.A.D. Coal Company, Inc., a Virginia corporation ("JAD"), Sandlick Coal Company, LLC, a Virginia limited liability company, formerly known as Sandlick Coal Company, Inc., a Virginia corporation ("Sandlick"), Fox Knob Coal Co., Inc., a Kentucky corporation ("Fox Knob" and together with JAD and Sandlick, the "Borrowers"), Aubra Paul Dean ("Aubra"), Carl E. McAfee ("Carl"), Julia L. McAfee ("Julia" and together with Aubra and Carl, the "JAD Sellers"), and CAMOFI Master LDC, a Cayman Islands Limited Duration Company, as collateral agent for the various purchasers (the "Bridge Lenders") under the Bridge Purchase Agreement (as hereinafter defined) (the "Agent"), East Coast Miner LLC, a Delaware limited liability company ("ECM"), and Wilmington Trust Company, as collateral agent on behalf of ECM (the "Collateral Agent").

## RECITALS

WHEREAS, the Borrowers requested that the Bridge Lenders make, and the Bridge Lenders made, a $5,000,000 bridge loan to the Borrowers on the terms set forth in Senior Secured Notes, dated as of April 15, 2008 and due December 31, 2011 (the "Bridge Notes");

WHEREAS, the Bridge Notes are subject to the terms of the Securities Purchase Agreement, dated as of April 15, 2008 (the "Bridge Purchase Agreement"), by and among the Borrowers, U.S. Coal Corporation, a Delaware corporation and parent of the Borrowers (the "Parent"), and the Bridge Lenders, and are secured by the collateral set forth in the Security Agreement (the "Centrecourt Collateral"), the terms and priority of which are as set forth in this Agreement;

WHEREAS, the Borrowers' obligations under the Bridge Notes, the Bridge Purchase Agreement and the other Borrower Transaction Documents (as hereinafter defined) are guaranteed by the Parent pursuant to the Guarantee, dated as of April 15, 2008 (the "Guarantee"), made by the Parent in favor of the Bridge Lenders;

WHEREAS, on or prior to April 15, 2008, the Parent and the JAD Sellers entered into a Purchase Agreement, dated as of June 19, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "JAD Purchase Agreement"), pursuant to which the Parent purchased (the "JAD Acquisition") all of the outstanding equity interests of the Borrowers;

WHEREAS, pursuant to the JAD Purchase Agreement, the Borrowers issued Convertible Notes, dated as of April 15, 2008, to the JAD Sellers in the total aggregate principal amount of $7,000,000 (the "JAD Notes") to finance the JAD Acquisition;

WHEREAS, in accordance with the terms of the JAD Purchase Agreement, the JAD Sellers were granted by the Parent (i) a second lien security interest in all right, title and interest

in and to all equipment and interests in real property owned by the Borrowers on April 15, 2008 in which the Borrowers have previously granted a first priority security interest (the "Existing Lender Collateral") to First Tennessee National Bank, CIT Financial, Powell Valley National Bank and their assignees (collectively, the "Existing Lenders"), (ii) a first lien security interest in all of Borrowers' right, title and interest in and to all equipment, fixtures and other personal property and coal reserves owned by the Borrowers on April 15, 2008 in which it has not previously granted a security interest to any third party (the "Unencumbered Collateral") and, (iii) in accordance with the terms of that certain security agreement dated as of April 15, 2008, made by and between the Borrowers and the JAD Sellers (the "JAD Security Agreement"), the right to receive a first lien security interest in the Other Collateral (as defined therein the "Other Collateral" and together with the Existing Lender Collateral and the Unencumbered Collateral, the "JAD Collateral"), to secure their rights and interests under (i) the JAD Notes, (ii) the Parent's obligations with respect to the Cumberland Surety Agreement for Bond for the Surface Effects of Surface Mining issued June 22, 1998, by Cumberland Surety Incorporated (the "Cumberland Surety") on behalf of Sandlick and (iii) the Parent's obligations with respect to their other personal guarantee obligations assumed by the Parent pursuant to the JAD Purchase Agreement;

WHEREAS, pursuant to that certain Assignment and Assumption dated as of September 30, 2009 between JMB Capital Partners Master Fund, L.P. ("JMB"), and ECM, ECM irrevocably purchased and assumed from JMB, all of JMB's rights and obligations in its capacity as a lender under that certain Second Amended and Restated Credit Agreement, dated August 29, 2008 by and between Parent, as Borrower, the Guarantors (as defined therein), the Collateral Agent, and JMB, as successor in interest to FURSA Master Global Event Driven Fund L.P. and Grand Central Asset Trust, MLN Series, as such credit agreement was amended by that certain First Amendment to Second Amended and Restated Credit Agreement and Value Right Agreement dated as of September 30, 2009 by and among Parent, the Guarantors, the Collateral Agent, and ECM (as amended from time to time the "Credit Agreement"), and the other transaction documents executed and delivered in connection therewith, including without limitation, that certain Amended and Restated Security Agreement dated as of August 29, 2008 made by Grantors (as defined therein the "Grantors") to the Collateral Agent, as the same was amended by that certain First Amendment to the Amended and Restated Security Agreement dated as of September 30, 2009 made by Parent, the Grantors, and the Collateral Agent (the "Amended Security Agreement");

WHEREAS, the Amended Security Agreement grants to the Collateral Agent, for the benefit of ECM, a security interest in each Grantor's right, title and interest in and to all of such Grantor's property and assets, whether now owned or thereafter existing or arising, including, without limitation, the coal preparation and wash plant at JAD (the "JAD Wash Plant", which, for the avoidance of doubt, does not include any portion of the coal preparation and wash plant consisting of an interest in real property) and the highwall miner, serial number _____, located at JAD (collectively, the "ECM Collateral");

WHEREAS, the Borrowers, the JAD Sellers, the Bridge Lenders, the Collateral Agent and ECM desire to enter into this Agreement to, among other things, confirm the relative priorities of and rights in the security interests in the JAD Collateral and the Atlas Drill;

2

NOW, THEREFORE, in consideration of the above recitals and the provisions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows, intending to be legally bound:

## AGREEMENT

**Section 1.    Definitions.** In addition to the terms defined elsewhere in this Agreement, the following terms have the meanings indicated in this Section 1:

"Additional Notes" shall mean any Bridge Notes issued to the holders of the Bridge Notes in payment of interest.

"Atlas Drill" shall mean that certain Atlas Drill, serial number 8836, acquired by the Borrowers subsequent to April 15, 2008, in which Agent holds a security interest under the Security Agreement, and which comprises part of the Centrecourt Collateral.

"Borrower Transaction Documents" shall mean the Bridge Purchase Agreement, the Bridge Notes, the Additional Notes (if any), the Security Agreement, the Guarantee, the Rights Agreement (only as it relates to the Parent's obligations under Section 2 of the Rights Agreement) and the Subordination Agreements (as they relate to enforcement costs thereunder).

"Default" shall mean a default or event of default under any instrument or agreement evidencing any of the Junior Creditor Debt.

"Encumbered Centrecourt Collateral" shall mean the portion of the Existing Lender Collateral in which Agent holds a security interest under the Security Agreement.

"Encumbered ECM Collateral" shall mean all Existing Lender Collateral other than the Encumbered Centrecourt Collateral.

"Exclusive ECM Collateral" shall mean all ECM Collateral other than: (i) property acquired by the Grantors subsequent to April 15, 2008 and (ii) the Centrecourt Collateral.

"First Priority Creditor" shall mean the JAD Sellers.

"First Priority Creditor Obligations" shall mean all debts, liabilities, obligations, covenants and duties owing to the First Priority Creditor by (i) the Borrowers under or in connection with the JAD Notes and (ii) the Parent under and in connection with the First Priority Senior Obligation, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

"First Priority Senior Obligation" shall mean all debts, liabilities, obligations, covenants and duties owing to the First Priority Creditor under or in connection with the JAD Notes, the Cumberland Surety and such other personally guaranteed debts of the First Priority Creditor to First Tennessee National Bank, Powell Valley National Bank and CIT Financial, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

3

"Junior Creditor Debt" shall mean all indebtedness, obligations, and liabilities of the Borrowers to either of the Junior Creditors, under any agreement of any kind, including, without limitation, all principal and interest (including, without limitation, any interest accruing after the filing of any petition in bankruptcy or the commencement of any Proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such Proceeding) and late fees payable thereunder.

"Junior Creditor Documents" shall mean any all documents evidencing the Junior Creditor Debt.

"Junior Creditors" shall mean (i) the Second Priority Creditor, to the extent such Second Priority Creditor shall not be a Senior Creditor pursuant to the terms of this Agreement, and (ii) the Third Priority Creditor, to the extent such Third Priority Creditor shall not be a Senior Creditor pursuant to the terms of this Agreement.

"Person" shall mean any corporation, association, joint venture, partnership, limited liability company, organization, business, individual, trust, government or agency or political subdivision thereof, or any other legal entity.

"Proceeding" shall mean (a) any insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, readjustment, composition, or other similar proceeding relating to the Borrowers or any of their respective properties, whether under any bankruptcy, reorganization, or insolvency laws or any law relating to relief of debtors, readjustment of indebtedness, reorganization, composition, or extension; (b) any proceeding for the liquidation, liquidating distribution, dissolution, or other winding up of the Borrowers, voluntary or involuntary, whether or not involving insolvency or bankruptcy proceedings; (c) any assignment for the benefit of creditors of the Borrowers; or (d) any other marshalling of the assets of the Borrowers.

"Remedy" shall mean, with respect to a Default, the acceleration of any Junior Creditor Debt or the exercise of any remedies in respect of such Default (including, without limitation, the right to sue the Borrowers, to exercise any right of set off, and to file or participate in any involuntary bankruptcy proceeding against the Borrowers, and explicitly including the imposition of default rate interest).

"Rights Agreement" shall mean the Rights Agreement, dated as of April 15, 2008, among the Parent, CAMOFI Master LDC, CAMHZN Master LDC, Futurtec, L.P., Lawrence Kaplan and Michael Miller.

"Second Priority Creditor" shall mean the Agent, on behalf of the Bridge Lenders.

"Second Priority Creditor Obligations" shall mean all debts, liabilities, obligations, covenants and duties owing by the Borrowers to the Second Priority Creditor under or in connection with the Bridge Notes, the Bridge Purchase Agreement and any other Borrower Transaction Documents, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

4

"Security Agreement" shall mean the Security Agreement, dated as of April 15, 2008, among the Borrowers, the Parent and the Agent, on behalf of the Bridge Lenders, as amended by Amendment No. 1 to Security Agreement, dated as of the date hereof.

"Senior Creditor" shall initially mean the First Priority Creditor unless and until such time as it is joined or replaced by the Second Priority Creditor and/or the Third Party Creditor pursuant to the terms of this Agreement.

"Senior Creditor Debt" shall mean all indebtedness, obligations, and liabilities owing by the Borrowers to a Senior Creditor, under the Senior Creditor Documents, including, without limitation, all principal and interest (including, without limitation, any interest accruing after the filing of any petition in bankruptcy or the commencement of any Proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such Proceeding) and late fees payable thereunder.

"Senior Creditor Documents" shall mean any all documents evidencing (i) if the First Priority Creditor is a Senior Creditor, the First Priority Creditor Obligations, (ii) if the Second Priority Creditor is a Senior Creditor, the Second Priority Creditor Obligations and (iii) if the Third Priority Creditor is a Senior Creditor, the Third Party Creditor Obligations.

"Senior Creditor Event of Default" shall mean a default or event of default under any instrument or agreement evidencing the Senior Creditor Debt.

"Stock Subordination Agreement" shall mean the Intercreditor and Subordination Agreement, dated April 15, 2008, among the Parent, the JAD Sellers, the Agent on behalf of the Bridge Lenders, JMB, and Merrill Lynch Commodities, Inc., a Delaware corporation.

"Subordination Agreements" shall mean, collectively, the Stock Subordination Agreement and this Agreement.

"Third Priority Creditor" shall mean the Collateral Agent, as collateral agent on behalf of ECM and ECM.

"Third Priority Creditor Documents" shall mean all documents evidencing the Third Priority Creditor Obligations.

"Third Priority Creditor Obligations" shall mean all debts, liabilities, obligations, covenants and duties owing by Parent and the Guarantors under or in connection with the Credit Agreement, whether now existing or hereafter arising, direct or indirect, contingent or non-contingent, secured or unsecured, due or not due.

"Unencumbered Centrecourt Collateral" shall mean the portion of the Unencumbered Collateral and Other Collateral in which Agent holds a security interest under the Security Agreement.

"Unencumbered ECM Collateral" shall mean all Unencumbered Collateral and Other Collateral other than the Unencumbered Centrecourt Collateral.

**Section 2.   Priority.**

As between the parties, the priority of the security interest in the JAD Collateral, and the Atlas Drill, are as set forth in this Section 2 of the Agreement:

(i)      the First Priority Creditor, as the initial Senior Creditor, shall hold a second priority security interest in the Existing Lender Collateral (junior only to the lien of each Existing Lender) and a first priority security interest in the Unencumbered Collateral and the Other Collateral, the Second Priority Creditor shall hold a third priority security interest in the Encumbered Centrecourt Collateral (junior only to (a) the lien of each Existing Lender and (b) the lien of the First Priority Creditor), a second priority security interest in the Unencumbered Centrecourt Collateral (junior only to the lien of the First Priority Creditor), and a first priority security interest in the Atlas Drill, and the Third Priority Creditor shall hold a fourth priority security interest in the Encumbered Centrecourt Collateral (junior only to (a) the lien of each Existing Lender, (b) the lien of the First Priority Creditor and (c) the lien of the Second Priority Creditor), a third priority security interest in the Encumbered ECM Collateral (junior only to (a) the lien of the each Existing Lenders and (b) the lien of the First Priority Creditor), a third priority security interest in the Unencumbered Centrecourt Collateral (junior only to (a) the lien of the First Priority Creditor and (b) the lien of the Second Priority Creditor), a second priority security interest in the Unencumbered ECM Collateral and the JAD Wash Plant (junior only to the lien of the First Priority Creditor), and a first priority security interest in all ECM Collateral other than JAD Collateral;

(ii)      at such time as the First Priority Senior Obligation is fully satisfied, the Second Priority Creditor shall, without further action, become an additional Senior Creditor and shall hold, solely with respect to Second Priority Creditor Obligations relating to an aggregate of up to $2,500,000 principal amount of Bridge Notes (including, without limitation, any interest, fees, or other liabilities or obligations thereon and relating thereto), (x) a first priority security interest in the Unencumbered Centrecourt Collateral pari passu with the First Priority Creditor, (y) a second priority security interest in the Encumbered Centrecourt Collateral (junior only to the lien of each Existing Lender) pari passu with the First Priority Creditor, and (z) a first priority security interest in the Atlas Drill, and, upon full satisfaction of the remaining First Priority Creditor Obligations, the First Priority Creditor shall no longer be a Senior Creditor and the Second Priority Creditor shall be the sole Senior Creditor with respect to all Second Priority Creditor Obligations;

(iii)      Upon full satisfaction of the remaining First Priority Creditor Obligations, the First Priority Creditor shall no longer be a Senior Creditor and the Third Priority Creditor shall be the sole Senior Creditor with respect to all Third Priority Creditor Obligations; and

(iv)      at such time as the First Priority Senior Obligation and the Second Priority Creditor Obligations are fully satisfied in cash, the Third Priority Creditor shall hold,

solely with respect to the Third Priority Creditor Obligations, (x) a second priority security interest in the Unencumbered ECM Collateral and the Unencumbered Centrecourt Collateral (junior only to the lien of the First Priority Creditor) and (y) a third priority security interest in the Encumbered ECM Collateral and the Encumbered Centrecourt Collateral (in each case junior only to (a) the lien of each Existing Lender and (b) the lien of the First Priority Creditor), and upon full satisfaction of the remaining First Priority Creditor Obligations, the First Priority Creditor shall no longer be a Senior Creditor and the Third Party Creditor shall be the sole Senior Creditor with respect to all Third Party Creditor Obligations.

**Section 3.**    <u>Subordination in the Event of a Proceeding.</u>

For so long as there is a Junior Creditor hereunder, upon any distribution of the Centrecourt Collateral or the proceeds of any sale thereof, upon any Proceeding, the Senior Creditors shall first be entitled to receive payments in full account of the Senior Creditor Debt in cash before the Junior Creditors are entitled to receive any payment on account of the Junior Creditor Debt and the Second Priority Creditor shall be entitled to receive payments in full account of the Second Priority Creditor Obligations in cash before the Third Priority Creditor is entitled to receive any payment on account of the Third Priority Creditor Obligations. Notwithstanding anything contained in this Section 3 to the contrary, upon any distribution of the Atlas Drill or the proceeds of any sale thereof, upon any Proceeding, the Second Priority Creditor shall first be entitled to receive any payments in full account of the Second Priority Creditor Obligations in cash before either the First Priority Creditor or the Third Priority Creditor are entitled to receive any payments on account of the First Priority Creditor Obligations or the Third Priority Creditor Obligations, respectively;

For so long as there is a Junior Creditor hereunder, upon any distribution of the Exclusive ECM Collateral, or the proceeds of any sale thereof, upon any Proceeding, the Senior Creditors shall first be entitled to receive payments in full account of the Senior Creditor Debt in cash before the Junior Creditors are entitled to receive any payment on account of the Junior Creditor Debt and the Third Priority Creditor shall be entitled to receive payments in full account of the Third Priority Creditor Obligations in cash before the Second Priority Creditor is entitled to receive any payment on account of the Second Priority Creditor Obligations.

