# EXHIBIT C
# PART VII

Permitted Encumbrance and clauses (a) and (g) above; provided, however, that (I) the Liens permitted by clause (f) above may cover Accounts and Inventory of the JAD Companies, (II) the Liens permitted by clause (i) above may cover Accounts and Inventory of the Rifle Companies, (III) the Liens permitted by clause (h) above may cover Accounts and Inventory of the Borrower and the Original Coal Producers, and (IV) the Liens permitted by clause (l) above may cover Accounts and Inventory of the Person so acquired or the newly created Subsidiary so formed to make such acquisition.

SECTION 6.03  Fundamental Changes.  (a) No Loan Party will, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, other than (i) a merger, consolidation or reorganization of a First Lien Subsidiary with any other First Lien Subsidiary, (ii) a merger of a Subsidiary into the Borrower or a First Lien Subsidiary, (iii) a merger, consolidation or reorganization of a Subordinated Lien Subsidiary with any other Subordinated Lien Subsidiary, or (iv) a Reverse Merger upon consummation of which the current shareholders of the Borrower continue to own not less than 66 2/3rd % of the outstanding voting Equity Interests of Borrower.

(b)      No Loan Party will, nor will it permit any of its Subsidiaries to, engage in any business other than businesses of the type conducted by the Borrower and its Subsidiaries on the Closing Date and businesses reasonably related or incidental thereto; provided, however, that upon consummation of the Permitted Acquisition, the Loan Parties may own and operate coal mines and preparation plants, related equipment and employ employees for mining purposes in connection with the operation of the business engaged in by the Rifle Companies.

SECTION 6.04  Investments, Loans, Advances, Guarantees and Acquisitions.  No Loan Party will, nor will it permit any Subsidiary to, purchase, hold or acquire any capital stock, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except:

(a)      Permitted Investments, subject to control agreements in favor of the Lenders or otherwise subject to a perfected security interest in favor of the Lenders;

(b)      investments in existence on the date of this Agreement and described in Schedule 6.04;

(c)      investments by the Borrower and the Subsidiaries in Equity Interests in their respective First Lien Subsidiaries or in their respective Subordinated Lien Subsidiaries, provided that (i) any such Equity Interests held by a Loan Party shall be pledged pursuant to the Security Agreement, and (ii) the aggregate amount of all Subordinated Lien Subsidiary Transactions at any time shall not exceed $10,000,000;

(d)      loans or advances made by the Borrower to any First Lien Subsidiary or Subordinated Lien Subsidiary and made by any Subsidiary to the Borrower or any other First

Lien Subsidiary or Subordinated Lien Subsidiary, provided that (i) any such loans and advances made by a Loan Party shall be evidenced by a promissory note pledged pursuant to the Security Agreement and (ii) the aggregate amount of all Subordinated Lien Subsidiary Transactions at any time shall not exceed $10,000,000;

(e)    Loans or advances made by Borrower to its directors, officers or employees of reasonable fees and costs pursuant to indemnification provisions of Borrower's Certificate of Incorporation or By-laws, in an aggregate amount not exceeding $100,000;

(f)    Guarantees constituting Indebtedness permitted by Section 6.01;

(g)    investments in the form of Swap Agreements permitted by Section 6.07;

(h)    investments received in connection with the dispositions of assets permitted by Section 6.05;

(i)    investments constituting deposits described in clauses (c) and (d) of the definition of the term "Permitted Encumbrances;"

(j)    the Centrecourt Equipment Purchase;

(k)    the Permitted Acquisition; and

(l)    the purchase or acquisition of Equity Interests or assets constituting a business unit of any other Person permitted pursuant to clause (s) of Section 6.01.

SECTION 6.05  Asset Sales. Other than the grant of the Liens on the Loan Parties' accounts receivables and deposit accounts securing indebtedness under the A/R Facility and any transfer or disposition of such collateral in connection with the exercise of the lienholder's remedies with respect thereto, no Loan Party will, nor will it permit any Subsidiary to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Borrower permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than to the Borrower or to another First Lien Subsidiary, or, from a Subordinated Lien Subsidiary to another Subordinated Lien Subsidiary, in each case in compliance with Section 6.04), except:

(a)    sales, transfers and dispositions of (i) inventory in the ordinary course of business and (ii) used, obsolete, worn out or surplus equipment or property in the ordinary course of business;

(b)    sales, transfers and dispositions to the Borrower or any Subsidiary, provided that any such sales, transfers or dispositions involving a Subsidiary that is not a First Lien Subsidiary shall be made in compliance with Section 6.09;

(c)    sales, transfers and dispositions of accounts receivable in connection with the compromise, settlement or collection thereof;

      (d)      sales, transfers and dispositions of investments permitted by clause (h) of
Section 6.04;

      (e)      dispositions resulting from any casualty or other insured damage to, or any
taking under power of eminent domain or by condemnation or similar proceeding of, any
property or asset of the Borrower or any Subsidiary;

      (f)      the resale of the Rifle Non-Core Assets upon consummation of the
Permitted Acquisition, as contemplated by the Rifle LOI;

      (g)      the leasing of equipment to the Rifle Companies and any other contract
miner working on any real property owned or leased by a Loan Party on market terms and in the
ordinary course of business; and

      (h)      the subleasing of leasehold real property by the Borrower or any
Subsidiary to a third party on market terms and in the ordinary course of business, provided that
all rent or other proceeds payable in respect of each such sublease are payable solely to the
Borrower or to the Subsidiary that is the holder of such leasehold,

      provided that all sales, transfers, leases and other dispositions permitted hereby (other
than those permitted by paragraphs (b) and (f) above) shall be made for fair value and for cash
consideration.

      SECTION 6.06  <u>Sale and Leaseback Transactions</u>.  No Loan Party will, nor will it
permit any Subsidiary to, enter into any arrangement, directly or indirectly, whereby it shall sell
or transfer any property, real or personal, used or useful in its business, whether now owned or
hereafter acquired, and thereafter rent or lease such property or other property that it intends to
use for substantially the same purpose or purposes as the property sold or transferred.

      SECTION 6.07  <u>Swap Agreements</u>.  No Loan Party will, nor will it permit any
Subsidiary to, enter into any Swap Agreement, except (a) Swap Agreements entered into to
hedge or mitigate risks to which such Loan Party has actual exposure (other than those in respect
of Equity Interests of the Borrower or any of its Subsidiaries), and (b) Swap Agreements entered
into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates,
from one floating rate to another floating rate or otherwise) with respect to any interest-bearing
liability or investment of such Loan Party.

      SECTION 6.08  <u>Restricted Payments; Certain Payments of Indebtedness</u>.  (a) No
Loan Party will, nor will it permit any Subsidiary to, declare or make, or agree to pay prior to the
payment in full of all Obligations or make, directly or indirectly, any Restricted Payment, or
incur any obligation (contingent or otherwise) to do so, except (i) the Borrower may declare and
pay dividends (A) with respect to its common stock payable solely in additional shares of its
common stock, and (B) with respect to its preferred stock, payable solely in additional shares of
such preferred stock or in shares of its common stock, and (ii) Subsidiaries may declare and pay
dividends ratably with respect to their Equity Interests.

      (b)      No Loan Party will, nor will it permit any Subsidiary to, make or agree to
pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities

or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i)    payment of Indebtedness created under the Loan Documents;

(ii)    payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness permitted by Section 6.01, other than payments in respect of the Subordinated Indebtedness prohibited by the subordination provisions thereof;

(iii)    refinancings of Indebtedness to the extent permitted by Section 6.01(f);

(iv)    payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(v)    payment to MLCI on or before September 30, 2008 of a deposit representing additional cash collateral in an amount up to $1,708,278 to secure the Borrower's "Performance Assurance" obligations under the MLCI Agreements; provided, however, that in no event shall the total amount deposited with MLCI as Performance Assurance under the MLCI Agreements exceed $5,000,000 (such amount to be reduced by any portion of such cash collateral that is set off against or applied to obligations of the Borrower under the MLCI Agreements);

(vi)    the payment on July 2, 2008 of principal and interest in the amount of $4,117,471.30 to the holders of the LRR Seller Notes solely from the proceeds of the sale by the Borrower of Equity Interests for aggregate consideration of $5,005,000 pursuant to Securities Purchase Agreements dated July 1, 2008, true and complete copies of which have been delivered to the Lenders;

(vii)    prepayment of principal under the Centrecourt Bridge Notes only with (w) the net cash proceeds from the Series B Offering and any other new equity or debt financing by Borrower (other than (1) a financing solely to fund the Permitted Acquisition or (2) the sale by Borrower of Equity Interests described in clause (vi) above) if such net cash proceeds are in excess of $20,000,000 and are not otherwise applied pursuant to clauses (vi) and (viii), up to a maximum aggregate amount of $2,500,000 plus fifty percent (50%) of the outstanding principal amount of any Centrecourt Bridge Notes issued in payment of deferred or "PIK" Interest, (x) the net cash proceeds from the refinancing of any of the assets of the JAD Companies that are not otherwise applied pursuant to clause (viii), (y) fifty percent (50%) of the positive monthly operating margin (i.e., the sales revenue for a particular month from tons produced at the Harlan mine minus the direct cash operating cost actually incurred in such month, including the selling, general and administrative expense allocated to the Harlan mine and minus any regularly scheduled payments applied to principal or interest on the JAD Seller Notes and/or the Equipment Purchase Note) from the Harlan surface mine to be opened in the third quarter of 2008, as set forth in the financial model delivered to Lender prior to execution of this Agreement (provided that (1) Borrower is able to meet its ordinary course obligations for the

