# EXHIBIT C
# PART VIII

FILED: NEW YORK COUNTY CLERK 01/23/2014
INDEX NO. 650411/2012

NYSCEF DOC. NO. 133

RECEIVED NYSCEF: 01/23/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

CAMOFI MASTER LDC AND
CAMHZN MASTER, LDC,

                                    Plaintiffs,

            - against -

U.S. COAL CORP., EAST COAST MINER, LLC, AND JAD
COAL COMPANY, INC.,                           Index No. 650411/12

                                    Defendants.

U.S. COAL CORP., AND JAD COAL COMPANY, INC.,      **AMENDED ANSWER**
                                                  **TO AMENDED**
                      Counterclaim Plaintiffs,    **COMPLAINT AND**
                                                  **AMENDED**
            - against -                           **COUNTERCLAIMS**

CAMOFI MASTER LDC AND CAMZHN MASTER LDC,

                      ·Counterclaim Defendants.

CENTRECOURT ASSET MANAGEMENT, LLC,

            Additional Defendant on the Counterclaims.

        Defendants-Counterclaim Plaintiffs U.S. Coal Corporation ("U.S. Coal") and JAD Coal

Company, Inc. ("JAD"), by their attorneys Nixon Peabody LLP, as for their Answer to the

Amended Complaint, Counterclaims against Plaintiffs-Counterclaim Defendants CAMOFI

MASTER LDC and CAMHZN MASTER LDC ("CAM") and claims against Additional

Defendant on the Counterclaims Centrecourt Asset Management, LLC ("Centrecourt") allege as

follows:

## ANSWER

        1.      Deny the allegations of Paragraph 1, except admit that JAD is a wholly-owned

subsidiary of U.S. Coal and deny knowledge or information sufficient to form a belief as to

CAM's reasons for bringing this action.

2.    Deny the allegations of Paragraph 2.

3.    Deny the allegations of Paragraph 3.

4.    Deny the allegations of Paragraph 4.

5.    Deny the allegations of Paragraph 5.

6.    Deny the allegations of Paragraph 6.

7.    Deny the allegations of Paragraph 7, except admit on information and belief the existence of an entity called East Coast Miner, LLC.

8.    Deny the allegations of Paragraph 8.

9.    Deny the allegations of Paragraph 9.

10.    Deny knowledge or information sufficient to form a belief as to the allegations of Paragraph 10.

11.    Deny knowledge or information sufficient to form a belief as to the allegations of Paragraph 11.

12.    Admit the allegations of Paragraph 12.

13.    Admit the allegations of Paragraph 13.

14.    Deny the allegations of Paragraph 14, except admit on information and belief that ECM is a Delaware limited liability company.

15.    Deny the allegations of Paragraph 15, except admit the existence of documents containing choice of forum and/or choice of law clauses.

16.    Deny knowledge or information sufficient to form a belief as to the allegations of Paragraph 16, except admit that U.S. Coal is a holding company and that its subsidiaries are engaged in the business of mining coal in Kentucky and Virginia.

2

17.    Deny knowledge or information sufficient to form a belief as to the allegations of Paragraph 17.

18.    Deny the allegations of Paragraph 18, except admit that CAM acquired an equity interest in U.S. Coal.

19.    Aver that no response is required to the extent that the allegations of Paragraph 19 call for a legal conclusion, and otherwise deny the allegations of Paragraph 19.

20.    Aver that no response is required to the extent that the allegations of Paragraph 20 call for a legal conclusion, admit the existence of Exhibit 1 to the Amended Complaint, and otherwise deny the allegations of Paragraph 20.

21.    Aver that no response is required to the extent that the allegations of Paragraph 21 call for a legal conclusion, admit the existence of Exhibit 2 to the Amended Complaint, and otherwise deny the allegations of Paragraph 21.

22.    Aver that no response is required to the extent that the allegations of Paragraph 22 call for a legal conclusion, admit the existence of Exhibit 3 to the Amended Complaint, and otherwise deny the allegations of Paragraph 22.

23.    Aver that no response is required to the extent that the allegations of Paragraph 23 call for a legal conclusion, admit the existence of Exhibit 2 to the Amended Complaint, and otherwise deny the allegations of Paragraph 23.

24.    Aver that no response is required to the extent that the allegations of Paragraph 24 call for a legal conclusion, admit the existence of Exhibit 4 to the Amended Complaint, and otherwise deny the allegations of Paragraph 24.

25.     Aver that no response is required to the extent that the allegations of Paragraph 25 call for a legal conclusion, admit the existence of Exhibit 4 to the Amended Complaint, and otherwise deny the allegations of Paragraph 25.

26.     Aver that no response is required to the extent that the allegations of Paragraph 26 call for a legal conclusion, admit the existence of Exhibit 4 to the Amended Complaint, and otherwise deny the allegations of Paragraph 26.

27.     Deny the allegations of Paragraph 27, except admit on information and belief the existence of ECM.

28.     Deny the allegations of Paragraph 28, and deny knowledge or information sufficient to form a belief as to CAM's purported concerns.

29.     Deny the allegations of Paragraph 29, except admit on information and belief that ECM holds security interests on certain assets of JAD.

30.     Deny the allegations of Paragraph 30.

31.     Deny the allegations of Paragraph 31.

32.     Deny the allegations of Paragraph 32, except admit the existence of Exhibit 5 to the Amended Complaint.

33.     Deny the allegations of Paragraph 33.

34.     Aver that no response is required to the extent that the allegations of Paragraph 34 call for a legal conclusion, admit the existence of Exhibit 3 to the Amended Complaint, and otherwise deny the allegations of Paragraph 34.

35.     Deny the allegations of Paragraph 35.

36.     Deny the allegations of Paragraph 36.

37.    Deny the allegations of Paragraph 37, except admit the existence of Exhibit 6 to the Amended Complaint.

38.    Deny the allegations of Paragraph 38, except admit the existence of Exhibit 7 to the Amended Complaint.

39.    Deny the allegations of Paragraph 39.

40.    Deny the allegations of Paragraph 40.

41.    Deny the allegations of Paragraph 41.

42.    Deny the allegations of Paragraph 42, except admit the existence of Exhibit 1 to the Amended Complaint.

43.    Deny the allegations of Paragraph 43, except admit the existence of Exhibit 1 to the Amended Complaint.

44.    Deny the allegations of Paragraph 44, except admit the existence of Exhibit 8 to the Amended Complaint.

45.    Deny the allegations of Paragraph 45, except admit the existence of Exhibit 8 to the Amended Complaint.

46.    Deny the allegations of Paragraph 46, except admit the existence of Exhibit 8 to the Amended Complaint.

47.    Deny the allegations of Paragraph 47, except admit the existence of Exhibit 8 to the Amended Complaint.

48.    Deny the allegations of Paragraph 48, except admit the existence of Exhibit 8 to the Amended Complaint.

49.    Deny the allegations of Paragraph 49.

50.    Deny the allegations of Paragraph 50.

51.    Deny the allegations of Paragraph 51.

52.    Answering Paragraph 52, repeat and reallege their responses to Paragraphs 1-51

above.

53.    Admit the allegations of Paragraph 53.

54.    Admit the allegations of Paragraph 54.

55.    Deny the allegations of Paragraph 55.

56.    Deny the allegations of Paragraph 56.

57.    Deny the allegations of Paragraph 57.

58.    Deny the allegations of Paragraph 58.

59.    Deny the allegations of Paragraph 59, and deny knowledge or information

sufficient to form a belief as to why CAM instituted this action.

60.    Deny the allegations of Paragraph 60.

61.    Answering Paragraph 61, repeat and reallege their responses to Paragraphs 1-60

above.

62.    Deny the allegations of Paragraph 62.

63.    Deny the allegations of Paragraph 63, and deny knowledge or information

sufficient to form a belief as to why CAM instituted this action.

64.    Deny the allegations of Paragraph 64.

65.    Answering Paragraph 65, repeat and reallege their responses to Paragraphs 1-64

above.