For so long as there is a Junior Creditor hereunder, upon any distribution of the JAD Collateral or the proceeds of any sale thereof, upon any Proceeding:

(i)    any payment or distribution of assets of any of the Borrowers of any kind or character, whether in cash, property, or securities to which either Junior Creditor would be entitled except for the provisions of this Agreement, shall be paid by the liquidating trustee or agent or other Person making such a payment or distribution, directly to the Senior Creditors, to the extent necessary to pay the Senior Creditor Debt in full after giving effect to all concurrent payments and distributions;

(ii)    in the event that, notwithstanding the foregoing, any payment or distribution of assets of any of the Borrowers of any kind or character, whether in cash, property, or securities to which either Junior Creditor would be entitled except for the

7

provisions of this Agreement, shall be received by either Junior Creditor on account of any Junior Creditor Debt before the Senior Creditor Debt is paid in full in cash, such payment or distribution shall be received and held in trust by such Junior Creditor for the benefit of the Senior Creditor, to the extent necessary to pay the Senior Creditor Debt in full in cash after giving effect to all concurrent payments and distributions; and

(iii)    notwithstanding anything contained herein to the contrary, upon any distribution of the JAD Wash Plant or the proceeds of any sale thereof upon any Proceeding, the First Priority Creditor shall be entitled to receive payments in full account of the First Priority Creditor Obligations before the Junior Creditors are entitled to receive any payment on account of the Junior Creditor Debt, and the Third Priority Creditor shall be entitled to receive payments in full account of the Third Priority Creditor Obligations before the Second Priority Creditor shall be entitled to receive any payment on account of the Second Priority Creditor Obligations.

The Borrowers shall give written notice to the Senior Creditors and the Junior Creditors within three days of receipt of notice of any Proceeding.

### Section 4.    Remedy Standstill.

(a) For so long as there is a Junior Creditor hereunder, until the date the Senior Creditor Debt has been paid in full in cash, no Junior Creditor shall, without the prior written consent of the Senior Creditor (i) exercise any Remedy in respect of any Default, or (ii) commence or join with any other creditor in commencing any bankruptcy, reorganization or insolvency proceeding, with respect to the JAD Collateral.

(b) Until the date on which all Second Priority Creditor Obligations have been paid in full in cash, (A) the Third Priority Creditor shall not, without the prior written consent of the Second Priority Creditor (i) exercise any Remedy in respect of any Default, or (ii) commence or join with any other creditor in commencing any bankruptcy, reorganization or insolvency proceeding, in the case of either (i) or (ii) above, solely to the extent that any such action would relate to the Atlas Drill, and (B) the Third Priority Creditor shall not, without the prior written consent of the Second Priority Creditor (i) exercise any Remedy in respect of any Default, or (ii) commence or join with any other creditor in commencing any bankruptcy, reorganization or insolvency proceeding, in the case of either (i) or (ii) above, solely to the extent that any such action would relate to any Centrecourt Collateral.

(c) Until the date on which the Third Priority Creditor Obligations are paid in full, the Second Priority Creditor shall not, without the prior written consent of the Third Priority Creditor (i) exercise any Remedy in respect of any Default, or (ii) commence or join with any other creditor in commencing any bankruptcy, reorganization or insolvency proceeding, in the case of either (i) or (ii) above, solely to the extent that any such action would relate to any Exclusive ECM Collateral or the JAD Wash Plant.

### Section 5.    Payments Held in Trust, Subrogation, Right to Cure and Purchase.

For so long as there is a Junior Creditor hereunder:

8

(i)    If any payment or distribution of assets on account of any Junior Creditor Debt shall be made by any of the Borrowers or received by either Junior Creditor holding such Junior Creditor Debt at a time when such payment or distribution was prohibited by the provisions of this Agreement, then such payment or distribution shall be received and held in trust by such Junior Creditor for the benefit of the Senior Creditors and shall be paid or delivered by such Junior Creditor to the Senior Creditors to the extent necessary to enable payment in full of the Senior Creditor Debt in cash.

(ii)    After the payment in full of all Senior Creditor Debt in cash, each Junior Creditor shall be subrogated to the rights of the holders of such Senior Creditor Debt to receive payments or distributions on the JAD Collateral applicable to the Senior Creditor Debt until all amounts owing on the Junior Creditor Debt shall be paid in full, and for the purpose of such subrogation no such payments or distributions to the holders of the Senior Creditor Debt by or on behalf of any of the Borrowers, or by or on behalf of each Junior Creditor by virtue of this Agreement, that otherwise would have been made to the Second Priority Creditor shall, as between any of the Borrowers and each Junior Creditor, be deemed to be payment by such Borrower to or on account of the Senior Creditor Debt in respect thereof, it being understood that the provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of each Junior Creditor, on the one hand, and the holders of such Senior Creditor Debt, on the other hand. If any payment or distribution to which any Junior Creditor would otherwise have been entitled but for the provisions of this Agreement shall have been applied, pursuant to the provisions of this Agreement, to the payment of amounts payable under the Senior Creditor Debt, then such Junior Creditor shall be entitled to receive from the holders of the Senior Creditor Debt any payments or distributions received by such holders of the Senior Creditor Debt in excess of the amount sufficient to pay all amounts payable under or in respect of such Senior Creditor Debt in full.

(iii)    The Senior Creditors hereby grant the Junior Creditors the right, but not the obligation, to cure any and all defaults under the Senior Creditor Debt (to the extent any such defaults are curable) within the same period of time afforded the Borrowers for curing such defaults before the same become Senior Creditor Events of Default. The Senior Creditors shall have no obligation hereunder, however, to provide notice of any Senior Creditor Event of Default to the Junior Creditors, and the lack of any such notice shall not affect the existence or occurrence of any Senior Creditor Event of Default.

## Section 6.    No Prejudice or Impairment.

Nothing contained in this Agreement, is intended to or shall impair, as between the Borrowers and the Junior Creditors, the obligation of the Borrowers, which is absolute and unconditional, to pay to the Junior Creditors the Junior Creditor Debt as and when the same shall become due and payable in accordance with its terms, or is intended to or shall affect the relative rights of the Junior Creditors and creditors of the Borrowers (other than the holders of the Senior Creditor Debt).

## Section 7.    Proofs of Claim.

9

In connection with any Proceeding involving any of the Borrowers, the Junior Creditors are entitled to file proofs of claim in respect of the Junior Creditor Debt. Upon the failure of the either Junior Creditor to take any such action as of the fifteenth Business Day preceding the bar date for the filing of proofs of claims, the Senior Creditors are hereby irrevocably authorized and empowered, but shall have no obligation to file proofs of claim with respect to the Junior Creditor Debt. Notwithstanding the foregoing, the Senior Creditors shall not have any right whatsoever to vote any claim that either Junior Creditor may have in the Proceeding to accept or reject any plan or partial or complete liquidation, reorganization, arrangement, composition, or extension; provided, that, the Junior Creditors shall not vote with respect to any such plan or take any other action in any way so as to contest (i) the relative rights and duties of the Senior Creditors under the Senior Creditor Documents with respect to any collateral or guaranties or (ii) the Junior Creditors' respective obligations and agreements set forth in this Agreement.

**Section 8.    Benefit of Agreement; Amendments of Certain Documents; etc.**

This Agreement shall constitute a continuing offer to all Persons who, in reliance upon such provisions, become a Senior Creditor, and such provisions are made for the benefit of each subsequent Senior Creditor and each of them may enforce such provisions.

The Senior Creditor Documents may be amended, supplemented, waived, altered, modified, or otherwise changed in any manner approved by the Senior Creditors, the Parent and the Borrowers without the consent or approval of the Junior Creditors.

The Senior Creditors shall have no obligation to preserve rights in the JAD Collateral against any prior parties or to marshal any of the JAD Collateral for the benefit of any Person. No failure to exercise, and no delay in exercising on the part of any party hereto, any right, power, or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power, or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided in this Agreement are cumulative and shall not be exclusive of any rights or remedies provided by law.

Except as expressly set forth herein, there shall be no third party beneficiaries of this Agreement.

**Section 9.    Further Agreements Concerning the Collateral and Senior Creditor Debt.**

(a) Each Junior Creditor, severally and not jointly, agrees that (i) it will not at any time contest the validity, perfection, priority or enforceability of the security interests and liens granted by the Borrowers to the Senior Creditors in the JAD Collateral; (ii) the Senior Creditors may administer the Senior Creditor Debt and any of the Senior Creditors' agreements with the Borrowers in any way the Senior Creditors deem appropriate consistent with the terms and provisions of the Senior Creditor Documents, without regard to the Junior Creditors or the Junior Creditor Debt; (iii) the Senior Creditors shall have no obligation to preserve rights in the JAD Collateral against any prior parties or to marshal any of the JAD Collateral for the benefit of any Person; (iv) nothing in this Agreement shall impair or adversely affect the manner or timing with

which the Senior Creditors enforce any of their security; (vi) nothing in this Agreement shall impair or adversely affect any right, privilege, power or remedy of the Senior Creditors with respect to the Senior Creditor Debt, the Borrowers, or any JAD Collateral, including without limitation, the Senior Creditors' right to (x) waive or release any of the Senior Creditors' security or rights, (y) waive or ignore any defaults by the Borrowers; and/or (z) restructure, renew, modify, or supplement the Senior Creditor Debt or any portion thereof or any agreement with the Borrowers relating to the Senior Creditor Debt or to increase the outstanding principal amount of the Senior Creditor Debt by extending additional credit to the Borrowers; and (vi) nothing contained herein is intended to alter or deprive the Senior Creditors of any of their rights as the senior secured creditors of the Borrowers to collect or otherwise foreclose upon any of the JAD Collateral.

(b)  The Third Priority Creditor agrees that (i) it will not at any time contest the validity, perfection, priority or enforceability of the security interests and liens granted by the Borrowers to the Second Priority Creditor in the Centrecourt Collateral; (ii) the Second Priority Creditor may administer the Second Priority Creditor Obligations and any of the Second Priority Creditor's agreements with the Borrowers in any way the Second Priority Creditor deems appropriate consistent with the terms and provisions of the Borrower Transaction Documents, without regard to the Third Priority Creditor or the Third Priority Creditor Obligations or the Third Priority Creditor Documents; (iii) the Second Priority Creditor shall have no obligation to preserve rights in the Centrecourt Collateral against any prior parties or to marshal any of the Centrecourt Collateral for the benefit of any Person; (iv) nothing in this Agreement shall impair or adversely affect the manner or timing with which the Second Priority Creditor enforces any of its security; (v) nothing in this Agreement shall impair or adversely affect any right, privilege, power or remedy of the Second Priority Creditor with respect to the Second Priority Creditor Obligations, the Borrowers, or any Centrecourt Collateral, including without limitation, the Second Priority Creditor's right to (x) waive or release any of the Second Priority Creditor's security or rights, (y) waive or ignore any defaults by the Borrowers; and/or (z) restructure, renew, modify, or supplement the Second Priority Creditor Obligations or any portion thereof or any agreement with the Borrowers relating to the Second Priority Creditor Obligations or to increase the outstanding principal amount of the Second Priority Creditor Obligations by extending additional credit to the Borrowers; and (vi) nothing contained herein is intended to alter or deprive the Second Priority Creditor of any of its rights to collect or otherwise foreclose upon any of the Centrecourt Collateral.

(c)  The Second Priority Creditor agrees that (i) it will not at any time contest the validity, perfection, priority or enforceability of the security interests and liens granted by the Grantors to the Third Priority Creditor in the Exclusive ECM Collateral and the JAD Wash Plant; (ii) the Third Priority Creditor shall have no obligation to preserve rights in the Exclusive ECM Collateral or the JAD Wash Plant against any prior parties or to marshal any of the Exclusive ECM Collateral or the JAD Wash Plant for the benefit of any Person; (iii) nothing in this Agreement shall impair or adversely affect the manner or timing with which the Third Priority Creditor enforces any of its security in the Exclusive ECM Collateral or the JAD Wash Plant; (iv) nothing in this Agreement shall impair or adversely affect any right, privilege, power or remedy of the Third Priority Creditor with respect to the Third Priority Creditor Obligations, the Borrowers, any Exclusive ECM Collateral or the JAD Wash Plant, including without limitation, the Third Priority Creditor's right to (x) waive or release any of the Third Priority Creditor's

11

security or rights, (y) waive or ignore any defaults by the Borrowers; and/or (z) restructure, renew, modify, or supplement the Third Priority Creditor Obligations or any portion thereof or any agreement with the Borrowers relating to the Third Priority Creditor Obligations or to increase the outstanding principal amount of the Third Priority Creditor Obligations by extending additional credit to the Borrowers; and (v) nothing contained herein is intended to alter or deprive the Second Priority Creditor of any of its rights or otherwise foreclose upon any of the Exclusive ECM Collateral or the JAD Wash Plant.

**Section 10. Representations and Warranties.** Each of the parties hereto hereby represents and warrants that (i) it has full power, authority and legal right to make and perform this Agreement and (ii) this Agreement is its legal, valid, and binding obligation, enforceable against it in accordance with its terms.

**Section 11. Amendment.** Neither this Agreement nor any of the terms hereof may be amended, waived, discharged, or terminated unless such amendment, waiver, discharge, or termination is in writing signed by the Senior Creditors and the Junior Creditors.

**Section 12. Successors and Assigns.** This Agreement and the terms, covenants, and conditions hereof shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns, and neither the Senior Creditor Debt nor the Junior Creditor Debt shall be sold, assigned, or transferred unless the assignee or transferee thereof expressly takes such debt subject to and agrees to be bound by the terms and conditions of this Agreement.

**Section 13. Governing Law.** This Agreement will be construed in accordance with and governed by the law of the State of New York, without regard to the choice of law principles thereof.

**Section 14. Notices.** Whenever it is provided herein that any notice, demand, request, consent, approval, declaration, or other communication shall or may be given to or served upon any of the parties by another, or whenever any of the parties desires to give or serve upon another any such communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration, or other communication shall be in writing and shall be deemed to have been duly given and received, for purposes hereof, when (i) delivered by hand, (ii) four days after being deposited in the mail, postage prepaid, and (iii) one Business Day after having been sent by reputable overnight courier, in each case addressed as set forth on the signature pages attached hereto or at such address as may be substituted by notice given as herein provided. Failure to delay in delivering copies of any communication to the persons designated to receive copies shall in no way adversely affect the effectiveness of such communication.

**Section 15. Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 16. Final Agreement.** THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES.

**Section 17.** <u>WAIVER OF JURY TRIAL.</u>    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE SENIOR CREDITORS, THE JUNIOR CREDITORS, THE BORROWERS AND THE JAD SELLERS HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED THEREBY OR THE ACTIONS OF THE SENIOR CREDITORS OR THE JUNIOR CREDITORS IN THE NEGOTIATION, ADMINISTRATION OR ENFORCEMENT HEREOF.

**Section 18.** <u>Action by the Collateral Agent.</u>    At the request of the Collateral Agent pursuant to Section 10.13 of the Credit Agreement, ECM, being the sole Lender (as defined in the Credit Agreement) under the Credit Agreement, hereby instructs the Collateral Agent to execute this Agreement.   Further, pursuant to Section 10.09(b) of the Credit Agreement, the Lender hereby certifies and confirms to the Collateral Agent that this Agreement is not contrary to the terms of the Credit Agreement or any other Loan Document (as defined in the Credit Agreement) and is not otherwise contrary to law.   Absent receipt of appropriate written instructions from ECM under the Credit Agreement, Wilmington Trust Company shall have no duty or obligation to take any action hereunder and no liability to any other party hereto or any other person claiming by, through or under any such party.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY; SIGNATURE PAGES FOLLOW.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly
executed by their proper and duly authorized officers as of the day and year first above written.

J. A. D. COAL COMPANY, INC.                          Address for Notice:

By: _____                        _____
Its: _____                       _____
                                                     _____

SANDLICK COAL COMPANY, LLC                           Address for Notice:

By: _____                        _____
Its: _____                       _____
                                                     _____

FOX KNOB COAL CO., INC.                              Address for Notice:

By: _____                        _____
Its: _____                       _____
                                                     _____

CAMOFI MASTER LDC, as Agent
for the Bridge Lenders                               Address for Notice:

By: _____                        _____
Its: _____                       _____
                                                     _____


_____                    Address for Notice:
          Aubra Paul Dean
                                                     _____
                                                     _____
                                                     _____


_____                    Address for Notice:
          Carl E. McAfee
                                                     _____
                                                     _____
                                                     _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their proper and duly authorized officers as of the day and year first above written.

**J. A. D. COAL COMPANY, INC.**

By:_____

Its:_____

Address for Notice:

_____

_____

_____

**SANDLICK COAL COMPANY, LLC**

By:_____

Its:_____

Address for Notice:

_____

_____

_____

**FOX KNOB COAL CO., INC.**

By:_____

Its:_____

Address for Notice:

_____

_____

_____

**CAMOFI MASTER LDC, as Agent
for the Bridge Lenders**

By:_____

Its:_____Michael Loew_____
            General Counsel

Address for Notice:

_____

_____

_____

_____

Aubra Paul Dean

Address for Notice:

_____

_____

_____

_____

Carl E. McAfee

Address for Notice:

_____

_____

_____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their proper and duly authorized officers as of the day and year first above written.