47

period of ninety (90) days after the proposed date of making of such prepayment, and (2) the applicable Loan Party and/or Borrower would not be rendered insolvent), and (z) the incremental increases in working capital as a result of any release by MLCI of all or a portion of the cash performance assurance provided by Borrower to MLCI pursuant to the MLCI Agreements; provided that (i) in respect of each prepayment under subclauses (w), (x) and (z) above, the Loan Parties shall furnish to the Lenders a certificate certified as true and correct by the Chief Financial Officer of the Borrower, setting forth a detailed calculation of the amount of such prepayment and certifying that such prepayment is permitted under the provisions of this Section 6.08(b)(vii)(w), (x) or (z), as applicable and (ii) in respect of subclause (y) above, the Loan Parties shall furnish to the Lenders, not later than the 20th day of each calendar month, a certificate (the "Monthly Harlan Report"), certified as true and correct by the Chief Financial Officer of the Borrower, setting forth a detailed calculation of the monthly operating margin for the calendar month preceding the calendar month in which the Monthly Harlan Report is delivered and the amount of any such proposed prepayment and certifying that such prepayment is permitted under the provisions of this Section 6.08(b)(vii)(y); and

(viii)    prepayment of principal under the JAD Seller Notes only with (y) net cash proceeds from the Series B Offering and any other new equity or debt financing by Borrower (other than (1) a financing solely to fund the Permitted Acquisition or (2) the sale by Borrower of Equity Interests described in clause (vi) above) that are in excess of $20,000,000 and are not otherwise applied pursuant to clauses (vi) or (vii), or (z) the net cash proceeds of any refinancing of assets of the JAD Companies that are not otherwise applied pursuant to clause (vii); provided that in respect of each prepayment hereunder, the Loan Parties shall furnish to the Lenders a certificate certified as true and correct by the Chief Financial Officer of the Borrower, setting forth a detailed calculation of the amount of such prepayment and certifying that such prepayment is permitted under the provisions of this Section 6.08(b)(viii)(y) or (z), as applicable.

SECTION 6.09  Transactions with Affiliates.  Except as set forth in Schedule 3.18, no Loan Party will, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) any investment permitted by Sections 6.04(c) or 6.04(d), (c) any Indebtedness permitted under Section 6.01(c), (d) any Restricted Payment permitted by Section 6.08, (e) the payment of reasonable fees to directors of the Borrower or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrower or its Subsidiaries in the ordinary course of business and (f) any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans approved by the Borrower's board of directors.

SECTION 6.10  Restrictive Agreements.  No Loan Party will, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with

48

respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the Closing Date identified on Schedule 6.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (v) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.11  Amendment of Material Documents.  No Loan Party will, nor will it permit any Subsidiary to, without the prior written consent of the Required Lenders amend or modify, or waive any of its rights under, (a) any agreement relating to any Subordinated Indebtedness, (b) the MLCI Agreements, (c) the 2007 Bridge Notes, (d) the Centrecourt Bridge Notes, the Centrecourt Guarantee, the Centrecourt Security Agreement (other than the amendments to the such documents pursuant to the Centrecourt Amendment) and the Centrecourt Amendment, (e) the Centrecourt Rights Agreement, (f) the Centrecourt Equipment Purchase Note, (g) the JAD Seller Guaranties, (h) the LRR Seller Notes, (i) the JAD Seller Notes, (j) the Rifle Seller Notes, (k) notes issued to the sellers of Equity Interests or assets pursuant to Section 6.01(s)hereof, or (l) its certificate of incorporation, by-laws, operating, management or partnership agreement or other organizational documents; provided, however, that simultaneous with the closing of the Permitted Acquisition, Borrower may amend its certificate of incorporation, by-laws, or other organizational documents to the extent reasonably necessary to implement the terms set forth in the Rifle LOI.

SECTION 6.12  Intentionally Omitted.

ARTICLE VII.    Events of Default

SECTION 7.01  If any of the following events ("Events of Default") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan (or any interest or other amounts due under Section 2.03(c)) when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, for a period of three days after the same shall become due and payable;

(c)    any representation or warranty made or deemed made by or on behalf of any Loan Party in or in connection with this Agreement or any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial

statement or other document furnished pursuant to or in connection with this Agreement or any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been materially incorrect when made or deemed made;

(d)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a), 5.03 (with respect to a Loan Party's existence), 5.08 or in Article VI;

(e)    any Loan Party shall fail to observe or perform any material covenant, condition or agreement contained in Section 5.01 or 5.02(b), and such failure shall continue unremedied for a period of 10 days after the earlier of knowledge by any officer of any Loan Party of such breach or notice thereof from any Lender;

(f)    any Loan Party shall fail to observe or perform any other covenant, condition or agreement contained in this Agreement (other than those which constitute a default under another Section of this Article), and such failure shall continue unremedied for a period of 30 days after the earlier of knowledge of such breach or notice thereof from any Lender;

(g)    any Loan Party shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (subject to any and all cure periods under the terms of such Material Indebtedness);

(h)    any event or condition occurs that results in (i) any Material Indebtedness or (ii) any other Indebtedness in an amount in excess of $100,000 in the aggregate that is secured by a lien that has priority over any of the Liens granted to Collateral Agent for the benefit of the Lenders and (including, without limitation, the Centrecourt Bridge Financing, the JAD Seller Notes or, upon consummation of the Permitted Acquisition, the Rifle Seller Notes) becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or such other Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness or such other Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity (other than a prepayment under the Centrecourt Bridge Notes (x) to the extent permitted pursuant to the provisions of Section 6.08(b)(vii) or (y) upon the occurrence of any of the events enumerated as items (i) through (iv) in the definition of Centrecourt Bridge Financing); provided, however, that if such event or condition is cured or waived by the applicable parties thereto prior to the later to occur of (i) the acceleration by Lender of the Loan pursuant to the provisions of this Article VII and (ii) fifteen (15) days after such event of default under such Indebtedness, then the Event of Default under this clause (h) shall immediately and automatically be deemed to have been cured or waived;

(i)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Loan Party of any Loan Party or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of its assets, and, in any such case, such proceeding or

petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(j)    any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(k)    any Loan Party shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(l)    one or more judgments for the payment of money in an aggregate amount in excess of $500,000 shall be rendered against any Loan Party, any Subsidiary of any Loan Party or any combination thereof which judgments are not adequately covered by insurance and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party to enforce any such judgment or any Loan Party shall fail within 30 days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

(m)    an ERISA Event shall have occurred that, in the opinion of any Lender, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(n)    a Change in Control shall occur;

(o)    the occurrence of any "default", as defined in any Loan Document (other than this Agreement) or the breach of any of the terms or provisions of any Loan Document (other than this Agreement), which default or breach continues beyond any period of grace therein provided;

(p)    the Loan Guaranty shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty, or any Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty to which it is a party, or any Guarantor shall deny that it has any further liability under the Loan Guaranty to which it is a party, or shall give notice to such effect;

(q)    (I) any Collateral Document shall for any reason fail to create a valid and perfected first priority security interest in any Collateral purported to be covered thereby, except (a) Permitted Encumbrances or (b) as permitted by the terms of any Collateral Document, or (II) any Collateral Document shall fail to remain in full force or effect, except where such failure

shall have primarily resulted from the acts or omissions of the Collateral Agent or any Lender, or any action, other than actions of the Collateral Agent or any Lender, shall be taken to discontinue or to assert the invalidity or unenforceability of any Collateral Document, or (III) any Loan Party shall fail to comply with any of the terms or provisions of any Collateral Document; or

(r)     any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms);

(s)     any Loan Party or any member of the Management Team is criminally convicted of any felony crime; provided, however, in the case of a member of the Management Team, such crime is related to the operation of the business of any Loan Party; or

(t)     an event of default under the MLCI Agreement which is not cured prior to the expiration of any applicable grace and cure periods thereunder; provided, however, that if such event of default under the MLCI Agreement is cured or waived by MLCI prior to the later to occur of (i) acceleration by Lender of the Loan pursuant to the provisions of this Article VII and (ii) fifteen (15) days after such event of default under the MLCI Agreement, then the Event of Default under this clause (t) shall be immediately and automatically be deemed to have been cured or waived;

then, and in every such event (other than an event with respect to the Borrower described in clause (i) or (j) of this Article), and at any time thereafter during the continuance of such event, the Required Lenders may, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) declare the Loan then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loan so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (i) or (j) of this Article, the principal of the Loan then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. Upon the occurrence and the continuance of an Event of Default, the Required Lenders may increase the rate of interest applicable to the Loan and other Obligations as set forth in this Agreement and exercise any rights and remedies provided to the Lenders under the Loan Documents or at law or equity, including all remedies provided under the UCC.

ARTICLE VIII.    Miscellaneous

SECTION 8.01 Notices. (a) Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other

communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

    (i)      if to any Loan Party, to the Borrower at:

        U.S. Coal Corporation
        448 Lewis Hargett Circle
        Suite 240
        Lexington, Kentucky 40503
        Attention: Robert Gabbard, Chief Executive Officer
        Facsimile No: (859) 219-0913

        With a copy (which shall not constitute notice) to:

        Pryor Cashman LLP
        410 Park Avenue
        10th Floor
        New York, New York 10022
        Attention: Eric M. Hellige, Esq.
        Facsimile No: (212) 326-0806

    (ii)      if to the Lenders, to JMB Capital Partners Master Fund, L.P. at:

        c/o JMB Capital Partners, L.P.
        1999 Avenue of the Stars
        Suite 2040
        Los Angeles, California 90087
        Attention: Alan Fragen
        Facsimile No: (310) 286-6662

        with a copy (which shall not constitute notice) to:

        Kasowitz, Benson, Torres & Friedman LLP
        1633 Broadway
        New York, NY 10019
        Attention: Michael D. Rosenbloom, Esq.
        Facsimile No.: (212) 506-1800

        or, in the case of any subsequent assignee, to the address of such assignee set forth in the relevant assignment agreement.