66.    Deny the allegations of Paragraph 66.

67.    Deny the allegations of Paragraph 67.

68.    Deny the allegations of Paragraph 68.

6

69.     Deny the allegations of Paragraph 69.

70.     Answering Paragraph 70, repeat and reallege their responses to Paragraphs 1-69 above.

71.     Aver that no response is required as the allegations of Paragraph 71 call for a legal conclusion.

72.     Deny knowledge or information sufficient to form a belief as to the allegations of Paragraph 72.

73.     Deny the allegations of Paragraph 73.

74.     Deny the allegations of Paragraph 74.

75.     Deny the allegations of Paragraph 75.

76.     Answering Paragraph 76, repeat and reallege their responses to Paragraphs 1-75 above.

77.     Aver that no response is required as the allegations of Paragraph 77 call for a legal conclusion.

78.     Deny knowledge or information sufficient to form a belief as to the allegations of Paragraph 78.

79.     Deny the allegations of Paragraph 79.

80.     Deny the allegations of Paragraph 80.

81.     Answering Paragraph 81, repeat and reallege their responses to Paragraphs 1-80 above.

82.     Aver that no response is required as the allegations of Paragraph 82 call for a legal conclusion.

83.    Deny knowledge or information sufficient to form a belief as to the allegations of
Paragraph 83.

84.    Deny the allegations of Paragraph 84.

85.    Deny the allegations of Paragraph 85.

## FIRST AFFIRMATIVE DEFENSE

86.    CAM's claims are barred in whole or in part by its prior material breach of
contracts with, and relating to, U.S. Coal and JAD, including their breach of the duty of good
faith.

## SECOND AFFIRMATIVE DEFENSE

87.    CAM's claims based on the Rights Agreement and the Equipment Note are barred
in whole or in part by the terms of the Transaction Documents for the April 2008 Transaction
including without limitation express conditions precedent set forth therein.

## THIRD AFFIRMATIVE DEFENSE

88.    CAM's claims are barred in whole or in part by the doctrines of collateral
estoppel and res judicata.

## FOURTH AFFIRMATIVE DEFENSE

89.    CAM's claims are barred in whole or in part by waiver, estoppel, laches and by
virtue of its unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

90.    CAM's claims are barred in whole or in part by setoff and recoupment.

## SIXTH AFFIRMATIVE DEFENSE

91.    CAM's claims are barred in whole or in part by payment.

## SEVENTH AFFIRMATIVE DEFENSE

92.    CAM's claims are barred in whole or in part by failure of consideration.

## EIGHTH AFFIRMATIVE DEFENSE

93.    The Complaint fails to state a cause of action.

## RESERVATION OF RIGHTS

94.    U.S. Coal and JAD expressly reserve the right to assert other or different affirmative defenses, as no discovery has yet been had and as relevant information is or may be solely in the possession of CAM or its agents and/or other third parties and not available to U.S. Coal and JAD at the time of filing of this Amended Answer and Amended Counterclaims.

## COUNTERCLAIMS

95.    U.S. Coal and JAD bring these counterclaims against CAM and Centrecourt Asset Management, LLC ("Centrecourt"). Centrecourt, the purported asset manager, and by extension CAM, the funds it manages and controls, have from the outset of their dealings with U.S. Coal and JAD been utterly conflicted, and as a result have engaged in self-dealing, breaches of contractual and other duties, and bad faith conduct.

## PARTIES

96.    U.S. Coal is a Delaware corporation with its principal place of business in Kentucky.

97.    JAD is a Virginia corporation and since April 2008 has been a wholly-owned subsidiary of U.S. Coal and its major operating company.

98.    Upon information and belief, CAMOFI Master LDC and CAMHZN Master LDC (collectively "CAM") are Cayman Island investment entities established, managed and controlled by Centrecourt.

99.    Upon information and belief, Centrecourt is a Delaware limited liability company with a principal place of business in New York, New York which purports to act on behalf of and with authority from CAM, and which directs and controls CAM's actions.

9

100.    This Court has jurisdiction over CAM and Centrecourt under CPLR 301 and 302

because they are doing business in New York, or have transacted business in New York out of

which these counterclaims arise.  Further, CAM has commenced this action in the Supreme

Court, New York County and is therefore subject to counterclaims here, and has consented to

jurisdiction in New York in agreements out of which certain of these counterclaims arise.

101.    Venue is proper under CPLR 501 because CAM has consented to venue in

Supreme Court, New York County and because Centrecourt has its principal place of business

within New York County.

## FACTS COMMON TO ALL COUNTERCLAIMS

102.    U.S. Coal is a holding company which was established as the vehicle to acquire

and hold the stock of small, family-owned coal companies in Kentucky and Virginia and through

those companies engage in the coal mining business.  The initial promoters and incorporators of

U.S. Coal included principals of or individuals associated with entities known as TerraNova

Capital Partners and/or European American Equities, Inc. who, upon information and belief, had

worked closely with principals of Centrecourt in the past.

103.    On information and belief, Centrecourt, on behalf of CAM and other funds, had

been involved with companies engaged in the coal business in Kentucky and Virginia before its

involvement with U.S. Coal and JAD, and in particular had been involved with a corporation

known as Consolidated Energy, Inc.

104.    In or around early 2007, the promoters of U.S. Coal caused it to enter into its first

acquisition, the acquisition of Licking River Resources, LLC, a family-owned Kentucky

company which owned and operated coal mines and mining facilities in Eastern Kentucky and

had for generations.  In connection with this acquisition, CAM, through Centrecourt, acquired an

equity interest in U.S. Coal.

10

105.    From June 2007, CAM and Centrecourt were intimately involved with U.S. Coal's operations, financing, business planning and acquisitions or targeted acquisitions. Centrecourt, for its own benefit and acting on behalf of CAM, was heavily and directly involved in efforts to obtain investors in and financing for U.S. Coal so that U.S. Coal could expand its holdings to include more operating subsidiaries and effectuate plans for a merger or initial public offering.

106.    On or about June 4, 2007, shortly after the Licking River acquisition when CAM acquired its initial equity interest in U.S. Coal, Centrecourt, on behalf of CAM, demanded that U.S. Coal execute a "side letter" granting CAM the right to consent to certain ordinary course of business decisions and financing or acquisition transactions before they were consummated. A copy of the June 4, 2007 side letter is annexed hereto as Exhibit A. As its terms reflect, the letter was intended solely to protect the equity interest CAM then had in U.S. Coal. It provided only for consent and not for the payment of any fee or the grant of any further rights to CAM or to Centrecourt as a condition of any consent. It was further expressly and impliedly understood and agreed that CAM would exercise consent rights in good faith, to protect its existing equity position, and not for the purpose of obtaining any further payments or consideration of any sort for CAM or, for that matter, for Centrecourt or any other entity.

107.    From on or about June 4, 2007, and continuing thereafter to the present, Centrecourt and CAM, wrongfully, in bad faith and in furtherance of no legitimate economic interest, threatened to withhold written consent to a variety of ordinary course of business corporate actions and transactions which they knew were in the best interests of U.S. Coal. In certain circumstances, oral consent was given and the corporate actions or transactions had been recommended, structured and approved by Centrecourt. CAM and Centrecourt then withheld

11

formal written consent to force U.S. Coal to pay fees or grant further equity interests or other

rights to CAM and/or Centrecourt to which they were not entitled.

108.    On or about June 19, 2007, with the knowledge, consent and participation of

Centrecourt, U.S. Coal entered into an agreement to purchase JAD, a family-owned and operated

mining company in Virginia (the "JAD Acquisition").

109.    Thereafter, Centrecourt for its own benefit and acting on behalf of CAM was

directly involved with developing and marketing a stock offering (the "Series B offering") to

raise funds to pay for the JAD Acquisition.  Centrecourt was also directly involved with the

structure and negotiation of the many "Transaction Documents" defined in and part of the April

2008 Transaction consummated at the same time as the acquisition of JAD.

110.    On or about March 1, 2008, Centrecourt and U.S. Coal executed an Advisory

Services Agreement pursuant to which Centrecourt agreed to provide U.S. Coal with "strategic

advisory services, including without limitation, advisory services in connection with the

proposed acquisitions" of JAD and another target, Rifle Coal Company.

111.    In consideration of the faithful performance of these strategic advisory services,

Centrecourt was to receive, and in fact received, an immediate cash payment of $175,000 and

650,000 shares of U.S. Coal common stock.  A copy of the Advisory Services Agreement is

annexed as Exhibit B.