**J. A. D. COAL COMPANY, INC.**

By:_____
Its:_____

Address for Notice:
_____
_____
_____

**SANDLICK COAL COMPANY, LLC**

By:_____
Its:_____

Address for Notice:
_____
_____
_____

**FOX KNOB COAL CO., INC.**

By:_____
Its:_____

Address for Notice:
_____
_____
_____

**CAMOFI MASTER LDC, as Agent
for the Bridge Lenders**

By:_____
Its:_____

Address for Notice:
_____
_____
_____

Aubra Paul Dean

Address for Notice:
_____
_____
_____

Carl E. McAfee

Address for Notice:
P. O. Box 321
Norton, VA 24273
_____

_Julia L. McAfee_
Julia L. McAfee

Address for Notice:
P.O. Box 321
Norton, VA 24273

**WILMINGTON TRUST COMPANY, as Collateral Agent for East Coast Miner LLC**

By:_____
Its:_____

Address for Notice:
_____
_____
_____

**EAST COAST MINER LLC**

By:_____
Its:_____

Address for Notice:
_____
_____
_____

15

_____                    Address for Notice:
       **Julia L. McAfee**                    _____
                                             _____
                                             _____


**WILMINGTON TRUST COMPANY, as**             Address for Notice:
**Collateral Agent for East Coast Miner LLC** _____
                                             _____
By:_____          _____
Its:_____
      James A. Hanley
      Vice President


**EAST COAST MINER LLC**                     Address for Notice:
                                             _____
                                             _____
By:_____          _____
Its:_____


15

_____
       Julia L. McAfee

Address for Notice:

_____

_____

_____


**WILMINGTON TRUST COMPANY, as
Collateral Agent for East Coast Miner LLC**

Address for Notice:

_____

_____

_____

By:_____
Its:_____


**EAST COAST MINER LLC**

Address for Notice:
5 East 17th St.
Apartment 7
New York, NY 10003

By:_____
Its: MANAGER

15

FILED: NEW YORK COUNTY CLERK 11/05/2012                    INDEX NO. 650411/2012

NYSCEF DOC. NO. 51                                         RECEIVED NYSCEF: 11/05/2012

**Exhibit 2**

**Credit Agreements**

**EXECUTION COPY**

## VALUE RIGHT AGREEMENT

**THIS VALUE RIGHT AGREEMENT** (this "Agreement") is entered into as of April 15, 2008 (the "Effective Date") by and among JMB Capital Partners Master Fund, L.P., a limited partnership registered and organized under the laws of the Cayman Islands (the "Holder"), U.S. Coal Corporation, a Delaware corporation (the "Company"), and the other Loan Parties signatory hereto (the "Loan Parties"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Credit Agreement (defined below).

WHEREAS, reference is made to that certain Amended and Restated Credit Agreement dated as of February 16, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among the Loan Parties, Wilmington Trust Company ("Collateral Agent"), and the Holder (successor in interest to FURSA Master Global Event Driven Fund L.P. and Grand Central Asset Trust, MLN Series), as Lender;

WHEREAS, reference is made to that certain Waiver and Restatement Agreement dated as of April 15, 2008 (as amended, restated, supplemented or otherwise modified from time to time, the "Waiver Agreement") among the Loan Parties, Holder, Collateral Agent and the other parties named therein pursuant to which (i) Holder, as Lender under the Credit Agreement, agreed, among other things, to amend certain provisions of the Credit Agreement, waive certain Events of Default and make other accommodations to the Loan Parties, and (ii) in partial consideration, and as an express condition for Holder entering into the Waiver Agreement, the Loan Parties granted to Holder certain additional consideration, all as more particularly set forth in the Waiver Agreement;

WHEREAS, the aforementioned consideration to the Holder under the Waiver Agreement includes, but is not limited to, the future payment by the Company to the Holder of the sum of $7,000,000, and the Loan Parties and the Holder desire to set forth herein all of the terms of such obligation (including certain modifications to the terms of such payment as were originally set forth in the Waiver Agreement);

NOW THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, the Company hereby agrees as follows:

1. Value Right. The Company hereby agrees to pay to the Holder on the Payment Date (as defined below) the sum of Seven Million Dollars ($7,000,000) (the "Original Principal Amount") plus interest thereon at the rate of 20% per annum commencing on the Effective Date. All interest shall accrue monthly and shall be capitalized and added to the Original Principal Amount on the first day of each calendar month). Notwithstanding the foregoing, during the occurrence and continuance of an Event of Default, interest shall accrue hereunder at the aggregate rate at which interest accrues on the Loan pursuant to Section 2.05 of the Credit Agreement during the continuance of an "Event of Default" under the Credit Agreement.

As used herein, the term "Payment Date" shall mean the earliest to occur of:

    (i)    March 31, 2010;

(ii)    the date of consummation of an initial public offering of shares of common stock (the "Shares") of the Company pursuant to a registration statement under the Securities Act of 1933 , as amended (an "IPO");

(iii) the date of consummation of any sale (a "Sale") of (a) all or substantially all of the Company's assets or (b) capital stock representing a majority of the voting power at elections of directors of the Company in one or a series of related transactions (other than in connection with a Reverse Merger upon consummation of which the current shareholders of the Company continue to own not less than 66 2/3rd % of the outstanding voting Equity Interests of the Company). The Holders right to payment of the Original Principal Amount plus all accrued interest is hereafter referred to as the "$7 Million Value Right".

The Company must give Holder no less than thirty (30) days prior written notice (such notice shall contain adequate information describing the terms of the proposed transaction (the "Proposed Transaction Notice")) prior to the proposed consummation of any IPO, Reverse Merger, or Sale; provided, however, none of the foregoing shall limit any notice or approval rights the Holder may otherwise have under the Loan Documents in connection with any proposed transaction by any Loan Party.

2.    Security.    This Agreement constitutes a Loan Document as defined in the Credit Agreement, and the obligations evidenced by this Agreement constitute Obligations under the Credit Agreement.    To secure payment and performance of all obligations of the Company under this Agreement, each Loan Party hereby grants to the Holder (and each Loan Party hereby reaffirms its prior grant of) a continuing security interest in, a lien upon, and a right of set off against, and collateralized by, the Collateral (as defined in the Loan Documents).

3.    Perfection of Security Interests.  Each Loan Party irrevocably and unconditionally authorizes Holder or its designee to file at any time and from time to time such financing statements in any jurisdiction with respect to the Collateral naming Holder or its designee as the secured party and each Loan Party as debtor, as Holder or its designee may require, and including any other information with respect to such Loan Party or otherwise required by part 5 of Article 9 of the Uniform Commercial Code of such jurisdiction as Holder or its designee may determine, together with any amendment and continuations with respect thereto, which authorization shall apply to all financing statements filed on, prior to or after the date hereof.

Each Loan Party shall take any other actions reasonably requested by Holder or its designee from time to time to cause the attachment and perfection of, and the ability of the applicable party to enforce, the security interest of Holder in any and all of the Collateral, including, without limitation, (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC or other applicable law, to the extent, if any, that any Loan Party's signature thereon is required therefore, (ii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to

2

attachment, perfection of, or ability of Holder to enforce, the security interest of Holder
in such Collateral, and (iii) obtaining the consents and approvals of any Governmental
Authority or third party, including, without limitation, any consent of any licensor, lessor
or other person obligated on Collateral, and taking all actions required by any law, as
applicable in any relevant jurisdiction.

4.  Events Of Default. Each of the following shall constitute an "Event of
Default" hereunder:

    a.  default in the due and punctual payment of the $7 Million Value Right
when and as the same shall become due and payable, whether at maturity,
by acceleration or otherwise;

    b.  an Event of Default under any of the Loan Documents that results in the
acceleration of the Obligations;

    c.  default in the performance or observance of any covenant, agreement or
condition of Company contained in this Agreement (other than set forth in
sections 4(a) and 4(b) herein) which default shall continue for a period of
five (5) Business Days after written notice thereof by the Holder to the
Company;

If an Event of Default occurs, at the election of Holder, the $7 Million Value
Right shall become due and payable immediately; provided, that, upon the occurrence of
any Event of Default described in Sections 7(i) or 7(j) of the Credit Agreement, the $7
Million Value Right shall automatically become immediately due and payable.  The
Holder may exercise in respect of the Collateral, all rights in law and equity, including,
but not limited to, the remedies specified in the Loan Documents.

5.  Transfers of Value Right.  The $7 Million Value Right and all rights
hereunder shall be freely transferable by Holder in whole or part.  The Holder and any of
its successors or assigns shall promptly notify the Company of any transfer of all or a
portion of the interests of the initial Holder hereunder.

6.  Successors and Assigns.  The terms and provisions of this Agreement shall
inure to the benefit of, and be binding upon, the Company and the Holder(s) hereof and
their respective successors and assigns.  The obligations of the Company or the other
Loan Parties hereunder are not assignable or transferable unless Holder consents in
writing to such assignment or transfer.

7.  Amendments and Waivers.  Any term of this Agreement may be amended and
the observance of any term of this Agreement may be waived (either generally or in a
particular instance and either retroactively or prospectively), with the written consent of
the Company and the Holder.  No term in any Loan Document that may impact the terms
or rights of the Holder hereunder may be amended or waived without the written consent
of the Holder.

8.  Notices.  All notices required under this Agreement shall be deemed to have
been given or made for all purposes (a) upon personal delivery, (b) upon confirmation

3

receipt that the communication was successfully sent to the applicable number if sent by facsimile; (c) one Business Day after being sent for next day delivery, when sent by professional overnight courier service, with all expenses and charges paid in full, or (d) five days after posting when sent by registered or certified mail, postage prepaid.

Notices to the Company shall be sent to:

> U.S. Coal Corporation
> 448 Lewis Hargett Circle, Suite 240
> Lexington, Kentucky 40503
> (859) 219-0913 (facsimile)
> Attn:    Robert Gabbard,
>          Chief Executive Officer

Notices to the Holder shall be sent to:

> JMB Capital Partners Master Fund, L.P.
> c/o JMB Capital Partners, L.P.
> 1999 Avenue of the Stars
> Suite 2040
> Los Angeles, California 90087
> 310 286-6662 (facsimile)
> Attn:    Alan Fragen

or at such other place as the Holder shall notify the Company hereof in writing.

9. _Additional Loan Parties_. At the time of the acquisition of any new subsidiary by any of the Loan Parties, the Company and each other Loan Party shall cause such subsidiary to become a party hereto and provide a security interest in its stock and assets (which shall be deemed to be Collateral), unless otherwise agreed in writing by the Lender, to secure payment and performance of all obligations of the Company under this Agreement.

10. _Captions_. The section and subsection headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof.

11. _Conflicts_. In the event of any conflict between the terms of any agreement (including the Waiver Agreement) and this Agreement, this Agreement shall control. For the avoidance of doubt, the parties hereto acknowledge that section 2(a) of the Waiver Agreement is hereby terminated and of no further force or effect.

12. _Specific Performance_. The Holder agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that (and without limiting any other remedies to which Holder may be entitled at law or in equity) the Holder shall be entitled, without the posting of any bond, to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement.

4

13. <u>Governing Law; Jurisdiction; Venue</u>.  This Agreement and all transactions contemplated by this Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without regard to principles of conflicts of laws.  Any action arising out of or relating to this Agreement shall be brought exclusively in the state or Federal courts sitting in New York, New York.  Each Party hereby submits to the jurisdiction of such courts and waives any claim that such action has been brought in an inconvenient forum.

[SIGNATURE PAGE FOLLOWS]

5

IN WITNESS WHEREOF, the undersigned has executed this Agreement on the date first above written.

U. S. COAL CORPORATION

By: _____
Name:  Robert Gabbard
Title:   Chief Executive Officer

LICKING RIVER RESOURCES, INC.

By: _____
Name:  Robert Gabbard
Title:   Secretary

OAK HILL COAL, INC.

By: _____
Name:  Robert Gabbard
Title:   Secretary

S. M. & J., INC.

By: _____
Name:  Robert Gabbard
Title:   Secretary

J.A.D. COAL COMPANY, INC.,

By: _____
Name:  Robert Gabbard
Title:   President

FOX KNOB COAL CO., INC.,

By: _____
Name:  Robert Gabbard
Title;   President

[US Coal Value Right]

6

SANDLICK COAL COMPANY, LLC,

By: _____
Name:  Robert Gabbard
Title:   Manager

JMB CAPITAL PARTNERS MASTER
FUND, L.P.

By: _____
Name:
Title:

[US Coal Value Right]

7

08/29/2008 16:24 IFAX                                                    @005/008
   09-29-08;12:23PM;                              ;310 268 6662       # 5/  8

SANDLICK COAL COMPANY, LLC,

By:_____
Name: Robert Gabbard
Title:   Manager

JMB CAPITAL PARTNERS MASTER
FUND, L.P.

By:_____
Name:
Title:

[US Coal Value Right]

7

EXECUTION VERSION

SECOND AMENDED AND RESTATED
CREDIT AGREEMENT

dated as of

August 29, 2008

among

**U.S. COAL CORPORATION,**
as Borrower,

and

**THE SUBSIDIARIES OF THE BORROWER
FROM TIME TO TIME PARTY HERETO,**
as Guarantors,

and

**WILMINGTON TRUST COMPANY,**
as Collateral Agent,

and

**JMB CAPITAL PARTNERS MASTER FUND, L.P.,**
as Lender

# TABLE OF CONTENTS

Page

ARTICLE I.    Definitions...................................................................................... 1
    SECTION 1.01    Defined Terms ............................................................. 1
    SECTION 1.02    Terms Generally........................................................ 20
    SECTION 1.03    Accounting Terms; GAAP........................................ 20

ARTICLE II.    THE LOAN............................................................................... 20
    SECTION 2.01    The Loan.................................................................... 20
    SECTION 2.02    Repayment of the Loan; Evidence of Debt................ 20
    SECTION 2.03    Prepayment of Loan.................................................. 21
    SECTION 2.04    Fees............................................................................ 22
    SECTION 2.05    Interest....................................................................... 22
    SECTION 2.06    Taxes.......................................................................... 22
    SECTION 2.07    Payments Generally; Allocation of Proceeds; Sharing of
                    Set-offs..................................................................... 23
    SECTION 2.08    Indemnity for Returned Payments ............................ 24
    SECTION 2.09    Pro Rata Treatment.................................................... 24
    SECTION 2.10    Effect of Amendment and Restatement..................... 24

ARTICLE III.    Representations and Warranties............................................. 24
    SECTION 3.01    Organization; Powers................................................ 24
    SECTION 3.02    Authorization; Enforceability. ................................. 25
    SECTION 3.03    Governmental Approvals; No Conflicts..................... 25
    SECTION 3.04    Financial Condition; No Material Adverse Change.... 25
    SECTION 3.05    Properties. ................................................................ 26
    SECTION 3.06    Litigation and Environmental Matters ...................... 26
    SECTION 3.07    Compliance with Laws and Agreements. .................. 27
    SECTION 3.08    Investment Company Status. ..................................... 27
    SECTION 3.09    Taxes.......................................................................... 27
    SECTION 3.10    ERISA........................................................................ 28
    SECTION 3.11    Disclosure.................................................................. 28
    SECTION 3.12    Material Agreements; Permitted/Pending Reserves ... 28
    SECTION 3.13    Solvency..................................................................... 28
    SECTION 3.14    Insurance ................................................................... 29
    SECTION 3.15    Capitalization and Subsidiaries................................. 29
    SECTION 3.16    Security Interest in Collateral ................................... 29
    SECTION 3.17    Employment Matters.................................................. 30
    SECTION 3.18    Affiliate Transactions................................................ 30
    SECTION 3.19    Common Enterprise.................................................... 30
    SECTION 3.20    MLCI Agreements ..................................................... 30

ARTICLE IV.    Conditions.............................................................................. 30
    SECTION 4.01    Closing Date............................................................... 30