    (iii)      if to the Collateral Agent, to Wilmington Trust Company at:

        1100 North Market Street
        Wilmington, Delaware 19890
        Attention: Corporate Trust Administration – US Coal

Collateral Agency
Facsimile No.: (302) 636-4140

with a copy (which shall not constitute notice) to:

Morris James LLP
500 Delaware Avenue
Suite 1500
Wilmington, DE 19801-1494
Attention: Ross Antonacci, Esq.
Facsimile No. (302) 888-6989

All such notices and other communications shall be deemed to have been given when received.

(b)        Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

SECTION 8.02    Waivers; Amendments. (a) No failure or delay by any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of the Loan shall not be construed as a waiver of any Event of Default, regardless of whether any Lender may have had notice or knowledge of such Event of Default at the time.

(b)        Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower, the Collateral Agent and the Lenders, or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Lenders and the Loan Party or Loan Parties that are parties thereto.

SECTION 8.03    Expenses; Indemnity; Damage Waiver. (a) The Borrower shall pay (i) all out of pocket expenses incurred by each Lender and its Affiliates, including the reasonable fees, charges and disbursements of counsel for such Lender (whether outside counsel or the allocated costs of its internal legal department), in connection with the credit facilities provided for herein, the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by any Lender, including the fees, charges and disbursements of any counsel for such Lender (whether outside counsel or the allocated costs of its internal legal

department), in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loan made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Loan. Expenses being reimbursed by the Borrower under this Section include, without limiting the generality of the foregoing, costs and expenses incurred in connection with:

    (i)  appraisals and insurance reviews;

    (ii)  field examinations and the preparation of Reports based on the fees charged by a third party retained by any Lender or the internally allocated fees for each Person employed by any Lender with respect to each field examination;

    (iii)  background checks regarding senior management (including but not limited to, members of the Management Team) and/or key investors, as deemed necessary or appropriate in the sole discretion of any Lender;

    (iv)  taxes, fees and other charges for (A) lien searches and (B) filing financing statements and continuations, and other actions to perfect, protect, and continue the Liens of the Collateral Agent (for the benefit of the Lenders);

    (v)  sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and

    (vi)  costs and expenses of preserving and protecting the Collateral.

  (b)  The Borrower shall indemnify each Lender, the Collateral Agent and each Related Party of each Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party, or any Environmental Liability related in any way to any Loan Party, or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

  (c)  The relationship between any Loan Party on the one hand and each Lender on the other hand shall be solely that of debtor and creditor.  None of the Lenders nor the Collateral Agent (i) shall have any fiduciary responsibilities to any Loan Party or (ii) will

undertake any responsibility to any Loan Party to review or inform such Loan Party of any matter in connection with any phase of any Loan Party's business or operations. To the extent permitted by applicable law, no Loan Party shall assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions or the other transactions contemplated hereby, or the Loan or the use of the proceeds thereof.

(d)    All amounts due under this Section shall be payable as promptly as practicable (but in any event not later than three days) after written demand therefor.

SECTION 8.04  Successors and Assigns.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lenders (and any attempted assignment or transfer by the Borrower without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    The Lender, acting solely for this purpose as agent of the Borrower, shall maintain a copy of each assignment agreement delivered to it and a register for the recordation of the name and address of each Lender, and principal amounts of the Obligations owing to each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower and each Lender may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and each Lender, at any reasonable time and from time to time upon reasonable prior notice.

(c)    Each Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loan at the time owing to it); provided, however, that any such assignment shall assign (i) an amount equal to or greater than $5,000,000 of the Loan or (ii) if less than $5,000,000, an amount equal to all of the Loan then owing to such assigning Lender (and any attempted assignment or transfer by a Lender in violation of this proviso shall be null and void). The assignee shall be a party hereto and, to the extent of the interest assigned, have the rights and obligations of a Lender under this Agreement, and the assigning Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement (and, in the case of an assignment covering all of such Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.06 and Section 8.03). Each Loan Party hereby agrees to execute any amendment and/or any other document that may be reasonably necessary to effectuate such an assignment.

(d)    Each Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including

56

any pledge or assignment to secure obligations to a Federal Reserve Lender, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 8.05  Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of the Loan regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Lender may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid.  The provisions of Section 2.06 and ARTICLE VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loan or the termination of this Agreement or any provision hereof.

SECTION 8.06  Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to any Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by each Lender and when each Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 8.07  Severability.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.08  Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower or such Guarantor against any of and all the Obligations held by such Lender, irrespective of whether or not such Lender shall have made any demand under the Loan Documents and although such

57

obligations may be unmatured. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 8.09  Governing Law; Jurisdiction; Consent to Service of Process.  (a) This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without giving effect to any principles of conflicts of law thereof which would result in the application of the laws of any other jurisdiction.

(b)      Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any U.S. Federal or New York State court sitting in New York, New York in any action or proceeding arising out of or relating to any Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c)      Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)      Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 8.10  WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 8.11  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 8.12  Confidentiality.  Each Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or to any assignee of such Lender, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to such Lender on a non-confidential basis from a source other than the Borrower.  For the purposes of this Section, "Information" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to any Lender on a non-confidential basis prior to disclosure by the Borrower; provided that, in the case of information received from the Borrower after the Closing Date, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 8.13  Violation of Law.  Anything contained in this Agreement to the contrary notwithstanding, no Lender shall be obligated to extend credit to the Borrower in violation of any limitation or prohibition provided by any applicable statute or regulation.

SECTION 8.14  USA PATRIOT ACT.  Each Lender is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") and hereby notifies the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.

SECTION 8.15  Disclosure.  Each Loan Party hereby acknowledges and agrees that each Lender and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

SECTION 8.16  Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Loan, together with all fees, charges and other amounts which are treated as interest on the Loan under applicable law (collectively the

"Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by any Lender holding the Loan in accordance with applicable law, the rate of interest payable in respect of the Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate.

SECTION 8.17 Release. Each of the Loan Parties acknowledges that Lender has acted in good faith in connection with this Agreement and the Loan Documents. Each of the Loan Parties, for itself and on behalf of its successors, assigns, and officers, directors, employees, agents and attorneys, and any Person acting for or on behalf of, or claiming through it, hereby fully, finally and forever release and discharge the Lenders and each Lenders' past and present officers, directors, managers, limited partners, general partners, investors, employees, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Lender Released Parties") of and from any and all past and present causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including without limitation those arising under 11 U.S.C. §§ 541-550 and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties) (collectively, "Claims"), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, matured or unmatured, liquidated or unliquidated, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Lender Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to the Loan Documents, and this Agreement and other financial accommodations made thereunder, the collateral security given in connection therewith, or any related discussions or negotiations, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

Each Loan Party waives any and all claims, rights and benefits it may have under any law of any jurisdiction that would render ineffective a release made by a creditor of claims that the creditor does not know or suspect to exist in its favor at the time of executing the release and that, if known by it, would have materially affected its settlement with the applicable debtor. Each Loan Party acknowledges that (a) it has been represented by independent legal counsel of its own choice throughout all of the negotiation that preceded the execution of this Agreement and that it has executed this Agreement after receiving the advice of such independent legal counsel, and (b) such Person and its respective counsel have had an adequate opportunity to make whatever investigation or inquiry they deem necessary or desirable in connection with the release contained in this Section 8.17.

## ARTICLE IX. LOAN GUARANTY

SECTION 9.01 Guaranty. Each Guarantor hereby agrees that it is jointly and severally liable for, and, as primary obligor and not merely as surety, absolutely and unconditionally guarantees to each Lender the prompt payment when due, whether at stated

maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by such Lender in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, the Borrower, any Guarantor or any other guarantor of all or any part of the Obligations (such costs and expenses, together with the Obligations, collectively the "Guaranteed Obligations"). Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of each Lender.

SECTION 9.02  Guaranty of Payment.  This Loan Guaranty is a guaranty of payment and not of collection. Each Guarantor waives any right to require any Lender to sue the Borrower, any Guarantor, any other guarantor, or any other person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

SECTION 9.03  No Discharge or Diminishment of Loan Guaranty.  (a) Except as otherwise provided for herein, the obligations of Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Borrower or any other guarantor of or other person liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Guarantor may have at any time against any Obligated Party, Lender, or any other person, whether in connection herewith or in any unrelated transactions.

(b)  The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)  Further, the obligations of any Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of any Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other person liable for any of the Guaranteed Obligations; (iv) any action or failure to act by any Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise,

61

in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

SECTION 9.04  Defenses Waived.  To the fullest extent permitted by applicable law, each Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower or any Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against any Obligated Party, or any other person. Any Lender may, at its election, foreclose on any Collateral held by it or the Collateral Agent by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Guarantor under this Loan Guaranty except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash. To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Obligated Party or any security.

SECTION 9.05  Rights of Subrogation.  No Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Loan Parties and the Guarantors have fully performed all their obligations to each Lender.

SECTION 9.06  Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of the Borrower or otherwise, each Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not any Lender is in possession of this Loan Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by any Lender.

SECTION 9.07  Information.  Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Loan

Guaranty, and agrees that no Lender shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

SECTION 9.08  Reserved.