112.    Pursuant to the Advisory Services Agreement, Centrecourt undertook a duty to act

in the best interest of U.S. Coal, not to engage in self-dealing, and to provide "strategic advisory

services" in good faith, free of conflicts of interest and with full disclosure.  Centrecourt assumed

a duty of higher trust and confidence as to U.S. Coal, and later as to JAD, and U.S. Coal and

12

JAD were entitled to rely, and did in fact rely, on Centrecourt well and truly providing "strategic advisor services".

113.    As strategic advisor, Centrecourt regularly participated in U.S. Coal board and executive meetings and conference calls and was provided with the same materials as board members and executives.  Documents drafted by U.S. Coal counsel were forwarded to Centrecourt for review and comment, as were numerous term sheets, financial models, and draft financing documents including documents relating to the Series B Offering and the Transaction Documents for the April 2008 Transaction.

114.    On about April 15, 2008, in derogation of its duties, obligations and undertakings to U.S. Coal and in breach of the trust and confidence which U.S. Coal had placed in it by virtue of the Advisory Services Agreement, Centrecourt advised U.S. Coal and JAD, without full disclosure of pertinent facts including its conflicts of interest, to enter into a series of transactions with CAM which were not fair and reasonable or in the best interests of U.S. Coal or JAD, and which actually benefitted Centrecourt individually, as more fully set forth below.

115.    As of a date on or about April 15, 2008, on the strategic advice of Centrecourt, U.S. Coal and JAD entered into an Equipment Transfer Agreement (a copy of which is annexed as Exhibit C) and an Equipment Note (annexed to the Amended Complaint as Exhibit 4), pursuant to which JAD (as a subsidiary of U.S. Coal once the acquisition closed) would agree to purchase certain mining equipment ("Equipment") allegedly owned by CAM for $4.8 million.

116.    On information and belief, Centrecourt affirmatively represented to U.S. Coal that the Equipment was essential to the success of the JAD Acquisition and other potential acquisitions, and to the fulfillment of U.S. Coal's other corporate objectives including its hope to complete an initial public offering or other transaction, and that it was fair and reasonable and

indeed essential that U.S. Coal and JAD agree to the provisions of the Equipment Transfer
Agreement so that the Equipment could be obtained without delay.

117.    Centrecourt failed to disclose and on information and belief affirmatively
withheld from U.S. Coal and JAD, in breach of its duties to U.S. Coal and its obligations under
the Advisory Services Agreement,  information within its knowledge concerning the Equipment,
including without limitation: (1) the fact that Centrecourt had affirmatively stated  in filed court
documents its belief that the Equipment, in total, was worth no more than $2 million; (2) the fact
that CAM, and other entities for whom Centrecourt was at the same time acting and who were
paying fees to Centrecourt, by virtue of their claims as secured creditors as to the Equipment in a
bankruptcy proceeding in the Eastern District of Kentucky, styled *In re Consolidated Energy,
Inc.*, Case No., 07-70314 would obtain a tremendous windfall payment if JAD agreed to the
terms of the Equipment Purchase Agreement and the Equipment Note; (3) the fact that, in that
bankruptcy proceeding, evidence had been submitted on behalf of Centrecourt, and Centrecourt
had affirmatively represented in written filings, that some of all of the Equipment it was to sell
under the Equipment Transfer Agreement did not exist, could not be located, and was
unworkable and unusable and could not be salvaged; (4) the fact that CAM, and other entities for
whom Centrecourt was at the same time acting and who were paying fees to Centrecourt, would
actually be paid twice for certain of the Equipment, including without limitation a "Fan" which
was a listed piece of Equipment under the Equipment Transfer Agreement, but which in fact was
sold through the bankruptcy proceeding for $100,000, paid to Centrecourt; and (5) the fact that
the cost of recovering and refurbishing the Equipment that did exist or could be located and
salvaged would exceed $2 million.

14

118.    As of the filing of these Counterclaims, U.S. Coal and JAD have paid CAM in

money and stock amounts well in excess of the value of the Equipment, and U.S. Coal and JAD

have paid in excess of $2 million to salvage the Equipment.

119.    On or about April 15, 2008, on the strategic advice of Centrecourt pursuant to the

Advisory Services Agreement, U.S. Coal and JAD entered into a Securities Purchase Agreement

(annexed to the Amended Complaint as Exhibit 2) and a Rights Agreement (annexed to the

Amended Complaint as Exhibit 3), under which CAM was to receive equity interests in U.S.

Coal in exchange for notes bearing interest rates, and including default rates, far exceeding rates

that were otherwise available in the market.  A strategic advisor in the good faith performance of

advisory services would never have recommended this transaction to U.S. Coal and JAD, yet

Centrecourt did.

120.    The Rights Agreement purported to grant to CAM the right to "put" shares

acquired under the Securities Purchase Agreement back to U.S. Coal at $5.40/share, a price far in

excess of their actual value.  A strategic advisor in the good faith performance of advisory

services would never have recommended this transaction to U.S. Coal and JAD, yet Centrecourt

did.

121.    The "put" right purportedly bestowed under the Rights Agreement was to be

exercisable under certain circumstances, including the failure of U.S. Coal to complete an initial

public offering or consummate a reverse merger or other corporate transaction by a certain date.

122.    Centrecourt had undertaken to provide U.S. Coal with strategic advisory services

including advice on initial public offerings, reverse mergers or other transactions which would

have satisfied the conditions of the "put" right.  Centrecourt could not well and truly perform its

strategic advisor services for U.S. Coal and JAD insofar as such services involved a potential

initial public offering, reverse merger, or other transaction, because to do so would have defeated the "put" right it had encouraged U.S. Coal and JAD to provide to CAM, the funds Centrecourt manages and controls.

123.    On or about March 28, 2008, in breach of the provisions of the June 4, 2007 letter, and in derogation of Centrecourt's obligations to U.S. Coal and JAD on or by reason of the Advisory Services Agreement, Centrecourt purporting to act on behalf of CAM demanded that U.S. Coal sign a letter agreement ( the "Additional Stock Letter" ) granting  CAM an additional 600,000 shares of U.S. Coal common stock in exchange for CAM's written consent to two transactions: (1) the hiring of a chief financial officer; and (2) the offering of Series B preferred stock, which Centrecourt had been marketing to raise funds for the JAD Acquisition.  A copy of the Additional Stock Letter is annexed as Exhibit D.

124.    Prior to March 28, 2008, Centrecourt had interviewed the chief financial officer candidate and orally approved his hiring on behalf of CAM.

125.    Prior to March 28, 2008, Centrecourt had encouraged U.S. Coal to proceed with the Series B offering in order to complete the acquisition of JAD, and had participated in determining the terms of that offering and actively marketed the Series B Offering on behalf of U.S. Coal as in U.S. Coal's best interest.

126.    The Series B Offering and the hiring of the chief financial officer had actually been approved and recommended by Centrecourt on its own behalf and on behalf of CAM as essential to the JAD Acquisition and to the ongoing daily business operation of U.S. Coal.

127.    CAM has no right to payment for consent under the June 4, 2007 letter, and Centrecourt had already been paid for agreeing to provide U.S. Coal with strategic advice on transactions like this.

16

128.    The hiring of a chief financial officer and the Series B Offering did not decrease the value of CAM's original equity interest.  The hiring of a chief financial officer was instead essential to the proper functioning of U.S. Coal and its operating subsidiaries.  Without the Series B Offering the JAD Acquisition would not have closed and thus the Series B Offering increased the value of CAM's original equity interest.

129.    In the Fall of 2011, U.S. Coal determined to enter into agreements pursuant to which additional debt investments were made in U.S. Coal (the "December 2011 Transaction"). Under these agreements, the due dates of debts to Senior Creditors under the April 2008 Transaction Documents and current members of the U.S. Coal Board would be extended, and sufficient funds raised to pay the face value of CAM-related debt in full, ahead of payments to Senior Creditors under the April 2008 Transaction Documents and all current members of the U.S. Coal Board, and before CAM was entitled to be paid.

130.    Centrecourt and CAM were fully aware of the December 2011 Transaction and provided comments on its terms.

131.    The December 2011 Transaction did not decrease the value of CAM's original equity interest.

132.    Centrecourt and CAM were fully aware that the purpose of this proposed transaction was to provide funds to pay CAM, and nevertheless in an attempt once again to exact further fees or other benefits to from U.S. Coal, Centrecourt on behalf of CAM wrongfully and in bad faith refused to consent to this transaction. CAM nonetheless accepted and upon information and belief has distributed and used for its own purposes the proceeds of the December 2011 Transaction.