ARTICLE V.    Affirmative Covenants ............................................................ 33
    SECTION 5.01    Financial Statements; Other Information................... 33
    SECTION 5.02    Notices of Material Events......................................... 35

i

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| SECTION 5.03 | Existence; Conduct of Business. | 35 |
| SECTION 5.04 | Payment of Obligations. | 36 |
| SECTION 5.05 | Maintenance of Properties | 36 |
| SECTION 5.06 | Books and Records; Inspection Rights. | 36 |
| SECTION 5.07 | Compliance with Laws. | 36 |
| SECTION 5.08 | Intentionally Omitted. | 36 |
| SECTION 5.09 | Insurance | 36 |
| SECTION 5.10 | Casualty and Condemnation. | 37 |
| SECTION 5.11 | Environmental Compliance. | 37 |
| SECTION 5.12 | Governmental Authorizations. | 38 |
| SECTION 5.13 | Additional Collateral; Further Assurances. | 38 |
| SECTION 5.14 | Compliance with Terms of Leaseholds. | 39 |
| ARTICLE VI | Negative Covenants | 40 |
| SECTION 6.01 | Indebtedness. | 39 |
| SECTION 6.02 | Liens. | 42 |
| SECTION 6.03 | Fundamental Changes. | 44 |
| SECTION 6.04 | Investments, Loans, Advances, Guarantees and Acquisitions.: | 44 |
| SECTION 6.05 | Asset Sales | 45 |
| SECTION 6.06 | Sale and Leaseback Transactions. | 46 |
| SECTION 6.07 | Swap Agreements. | 46 |
| SECTION 6.08 | Restricted Payments; Certain Payments of Indebtedness. | 46 |
| SECTION 6.09 | Transactions with Affiliates. | 48 |
| SECTION 6.10 | Restrictive Agreements. | 48 |
| SECTION 6.11 | Amendment of Material Documents. | 49 |
| SECTION 6.12 | Intentionally Omitted. | 49 |
| ARTICLE VII. | Events of Default | 49 |
| ARTICLE VIII. | Miscellaneous | 52 |
| SECTION 8.01 | Notices | 52 |
| SECTION 8.02 | Waivers; Amendments. | 54 |
| SECTION 8.03 | Expenses; Indemnity; Damage Waiver. | 54 |
| SECTION 8.04 | Successors and Assigns. | 56 |
| SECTION 8.05 | Survival. | 57 |
| SECTION 8.06 | Counterparts; Integration; Effectiveness. | 57 |
| SECTION 8.07 | Severability | 57 |
| SECTION 8.08 | Right of Setoff. | 57 |
| SECTION 8.09 | Governing Law; Jurisdiction; Consent to Service of Process. | 58 |
| SECTION 8.10 | WAIVER OF JURY TRIAL. | 58 |
| SECTION 8.11 | Headings. | 59 |
| SECTION 8.12 | Confidentiality. | 59 |
| SECTION 8.13 | Violation of Law. | 59 |
| SECTION 8.14 | USA PATRIOT ACT. | 59 |

ii

# TABLE OF CONTENTS

**Page**

SECTION 8.15  Disclosure.. ................................................................................. 59
SECTION 8.16  Interest Rate Limitation. ............................................................ 59
SECTION 8.17  Release.. ...................................................................................... 60
ARTICLE IX.  LOAN GUARANTY ................................................................. 60
SECTION 9.01  Guaranty. ..................................................................................... 60
SECTION 9.02  Guaranty of Payment.. ............................................................... 61
SECTION 9.03  No Discharge or Diminishment of Loan Guaranty. ..................... 61
SECTION 9.04  Defenses Waived. ....................................................................... 62
SECTION 9.05  Rights of Subrogation.. .............................................................. 62
SECTION 9.06  Reinstatement; Stay of Acceleration. .......................................... 62
SECTION 9.07  Information. ................................................................................. 62
SECTION 9.08  Reserved. ..................................................................................... 63
SECTION 9.09  Taxes. .......................................................................................... 63
SECTION 9.10  Maximum Liability. .................................................................... 63
SECTION 9.11  Contribution. .............................................................................. 63
SECTION 9.12  Liability Cumulative. .................................................................. 64
ARTICLE X.  THE COLLATERAL AGENT ................................................... 64
SECTION 10.01  Authorization and Action. ........................................................... 64
SECTION 10.02  Collateral Agent's Reliance, Etc. ................................................ 65
SECTION 10.03  Indemnification.. ......................................................................... 66
SECTION 10.04  Successor Collateral Agent. ........................................................ 66
SECTION 10.05  Limitation on Duty of Collateral Agent in Respect of
                Collateral. ................................................................................ 67
SECTION 10.06  No Discretion. ............................................................................. 67
SECTION 10.07  No Representations or Warranties as to the Collateral or
                Loan Documents.. .................................................................... 67
SECTION 10.08  No Segregation of Monies; No Interest.. ..................................... 68
SECTION 10.09  Action upon Instructions. ............................................................ 68
SECTION 10.10  Doing Business in Other Jurisdictions. ........................................ 69
SECTION 10.11  Rights; Powers; Litigation. .......................................................... 69
SECTION 10.12  Limitation on Damages. ............................................................... 69
SECTION 10.13  Amendments; Modifications; Waivers. ........................................ 69
SECTION 10.14  Independent Credit Investigation. ................................................ 70
SECTION 10.15  The Collateral Agent in Its Individual Capacity. ......................... 70
SECTION 10.16  Knowledge of Default, etc.. ......................................................... 70
SECTION 10.17  No Duty to Provide Additional Credit Information; No
                Responsibility for Perfection or Priority of Liens, etc. ............... 70
SECTION 10.18  Fees; Expenses. ............................................................................ 70
SECTION 10.19  Force Majeure. ............................................................................. 71
SECTION 10.20  Merger of Collateral Agent. ......................................................... 71

iii

## SECOND AMENDED AND RESTATED CREDIT AGREEMENT

**THIS SECOND AMENDED AND RESTATED CREDIT AGREEMENT** dated as of August 29, 2008 (this "Agreement"), by and between U.S. COAL CORPORATION, a Delaware corporation formerly known as "U.S. Coal Acquisition Corp.", as borrower (the "Borrower"), the Guarantors (as defined herein), WILMINGTON TRUST COMPANY, as Collateral Agent, and JMB CAPITAL PARTNERS MASTER FUND, L.P., a limited partnership registered and organized under the laws of the Cayman Islands (in its individual capacity, "JMB") (successor in interest to FURSA Master Global Event Driven Fund L.P. ("FURSA") and Grand Central Asset Trust, MLN Series ("GCAT" and, collectively with FURSA, the "Prior Lenders")), as Lender, and the other Lenders signatory hereto from time to time.

### WITNESSETH

**WHEREAS**, the Borrower is party to that certain Amended and Restated Credit Agreement, dated as of February 16, 2007, as amended by that certain Amendment dated as of February 28, 2007, that certain Second Amendment to Credit Agreement dated as of March 5, 2007, that certain Third Amendment to Credit Agreement dated as of April 13, 2007 and that certain Fourth Amendment to Credit Agreement dated as of November 16, 2007, among the Borrower, the Guarantors, the Collateral Agent and the Prior Lenders, and as further amended by that certain Waiver and Restatement Agreement dated as of April 15, 2007, among the Borrower, the Guarantors, the Collateral Agent, the Lender and MLCI (as defined below) (collectively, the "Existing Credit Agreement");

**WHEREAS**, GCAT assigned its interest in the Existing Credit Agreement and the other Loan Documents to FURSA, which subsequently assigned all of its interest in the Existing Credit Agreement and the other Loan Documents to Guggenheim Capital Markets, LLC, which subsequently assigned all of its interest in the Existing Credit Agreement and the other Loan Documents to JMB pursuant to an Assignment and Assumption, dated as of March 5, 2008;

**WHEREAS**, the parties to the Existing Credit Agreement have agreed to amend and restate the Existing Credit Agreement as set forth herein;

**NOW, THEREFORE, IN CONSIDERATION** of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I.   Definitions

SECTION 1.01      Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"2007 Bridge Financing" means the loan to the Borrower represented by secured 8% Promissory Notes Due October 31, 2008 issued by the Borrower between October 2007 and March 2008 in an aggregate principal amount of $3,775,000, of which $1,616,450 remains outstanding as of the date of this Agreement, with a maturity date of the earlier to occur of: (i) October 31, 2008, and (ii) any or all of the Loan Parties having raised, in the aggregate, commencing on the date of issuance of such secured 8% Promissory Notes, (x) $20,000,000 of

gross proceeds from the issuance of Equity Interests or (y) $30,000,000 of gross proceeds from debt financing.

"2007 Bridge Notes" means the secured 8% Promissory Notes Due October 31, 2008 issued by the Borrower between October 2007 and March 2008 in respect of the 2007 Bridge Financing.

"Account" has the meaning assigned to such term in Section 9-102(a)(2) of the UCC.

"Account Debtor" means any Person obligated on an Account.

"Act" has the meaning assigned to such term in Section 8.14.

"Acquisition" means any transaction, or any series of related transactions, consummated on or after the date of this Agreement, by which any Loan Party (a) acquires any going business or all or substantially all of the assets of any Person, whether through purchase of assets, merger or otherwise or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the Equity Interests of a Person which has ordinary voting power for the election of directors or other similar management personnel of a Person (other than Equity Interests having such power only by reason of the happening of a contingency) or a majority of the outstanding Equity Interests of a Person.

"Additional Indebtedness" has the meaning assigned to such term in Section 6.01.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" has the meaning assigned to such term in the preamble.

"Amendment Fee" has the meaning assigned to such term in Section 2.04(a).

"Applicable Percentage" has the meaning assigned to such term in Section 9.11.

"A/R Facility" means the Loan Parties' $6,000,000 secured revolving line of credit with First Tennessee Bank, as described in the commitment letter and term sheet dated November 30, 2006.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning assigned to such term in the preamble.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Wilmington, Delaware are authorized or required by law to remain closed.

2

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Equivalents" means (a) securities issued or directly and fully guaranteed or insured by the United States of America and having a maturity of not more than 365 days from the date of acquisition; (b) certificates of deposit, time deposits and eurodollar time deposits with maturities of 365 days or less from the date of acquisition, bankers' acceptances with maturities not exceeding 365 days and overnight bank deposits, in each case, (i) with any Lenders, (ii) with any domestic office of Central Bank and Trust Co., or (iii) with any domestic commercial bank organized under the laws of the United States of America or any state thereof, in each case having a rating of not less than A or its equivalent by S&P or any successor and having capital and surplus in excess of $1,000,000,000; (c) repurchase obligations with a term of not more than seven (7) days for underlying securities of the types described in clauses (a) and (b) above; (d) any commercial paper or finance company paper issued by (i) any Lender or any holding company controlling any Lender or (ii) any other Person that is rated not less than "P-1" or "A-1" or their equivalents by Moody's or S&P or their successors; and (e) investments, classified in accordance with GAAP as current assets of the Borrower or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to investments of the character, quality and maturity described in clauses (a), (b), (c) and (d) of this definition.

"Centrecourt Amendment" means that certain Letter Agreement dated of even date herewith between the Loan Parties, CAMOFI Master LDC, a Cayman Islands limited duration company, and CAMHZN Master LDC, a Cayman Islands limited duration company, pursuant to which, among other things, CAMOFI Master LDC and CAMHZN Master LDC, individually and as holders of a majority of the outstanding principal amount of the Centrecourt Bridge Notes, (i) irrevocably amend that certain side letter between CAMOFI Master LDC and CAMHZN Master LDC and the Borrower dated as of April 14, 2008 such that the consent of CAMOFI Master LDC and CAMHZN Master LDC shall not be required for the Lenders to loan additional funds to the Borrower (ii) agree to certain amendments to the Centrecourt Securities Purchase Agreement, the Centrecourt Bridge Notes and the Centrecourt Security Agreement, (iii) consent to the execution of this Agreement, the Value Rights Agreement, and the other Loan Documents and (iv) waive any event of default under the Centrecourt Securities Purchase Agreement, the Centrecourt Bridge Notes and any other Transaction Document (as defined in the Centrecourt Securities Purchase Agreement) arising as a result of that certain Notice of Default dated July 1, 2008 issued by the Lender to the Borrower.

"Centrecourt Bridge Financing" means the secured bridge loan to the JAD Companies from the Centrecourt Bridge Lenders on April 15, 2008 in an aggregate initial principal amount of $5,000,000, plus the principal amount of any additional notes representing deferred or "PIK" interest, which amounts are guaranteed by the Borrower (such guarantee by Borrower being secured solely by a lien on the JAD Equity Interests) and mature on the earlier to occur of (i) the

3

consummation of an equity financing or a debt financing by Borrower (other than the Series B
Offering and the Rifle Acquisition), which financing results in gross proceeds to Borrower of at
least $20,000,000, (ii) the consummation of an initial public offering of Borrower's common
stock, (iii) a "change of control" (as defined in the Centrecourt Bridge Notes), (iv) the
disposition by the JAD Companies of the collateral in which the JAD Companies have granted a
security interest to the Centrecourt Bridge Lenders pursuant to the Centrecourt Security
Agreement, and (v) October 1, 2009.

"Centrecourt Bridge Lenders" means, collectively, (i) CAMOFI Master LDC, a Cayman
Islands limited duration company, (ii) CAMHZN Master LDC, a Cayman Islands limited
duration company, (iii) Futurtec, L.P., a Delaware limited partnership, (iv) Michael Miller and
(v) Lawrence Kaplan, and the successors and assigns of each.

"Centrecourt Bridge Notes" means the secured notes issued by the JAD Companies to the
Centrecourt Bridge Lenders in respect of the Centrecourt Bridge Financing, including any notes
representing deferred or "PIK" interest issued pursuant to the terms thereof.

"Centrecourt Equipment" means the two (2) underground continuous miner spreads of
equipment (Joy Manufacturing) and supporting equipment, as more particularly defined in
Schedule 1.01 annexed hereto.

"Centrecourt Equipment Purchase" means the purchase by the JAD Companies of the
Centrecourt Equipment, in consideration for the issuance of the Centrecourt Equipment Purchase
Note.

"Centrecourt Equipment Purchase Note" means the Convertible Promissory Note in the
principal amount of $4,800,000, dated as of April 15, 2008 and maturing on April 15, 2012,
issued by J.A.D. Coal Company, Inc., a Virginia corporation, in respect of the Centrecourt
Equipment Purchase in favor of CAMOFI Master LDC, a Cayman Islands limited duration
company, and to which the Borrower is made a party thereto with respect to the convertible
feature of the note and certain representations and warranties related thereto.

"Centrecourt Equity Registration Claim" means the claim of the Centrecourt Bridge
Lenders, pursuant to the Centrecourt Rights Agreement, for up to $500,000 for potential
damages if the Borrower fails to timely register such Equity Interests upon the happening of
certain conditions, which right is unsecured.

"Centrecourt Guarantee" means the Guarantee dated as of April 15, 2008 by Borrower in
favor of the Centrecourt Bridge Lenders.

"Centrecourt Put Right" means the right of the Centrecourt Bridge Lenders, pursuant to
the Centrecourt Rights Agreement, to cause the Borrower to buy back from the Centrecourt
Bridge Lenders certain Equity Interests in Borrower for an aggregate price of $2,700,000, which
right is unsecured during both the term of this Agreement and the term of the Value Rights
Agreement.

"Centrecourt Rights Agreement" means the Rights Agreement dated as of April 15, 2008
among the Borrower and the Centrecourt Bridge Lenders, pursuant to which the Centrecourt

Bridge Lenders have (i) the Centrecourt Put Right and (ii) the Centrecourt Equity Registration Claim.

"Centrecourt Securities Purchase Agreement" means the Securities Purchase Agreement dated as of April 15, 2008 among the Borrower, the JAD Companies and the Centrecourt Bridge Lenders in respect of the issuance of the Centrecourt Bridge Notes.

"Centrecourt Security Agreement" means the Security Agreement dated as of April 15, 2008, among the Borrower, the JAD Companies and CAMOFI Master LDC, as Agent for the Centrecourt Bridge Lenders.

"Change in Control" means any of the following: (i) the Borrower shall cease to own, free and clear of all Liens or other encumbrances, at least 100% of the outstanding voting Equity Interests of the Coal Producers on a fully diluted basis, (ii) the sale, exchange or transfer, directly or indirectly, by any of the Borrower's stockholders, in a single transaction or series of related transactions to one or more unaffiliated third parties, of capital stock representing a majority of the voting power at elections of directors of the Borrower, other than a Reverse Merger upon consummation of which the current shareholders of the Borrower continue to own not less than 66 2/3rd % of the outstanding voting Equity Interests of Borrower, or (iii) the Employment Agreement dated as of January 5, 2007, between the Borrower and Robert Gabbard (the "Executive") is terminated without Cause (as such term is defined in such Employment Agreement) or by the Executive for Good Reason (as such term is defined in such Employment Agreement).

"Change in Law" means (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date.

"Charges" has the meaning assigned to such term in Section 8.16.

"Closing Date" means August 29, 2008.

"Coal Agreement" means those contracts now in effect or hereafter entered into by any Loan Party in the ordinary course of business for the sale, purchase, exchange, processing, extracting or handling of coal.

"Coal Producers" means, collectively, the Original Coal Producers and the New Coal Producers.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all property owned, leased or operated by a Person covered by the Collateral Documents and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Collateral Agent, for the benefit of the Lenders, to secure the Obligations, other than the Excluded Assets.

5

"Collateral Agent" has the meaning assigned to it in the Security Agreement.

"Collateral Documents" means, collectively, the Security Agreement and any other documents granting a Lien upon the Collateral as security for payment of the Obligations.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Disclosed Matters" means the actions, suits and proceedings and the Environmental matters disclosed in Schedule 3.06.

"dollars" or "$" refers to lawful money of the United States of America.

"Environment" means environment or natural environment as defined in any Environmental Law and includes soil, land surface or subsurface strata, surface waters (including navigable waters), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life and any other environmental medium or natural resource, the environment in the workplace, and any sewer system.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the Environment, preservation the management, release or threatened release of any Hazardous Material or to health and safety matters and all common laws now or hereafter in effect under which Environmental liabilities can arise.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of Environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law or Occupational Health and Safety Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the Environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permits" means all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the failure to make a required installment or other payment to a Plan which gives rise to liability under Section 302(f) of ERISA; (e) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; (f) a notice under Section 4010 of ERISA has been or is required to be filed with the PBGC with respect to any Plan; (g) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (h) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (i) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (j) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excluded Assets" has the meaning assigned to such term in Section 5.13.

"Excluded Taxes" means, with respect to any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of such Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located.

"Existing Credit Agreement" has the meaning assigned to such term in the preamble.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"First Lien Subsidiaries" means Subsidiaries that are or become Loan Parties whose Equity Interests are secured by a first priority Lien in favor of Collateral Agent for the benefit of the Lenders.

"GAAP" means generally accepted accounting principles in the United States of America consistent with those applied in the preparation of the financial statements referred to in Section 3.04.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Authorization" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guaranteed Obligations" has the meaning assigned to such term in Section 9.01.

"Guarantor" means each Loan Party (other than the Borrower).

"Hazardous Materials"  means all contaminants, pollutants, explosive or radioactive substances or wastes and all hazardous or toxic substances, or wastes, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid (excluding current accounts payable, accrued obligations, operating lease obligations, customer deposits and

8

deferred liabilities other than for borrowed money, all incurred in the ordinary course of business), (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable, accrued obligations, operating lease obligations, customer deposits and deferred liabilities other than for borrowed money, all incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) obligations under any liquidated earn-out and (l) obligations of such Person to purchase securities or other property arising out of or in connection with the sale of the same or substantially similar securities or property or any other Off-Balance Sheet Liability. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Interest Expense" means, with reference to any period, the interest expense (including that attributable to Capital Lease Obligations) of the Loan Parties for such period with respect to all outstanding Indebtedness of the Loan Parties (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Swap Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP), calculated on a consolidated basis for the Loan Parties for such period in accordance with GAAP.