SECTION 9.09  Taxes.  All payments of the Guaranteed Obligations will be made by each Guarantor free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if any Guarantor shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) each Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Guarantor shall make such deductions and (iii) such Guarantor shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

SECTION 9.10  Maximum Liability.  The provisions of this Loan Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Loan Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Loan Guaranty, then, notwithstanding any other provision of this Loan Guaranty to the contrary, the amount of such liability shall, without any further action by the Guarantors or any Lender, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "Maximum Liability". This Section with respect to the Maximum Liability of each Guarantor is intended solely to preserve the rights of each Lender to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other person or entity shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law. Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Loan Guaranty or affecting the rights and remedies of any Lender hereunder, provided that, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

SECTION 9.11  Contribution.  In the event any Guarantor (a "Paying Guarantor") shall make any payment or payments under this Loan Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Loan Guaranty, each other Guarantor (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Applicable Percentage" of such payment or payments made, or losses suffered, by such Paying Guarantor. For purposes of this Article IX, each Non-Paying Guarantor's "Applicable Percentage" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from

the Borrower after the Closing Date (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantor, the aggregate amount of all monies received by such Guarantors from the Borrower after the Closing Date (whether by loan, capital infusion or by other means). Nothing in this provision shall affect any Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Guarantor's Maximum Liability). Each of the Guarantors covenants and agrees that its right to receive any contribution under this Loan Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations. This provision is for the benefit of each Lender and the Guarantors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

SECTION 9.12  Liability Cumulative.  The liability of each Loan Party as a Guarantor under this Article IX is in addition to and shall be cumulative with all liabilities of each Loan Party to each Lender under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

## ARTICLE X.  THE COLLATERAL AGENT

SECTION 10.01  Authorization and Action.  (a) Each Lender hereby appoints and authorizes the Collateral Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents to which the Collateral Agent is a party as are delegated to the Collateral Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto. Each Lender further authorizes and instructs the Collateral Agent to execute and deliver the Security Agreement, the MLCI Subordination Agreement and the JAD Stock Intercreditor Agreement. As to any matters not expressly provided for by the Loan Documents to which the Collateral Agent is a party, the enforcement or collection of any Obligation or any matter requiring the Collateral Agent to exercise discretion, the Collateral Agent shall not be required to act, enforce or collect upon any Obligation or exercise any discretion , but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders; provided, however, that the Collateral Agent shall not be required to take any action that exposes the Collateral Agent to personal liability or that is contrary to this Agreement or applicable law.

(b)    In furtherance of the foregoing, each Lender hereby appoints and authorizes the Collateral Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers as are reasonably incidental thereto.

(c)    The Collateral Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to

such duties.  The Collateral Agent shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the opinion or advice of any such counsel, consultants or experts as long as no officer of the Collateral Agent has any actual knowledge that such opinion or advice is inappropriate or based on incorrect information.  Notwithstanding any other provision of this Agreement to the contrary, at any time or times, in the event that the Collateral Agent or any Lender shall deem it necessary or prudent in order to conform to the legal requirements of any jurisdiction in which any part of the Collateral may at such time or times be located to make any claim or bring any suit with respect to the Collateral or any Loan Document, or the Collateral Agent or any Lender shall be advised by counsel satisfactory to it that it is so necessary or prudent, the Collateral Agent shall execute and deliver an agreement supplemental hereto and all other instruments and agreements, and shall take all other action necessary or proper to constitute one or more persons, who need not meet any requirements of the Collateral Agent contained herein (and the Collateral Agent may appoint one or more of its officers), either as co collateral agent or co-collateral agents jointly with the Collateral Agent of all or any part of the Collateral, or as separate collateral agent or separate collateral agents of all or any part of the Collateral (each, a "Supplemental Collateral Agent"), and to vest in such persons, in such capacity, such title to the Collateral or any part thereof and such rights powers, privileges or duties as may be necessary or desirable, all for such period and under such terms and conditions as are satisfactory to the Collateral Agent and Required Lenders.  In case any Supplemental Collateral Agent shall die, become incapable of acting, resign or be removed, the title to the Collateral and all rights powers, privileges and duties of such Supplemental Collateral Agent, so far as permitted by law, vest in and be exercised by the Collateral Agent, without the appointment of a successor to such Supplemental Collateral Agent.  Should any instrument in writing from the Borrower or any other Loan Party be required by any Supplemental Collateral Agent so appointed by the Collateral Agent to more fully or certainly vest in and confirm to such Supplemental Collateral Agent such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Collateral Agent.  No Agent shall be responsible for the negligence or misconduct of any agent, attorney-in-fact or Supplemental Collateral Agent that it selects in accordance with the foregoing provisions of this Section 10.01(c) in the absence of such Agent's gross negligence or willful misconduct.

SECTION 10.02  Collateral Agent's Reliance, Etc.  Neither the Collateral Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct.  Without limitation of the generality of the foregoing, the Collateral Agent: (a) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other experts selected by it at the expense of the Borrower and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (c) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of any Loan Party; (d) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness,

sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (e) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy or electronic communication) believed by it to be genuine and signed or sent by the proper party or parties.

SECTION 10.03  Indemnification.  (a)  Each Lender jointly and severally agrees to indemnify the Collateral Agent, any Supplemental Collateral Agent and their respective officers, directors, employees, stockholders agents and advisors (each, an "Indemnified Party") (to the extent not promptly reimbursed by the Borrower) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and expenses of counsel) that may be imposed on, incurred by, or asserted or awarded against any Indemnified Party in any way relating to or arising out of the Loan Documents or any action taken or omitted by the Collateral Agent under the Loan Documents (collectively, the "Indemnified Costs"); provided, however, that such Lender shall not be liable for any portion of such Indemnified Costs resulting from any Indemnified Party's own gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  The agreements in this Section 10.03 shall survive the resignation or removal of the Collateral Agent and each Supplemental Collateral Agent and the termination of this Agreement.

SECTION 10.04  Successor Collateral Agent.  The Collateral Agent may resign at any time by giving written notice thereof to each Lender and the Borrower and may be removed at any time with or without cause by the Required Lenders provided, however, that any removal of the Collateral Agent will not be effective until it has received all of the compensation and any Indemnified Costs due and owing to it and it has been released from all of its obligations hereunder.  Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Collateral Agent.  If no successor Collateral Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Collateral Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Collateral Agent, then the retiring or removed Collateral Agent may apply to any court of competent jurisdiction to appoint a successor Collateral Agent (the costs of which shall be borne by the Borrower) to act until such time, if any, as a successor shall have been appointed and shall have accepted its appointment as provided above.  Upon the acceptance of any appointment as Collateral Agent hereunder by a successor Collateral Agent and upon the execution and filing or recording by the Borrower of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, such successor Collateral Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Collateral Agent, and the retiring Collateral Agent shall be discharged from its duties and obligations under the Loan Documents.  If within 45 days after written notice is given of the retiring Collateral Agent's resignation or

removal under this Section no successor Collateral Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (or the next succeeding Business Day) (a) the retiring Collateral Agent's resignation or removal shall become effective, (b) the retiring Collateral Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (c) the Required Lenders shall thereafter perform all duties of the retiring Collateral Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Collateral Agent as provided above.  After any retiring Collateral Agent's resignation or removal hereunder as Collateral Agent shall have become effective, and thereafter following the termination of this Agreement, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent under this Agreement.

SECTION 10.05  <u>Limitation on Duty of Collateral Agent in Respect of Collateral</u>. (a) Beyond the exercise of reasonable care in the custody thereof, the Collateral Agent shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Collateral Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral.  The Collateral Agent shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent in good faith.

(b)      The Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Collateral Agent, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any Loan Party to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.  The Collateral Agent shall be under no duty or responsibility to any Lender to ascertain or to inquire into the performance or observance by any Loan Party of any of the provisions of any Loan Document.

SECTION 10.06  <u>No Discretion</u>.  In any circumstance where the Collateral Agent is required to exercise discretion, approve documentation or distribute proceeds, the Collateral Agent may, at its option, seek to obtain instructions or directions from the Required Lenders with respect to such action.  If the Collateral Agent so elects, then it may refrain from taking such action until such directions or instructions are received and shall have no liability to anyone for so refraining.

SECTION 10.07  <u>No Representations or Warranties as to the Collateral or Loan Documents</u>.  NEITHER WILMINGTON TRUST COMPANY NOR THE COLLATERAL

AGENT (i) WILL MAKE AN INSPECTION OF THE COLLATERAL OR ANY PART
THEREOF, (ii) MAKES OR SHALL BE DEEMED TO HAVE MADE ANY
REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO THE
TITLE, CONDITION, VALUE, DESIGN, OPERATION, MERCHANTABILITY OR FITNESS
FOR USE FOR ANY PARTICULAR PURPOSE OF THE COLLATERAL OR ANY PART
THEREOF, AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP WITH
RESPECT TO THE COLLATERAL OR ANY PART THEREOF, AS TO THE ABSENCE OF
LATENT OR OTHER DEFECTS WHETHER OR NOT DISCOVERABLE, AS TO THE
ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT,
AS TO THE ABSENCE OF OBLIGATIONS BASED ON STRICT LIABILITY IN TORT OR
AS TO TITLE OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER,
EXPRESS OR IMPLIED, WITH RESPECT TO THE COLLATERAL OR ANY PART
THEREOF, OR (III) MAKES OR SHALL BE DEEMED TO HAVE MADE ANY
REPRESENTATION OR WARRANTY AS TO THE VALIDITY, LEGALITY OR
ENFORCEABILITY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT TO
WHICH THE COLLATERAL AGENT IS A PARTY, OR ANY OTHER DOCUMENT OR
INSTRUMENT, OR AS TO THE CORRECTNESS OF ANY STATEMENT CONTAINED IN
ANY THEREOF.