17

## FIRST COUNTERCLAIM
### (Breach of Contract against Centrecourt)

133.    U.S. Coal and JAD repeat the allegations of Paragraphs 95-132 above.

134.    The Advisory Services Agreement is a binding agreement between U.S. Coal and

Centrecourt.

135.    U.S. Coal has fully performed under the Advisory Services Agreement.

136.    Centrecourt has materially breached its obligations under the Advisory Services

Agreement.

137.    By reason of the foregoing, U.S. Coal and JAD have been damaged, in an amount

to be proven with specificity.

## SECOND COUNTERCLAIM
### (Breach of Contract against CAM)

138.    U.S. Coal and JAD repeat the allegations of Paragraphs 95-132 above.

139.    CAM, through Centrecourt, has willfully, unjustifiably, maliciously and in bad

faith refused to consent in writing to the corporate actions and transactions as explained above

and has withheld consent, unreasonably and for no good reason, solely in an effort to obtain

payments and other consideration to which it is not entitled.

140.    This conduct was not within the legitimate economic interest of CAM.

141.    By reason of the foregoing, U.S. Coal and JAD have been damaged, in an amount

to be determined with specificity at time of trial.

## THIRD COUNTERCLAIM
### (In the alternative, Unjust Enrichment against Centrecourt and CAM)

142.    U.S. Coal and JAD repeat and reallege each and every allegation in Paragraphs

95-132.

18

143.    Centrecourt and CAM have received monies, equity, and other benefits from U.S.
Coal and JAD to which they were not entitled and as to which they had no right, and have
therefore been unjustly enriched at the expense of U.S. Coal and JAD.

144.    In equity and good conscience, Centrecourt and CAM should be directed to
disgorge all such benefits unjustly received.

WHEREFORE, U.S. Coal and JAD demand judgment:

1.    Dismissing the Amended Complaint with prejudice;

2.    Granting U.S. Coal and JAD money damages according to the proof
against CAM and Centrecourt;

3.    Directing that CAM and Centrecourt disgorge benefits unjustly obtained
from U.S. Coal and JAD;

4.    Granting such other relief as is just, including costs and attorneys' fees.

Dated: New York, New York
January 23, 2014

NIXON PEABODY LLP

By: _____
Frank H. Penski
Abigail T. Reardon
*Attorneys for U.S. Coal Corporation and
JAD Coal Company*
437 Madison Avenue
New York, New York 10022
(212) 940-3000

19

FILED: NEW YORK COUNTY CLERK 01/23/2014

NYSCEF DOC. NO. 134

INDEX NO. 650411/2012

RECEIVED NYSCEF: 01/23/2014

# Exhibit A

U.S. Coal Acquisition Corp.
17838 U.S. Route 23
Catlettsburg, KY 41129

June 4, 2007

CAMOFI Master LDC
CAMHZN Master LDC
C/O CENTRECOURT ASSET MANAGEMENT
350 MADISON AVENUE, 8ᵀᴴ FLOOR
NEW YORK, NY 10017
Attention: Keith D. Wellner, General Counsel

Dear Keith:

    Pursuant to our recent discussions, U.S. Coal Acquisition Corp., a Delaware corporation (the
"Corporation"), hereby covenants to CAMOFI Master LDC and CAMHZN Master LDC (each a
"CAM Entity" and, collectively, the "CAM Entities") as follows:

    For so long as the CAM Entities collectively own more than five percent (5%) of the
outstanding shares of the Corporation's common stock, $.001 par value per share ("Common Stock"),
on a fully-diluted basis (assuming conversion of all securities convertible into or exercisable for the
purchase of Common Stock), the Corporation will not, without the written prior consent of the CAM
Entities, take any of the following actions:

    (1)    create, assume or incur indebtedness for borrowed money, other than (a)
indebtedness (including interest and fees) pursuant to loan or credit agreements existing on the
date hereof (as renewed or extended, provided that such renewals or extensions do not increase
the amount of indebtedness); (b) indebtedness incurred from time to time under the
Corporation's line of credit with First Tennessee Bank, N.A., as in existence on the date hereof,
provided that the proceeds of which are used to fund operations; (c) indebtedness of up to $100
million, on terms and conditions satisfactory to the CAM Entities in their reasonable discretion,
provided such indebtedness is incurred in connection with (w) the financing of the acquisition of
J.A.D. Coal Company (or its affiliates) (the "JAD Acquisition"), (x) the assumption of
indebtedness by the Corporation in the JAD Acquisition; (y) the refinancing of the Corporation's
secured debt existing on the date hereof and (z) the financing of one or more additional
acquisitions by the Corporation, or (d) other indebtedness incurred in the ordinary course of
business not to exceed $1 million at any time outstanding;

    (2)    (a) enter into any strategic partnership or joint venture or (b) other than in
connection with the JAD Acquisition, consummate any asset or stock acquisition of another
person or entity, if, as a result of such acquisition, such asset(s) or stock would represent a
material portion of the assets of the Corporation;

(3)      sell, assign or transfer all or substantially all of the assets of the Corporation and its subsidiaries (taken as a whole), consummate any merger or consolidation of the Corporation with or into another entity, or enter into any agreement to do any of the foregoing, other than such of the foregoing as it may relate to a merger or acquisition involving the Corporation and a public "shell" corporation as currently contemplated by the Corporation (a "Shell Merger");

(4)      hire or terminate the employment of any executive officer of the Corporation with a salary in excess of $100,000, other than hiring of executive officers in connection with the JAD Acquisition;

(5)      make any expenditure for the acquisition, construction or improvement of any fixed or capital asset in an amount greater than $5 million, other than capital expenditures incurred in connection with the Corporation's acquisition of one high-wall miner, the construction and/or improvement of a coal preparation plant and capital leases assumed in the JAD Acquisition;

(6)      (a) amend, modify or alter the terms of any option, warrant or other right to purchase or acquire shares of capital stock or other equity interests of the Corporation ·outstanding on the date hereof or (b) amend the terms of the Corporation's existing equity incentive plan or adopt any new equity incentive plan for the benefit of the Corporation's employees;

(7)      increase or decrease the number of authorized shares of the Common Stock, or Preferred Stock, other than the designation of 16.2 million shares of the Corporation's preferred stock as Series A Convertible Preferred Stock, $.001 par value per share (the "Series A Preferred") in connection with the Corporation's proposed sale of the Series A Preferred;

(8)      create, designate or establish any class or series of capital stock, other than Common Stock or the Series A Preferred;

(9)      pay or declare any dividend or make any distribution on any securities other than on the Series A Preferred;

(10)      declare bankruptcy, dissolve, liquidate or wind up the affairs of the Corporation or any subsidiary;

(11)      issue or sell, in a single transaction or a series of related transactions, any capital stock or other security convertible into or exercisable for capital stock of the Corporation, which, at the time of issuance, represents more than five percent (5%) of the number of the then-outstanding shares of Common Stock on a fully-diluted basis, other than issuance in connection with the JAD Acquisition or the Shell Merger;

(12)      enter into any transaction with an affiliate of the Corporation (other than inter-company transactions) which the dollar value of such transaction exceeds $500,000.

The Corporation's obligations hereunder will terminate upon the consummation by the Corporation of either (i) the Corporation's first underwritten public offering of Common Stock pursuant to a registration statement filed under the Securities Act of 1933, as amended (the "Act"), or (ii) a Shell Merger in which the securities issued in exchange for shares of Common Stock is registered under the Act. Without limiting the foregoing, this letter shall terminate as to either CAM Entity when such CAM Entity does not singly beneficially own any shares of Common Stock. The letter shall be governed by and construed in accordance with the laws of the State of New York.

If the foregoing is in accordance with your understanding, please confirm your acceptance by signing and returning the enclosed copy of this letter, which upon execution will constitute an agreement between us.

Sincerely,

U.S. COAL ACQUISITION CORP.