"Interest Payment Date" means the first Business Day of each calendar month and the Maturity Date.

"Inventory" has the meaning assigned to such term in the Security Agreement.

"JAD Companies" means J.A.D. Coal Company, Inc., a Virginia corporation, Fox Knob Coal Co., Inc., a Kentucky corporation and Sandlick Coal Company, LLC, a Virginia limited liability company.

"JAD Equity Interests" means all of the Equity Interests in each of the JAD Companies.

"JAD Notes" means the Promissory Notes dated October 15, 2007 issued by the JAD Companies (i) to Aubra Paul Dean in the original principal amount of $500,000 and (ii) to Carl E. McAfee and Julia L. McAfee as tenants by the entirety in the original principal amount of $500,000, each maturing on December 1, 2009.

9

"JAD PPE Indebtedness" means the existing Indebtedness of the JAD Companies with various lenders as set forth on Schedule 6.01(b), which is secured by the plant, property and equipment of the JAD Companies.

"JAD Seller Guaranties" means the personal guaranties of the JAD Sellers issued pursuant to the Surety Agreement for Bond for the Effects of Surface Mining issued June 22, 1998 between Cumberland Surety Incorporated and Sandlick Coal Company, Inc.

"JAD Seller Notes" means the Convertible Promissory Notes dated April 15, 2008 issued by Borrower (i) to Aubra Paul Dean in the original principal amount of $3,500,000 and (ii) to Carl E. McAfee and Julia L. McAfee as tenants in the entirety in the original principal amount of $3,500,000, each maturing on the earlier to occur of (x) Borrower refinancing its Indebtedness in an amount equal to or greater than $35,000,000, (y) the consummation of an initial public offering of Borrower's common stock and (z) April 1, 2011.

"JAD Sellers" means Carl E. McAfee, Julia L. McAfee and Aubra Paul Dean, and for the purposes of the JAD Notes and the JAD Seller Notes, shall also include the heirs, successors and assigns of each.

"JAD Stock Intercreditor Agreement" means the Intercreditor Agreement dated as of April 15, 2008 among the JAD Sellers, the Centrecourt Bridge Lenders, the Lenders and MLCI, which, among other things, sets forth the priorities of the various parties in the Equity Interests of the JAD Companies.

"Joinder Agreement" has the meaning assigned to such term in Section 5.13.

"Lenders" means JMB, the other Lenders named on the signatory pages of this Agreement and, if any Lender shall decide to assign all or any portion of the Obligations, such term shall include any assignee of such Lender. For the purposes of the Security Agreement, the term "Lender" shall mean the Lenders.

"Lien" means, with respect to any asset, (a) any mortgage (including any leasehold mortgage), deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan" has the meaning assigned to such term in Section 2.01.

"Loan Documents" means this Agreement, the Note or any other promissory notes issued pursuant to this Agreement, the Collateral Documents, the Value Rights Agreement, the MLCI Subordination Agreement, the JAD Stock Intercreditor Agreement, upon consummation of the Permitted Acquisition the Rifle Stock Intercreditor Agreement, and all other agreements, instruments, documents and certificates identified in Section 4.01 executed and delivered to, or in favor of, any Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, letter of credit agreements and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any

Loan Party, and delivered to any Lender in connection with the Agreement or the transactions contemplated thereby. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to the Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative. Notwithstanding anything to the contrary contained herein, as used in Article III and Section 4.01(a), the term "Loan Documents" shall have the meaning set forth in the Existing Credit Agreement.

"Loan Guaranty" means Article IX of this Agreement.

"Loan Parties" means the Borrower, the Borrower's Subsidiaries and any other Person (other than the Collateral Agent and the Lenders) who becomes a party to this Agreement pursuant to a Joinder Agreement and their successors and assigns.

"LRR Seller Notes" means the Third Amended and Restated Promissory Notes issued by the Borrower to Kenneth Whitt, John Collins, John Whitt, Linda Whitt, Stephanie Lacy, Melissa Lewis and Jonathan Whitt, in connection with the acquisition of the Equity Interests of Licking River Resources, Inc., Oak Hill Coal, Inc. and S.M.& J., Inc., originally dated January 5, 2007, as amended and restated on June 14, 2008, in an aggregate principal amount of $10,000,000, of which (a) $3,333,333 in principal was due on July 15, 2008 and was paid on July 2, 2008 and (b) the remainder principal amount (i.e., $6,666,667) is due on the earlier of (i) October 31, 2009 and (ii) the consummation of an initial public offering of the Borrower's common stock. Each of the LRR Seller Notes bears interest at the rate of 5% per annum until July 15, 2008 and thereafter at 10% per annum until maturity.

"Management Team" means Robert Gabbard, John Collins, John Whitt and Kenneth Whitt.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Loan Parties taken as a whole, (b) the ability of any Loan Party to perform any of its obligations under the Loan Documents to which it is a party, (c) the Collateral, or the Collateral Agent's Liens (for the benefit of the Lenders) on the Collateral or the priority of such Liens, or (d) the rights of or benefits available to any Lender thereunder.

"Material Agreements" has the meaning assigned to such term in Section 3.12.

"Material Indebtedness" means Indebtedness (other than the Loan), or obligations in respect of one or more Swap Agreements, of any one or more of the Loan Parties in an aggregate principal amount exceeding $100,000. For purposes of determining Material Indebtedness, the "obligations" of any Loan Party in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Loan Party would be required to pay if such Swap Agreement were terminated at such time.

"Maturity Date" means March 31, 2009; provided, however, that so long as no Event of Default has occurred which has not been waived by the Lender, the Borrower shall have six separate options (each an "Extension Option") to extend the Maturity Date by a period of one

11

month (each an "Extension Period") immediately following March 31, 2009, subject to the
following terms:

(i)       the Borrower shall exercise each Extension Option by delivery to Lender
of written notice exercising the Extension Option not less than thirty (30) days prior to the then
current Maturity Date;

(ii)      upon exercising an Extension Option, the Borrower shall pay to the
Lender in cash an Extension Fee with respect to the relevant Extension Period in the amount of
one percent (1%) of the then outstanding amount of principal and interest under the Loan; and

(iii)     in no event shall the Maturity Date be extended pursuant to the Extension
Options beyond September 30, 2009.

"Maximum Liability" has the meaning assigned to such term in Section 9.10.

"MLCI" means Merrill Lynch Commodities, Inc., a Delaware corporation.

"MLCI Agreements" means (i) that certain Coal Services Agreement dated as of June 5,
2007 between the Borrower and MLCI, (the "Coal Services Agreement"), and (ii) that certain
Master Coal Purchase and Sale Agreement dated as of June 5, 2007 between the Borrower and
MLCI (the "Master Trading Agreement"), as said agreements are amended by that certain
Amendment to the Coal Services Agreement and Master Coal Purchase and Sale Agreement
dated as of the date hereof.

"MLCI Subordination Agreement" means the Intercreditor and Subordination agreement
dated as of the date hereof executed by MLCI in favor of the Collateral Agent and the Lenders.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of
ERISA.

"Net Proceeds" means, with respect to any event, (a) the sum of cash proceeds and Cash
Equivalents received in respect of such event including (i) any cash and Cash Equivalents
received in respect of any non-cash proceeds (including any cash payments received by way of
deferred payment of principal pursuant to a note or installment receivable or purchase price
adjustment receivable or otherwise, but excluding any interest payments), but only as and when
received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation
or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all
reasonable and customary fees and out-of-pocket expenses paid by any Loan Party to third
parties (other than Affiliates) in connection with such event, (ii) in the case of a sale, transfer or
other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty
or a condemnation or similar proceeding), the amount of all payments required to be made as a
result of such event to repay Indebtedness (other than the Loan) secured by such asset subject to
mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or
reasonably estimated to be payable) and the amount of any reserves established to fund
contingent liabilities reasonably estimated to be payable prior to the Maturity Date, in each case

12

during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer).

"New Coal Producers" means, collectively, J. A. D. Coal Company, Inc., Fox Knob Coal Co., Inc. and Sandlick Coal Company, LLC.

"Non-Paying Guarantor" has the meaning assigned to such term in Section 9.11.

"Note" means the promissory note of the Borrower in form and substance satisfactory to Lenders, issued to evidence the Loan.

"Obligated Party" has the meaning assigned to such term in Section 9.02.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loan, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations of the Loan Parties to the Lenders or any indemnified party arising under the Loan Documents. Obligations shall also include all Swap Obligations owing to any Lender or its Affiliates.

"Occupational Safety and Health Law" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices, or binding agreements issued, promulgated or entered into by any Governmental Authority designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, including the Occupational Safety and Health Act, and any program, whether governmental or private (such as those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

"Off-Balance Sheet Liability" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any sale and leaseback transaction which is not a Capital Lease Obligation, (c) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (d) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheets of such Person (other than operating leases).

"Original Coal Producers" means, collectively, Licking River Resources, Inc., Oak Hill Coal, Inc. and S. M. & J., Inc.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement.

"Paying Guarantor" has the meaning assigned to such term in Section 9.11.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Acquisition" means the Rifle Acquisition, so long as all of the following conditions are satisfied as of the time of the consummation thereof:

      (a)      the Loan Parties shall have provided the Lenders with prior written notice of the Rifle Acquisition not less than twenty (20) days prior to the anticipated closing date thereof together with such documentation that the Lenders may reasonably require demonstrating that the terms of the Rifle Acquisition will be in compliance with the Rifle Acquisition Terms;

      (b)      concurrently with delivery of the notice referred to in the preceding clause (a), the Borrower shall have delivered to the Lenders, in form and substance reasonably satisfactory to the Lenders a certificate of an Authorized Officer of the Borrower to the effect that each Loan Party (after taking into consideration all rights of contribution and indemnity such Loan Party has against each other Loan Party) will be solvent upon the consummation of the Rifle Acquisition;

      (c)      as soon as practicable prior to the closing date of the Rifle Acquisition (but in no event less than five (5) Business Days before such date), the Borrower shall have provided the Lenders with copies of the Rifle Acquisition Documents, each of which shall be in form and substance reasonably satisfactory to the Lenders for purposes of ascertaining that the Rifle Acquisition Documents (i) are in compliance with the Rifle Acquisition Terms and (ii) do not contain any terms or provisions that could reasonably be expected to result in a Material Adverse Effect, together with a certificate of an Authorized Officer certifying each such document as being a true, correct and complete copy thereof and in full force and effect;

      (d)      no Default or Event of Default shall have occurred and be continuing or would result from or exist upon the consummation of the Rifle Acquisition; and

      (e)      On or prior to the closing date of the Rifle Acquisition, (i) the Borrower shall have caused the Rifle Sellers to execute and deliver the Rifle Stock Intercreditor Agreement and (ii) the Borrower shall have caused the Rifle Companies to execute and deliver a Joinder Agreement in order to make such Person a Guarantor hereunder, together with any and all other Loan Documents and other documentation reasonably requested by the Lenders in order to cause the Rifle Companies to be obligated with respect to the Obligations and to include the Equity Interests of the Rifle Companies within the Collateral hypothecated under the Loan Documents, and all Disclosure Schedules shall be updated to reflect information relating to the Rifle Companies so that all representations and warranties herein and in all other Loan Documents shall continue to be true and correct after taking into account the Rifle Acquisition.

"Permitted Encumbrances" means:

      (a)      Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.04;

      (b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlord's and other like Liens imposed by law or contract, arising in the ordinary course of business and securing obligations that are not overdue by more than 45 days or are being contested in compliance with Section 5.04;

(c)        pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)        deposits, certificates of deposit, cash collateral accounts and/or cash reserves to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)        judgment liens in respect of judgments that do not constitute an Event of Default under Section 7.01(l); and

(f)        easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Investments" means:

(a)        direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)        investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)        investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of Central Bank and Trust Co. or any other commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)        fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e)        investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (d) above; and

(f)        tax exempt securities rated A or higher by Moody's or A+ or higher by Standard & Poor's.

15

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Prepayment Event" means:

(a)      any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any property or asset of any Loan Party, other than dispositions described in Sections 6.05(a), 6.05 (b) (only in respect of sales, transfers or dispositions to Subsidiaries that are Loan Parties whose assets are secured by a first priority Lien in favor of Collateral Agent for the benefit of the Lenders), or 6.05 (c); or

(b)      any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Loan Party with a fair value immediately prior to such event equal to or greater than $100,000; or

(c)      the incurrence by any Loan Party of any Indebtedness, other than Indebtedness permitted under Section 6.01.

"Prior Lenders" has the meaning assigned to such term in the preamble.

"Prior Liens" has the meaning assigned to such term in Section 3.16.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Report" means reports prepared by any Lender or another Person showing the results of appraisals, field examinations or audits pertaining to the Borrower's assets from information furnished by or on behalf of the Borrower, after such Lender has exercised its rights of inspection pursuant to this Agreement.

"Required Lenders" means, at any time, the Lenders holding in the aggregate at least a majority of the aggregate principal amount of the Loan outstanding at such time.

"Requirement of Law" as to any Person, the Certificate of Incorporation and By Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in any Loan Party, or any

payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests.

"Reverse Merger" means a reverse merger, share exchange or similar transaction with a public "shell" corporation (or the shareholders thereof) which results in the Borrower becoming a direct or indirect, wholly-owned subsidiary of such public "shell" company and subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act of 1934, as amended.

"Rifle Acquisition" means the purchase by the Borrower of all the Equity Interests of the Rifle Companies.

"Rifle Acquisition Documents" means the purchase agreement and all related documents and agreements evidencing the Rifle Acquisition.

"Rifle Acquisition Terms" means the terms and conditions set forth in the Rifle LOI.

"Rifle Companies" means Rifle Coal Company, a Kentucky limited liability company, and Associated Contracting LLC, a Kentucky limited liability company.

"Rifle Equipment Line of Credit" means a proposed line of credit with Caterpillar Industries, Inc. or another lender reasonably acceptable to Lender in an aggregate principal amount not to exceed $25,000,000 comprised of (i) the Rifle PPE Indebtedness and (ii) up to an additional $10,000,000 of credit to finance the acquisition of equipment for the Rifle Companies and the Borrower, so long as such indebtedness is secured solely by the equipment financed thereby.

"Rifle Equity Interests" means all of the Equity Interests in each of the Rifle Companies.

"Rifle LOI" means that certain confidential, letter of intent, dated as of March 31, 2008, previously furnished to the Lenders setting forth the Rifle Acquisition Terms.

"Rifle Non-Core Assets" means the Road-Building Assets and the Farming Assets (as such terms are defined in the Rifle LOI) which are to be purchased by Borrower in consideration for the issuance to Rifle Sellers of the Rifle Non-Core Asset Notes and contemporaneously resold to the Rifle Sellers at the closing of the Permitted Acquisition, whereupon the Rifle Non-Core Asset Notes shall be cancelled.

"Rifle Non-Core Asset Notes" means the demand promissory notes in the principal amount of $3,000,000 to be issued to the Rifle Sellers and contemporaneously cancelled upon the closing of the Permitted Acquisition.

"Rifle PPE Indebtedness" means the indebtedness of the Rifle Companies with various lenders, currently in an aggregate principal amount not in excess of $1,700,000, which indebtedness is secured solely by the plant, property and equipment of the Rifle Companies and which may be refinanced in connection with the consummation of the Permitted Acquisition so

that upon consummation of the Permitted Acquisition the aggregate principal amount of Rifle PPE Indebtedness shall not exceed $15,000,000.

"Rifle Seller Notes" means the Promissory Notes to be issued by the Borrower to each of the Rifle Sellers in a Permitted Acquisition, having an original aggregate principal amount not to exceed $3,000,000 and on terms no less favorable to the Borrower or the Lenders than the terms specified in the Rifle LOI.

"Rifle Sellers" means Barrett Frederick, Randolph Frederick, Grover Frederick, James Frederick and Anthony Frederick.

"Rifle Stock Intercreditor Agreement" means the Intercreditor Agreement to be entered into upon consummation of the Permitted Acquisition among the Rifle Sellers and the Lenders in form and substance satisfactory to the Lenders in their reasonable discretion, which shall, among other things, shall set forth the priorities of the parties in the Equity Interests of the Rifle Companies.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc.

"Security Agreement" means that certain Amended and Restated Security Agreement, dated as of the Closing Date, among the Loan Parties and the Collateral Agent, and any other pledge or security agreement entered into, after the date of this Agreement by any other Loan Party (as required by this Agreement or any other Loan Document), or any other Person, as the same may be amended, restated or otherwise modified from time to time.

"Series B Documents" means collectively (i) the Subscription Agreements, (ii) the Amended and Restated Registration Rights Agreement, (iii) the Warrants and (iv) the Certificate of Designations, each in the form previously delivered to the Lenders.

"Series B Offering" means the issuance from time to time by the Borrower of shares of its Series B Preferred Stock pursuant to the Series B Documents.

"Subordinated Indebtedness" of a Person means any Indebtedness of such Person the payment of which is subordinated to payment of the Obligations to the written satisfaction of the Required Lenders.

"Subordinated Lien Subsidiaries" means Subsidiaries that are or become Loan Parties whose Equity Interests are secured by a Lien in favor of Collateral Agent for the benefit of the Lenders that is not a first priority lien.