      SECTION 10.08  No Segregation of Monies; No Interest.  Except as otherwise
expressly provided herein, monies received by the Collateral Agent hereunder or under any Loan
Document to which it is a party need not be segregated in any manner, except to the extent
required by law, and may be deposited under such general conditions as may be prescribed by
law, and neither Wilmington Trust Company nor the Collateral Agent shall be liable for any
interest thereon, except as may be expressly agreed to by Wilmington Trust Company or the
Collateral Agent in writing.

      SECTION 10.09  Action upon Instructions.  (a) The Required Lenders may by joint
written instruction direct the Collateral Agent in the administration of the Collateral and any
matter affecting the Collateral.

      (b)      Notwithstanding the foregoing, the Collateral Agent shall not be required
to take any action hereunder or under any other Loan Document at the request of the Required
Lenders or otherwise if the Collateral Agent shall have reasonably determined, or shall have
been advised by counsel, that such action is likely to result in liability on the part of the
Collateral Agent or is contrary to the terms hereof or of any other Loan Document or is
otherwise contrary to law; provided, however, that the Collateral Agent shall have no obligation
to make any such determination.

      (c)      Whenever the Collateral Agent is unable to decide between alternative
courses of action permitted or required by the terms of this Agreement or under any other Loan
Document, or in the event that the Collateral Agent is unsure as to the application of any
provision of this Agreement or any other Loan Document, or believes any such provision is
ambiguous as to its application, or is, or appears to be, in conflict with any other applicable
provision, or in the event that this Agreement or any other Loan Document permits any
determination or discretion by the Collateral Agent or is silent or is incomplete as to the course
of action that the Collateral Agent is required to take with respect to a particular set of facts, the

Collateral Agent shall promptly give notice (in such form as shall be appropriate under the circumstances) to each Lender requesting instruction as to the course of action to be adopted, and to the extent the Collateral Agent acts in good faith in accordance with any written instructions received from the Required Lenders, the Collateral Agent shall not be liable on account of such action to any person. If the Collateral Agent shall not have received appropriate instruction within 10 days of such notice (or such shorter period as reasonably may be specified in such notice or as may be necessary under the circumstances) it may, but shall be under no duty to, take or refrain from taking such action as it shall deem to be in the best interests of the Lenders; and the Collateral Agent shall have no liability to any person for such action or inaction.

SECTION 10.10  Doing Business in Other Jurisdictions.  Notwithstanding anything contained herein or elsewhere to the contrary, neither Wilmington Trust Company nor the Collateral Agent shall be required to take any action in any jurisdiction other than in the State of Delaware if the taking of such action will, even after the appointment of a Supplemental Collateral Agent in accordance with Section 10.01(c), (i) require the Collateral Agent in its individual capacity to obtain the consent, approval, authorization or order of or the giving of notice to, or the registration with, or taking of any action in respect of, any state or other governmental authority or agency other than the State of Delaware; (ii) result in any fee, tax or other governmental charge under the laws of any jurisdiction other than the State of Delaware becoming payable by the Collateral Agent in its individual capacity, or (iii) subject the Collateral Agent in its individual capacity to personal jurisdiction in any jurisdiction other than the State of Delaware for causes of action arising from acts unrelated to the consummation of the transactions by the Collateral Agent contemplated hereby.

SECTION 10.11  Rights; Powers; Litigation.  The Collateral Agent shall be under no obligation to exercise any right or power vested in it or duty imposed upon it by this Agreement, or to institute, conduct or defend any litigation under this Agreement or otherwise or in relation to this Agreement or any other Loan Document, either at the request, order or direction of any Lender, unless such Lender shall have offered the Collateral Agent security or indemnity satisfactory to it against the costs, expenses and liabilities that may be incurred by the Collateral Agent therein or thereby. The right of the Collateral Agent to perform any discretionary act enumerated in this Agreement or in any other Loan Document shall not be construed as a duty, and the Collateral Agent shall not be answerable to any Lender or other person for other than its gross negligence, bad faith or willful misconduct in the performance of any such act.

SECTION 10.12  Limitation on Damages.  In no event shall the Collateral Agent be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

SECTION 10.13  Amendments; Modifications; Waivers.  Notwithstanding anything herein or elsewhere to the contrary, in the event that the Collateral Agent is asked to execute any amendment, modification or waiver to this or any other Loan Document to which it is a party, or consent to any such amendment, modification or waiver, the Collateral Agent shall be entitled to request and conclusively rely upon the written instructions of the Required Lenders and shall

have no duty or obligation to execute any such amendment, modification or waiver or consent to the same absent receipt of such written instructions.

SECTION 10.14 <u>Independent Credit Investigation</u>. Each Lender expressly acknowledges that the Collateral Agent has not made any representations or warranties to it and that no act taken by the Collateral Agent shall be deemed to constitute any representation or warranty by the Collateral Agent to any Lender. Each Lender acknowledges that it has taken and will continue to take such actions and to make such investigations as it deems necessary to inform itself of the affairs of the Loan Parties, and each Lender acknowledges that it has made and will continue to make its own independent investigation of the creditworthiness and the business and operations of the Loan Parties, and that, in entering into this Agreement and the Loan Documents, as applicable, it has not relied and will not rely upon any information or representations furnished or given by the Collateral Agent.

SECTION 10.15 <u>The Collateral Agent in Its Individual Capacity</u>. Wilmington Trust Company, in its individual capacity, and its affiliates may accept deposits from, lend money to, and generally engage in any kind of business with any Loan Party and any of their respective Affiliates as though Wilmington Trust Company were not the Collateral Agent hereunder.

SECTION 10.16 <u>Knowledge of Default, etc</u>. The Collateral Agent shall be entitled to assume that no Default, Event of Default or Material Adverse Effect or development in the perfection of the security interest of the Collateral Agent in the Collateral exists, unless the officers of the Collateral Agent immediately responsible for matters concerning this Agreement shall have obtained actual knowledge of such Default, Event of Default or Material Adverse Effect or development through the performance of the Collateral Agent's duties hereunder and under the Loan Documents to which it is a party or shall have been notified in writing by any Loan Party or any Lender that it considers that a Default, Event of Default or such Material Adverse Effect or development exists and specifying the general nature thereof.

SECTION 10.17 <u>No Duty to Provide Additional Credit Information; No Responsibility for Perfection or Priority of Liens, etc</u>. The Collateral Agent shall not have any duty or responsibility to provide any Lender with any credit information concerning the affairs, financial condition or business of any Loan Party which may at any time come into the possession of the Collateral Agent or any responsibility for the perfection or priority of any lien.

SECTION 10.18 <u>Fees; Expenses</u>. The Borrower shall pay to the Collateral Agent within 10 Business Days of its demand the amount of any and all reasonable costs and expenses, including the reasonable fees and expenses of its counsel, that the Collateral Agent may incur in connection with (i) the acceptance and administration of this Agreement and its duties as Collateral Agent hereunder, (ii) the custody or preservation of, or the sale of, collection from or other realization upon, any of the Collateral or (iii) the exercises and enforcements of any rights of the Collateral Agent hereunder or under the Loan Documents to which it is a party. The fees discussed in clause (i) of this Section shall be set forth in a separate agreement between the Collateral Agent and the Borrower. The provisions of this Section 10.18 shall survive the termination of this Agreement and the resignation or removal of the Collateral Agent.

SECTION 10.19  Force Majeure.  The Collateral Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation:  acts of God; earthquakes; fires; floods; wars; civil or military disturbances; sabotage; act of terrorism, epidemics; riots; interruptions, loss or malfunctions of utilities, computer hardware, software or communications service; accidents; labor disputes; or acts of civil or military authority or governmental actions; it being understood that the Collateral Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

SECTION 10.20  Merger of Collateral Agent.  Any corporation or other entity into which the Collateral Agent may be merged or converted or with which it may be consolidated, or any corporation or other entity resulting from any merger, conversion or consolidation to which the Collateral Agent shall be a party, or any corporation or other entity to which substantially all the corporate trust business of the Collateral Agent may be transferred, shall be the collateral agent under this Agreement without further act.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**U.S. COAL CORPORATION,**
as Borrower

By: _____
Name: Robert Gabbard
Title: Chief Executive Officer


**LICKING RIVER RESOURCES, INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**OAK HILL COAL, INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**S. M. & J., INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**J.A.D. COAL COMPANY, INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary

**FOX KNOB COAL CO., INC.,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**SANDLICK COAL COMPANY, LLC,**
as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary


**WILMINGTON TRUST COMPANY**, as
Collateral Agent


By:_____
Name: _____
Title:_____


**JMB CAPITAL PARTNERS MASTER FUND,
L.P.,** as Lender


By:_____
Name:_____
Title:_____


73

**FOX KNOB COAL CO., INC.,**
as Guarantor

By:_____
Name: Robert Gabbard
Title: Assistant Secretary


**SANDLICK COAL COMPANY, LLC,**
as Guarantor

By:_____
Name: Robert Gabbard
Title: Assistant Secretary


**WILMINGTON TRUST COMPANY,** as
Collateral Agent

By:_____
Name:_____ Joseph B. Feil_____
Title:_____ Vice President_____


**JMB CAPITAL PARTNERS MASTER FUND,**
L.P., as Lender


By:_____
Name:_____
Title:_____

73

**FOX KNOB COAL CO., INC.,**
as Guarantor

By:_____
Name: Robert Gabbard
Title: Assistant Secretary


**SANDLICK COAL COMPANY, LLC,**
as Guarantor

By:_____
Name: Robert Gabbard
Title: Assistant Secretary


**WILMINGTON TRUST COMPANY,** as
Collateral Agent

By:_____
Name:_____
Title:_____


**JMB CAPITAL PARTNERS MASTER FUND,**
**L.P.,** as Lender

By:___Cyrus Hadidi_____
Name:___Cyrus Hadidi_____
Title:___Partner_____

73

EXHIBIT A
FORM OF
COMPLIANCE CERTIFICATE

To:    [THE LENDERS]

This Compliance Certificate is furnished pursuant to that certain Second Amended and Restated Credit Agreement dated as of August 29, 2008 (as amended, modified, renewed or extended from time to time, the "Agreement") among U.S. Coal Corporation (the "Borrower"), the other Loan Parties, as Guarantors, Wilmington Trust Company, as Collateral Agent, and the lenders party thereto, as Lenders. Unless otherwise defined herein, capitalized terms used in this Compliance Certificate have the meanings ascribed thereto in the Agreement.