By:     Robert Gabbard
Title:   Chief Executive Officer

Agreed to and accepted as of the date
first above written:

**CAMOFI MASTER LDC**

_____
By:
Title:

**CAMHZN MASTER LDC**

_____
By:
Title:

The Corporation's obligations hereunder will terminate upon the consummation by the Corporation of either (i) the Corporation's first underwritten public offering of Common Stock pursuant to a registration statement filed under the Securities Act of 1933, as amended (the "Act"), or (ii) a Shell Merger in which the securities issued in exchange for shares of Common Stock is registered under the Act. Without limiting the foregoing, this letter shall terminate as to either CAM Entity when such CAM Entity does not singly beneficially own any shares of Common Stock. The letter shall be governed by and construed in accordance with the laws of the State of New York.

If the foregoing is in accordance with your understanding, please confirm your acceptance by signing and returning the enclosed copy of this letter, which upon execution will constitute an agreement between us.

Sincerely,

U.S. COAL ACQUISITION CORP.

By:    Robert Gabbard
Title:   Chief Executive Officer

Agreed to and accepted as of the date
first above written:

CAMOFI MASTER LDC

By:     Jeffrey M. Haas
Title:    Authorized Signatory

CAMHZN MASTER LDC

By:     Jeffrey M. Haas
Title:    Authorized Signatory

FILED: NEW YORK COUNTY CLERK 01/23/2014

INDEX NO. 650411/2012

NYSCEF DOC. NO. 135

RECEIVED NYSCEF: 01/23/2014

# Exhibit B

March 1, 2008

U.S. Coal Corporation
448 Lewis Hargett Circle, Suite 240
Lexington, KY 40503
Attention: Robert Gabbard
            Chief Executive Officer

Dear Mr. Gabbard:

This letter agreement (this "Agreement"), when executed by the parties hereto, will memorialize our understanding and constitute an agreement between U.S. Coal Corporation, a Delaware corporation (the "Company"), and Centrecourt Asset Management LLC, a Delaware limited liability company ("Centrecourt"), pursuant to which the Company agrees to retain Centrecourt and Centrecourt agrees to be retained by the Company under the terms and conditions set forth below:

1.    The Company hereby retains Centrecourt to provide it with strategic advisory services, including without limitation, advisory services in connection with the proposed acquisitions (the "Acquisitions") by the Company of (i) J.A.D. Coal Company, Inc. ("JAD"), and (ii) Rifle Coal Company and Associated Contracting LLC ("Rifle"). The term of this Agreement shall be for a period of twelve months commencing on the date hereof and ending on February 28, 2009. As compensation for the services to be provided by Centrecourt to the Company pursuant to this Agreement, the Company shall pay Centrecourt (i) simultaneously with the consummation of the first Acquisition, a cash fee of $175,000, and (ii) on or before March 31, 2008, 650,000 shares of the Company's common stock, par value $0.001 per share.

2.    The Company shall reimburse Centrecourt for any and all reasonable expenses incurred by Centrecourt in the performance of its duties hereunder, and Centrecourt shall account for such expenses to the Company by submission of vouchers reasonably satisfactory to the Company setting forth in reasonable detail the amount and reason for such cost or expense.

3.    All obligations of Centrecourt contained in this Agreement shall be subject to Centrecourt's reasonable availability for such performance, in view of the nature of the requested service and the amount of notice received. Centrecourt shall devote such time and effort to the performance of its duties hereunder as Centrecourt shall determine is reasonably necessary for such performance. Centrecourt may look to such others for such factual information, investment recommendations, economic advice and/or research, upon which to base its advice to the Company hereunder, as it shall deem appropriate. The Company shall furnish to Centrecourt all information relevant to the performance by Centrecourt of its obligations under this Agreement, or particular projects as to which Centrecourt is acting as advisor, which will permit Centrecourt to know all facts material to the advice to be rendered, and all materials or information reasonably requested by Centrecourt. In the event that the Company fails or refuses to furnish any such material or information reasonably requested by Centrecourt, and thus prevents or impedes Centrecourt's performance hereunder, any inability of Centrecourt to perform shall not be a breach of its obligations hereunder.

1 of 5

4.    Nothing contained in this Agreement shall limit or restrict the right of Centrecourt or of any partner, affiliate, employee, agent or representative of Centrecourt, to be a partner, director, officer, employee, agent or representative of, or to engage in, any other business, whether or not of a similar nature to the Company's business, nor to limit or restrict the right of Centrecourt to render services of any kind to any other corporation, firm, individual or association.

5.    The Company agrees that it will not provide any material non-public information to Centrecourt.

6.    Because Centrecourt will be acting on your behalf, it is Centrecourt's practice to receive indemnification.    A copy of Centrecourt's standard indemnification provisions (the "Indemnification Provisions") is attached to this Agreement and is incorporated herein and made a part hereof.

7.    This Agreement may not be transferred, assigned or delegated by any of the parties hereto without the prior written consent of the other party hereto.

8.    The failure or neglect of the parties hereto to insist, in any one or more instances, upon the strict performance of any of the terms or conditions of this Agreement, or their waiver of strict performance of any of the terms or conditions of this Agreement, shall not be construed as a waiver or relinquishment in the future of such term or condition, but the same shall continue in full force and effect.

9.    Any notices hereunder shall be sent to the Company and to Centrecourt at their respective addresses. Any notice shall be given by hand delivery, facsimile transmission or overnight delivery or courier service, against receipt therefor, and shall be deemed to have been given when received. Either party may designate any other address to which notice shall be given. by giving written notice to the other of such change of address in the manner herein provided.

10.    This Agreement has been made in the State of New York and shall be construed and governed in accordance with the laws thereof without giving effect to principles governing conflicts of law.

11.    This Agreement contains the entire agreement between the parties, may not be altered or modified, except in writing, and signed by the party to be charged thereby, and supersedes any and all previous agreements between the parties relating to the subject matter hereof.

12.    This Agreement shall be binding upon the parties hereto and their respective heirs, administrators, successors and permitted assigns.

If you are in agreement with the foregoing, please execute two copies of this letter in the
space provided below and return them to the undersigned.

Yours truly,

Centrecourt Asset Management LLC

By: _Richard Smithie_____
Name:  Richard Smithie
Title:  CEO


ACCEPTED AND AGREED TO
AS OF THE DATE FIRST ABOVE
WRITTEN:

U.S. Coal Corporation

By: _Robert B. Gabbard_
Name:  Robert B. Gabbard
Title:  C.E.O.

## INDEMNIFICATION PROVISIONS

U.S. Coal Corporation, a Delaware corporation (the "Company"), agrees to indemnify and hold harmless Centrecourt Asset Management LLC, a Delaware limited liability company ("Centrecourt"), and each of its members, officers, directors and affiliates from and against any and all losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements (and any and all actions, suits, proceedings and investigations in respect thereof and any and all legal and other costs, expenses and disbursements in giving testimony or furnishing documents in response to a subpoena or otherwise are each a "Liability"), including, without limitation, the costs, expenses and disbursements, as and when incurred, of investigating, preparing or defending any such action, suit, proceeding or investigation (whether or not in connection with litigation in which Centrecourt is a party), directly or indirectly, relating to, based upon, arising out of, or in connection with, its acting for the Company under the Agreement, dated as of March 1, 2008, between the Company and Centrecourt to which these indemnification provisions are attached and form a part (the "Agreement"), except to the extent that any such Liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from Centrecourt's gross negligence or willful misconduct. The Company also agrees that Centrecourt shall not have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with the engagement of Centrecourt, except to the extent that any such liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from Centrecourt's gross negligence or willful misconduct.

The indemnification provisions contained herein shall be in addition to any liability which the Company may otherwise have to Centrecourt or the persons identified below in this sentence and shall extend to the following: Centrecourt, its affiliated entities, partners, employees, legal counsel, agents and controlling persons (within the meaning of the federal securities laws), and the officers, directors, employees, legal counsel, agents and controlling persons of any of them. All references to Centrecourt in these indemnification provisions shall be understood to include any and all of the foregoing.