"Subordinated Lien Subsidiary Transactions" means collectively, (i) all Indebtedness of any Subordinated Lien Subsidiary owed to the Borrower and/or any First Lien Subsidiary pursuant to Section 6.01(c), (ii) all Guarantees by the Borrower and/or any First Lien Subsidiary of Indebtedness of any Subordinated Lien Subsidiary pursuant to Section 6.01(d), (iii) all investments made by the Borrower and/or any First Lien Subsidiary into any Subordinated Lien Subsidiary pursuant to Section 6.04(c), and (iv) all loans or advances made by the Borrower

and/or any First Lien Subsidiary to any Subordinated Lien Subsidiary permitted pursuant to Section 6.04(d).

"subsidiary" means, with respect to Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of the Borrower or a Loan Party, as applicable.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Swap Obligations" of a Person means any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Swap Agreements, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings (including penalties) imposed by any Governmental Authority.

"Total Indebtedness" means, at any date, the aggregate principal amount of all Indebtedness of the Borrower and its Subsidiaries at such date, determined on a consolidated basis in accordance with GAAP.

"Transactions" means the execution, delivery and performance by the Loan Parties of the Credit Agreement, the borrowing of the Loan and the use of the proceeds thereof.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"Value Rights Agreement" means that certain Value Rights Agreement dated as of April 15, 2008 between the Borrower and JMB, as such document may be amended, restated or otherwise modified from time to time.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02  Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.03  Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Lenders that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if any Lender notifies the Borrower that such Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

## ARTICLE II.  THE LOAN

SECTION 2.01  The Loan.  The Borrower hereby acknowledges that the aggregate principal amount of the term loan originally made under the Existing Credit Agreement outstanding as of August 1, 2008 is $13,311,818.21 (the "Loan"), comprised of (i) $13,000,000 of original principal plus (ii) $311,818.21 in capitalized interest.  Amounts repaid in respect of the Loan may not be reborrowed.

SECTION 2.02  Repayment of the Loan; Evidence of Debt.

(a)     The Borrower hereby unconditionally promises to pay to each Lender for
its account the then unpaid principal amount of the Loan owed to such Lender on the Maturity
Date

(b)     Each Lender shall maintain in accordance with its usual practice an
account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from
the Loan made hereunder, including the amounts of principal and interest due and payable and
paid to such Lender from time to time hereunder.

(c)     The entries made in the accounts maintained pursuant to paragraph (b) of
this Section shall be prima facie evidence of the existence and amounts of the obligations
recorded therein; provided that the failure of any Lender to maintain such accounts or any error
therein shall not in any manner affect the obligation of the Borrower to repay the Loan in
accordance with the terms of this Agreement.

(d)     Each Lender may request that the Loan made by it be evidenced by a
promissory note. In such event, the Borrower shall prepare, execute and deliver to such Lender a
promissory note payable to the order of such Lender (or, if requested by such Lender, to such
Lender and its registered assigns) and in a form reasonably approved by such Lender.
Thereafter, the Loan evidenced by such promissory note and interest thereon shall at all times
(including after assignment pursuant to Section 8.04) be represented by one or more promissory
notes in such form payable to the order of the payee named therein (or, if such promissory note is
a registered note, to such payee and its registered assigns).

SECTION 2.03  Prepayment of Loan. (a) *Optional Prepayment*. The Borrower
shall have the right at any time and from time to time to optionally prepay the Loan in whole or
in part, subject to prior notice in accordance with paragraph (c) of this Section and the payment
of accrued interest in accordance with Section 2.03(c) and any other amounts pursuant to and in
accordance with this Agreement; provided, however, that each prepayment under this Section
2.03(a) shall be in a minimum amount equal to $100,000 and integral multiples of $25,000 in
excess thereof.

(b)     *Mandatory Prepayment*. In the event and on each occasion that any Net
Proceeds are received by or on behalf of any Loan Party in respect of any Prepayment Event, the
Borrower shall, immediately after such Net Proceeds are received by such Loan Party, prepay the
Obligations in an aggregate amount equal to 100% of such Net Proceeds, provided that, in the
case of any event described in clause (a) or (b) of the definition of the term "Prepayment Event",
if the Borrower shall deliver to the Lenders a certificate of a Financial Officer to the effect that
the Loan Parties intend to apply the Net Proceeds from such event (or a portion thereof specified
in such certificate), within 30 days after receipt of such Net Proceeds, to acquire (or replace or
rebuild) real property, equipment or other tangible assets (excluding inventory) to be used in the
business of the Loan Parties, and certifying that no Default has occurred and is continuing, then
no prepayment shall be required pursuant to this paragraph in respect of the Net Proceeds
specified in such certificate, provided that such Net Proceeds are so applied within such 30 day
period.

21

(c)     The Borrower shall notify the Lenders by telephone (confirmed by facsimile) of any prepayment hereunder not later than 10:00 a.m., New York City time, three Business Days before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount to be prepaid to each Lender. Prepayments shall be accompanied by accrued interest as set forth in Section 2.05(c).

SECTION 2.04  Fees.

(a)     On the Closing Date, the Borrower shall pay to the Lenders an amendment fee (the "Amendment Fee") in the amount of $175,000.

(b)     Intentionally Omitted.

(c)     All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Lenders. Fees paid shall not be refundable under any circumstances.

SECTION 2.05  Interest. (a)  The unpaid principal amount of the Loan shall bear interest beginning as of April 15, 2008 at an aggregate rate per annum equal to twenty percent (20.00%) per annum, payable as follows: (i) twelve percent (12.00%) per annum payable in cash and (ii) eight percent (8.00%) per annum payable by capitalizing such interest on the date when due and adding such capitalized amount to the outstanding principal amount of the Loan.

(b)     Notwithstanding the foregoing, during the occurrence and continuance of an Event of Default, (i) the unpaid principal amount of the Loan shall bear interest at 2% per annum plus the rate otherwise applicable to the Loan as provided in the preceding paragraph of this Section or (ii) in the case of any other amount outstanding hereunder, such amount shall accrue at 2% per annum plus the rate applicable to such fee or other obligation as provided hereunder (provided that, if this Agreement does not expressly provide for a rate applicable to such fee or other obligation, such amount outstanding hereunder shall accrue at 14% per annum). All interest accruing during the occurrence and continuance of an Event of Default pursuant to this Section 2.05(b) shall be payable in cash.

(c)     Accrued interest on the unpaid principal amount of the Loan shall be payable or capitalized, as applicable, in arrears on each Interest Payment Date; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand, and (ii) in the event of any repayment or prepayment of the Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)     All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed.

SECTION 2.06  Taxes. (a)  Any and all payments by or on account of any obligation of the Borrower hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if the Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) each Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made,

(ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    The Borrower shall indemnify each Lender within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by such Lender on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by such Lender shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the applicable Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to such Lender.

SECTION 2.07  Payments Generally; Allocation of Proceeds; Sharing of Set-offs.
(a)    The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees or otherwise) prior to 11:00 a.m., New York City time, on the date when due, in immediately available funds, without set off or counterclaim. Any amounts received by any Lender after such time on any date may, in the discretion of such Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to each Lender at its address as notified to the Borrower in writing from time to time. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars.

(b)    Any proceeds of Collateral received by any Lender (i) not constituting either (A) a specific payment of principal, interest, fees or other sum payable under the Loan Documents (which shall be applied as specified by the Borrower), or (B) a mandatory prepayment (which shall be applied in accordance with Section 2.03) or (ii) after an Event of Default has occurred and is continuing and the Required Lenders so elect, shall be applied ratably first, to the payment of all amounts payable under this Agreement on account of the Collateral Agent's fees or any legal fees, costs and expenses or other liabilities of any kind incurred by the Collateral Agent or any co-agent in connection with any Loan Document, second, to pay any fees, indemnities, or expense reimbursements including amounts then due to the Lenders from the Borrower, third, interest then due and payable on the Loan, fourth, to prepay principal on the Loan, fifth, to payment of any amounts owing with respect to Swap Obligations, and sixth, to the payment of any other Obligation due to the Lenders by the Borrower. The Required Lenders shall have the continuing and exclusive right to apply and

reverse and reapply any and all such proceeds and payments to any portion of the Obligations. For this purpose, "<u>proceeds</u>" of Collateral means any and all cash, securities and other property realized from collection, foreclosure or enforcement of the Collateral Agent's Liens upon the Collateral (including distributions of Collateral in satisfaction of any Obligations).

SECTION 2.08  Indemnity for Returned Payments.  If after receipt of any payment which is applied to the payment of all or any part of the Obligations, any Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by such Lender and the Borrower shall be liable to pay such Obligations to such Lender.  The provisions of this Section 2.08 shall be and remain effective notwithstanding any contrary action which may have been taken by any Lender in reliance upon such payment or application of proceeds.  The provisions of this Section 2.08 shall survive the termination of this Agreement.

SECTION 2.09  Pro Rata Treatment.  Except to the extent otherwise provided herein, the Loan, each payment or prepayment of principal of the Loan, each payment of interest on the Loan and each payment of fees due and payable to the Lenders under the Loan Documents shall be allocated pro rata among the Lenders in accordance with the respective principal amounts of the outstanding Loan held by the Lenders. The Loan Parties hereby agree to make all such pro rata payments directly to each Lender in accordance with this Section in accordance with instructions provided by to the Borrower by such Lender.

SECTION 2.10  Effect of Amendment and Restatement.  Upon the execution and delivery of this Agreement, the indebtedness, obligations and other liabilities of each of the Loan Parties previously governed by the Existing Credit Agreement (the "Existing Obligations") shall continue in full force and effect, but shall be governed by the terms and conditions set forth in this Agreement.  The Existing Obligations shall include all interest, fees and other amounts accrued through the Closing Date.  Guaranties issued under the Existing Credit Agreement shall be deemed to be outstanding under this Agreement, except as amended on the date hereof or hereafter.  The Existing Obligations, together with any and all additional Obligations incurred by the Borrower hereunder or under any of the other Loan Documents shall continue to be secured by the assets of each Loan Party, other than the Excluded Assets, whether now existing or hereafter acquired and wheresoever located, all as more specifically set forth in the Collateral Documents.  The execution and delivery of this Agreement shall not constitute a novation or repayment of the Existing Obligations.

ARTICLE III. Representations and Warranties

Each Loan Party hereby represents and warrants to the Lenders that, as of the Closing Date:

SECTION 3.01         Organization; Powers.  Each of the Loan Parties is duly organized, validly existing and in good standing under the laws of the jurisdiction of its

24

organization, has all requisite power and authority to own or lease and operate its properties and carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02    Authorization; Enforceability. The Transactions are within each Loan Party's corporate, limited liability, or limited partnership powers (as applicable) and have been duly authorized by all necessary corporate and, if required, stockholder action. The Loan Documents to which each Loan Party is a party have been duly executed and delivered by such Loan Party and constitute a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms.

SECTION 3.03    Governmental Approvals; No Conflicts. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (i) the execution, delivery or performance by, or enforcement against, any Loan Party of the Credit Agreement or any other Loan Document, or for the consummation of the Transactions, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature of the Collateral as set forth in the Collateral Documents and this Agreement, other than that portion of the Collateral in which the Lien in favor of the Collateral Agent shall not be first priority as expressly set forth in Section 3.16), other than the due filing of UCC-1 financing statements and the delivery of a duly executed JAD Stock Intercreditor Agreement, or (iv) the exercise by any Lender or the Collateral Agent of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents. All applicable waiting periods in connection with the Transactions have expired without any action having been taken by any Governmental Authority restraining, preventing or imposing materially adverse conditions upon the Transactions or the rights of the Loan Parties freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them. Each Loan Party has all requisite corporate, limited liability company or partnership (as applicable) power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.

SECTION 3.04    Financial Condition; No Material Adverse Change. (a) Each of the Loan Parties has heretofore furnished to the Lender its (1) combined, audited balance sheet and statements of income, stockholders equity and cash flows (i) as of and for the fiscal year ended December 31, 2007, reported on by Coulter & Justus, P.C., independent public accountants, and (ii) reviewed, unaudited balance sheet and statements of income and cash flows as of and for the fiscal quarter and the portion of the fiscal year ended March 31, 2008, certified by a Financial Officer. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Loan Parties as of such dates and for such periods in accordance with GAAP, subject to year end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)    Except for the matters disclosed in Schedule 3.04(b), no event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect, since the date of the financial statements described in subsection (a) above.

25

SECTION 3.05  Properties.  (a) As of the Closing Date, Schedule 3.05 sets forth the address of each parcel of real property that is owned or leased by each Loan Party.  Each of such leases and subleases is valid and enforceable in accordance with its terms and is in full force and effect, and no default by any party to any such lease or sublease exists.  Each of the Loan Parties has good and indefeasible title to, or valid leasehold interests in, all its real and personal property, free of all Liens other than those permitted by Section 6.02.

(b)        Each Loan Party owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to its business as currently conducted, a correct and complete list of which, as of the Closing Date, is set forth on Schedule 3.05, and the use thereof by the Loan Parties does not infringe in any material respect upon the rights of any other Person, and the Loan Parties' rights thereto are not subject to any licensing agreement or similar arrangement.

SECTION 3.06  Litigation and Environmental Matters.  (a) Except for the Disclosed Matters, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened against or affecting the Loan Parties that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or that involve the Agreement or the Transactions.

(b)        Since April 15, 2008, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or increased the likelihood of, a Material Adverse Effect.

(c)        Except for the Disclosed Matters: (A) each Loan Party's real property has not been used by any Loan Party, and to its knowledge by any other person, as a landfill or for final disposal of waste, is free of contamination from any Hazardous Materials, except for such contamination that could not reasonably be expected to result in a Material Adverse Effect, and no such real property is the subject of any mandatory order from a Governmental Authority, nor has any Loan Party received any notice of intent to issue such an order; (B) no written notice has been received by any Loan Party identifying it as a "potentially responsible party" or a party responsible for the remediation or clean up of any Hazardous Material, or requesting information under any Environmental Law pertaining to any release of Hazardous Material, or to any contaminated site; and (C) to the knowledge of the Loan Parties, there are no facts, circumstances or conditions that could reasonably be expected to result in any Loan Party being identified as a "potentially responsible party" or a party responsible for the remediation or clean up of any Hazardous Material under any Environmental Law, except to the extent that such identification could not reasonably be expected to result in a Material Adverse Effect.

(d)        Except for the Disclosed Matters: (A) each Loan Party is in material compliance with all requirements of Environmental Laws; (B) each Loan Party has obtained, and is in material compliance with the requirements of all material Environmental Permits required by Environmental Laws for the operations of its businesses as presently conducted, and all such Environmental Permits are valid, uncontested and in good standing, and there is no application pending to revoke any such Environmental Permit; (C) there is no litigation arising under or related to any Environmental Laws, Environmental Permits or Hazardous materials which seeks

26

damages, penalties, fines, costs or expenses in an amount which could reasonably be expected to result in a Material Adverse Effect or which alleges criminal or quasi-criminal misconduct by the Borrower; (D) each Loan Party has not received written notice of any investigation or threatened investigation under any Environmental Laws, pertaining to its real property, the Environmental Permits, any Loan Party or the operations of its business, nor, to the knowledge of such Loan Party has it received, any oral notice of any such investigation, threatened investigation or evaluation; and (E) each Loan Party has provided to the Lender all existing material environmental reports or audits pertaining to its real property or the operations of its business in its possession or control.

(e)     Each Loan Party hereby acknowledges and agrees that each Lender (A) is not now, and has not ever been, in control of any of the Loan Parties' real property or affairs; and (B) does not have the capacity through the provisions of the Loan Documents or otherwise to influence any Loan Party's conduct with respect to the ownership, operation or management of any of its real property or compliance with Environmental Laws or Environmental Permits.

(f)     To the knowledge of the Loan Parties, no conditions exist at, on or under any real property or asset now or previously owned, leased or used by or under the control or management of any Loan Party which, with the passage of time, or the giving of notice or both, would give rise to any Environmental Liability which could reasonably be expected to have a Material Adverse Effect.

(g)     For the purposes of this section, "knowledge" of each Loan Party means that a senior officer of such Loan Party has actual knowledge or awareness of a particular fact or circumstance or that such person, if he or she had exercised reasonable diligence, would have known or been aware of such fact or circumstance (together with such other officers or employees of such Loan Party who, or after due inquiry, should have knowledge of such fact or circumstance).

SECTION 3.07  Compliance with Laws and Agreements.  Each Loan Party is in compliance with all Requirements of Law applicable to it or its property and, other than the matters disclosed on Schedule 3.07, all indentures, agreements and other instruments binding upon it or its property, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  No Default has occurred and is continuing.

SECTION 3.08  Investment Company Status.  No Loan Party nor any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09  Taxes.  Each Loan Party has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party or such Subsidiary, as applicable, has set aside on its books adequate reserves.  No Tax liens have been filed and no claims are being asserted with respect to any such Taxes.  The New Coal Producers failed to timely file their Tax returns for the September 30, 2007 fiscal year; however, as of the Closing Date, all Tax returns

27

and reports for the New Coal Producers for the September 30, 2007 fiscal year have been filed and all Taxes for the September 30, 2007 fiscal year have been paid.

       SECTION 3.10 <u>ERISA</u>. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect. Each Loan Party shall cause to be delivered to the Lenders all of the following: (i) a copy of each Plan (or, where such Plan is not in writing, a complete description thereof) and, if applicable, related trust agreements or other funding instruments, all amendments thereto, all written interpretations and descriptions thereof that have been distributed to employees or former employees of the Borrower or any ERISA Affiliate; (ii) the most recent determination letter issued by the Internal Revenue Service with respect to each Plan; (iii) for the three most recent plan years, Annual Reports on Form 5500 required to be filed with any governmental agency for each Plan; (iv) a listing of all Multiemployer Plans, with the aggregate amount of the most recent annual contributions required to be made by the Borrower or any ERISA Affiliate to each such Plan and copies of the collective bargaining agreements requiring such contributions; (v) any information that has been provided to the Borrower or any ERISA Affiliate regarding withdrawal liability under any Multiemployer Plan; (vi) the aggregate amount of payments made under any employee welfare benefit plan (as defined in Section 3(1) of ERISA) to any retired employees (or dependents thereof) of the Borrower or any of its Subsidiaries during the most recently completed fiscal year along with a copy or description of such employee welfare benefit plan; (vii) documents reflecting any agreements between the PBGC and the Borrower or any ERISA Affiliate with respect to any Plan, and (viii) the most recent actuarial valuation of each Plan.