THE UNDERSIGNED HEREBY CERTIFIES THAT:

1.    I am the duly elected                of the Borrower;

2.    I have reviewed the terms of the Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of the Borrower and its Subsidiaries during the accounting period covered by the attached financial statements [for quarterly financial statements add: and such financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes];

3.    The examinations described in paragraph 2 did not disclose, except as set forth below, and I have no knowledge of (i) the existence of any condition or event which constitutes a Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate or (ii) any change in GAAP or in the application thereof that has occurred since the date of the audited financial statements referred to in Section 3.04 of the Agreement;

4.    I hereby certify that no Loan Party has changed (i) its name, (ii) its chief executive office, (iii) principal place of business, (iv) the type of entity it is or (v) its state of incorporation or organization without having given the Collateral Agent and the Lenders the notice required by the Security Agreement;

5.    Schedule I attached hereto sets forth financial data and computations evidencing the Borrower's compliance with certain covenants of the Agreement, all of which data and computations are true, complete and correct;  and

Described below are the exceptions, if any, to paragraph 3 by listing, in detail, the (i) nature of the condition or event, the period during which it has existed and the action which the Borrower has taken, is taking, or proposes to take with respect to each such condition or event or (i) the change in GAAP or the application thereof and the effect of such change on the attached financial statements:

1

_____

_____

_____

The foregoing certifications, together with the computations set forth in Schedule I hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this _____ day of _____.

U.S. COAL CORPORATION

By: _____

Name: _____

Title: _____

## SCHEDULE I

Compliance as of _____, _____ with
Provisions of      and      of
the Agreement

EXHIBIT B
FORM OF
JOINDER AGREEMENT

THIS JOINDER AGREEMENT (this "Agreement"), dated as of _____, ____, 200_, is entered into between _____, a _____ (the "New Subsidiary") and the Lenders under that certain Second Amended and Restated Credit Agreement, dated as of August 29, 2008 among U.S Coal Corporation (the "Borrower"), the other Loan Parties, as Guarantors, Wilmington Trust Company, as Collateral Agent, and the lenders party thereto, as Lenders (as the same may be amended, modified, extended or restated from time to time, the "Credit Agreement"). All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Credit Agreement.

The New Subsidiary and the Lenders, hereby agree as follows:

1.      The New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a Loan Party under the Credit Agreement and a "Guarantor" for all purposes of the Credit Agreement and shall have all of the obligations of a Loan Party and a Guarantor thereunder as if it had executed the Credit Agreement. The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Credit Agreement, including without limitation (a) all of the representations and warranties of the Loan Parties set forth in Article III of the Credit Agreement, (b) all of the covenants set forth in Articles V and VI of the Credit Agreement and (c) all of the guaranty obligations set forth in Article IX of the Credit Agreement. Without limiting the generality of the foregoing terms of this paragraph 1, the New Subsidiary, subject to the limitations set forth in Section 9.10 of the Credit Agreement, hereby guarantees, jointly and severally with the other Guarantors, to the Lenders, as provided in Article IX of the Credit Agreement, the prompt payment and performance of the Guaranteed Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise) strictly in accordance with the terms thereof and agrees that if any of the Guaranteed Obligations are not paid or performed in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise), the New Subsidiary will, jointly and severally together with the other Guarantors, promptly pay and perform the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

2.      If required, the New Subsidiary is, simultaneously with the execution of this Agreement, executing and delivering such Collateral Documents (and such other documents and instruments) as reasonably requested by the Required Lenders in accordance with the Credit Agreement.

1

3.    The address of the New Subsidiary for purposes of Section 8.01 of the Credit Agreement is as follows:

_____
_____
_____
_____

4.    The New Subsidiary hereby waives acceptance by the Lenders of the guaranty by the New Subsidiary upon the execution of this Agreement by the New Subsidiary.

5.    This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same instrument.

6.    This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without giving effect to any principles of conflicts of law thereof which would result in the application of the laws of any other jurisdiction.

7.    IN WITNESS WHEREOF, the New Subsidiary has caused this Agreement to be duly executed by its authorized officer, and each Lender has caused the same to be accepted by its authorized officer, as of the day and year first above written.

[NEW SUBSIDIARY]

_____
_____
_____

Acknowledged and accepted:

[LENDERS]

By:_____
Name: _____
Title: _____

2

FILED: NEW YORK COUNTY CLERK 11/05/2012

NYSCEF DOC. NO. 52

INDEX NO. 650411/2012

RECEIVED NYSCEF: 11/05/2012

**Exhibit 3**

**Amended Credit Agreement**

Execution Version

## FIRST AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AGREEMENT AND VALUE RIGHT AGREEMENT

THIS FIRST AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AGREEMENT AND VALUE RIGHT AGREEMENT, dated as of September 30, 2009 (as amended, restated, supplemented or otherwise modified from time to time, this "**Amendment**"), by and among U.S. Coal Corporation, a Delaware corporation (the "**Borrower**"), Licking River Resources, Inc., a Kentucky corporation ("**LRR**"), Oak Hill Coal, Inc., a Kentucky corporation ("**OAK**"), S. M. & J., Inc., a Kentucky corporation ("**SMJ**"), J. A. D. Coal Company, Inc., a Virginia corporation ("**JAD**"), Fox Knob Coal Co., Inc., a Kentucky corporation ("**FOX**") and Sandlick Coal Company, LLC, a Virginia limited liability company ("**SCC**" and collectively with LRR, OAK, SMJ, JAD and FOX, the "**Guarantors**"), Wilmington Trust Company, as Collateral Agent (the "**Collateral Agent**"), and East Coast Miner LLC, a Delaware limited liability company ("**ECM**" and together with any successors, assigns or refinancing lenders, collectively the "**Lender**").

### W I T N E S S E T H:

WHEREAS, the Borrower is a party to that certain Second Amended and Restated Credit Agreement, dated as of August 29, 2008, among the Borrower, the Guarantors, the Collateral Agent, and JMB (collectively, the "**Existing Credit Agreement**");

WHEREAS, JMB Partners Master Fund, L.P., a limited partnership registered and organized under the laws of the Cayman Islands ("**JMB**"), assigned all of its interest in the Existing Credit Agreement and the other Loan Documents to ECM pursuant to an Assignment and Assumption, dated as of September 30, 2009 (the "**JMB Assignment**");

WHEREAS, the Borrower is also a party to that certain Value Right Agreement, dated as of April 15, 2008, among the Borrower, the Guarantors and JMB (as amended, the "**Value Right Agreement**");

WHEREAS, JMB assigned its interest in the Value Right Agreement to ECM pursuant to an Assignment and Assumption, dated as of September 30, 2009;

WHEREAS, the parties to the Existing Credit Agreement and the Value Right Agreement have agreed to amend the Existing Credit Agreement and the Value Right Agreement as set forth herein;

NOW THEREFORE, in consideration of the above premises and the agreements contained herein, and for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree to amend the Existing Credit Agreement and the Value Right Agreement as follows:

1.    The Value Right Agreement, together with all rights and obligations thereunder, is hereby terminated in its entirety in consideration of adding such amounts payable thereunder to the principal amount due under the Existing Credit Agreement, as set forth in paragraph 20 of this Amendment.

2.    Capitalized Terms not otherwise defined herein shall have the meaning set forth in the Existing Credit Agreement.

3.    The term "**Maturity Date**" in the Existing Credit Agreement is hereby amended to mean December 31, 2011.

4.    The term "**Closing Date**" in the Existing Credit Agreement is hereby amended to mean September 30, 2009.

5.    The term "**Amendment Fee**" in the Existing Credit Agreement is hereby deleted in its entirety.

6.    "**2008 Bridge Financing**" means the loan to the Borrower represented by unsecured 20% Promissory Notes Due originally due November 30, 2009 (and since extended to December 31, 2011, *provided, however,* that the 20% Promissory Note issued to CAMOFI Master LDC, dated as of December 23, 2008 (the "**Centrecourt 2008 Note**") is not extended and is due November 30, 2009) issued by the Borrower in December 2008 and January 2009 in an aggregate principal amount of $4,500,000, $4,400,000 of which remains outstanding as of the date of this Amendment.

7.    "**2008 Bridge Notes**" means the unsecured 20% Promissory Notes originally due November 30, 2009 issued by the Borrower in respect of the 2008 Bridge Financing, as amended and restated on the date hereof and now due on December 31, 2011, *provided, however,* that the Centrecourt 2008 Note is not extended and is due November 30, 2009.

8.    All references in the Existing Credit Agreement to the 2007 Bridge Financing and the 2007 Bridge Notes are hereby deleted in their entirety.