If any action, suit, proceeding or investigation is commenced, as to which Centrecourt proposes to demand indemnification, it shall notify the Company with reasonable promptness (but any failure by Centrecourt to notify the Company shall not relieve the Company from its obligations hereunder); and the Company shall promptly assume the defense of such action, suit, proceeding or investigation, including the employment of counsel (reasonably satisfactory to Centrecourt) and payment of fees and expenses. Notwithstanding the foregoing sentence, Centrecourt shall have the right to retain counsel of its own choice to represent it and such counsel shall, to the extent consistent with its professional responsibilities, cooperate with the Company and any counsel designated by the Company, but the fees and expenses of such counsel employed by Centrecourt shall be at the expense of Centrecourt unless (i) the employment of such counsel shall have been authorized in writing by the Company in connection with the defense of such action, (ii) the Company shall not have promptly employed counsel reasonably satisfactory to Centrecourt, or (iii) Centrecourt shall have reasonably concluded that there may be one or more legal defenses available to it which are different from or additional to those available to the Company, in any of which events such fees and expenses shall be borne by the Company and the Company shall not have the right to direct the defense of such action on behalf of Centrecourt. The Company shall be liable for any settlement of any claim against Centrecourt made with the Company's written consent, which consent shall not be unreasonably withheld. The Company shall not, without the prior written consent of Centrecourt, settle or compromise any claim, or permit a default or consent to the entry of any judgment in respect thereof, unless such settlement,

4 of 5

compromise or consent includes, as unconditional term thereof, the giving by the claimant to Centrecourt of an unconditional release from all liability in respect of such claim.

In order to provide for just and equitable contribution, if a claim for indemnification pursuant to these indemnification provisions is made but it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that such indemnification may not be enforced in such case, even though the express provisions hereof provide for indemnification in such case, then the Company, on the one hand, and Centrecourt, on the other hand, shall contribute to the losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses, and disbursements to which the indemnified persons may be subject in accordance with the relative benefits received by the Company, on the one hand, and Centrecourt, on the other hand, and also the relative fault of the Company, on the one hand, and Centrecourt, on the other hand, in connection with the statements, acts or omissions which resulted in such losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses or disbursements and all relevant equitable considerations shall also be considered. No person found liable for a fraudulent misrepresentation shall be entitled to contribution from any person who is also found liable for such fraudulent misrepresentation. Notwithstanding the foregoing, Centrecourt shall not be obligated to contribute any amount hereunder that exceeds the amount of fees previously received by Centrecourt pursuant to the Agreement.

Neither termination nor completion of the engagement of Centrecourt referred to above shall affect these indemnification provisions which shall then remain operative and in full force and effect.

FILED: NEW YORK COUNTY CLERK 01/23/2014

INDEX NO. 650411/2012

NYSCEF DOC. NO. 136

RECEIVED NYSCEF: 01/23/2014

# Exhibit C

# EQUIPMENT TRANSFER AGREEMENT

THIS EQUIPMENT TRANSFER AGREEMENT ("Agreement") is made effective as of the 15th day of April, 2008, by and among (i) CAMOFI MASTER LDC, a Cayman Islands limited duration company ("Transferor"), (ii) J.A.D. COAL COMPANY, INC., a Virginia corporation ("Transferee"), and (iii) U.S. COAL CORPORATION, a Delaware corporation ("US Coal").

RECITALS:

A.    This Agreement is the "Equipment Purchase Agreement" described in Section 2.2 of that certain Securities Purchase Agreement dated April 15, 2008, by and among Transferee, Transferor, US Coal and certain other "Borrowers" and "Purchasers" defined therein ("Securities Purchase Agreement").

B.    Transferor has the only first priority security interest in the mining equipment more particularly described on Exhibit A, attached hereto and incorporated herein by reference ("Equipment"). Consolidated Energy, Inc., Eastern Consolidated energy, Inc., Eastern Consolidated Oil and Gas, Inc., Morgan Mining, Inc., Warfield Processing, Inc., and Eastern Coal Energies, Inc., (collectively, "Debtor") has defaulted in its obligations owed to Transferor. Transferor intends to exercise its post-default remedies by disposing of the Equipment as permitted by §9-610 of the Kentucky Uniform Commercial Code ("Uniform Commercial Code") and causing all of Debtor's rights in the Equipment to be transferred to Transferee pursuant to Uniform Commercial Code §9-615.

C.    Transferee desires to acquire all of Transferor's rights, if any, and all of Debtor's rights in the Equipment on the terms and conditions set forth herein.

D.    The Equipment is currently in possession of various third parties (collectively, "Refurbishment Agent"), which is performing repair and maintenance necessary to make the Equipment ready for Transferee's use.

E.    US Coal owns 100% of the issued and outstanding capital stock of Transferee and will receive substantial economic benefit from Transferee's use of the Equipment.

F.    In consideration of the substantial economic benefit that US Coal will receive from the Equipment, and in order to induce Transferor to sell the Equipment to Transferee, without which inducement Transferor would be unwilling to sell the Equipment to Transferee, US Coal has agreed to execute the "Note" defined herein, which is convertible into shares of the common stock of U.S. Coal, as more particularly described therein.

AGREEMENT:

NOW, THEREFORE, for the consideration described in the Recitals which are a material part of this Agreement, and the mutual promises, releases and covenants

contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### 1. TRANSFER OF EQUIPMENT.

*1.1 Agreement to Transfer and Acquire.* Transferor agrees to transfer, and Transferee agrees to acquire, the Equipment on the terms and conditions contained herein.

*1.2 Purchase Price.* The total purchase price ("Purchase Price") to be delivered by Transferee to Transferor for the Equipment shall be paid by Transferee on the date hereof by the execution and delivery of a promissory note payable to Transferor in the face principal amount of FOUR MILLION EIGHT HUNDRED THOUSAND AND NO/100 DOLLARS ($4,800,000.00), which is convertible into shares of common stock in US Coal, a form of which is attached hereto as Exhibit B and incorporated herein by reference ("Note"); and

*1.3 Security Interest.* Repayment of the Note and performance of all obligations required by this Agreement shall be secured by, and Transferee hereby grants, a security interest in the Equipment and products and proceeds thereof. This security interest shall be evidenced by the Security Agreement attached hereto as Exhibit C and incorporated herein by reference.

### 2. DELIVERY AND REFURBISHMENT OF EQUIPMENT.

*2.1 Notice.* Transferor has notified all parties entitled to notice pursuant to §9-611, et. seq. of the Uniform Commercial Code regarding the transfer contemplated by this Agreement (the "Notice").

*2.2 Closing.* The closing of the transactions contemplated in this Agreement ("Closing"), shall occur upon: (i) ten (10) days passing from the date of the Notice with no objection or other response calling into question the validity of the transfer; (ii) execution of this Agreement and any other document reasonably required by Transferor; and (iii) delivery of the Purchase Price. Notwithstanding the date of the Closing, this Agreement shall be deemed effective April 15, 2008.

*2.3 Title; Possession.* Title shall pass from Debtor to Transferee at the Closing. Further, Transferee shall be deemed to take possession of the Equipment at Closing, notwithstanding actual possession of the Equipment by Refurbishing Agent.

*2.4 Prior Use of Equipment.* The Equipment has been previously used and is not new.

*2.5 Delivery Documents.*

(a) On the date of Closing, Transferor shall provide and convey to Transferee the following items:

2

*(1)* A Transfer Statement executed in favor of Transferee or its designee, the form of which is attached hereto as Exhibit D and incorporated herein by reference;

*(2)* Assignment of any agreements, such as license or maintenance agreements, that may be required by third parties in connection with the sale of the Equipment; and

*(3)* Such other documents as may be reasonably necessary to effect the Closing.

*(b)* On the date of Closing, Transferee shall provide and convey to Transferor the following items:

*(1)* The original executed Note; and

*(2)* Such other documents as may be reasonably necessary to effect the Closing.

*2.6  Risk of Loss.*  Title to and risk of loss, damage or destruction to the Equipment by fire or other casualty or occurrence shall be assumed by Transferee upon delivery of title to the Equipment by Transferor to Transferee at the Closing.

*2.7  Refurbishment of Equipment.*  Transferee shall bear all of the cost and expense of repairing or refurbishing the Equipment for Transferee's use.

3. REPRESENTATIONS AND WARRANTIES.

*3.1  By Transferor.*  Transferor hereby represents and warrants to Transferee as follows:

*(a)* Transferor is a limited duration company validly existing and in good standing under the laws of the Cayman Islands and has the power and authority to carry on its business and to enter into and perform its obligations under this Agreement and each document delivered hereunder.

*(b)* This Agreement and each document delivered or to be delivered by Transferor hereunder have been duly authorized by all necessary company action on the part of Transferor.