       SECTION 3.11 <u>Disclosure</u>. Each Loan Party has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Lenders in connection with the negotiation of the Agreement or any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, each Loan Party represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Closing Date, as of the Closing Date.

       SECTION 3.12 <u>Material Agreements; Permitted/Pending Reserves</u>. All material agreements and contracts to which any Loan Party is a party or is bound as of the Closing Date are listed on Schedule 3.12 (collectively, the "<u>Material Agreements</u>"). No Loan Party is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (i) any material agreement to which it is a party or (ii) any agreement or instrument evidencing or governing Indebtedness.

       SECTION 3.13 <u>Solvency</u>. (a) As of the Closing Date and after giving effect to the payment and accrual of all transaction costs in connection with the execution and delivery of this Agreement, (i) the fair value of the assets of each Loan Party, at a fair valuation, will exceed its

debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair saleable value of the property of each Loan Party will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) each Loan Party will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured, and (iv) each Loan Party will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted after the Closing Date.

(b)    No Loan Party intends to, or will permit any of its Subsidiaries to, and no Loan Party believes that it or any of its Subsidiaries will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by it or any such Subsidiary and the timing of the amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such Subsidiary.

SECTION 3.14  Insurance.  Schedule 3.14 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and the Subsidiaries as of the Closing Date.  As of the Closing Date, all premiums in respect of such insurance have been paid.  Each Loan Party believes that the insurance maintained by or on behalf of the Loan Parties is adequate.

SECTION 3.15  Capitalization and Subsidiaries.  Schedule 3.15 sets forth (a) a correct and complete list of the name and relationship to the Borrower of each and all of the Borrower's Subsidiaries, (b) a true and complete listing of each class of each of the Loan Party's authorized Equity Interests, of which all of such issued shares are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified on Schedule 3.15, and (c) the type of entity of each of the Loan Parties.   All of the issued and outstanding Equity Interests owned by any Loan Party has been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and is fully paid and non assessable.

SECTION 3.16  Security Interest in Collateral.  The Loan Parties acknowledge and reaffirm that the provisions of the Existing Credit Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of the Collateral Agent (for the benefit of the Lenders), and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, assuming due and proper filings of all Uniform Commercial Code financing statements in the appropriate jurisdictions which remain in effect and have not been terminated or released, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of (i) Permitted Encumbrances, to the extent any such Permitted Encumbrances would have priority over the Liens in favor of the Collateral Agent (for the benefit of the Lenders) pursuant to any applicable law, (ii) the JAD Equity Interests, Liens in favor of the JAD Sellers and the Centrecourt Bridge Lenders, (iii) the Rifle Equity Interests, Liens in favor of the Rifle Sellers upon consummation of a Permitted Acquisition, (iv) any Excluded Assets, and (v) the Liens permitted under Sections 6.02(d) and (k), to the extent any such Liens would have priority over the Liens in favor of the Collateral Agent (for the benefit of the Lenders) pursuant to this Agreement and/or any applicable law (collectively, items (i) through (v) are referred to as the "Prior Liens").

SECTION 3.17  Employment Matters.  As of the Closing Date, there are no strikes, lockouts or slowdowns against any Loan Party pending or, to the knowledge of any Loan Party threatened.  The hours worked by and payments made to employees of the Loan Parties have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.  All payments due from any Loan Party, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party.

SECTION 3.18  Affiliate Transactions.  Except as set forth on Schedule 3.18, as of the Closing Date, (i) there are no existing or proposed agreements, arrangements, understandings, or transactions between any Loan Party and any of the officers, members, managers, directors, stockholders, parents, other interest holders, employees, or Affiliates (other than Loan Parties) of any Loan Party or any members of their respective immediate families, and (ii) none of the foregoing Persons are directly or indirectly indebted to or have any direct or indirect ownership, partnership, or voting interest in any Affiliate of any Loan Party or any Person with which any Loan Party has a business relationship or which competes with any Loan Party.  The Centrecourt Equipment Purchase, including the agreement in respect thereof referenced on Schedule 3.18, is for a price and on terms and conditions not less favorable to the Borrower than could be obtained on an arm's-length basis from unrelated third parties.

SECTION 3.19  Common Enterprise.  The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party.  Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrower hereunder, both in their separate capacities and as members of the group of companies.  Each Loan Party has determined that execution, delivery, and performance of the Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.20  MLCI Agreements.  As of the Closing Date, Borrower has delivered to Lenders a complete and correct copy of the MLCI Agreements (including all schedules, exhibits, amendments, supplements, modifications, assignments and all other documents or agreements delivered pursuant thereto or in connection therewith).  All Obligations constitute Indebtedness entitled to the benefits of the subordination provisions contained in the MLCI Subordination Agreement.  As of the Closing Date, the amount of cash performance assurance held by MLCI pursuant to the MLCI Agreements is $3,291,722.

ARTICLE IV. Conditions

SECTION 4.01  Closing Date.  The closing of this Agreement (the "Closing Date") shall be deemed to occur on the date on which each of the following conditions is satisfied (or waived in accordance with Section 8.02):

30

(a)    <u>Credit Agreement and Loan Documents</u>. The Lenders (or their counsel) shall have received (i) from each party hereto either (A) a counterpart of this Agreement signed by such party or (B) written evidence satisfactory to the Lenders (which may include facsimile transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and (ii) duly executed copies of other Loan Documents and such other certificates, documents, instruments and agreements as the Lenders shall request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including written opinions of the Loan Parties' counsel, addressed to the Lenders in form and substance reasonably satisfactory to the Lenders.

(b)    <u>Financial Statements and Projections</u>. The Lenders shall have received (i) audited combined financial statements of the Original Coal Producers for the December 31, 2005, 2006 and 2007 fiscal years, (ii) audited combined financial statements of the New Coal Producers for the September 30, 2005 and 2006 fiscal years, and (iii) unaudited interim combined financial statements of the Coal Producers for the three months ended March 31, 2008, and such financial statements shall not, in the reasonable judgment of the Lenders, reflect any material adverse change in the combined financial condition of the Coal Producers, as reflected in the financial statements.

(c)    <u>Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates</u>. The Lenders shall have received (i) a certificate of each Loan Party, dated the Closing Date and executed by its Secretary or Assistant Secretary, which shall (A) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of the Financial Officers and any other officers of such Loan Party authorized to sign the Loan Documents to which it is a party, and (C) contain appropriate attachments, including the certificate or articles of incorporation or organization of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its by laws or operating, management or partnership agreement, and (ii) a short form good standing certificate for each Loan Party from its jurisdiction of organization.

(d)    <u>No Default Certificate</u>. The Lenders shall have received a certificate, signed by the chief financial officer of each Loan Party, on the Closing Date (i) stating that no Default has occurred and is continuing, (ii) stating that the representations and warranties contained in Article III are true and correct as of such date, and (iii) certifying any other factual matters as may be requested by the Lenders.

(e)    <u>Fees</u>. The Lenders shall have received the Amendment Fee and all other fees required to be paid and all expenses (including the reasonable fees and expenses of legal counsel) on or before the Closing Date.

(f)    <u>Lien Searches</u>. The Lenders shall have received the results of a recent lien search in each jurisdiction requested by the Lenders (including, but not limited to, the jurisdiction of organization of each Loan Party), and such search shall reveal no liens on any of the assets of the Loan Parties except for liens permitted by Section 6.02 or discharged on or prior to the Closing Date pursuant to a pay-off letter or other documentation satisfactory to the Lenders.

(g)    Solvency.  The Lenders shall have received a solvency certificate from a Financial Officer.

(h)    Pledged Stock; Stock Powers; Pledged Notes.  The Lenders shall have received either (i) the certificates representing the JAD Equity Interests pledged pursuant to the Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof or (ii) the duly executed JAD Stock Intercreditor Agreement in form and substance satisfactory to the Lenders in their sole discretion, whereby the JAD Sellers and then the Centrecourt Bridge Lenders acknowledge that they are holding the JAD Equity Interests and undated stock powers for each such certificate executed in blank on behalf of the Collateral Agent and the Lenders.

(i)    Filings, Registrations and Recordings.  Each document (including any Uniform Commercial Code financing statement) required by the Collateral Documents or under law or reasonably requested by the Lenders to be filed, registered or recorded in order to create in favor of the Collateral Agent (for the benefit of the Lenders), a perfected Lien on the Collateral described therein, prior and superior in right to any other Person except for the holders of Prior Liens, shall be in proper form for filing, registration or recordation.

(j)    Insurance.  The Lenders shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Lenders and otherwise in compliance with the terms of the Security Agreement.

(k)    Amendment to Coal Services Agreement.  The Lenders shall have received a duly executed Amendment to the Coal Services Agreement, in form and substance satisfactory to the Lenders in their sole discretion.

(l)    MLCI Subordination Agreement.  The Lenders shall have received the MLCI Subordination Agreement duly executed by MLCI, in form and substance satisfactory to the Lenders in their sole discretion.

(m)    Side Letter Agreement as to Value Rights Agreement.  The Lenders shall have received a side letter agreement regarding the Value Rights Agreement duly executed by the Loan Parties, in form and substance satisfactory to the Lenders in their sole discretion.

(n)    Note.  The Lenders shall have received the Note duly executed by the Borrower.

(o)    Centrecourt Documents.  The Lenders shall have received duly executed copies of the documents relating to the Centrecourt Bridge Financing and the Centrecourt Equipment Purchase, in form and substance reasonably satisfactory to the Lenders.

(p)    Centrecourt Amendment.  The Lenders shall have received a duly executed copy of the Centrecourt Amendment in form and substance satisfactory to the Lenders in their sole discretion.

(q)    Dismissal of Complaint.  The Loan Parties shall have dismissed Lenders and Collateral Agent with  prejudice from the lawsuit they filed in Kentucky Civil Action No.

32

08-CI-00165, pursuant to the filing of a Notice of Dismissal acceptable, in form and substance, to the Lenders and Collateral Agent.

(r)    <u>Post-Closing Agreement</u>.  The Lenders shall have received a duly executed copy of the Post-Closing Agreement in form and substance satisfactory to the Lenders in their sole discretion.

(s)    <u>Other Documents</u>.  The Lenders shall have received such other documents as the Lenders or their counsel may have reasonably requested.

ARTICLE V.  Affirmative Covenants

Until the principal of and interest on the Loan and all fees, expenses and other amounts payable hereunder shall have been paid in full, each Loan Party covenants and agrees, jointly and severally with all of the Loan Parties, with each Lender that:

SECTION 5.01    <u>Financial Statements; Other Information</u>.  The Borrower will furnish to each Lender:

(a)    within 120 days after the end of each fiscal year of the Borrower, its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by independent public accountants of recognized regional standing or who is otherwise acceptable to the Required Lenders (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, accompanied by any management letter prepared by said accountants; provided, however, that the audited combined financial statements of the New Coal Producers for the September 30, 2007 fiscal year shall be furnished to each Lender no later than July 1, 2008;

(b)    within 60 days after the end of each of the first three fiscal quarters of the Borrower, its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)    within 20 days after the end of each fiscal month of the Borrower, a certificate from a financial officer of the Borrower setting forth the top lines sales, the tons of coal extracted and the tons of coal sold by the Loan Parties in the preceding month;

(d)    concurrently with any delivery of financial statements under clause (a) or (b) or (c) above, a certificate of a Financial Officer of the Borrower in substantially the form of

33

Exhibit A (i) certifying, in the case of the financial statements delivered under clause (b) or (c), as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, (ii) certifying as to whether an Event of Default has occurred and, if an Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(e)      concurrently with any delivery of financial statements under clause (a) above, a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default (which certificate may be limited to the extent required by accounting rules or guidelines);

(f)      Intentionally Omitted.

(g)      as soon as possible and in any event within 10 Business Days of filing thereof, copies of all tax returns filed by any Loan Party with the U.S. Internal Revenue Service;

(h)      promptly, and in any event within 10 Business Days of becoming aware of same, deliver to each Lender a detailed statement describing any of the following occurrences: (i) any order or judgment of any Governmental Authority requiring any Loan Party to incur Environmental Liabilities (A) in excess of $100,000 in any one instance, (B) together with all other expenditures incurred in respect of Environmental Liabilities in any Financial Year, in excess of $500,000 in the aggregate, and (ii) any state of affairs which could reasonably be expected to result in the incurrence of Environmental Liabilities (A) in excess of $100,000 in any one instance, or (B) together with all other expenditures incurred in respect of Environmental Liabilities in any Financial Year, in excess of $500,000 in the aggregate, and (C) the action taken or proposed to be taken in connection with such occurrences;

(i)      promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Loan Party with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed by any Loan Party to its shareholders generally, as the case may be;

(j)      promptly after delivering the same to any other creditor of the Loan Parties, copies of any other financial reports, statements and information that are provided to other creditors of the Loan Parties; and

(k)      promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary, or compliance with the terms of this Agreement, as the Required Lenders may reasonably request.

34

SECTION 5.02  Notices of Material Events.  Each Loan Party will furnish to each Lender prompt written notice of the following:

(a)      the occurrence of any Event of Default;

(b)      receipt of any notice of any governmental investigation or any litigation commenced or threatened against any Loan Party that (i) seeks damages in excess of $100,000, (ii) seeks injunctive relief which results in, or could reasonably be expected to result in, a Material Adverse Effect, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets which results in, or could reasonably be expected to result in, a Material Adverse Effect, (iv) alleges criminal misconduct by any Loan Party, (v) alleges the violation of any law regarding, or seeks remedies in connection with, any Environmental Laws which results in, or could reasonably be expected to result in, a Material Adverse Effect; or (vi) contests any tax, fee, assessment, or other governmental charge which results in, or could reasonably be expected to result in, a Material Adverse Effect;

(c)      to the knowledge of any Loan Party, any Lien (other than Permitted Encumbrances) or claim made or asserted against any of the Collateral;

(d)      any loss, damage, or destruction to the Collateral in the amount of $250,000 or more per occurrence or $1,000,000 or more in the aggregate, whether or not covered by insurance;

(e)      any and all default notices received under or with respect to any Indebtedness or any leased location or public warehouse where Collateral is located (which shall be delivered within two Business Days after receipt thereof);

(f)      all material amendments to any Material Agreement, together with a copy of each such amendment;

(g)      the fact that a Loan Party has entered into a Swap Agreement or an amendment to a Swap Agreement, together with copies of all agreements evidencing such Swap Agreement or amendments thereto (which shall be delivered within five Business Days);

(h)      the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to have a  Material Adverse Effect; and

(i)      any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(j)      Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03  Existence; Conduct of Business.  Each Loan Party will, and will cause each Subsidiary to, (a) do or cause to be done all things necessary to preserve, renew and

35

keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, unless otherwise (i) determined by any Loan Party upon the exercise of its reasonable business judgment or (ii) permitted by Section 6.03(a), and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted, and (b) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted as permitted by Section 6.03(b).

SECTION 5.04  Payment of Obligations.  Each Loan Party will, and will cause each Subsidiary to, pay or discharge all Material Indebtedness and all other material liabilities and obligations, including Taxes, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, and (b) such Loan Party or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

SECTION 5.05  Maintenance of Properties.  Each Loan Party will, and will cause each Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

SECTION 5.06  Books and Records; Inspection Rights.  Each Loan Party will, and will cause each Subsidiary to, (i) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (ii) permit any representatives designated by any Lender (including employees of such Lender, or any consultants, accountants, lawyers and appraisers retained by such Lender), upon reasonable prior notice and during such Loan Party's normal business hours, to visit and inspect its properties, to examine and make extracts from its books and records, including environmental assessment reports and Phase I or Phase II studies, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested. The Loan Parties acknowledge that any Lender, after exercising its rights of inspection, may prepare certain Reports pertaining to the Loan Parties' assets for internal use by such Lender. Each Loan Party will permit one Lender to conduct field audit examinations of the Loan Party's assets, liabilities, books and records at a frequency not more than once every 90 days; provided further that the Loan Party will permit any Lender to conduct such examinations at any time and with any reasonable frequency upon the occurrence and continuation of an Event of Default.

SECTION 5.07  Compliance with Laws.  Each Loan Party will, and will cause each Subsidiary to, comply in all material respects with all Requirements of Law applicable to it or its property.

SECTION 5.08  Intentionally Omitted.

SECTION 5.09  Insurance.  In addition to insurance requirements set forth in the Collateral Documents, each Loan Party shall maintain, and shall cause each of its Subsidiaries to maintain, with financially sound and reputable independent insurers, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons of a similar size engaged in the same or similar business, of such types and in such

amounts as are customarily carried under similar circumstances by such other Persons; including workers' compensation insurance, public liability and property and casualty insurance which amounts shall not be reduced by any Loan Party in the absence of 30 days' prior notice to each Lender. All such insurance shall name the Collateral Agent as loss payee/mortgagee and as additional insured. Upon request of the Required Lenders, the Borrower shall furnish each Lender, at reasonable intervals (but not more than once per calendar year) a certificate of a Financial Officer of the Borrower (and, if requested by the Required Lenders, any insurance broker of the Borrower) setting forth the nature and extent of all insurance maintained by the Borrower and its Subsidiaries in accordance with this Section or any Collateral Document (and which, in the case of a certificate of a broker, were placed through such broker).