9.    The definition of the term "**JAD Notes**" is hereby amended by replacing the words, "December 1, 2009", with "December 31, 2011."

10.    Clause (z) of the term "**JAD Seller Notes**" in the Existing Credit Agreement is hereby deleted and replaced with the words "(z) December 31, 2011."

11.    The term "**LRR Seller Notes**" in the Existing Credit Agreement is hereby amended by deleting the word "Third" and inserting in its place the word "Fourth" and deleting clause (b)(i) and inserting in its place "(i) December 31, 2011 and".

12.    All references in Existing Credit Agreement to "MLCI Agreements" and "MLCI Subordination Agreement" are hereby deleted in their entirety.

2

13.    The term "**Post-Closing Agreement**" means the Agreement attached to the First Amendment as Exhibit A, as amended, restated, supplemented or otherwise modified from time to time.

14.    The term "**First Amendment**" means that certain First Amendment to Second Amended and Restated Credit Agreement and Value Right Agreement dated as of September 30, 2009 by and among the Borrower, the Guarantors, the Lender and the Collateral Agent, as amended, restated, supplemented or otherwise modified from time to time.

15.    The term "**First Security Agreement Amendment**" means that certain First Amendment to the Amended and Restated Security Agreement dated as of September 30, 2009, by and among the Borrower, the Original Coal Producers and the Collateral Agent.

16.    The term "**A/R Facility**" in the Existing Credit Agreement is hereby amended by deleting the words "First Tennessee Bank" and replacing them with "Commercial Bank".

17.    All references in the Existing Credit Agreement to the "Rifle Acquisition," the "Rifle Acquisition Documents," the "Rifle Acquisition Terms," the "Rifle Companies," the "Rifle Equipment Line of Credit," the "Rifle Equity Interests," the "Rifle LOI," the "Rifle Non-Core Assets," the "Rifle Non-Core Asset Notes," the "Rifle PPE Indebtedness," the "Rifle Seller Notes," the "Rifle Sellers" the "Rifle Stock Intercreditor Agreement" and "Permitted Acquisition" are hereby deleted in their entirety.

18.    Section 2.01 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

The Loan. The Borrower hereby acknowledges that, immediately prior to the amendments hereto effected by the First Amendment, the aggregate amount of the term loan made under the Existing Credit Agreement due and payable as of September 30, 2009 was $14,628,914.80 (the "**Credit Agreement Payable**"), the aggregate amount as of September 30, 2009 to be payable under the Value Right Agreement was $9,389,354.80 (the "**Value Right Payable**"). Immediately following the effectiveness of the First Amendment, the aggregate amount payable hereunder is the combined value of the Credit Agreement Payable and the Value Right Payable, specifically $24,018,269.60 (as so combined, the "**Loan**"). Amounts repaid in respect of the Loan may not be reborrowed.

19.    Section 2.03(b) and (c) of the Existing Credit Agreement is hereby renumbered "Section 2.03(e)" and "Section 2.03(f), respectively.

20.    A new Section 2.03(b) shall be inserted into the Existing Credit Agreement to read as follows:

3

Prepayment of Loan. (b) *Mandatory Prepayments*. The Borrower shall make a minimum payment of principal in an amount equal to $500,000 on the first Business Day of each calendar month during the term of the Loan ("**Mandatory Prepayments**").

21.    A new Section 2.03(c) shall be inserted into the Existing Credit Agreement to read as follows:

(c) *Mandatory Excess Prepayments*. In addition to the Mandatory Prepayments required pursuant to Section 2.03(b) above, the Borrower shall also make a minimum payment of principal on each of the Loan and the loans set forth on Schedule 1 to the First Amendment (each, including the Loan, an "**Existing Term Loan**" and collectively the "**Existing Term Loans**") on the first Business Day of each calendar month during the term of the Loan in an amount equal to $500,000 multiplied by a fraction consisting of a numerator equal to the then outstanding principal amount of such Existing Term Loan and a denominator equal to the then outstanding principal amount of all Existing Term Loans ("**Mandatory Excess Prepayments**").

22.    A new Section 2.03(d) shall be inserted into the Existing Credit Agreement to read as follows:

(d) *Mandatory Refinancing Prepayments*. In addition to the Mandatory Prepayments and the Mandatory Excess Prepayments required pursuant to Sections 2.03(b) and (c) above, the Borrower shall also make prepayments of principal to each Existing Term Loan from the entire Net Proceeds from any new equity or debt financing by the Borrower if such Net Proceeds are in excess of $20,000,000, in an amount equal to the amount of such Net Proceeds multiplied by a fraction consisting of a numerator equal to the then outstanding principal amount of such Existing Term Loan and a denominator equal to the then outstanding principal amount of all Existing Term Loans ( "**Mandatory Refinancing Prepayments**").

23.    Section 2.04 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

SECTION 2.04 Warrants. On the Closing Date, the Borrower will issue to the Lender warrants to purchase up to 9,500,000 shares of the common stock of the Borrower, par value $.001 per share (the "**Common Stock**"), at an initial exercise price per share equal to $.01, and warrants to purchase up to 2,000,000 shares of the Common Stock at an initial exercise price per share equal to $3.50 (the "**Warrants**"), in each case pursuant to the terms and conditions set forth in the Warrant Agreements (the "**Warrant Agreements**") attached hereto as Exhibit B, in consideration for the Amendment.

24.    Section 2.05(a) and (b) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

4

Interest. (a) The unpaid principal amount of the Loan shall bear interest beginning October 1, 2009 at a rate per annum equal to twelve percent (12.00%).

(b) Notwithstanding the foregoing clause (a), during the occurrence and continuance of an Event of Default, the unpaid principal amount of the Loan shall bear interest at a rate per annum equal to five percent (5.00%) (the "**Default Rate**") in addition to the rate otherwise applicable pursuant to the foregoing clause (a).

25.    Section 3.04(a) of the Existing Credit Agreement is hereby amended to replace the date in clause (1)(i) with December 31, 2008, and the date in clause (1)(ii) with March 31, 2009.

26.    Section 3.06 (b) of the Existing Credit Agreement is hereby amended to replace the date therein with April 15, 2009.

27.    Section 3.09 of the Existing Credit Agreement is hereby amended to delete the last sentence in its entirety.

28.    Section 3.16 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

Security Interest in Collateral.  The Loan Parties acknowledge and reaffirm that the provisions of the Existing Credit Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of the Collateral Agent (for the benefit of the Lenders), and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, assuming due and proper filings of all Uniform Commercial Code financing statements in the appropriate jurisdictions which remain in effect and have not been terminated or released, deeds evidencing liens on real property have been filed in the appropriate governmental offices, the entering into of applicable control agreements and appropriate actions have been taken to establish possessory interests as set forth in Articles 8 and 9 of the Uniform Commercial Code, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of (i) Permitted Encumbrances, to the extent any such Permitted Encumbrances would have priority over the Liens in favor of the Collateral Agent (for the benefit of the Lenders) pursuant to any applicable law, (ii) the JAD Equity Interests, Liens in favor of the JAD Sellers, the Centrecourt Bridge Lenders, and CAMOFI in respect of the Centrecourt Equipment Purchase Note, (iii) any Excluded Assets, (iv) items listed on Schedule VIII to the Security Agreement and (v) the Liens permitted under Sections 6.02(d), (e) and (k), to the extent any such Liens would have priority over the Liens in favor of the Collateral Agent (for the benefit of the Lenders) pursuant to this Agreement and/or any applicable law (collectively, items (i) through (v) are referred to as the "Prior Liens").

5

29.    Section 3.20 of the Existing Credit Agreement is hereby deleted in its entirety.

30.    Sections 4.01(l), (m) and (q) of the Existing Credit Agreement are hereby deleted in their entirety

31.    Section 5.08 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

Review of Existing Relationships. Not later than 60 days subsequent to the Closing Date, the Board of Directors of the Borrower at a duly and properly noticed and called meeting of the Board will discuss the Borrower's existing relationships with TerraNova Capital Partners, Inc. and Pryor Cashman LLP, and any payables outstanding to either of them, and resolve whether or not it is in the Borrower's best interests to terminate its relationship with either of them. The Borrower will provide to the Lender the minutes from such meeting not later than three weeks after the meeting takes place and any adjournments thereof.

32.    Section 5.13(d) of the Existing Credit Agreement is hereby amended by deleting the parenthetical clause "(other than any real property or improvements thereto or any interest therein)" in its entirety.

33.    Section 6.01(j) and (k) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

(j)    Indebtedness under the A/R Facility in an aggregate principal amount not to exceed $6,000,000 (such amount to be reduced by the amount of any permanent reductions of the commitments thereunder) and the guaranty thereof by Borrower;

(k)    Indebtedness under the 2008 Bridge Financing in an aggregate principal amount not to exceed $4,500,000 (such amount to be reduced by the amount of any principal repayments of the loans thereunder);

34.    Section 6.01(s) of the Existing Credit Agreement is hereby amended to delete clause (ii) and the word "and" preceding clause (ii) in their entirety.

35.    Section 6.08(b)(vi) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

(vi)    Mandatory Excess Prepayments or Mandatory Refinancing Prepayments;

36.    Section 6.08(b)(vii) of the Existing Credit Agreement is hereby amended to delete clause (w) in its entirety and replace it with the following clause (w):

"(w) any amounts payable in accordance with Sections 2.03(c) and (d) hereof;".