*(c)* The execution, delivery and performance by Transferor of this Agreement and any related documents to which it is a party (i) do not violate any federal, state or local law and (ii) do not and will not violate or result in a material breach of or constitute (with due notice or lapse of time or both) a default under any contract, lease, loan agreement, mortgage, security agreement, trust indenture or other agreement or instrument to which Transferor is a party or by which it is bound or to which any of the Equipment is subject.

3

(d) No representation or warranty of Transferor contained in this Agreement and no statement contained in this Agreement or in any certificate or other instrument furnished or to be furnished to Transferee hereunder contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements contained herein or therein not misleading.

### 3.2 By Transferee.    Transferee hereby represents and warrants to Transferor as follows:

(a) Transferee is a corporation duly incorporated, validly existing and in good standing under the laws of the Commonwealth of Virginia and has the power and authority to carry on its business and to enter into and perform its obligations under this Agreement and each document delivered hereunder.

(b) This Agreement and each document delivered or to be delivered by Transferee hereunder have been duly authorized by all necessary corporate action on the part of Transferee.

(c) The execution, delivery and performance by Transferee of this Agreement and any related documents to which it is a party (i) do not violate any federal, state or local law and (ii) do not and will not violate or result in a material breach of or constitute (with due notice or lapse of time or both) a default under any contract, lease, loan agreement, mortgage, security agreement, trust indenture or other agreement or instrument to which Transferee is a party or by which it is bound or to which any of the Equipment is subject.

(d) No representation or warranty of Transferee contained in this Agreement and no statement contained in this Agreement or in any certificate or other instrument furnished or to be furnished to Transferor hereunder contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements contained herein or therein not misleading.

### 3.3 By US Coal.

(a) US Coal is a corporation duly incorporated, validly existing and in good standing under the laws of the state of Delaware and has the power and authority to carry on its business and to enter into and perform its obligations under this Agreement and each document delivered hereunder.

(b) The execution, delivery and performance by US Coal of this Agreement and any related documents to which it is a party (i) do not violate any federal, state or local law and (ii) do not and will not violate or result in a material breach of or constitute (with due notice or lapse of time or both) a default under any contract, lease, loan agreement, mortgage, security agreement, trust indenture or other agreement or instrument to which US Coal is a party or by which it is bound or to which any of the Equipment is subject.

4

*3.4 Disclaimer.* EXCEPT FOR THE EXPRESS WARRANTIES AND REPRESENTATIONS MADE BY TRANSFEROR HEREUNDER, TRANSFEREE ACKNOWLEDGES AND AGREES THAT TRANSFEROR HAS NOT MADE, AND DOES NOT HEREBY MAKE, ANY REPRESENTATION, WARRANTY OR COVENANT, EXPRESS OR IMPLIED, WITH RESPECT TO THE MERCHANTABILITY, CONDITION, QUALITY, DURABILITY, DESIGN, OPERATION, FITNESS FOR USE, OR SUITABILITY OF THE EQUIPMENT, ANY COMPONENT THEREOF, OR ANY OTHER ASSET IN ANY RESPECT WHATSOEVER OR IN CONNECTION WITH OR FOR THE PURPOSES AND USES OF TRANSFEREE, AS TO THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, OR ANY OTHER REPRESENTATION, WARRANTY OR COVENANT OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT THERETO. TRANSFEREE IS PURCHASING THE EQUIPMENT, ALL COMPONENTS THEREOF, AND ALL OTHER ASSETS "AS IS, WHERE IS, AND WITH ALL FAULTS," AND TRANSFEROR SHALL NOT BE LIABLE FOR ANY ACTUAL, INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES OF OR TO ANY PERSON WHATSOEVER.

## 4.1 Indemnity; Right Of Setoff.

*(a)* Transferor shall indemnify and hold harmless Transferee, its successors and their respective equity holders, directors, managers, employees, agents, representatives, and affiliates (collectively, the "Indemnified Persons") from and against the amount of any loss, liability, claim, damage or expense incurred by the Indemnified Persons, whether or not involving a third-party claim, arising, directly from or in connection with (i) any breach by Transferor of any of the recitals, representations, warranties, covenants and agreements contained in this Agreement, or (ii) the liens for federal, state or local taxes set forth in Exhibit E attached hereto, or the enforcement or threatened enforcement of said liens, which may affect or encumber the Equipment.

*(b)* Promptly after receipt by any Indemnified Person of notice of the commencement or proposed commencement of any claim, action or proceeding (a "Claim"), to recover any amounts owing in respect of (i) any alleged breach of any of the representations, warranties, covenants and agreements contained in this Agreement, or (ii) any Taxes allegedly due and owing relating to any of the Equipment, such Indemnified Person shall, if a claim in respect thereof is to be made against Transferor pursuant to Section 4.1(a) hereof, promptly notify Transferor in writing of the commencement thereof, such notice to include all material details of the Claim. Transferor shall have the right to assume the defense of any Claim with counsel of its choice, which counsel shall be subject to the consent of the Indemnified Person, provided that such consent shall not be unreasonably conditioned, withheld or delayed. Should Transferor fail to assume the defense of any Claim, then the Indemnified Person shall have the right to undertake the control, conduct or settlement of such Claim through their own counsel at Transferor's reasonable expense, and may settle such matters without the consent of Transferor at Transferor's sole expense. Neither the giving of notice, the failure to give notice or to assert a right of set-ff shall constitute an election of remedies

5

or limit Transferee in any manner in the enforcement of any other remedies that may be available to it.

(c) Once a Claim has been finally, judicially adjudicated, from which no further appeal may be taken, if such adjudication results in a finding of monetary damages against Transferee, Transferee may elect to (i) pay such amount and be entitled to set-off such amount against amounts due and owing under the Note, or (ii) have Transferor pay such amounts directly to the party to which such amount is owed. The indemnities and covenants contained in this Section 4.1 shall survive the discharge of the Note, whether through full payment of the Note, or otherwise, until the expiration of the original maturity date of the Note.

## 5. MISCELLANEOUS.

*5.1 Taxes.* Transferee shall execute any required tax exemption certificates and pay any and all taxes, duties or fees assessed or levied by any U.S. Federal, State or local taxing authority as a result of this sale, delivery, registration or ownership of the Equipment by Transferee (excluding taxes on net or gross income or gain realized by Transferor).

*5.2 Indemnification.* On the date hereof, subject to Section 4.1 hereof, Transferee will assume all liability of any nature whatsoever arising out of the use or possession by Transferee of the Equipment and agrees to indemnify, protect, defend and save harmless Transferor, and its affiliates, officers, directors, shareholders, members, managers, employees, successors and assigns with respect to any claim, suit, action or judgment of any kind arising out of Transferee's use or possession of the Equipment.

*5.3 Entire Agreement.* Transferee and Transferor warrant that the terms and conditions of this Agreement including the exhibits attached hereto were fully read and constitute the entire Agreement between the parties and supersede all prior negotiations or agreements.

*5.4 Severability.* If any provision of this Agreement, or the application thereof to any person, entity or circumstances, shall be invalid or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to other persons, entities or circumstances, shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

*5.5 Binding Agreement.* Except as otherwise provided herein, this Agreement shall be binding upon, and inure to the benefit of, the parties hereto, and their respective successors and assigns.

*5.6 Further Assurance.* Transferee and Transferor each hereby agree that it will take, or cause to be taken, such reasonable actions (excluding the payment of money or other further consideration), and will execute and deliver, or cause to be executed and delivered, such additional documents and instruments, and will do, or cause

6

to be done, all such things as are necessary, proper or advisable under the provisions of this Agreement and applicable law to consummate and make effective all of the transactions contemplated by this Agreement.

*5.7  Applicable Law and Forum.*  This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Kentucky without regard to its conflict of laws rules. Each of the parties consents and voluntarily submits to personal jurisdiction in the Commonwealth of Kentucky and in the courts in such state located in Fayette County, Kentucky and the United States District Court for the Eastern District of Kentucky in any proceeding arising out of or relating to this Agreement, and agrees that all claims raised in such proceeding may be heard and determined in such court.

*5.8  Brokers.*  Each of Transferor and Transferee mutually represent and warrant that it has dealt with no broker or finder in connection with this transaction and no other person is entitled to any commission or fee therefrom. Each party agrees to indemnify the other party for, and hold the other party harmless from, any loss, liability or expense as a result of any breach by such party of this warranty.

*5.9  Execution in Counterparts.*  This Agreement may be executed in counterparts, each of which shall constitute an original document.