SECTION 5.10  Casualty and Condemnation.  The Borrower (a) will furnish to each Lender prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) will ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Collateral Documents.

SECTION 5.11  Environmental Compliance.  The Borrower will (i) comply in all material respects, and cause each of its Subsidiaries to comply in all material respects, with the requirements of all applicable Laws (including Environmental Laws) and duly observe in all material respects all valid requirements of any Governmental Authority as applicable to the Borrower's business and the industry of its business, and maintain the appropriate corporate or other similar registrations in each jurisdiction in which the Borrower or any of its Subsidiaries carries on business, except where the failure to be so registered would not have a Material Adverse Effect, and (ii) promptly, if the Required Lenders have a reasonable basis to believe that a discharge of a Hazardous Material has occurred or a condition exists at, on or under any of the real properties or assets now or hereafter owned, leased or used by the Borrower or under the control or management of the Borrower that individually or in the aggregate involve a "loss or potential" loss in excess of $100,000 or otherwise could reasonably be expected to have a Material Adverse Effect, cause to be conducted such environmental investigations (including without limitation, environmental site assessments and environmental compliance reviews) as are reasonably required by the Required Lenders by an environmental consultant approved by the Required Lenders, such approval not to be unreasonably withheld, and remedy any condition that could reasonably be expected, if not addressed, to have a Material Adverse Effect, and any non-compliance with Environmental Laws revealed by any such investigation.  Without limiting the foregoing, upon the occurrence and continuation of an Event of Default, at request of any Lender, the Borrower shall cause to be conducted an environmental compliance audit, to be conducted by a third party reasonably satisfactory to such Lender.  If the Borrower fails to provide any such report or audit referred to in this Section within 60 days of such request of any Lender, such Lender may, but shall be under no obligation to do so, conduct same, and the Borrower hereby grants each Lender and its agents and representatives access to the Real Property or any other property owned, leased or occupied by the Borrower to undertake such investigations, assessments and reviews (all of which shall be at the sole cost of the Borrower).

37

SECTION 5.12 <u>Governmental Authorizations</u>. Each Loan Party shall conduct its business in conformity, in all material respects, to each Governmental Authorization.

SECTION 5.13 <u>Additional Collateral; Further Assurances</u>. (a) Subject to applicable law, each Loan Party shall, unless each Lender otherwise consents, cause each Subsidiary of such Loan Party formed or acquired after the date of this Agreement in accordance with the terms of this Agreement to become a Loan Party by executing the Joinder Agreement set forth as Exhibit B hereto (the "<u>Joinder Agreement</u>"). Upon execution and delivery thereof, each such Person (i) shall automatically become a Guarantor hereunder and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the Loan Documents and (ii) will grant Liens to the Collateral Agent, for the benefit of the Lenders, in any property of such Loan Party which constitutes Collateral; <u>provided</u>, <u>however</u>, that (w) the assets of the JAD Companies, (x) upon consummation of the Permitted Acquisition, the assets of the Rifle Companies, (y) all cash collateral held by MLCI in respect of the MLCI Agreements in an amount not to exceed $5,000,000 (such amount to be reduced by any portion of such cash collateral that is set off against or applied to obligations of the Borrower under the MLCI Agreements), and (z) the assets of any Person or new Subsidiary which Person or Subsidiary was financed with Indebtedness pursuant to Section 6.01(s), will not be subject to the Liens granted to the Collateral Agent for the benefit of the Lenders (collectively, items (w) through (z) are referred to as the "<u>Excluded Assets</u>").

(b)        Each Loan Party will cause 100% of the issued and outstanding Equity Interests of each of its Subsidiaries to be subject at all times to a first priority, perfected Lien in favor of the Collateral Agent (for the benefit of Lenders) pursuant to the terms and conditions of the Loan Documents or other security documents as any Lender shall reasonably request; provided, however, that (i) the pledge to the Collateral Agent of all of the Equity Interests in the JAD Companies will be subordinate to the pledge of such Equity Interests to (x) the JAD Sellers, until the termination of the JAD Seller Guaranties, as security for the obligations of Borrower under the JAD Seller Notes and the JAD Seller Guaranties, and (y) the Centrecourt Bridge Lenders as security for the obligations of the Borrower under the Centrecourt Bridge Financing, in accordance with the terms of the JAD Stock Intercreditor Agreement; (ii) the pledge to the Collateral Agent of all of the Equity Interests in the Rifle Companies upon consummation of the Permitted Acquisition will be subordinate to the pledge of such Equity Interests to the Rifle Sellers, as security for the obligations of the Borrower under the Rifle Seller Notes in accordance with the terms of the Rifle Stock Intercreditor Agreement; and (iii) the pledge to the Collateral Agent of all of the Equity Interests in any Person or new Subsidiary financed pursuant to Section 6.01(s) hereof to acquire assets which constitute a business unit will be subordinate to the pledge of such Equity Interests to the seller(s) of such Person or business unit, as security for the obligations of the Borrower under any promissory notes issued to such seller(s) in accordance with the terms of an intercreditor agreement to be entered into among the Lenders and such seller(s) in form and substance satisfactory to the Lenders in their reasonable discretion.

(c)        Without limiting the foregoing, each Loan Party will, and will cause each Subsidiary to, execute and deliver, or cause to be executed and delivered, to any Lender such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings and other documents

and such other actions or deliveries of the type required by Section 4.01, as applicable), which may be required by law or which any Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents, all at the expense of the Loan Parties; provided, however, that the Borrower shall not be required to deliver the stock certificates and powers for (i) the JAD Equity Interests for so long as the JAD Seller Notes and the Centrecourt Bridge Notes are outstanding, (ii) upon consummation of the Permitted Acquisition, the Rifle Equity Interests, for so long as the Rifle Seller Notes are outstanding, and (iii) upon consummation of the acquisition of any Person or new Subsidiary financed pursuant to Section 6.01(s) hereof to acquire assets which constitute a business unit, the Equity Interests of such Person and/or new Subsidiary, for so long as the seller note(s) related to such acquisition (x) are secured by such Equity Interests and (y) remain outstanding.

(d)        If any material assets (other than any real property or improvements thereto or any interest therein) are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Agreement that become subject to the Lien in favor of the Collateral Agent for the benefit of the Lenders upon acquisition thereof), such Loan Party will notify each Lender and the Collateral Agent and will cause such assets to be subjected to a Lien securing the Obligations and will take, and cause its Subsidiaries to take, such actions as shall be necessary or reasonably requested by any Lender to grant and perfect such Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties.

SECTION 5.14  Compliance with Terms of Leaseholds.  Unless otherwise determined by any Loan Party upon the exercise of its reasonable business judgment and so long as the failure to do any of the following could not reasonably be expected to have a Material Adverse Effect, each Loan Party shall make all payments and otherwise perform all obligations in respect of all leases of real property material to the conduct of its business to which any Loan Party is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled, notify each Lender of any default by any party with respect to such leases and cooperate with each Lender in all respects to cure any such default, and cause each of its Subsidiaries to do so.

ARTICLE VI. Negative Covenants

Until the principal of and interest on the Loan and all fees, expenses and other amounts payable under any Loan Document have been paid in full, the Loan Parties covenant and agree, jointly and severally, with each Lender that:

SECTION 6.01        Indebtedness.  No Loan Party will, nor will it permit any Subsidiary to, create, incur or suffer to exist any Indebtedness, except:

(a)        the Obligations;

(b)         Indebtedness existing on the Closing Date and set forth in Schedule 6.01 and extensions, renewals and replacements of any such Indebtedness in accordance with clause (f) hereof;

(c)         Indebtedness of (i) the Borrower to any Subsidiary, (ii) of any First Lien Subsidiary to the Borrower or any other Subsidiary, and (iii) of any Subordinated Lien Subsidiary to the Borrower or any other Subsidiary; provided, that: (A) each Loan Party shall have executed and delivered to each other Loan Party, on the Closing Date, a demand note (collectively, the "Intercompany Notes") to evidence any such intercompany Indebtedness owing at any time by such Loan Party to any other Loan Parties, which Intercompany Notes shall be in form and substance reasonably satisfactory to Lenders and shall be pledged and delivered to Collateral Agent pursuant to the Security Agreement as additional collateral security for the Obligations; (B) each Loan Party shall record all intercompany transactions on its books and records in a manner reasonably satisfactory to Lenders; (C) the obligations of Borrower under any such Intercompany Notes shall be subordinated to the Obligations of Borrower hereunder in a manner reasonably satisfactory to Lenders; (D) at the time any such intercompany loan or advance is made by Borrower to any other Loan Party and after giving effect thereto, Borrower shall be solvent; (E) no Default or Event of Default would occur and be continuing after giving effect to any such proposed intercompany loan; and (F) the aggregate amount of all Subordinated Lien Subsidiary Transactions shall not exceed $10,000,000 at any time.

(d)         Guarantees by (i) the Borrower of Indebtedness of any First Lien Subsidiary or any Subordinated Lien Subsidiary and (ii) by any Subsidiary of Indebtedness of the Borrower or any other First Lien Subsidiary or Subordinated Lien Subsidiary, provided that (x) the Indebtedness so Guaranteed is permitted by this Section 6.01, and (y) the aggregate amount of all Subordinated Lien Subsidiary Transactions shall not exceed $10,000,000 at any time;

(e)         Indebtedness of the Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets (whether or not constituting purchase money Indebtedness), including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Indebtedness in accordance with clause (f) hereof; provided that such Indebtedness is incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement;

(f)         Indebtedness which represents an extension, refinancing, or renewal of any of the Indebtedness described in clauses (b), (e), (j) and (p) hereof; provided that, (i) the principal amount or interest rate of such Indebtedness is not increased, (ii) any Liens securing such Indebtedness are not extended to any additional property of any Loan Party, (iii) no Loan Party that is not originally obligated with respect to repayment of such Indebtedness is required to become obligated with respect thereto, (iv) such extension, refinancing or renewal does not result in a shortening of the average weighted maturity of the Indebtedness so extended, refinanced or renewed, (v) the terms of any such extension, refinancing, or renewal are not less favorable to the obligor thereunder than the original terms of such Indebtedness and (vi) if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to

40

the Obligations, then the terms and conditions of the refinancing, renewal, or extension Indebtedness must include subordination terms and conditions that are at least as favorable to each Lender as those that were applicable to the refinanced, renewed, or extended Indebtedness;

(g)     Indebtedness owed to any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such person, in each case incurred in the ordinary course of business;

(h)     Indebtedness of the Borrower or any Subsidiary in respect of performance bonds, reclamation bonds, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the ordinary course of business;

(i)     Indebtedness of the Borrower or any Subsidiary to any lessor pursuant to any real property leases;

(j)     Indebtedness under the A/R Facility in an aggregate principal amount not to exceed $6,000,000 (such amount to be reduced by the amount of any permanent reductions of the commitments thereunder);

(k)     Indebtedness under the 2007 Bridge Financing in an aggregate principal amount not to exceed $1,616,450 (such amount to be reduced by the amount of any principal repayments of the loans thereunder);

(l)     Indebtedness under the Centrecourt Bridge Financing in an aggregate principal amount not to exceed $5,000,000, plus the amount of any additional notes representing deferred or "PIK" interest issued pursuant to the terms of the Centrecourt Bridge Notes (such amount to be reduced by the amount of any principal repayments of the loans thereunder);

(m)     Indebtedness under the Centrecourt Equipment Purchase Note in a principal amount not to exceed $4,800,000 (such amount to be reduced by the amount of any principal repayments of the loan thereunder);

(n)     Indebtedness under the Rifle Non-Core Asset Notes upon consummation of the Permitted Acquisition, provided that the Rifle Non-Core Asset Notes shall be cancelled contemporaneously with the closing of the Permitted Acquisition;

(o)     Indebtedness under (i) the LRR Seller Notes, (ii) the JAD Notes, (iii) the JAD Seller Notes and (iv) upon consummation of the Permitted Acquisition, the Rifle Seller Notes;

(p)     upon consummation of the Permitted Acquisition, the Rifle Equipment Line of Credit and extensions, renewals or replacements of any such Indebtedness in accordance with clause (f) hereof;

(q)     Indebtedness under the MLCI Agreements;

41

(r)        Indebtedness, and Guaranties thereof, under any Coal Agreements incurred in the ordinary course of business;

(s)        Indebtedness of the Borrower incurred to finance the purchase or acquisition of all, or substantially all, of the Equity Interests or assets of any other Person constituting a business unit (whether via merger, creation of a new subsidiary or otherwise) and/or Indebtedness of such acquired Person or attaching to such acquired assets existing at the time of the acquisition thereof which transaction shall be on terms reasonably acceptable to the Lenders, provided that (i) all of such Equity Interests so acquired or the Equity Interests in any new Subsidiary formed to acquire such assets shall at all times be subject to the perfected Lien in favor of Collateral Agent for the benefit of the Lenders, in accordance with the provisions of Section 5.13 hereof and (ii) if, prior to the consummation of such transaction, Borrower delivers to the Lenders a "fairness" opinion from a reputable investment advisor that is unaffiliated with any of the Loan Parties or holders of their Equity Interests stating that the terms of such purchase or acquisition are fair to the Borrower, the consent of Lenders to the terms of such Indebtedness shall not be required;

(t)        Other unsecured Indebtedness, not to exceed $1,000,000 in the aggregate amount outstanding at any one time; and

(u)        unsecured indebtedness to the Centrecourt Bridge Lenders in respect of the Centrecourt Put Right and the Centrecourt Equity Registration Claim; provided that, pursuant to the Centrecourt Rights Agreement, the Centrecourt Put Right may become subject to a lien in favor of the Centrecourt Bridge Lenders after payment in full of the Obligations.

SECTION 6.02        Liens. No Loan Party will, nor will it permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)        Liens created pursuant to any Loan Document;

(b)        Permitted Encumbrances;

(c)        any Lien on any property or asset of the Borrower or any Subsidiary existing on the Closing Date and set forth in Schedule 6.02; provided that (i) such Lien shall not apply to any other property or asset of the Borrower or Subsidiary and (ii) such Lien shall secure only those obligations which it secures on the Closing Date;

(d)        Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any Subsidiary; provided that (i) such security interests secure Indebtedness permitted by clause (e) of Section 6.01, (ii) such security interests and the Indebtedness secured thereby are incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement (other than Indebtedness in respect of the JAD PPE Indebtedness and, upon consummation of the Permitted Acquisition, the Rifle Equipment Line of Credit) and (iii) such security interests shall not apply to any other property or assets of the Borrower or any Subsidiary;

42

(e)       Liens on the Loan Parties' accounts receivables and on the deposit accounts into which payments relating thereto are made, in each case securing Indebtedness under the A/R Facility;

(f)       Liens on (i) the JAD Equity Interests in favor of (x) the Centrecourt Bridge Lenders securing the Borrower's obligations under the Centrecourt Guarantee in respect of the Centrecourt Bridge Notes, the Centrecourt Securities Purchase Agreement and the Centrecourt Security Agreement only and (y) the JAD Sellers until the termination of the JAD Seller Guaranties, securing the JAD Seller Notes and the Borrower's obligations under the JAD Sellers Guaranties, and (ii) the assets of the JAD Companies in favor of (x) the Centrecourt Bridge Lenders securing the JAD Companies' obligations under the Centrecourt Bridge Notes, the Centrecourt Guarantee, the Centrecourt Securities Purchase Agreement and the Centrecourt Security Agreement and (y) the JAD Sellers securing the JAD Seller Notes, the Borrower's obligations under the JAD Sellers Guaranties and the JAD Companies' obligations under the JAD Sellers' guaranties of the JAD PPE Indebtedness;

(g)       Liens in favor of the holders of the 2007 Bridge Notes securing the 2007 Bridge Financing;

(h)       Liens in favor of MLCI on (i) a cash collateral account in an amount not to exceed $5,000,000 (such amount to be reduced by any portion of such cash collateral that is set off against or applied to obligations of the Borrower under the MLCI Agreements), and (ii) the assets of the Loan Parties that are subject to Liens in favor of the Collateral Agent for the benefit of the Lenders (including, without limitation, on the JAD Equity Interests and, upon consummation of the Permitted Acquisition, the Rifle Equity Interests); provided, that such Liens in subclause (ii) shall be subordinated to the Lien in favor of Collateral Agent pursuant to the terms of the MLCI Subordination Agreement;

(i)       Upon consummation of the Permitted Acquisition, Liens in favor of the Rifle Sellers securing the Rifle Seller Notes;

(j)       Liens securing the JAD PPE Indebtedness and, upon the consummation of the Permitted Acquisition, Liens securing the Rifle Equipment Line of Credit, provided that such Liens apply only to the property, plant and equipment financed thereby;

(k)       Liens for Indebtedness permitted pursuant to Section 6.01(h) and deposits, certificates of deposit, cash collateral accounts, cash reserves and/or cash escrows required, directly or indirectly, under any Coal Agreements in the ordinary course of business;

(l)       Liens in favor of the sellers of the Equity Interests or assets of any Person or new Subsidiary constituting a business unit acquired by the Loan Parties on such acquired Equity Interests or assets, or new Subsidiary created to make such acquisition, acquired with financing in compliance with Section 6.01(s) hereof.

(m)       Notwithstanding the foregoing, none of the Liens permitted pursuant to this Section 6.02 may at any time attach to any Loan Party's (1) Accounts, other than those permitted under clause (a) of the definition of Permitted Encumbrance and clauses (e) and (g) above, and (2) Inventory, other than those permitted under clauses (a) and (b) of the definition of

43