6

37.    Section 6.08(b)(viii) of the Existing Credit Agreement is hereby deleted in its entirety.

38.    Section 8.01(a)(i) and (ii) of the Existing Credit Agreement is hereby amended and restated as follows:

(i)    if to any Loan Party, to the Borrower at:

U.S. Coal Corporation
448 Lewis Hargett Circle
Suite 240
Lexington, Kentucky  40503
Attention: Robert Gabbard, Chief Executive Officer
Facsimile No:  (859) 219-0913

With a copy (which shall not constitute notice) to:

Pryor Cashman LLP
7 Times Square
New York, New York  10036-6569
Attention: Eric M. Hellige, Esq.
Facsimile No:  (212) 326-0806

(ii)    if to the Lender, to East Coast Miner LLC at:

c/o Mr. Keith Goggin, Managing Member
5 East 17th Street
Apartment 7
New York, NY 10003

With a copy (which shall not constitute notice) to

The Nelson Law Firm, LLC
White Plains Plaza
One North Broadway
White Plains, NY 10601
Attention:  Stephen J. Nelson, Esq.
Facsimile No:  (914) 220-1910
Email:  sjnelson@nelsonlf.com

or in the case of any subsequent assignee, to the address of such assignee set forth in the relevant assignment document.

39.    The first sentence of Section 8.09 (b) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

7

(b)    Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any U.S. Federal or State court sitting in New York, New York or Wilmington, Delaware in any action or proceeding arising out of or relating to any Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such State or, to the extent permitted by law, in such Federal court.

40.    This Amendment shall be effective upon the occurrence or waiver by the Lender of each of the following:

    a.    The Lender shall have received executed counterparts of this Amendment, the First Security Agreement Amendment and the Post-Closing Agreement from each Person party thereto.

    b.    The Lender shall have received the reasonable fees and expenses of legal counsel to the Lender and any legal counsel to any of the Lender's members on or before the Closing Date.

    c.    The Lender shall have received (i) audited combined financial statements of the Original Coal Producers for the December 31, 2006, 2007 and 2008 fiscal years, (ii) audited combined financial statements of the New Coal Producers for the September 30, 2007 and 2008 fiscal years, and (iii) unaudited interim combined financial statements of the Coal Producers for the three months ended March 31, 2009, and such financial statements shall not, in the reasonable judgment of the Lenders, reflect any material adverse change in the combined financial condition of the Coal Producers, as reflected in the financial statements.

    d.    The Lender shall have received executed copies of amendments demonstrating that the holders of (i) the 2008 Bridge Notes, *except* for the Centrecourt 2008 Note, (ii) the JAD Notes, (iii) the JAD Seller Notes and (iv) the LRR Seller Notes have agreed to extend the maturity of the obligations set forth therein to December 31, 2011.

    e.    The Lender shall have received satisfactory evidence that the Coal Services Agreement and the Master Trading Agreement have been terminated.

    f.    The Lender shall have received the Note duly executed by the Borrower.

41.    In order to induce ECM to enter into this Amendment, each Loan Party hereby represents and warrants as follows:

    a.    Each of the Loan Parties is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to own or lease and operate its properties

8

and carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

b.  The execution, delivery and performance of this Amendment, the First Security Agreement Amendment and the Post-Closing Agreement are within each Loan Party's corporate, limited liability, or limited partnership powers (as applicable) and have been duly authorized by all necessary corporate and, if required, stockholder action. Each such Loan Document to which each Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms.

c.  The execution, delivery and performance by, or enforcement against, any Loan Party of this Amendment and the Security Agreement Amendment do not and will not (a) violate, conflict with or result in the breach of any provision of the charter or by-laws (or similar organization documents) of any Loan Party, (b) conflict with or violate in any material respect any Requirement of Law or order of any Governmental Authority applicable to any Loan Party or any of their respective assets, properties or businesses, or (c) conflict in any material respect with, result in any material breach of, constitute a material default (or event which with the giving of notice or lapse of time, or both, would become a material default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in any Lien on any material assets or properties of any Loan Party pursuant to any Material Agreement or any other material license, permit, franchise or other instrument or arrangement to which any Loan Party is a party or by which any of its assets or properties is bound or affected, *except* for the Centrecourt Bridge Notes and the letter agreement between the Borrower, CAMOFI Master LDC and MAHZN Master LDC, together with their respective limited partners and members, dated as of April 14, 2008, as amended by the Centrecourt Amendment.

d.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (i) the execution, delivery or performance by, or enforcement against, any Loan Party of this Amendment, the First Security Agreement Amendment or the Post-Closing Agreement, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the First Security Agreement Amendment, (iii) the perfection or maintenance of the Liens created under the Collateral Documents, other than the due filing of UCC-1 financing statements, actions taken to establish possessory interests as set forth in Articles 8 and 9 of the Uniform Commercial Code, the entering into of applicable control agreements and the delivery of a duly executed JAD Stock Intercreditor Agreement, or (iv) the exercise by any Lender or the Collateral Agent of

its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents. All applicable waiting periods in connection with the Transactions have expired without any action having been taken by any Governmental Authority restraining, preventing or imposing materially adverse conditions upon the Transactions or the rights of the Loan Parties freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

    e.   Each Loan Party has all requisite corporate, limited liability company or partnership (as applicable) power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.

    f.   No fees, commissions or other remuneration of any kind are payable by the Borrower, any Loan Party or the Lender to any finder, broker, dealer, investment banker or investment adviser in connection with the execution and delivery of this Amendment, amendments to any other Loan Document (as defined in the Existing Credit Agreement), the Transactions (as defined in the Existing Credit Agreement) or the JMB Assignment.

This Amendment modifies and amends the Existing Credit Agreement with respect to the subject matter hereof and is hereby made a part of the Existing Credit Agreement. Except to the extent this Amendment expressly and specifically modifies and amends the terms and conditions of the Existing Credit Agreement, the terms and the conditions of the Existing Credit Agreement remain applicable in their entirety, and this Amendment shall not otherwise limit or reduce Borrower's or Guarantors' duties, obligations, or responsibilities under the Existing Credit Agreement. In the event of any claim of conflict between the terms and conditions of this Amendment and the terms and conditions of any part of the Existing Credit Agreement that have not been amended hereby, the interpretation given to such terms and conditions in the Existing Credit Agreement that have not been amended shall control the meaning thereof.

At the request of the Collateral Agent pursuant to Section 10.13 of the Existing Credit Agreement, the Lender, being the sole Lender under the Existing Credit Agreement, hereby instructs the Collateral Agent to execute this Amendment and further instructs the Collateral Agent to execute the First Security Agreement Amendment. Further, pursuant to Section 10.09(b) of the Existing Credit Agreement, the Lender hereby certifies and confirms to the Collateral Agent that this Amendment and the Security Agreement Amendment are not contrary to the terms of the Existing Credit Agreement or any other Loan Document and are not otherwise contrary to law.

[Remainder of page intentionally blank.]

This Amendment may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

Very truly yours,

**EAST COAST MINER LLC**, as Lender

By: _____
Name: KEITH F. GOGGIN
Title: MANAGER

**U.S. COAL CORPORATION**, as Borrower

By: _____
Name: Robert Gabbard
Title: Chief Executive Officer

**LICKING RIVER RESOURCES, INC.**, as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary

**OAK HILL COAL, INC.**, as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary

**S. M. & J., INC.**, as Guarantor

By: _____
Name: Robert Gabbard
Title: Assistant Secretary

11

This Amendment may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

Very truly yours,

**EAST COAST MINER LLC**, as Lender

By: _____
Name:
Title:

**U.S. COAL CORPORATION**, as Borrower

By: _____
Name:  Robert Gabbard
Title:   Chief Executive Officer

**LICKING RIVER RESOURCES, INC.**, as Guarantor

By: _____
Name:  Robert Gabbard
Title:   Assistant Secretary

**OAK HILL COAL, INC.**, as Guarantor

By: _____
Name:  Robert Gabbard
Title:   Assistant Secretary

**S. M. & J., INC**, as Guarantor

By: _____
Name:  Robert Gabbard
Title:   Assistant Secretary

11

**J. A. D. COAL COMPANY, INC.**, as Guarantor

By: _____

Name: Robert Gabbard

Title:    Assistant Secretary


**FOX KNOB COAL CO., INC.**, as Guarantor

By: _____

Name: Robert Gabbard

Title:    Assistant Secretary


**SANDLICK COAL COMPANY, LLC**, as Guarantor

By: _____

Name: Robert Gabbard

Title:    Assistant Secretary


AGREED TO AND ACKNOWLEDGED
AS OF THE DATE FIRST WRITTEN ABOVE BY:

**WILMINGTON TRUST COMPANY**, in its capacity as Collateral Agent


By: _____

Name:

Title:

**J. A. D. COAL COMPANY, INC.**, as Guarantor

By:_____
Name: Robert Gabbard
Title:   Assistant Secretary

**FOX KNOB COAL CO., INC.**, as Guarantor

By:_____
Name: Robert Gabbard
Title:   Assistant Secretary

**SANDLICK COAL COMPANY, LLC**, as Guarantor

By:_____
Name: Robert Gabbard
Title:   Assistant Secretary

AGREED TO AND ACKNOWLEDGED
AS OF THE DATE FIRST WRITTEN ABOVE BY:

**WILMINGTON TRUST COMPANY**, in its capacity as Collateral Agent

By:_____
Name:
Title:          James A. Hanley
                 Vice President

# EXHIBIT A

## FORM OF POST-CLOSING AGREEMENT

# EXHIBIT B

## FORM OF WARRANTS

## SCHEDULE 1

## EXISTING TERM LOANS

1. 2008 Bridge Notes

2. Centrecourt Bridge Notes

3. Centrecourt Equipment Purchase Note

4. JAD Notes

5. JAD Seller Notes

6. LRR Seller Notes