*5.10  Assignment.*  Except for an assignment to an affiliate, neither Transferee nor Transferor may assign its rights hereunder without the prior written consent of the other. Assignment shall not release the assigning party from its obligations under this Agreement.

*5.11  Survival.*  Except as otherwise expressly stated herein, all representations and warranties contained in this Agreement by any party to this Agreement and any certificate or other instrument delivered by or on behalf of any party pursuant to this Agreement shall be continuous and shall survive the Closing and the covenants and agreements contained herein for one (1) year from the date hereof.

*Remainder of page intentionally left blank.*

*Signature page to follow.*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their authorized representatives.

CAMOFI MASTER LDC

BY: _____

TITLE: _____

("Transferor")


J.A.D. COAL COMPANY, INC.

BY: _____

TITLE: _____

("Transferee")


U.S. COAL CORPORATION

BY: _____

TITLE: _____

("U.S. Coal")

30492686.4
8/29/2008 4:01 PM

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their authorized representatives.

CAMOFI MASTER LDC

BY: _____

TITLE: _____
("Transferor")

J.A.D. COAL COMPANY, INC.

BY: _____

TITLE: _C. E. O._
("Transferee")

U.S. COAL CORPORATION

BY: _____

TITLE: _C. E. O._
("U.S. Coal")

# EXHIBIT A

## EQUIPMENT LIST

| | |
|---|---|
| Continuous Miner | Stoney Fork (Joy 1410-AA SN JM4747) |
| Rood Ranger II roof bolter | Stoney Fork (Fletcher R-R-2 SN 8702) |
| Schroder Feeder | Stoney Fork (Stamler SN 43040) |
| Allowance to rebuild existing scoop | Stoney Fork (S&S 488 SN 4881896) |
| Single personnel carrier | Stoney Fork (S&S 480 SN 480-100) |
| Cable Allowance | Star Fire Enterprises, 500ft of new cable |
| SC 21 shuttle cars | Stoney Fork (Joy SC 21 SN ET – 14305) |
| SC 21 shuttle cars | Stoney Fork (Joy SC 21 SN ET – 14304) |
| SC 21 shuttle cars | Stoney Fork (Joy SC 21 SN ET – 12333) |
| SC 21 shuttle cars | Bentley Equipment Rebuilt |
| SC 21 shuttle cars | Bentley Equipment Rebuilt |
| Roof Ranger II roof bolter | StarFire Enterprises (DDO – 13ECF SN 92307/84034) |
| Belthead | *****B&F Parts and Service |
| Diesel personnel carrier | Stoney Fork (S&S 786 SN 270-A) |

| | |
|---|---|
| Joy 14 CM 10 A Miner | Joy 1410-AA (SN JM 4587) Sam Blankinship |
| Underground Power Center | Stoney Fork (7200V/22 50KVA) |
| Transformer boxes | ****B&F Parts and Service |
| Transformer boxes | ****B&F Parts and Service |
| 2/0 Highline cable [allowance] | |
| Cable Allowance | |
| Fan | Pauls Fan and Repair Shop |
| Permissible single personnel carriers | Stoney Fork (S&S 484 SN 4841331) |
| Belthead | *****B&F Parts and Service |
| Belthead | *****B&F Parts and Service |
| Roof Ranger II roof bolter | River Creek Equipment Outfitters, LLC |
| Roof Ranger II roof bolter | *****B&F Parts and Service |

EXHIBIT B

NOTE

EXHIBIT C

SECURITY AGREEMENT

EXHIBIT D

TRANSFER STATEMENT

## EXHIBIT E

### Tax Liens

1.    Federal Tax Lien against Eastern Consolidated Energy, Inc., Notice of which was filed on June 18, 2004, in Lis Pendens Book 39, page 381, in the office of County Clerk of Martin County, Kentucky.

2.    Federal Tax Lien against Eastern Consolidated Energy, Inc., Notice of which was filed on September 20, 2004, in Lis Pendens Book 27, page 287, in the office of County Clerk of Floyd County, Kentucky.

3.    Federal Tax Lien against Eastern Consolidated Energy, Inc., Notice of which was filed on February 22, 2005, in Lis Pendens Book 40, page 154, in the office of County Clerk of Martin County, Kentucky.

4.    Kentucky State Tax Lien against Morgan Mining, Inc., Notice of which was filed on June 26, 2006, in Lis Pendens Book 32, page 615, in the office of County Clerk of Floyd County, Kentucky.

5.    Kentucky State Tax Lien against Consolidated Energy, Inc., Notice of which was filed on May 15, 2007, in Lis Pendens Book 36, page 435, in the office of County Clerk of Floyd County, Kentucky.

6.    Kentucky State Tax Lien against Eastern Consolidated Energy, Inc., Notice of which was filed by the Commonwealth of Kentucky, Office of Employment Training Division of Unemployment Insurance on April 9, 2007, in Lis Pendens Book 42, page 120, in the office of County Clerk of Martin County, Kentucky.

FILED: NEW YORK COUNTY CLERK 01/23/2014

INDEX NO. 650411/2012

NYSCEF DOC. NO. 137

RECEIVED NYSCEF: 01/23/2014

# Exhibit D

U.S. Coal Acquisition Corp.
448 Lewis Hargett Circle, Suite 240
Lexington, Kentucky 40503

March 28, 2008

**VIA HAND DELIVERY**
CAMOFI Master LDC
CAMHZN Master LDC
c/o CENTRECOURT ASSET MANAGEMENT
350 Madison Avenue, 8th Floor
New York, NY 10017
Attention: Richard L. Smithline, Chairman and CEO

Re: Series B Offering; other matters

Dear Mr. Smithline:

Reference is hereby made to that certain Side Letter (the "Side Letter"), dated June 4, 2007, by and between U.S. Coal Corporation, f/k/a U.S. Coal Acquisition Corp. (the "Company"), CAMOFI Master LDC ("CAMOFI") and CAMHZN Master LDC, ("CAMHZN" and together with CAMOFI, the "Approving Investors"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Side Letter.

Pursuant to our recent discussions about various proposed corporate actions by the Company (as more particularly described below)(the "Corporate Matters"), the Company has requested that the Approving Investors give their consent to the Company's consummation of the Proposed Matters. The Proposed Matters are as follows:

1. Series B Preferred. The Company commenced an offering of Units, each unit consisting of ten shares of Series B Preferred Stock and a warrant to purchase common stock at $2.50 per share (or in the case of investors in the first closing, a warrant to purchase 2.2 shares of common stock) for gross proceeds of up to $30,000,000 (subject to a $5,000,000 over-allotment option). In connection with the closing of the sale of Units, the Company intends to designate up to 21,600,000 shares of its blank check preferred stock as Series B Preferred Stock. The basic terms of the Series B Preferred and the terms of the offer and sale of the units are described in the Company's Term Sheet, dated March 28, 2008, a copy of which was previously provided to the Approving Investors.

2. Chief Financial Officer. The Company hired James Wolff as its chief financial officer on or about January 1, 2008. The Company offered a competitive compensation package which the Company believes is in line with industry compensation norms. The Company entered into an employment agreement with Mr. Wolff, a copy of which is attached hereto.

Consent and Waiver

Notwithstanding the terms of the Side Letter, in consideration of the issuance of 600,000 shares of the Company's common stock, $.001 par value per share, the Approving Investors do hereby consent to the Company's consummation of the Corporate Matters on substantially the terms and conditions described above and in the documents referenced above, with such changes as Company management

703840

may reasonably make in the exercise of its good faith judgment, and do hereby waive any breach of the Side Letter, as amended, which may exist immediately prior to the execution of this letter. The consent of Applying Investors pursuant to this letter is limited only to the transactions as described above.

Except as expressly set forth herein and in the consent letters dated November 14, 2007 and January 31, 2008, there are no amendments, modifications or waivers to the Side Letter, and all of the other forms, terms and provisions of the Side Letter remain in full force and effect.

703840

Please indicate your agreement to the terms of this letter by countersigning this letter in the space
provided below and returning your original signed letter to the Company.

Very truly yours,

Robert Gabbard

ACKNOWLEDGED AND AGREED:

CAMOFI MASTER LDC

By: _____
    Name: Richard Smithline
    Title: Director

CAMHZN MASTER LDC

By: _____
    Name: Richard Smithline
    Title: Director

703Y40